UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JERAMIAH BROWN,

                       Plaintiff,

v.                                                  5:22-CV-0761
                                                  (BKS/ML)

FAT DOUGH INCORP., doing business
as Dominos Pizza,

                       Defendant.
_____

APPEARANCES:                                     OF COUNSEL:

JERAMIAH BROWN
  Plaintiff, *Pro Se*
35033 Eddy Road
Lot 85
Theresa, New York 13691


MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT and RECOMMENDATION**

      The Clerk has sent this *pro se* Amended Complaint (Dkt. No. 7) filed by Jeramiah Brown

("Plaintiff") to the Court for review.  For the reasons discussed below, I recommend that

Plaintiff's Amended Complaint (Dkt. No. 7) be (1) accepted in part for filing, and (2) dismissed

(a) in part with leave to amend, and (b) in part without leave to amend.

I.    **BACKGROUND**

Construed as liberally[1] as possible, Plaintiff's Amended Complaint—which was completed on a form complaint alleging violations of Title VII of the Civil Rights Act, as amended ("Title VII")—alleges that his civil rights were violated by Fat Dough Incorp., doing business as Dominos Pizza ("Defendant").  (*See generally* Dkt. No. 7.)

More specifically, Plaintiff alleges that he was discriminated against based on his sex (or sexual harassment), his national origin, and his disability.  (Dkt. No. 7 at 2.)  Plaintiff alleges that the conduct complained of in this action includes the termination of his employment, unequal terms and conditions of his employment, retaliation, and harassment.  (*Id*.)

Plaintiff alleges that he identifies as gender non-binary,[2] his national origin is Norwegian, he was born with thrombocytopenia with absent radius, and he was diagnosed with traumatic brain injury in 2014.  (Dkt. No. 7 at 3.)  Plaintiff alleges that he was employed by Defendant on October 8, 2021.[3]  (*Id*.)  Plaintiff alleges that as part of his employee training, he was required to "shadow" a delivery driver named Megan, who stole Plaintiff's "delivery change" and discriminated against Plaintiff's "National Origin ethnicity."  (*Id*.)

Plaintiff alleges that he was harassed by co-worker and supervisor Richard Filkins "on occasions" and Mr. Filkins asked Plaintiff about his sexual orientation "on [n]umerous

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]    Plaintiff does not state his preferred pronouns.  As a result, the undersigned used he/him pronouns throughout this Report and Recommendation.

[3]    It is unclear whether Plaintiff intended to allege that he began his employment with Defendant on October 8, 2021, or merely that on that specific date, he was employed by Defendant.

[o]ccasions." (*Id.*) Plaintiff alleges that Mr. Filkins asked Plaintiff for sexual favors and when Plaintiff refused, Mr. Filkins retaliated by assigning Plaintiff to work with Megan. (*Id.*)

Plaintiff alleges that he reported feeling uncomfortable and harassed by Megan and Mr. Filkins to his "Widow Grandmother" and to his manager Martin Wilder. (*Id.*) Plaintiff alleges that on October 14, 2021, he filed "an open door policy complaint about the harassment from [e]mployees" including sexual harassment by Mr. Filkins and Megan taking money that did not belong to her. (*Id.* at 4, 6.)

Plaintiff alleges that on October 27, 2021, co-worker Ethan Talley threw dirty water and mushrooms at Plaintiff. (*Id.* at 4.) Plaintiff alleges that unnamed other employees laughed and humiliated Plaintiff and stated that Plaintiff would allow other employees to treat him poorly because Plaintiff is disabled. (*Id.*) Plaintiff alleges that he reported the incident to Mr. Wilder, but that Mr. Wilder yelled at Plaintiff for sitting outside on a bench. (*Id.*) Plaintiff alleges that Mr. Wilder did nothing to resolve the harassment. (*Id.*) Plaintiff alleges that he also reported the harassment to another supervisor named Dorothy. (Dkt. No. 7 at 11.)

Plaintiff alleges that he asked for earlier day shifts to accommodate his disability and to avoid working with Mr. Filkins. (Dkt. No. 7 at 6.) Plaintiff alleges that on October 19, 2021, he was scheduled to work an earlier shift and Mr. Filkins created a hostile work environment yelling, screaming, and questioning why Plaintiff was scheduled for an earlier shift. (*Id.*)

Plaintiff alleges that on October 22, 2021, he was assigned the role of dishwasher, which was a demotion from his role of delivery driver, in retaliation for filing an open-door policy complaint with Defendant. (Dkt. No. 7 at 9.) Plaintiff alleges that he was assigned the dishwasher role from October 22, 2021, until October 28, 2021. (*Id.*) Plaintiff alleges that before his reassignment to dishwasher on October 22, 2021, an employee used a toilet plunger as

a door stopper, which caused the door to "maliciously close" on Plaintiff when Plaintiff was leaving and entering to deliver pizzas. (*Id.*) Plaintiff alleges that Brian Galloway and Martin Wilder "made unequal terms of employment" for Plaintiff by assigning him to the role of dishwasher and yelling at him for not being fast enough to be a delivery driver. (Dkt. No. 7 at 4.)

Plaintiff alleges that on October 28, 2021, another employee of Defendant's broke into Plaintiff's car and drew a smiley face with pizza grease on the inside windshield. (Dkt. No. 7 at 4.) Plaintiff alleges that he reported the car break-in to Defendant's manager and supervisor Mr. Wilder and Dorothy. (*Id.*) Plaintiff alleges that he also notified the Fort Drum military police about his car being broken into. (*Id.* at 3.) Plaintiff alleges that the managers failed to properly investigate who broke into his vehicle and, instead, Mr. Wilder told Plaintiff to go home early "in a hostile way" and informed Plaintiff he would never work for Defendant again because Plaintiff reported the incident to police. (*Id.* at 11.)

Plaintiff alleges that on October 28, 2021, and October 29, 2021, Brian Galloway told Plaintiff to "never show up for a shift again" and explained to Plaintiff that he was not "allowed to work" at Defendant again because Plaintiff involved the police. (*Id.* at 11.)

Based on these factual assertions, Plaintiff appears to assert the following seven causes of action (1) a claim that Plaintiff was discriminated and retaliated against in violation of Titles I, II, and V of the Americans with Disabilities Act ("ADA"); (2) a claim that Plaintiff's equal rights under the law were violated pursuant to 42 U.S.C. § 1981; (3) a claim that Plaintiff endured a hostile work environment in violation of Title VII; (4) a claim that employees of Defendant retaliated against Plaintiff for filing an open door policy claim and notifying the Fort Drum military police of the pizza grease incident in violation of Title VII; (5) a claim of discrimination pursuant to Section 504 of the Rehabilitation Act; (6) a claim that Defendant's employee Brian

Galloway violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634

("ADEA"); (7) a claim of sexual harassment by Mr. Filkins in violation of Title VII.[4]  (Dkt. No.

7 at 12-15.)

As relief Plaintiff seeks $200,000.00 in damages.  (Dkt. No. 7 at 12.)

On October 17, 2022, the undersigned issued an Order and Report-Recommendation that

(1) granted Plaintiff's leave to proceed *in forma pauperis*, (2) denied Plaintiff's motion for

appointment of counsel, and (3) recommended that Plaintiff's Complaint be dismissed with leave

to replead for failure to state a claim upon which relief may be granted.  (Dkt. No. 6.)  On

October 31, 2022, Plaintiff filed an amended complaint.  On November 7, 2022, Chief United

States District Judge Brenda K. Sannes issued a memorandum-decision and order that reviewed

the undersigned's Report-Recommendation and found no clear error but, nonetheless, rejected

the Report-Recommendation as moot in light of Plaintiff's Amended Complaint which

superseded the original in all respects.  (Dkt. No. 8.)

## II.    LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the

court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks

monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

---

[4]    The Court notes that although Plaintiff incorrectly alleges that the Equal Employment
Opportunity Commission ("EEOC") Notice-of-Right-to-Sue letter was attached to the Amended
Complaint (Dkt. No. 7 at 4), the EEOC Notice of Right to Sue letter appears to be attached to the
Complaint.  (Dkt. No. 1, Attach. 1 at 1-2.)  Construing the Amended Complaint liberally, the
undersigned considered the EEOC Notice of Right to Sue letter notwithstanding that "an
amended complaint ordinarily supersedes the original."  *Shields v. Citytrust Bancorp, Inc.*, 25
F.3d 1124, 1128 (2d Cir. 1994).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity . . . occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory . . . or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## III.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that a response be required to certain of Plaintiff's claims and that other claims be dismissed.

A.    **Plaintiff's Claims Pursuant to the ADA[5]**

The ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane,* 541 U.S. 509, 516-17 (2004).  In addition, "Title V of the ADA, sometimes referred to as the 'retaliation provision,'" prohibits retaliation against individuals "engaged in activity protected by the ADA." *Griffiths v. Saint Josephs Hosp.*, 22-CV-0199, 2022 WL 1271533, at *3 n.5 (N.D.N.Y. Apr. 5, 2022) (Dancks, M.J.) (citing *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.)), *report and recommendation adopted by*, 2022 WL 1265761 (N.D.N.Y. Apr. 28, 2022) (Hurd, J.).

1.    **Title I**

Section 12112 of the ADA provides:

---

[5]    Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications.  *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3 n.5 (W.D.N.Y. June 4, 2018).  The Amended Complaint does not appear to assert a claim pursuant to Title III of the ADA, however, to the extent that it is liberally construed as making such a claim, I recommend that it be dismissed.  Title III of the ADA prevents discrimination based on a disability in places of public accommodation.  42 U.S.C. § 12182. The term "public accommodation" includes "an inn, hotel, motel, or other place of lodging . . . ." 42 U.S.C. § 12181(7)(A); *see Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) ("[T]he statutory framework of the ADA expressly limited discrimination in employment practices to Title I of the ADA," and holding that Title III of the ADA is inapplicable to employment discrimination claims).  Moreover, "Title III provides a private right of action for injunctive relief but no right of action for monetary relief."  *Guarneri v. Schoharie Cnty. Dep't of Soc. Servs.*, 21-CV-0991, 2021 WL 6050305, at *10 (N.D.N.Y. Dec. 21, 2021) (Lovric, M.J.) (citing 42 U.S.C. § 12188; *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief . . . is not available to private individuals under Title III of the ADA."); *see also Ervine v. Deser View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the ADA; individuals may receive only injunctive relief.")), *report and recommendation adopted by*, 2022 WL 1472562 (N.D.N.Y. May 10, 2022) (McAvoy, J.).

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Title I of the ADA provides a remedy for disability discrimination committed by "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2).

A plaintiff challenging disability-based discrimination under the ADA must establish a prima facie case, which consists of a showing that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Title I ADA discrimination claim.

### 2.    Title II

"Title II of the ADA proscribes discrimination against the disabled in access to public services."  *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).  To plead a violation of Title II of the ADA, a plaintiff must allege "(1) that [she] is a qualified individual with a disability; (2) that [she] was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination

was due to [her] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)) (internal quotation marks omitted).  The public entities defined in the ADA are state or local governments and their instrumentalities.  42 U.S.C. § 12131(1).  Private entities are not subject to the provisions of Title II even if they receive government funding.  *Brennan v. NCAComp Inc.*, 22-CV-012, 2022 WL 4290660, at *7 (N.D.N.Y. Apr. 25, 2022) (Lovric, M.J.), *report-recommendation adopted*, 2022 WL 3097843 (N.D.N.Y. Aug. 4, 2022) (Suddaby, C.J.) (citations omitted).

"The structure of the ADA demonstrates Congress' clear intent for Title II not to apply to employment claims." *Scherman v. New York State Banking Dep't*, 09-CV-2476, 2010 WL 997378, at *8 (S.D.N.Y. Mar. 19, 2010).  For example, "Title I defines a 'qualified individual' with a disability in terms of employment, [while] Title II defines it on the basis of a person's ability to receive services or participate in programs or activities." *Scherman*, 2010 WL 997378, at *8 (citing *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1176 (9th Cir. 1999)).  Moreover "if employment discrimination claims were allowed to be brought under ADA Title II, Title I would become redundant." *Id*. at *9.  Thus, "Title II of the ADA does not apply to employment discrimination." *Id*. at *10; *see Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 171 (2d Cir. 2013) ("[W]e conclude that the statute unambiguously limits employment discrimination claims to Title I.").

As a result, I recommend that, to the extent the Amended Complaint is construed as alleging a claim pursuant to Title II of the ADA, it be dismissed because Plaintiff's claims relate solely to his interactions with Defendant as an employer.

In the alternative, I recommend that Plaintiff's claim pursuant to Title II of the ADA be dismissed for failure to state a claim upon which relief may be granted.  The Amended

Complaint fails to allege facts plausibly suggesting that Plaintiff experienced discrimination in accessing public services.  (*See generally* Dkt. No. 7.)  In addition, the Amended Complaint fails to allege facts plausibly suggesting that Defendant is a public entity subject to the provisions of Title II of the ADA.  As a result, I recommend that, to the extent the Amended Complaint is construed as alleging a claim pursuant to Title II of the ADA, it be dismissed for failure to state a claim upon which relief may be granted.  *See Chavous v. Housing Visions Unlimited, Inc.*, 22-CV-0811, 2022 WL 9967833, at *4 (N.D.N.Y. Oct. 17, 2022) (Dancks, M.J.) (recommending that the plaintiff's Title II ADA claim be dismissed because the complaint was "devoid of factual allegations plausibly suggesting [that the d]efendants are public entities" or that the plaintiff "was unable to access public programs due to her disability, how her disability prevented her from accessing the programs, or what accommodations she sought and was denied by" the defendants), *report and recommendation adopted by*, 2023 WL 1775699 (N.D.N.Y. Feb. 6, 2023) (Nardacci, J.).

### 3.    Title V

A prima facie retaliation claim under the ADA requires four elements: (1) that the plaintiff engaged in activity protected by the ADA, (2) the employer must be aware of that activity, (3) the employer must have taken an adverse employment action against the plaintiff, and (4) and there must be a causal connection between the alleged adverse action and the protected activity.  *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002).  The plaintiff must show "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and

without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's ADA Title V retaliation claim.

**B.    Claim Pursuant to 42 U.S.C. § 1981**

"To establish a claim under 42 U.S.C. § 1981, a plaintiff must establish the following elements: (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) discrimination concerned 'one of the statute's enumerated activities.'"  *Gatling v. West*, 850 F. App'x 91, 96 (2d Cir. 2021) (summary order) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)).  "The enumerated activities include the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.'"  *Gatling*, 850 F. App'x at 96-97 (quoting 42 U.S.C. § 1981(a)). In addition, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

A claim of discrimination under Section 1981 requires a showing of intentional discrimination.  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). Therefore, at the pleading stage, a plaintiff must "specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent.'"  *Wade v. Kay Jewelers, Inc.*, 17-CV-0990, 2018 WL 4440532, at *7 (D. Conn. Sept. 17, 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994)).

Here, the Amended Complaint fails to allege facts plausibly suggesting that Plaintiff was discriminated against on the basis of race.  (*See generally* Dkt. No. 7.)  Plaintiff alleges that his

"National Origin is Norwegian" (Dkt. No. 7 at 3), but fails to allege any facts plausibly

suggesting that he is a member of a minority-race or that any discriminatory action occurred

because of his race. (*See generally* Dkt. No. 7.)

As a result, I recommend that Plaintiff's discrimination claim pursuant to 42 U.S.C. §

1981 be dismissed.

### C.     Claims Pursuant to Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e-2(a)(1); *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1747

(2020) (concluding "discrimination based on homosexuality or transgender status necessarily

entails discrimination based on sex; the first cannot happen without the second.").

Plaintiff appears to assert three claims pursuant to Title VII. More specifically, Plaintiff

appears to allege (1) one claim of a hostile work environment based on disability discrimination

perpetuated by his co-workers and supervisors, (2) one claim of sexual harassment perpetuated

by Mr. Filkins that Defendant was aware of and permitted to continue, and (3) one claim of

retaliation. (*See generally* Dkt. No. 1.)

### 1.     Hostile Work Environment

To state a *prima facie* case of discrimination under Title VII, a plaintiff must allege "(1)

he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an

adverse employment action; and (4) the adverse employment action occurred under

circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*,

673 F.3d 141, 150 (2d Cir. 2012). "Specifically, Plaintiff must show either that he suffered an

adverse job action under circumstances giving rise to an inference of discrimination on the basis

of race, color, religion, sex, or national origin, or . . . demonstrate that harassment on one or more

of these bases amounted to a hostile work environment." *Morren v. New York Univ.*, 20-CV-

10802, 2022 WL 1666918, at *14 (S.D.N.Y. Apr. 29, 2022) (quoting *Feingold v. New York,* 366

F.3d 138, 149 (2d Cir. 2004)), *report and recommendation adopted*, 2022 WL 1665013

(S.D.N.Y. May 25, 2022).

      "To state a hostile work environment claim, a plaintiff must plead facts tending to show

that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an

environment that a reasonable person would find hostile or abusive; (2) creates an environment

that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

because of the plaintiff's sex, or another protected characteristic." *Robinson v. Harvard Prot.*

*Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012); *see also Feingold,* 366 F.3d at 149-50.

      Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se*

plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and

without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to

dismiss or for summary judgment, I recommend that a response be required to Plaintiff's hostile

work environment claim pursuant to Title VII.

## 2.    Sexual Harassment

      Title VII makes it unlawful for a covered employer to "discriminate against any

individual with respect to his [or her] compensation, terms, conditions, or privileges of

employment, because of," *inter alia*, "such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).

Title VII's prohibition against sexual discrimination includes sexual harassment.  *Redd v. New*

*York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012).  "For sexual harassment to be actionable,

it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "[T]he kinds of workplace conduct that may be actionable . . . include [u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank*, 777 U.S. at 65.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's sexual harassment claim pursuant to Title VII.

### 3.    Retaliation

To state a *prima facie* case of retaliation pursuant to Title VII, a plaintiff must establish that: (1) she participated in a protected activity; (2) her protected activity was known to her employer; (3) the employer thereafter subjected her to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). "An adverse employment action that may not be discriminatory may still be retaliatory, and therefore unlawful." *Goldson v. Kral*, 13-CV-2747, 2016 WL 1241526, at *6 (S.D.N.Y. Mar. 24, 2016). Internal complaints are sufficient to satisfy the first prong as protected activity. *See McKenna v. Santander Inv. Sec., Inc.*, 21-CV-0941, 2022 WL 2986588, at *10 (S.D.N.Y. July 28, 2022) ("Protected activity need not consist of a formal complaint of discrimination; an 'internal complaint to company management' can constitute a protected activity under Title VII."). In addition, a police report regarding the harassing behavior in the work setting may be sufficient to

satisfy the first prong as protected activity. *See Williams v. City of New York*, 99-CV-2697, 2006 WL 2668211, at *20 (E.D.N.Y. Sept. 11, 2006) (quoting *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989)) (finding that the "plaintiff engaged in a statutorily protected activity when she called the police to report" a sexual assault and noting that "the Second Circuit has recognized that 'Congress sought to protect a wide range of activity in addition to the filing of a formal complaint' [with the EEOC or in the form of a lawsuit]."); *Borrero v. Collins*, 01-CV-6885, 2002 WL 31415511, at *14 (S.D.N.Y. 2002) (holding that the plaintiff engaged in a protected activity when she called the police to report harassment by a co-worker); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 292 (S.D.N.Y. 1999) ("Pursuing a criminal proceeding against an alleged harasser is also a form of 'protected activity' for purposes of [a Title VII] retaliation claim."); *but see Castagna v. Luceno*, 09-CV-9332, 2011 WL 1584593, at *11 n.7 (S.D.N.Y. Apr. 26, 2011) (declining "to address whether the filing of a police report constitutes protected activity" and noting that the "Second Circuit appears not to have addressed [the] issue" of whether "the filing of a police report can constituted protected activity" under Title VII, but noting that "various other circuit courts have considered the issue and held that a police report does qualify as protected activity.")

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's retaliation claim pursuant to Title VII.

### D.    Plaintiff's Claim Pursuant to the Rehabilitation Act

In order to assert a violation of Section 504 of the Rehabilitation Act, a plaintiff must

allege that (1) "he is a qualified individual with a disability"; (2) "[the defendant] is an entity

subject to the act[ ]"; and (3) "he was denied the opportunity to participate in or benefit from [the

defendant's] services, programs, or activities or [the defendant] otherwise discriminated against

him by reason of his disability." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir.

2016) (citation omitted). "Exclusion or discrimination may take the form of disparate treatment,

disparate impact, or failure to make a reasonable accommodation." *B.C. v. Mount Vernon Sch.

Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (citation omitted).

The Second Circuit has emphasized that "§504 applies only to entities that *receive* federal

funds. The rationale is that entities that receive federal funds are 'in a position to accept or

reject' corresponding 'obligations' under the Rehabilitation Act 'as part of the decision whether

or not to receive federal funds.'" *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 94 (2d

Cir. 2021) (quoting *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 330 (2d Cir. 1998)

(emphasis and internal quotation marks omitted)).

The Amended Complaint fails to allege facts plausibly suggesting that Defendant

receives federal funds such that it would be subject to the Rehabilitation Act. (*See generally*

Dkt. No. 7.) Although the Amended Complaint alleges that the "United Parcel Service Incorp

received Financial Assistance numerous times from the Federal Government," there does not

appear to be any logical connection between the United Parcel Service and Defendant. (Dkt. No.

7 at 14.) As a result, I recommend that Plaintiff's Rehabilitation Act claims be dismissed. *See

Askins v. Weinberg*, 19-CV-8793, 2022 WL 4567695, at *6 (S.D.N.Y. Sept. 29, 2022) (holding

that the plaintiff sufficiently alleged that the defendant was "covered by Section 504" where the

complained alleged that the defendant "participates in several federal . . . programs" and receives "Government Grants.").

E.    **Claim Pursuant to the ADEA**

The ADEA bars an employer from discharging an employee because of age.  29 U.S.C. § 623(a) (1976); *Stanojev v. Ebasco Services, Inc*., 643 F.2d 914, 919, 921-22 (2d Cir. 1981).  ADEA claims are, like Title VII discrimination claims, reviewed under the *McDonnell Douglas Corp. v. Green* framework. 411 U.S. 792 (1973); *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000).  To show discriminatory treatment, a "plaintiff must [first] establish a *prima facie* case of discrimination."  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000).  In the ADEA context, a plaintiff must show "(i) membership in the protected group (40 to 70 years of age); (ii) she was sufficiently qualified to continue holding her position; (iii) that she experienced adverse employment action, and (iv) that the action occurred under circumstances giving rise to an inference of discrimination." *Bucalo v. Shelter Island Union Free Sch. Dist*., 691 F.3d 119, 129 (2d Cir. 2012).

Here, the Amended Complaint fails to allege facts plausibly suggesting that Plaintiff is a member in the protected group.[6]  (*See generally* Dkt. No. 7.)  As a result, I recommend that Plaintiff's claim pursuant to 29 U.S.C. § 623 be dismissed for failure to state a claim upon which relief may be granted.  *See* 29 U.S.C. 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."); *Feldman v. Nassau Cnty*, 434 F.3d 177, 180 (2d Cir. 2006) ("The ADEA generally protects individuals over forty from age discrimination in employment.").

---

[6]    The Amended Complaint fails to allege any facts regarding Plaintiff's age.

In the alternative, I recommend that Plaintiff's claim pursuant to 29 U.S.C. § 623 be dismissed because he fails to allege facts plausibly suggesting that any adverse action was taken against him because of his age.  (*See generally* Dkt. No. 7.)

F.    **Other Statutes in the Amended Complaint**

The Amended Complaint also references, *inter alia*, the following four statutes: (1) the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") (Dkt. No. 7 at 3), (2) the Workforce Investment Act, 29 U.S.C. § 2801 *et seq.* ("WIA") (Dkt. No. 7 at 14); (3) the Equal Pay Act, 29 U.S.C. § 206 *et seq.* ("EPA") (Dkt. No. 7 at 15); and (4) the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff *et seq.* ("GINA") (Dkt. No. 7 at 15). However, to the extent that the Amended Complaint is liberally construed as asserting claims pursuant to those statutes, I recommend that they be dismissed.

1.    **FDCPA**

To state a claim under the FDCPA, "a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA."  *Felberbaum v. Sequium Asset Solutions*, 21-CV-9513, 2023 WL 167559, at *3 (S.D.N.Y. Jan. 11, 2023) (citing *Cohen v. Ditech Fin. LLC*, 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y. Mar. 24, 2017)).

The Amended Complaint fails to allege facts plausibly suggesting that (1) Plaintiff is a person who was the object of efforts to collect a consumer debt, (2) Defendant is a debt collector, or (3) that Defendant engaged in an act or omission in violation of the FDCPA.  (*See generally* Dkt. No. 7); *Komatsu v. Urban Pathways, Inc.*, 22-CV-9080, 2023 WL 419699, at *9 (S.D.N.Y. Jan. 26, 2023) (citing 15 U.S.C. 1692e ("In cases where the FDCPA applies, it prohibits

deceptive and misleading practices by 'debt collectors.'").  As a result, to the extent that the

Amended Complaint is construed as alleging a claim pursuant to the FDCPA, I recommend that

it be dismissed for failure to state a claim upon which relief may be granted.

> **2.    WIA**

The non-discrimination provision of the Workforce Investment Act of 1998 provides that

> [n]o individual shall be excluded from participation in, denied the benefits
> of, subjected to discrimination under, or denied employment in the
> administration of or in connection with, any [program or activity funded
> under the Workforce Investment Act] because of race, color, religion, sex
> (except as otherwise permitted under title IX of the Education
> Amendments of 1972), national origin, age, disability, or political
> affiliation or belief.

29 U.S.C. § 2938(a)(2).  "But there is no private right of action under this section. Instead, the

Secretary of Labor and Attorney General are charged with enforcement."  *McCrudden v. E-*

*Trade Fin. Corp.*, 13-CV-8837, 2014 WL 3952903, at *4 (S.D.N.Y. Aug. 12, 2014) (citing 29

U.S.C. § 2938(b)-(c); *Machie v. Nguyen,* 824 F. Supp. 2d 146, 151 (D.D.C. 2011); *McGowan v.*

*New Jersey,* 08-CV-5841, 2009 WL 1687663, at *8 (D.N.J. June 16, 2009); *Borrero-Rodriguez*

*v. Montalvo-Vazquez,* 275 F. Supp. 2d 127, 132 (D.P.R. 2003)).

As a result, I recommend that, to the extent the Amended Complaint is construed as

alleging a claim pursuant to the WIA, it be dismissed because there is no private right of action

under the WIA.

> **3.    EPA**

The EPA prohibits employers from "discriminating among employees on the basis of sex

by paying higher wages to employees of the opposite sex for 'equal work.'"  *Chepak v. Metro.*

*Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (quoting 29 U.S.C. § 206(d); *Belfi v. Prendergast*, 191

F.3d 129, 135 (2d Cir. 1999)).  To establish an EPA claim, a plaintiff must make an initial

showing that "(1) the employer pays different wages to employees of the opposite sex; (2) the

employees perform equal work on jobs requiring equal skill, effort and responsibility; and (3) the jobs are performed under similar working conditions." *Chepak*, 555 F. App'x at 76 (quoting *Belfi*, 191 F.3d at 135). "At the pleading stage . . . a plausible EPA claim must include 'sufficient factual matter, accepted as true' to permit 'the reasonable inference' that the relevant employees' job content was 'substantially equal.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 256 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Substantial similarity is not based on mere "overlap in titles or classifications." *E.E.O.C.*, 768 F.3d at 255. Instead, a female employee's "actual job content" must be substantially equal to her male comparators. *Id.*

Here, the Amended Complaint is devoid of factual allegations plausibly suggesting that Defendant paid different wages to employees of the opposite sex from Plaintiff. As a result, to the extent that the Amended Complaint is construed as asserting a claim pursuant to EPA, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

### 4.      GINA

GINA makes it unlawful for an employer "to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee . . . because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1). GINA defines "genetic information" to include: (1) an employee's genetic tests; (2) the genetic tests of the employee's family members; or (3) the manifestation of a disease or disorder in the employee's family members. *See Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, 16-CV-4897, 2017 WL 2258374, at *10 (S.D.N.Y. May 22, 2017) (citing 42 U.S.C. § 2000ff(4)), *report and recommendation adopted by*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017). To establish a claim for genetic discrimination under GINA, plaintiff must plead and prove "(1) that she was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from

[her] genetic tests." *Allen v. Verizon Wireless*, 12-CV-0482, 2013 WL 2467923, at \*23 (D. Conn. June 6, 2013) (citation omitted).

The Amended Complaint fails to allege facts plausibly suggesting that Defendant had any knowledge of Plaintiff's genetic information or that Plaintiff was discharged or deprived or employment opportunities because of information from his genetic tests. As a result, to the extent that the Amended Complaint is construed as asserting a claim pursuant to GINA, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

## IV. OPPORTUNITY TO REPLEAD

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[7]

---

[7]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can

With respect to Plaintiff's claims pursuant to Title II of the ADA and WIA, I recommend that those claims be dismissed without leave to replead because the problem with those claims is substantive such that a better pleading will not cure it.

However, with respect to Plaintiff's claims pursuant to 42 U.S.C. § 1981, the Rehabilitation Act, ADEA, FDCPA, EPA, and GINA, it is not clear whether better pleading would permit Plaintiff to assert a cognizable claim. Out of deference to Plaintiff's *pro se* status, I recommend that Plaintiff be granted leave to replead those claims.[8]

If Plaintiff chooses to avail himself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which he relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). In addition, the amended complaint must include allegations reflecting how the individuals named as Defendants are involved in the allegedly unlawful activity. Finally, Plaintiff is informed that any amended complaint will replace the existing Amended Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

---

rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

[8]    The undersigned notes that Plaintiff has already amended the complaint once. (*Compare* Dkt. No. 1, *with* Dkt. No. 7.) However, Plaintiff did not receive the full benefit of the Court's review of the Complaint pursuant to 28 U.S.C. § 1915 because he filed an Amended Complaint before Chief Judge Sannes ruled on the undersigned's report and recommendation regarding the Complaint. (Dkt. Nos. 6, 7, 8.) In addition, the Amended Complaint appears to assert several additional causes of action that were not previously considered by the undersigned when analyzing the Complaint.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD**

Plaintiff's Amended Complaint (Dkt. No. 7) to the extent that it asserts claims pursuant to (1) 42

U.S.C. § 1981, (2) the Rehabilitation Act, (3) ADEA, (4) FDCPA, (5) EPA, and (6) GINA, for

failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B);

and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD**

Plaintiff's Amended Complaint (Dkt. No. 7) to the extent that it asserts claims pursuant to (1)

Title II of the ADA, and (2) WIA, for failure to state a claim upon which relief may be granted

pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that **A RESPONSE BE REQUIRED** to Plaintiff's Amended

Complaint (Dkt. No. 7) to the extent that it asserts claims pursuant to (1) Titles I and V of the

ADA, and (2) Title VII of the Civil Rights Act amended alleging (a) a hostile work environment,

(b) sexual harassment, and (c) retaliation; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[9]

---

[9]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein
in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: February  27 , 2023
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[10]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Distinguished by  U.S. v. $6,787.00 in U.S. Currency,   N.D.Ga.,   February 13, 2007

1999 WL 1067841
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Francisco AGUILAR, Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant.

Nos. 3:99–MC–304 (EBB), 3:99–MC–408 (EBB).
|
Nov. 8, 1999.

*Dismissal of Plaintiff's Complaints*

BURNS, Senior J.

**\*1**  Francisco Aguilar, pro se, seeks leave to proceed in forma pauperis ("IFP") to press two meritless complaints against the government, which is prosecuting related civil forfeiture actions against his properties. Although Aguilar is otherwise financially eligible, the court dismisses these complaints sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B) because the purported claims are frivolous, baseless and irremediable.

*Background*

Would-be plaintiff Aguilar is no stranger to this court. He is currently serving a forty-year sentence for drug trafficking at the federal penitentiary in Leavenworth, Kansas. *See United States v. Tracy,* 12 F.3d 1186, 1189 (2d Cir.1993) (affirming conviction and sentence). In connection with his conviction for narcotics offenses, the government filed civil forfeiture actions pursuant to 21 U.S.C. § 881(a) in 1990 and 1991 against four of Aguilar's Connecticut properties, which have since been sold. With the help of CJA-appointed counsel, Aguilar has vigorously defended each of these four actions, three of which remain pending before this court, and are scheduled for trial in January 2000. [1]

Now Aguilar seeks to take the offensive by filing these purported claims against the government, and serving the current property owners as well as the Assistant United States Attorney who is prosecuting the related forfeiture cases. This court denied without prejudice Aguilar's initial complaint, which was erroneously captioned "United States v. One Parcel Of Property Located At 414 Kings Hwy.," one of the cases already docketed and then pending. *See* Order of June 15, 1999. Upon refiling an amended complaint (the "Amended Complaint") with the appropriate caption, Aguilar also filed a second complaint (the "Second Complaint"), seeking the same relief and asserting essentially the same claims against the government for bringing the other three forfeiture cases. The clerk returned these pleadings because Aguilar failed to complete the IFP forms. *See* Order of August 25, 1999. After Aguilar cured these pleading deficiencies, miscellaneous docket numbers were assigned to the complaints.

In Aguilar's Amended Complaint—the one originally filed against his own property at 414 Kings Highway—Aguilar seeks return of the property, compensatory damages and $100,000,000 in punitive damages "to deter the United States of America from committing a similar Abuse of Power." Aguilar pleads his case in four "Articles," asserting sundry state and federal "constitutional" claims, including conversion, false pretenses, mail fraud, and breach of fiduciary duty. The Amended Complaint also suggests an allegation that the government falsified and deliberately omitted known material facts from its probable cause affidavit in "disregard" of 19 U.S.C. § 1615, the statute outlining the burden of proof in administrative forfeiture proceedings.

The Second Complaint—the one related to the government's seizure of the other three properties—seeks similar equitable and monetary relief, including return of the properties, compensation for "suffering," "usurpation," denial of his use and enjoyment of the properties and lost rents, and one billion dollars in punitive damages. Liberally construed, the Second Complaint simply repeats the claims of the Amended Complaint except for one additional allegation: that Aguilar was entitled to, and did not receive, a hearing prior to the seizure and sale of his properties.

*Discussion*

A.  *§ 1915(e)(2)(B) Standards*
**\*2**  The Prisoner Litigation Reform Act ("PLRA") mandates dismissal of an IFP action if it: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune

from such relief." 28 U.S.C. § 1915(e)(2)(B) (as amended in 1996). Prior to the adoption of the PLRA, district courts had discretion to dismiss frivolous actions; now they are required to do so. *See* Pub.L. 104–134, 110 Stat. 1321 (1996) (making dismissal of frivolous actions mandatory, and also requiring dismissal for failing to state a claim or seeking damages from an immune defendant). Because Aguilar's claims qualify for dismissal under all three of these prongs, the standards for each are set out in turn.

### 1. *Frivolous or Malicious*

A complaint is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989) (interpreting § 1915(d), later redesignated as § 1915(e)(2)(B)(i), to preclude "not only the inarguable legal conclusion, but also the fanciful factual allegation"). Factual frivolity occurs where "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833). Legal frivolity, by contrast, occurs where "the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Livingston,* 141 F.3d at 327 (internal quotes and citation omitted); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999) (upholding dismissal as frivolous where "[t]he complaint's conclusory, vague, and general allegations ... d[id] not [ ] suffice to establish" plaintiff's claims).

In addition to frivolous claims, the court must also dismiss any malicious claims, i.e., where "[t]he manifest purpose of appellant's complaint [i]s not to rectify any cognizable harm, but only to harass and disparage." *Tapia–Ortiz,* 185 F.3d at 11.

### 2. *Failure To State A Claim*

An IFP action must also be dismissed sua sponte if it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Star v. Burlington Police Dep't,* 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (summarily affirming dismissal made pursuant to § 1915(e)(2)(B)(ii)

of purported due process challenge that failed to state a claim). As in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a § 1915(e)(2)(B)(ii) dismissal is warranted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

**\*3** Pro se complaints, such as these, however, must be read broadly, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), and may not be dismissed "simply because the court finds the plaintiff's allegations unlikely." *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1982) (construing pre-PLRA complaint as frivolous). Therefore,

> a pro se plaintiff who is proceeding in forma pauperis should be afforded the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim [under § 1915(e)(2)(B)(ii)], unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

*Gomez v. USAA Federal Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam) (vacating § 1915(e)(2)(B)(ii) dismissal where "the district court did not give th[e] pro se litigant an opportunity to amend his complaint, and because [the court] cannot rule out the possibility that such an amendment will result in a claim being successfully pleaded").

### 3. *Relief Against An Immune Defendant*

Dismissal of an IFP case is also required where plaintiff seeks monetary damages against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii); *see also,* *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998) (affirming dismissal pursuant to § 1915(e)(2)(B)(iii) of

official-capacity claims in § 1983 civil rights action because "the Eleventh Amendment immunizes state officials sued for damages in their official capacity"). Here, even if Aguilar's claims had any merit, the complaints must be dismissed nevertheless because each seeks monetary damages from the United States, which is immune from such relief. *See Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 139 (2d Cir.1999) (noting "[t]he sovereign immunity of the United States may only be waived by federal statute").

B. *Dismissal Standards Applied*
Aguilar's complaints are devoid of any arguable basis in law or fact. Most of his factual allegations—to the extent they are even comprehensible—are conclusory, vague and baseless. For example, he purports to allege: "The United States of America has misused its power against the Francisco Aguilar's Intangible Rights." (Amended Complaint at 2); and "The United States of America overpassed its bound of its authority and make a tyrannic use of its powers." (Second Complaint at 4). Even the Second Circuit has recognized Aguilar's prior handiwork to be "so indisputably lacking in merit as to be frivolous within the meaning of 28 U.S.C. § 1915(e)." *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 97–6004 (2d Cir. April 23, 1997) (mandate [Doc. No. 167] dismissing appeal of Aguilar's motion to enjoin state default proceedings).

Only two allegations asserted by Aguilar are even arguably actionable: the lack-of-probable-cause argument in the Amended Complaint and the due process claim in the Second Complaint. Both of these, however, must be dismissed because each fails to state a claim for which relief may be granted.

1. *Probable Cause*
**\*4**  The one potentially cogent legal claim that can be derived from a liberal reading of the Amended Complaint has already been conclusively decided by the court and is therefore barred from relitigation. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158 (denying lack-of-probable-cause argument in motion to dismiss [Doc. No. 64] in 1993, and in motions for summary judgment [Doc. Nos. 55, 96] in 1996). Here again, Aguilar reiterates his allegation that the government's affidavit in support of probable cause was tainted because it failed to disclose that the 414 Kings Highway property was subject to a mortgage held by People's

Bank, and therefore could not have been purchased with funds traceable to drug sales.

After the government voluntarily dismissed that forfeiture action, this court initially ordered the sale proceeds of the property disbursed to Aguilar. *See id.,* Order of Oct. 25, 1996 [Doc. No. 151]. The bank appealed the order and, during the pendency of the appeal, secured a default judgment in state court against Aguilar. *See People's Bank v. Aguilar,* No. CV–96–0337761–S (Conn.Super.Ct.1997). On the Bank's appeal from this court's disbursal of proceeds to Aguilar, the Second Circuit reversed and remanded. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* 128 F.3d 125, 128 (2d Cir.1997). On remand, in accordance with the Second Circuit mandate, this court disbursed the proceeds from the sale of 414 Kings Highway to the bank in partial satisfaction of Aguilar's debt owed on the defaulted mortgage. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158, 1999 WL 301704 (D.Conn. May 11, 1999).

Because the lack-of-probable-cause claim, perfunctorily adverted to in Aguilar's otherwise meritless Amended Complaint, has already been addressed in the *414 Kings Highway* forfeiture case, the court will not consider it again. As such, it must be dismissed because it fails to state a claim for which this court could grant further relief.

2. *Due Process*
In addition to his now-stale probable cause allegation about 414 Kings Highway, Aguilar claims in the Second Complaint that he was wrongfully denied a hearing prior to the seizure and sale of the other three properties. However, the constitutional right to a preseizure hearing in civil forfeiture proceedings was not recognized until 1993, two years after the seizure in this case. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that Fifth Amendment Due Process protections apply to civil forfeiture proceedings against real property). Even if such due process protections applied retroactively, Aguilar's challenge to the sale of the properties would lack merit because exigent circumstances required their interlocutory sale.

In civil forfeiture proceedings "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil

forfeiture." *Id.* at 62, 114 S.Ct. at 505; *see also United States v. One Parcel Of Property Located At 194 Quaker Farms Rd.,* 85 F.3d 985, 988 (2d Cir.1996) ("[a]bsent exigent circumstances, a hearing, with notice to record owners, is held before seizure."). "To establish exigent circumstances, the Government must show that less restrictive measures— i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interest in preventing the sale, destruction, or continued unlawful use of the real property." *Id.* at 62, 114 S.Ct. at 505.

**\*5** Aguilar's properties addressed in the Second Complaint were seized because there was probable cause that each had been used to facilitate the offenses for which he was convicted. *See* 21 U.S.C. § 881(a)(7) (1999). This civil forfeiture statute authorizes interlocutory sale of seized properties by two methods, which are incorporated by reference into the statute. *See* 21 U.S.C. § 881(b) (authorizing seizure of property subject to civil forfeiture upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; 21 U.S.C. § 881(d) (authorizing seizure and summary sale governed by the customs laws codified in the Tariff Act of 1930, 19 U.S.C. §§ 1602–1619). Though the source of authority differs, the standards for sale under each are virtually indistinguishable.

Rule E(9)(b) of the Maritime Rules permits the interlocutory sale of seized property if such property

> is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is [sic] excessive or disproportionate, or if there is unreasonable delay in securing the release of property....

Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b). Section 1612(a) of the customs laws, by contrast, provides for seizure and summary sale whenever it appears that such property

> is liable to perish or to waste or to be greatly reduced in value by keeping, or

> that the expense of keeping the same is disproportionate to the value thereof....

19 U.S.C. § 1612(a) (1999).

Here, the Chief Deputy United States Marshal certified that the properties located at both 2030–32 Main St., Bridgeport (No. 5:90–cv–544), and 8 Drumlin Rd., Westport (No. 5:90–cv–545), were abandoned and therefore subject to vandalism, deterioration and depreciation. *See* 2/20/91 Declaration in Support of Motion for Interlocutory Sale [Doc. Nos. 28 (5:90–cv–544), 31 (5:90–cv–545) ] at ¶¶ 4, 5. The marshal also certified that the mortgage obligations exceeded by over $ 1,000 per month the rental income of the 2034–38 Main St., Bridgeport (No. 5:90–cv–546), property, which was several months in arrears and had little or no equity. *See* 2/21/90 Declaration in Support of Motion for Interlocutory Sale [Doc. No. 27 (5:90–cv–546) ] at ¶ 4. This court found these reasons sufficiently exigent to order the interlocutory sales. *See* 8/1/90 Order for an Interlocutory Sale [Doc. Nos. 34 (5:90–cv–544), 50 (5:90–cv–545), 31 (5:90–cv–546) ]. Interlocutory sale was thus warranted under both Rule E(9)(b) and § 1612(a) because the two abandoned properties were liable to deteriorate or lose value and the mortgage liabilities of the rented property were disproportionate in comparison to its value. *Cf. United States v. Esposito,* 970 F.2d 1156, 1161 (2d Cir.1992) (vacating order of interlocutory sale of forfeited home where "there was no finding that t[he amount expended for maintenance and repairs] was excessive or disproportionate").

**\*6** Aguilar's claim that he was wrongfully denied an opportunity to be heard prior to the sale of his properties is therefore not a cognizable due process challenge because the exigency of the properties' abandonment and disproportionate cost of upkeep required their interlocutory sale. Thus, sua sponte dismissal is warranted because Aguilar's due process claim fails to state a remediable cause of action.

3. *Other Claims*

The remainder of Aguilar's claims are frivolous and can be disposed of readily. To the extent Aguilar's claim invoking 19 U.S.C. § 1615 can be construed as challenging the constitutionality of shifting the burden to the claimant upon the government's showing of probable cause, the Second Circuit has "[h]e]ld that it does not violate due process to place the burden of proving an innocent owner affirmative

defense on the claimant." 🚩 *194 Quaker Farms Rd.,* 85 F.3d at 987. In addition, the tort claims for false pretenses and conversion are not actionable as these are intentional torts to which the limited waiver of sovereign immunity of the Federal Tort Claims Act ("FTCA") is inapplicable.

*See* 🚩 28 U.S.C. § 2680(h); *see also* 🚩 *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) ("the FTCA does not authorize suits for intentional torts based on the actions of Government prosecutors"). Furthermore, because the United States government is not a fiduciary and owes no associated duties to Aguilar, his breach of fiduciary duty allegation against the government fails to state a claim. Finally, Aguilar also fails to state a valid mail fraud claim as that criminal code provision, 🚩 18 U.S.C. § 1341, may only be prosecuted by the government, not against it.

*Conclusion*

For the foregoing reasons, Aguilar's complaints [Nos. 3:99–mc–304 and 3:99–mc–408] are dismissed pursuant to 🚩 28 U.S.C. § 1915(e)(2)(B) because they present frivolous allegations, none of which state a cognizable claim, and seek monetary relief from an immune defendant. Because the court cannot definitively rule out the possibility that amendment to the pleadings might result in an actionable claim, *see* 🚩 *Gomez,* 171 F.3d at 796, these dismissals are made without prejudice and may be replead after the conclusion of the related forfeiture proceedings.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1067841

## Footnotes

1       *See United States v. One Parcel Of Property Located At 2030–32 Main St.,* No. 5:90–cv–544(EBB) (pending); *United States v. One Parcel Of Property Located At 8 Drumlin Rd.,* No. 5:90–cv–545 (EBB) (pending); *United States v. One Parcel Of Property Located At 2034–38 Main St.,* No. 5:90–cv–546(EBB) (pending); *see also United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158(EBB) (closed).

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1271533
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL, et al., Defendants.

5:22-cv-00199 (DNH/TWD)

|

Signed 04/05/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, pro se, 7075 South Court St., Canastota, NY 13032.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** The Clerk has sent to the Court for review a *pro se* complaint submitted by Joanna Griffiths ("Plaintiff"), together with an application to proceed *in forma pauperis* ("IFP Application"). (Dkt. Nos. 1, 2.) For the reasons discussed below, the Court grants Plaintiff's IFP Application and recommends that the complaint be dismissed in its entirety with leave to amend.

**I. PLAINTIFF'S IFP APPLICATION**

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's IFP Application (Dkt. No. 2), the Court finds she meets this standard. Therefore, Plaintiff's IFP Application is granted. [1]

**II. SCREENING OF THE COMPLAINT**

Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who

is immune from such relief." 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citation omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.*

**\*2** In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Similarly, allegations that "are so vague as to fail

to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009). Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).

Generally, when the court dismisses a *pro se* complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to replead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with the plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

## III. SUMMARY OF PLAINTIFF'S COMPLAINT

Utilizing a form complaint pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq*, Plaintiff brings this action against Defendants Saint Joseph's Hospital ("Hospital") and CEO Jeremy Zochs. (Dkt. No. 1.[2]) As a basis for the Court's jurisdiction, Plaintiff has indicated "Federal Jurisdiction" and specifies the ADA and "disparate treatment resulting in loss of dentures, causing personal injury." (Dkt. No. 1-1.) She lists the following disabilities in the complaint:

> severe mental disability, bi-polar, post traumatic stress, ADD, borderline personality disorder. My physical condition has greatly worsened due to the loss of my dentures, my face has sunken in and I have lost 31 pounds.

(Dkt. No. 1 at ¶ 4.) As to the conduct at issue in this action, she checked "failure to make alterations to accommodate disability" and "other acts." *Id.* at ¶ 5. Plaintiff states that on November 20, 2021, she was having a nervous breakdown and was brought to "CPAP"[3] and was given "additional meds." *Id.* She has "little memory" of that day, "but some memory." *Id.* According to Plaintiff, her dentures were lost, stolen, or misplaced while she was in the Hospital's care. *Id.*

She has "since gone 3 months with no teeth causing [her] to lose 31 pounds, emotional distress." *Id.* Plaintiff wants a jury trial where she can "prove disparate treatment." *Id.* at ¶ 7. She has "suffered greatly both physically and mentally from their discrimination." *Id.* Plaintiff seeks $100,000.00 in damages. *Id.*

**\*3**  In an "Affidavit of Disparate Treatment" which is attached to the complaint, Plaintiff states that from what she can remember, she "was not treated well at all." (Dkt. No. 1, Exhibit A.[4]) She avers she had her dentures when she arrived at "CPAP" but did not have them when she returned home. *Id.* On "numerous occasions" she contacted the Hospital and received "more disparate treatment from the internal investigation done by ... Jennifer from Loss Prevention." *Id.* Plaintiff claims employees of the hospital "colluded their statements as to prevent the hospital's correct responsibility." *Id.* "Jennifer told [Plaintiff] that the hospital in no way lost [her] teeth in a disparaging manner, and in fact very rudely." *Id.* As a result, she has suffered physical and mental stress and loss of enjoyment. *Id.*

## IV. DISCUSSION

The complaint refers to the ADA generally, and does not identify the title of the ADA allegedly violated by Defendants. (*See generally* Dkt No. 1.) The ADA is divided in five separate titles. Reading the complaint liberally, the Court considers whether Plaintiff has stated a claim under Title III of the ADA."[5]

### A. Title III of the ADA

Title III of the ADA prevents discrimination on the basis of a disability in places of public accommodation. 42 U.S.C. § 12182. "[P]ublic accommodations" are defined under 42 U.S.C. § 12181(7)(F), which includes a long list of qualifying private facilities, provided that their operations "affect commerce," such as an "insurance office, professional office of a health care provider, hospital, or other service establishment." To state a claim under Title III of the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability;[6] (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants on the basis of her disability. *Doe v. NYSARC Tr. Serv., Inc.*, No. 1:20-CV-801 (BKS/CFH), 2020 WL 5757478, at *4 (N.D.N.Y.

Sept. 28, 2020), *report-recommendation adopted*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020); *see Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008). Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief ... is not available to private individuals under Title III of the ADA.").

**\*4** As an initial matter, because Plaintiff seeks only monetary relief, the complaint "fails to state a plausible claim for relief under Title III of the ADA." *Sandler v. Benden*, 15-CV-1193, 2016 WL 9944017, at \*16 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 16-3218, 2017 WL 5256812 (2d Cir. Nov. 13, 2017); *see, e.g.*, *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 7040982, at \*3 (*sua sponte* dismissing the plaintiff's claims for monetary damages pursuant to Title III of the ADA with prejudice and without leave to amend).

Additionally, even assuming the Hospital is a public accommodation, 42 U.S.C. § 12181(7), and that Plaintiff is a qualified individual with a disability under the ADA, 42 U.S.C. § 12131(2), the complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of the ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *See Benyi v. New York*, No. 3:20-CV-1463 (DNH/ML), 2021 WL 1406649, at \*14 (N.D.N.Y. Mar. 23, 2021), *report-recommendation adopted*, 2021 WL 1404555 (N.D.N.Y. Apr. 13, 2021) (citations omitted); *see, e.g.*, *Heendeniya v. St. Joseph's Hosp. Health Ctr. (SJHHC)*, No. 5:15-CV-1238 (GTS/TWD), 2017 WL 1013081, at \*9 n.14 (N.D.N.Y. Mar. 14, 2017) (dismissing Title III ADA claims against St. Joseph's Hospital Health Center for failure to state a claim where the plaintiff failed to alleged that he was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" and that Defendants discriminated against him "based on [his] disability"). Rather, as described above, Plaintiff was provided with medication at "CPAP" due to her "nervous breakdown" and seems to argue that employees of the Hospital were negligent and/or rude. Thus, the complaint does not state a Title III ADA claim against the Hospital.

As to CEO Jeremey Zochs, "the question of whether a person is a proper defendant under the ADA turns ... on ... whether the defendant owns, leases, or operates a place of public accommodation within the meaning of the ADA." *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) (emphasis removed)). In assessing whether an individual is a proper defendant under Title III of the ADA, "[c]ourts ... have focused on the issue of control and whether the named defendant 'operates' a place of public accommodation within the meaning of the ADA." *Id.* at \*4. "Under Title III, 'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; manage.' " *Id.* (quoting *Green v. DGG Properties Co., Inc.*, No. 3:11-CV-01989, 2013 WL 395484, at \*13 (D. Conn. Jan. 31, 2013) (quoting *Celeste v. East Meadow Union Free School Dist.*, 373 F. App'x 85, 91 (2d Cir. 2010)) (summary order) (additional internal quotation marks and citation omitted))). Further, "[t]he term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts." *Coddington*, 45 F. Supp. 2d at 215. Moreover, courts have explained that "[s]uch discriminatory acts may result in the imposition of liability under the ADA where they are the result of the exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." *Id.*

**\*5** However, courts have held that "naked assertions devoid of further factual enhancement" concerning an individual defendant's level of control over a public accommodation are insufficient for purposes of establishing individual liability under Title III of the ADA. *Doe v. NYSARC Tr. Serv., Inc.*, 2020 WL 5757478, at \*4 (quoting *Iqbal*, 556 U.S. at 678); *see Green*, 2013 WL 395484, at \*14. For example, in *Green*, where "[p]laintiff merely assert[ed] the names of the individual defendants and their respective titles," without more, the court held that, although the individual defendants could "be proper defendants in [the] action if they exercised the requisite control over [the public accommodation], the plaintiff "failed to allege any facts in his complaint that would allow the court to conclude that [the individual defendants] exercised such control over the functioning of affairs of [the public accommodation]."

Here, even affording the complaint the most liberal construction possible, Plaintiff has not pleaded *any* facts to state a claim against CEO Jeremy Zochs under Title III of the ADA. In this regard, CEO Jeremy Zochs is listed as a party and his name is not referenced in body of Plaintiff's complaint. Thus, Plaintiff has not stated a Title III ADA claim against CEO Jeremey Zochs.

Based on the foregoing, the Court recommends that Plaintiff claims brought pursuant to Title III of the ADA for monetary damages against Defendants be dismissed. *See Benyi*, 2021 WL 1406649, at *15.

### B. State Law Claims

Inasmuch as this Court is recommending that Plaintiff's federal claims—to the extent that she alleged any—be dismissed, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over any state law claims. *See Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006) ("[A] district court has discretion to decline to exercise supplemental jurisdiction over state law claims because all claims over which the federal court has jurisdiction have been dismissed."). Of course, Plaintiff may also pursue any state law claims in state court.

### C. Opportunity to Amend

This Court has serious doubts about whether Plaintiff can amend to assert actional ADA claims against Defendants. Nevertheless, in light of Plaintiff's *pro se* status and out of an abundance of caution, the Court recommends that Plaintiff be granted leave to file an amended complaint, except that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be dismissed with prejudice and without leave to amend. [7]

**ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that Plaintiff's claims for monetary damages pursuant to Title III of the ADA be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is further

*6 **RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over any state law claims; and it is further

**ORDERED** that the Clerk shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

### All Citations

Slip Copy, 2022 WL 1271533

## Footnotes

1    Plaintiff is reminded that, although her IFP Application has been granted, she will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

2    The Court assumes Plaintiff is referring to St. Joseph's Health Hospital. The address that Plaintiff has listed for this Defendant is that of St. Joseph's Health Hospital. The Court takes judicial notice of the fact that St. Joseph's Health Hospital is a regional non-profit health care system based in Syracuse, New York, and is part

of Trinity Health, the nation's second-largest Catholic Health System. *See* https://www.sjhsyr.org/about-us/ (last visited Apr. 4, 2022); *see also* 🚩 *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (noting that, for the purposes of a motion to dismiss under 🚩 Fed. R. Civ. P. 12(b)(6), "a court may take judicial notice of information publicly available on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.' ").

3    Plaintiff may be referring to the Comprehensive Psychiatric Emergency Program, also known as "CPEP". *See* https://www.sjhsyr.org/location/st-josephs-health-hospital-comprehensive-psychiatric-emergency-program-cpep (last visited Apr. 4, 2022).

4    *See* 🚩 *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

5    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because she has not alleged that she was employed by Defendants. 🚩 42 U.S.C. § 12117; *see* 🚩 *Mary Jo C. v. New York State and Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) ("Title I of the ADA expressly deals with th[e] subject of employment discrimination....") (citation and internal quotation marks omitted). Title II of the ADA covers disability discrimination in public services, programs, and activities, defined as "state or local governments and their instrumentalities." *Sherman v. Black*, 510 F. Supp. 2d 193, 197 (E.D.N.Y. 2007) (citing 42 U.S.C. § 12131(1)). However, "[a] private hospital performing services pursuant to a contract with a municipality[,] even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity." 🛑 *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *See* *Genco v. Sargent & Collins LLP*, No. 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Lastly, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that she engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against her and the protected activity. *See* 🚩 *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.).

6    Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. A physical or mental impairment can be "[a]ny mental or psychological disorder, such as an intellectual disability [or an] emotional or mental illness[.]" 🚩 29 C.F.R. § 1630.2(h)(2). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending speaking, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102.

7    If the District Court adopts this Report-Recommendation, and if Plaintiff chooses to file an amended complaint, the pleading must comply with Rules 8 and 10 of the Federal Rules. The revised pleading will replace the original complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See* 🚩 *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."). The revised pleading should not attempt to resurrect any claims dismissed with prejudice in this action Additionally, although Plaintiff may submit objections to

this Report-Recommendations, *see infra*, Plaintiff should wait for the District Court to rule on this Report-Recommendation before submitting an amended pleading.

8    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6

2022 WL 1265761
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joanna GRIFFITHS, Plaintiff,

v.

SAINT JOSEPHS HOSPITAL and
CEO Jeremy Zochs, Defendants.

5:22-CV-199
|
Signed 04/28/2022

**Attorneys and Law Firms**

JOANNA GRIFFITHS, Plaintiff, Pro Se, 7075 South Court
Street, Canastota, NY 13032.

MOLLY C. CASEY, ESQ., MAGUIRE CARDONA, P.C.,
Attorneys for Defendants, 22 Clinton Avenue, Albany, NY
12207.

**ORDER ON REPORT & RECOMMENDATION**

DAVID N. HURD, United States District Judge

**\*1** On March 3, 2022, *pro se* plaintiff Joanna Griffiths
("plaintiff") filed this action alleging that defendants violated
her rights under the Americans with Disabilities Act ("ADA")
in connection with alleged mistreatment that resulted in the
loss of her dentures. Dkt. No. 1. Along with her complaint,
plaintiff sought leave to proceed *in forma pauperis* ("IFP
Application"). Dkt. No. 2.

On April 5, 2022, U.S. Magistrate Judge Thérèse Wiley
Dancks granted plaintiff's IFP Application and advised
by Report & Recommendation ("R&R") that plaintiff's
complaint be dismissed with leave to amend except as to her
claims for money damages under Title III of the ADA. Dkt.

No. 7. As Judge Dancks explained, monetary relief is not
available to private plaintiffs who sue under this title of the
ADA. *Id.* However, in light of plaintiff's *pro se* status, Judge
Dancks recommended that plaintiffs be given an opportunity
to amend the rest of her pleading in accordance with Rules 8
and 10 of the Federal Rules of Civil Procedure. *Id.*

Plaintiff has not filed objections, and the time period in which
to do so has expired. *See* Dkt. No. 7. Upon review for clear
error, the R&R will be accepted and adopted in all respects.
*See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED with leave to amend;

3. Plaintiff's claim for money damages under Title III of the
ADA is DISMISSED with prejudice and without leave to
amend;

4. Plaintiff shall have thirty days from the date of this
Order in which to amend her pleading in accordance with
the instructions set forth in Judge Dancks's Report &
Recommendation and this Order; and

5. If plaintiff does not file an amended complaint within this
thirty-day period, the Clerk of the Court shall enter a judgment
accordingly and close the file without further Order of this
Court.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1265761

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4290660
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin Joseph Gabriel BRENNAN, Plaintiff,

v.

NCACOMP INC., Owner Kevin Gregory;
Joleen M. Bolger, (Snowdon) Manager, NCA
Inc.; Dr. Anne M. Caulkins; Dr. Ira Breite;
and Rene Barnes (Picirrili), Defendants.

3:22-CV-0127 (GTS/ML)
|
Signed April 25, 2022

**Attorneys and Law Firms**

KEVIN JOSEPH GABRIEL BRENNAN, Plaintiff, Pro Se,
319 Exchange Avenue, Townhouse #20, Endicott, New York
13760.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* complaint together
with an amended complaint, application to proceed *in forma
pauperis*, and supplemental information to the *in forma
pauperis* application filed by Kevin Joseph Gabriel Brennan
("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2, 4,
5.) For the reasons discussed below, I grant Plaintiff's *in
forma pauperis* application (Dkt. No. 2) and recommend that
Plaintiff's Amended Complaint (Dkt. No. 5) be dismissed in
its entirety (1) in part with leave to amend, and (2) in part
without leave to amend.

### I. BACKGROUND

On February 10, 2022, Plaintiff commenced this action by the
filing of a Complaint alleging that his rights were violated
by defendants NCAComp Inc., Joleen Bolger, Dr. Anne
M. Caulkins, Dr. Ira Breite, and Rene Barnes (collectively
"Defendants"). (Dkt. No. 1.) On March 25, 2022, Plaintiff
filed an amended complaint as of right, which supersedes his

original complaint. (*See* Dkt. No. 5 [Am. Compl.]); 🚩 *Int'l
Controls Corp v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)
("It is well established that an amended complaint ordinarily
supersedes the original, and renders it of no legal effect.").

Thus, presently before the undersigned for review pursuant to
🚩 28 U.S.C. § 1915, is Plaintiff's Amended Complaint.

Plaintiff alleges that he is disabled based, at least in part, on
an injury he sustained at work on November 1, 1995. (*See
generally* Dkt. No. 5.)

Plaintiff alleges that "in the Spring of 2018" his workers'
compensation case was "turned over to NCAComp. Inc." and
Defendant Bolger was assigned as his claim examiner. (*Id.*)

Plaintiff alleges that on December 14, 2018, he was injected
with Depomedrol by Defendant Caulkins while he was also
taking Meloxicam and Voltaren Gel. (*Id.*) Plaintiff alleges that
in January 2019, he "experienced the worst episode of rectal
bleeding he had ever had." (*Id.*) Plaintiff alleges that due to
his rectal bleeding, he went to "the Lourdes Walk-in," where
he was directed to stop taking the Meloxicam but the Voltaren
Gel was not discussed. (*Id.*)

Plaintiff alleges that on February 10, 2019, he filled his
prescription for Voltaren Gel, but the amount that he was
usually prescribed doubled "from two tubes to four." (*Id.*)
Plaintiff alleges that, pursuant to New York State Workers'
Compensation Law, any prescription medication change must
be accompanied by either an appointment where the change
was requested or a written order from a treating physician
explaining why the change was necessary. (*Id.*) Plaintiff
alleges that he did not request a change in the amount of
Voltaren Gel and he has not seen any written order explaining
a need for the increase. (*Id.*)

Plaintiff alleges that on February 26, 2019, he was examined
by Dr. Saleem, who ordered a colonoscopy to determine the
cause of Plaintiff's rectal bleeding. (*Id.*) Plaintiff alleges that
Defendant Bolger "assisted the office staff" at Dr. Saleem's
office "with completing the [C-4] form." (*Id.*) Plaintiff alleges
that he did not have the colonoscopy procedure because his
request through workers' compensation was not approved and
he did not have health insurance. (*Id.*)

**\*2** Plaintiff alleges that, at some point in time, due to the
rectal bleeding, on his own accord, he stopped taking all of
the other medication he was prescribed except the Voltaren
Gel. (*Id.*)

Plaintiff alleges that on June 1, 2019, he obtained health
insurance. (*Id.*) Plaintiff alleges that on June 12, 2019, he
scheduled his first colonoscopy, and was diagnosed with

ulcerative colitis, which requires him to take Mesalamine for the rest of his life. (*Id.*) The same day, Plaintiff alleges that he applied the Voltaren Gel and looked closely at the container, which contained a warning to discontinue use if rectal bleeding occurred. (*Id.*) Plaintiff alleges that he immediately ceased use of Voltaren Gel and began taking Mesalimine, and the rectal bleeding stopped the following day. (*Id.*)

Plaintiff alleges that Voltaren Gel is "a powerful NSAID which contains the chemicals known to cause deterioration of the mucosal walls of the colon." (*Id.*) Plaintiff alleges that Defendant Caulkins was aware of the risks associated with Voltaren and that in July of 2018, she stated that his Voltaren Gel dosage should not be increased due to toxicity. (*Id.*) Plaintiff alleges that he filed a medical malpractice lawsuit in New York State court against Defendant Caulkins, and that in retaliation, she improperly doubled his prescription for Voltaren Gel. (*Id.*)

Plaintiff alleges that Defendant Bolger improperly authorized his Voltaren Gel prescription change but failed to authorize the colonoscopy procedure. (*Id.*)

Plaintiff alleges that Defendant NCAComp and its employees intentionally deny medical treatment so that it does not have to pay for the treatment. (*Id.*)

Plaintiff alleges that Defendant Barnes is associated with the New York State Workers' Compensation Board and was aware that Plaintiff was being treated for rectal bleeding, that his Voltaren Gel prescription was doubled, and took no action to protect him. (*Id.*)

Plaintiff alleges that in December—of an unspecified year —he received a report completed by independent medical examiner Defendant Breite, which included several false claims and omitted significant information. (*Id.*)

Based on these factual allegations, Plaintiff appears to assert the following seven causes of action: (1) a claim that Defendant Caulkins retaliated against him by improperly doubling his prescription for Voltaren Gel after he filed a medical malpractice suit against her, and that Defendant Bolger authorized the improper increased prescription; (2) a claim that Defendant Bolger intentionally denied Plaintiff's necessary medical treatment by failing to provide information when requested and then providing inaccurate information; (3) a claim that Defendant NCAComp, through its employees,

denied Plaintiff his prescribed gym membership in violation of New York State Workers' Compensation Law; (4) a claim that Defendant Caulkins falsified records by stating that Plaintiff's left hip replacement was not causally related to his work injury; (5) a claim that Defendant Breite violated his Hippocratic oath by stating that ulcerative colitis is not a disease, which caused violations of Plaintiff's "constitutional right to due process and equal access to medical treatment"; (6) a claim that Defendant Barnes has been e-mailed "many documents" and knows that Plaintiff "has been grossly denied his right to due process and access accommodations" and that he is permanently disabled but the Workers' Compensation Board refuses to identify him as such, which is a "gross violation of [his] right to life, liberty, and the pursuit of happiness" and an intentional infliction of emotional distress; and (7) a claim that pursuant to New York Workers' Compensation Law, Defendant NCAComp intentionally denied Plaintiff a medical procedure, which resulted in denial of his procedural and substantive due process rights and was a "gross violation of the covenant of 'Exclusive Remedy.'" (*Id.*)

**\*3** As relief, Plaintiff seeks $120,000.00 in damages from each of Defendants and treble damages pursuant to the Americans with Disabilities Act. (*Id.*)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [1] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [2]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged– but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**\*4** Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding

the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Pursuant to 42 U.S.C. § 1983

To the extent that Plaintiff attempts to assert any constitutional claims, the Court construes those claims as made pursuant to 42 U.S.C. § 1983. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (internal quotation marks omitted). "A plaintiff pressing a claim of [a] violation of his constitutional rights under § 1983 is thus required to show state action." *Fabrikant*, 691 F.3d at 206 (internal quotation marks omitted). "State action requires *both* ... the exercise of some right or privilege created by the State ... *and* " the involvement of "a person who may fairly be said to be a state actor." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks and brackets omitted).

There is no single test that is determinative of whether a private person or entity may be a state actor, but rather a host of factors. 🚩 *Baum. N. Dutchess Hosp.*, 764 F. Supp. 2d 410, 428 (N.D.N.Y. 2011) (Treece, M.J.). A state actor may be found when: (1) "[the challenged activity] results from the State's exercise of coercive powers"; (2) "the State provides significant encouragement, either overt or covert ... or when a private actor operates as a willful participant in joint activity with the State or its agents"; (3) "it is controlled by an agency of the State;" (4) "it has been delegated a public function by the State [known as the public function test]"; or (5) "it is entwined with governmental policies or when government is entwined in its management or control[.]" 🚩 *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citations, quotation marks, and alterations omitted). [3]

**\*5** Here, Defendants ostensibly are private actors. However, in the interest of reading Plaintiff's Amended Complaint "liberally and interpreted to raise the strongest arguments that [it can] suggest," *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013), the Court considers whether Defendants' alleged activities establish "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be treated as that of the State itself.'" *Tancredi v. Metropolitan Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (quoting 🚩 *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

Plaintiff does not allege facts plausibly suggesting that the state exercised coercive power over Defendants. Therefore, the Court considers the joint-activity and public-function tests.

"The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state].'" *Forbes v. City of New York*, 05-CV-7331, 🚩 2008 WL 3539936, at \*5 (S.D.N.Y. Aug. 12, 2008) (quoting 🚩 *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). "A private actor can only be a willful participant in joint activity with the State or its agents if the two share some common goal to violate the plaintiff's [constitutional] rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (internal citations omitted). Here, Plaintiff fails to allege facts plausibly suggesting the existence of a conspiracy or a "prearrangement" between

Defendants and the state. As a result, I find that Plaintiff fails to allege facts plausibly suggesting joint action. *See Brignardello v. Las Vegas Metro Police Dep't*, 06-CV-0855, 2006 WL 3308428, at \*2-3 (D. Nev. Nov. 13, 2006) (finding that the complaint "failed to set forth any facts showing that [the third-party insurance administrators] conspired with [the Las Vegas Metro Police Department] to deprive [the plaintiff] of his constitutional rights" and thus, failed to allege " 'joint action with state actors to violate' his constitutional rights.").

Under the public-function test, "a private entity may be considered a state actor when it exercises a function 'traditionally exclusively reserved to the State.'" 🚩 *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019). "The [Supreme] Court has stressed that 'very few' functions fall into that category." 🚩 *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1929 (quoting 🚩 *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978)). Public functions may include running elections and operating a company town but not running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, or supplying electricity. *Id.*

Here, Plaintiff fails to allege facts plausibly suggesting that Defendants perform a public function. Neither the provision of medical services nor the administration of insurance payments in connection with state workers' compensation system are functions traditionally and exclusively exercised by the government. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 529 U.S. 40, 55-57 (1999) (holding that private companies' administration of insurance payments in connection with state workers' compensation system was not state action); *DuBois v. Bedford-Flatbush Chiropractic, P.C.*, 409 F. Supp. 3d 62, 69-70 (E.D.N.Y. Aug. 29, 2019) (finding that "[n]either the provision of chiropractic services nor the issuance of medical reports pursuant to FECA is a function traditionally and exclusively exercised by government."); *Peterec-Tolino v. Ace Am. Ins. Co.*, 20-CV-5354, 2020 WL 5211045, at \*4-5 (S.D.N.Y. Aug. 28, 2020) (holding that independent medical examiners and a private insurance company are not state actors for claims pursuant to 🚩 42 U.S.C. § 1983).

**\*6** Therefore, I find that drawing all reasonable inferences and construing the Amended Complaint liberally, it fails to allege facts plausibly suggesting that Defendants are state actors for purposes of liability pursuant to 🚩 42 U.S.C. §

1983. As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983, be dismissed for failure to state a claim.

In the alternative, I recommend that to the extent that Plaintiff asserts a claim pursuant to the equal protection clause, that claim be dismissed for failure to state a claim.

Under the Equal Protection Clause, a state and its instrumentalities may not deny "any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. At its core, equal protection prohibits the government from treating similarly situated persons differently. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985); Sound Aircraft Services, Inc. v. Town of East Hampton, 192 F.3d 329, 335 (2d Cir. 1999). Vague or nonspecific allegations are insufficient to make out an equal protection claim.

In order to claim that the conduct of Defendants violate Plaintiff's equal protection rights, he must allege that:

> (1) ... compared with others similarly situated, [he] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [him].

Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (quoting FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992)).

Plaintiff appears to assert an equal protection claim under the "class of one" theory. Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138, 139-40 (2d Cir. 2008). Under this theory, a plaintiff must show that he was "intentionally treated differently from other similarly-situated individuals without any rational basis." Clubside, Inc. v. Valentin, 468 F.3d

144, 159 (2d Cir. 2006). Additionally, "an extremely high degree of similarity between" Plaintiff and the person with whom he compares himself must be alleged. Clubside, Inc., 468 F.3d at 159 (citing Neilson, 409 F.3d at 104).

The Amended Complaint fails to allege facts plausibly suggesting that Plaintiff was treated differently from other similarly-situated individuals without any rational basis. As a result, I recommend that, in the alternative, Plaintiff's equal protection claim against Defendants be dismissed for failure to state a claim.

**B. Claims Pursuant to the ADA**

To the extent that Plaintiff intended to assert claims pursuant to the ADA, I recommend that those claims be dismissed for failure to state a claim upon which relief may be granted.

The Amended Complaint includes no allegations of discrimination based on Plaintiff's disability. (*See generally* Dkt. No. 5.) In addition, construing the Amended Complaint liberally, as the Court must, Plaintiff failed to allege facts plausibly suggesting claims pursuant to Title II, Title III, or Title V of the ADA. [4]

**1. Title II of the ADA**

**\*7** Title II of the ADA "proscribes discrimination against the disabled in access to public services." Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009) (citing Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84-85 (2d Cir. 2004), corrected, 511 F.3d 238 (2d Cir. 2004)). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To plead a violation of Title II of the ADA, a plaintiff must allege "(1) that [he] is a qualified individual with a disability; (2) that [he] was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [his] disability." Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (quoting Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003)) (internal quotation marks omitted).

A "qualified individual" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). A qualified individual can base a discrimination claim on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

The public entities defined in the ADA are state or local governments and their instrumentalities. 42 U.S.C. § 12131(1). Private entities are not subject to the provisions of Title II even if they receive government funding. *Wilshire v. L&M Dev. Partners*, 20-CV7998, 2022 WL 847067, at *3 (S.D.N.Y. Mar. 22, 2022) (citing *Wiltz v. N.Y. Univ.*, 19-CV-3406, 2019 WL 8437456, at *7 (S.D.N.Y. Dec. 23, 2019), *report-recommendation adopted by*, 2020 WL 614658 (S.D.N.Y. Feb. 10, 2020) (collecting cases on private entities receiving government funding not being subject to Title II of the ADA)).

Here, the Amended Compliant is devoid of factual allegations plausibly suggesting that Defendants are public entities. As set forth above in Part IV.A. of this Order and Report-Recommendation, the Amended Complaint fails to allege facts plausibly suggesting that Defendants are state actors. In addition, the Amended Complaint fails allege facts plausibly suggesting that Plaintiff was unable to access programs due to his disability, how his disability prevented him from accessing those programs, or what accommodations he sought and was denied by Defendants. (*See generally* Dkt. No. 5.)

Moreover, "[w]hen a private individual seeks damages under Title II of the ADA, the Second Circuit requires the plaintiff to 'establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability.' " *Day v. Warren*, 06-CV-0155, 2008 WL 474261, at *4 (D. Conn. Feb. 7, 2008) (quoting *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 111 (2d Cir. 2001)). The Amended Complaint fail to allege facts plausibly suggesting discriminatory animus or ill will towards Plaintiff's alleged disability or disabilities. (*See generally* Dkt. No. 5.)

As a result, I recommend that Plaintiff's ADA claims under Title II be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted. *See Hill v. LaClair*, 20-CV-0441, 2020 WL 2404771, at *8 (N.D.N.Y. May 11, 2020) (Hurd, J.) (dismissing ADA Title II claims "pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.") [5]

## 2. Title III of the ADA

**\*8** Title III of the ADA, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Doctors' offices and hospitals are considered "public accommodations" for the purposes of the ADA. 42 U.S.C. § 12181(7)(F) (defining "public accommodation" to include "a ... professional office of a health care provider [and] hospital").

Discrimination on the basis of disability in public accommodations involves, among other things, "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008) (citing 42 U.S.C. § 12182(b)(2)(A)(iii)); *see also Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii) ("The Act defines discrimination to include ... 'a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods [and] services ... to individuals with disabilities, unless ... such

modifications would fundamentally alter the nature of such goods [and] services.' ")).

The Amended Complaint does not allege facts plausibly suggesting that Defendants' actions constituted discrimination under Title III of the ADA or resulted in the discriminatory provision of services to Plaintiff. Although the Amended Complaint appears to allege that: (1) Defendant NCAComp denied Plaintiff's claims in an effort to save money, (2) Defendant Caulkins rendered inadequate medical care, (3) Defendant Bolger knew of Defendant Caulkins' improper medical care and inappropriately approved Plaintiff's prescription change, (4) Defendant Breite's independent medical report included inaccurate information, and (5) Defendant Barnes knew of Defendant Caulkins' improper medical care, it does not allege that Defendants took these actions for the purpose of discriminating against Plaintiff because of an alleged disability.

As a result, I recommend that Plaintiff's disability discrimination pursuant to Title III of the ADA be dismissed for failure to state a claim.

In the alternative, I recommend that Plaintiff's Title III claim be dismissed because Plaintiff seeks only monetary damages, and the sole available remedy under Title III of the ADA is injunctive relief. 42 U.S.C. § 12188(a)(1). "Monetary relief ... is not available to private individuals under Title III of the ADA." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004); *see also Krist.* 688 F.3d at 94 (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages"). "Since [P]laintiff seeks only monetary relief with respect to [his] ADA claims", the Amended Complaint "fails to state a plausible claim for relief under Title III of the ADA." *Sandler v. Benden*, 15-CV-1193, 2016 WL 9944017, at *16 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 2017 WL 5256812 (2d Cir. Nov. 13, 2017).

Here, Plaintiff has not requested injunctive relief and thus has failed to state a claim upon which relief may be granted. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 478 (1990) (*quoting Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). As a result, I recommend that, to the extent that Plaintiff intended to assert claims pursuant to Title III of the ADA, those claims be dismissed.

### 3. Title V of the ADA

**\*9** 42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." For an ADA retaliation claim, a plaintiff must plead the following: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse ... action; and (4) a causal connection between the protected activity and the adverse ... action." *Perez v. City of New York*, 843 F. App'x 406, 407 (2d Cir. 2021) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

"Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Shannon v. Credit Agricole Sec. (USA), Inc.*, 17-CV-0667, 2021 WL 1063183, at *9 (S.D.N.Y. Mar. 19, 2021) (quoting *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019)). "Protected activities include requests for reasonable accommodations." *Wells v. Achievement Network*, 18-CV-6588, 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) (citing *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

The Amended Complaint fails to allege facts plausibly suggesting that Plaintiff engaged in any protected activity. Instead, Plaintiff appears to allege that he filed a medical malpractice lawsuit against Defendant Caulkins in February 2019. (Dkt. No. 5 at 7-8.) This is insufficient to allege that Plaintiff "has opposed any act or practice made unlawful by" the ADA. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."); *Weinstein v. Miller*, 21-CV-4543, 2021 WL 3038370, at *7 (S.D.N.Y. July 15, 2021) (dismissing the plaintiff's complaint where she failed to allege facts "suggesting that she made [a] complaint of disability discrimination or that any Defendant discriminated or retaliated against her because of any such complaint."); *Smith v. City of New York*, 15-CV-4493, 2016 WL 4574924, at *10 (S.D.N.Y. Sept. 1, 2016) (finding that the plaintiff's "objection to being subjected to the disrobement policy does not constitute a protected activity because [the plaintiff]

cannot show an objectively reasonable basis for believing that the policy violates the ADA.").

Moreover, Plaintiff has not alleged any adverse actions that would be sufficient to state a claim of retaliation. "Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable [person] from making or supporting a charge of discrimination [or retaliation]." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). It is well established that complaints about medical treatment are generally insufficient to state a claim under the ADA. *See United States v. Univ. Hosp.*, 729 F.2d 144, 156-60 (2d Cir. 1984); *see also Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) ("[A] lawsuit under the Rehab[ilitation] Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions.") (citing cases). Here, the undersigned simply will not second-guess Defendant Caulkins' alleged decision to change Plaintiff's prescription quantity. *See Smith*, 2016 WL 4574924, at *11 (finding that the plaintiff failed to allege a claim of retaliation pursuant to the ADA based on allegations that the plaintiff disagreed with the decisions made by the defendant hospital about the plaintiff's care).

**\*10** As a result, I recommend that, to the extent Plaintiff intended to assert claims pursuant to Title V of the ADA, those claims be dismissed for failure to state a claim upon which relief may be granted.

In the alternative, I recommend that Plaintiff's claim be dismissed because Title V "does not provide for punitive or compensatory damages under the ADA." *Jones v. Volunteers of Am. Greater New York*, 20-CV-5581, 2022 WL 768681, at *6 n.8 (S.D.N.Y. Mar. 14, 2022) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269-70 (9th Cir. 2009) (holding "punitive and compensatory damages are not available for ADA retaliation claims."); *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961 (7th Cir. 2004), *cert. denied*, 542 U.S. 932 (2004) (holding that a plaintiff can only recover equitable relief for a retaliation claim under the ADA); *Shipman v. New York State Office of Persons with Developmental Disabilities*, 11-CV-2780, 2012 WL 897790, at *9 (S.D.N.Y. Mar. 12, 2012) (even in the retaliation context, "individuals cannot be held liable for money damages under the ADA in either their personal or official capacities."), *report and recommendation adopted* 2012 WL 3704837, at *3

(S.D.N.Y. Mar. 26, 2012) (money damages unavailable under the ADA)).

### C. State Law Claims

Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that, to the extent that Plaintiff has asserted any state law claims, the Court decline to exercise jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

In the alternative, I recommend that Plaintiff's state law claims be dismissed for failure to state a claim.

### 1. Intentional Infliction of Emotional Distress ("IIED")

New York has adopted the Restatement (Second) formulation of IIED. *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115 (N.Y. 1993). "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1) (1965). This broad definition, is "both a virtue and a vice." *Howell*, 81 N.Y.2d at 122. "The tort is as limitless as the human capacity for cruelty. The price for this flexibility in redressing utterly reprehensible behavior, however, is a tort that, by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful." *Id.* Therefore, IIED "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do

not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted).

**\*11** Under New York law, then, a claim for IIED requires a showing of: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell*, 81 N.Y.2d at 121.

Under New York law, although "[t]he standard of outrageous conduct is strict, rigorous and difficult to satisfy ..., that is not the case when there is a deliberate and malicious campaign of harassment or intimidation." *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (N.Y. App. Div. 1st Dep't 2018) (internal quotations omitted). To be sure, "it is manifestly neither practical nor desirable for the law to provide[ ] a remedy against any and all activity which an individual might find annoying." *Nader v. Gen. Motors Corp.*, 25 N.Y.2d 560, 569 (N.Y. 1970). At the same time, "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation," IIED provides a remedy. *Nader*, 25 N.Y.2d at 569. "In other words, under New York law, the proper inquiry is not merely whether each individual act might be outrageous. Rather, the question is whether those actions—under the totality of the circumstances—amounted to a deliberate and malicious campaign." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 123 (2d Cir. 2019).

The Amended Complaint fails to allege facts plausibly suggesting that Defendants engaged in extreme and outrageous conduct. As a result, in the alternative, I recommend that Plaintiff's claim for IIED be dismissed for failure to state a claim upon which relief may be granted.

## 2. Hippocratic Oath

"[V]iolating the Hippocratic oath does not state a claim upon which relief can be granted." *See Moore v. St. John's Hosp.*, 15-CV-4177, 2016 WL 1735769, at \*3 (C.D. Ill. Mar. 23, 2016); *accord Brady v. Halawa Corr. Facility Med. Unit Staff*, 05-CV0144, 2006 WL 2520607 (D. Hawaii Aug. 29, 2006); *see also Rose v. Borsos*, 17-CV-0204, 2018 WL 3967673, at \*12 (E.D. Tenn. Aug. 17, 2018) (dismissing the plaintiff's claim for violation of the Hippocratic Oath because

"there are no federal ... civil causes of action for violations of professional ethics.").

As a result, I recommend that Plaintiff's claim be dismissed for failure to state a claim. [6]

## 3. Exclusive Remedy

**\*12** "In New York, recovery for accidental injuries arising out of and in the course of employment, including injuries caused by an employer's negligence, is governed by the Workers' Compensation Law." *Arroyo v. WestLB Admin., Inc.*, 54 F. Supp.2d 224, 232 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) (citing *O'Brien v. King World Prods., Inc.*, 669 F. Supp. 639, 641 (S.D.N.Y. 1987); *Persaud v. S. Axelrod Co.*, 95-CV-7849, 1996 WL 11197, at \*5 (S.D.N.Y. Jan. 10, 1996)). To the extent that a plaintiff may recover for his injuries under the Workers' Compensation Law, this law becomes the plaintiff's exclusive remedy against his employer. *See* N.Y. Work. Comp. Law § 11. Exceptions to the exclusive remedy provision of the Workers' Compensation law are limited to circumstances in which the employer failed to secure workers' compensation insurance or intentionally injured the employee. *See Garibaldi v. Anixter, Inc.*, 492 F. Supp. 290, 292 (W.D.N.Y. 2007) (citing *Hill v. Delta Int'l Mach. Corp.*, 386 F. Supp. 2d 427, 432 (S.D.N.Y. 2005)).

Thus, the exclusive remedy provisions of New York State's Workers' Compensation Law, provide employers an affirmative defense in claims seeking damages for accidental injuries arising out of and in the course of employment. *See Hnatko v. Langston Corp.*, 10-CV-0991, 2012 WL 1574751, at \*2 (N.D.N.Y. May 3, 2012) (Mordue, J.) (granting the third-party defendant employer's motion to dismiss where it produced evidence that it had procured a policy of workers compensation and that the plaintiff received benefits pursuant to the policy as a result of the injuries he sustained); *Roche v. T.G. Realty, Inc.*, 266 A.D.2d 367, 367 (N.Y. App. Div. 2d Dep't 1999) (finding that the trial court erred in striking the defendant's affirmative defense based upon the exclusive remedy provisions of the Workers' Compensation Law). Therefore, the exclusive remedy provisions do not provide a private cause of action for Plaintiff to seek damages.

As a result, I recommend that, to the extent Plaintiff sought to assert a claim pursuant to the exclusive remedy provisions, such claim be dismissed for failure to state a claim upon which relief may be granted.

### 4. Workers' Compensation Law

Here, Plaintiff alleges that Defendant NCAComp violated New York Workers' Compensation Law by denying him a gym membership. (Dkt. No. 5 at 13.) However, Plaintiff has already litigated the issue of his gym membership in state court. (Dkt. No. 5 at 8); *Brennan v. Vil. of Johnson City*, 192 A.D.3d 1287 (N.Y. App. Div. 3d Dep't 2021). The New York Appellate Division Third Department held that Plaintiff "successfully obtained authorization for a one-year gym membership, reimbursement for monies already paid for that membership and the right to reimbursement for future amounts paid for that gym membership." *Brennan*, 192 A.D. 3d at 1289. Therefore, the Appellate Division found that it lacked jurisdiction to entertain Plaintiff's appeal because Plaintiff obtained the relief that he sought and was thus, not "aggrieved by the Board's September 2019 decision such that he may invoke this Court's jurisdiction." *Id.* at 1288.

As a result, I recommend that, to the extent that Plaintiff seeks review of the New York State Workers' Compensation Board's decision regarding his gym membership, such claim be dismissed because he has obtained the relief he sought.[7]

### V. OPPORTUNITY TO AMEND

**\*13** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also* *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is

not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

In this case, it is not clear whether better pleading would permit Plaintiff to assert cognizable causes of action pursuant to 42 U.S.C. § 1983, the ADA, and New York State law for intentional infliction of emotional distress and violation of the Workers' Compensation provisions. Out of deference to Plaintiff's *pro se* status, I recommend that Plaintiff be granted leave to amend the Complaint with respect to these claims.

However, with respect to Plaintiff's claims for violation of the Hippocratic oath and the exclusive remedy, I recommend that those causes of action be dismissed without leave to replead because the problems with those claims are substantive and a better pleading will not cure the deficiencies.

If Plaintiff chooses to avail himself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which he relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). In addition, the amended complaint must include allegations reflecting how the individual named as Defendant is involved in the allegedly unlawful activity. Finally, Plaintiff is informed that any such amended complaint will replace the existing Amended Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. See *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 5) to the extent that it asserts claims pursuant to 42 U.S.C. § 1983, the ADA, and New York State law for intentional infliction of emotional distress and violation of the Workers' Compensation provisions, for failure to state a claim

upon which relief may be granted pursuant to 🚩 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**\*14 RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 5) to the extent that it asserts claims pursuant to the Hippocratic Oath and New York State Workers' Compensation Law exclusive remedy, for failure to state a claim upon which relief may be granted pursuant to 🚩 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

**NOTICE:** Pursuant to 🚩 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 🚩 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; 🚩 *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing 🚩 *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2022 WL 4290660

# Footnotes

1    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 🚩 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

2    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

3    On occasion, these criteria have been stated differently but the impact remains the same:

     The conduct of private actors can be attributed to the State for [🚩 § 1983] purposes if (1) the State compelled the conduct, (2) there is a sufficiently close nexus between the State and the private conduct, or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State.

     🚩 *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (citing 🚩 *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)).

4    Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because he has neither alleged that he was employed by Defendants, nor alleged that he exhausted administrative remedies by filing a charge with the Equal Employment Opportunity Commission before pursuing litigation in federal court. 🚩 42 U.S.C. § 12117; *see* 🚩 *Mary Jo C. v. New York State Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (quoting 🚩 *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, n.1 (2001)) (" 'Title I of the ADA expressly deals with th[e] subject' of employment discrimination."). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's

claims because Title IV prohibits disability discrimination in telecommunications. *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018).

5    In the alternative, to the extent that Plaintiff attempts to assert ADA Title II claims against Defendants Bolger, Caulkins, Breite, and Barnes in their individual capacities, I recommend that those claims be dismissed because "individuals cannot be held liable under the ADA." *Netti v. Ayers*, 17-CV-0976, 2017 WL 7542494, at *18 (N.D.N.Y. Oct. 5, 2017) (Baxter, M.J.) (citing *Baross v. Greenlawn*, 16-CV-4805, 2017 WL 2124424, at *4 (E.D.N.Y. May 15, 2017)), *report and recommendation adopted by* 2018 WL 813509 (N.D.N.Y. Feb. 9, 2018) (Suddaby, C.J.); *accord Rosenfield v. New York State Div. of Veterans' Affairs*, 18-CV-1299, 2019 WL 4621962, at *10 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.); *see* 🚩 *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law*, 96-CV-6935, 🔺1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA.").

6    Even if the Court construed Plaintiff's violation of the Hippocratic Oath claim as a medical malpractice claim, a medical malpractice claim is pursuant to New York law. *See Buchanan v. Hesse*, 21-CV-0649, 2022 WL 829163, at *1 (Mar. 21, 2022) (concluding that a medical malpractice claim is governed by New York law); *Lindenbaum v. Northwell Health, Inc.*, 21-CV-1525, 2022 WL 541644, at *7 (E.D.N.Y. Feb. 23, 2022) (opting to exercise supplemental jurisdiction over the plaintiff's "New York State law claims for medical malpractice" because the plaintiff's "🚩 Section 1983 claim will proceed."). As set forth above, I recommend that because Plaintiff's federal claims are subject to dismissal, the Court decline to exercise supplemental jurisdiction over any state law claims. The Court also notes that Plaintiff appears to allege that he has brought an action sounding in medical malpractice claim against Defendant Caulkins in New York State Court. As a result, any medical malpractice claim here may be duplicative.

7    In addition, Plaintiff's claim may be subject to dismissal based on the *Rooker-Feldman* doctrine, which directs that except for the Supreme Court, federal courts are not authorized to exercise appellate jurisdiction over state-court judgments. 🚩 *McKithen v. Brown*, 481 F.3d 89, 96 (2d Cir. 2007).

8    *See also* 🚩 *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in 🚩 *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

9    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with 🚩 *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

10    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 3097843

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Kevin Joseph Gabriel BRENNAN, Plaintiff,

v.

NCACOMP, INC.; Joleen M. Bolger (Snowdon),
Manager of NCAComp, Inc.; Dr. Anne M. Caulkins,
Site Supervisor of Our Lady of Lourdes Mem'l
Hosp. and Wellness Ctr.; Dr. Ira Breite, Indep. Med.
Examiner; and Rene Barnes (Picirrili), Manager of
New York State Workers Comp. Bd., Defendants.

3:22-CV-0127 (GTS/ML)
|
Signed August 4, 2022

**Attorneys and Law Firms**

KEVIN JOSEPH GABRIEL BRENNAN, Plaintiff, Pro Se,
319 Exchange Avenue, Townhouse #20, Endicott, New York
13760.

## **DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kevin Joseph Gabriel Brennan ("Plaintiff")
against NCAComp, Inc., and the four above-captioned
individuals (together "Defendants"), are (1) United States
Magistrate Judge Miroslav Lovric's Report-Recommendation
recommending that certain of Plaintiff's claims be dismissed
with prejudice at this time (without prior leave to amend) and
that the remainder of Plaintiff's claims be dismissed with prior
leave to amend, and (2) Plaintiff's Objection to the Report-
Recommendation. (Dkt. Nos. 6, 8.) For the reasons set forth
below, the Report-Recommendation is accepted and adopted
in its entirety.

## I. RELEVANT BACKGROUND

### A. Magistrate Judge Lovric's Report-
### Recommendation

Generally, in his Report-Recommendation, Magistrate Judge
Lovric made the following six findings of fact and
conclusions of law: (1) to the extent Plaintiff's Amended

Complaint asserts any claims under 🚩 42 U.S.C. § 1983,
those claims should be *sua sponte* dismissed, with prior leave
to amend, for failure to state a claim upon which relief
can be granted, because (a) the Amended Complaint fails
to allege facts plausibly suggesting that any Defendant was
a state actor, and (b) in the alternative, any claims asserted
under the Fourteenth Amendment's Equal Protection Clause
are unsupported by factual allegations plausibly suggesting
that Plaintiff was intentionally treated differently from other
similarly situated individuals without any rational basis; (2)
to the extent Plaintiff's Amended Complaint asserts any
claims under the Americans with Disabilities Act ("ADA"),
those claims should be *sua sponte* dismissed, with prior
leave to amend, for failure to state a claim upon which
relief can be granted, because (a) the Amended Complaint
fails to allege facts plausibly suggesting that any Defendant
was a public entity for purposes of Title II of the ADA,
that Plaintiff was unable to access programs due to his
disability, how his disability prevented him from accessing
those programs, what accommodations he sought and was
denied by that Defendant, or that any such Title II violation
was motivated by either discriminatory animus or ill will due
to disability, (b) the Amended Complaint fails to allege facts
plausibly suggesting that Defendants' actions constituted
discrimination, or resulted in the discriminatory provision
of services to Plaintiff, under Title III of the ADA, and
the Amended Complaint fails to request the only available
relief under Title III, namely, injunctive relief, and (c) the
Amended Complaint fails to allege facts plausibly suggesting
that Plaintiff engaged in any protected activity, or experienced
any adverse action, under Title V of the ADA, and (again)
the Amended Complaint fails to request the only available
relief under Title V, namely, injunctive relief; (3) to the
extent Plaintiff's Amended Complaint asserts a claim for
the intentional infliction of emotional distress under New
York State law, that claim should be *sua sponte* dismissed,
with prior leave to amend, for failure to state a claim upon
which relief can be granted, because it does not allege facts
plausibly suggesting that Defendants' conduct was "extreme"
or "outrageous"; and (4) to the extent Plaintiff's Amended
Complaint asserts any claims under the Hippocratic Oath,
those claims should be *sua sponte* dismissed at this time,
without prior leave to amend, for failure to state a claim upon
which relief can be granted, because violating the Hippocratic
Oath does not give rise to a cause of action; (5) to the
extent Plaintiff's Amended Complaint asserts any claims for
accidental injuries arising out of and in the course of his
employment, those claims should be *sua sponte* dismissed
at this time, without prior leave to amend, for failure to

state a claim upon which relief can be granted, because the exclusive-remedy provision of the New York Workers' Compensation Law deprives Plaintiff of a private cause of action for such accidental injuries; and (6) to the extent that Plaintiff's Amended Complaint asserts a claim for the denial of a prescribed gym membership under the New York Workers' Compensation Law, those claims should be *sua sponte* dismissed, with prior leave to amend, for failure to state a claim upon which relief can be granted, because he has already obtained the relief sought in New York State court. (Dkt. No. 6, Part IV.)

### B. Plaintiff's Objection to the Report-Recommendation

**\*2** Generally, in his Objection, Plaintiff asserts the following three arguments: (1) Plaintiff's retaliation claim against Defendant Caulkins should not be dismissed, because he has alleged facts plausibly suggesting that (a) he engaged in protected activity under the ADA by somehow causing the termination of her "co supervisor," and (b) he experienced adverse action when Defendant Caulkins prescribed a stronger non-steroidal anti-inflammatory drug to treat his ulcerative colitis condition than necessary (and failed to complete the Worker's Compensation form required for Plaintiff's disability application); (2) Plaintiff claims under 42 U.S.C. § 1983 should not be dismissed, because he has alleged facts plausibly suggesting that Independent Medical Examiners who are employed by New York State (like Defendant Breite) are state actors; and (3) Plaintiff's intentional-infliction-of-emotional-distress claim against Defendant Barnes should not be dismissed, because he has alleged facts plausibly suggesting that Defendant Barnes' conduct was extreme and outrageous. (*See generally* Dkt. No. 8.)

### II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Lovric's thorough Report-

Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Lovric employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court would add only that Plaintiff's Objections are not persuasive, because they are unsupported by either case law or the factual allegations of his Amended Complaint.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 6) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the following claims in Plaintiff's Amended Complaint (Dkt. No. 5) are *sua sponte* **DISMISSED with prejudice** (and without prior leave to amend):

(1) Plaintiff's claim pursuant to the Hippocratic Oath; and

(2) Plaintiff's claims for accidental injuries arising out of and in the course of his employment under the New York Workers' Compensation Law; and it is further

**ORDERED** that the following claims in Plaintiff's Amended Complaint (Dkt. No. 5) **shall be DISMISSED with prejudice** and without further Order of the Court if, **within thirty (30) days** of the issuance of this Decision and Order, Plaintiff does not file a Second Amended Complaint curing the above-described defects in those claims:

(1) Plaintiff's claims under 42 U.S.C. § 1983;

(2) Plaintiff's claims under the Americans with Disabilities Act;

(3) Plaintiff's claim for intentional infliction of emotional distress under New York State common law; and

(4) Plaintiff's claim for the denial of a prescribed gym membership under the New York Workers' Compensation Law; and it is further

**ORDERED** that, should Plaintiff file a Second Amended Complaint in this action, it shall be automatically referred to Magistrate Judge Lovric for review of its pleading sufficiency pursuant to 28 U.S.C. § 1915(e).

**All Citations**

Slip Copy, 2022 WL 3097843

# Footnotes

1    *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf.*

⚑ *U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe ⚑ § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    *See* ⚑ *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); ⚠ *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4    *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 997378
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Deborah Ann SCHERMAN, Plaintiff,

v.

NEW YORK STATE BANKING
DEPARTMENT, Defendant.

No. 09 Civ. 2476(DAB)(AJP).
|
March 19, 2010.

REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable Deborah A. Batts, United States District Judge:**
Pro se plaintiff Deborah Scherman brings this employment discrimination action pursuant to the Americans with Disabilities Act ("ADA") against the her employer, the New York State Banking Department. (Dkt. No. 2: Compl. at 1–3.)

The Banking Department has moved to dismiss the complaint pursuant to ⚑Fed.R.Civ.P. 12(b)(1) and ⚑12(b)(6) on the grounds that: (1) Scherman's claim for money damages pursuant to ADA Title I is barred by the Eleventh Amendment because the Banking Department is "an agency of the State of New York"; and (2) Scherman fails to state a valid claim pursuant to ADA Title II because "Title I is the exclusive federal remedy for claims of disability discrimination in employment under the ADA." (Dkt. No. 6: Banking Dep't Notice of Motion; Dkt. No. 8: Banking Dep't Br. at 4–5; Dkt. No. 11: Banking Dep't Reply Br. at 1–3.)

For the reasons set forth below, the Banking Department's motion to dismiss should be *GRANTED.*

FACTS

The facts alleged in Scherman's complaint are assumed to be true for purposes of this motion, and will be set forth herein without use of the preamble "Scherman alleges."

Scherman has been employed by the State of New York since 1979 and began working for the State Banking Department in 1989. (Dkt. No. 2: Compl. at 7; *see also* Dkt. No. 10: Scherman Br. at 1.) During the period in issue, 2003–2006, Scherman worked at the Banking Department's helpdesk. (Compl. at 7.)

***Scherman's Carpal Tunnel Syndrome, Surgeries and Grievances***
Scherman has experienced carpal tunnel syndrome for "at least the past 9 years." (Dkt. No. 10: Scherman Br. at 1–2; *see* Dkt. No. 2: Compl. at 7–8.) Scherman underwent carpal tunnel release surgery in both hands in 2003 and again in 2004. (Compl. at 8.) Additionally, Scherman underwent shoulder adhesive repair surgery in March 2006. (Compl. at 3, 7.) After each surgery, Scherman was assigned tasks which required "heavy" manual labor despite her condition. (Compl. at 7.)

Following carpal tunnel surgery in 2003, Scherman returned to work at the Banking Department's helpdesk and received a laptop exchange assignment which "cause[d] an exhausting strain" on Scherman's hands and wrists. (Compl. at 8.) "[T]he extreme usage from the laptop assignment while still in the healing ph [ ]ase necessitat[ed] another [carpal tunnel] release surgery," in October and December 2004. (*Id.*) Upon returning to work, Scherman provided a doctor's note stating that she should not lift "more than 5l/bs." (*Id.*)

In July 2005, Scherman met with Diane Rulon of the Banking Department. (Compl. at 8.) Scherman discussed the "possibility of doing onsite training" of Banking Department staff as well as the "possibility of [Scherman] being promoted" as a result of her recently passing the civil service exam. (*Id.*) Rulon informed Scherman that her score was "too low on the list" and because of problems in the IT department, the chances of her getting a promotion were "like none." (*Id.*) However, during this time frame, temporary employees were hired and promoted over Scherman. (*Id.*)

**\*2** In March 2006, Scherman underwent shoulder repair surgery. (Compl. at 7.) Upon returning to work, Scherman again supplied a doctor's note that she should not lift more than five pounds. (Compl. at 7–8.) On April 12, 2006, the Banking Department notified Scherman that she now also would be responsible for "all printer related issues," including "maintaining, tracking, and ordering" printer parts and toner cartridges. (Compl. at 7.) Despite the doctor's note, Scherman

was expected to handle toner cartridges weighing "close to 20*lbs.*" (*Id.*) [1]

### *Scherman's Claims and the Banking Department's Motion to Dismiss*

Scherman initially brought this action pursuant to ADA Title I. (Dkt. No. 2: Compl. at 1.) In response to the Banking Department's motion to dismiss, Scherman restyled her action as pursuant to ADA Title II. (Dkt. No. 10: Scherman Br. at 2.) [2] Scherman's complaint requests unspecified compensatory damages and attorney's fees for the physical, mental, and emotional pain and suffering caused by the Banking Department's actions. (Compl. at 4.)

The Banking Department has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) (Dkt. No. 6: Banking Dep't Notice of Motion to Dismiss at 1; Dkt. No. 11: Banking Dep't Reply Br. at 1), on the grounds that: (1) the Court lacks subject matter jurisdiction over Scherman's claims under Title I of the ADA because the Banking Department, "as an agency of the State of New York, is shielded by state sovereignty under the Eleventh Amendment of the United States Constitution" (Dkt. No. 8: Banking Dep't Br. at 4); and (2) Scherman fails to state a valid claim under Title II of the ADA because "Title I is the exclusive federal remedy for claims of disability discrimination in employment under the ADA" (Banking Dep't Reply Br. at 2–3).

### *ANALYSIS*

### I. *THE STANDARDS GOVERNING A MOTION TO DISMISS*

#### A. *The Twombly–Iqbal "Plausibility" Standard*

In two decisions in the last few years, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* the pleading standard Rule 8 announces does not require "detailed factual allegations," but it *demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation*. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

> To survive a motion to dismiss, *a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

> **\*3** Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.* Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second, only a complaint that states a plausible claim for relief survives a motion to dismiss*. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

> *Ashcroft v. Iqbal,* —— U.S. ——, —— – ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citations omitted & emphasis added) (quoting *Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 1965–66, 1974, 167 L.Ed.2d 929 (2007) (retiring the *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")). [3]

### B. *Consideration Of Documents Attached To Or Referred To In The Complaint*

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l, Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin,* 922 F.2d 152, 154–55 (2d Cir.1991)). [4] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference...."). [5]

**\*4** "However, before materials outside the record may become the basis for a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." *Faulkner v. Beer,* 463 F.3d at 134 (citations omitted).

In this case, the Court need not refer to any of the documents attached to Scherman's complaint because the issue is one of law. In any event, the documents do not help Scherman in connection with this motion.

\* \* \* \*

The Court's role in deciding a motion to dismiss " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar.15, 1994) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)); *accord, e.g., Watson v. McGinnis,* 964 F.Supp. 127, 130–31 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

Even after *Twombly* and *Iqbal,* when reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel and must construe a pro se complaint liberally. *See, e.g., Harris v. Mills,* 22 A.D. 379, 572 F.3d 66, 72 (2d Cir.2009); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Watson v. McGinnis,* 964 F.Supp. at 131; *Saunders v. Coughlin,* 1994 WL 88108 at *2 (citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). However, "[d]ismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief...." 2 *Moore's Federal Practice* § 12.34[4] [a], at 12–72.7 (2005). Thus, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.,* § 12.34[1] [b], at 12–61; *see also, e.g., Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D.N.Y.2002) (action dismissed because pro se plaintiff "failed to allege facts tending to establish" that defendants violated his constitutional rights).

## II. *SCHERMAN'S ADA TITLE I CLAIM SHOULD BE DISMISSED AS BARRED BY THE ELEVENTH AMENDMENT*

The Banking Department asserts that Scherman's employment discrimination claims pursuant to Title I of the ADA are "barred by New York State's Eleventh Amendment sovereign immunity." (Dkt. No. 8: Banking Dep't Br. at 4–5.)

### A. *Eleventh Amendment Immunity Generally*

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or

Subjects of any Foreign State." U.S. Const. Amend. XI. As the Second Circuit has explained:

> The Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens. Thus, *it is clear that, with few exceptions, federal courts are barred from entertaining suits by a private party against a state in its own name.*

**\*5** Dwyer v. Regan, 777 F.2d 825, 835 (2d Cir.1985) (emphasis added); *accord, e.g., Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 446, 124 S.Ct. 1905, 1909, 158 L.Ed.2d 764 (2004); *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001); *Gollomp v. Spitzer,* 568 F.3d 355, 365–66 (2d Cir.2009); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006); *Iwachiw v. Port Auth. of N.Y. & N.J.,* 151 Fed. Appx. 93, 94 (2d Cir.2005); *Clissuras v. City Univ. of N .Y.,* 359 F.3d 79, 81 (2d Cir.), *cert. denied,*543 U.S. 987, 125 S.Ct. 498, 160 L.Ed.2d 372 (2004); *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 (2d Cir.1990) (quoting *Dwyer* ), *cert. denied,*501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). [6]

The result is no different when suits are brought against state agencies as opposed to the State in its own name. "For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity."*Fields v. Walthers,* No. 94–CV–1659, 1997 WL 204308 at *2 (N.D.N.Y. Apr. 5, 1997) (Pooler, D.J.); *accord, e.g., Gollomp v. Spitzer,* 568 F.3d at 366;*Gorton v. Gettel,* 554 F.3d 60, 62 (2d Cir.2009); *Deposit Ins. Agency v. Superintendent of Banks of N.Y.,* 482 F.3d 612, 617 (2d Cir.2007); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d at 236; *In re Charter Oak Assocs.,* 361 F.3d

760, 765 (2d Cir.), *cert. denied,*543 U.S. 955, 125 S.Ct. 408, 160 L.Ed.2d 316 (2004); *Clissuras v. City Univ. of N.Y.,* 359 F.3d at 81;*Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999); *Harris v. N.Y.S. Educ. Dep't,* 419 F.Supp.2d 530, 533 (S.D.N.Y. Mar.6, 2006). [7]

The State and its agencies are protected by Eleventh Amendment immunity "whether the relief sought is legal or equitable." *Papasan v. Allain,* 478 U.S. at 276, 106 S.Ct. at 2939;*accord, e.g., Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 100, 104 S.Ct. at 908;*Missouri v. Fiske,* 290 U.S. 18, 27, 54 S.Ct. 18, 21, 78 L.Ed. 145 (1933) ("Expressly applying to suits in equity as well as at law, the [Eleventh A]mendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a state."). [8]

The Second Circuit has developed a two factor test to determine whether an agency is an arm of the state: "(1) 'the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity'; and (2) 'the degree of supervision exercised by the state over the defendant entity.' " *Clissuras v. City Univ. of N.Y.,* 359 F.3d at 82 (quoting *Pikulin v. City Univ. of N.Y.,* 176 F.3d 598, 600 (2d Cir.1999)). [9] The Banking Department satisfies both factors. First, the Banking Department is included in the State's Executive Budget, and the State Comptroller pays the Banking Department's expenses out of State funds. (*See* State of New York Banking Department —History, at http:// www.banking.state.ny.us/history.htm.) Second, the Superintendent and the Banking Department board members are appointed by the Governor with the advice and consent of the State Senate. N.Y. Banking Law §§ 12–13. Scherman does not contest that the Banking Department qualifies as an "arm of the state" (*see* Dkt. No. 10: Scherman Br.), and prior cases have held the Banking Department to be an arm of the state for Eleventh Amendment purposes. *E.g., Deposit Ins. Agency v. Superintendent of Banks of N.Y.,* 482 F.3d at 617 ("[W]e assume, and no party disputes, ... that the Superintendent is an arm of the State of New York and thus entitled to whatever immunity the Eleventh Amendment may bestow."); *Bechtel v. N.Y. S.*

*Banking Dep't,* No. 92CV 182, 1997 WL 667784 at *2 (W.D.N.Y. Oct. 14, 1997).

**\*6** Accordingly, absent an exception to Eleventh Amendment immunity, the Banking Department is immune from Scherman's suit for damages.

**B. *No Exception to Eleventh Amendment Immunity Exists Here***

"The Eleventh Amendment bar to suit is not absolute." 🚩 *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990). As the Supreme Court has explained:

> While [Eleventh Amendment] immunity from suit is not absolute, we have recognized only two circumstances in which an individual may sue a State. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. Second, a State may waive its sovereign immunity by consenting to suit.

🚩 *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd. .,* 527 U.S. 666, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999) (citations omitted); *see, e.g.,* 🚩 *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) ("Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority,' " including § 5 of the 14th Amendment.); 🚩 *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. at 304, 110 S.Ct. at 1872; *In re Charter Oaks Assocs.,* 361 F.3d 760, 765 (2d Cir.2004). [10]

Neither exception to Eleventh Amendment immunity applies in this case. First, the Supreme Court has held that Congress's enactment of Title I of the ADA did not validly abrogate state sovereign immunity. 🚩 *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. at 3 68, 121 S.Ct. at 964–65 (2001); *accord, e.g., Darcy v. Lippman,* No. 08–2293, 2009 WL 3416168 at *1 (2d Cir. Oct.22, 2009) ("Abrogation of state sovereign immunity is [not] accomplished ... by ADA Title I ...."); *Nicolae v. Office of Vocational & Educ. Servs. for Individuals with Disabilities,* 257 Fed. Appx. 455, 456–67 (2d Cir.2007); *Palma v. Workers Comp. Bd. of the State of N.Y.,* 151 Fed. Appx. 20, 22 (2d Cir.2005), *cert. denied,* 549 U.S. 814, 127 S.Ct. 347, 166 L.Ed.2d 24 (2006); *Perry v. State Ins. Fund,* 83 Fed. Appx. 351, 353 (2d Cir.2003) ("[T]he Fund is a 'state agency' entitled to sovereign immunity and therefore that [plaintiff's] claims asserted under Title I of the ADA cannot proceed.") (citations omitted); *Melrose v. N.Y.S. Dep't of Health Office of Prof'l Med. Conduct,* 05 Civ. 8778, 2009 WL 211029 at *5 (S.D.N.Y. Jan.26, 2009) (State agency "is entitled to Eleventh Amendment immunity for the purposes of Plaintiff's [ADA] claim against it for money damages ."). Second, the State (and the Banking Department) did not waive its Eleventh Amendment immunity. [11] (*See* Dkt. No. 8: Banking Dep't Br. at 5.)

Accordingly, Scherman's ADA Title I claim should be dismissed as barred by the Eleventh Amendment.

**III. *SCHERMAN'S TITLE II ADA CLAIM SHOULD BE DISMISSED BECAUSE ADA TITLE I DEALS WITH EMPLOYMENT DISCRIMINATION***

**\*7** In opposing the Banking Department's motion to dismiss, Scherman (assisted by counsel) changed her reliance to ADA Title II, rather than Title I. (Dkt. No. 10: Scherman Br. at 2–3.) [12] The Banking Department's reply moved pursuant to 🚩 Rule 12(b)(6) to dismiss Scherman's employment discrimination claims under ADA Title II on the grounds that "Title I is the exclusive federal remedy for claims of disability discrimination in employment under the ADA." (Dkt. No. 11: Banking Dep't Reply Br. at 2–3.) [13]

The Supreme Court has yet to decide whether Congress validly abrogated state sovereign immunity by its enactment of Title II. *See* 🚩 *Bd. of Trs. of Univ. of Ala. v. Garrett* 531 U.S. 356, 360, 121 S.Ct. 955, 148 L.Ed.2d 866 n .1, 🚩 531 U.S. 356, 121 S.Ct. 955, 960 n. 1, 148 L.Ed.2d 866 (2001) ("We are not disposed to decide the constitutional issue whether [ADA] Title II, which has somewhat different remedial provisions from [ADA] Title I, is appropriate

legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question.").

The Supreme Court also has not addressed whether a claim for employment discrimination may be brought by a plaintiff under Title II of the ADA, [14] and the Courts of Appeals that have addressed the issue are divided.

*Compare, e.g.,* *Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1172–84 (9th Cir.1999) (Title II does not apply to employment discrimination), *cert. denied,* 531 U.S. 1189, 121 S.Ct. 1186, 149 L.Ed.2d 103 (2001); *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir.1997) ("[T]he statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA." Refuses to allow employment discrimination claim under ADA Title III.), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *Decker v. Univ. of Houston,* 970 F.Supp. 575, 577–80 (S.D.Tex.1997) (Title II is inapplicable to employment discrimination claims; "[a]ny other reading simply ignores the ADA's statutory scheme."), *aff'd* 159 F.3d 1355 (5th Cir.1998); with *Bledsoe v. Palm Beach County Flood & Water Conservation Dist.,* 133 F.3d 816, 825 (11th Cir.) (Title II permits an employment discrimination claim), *cert. denied,* 525 U.S. 826, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998). [15]

The Second Circuit has yet to decide whether Title II of the ADA applies to employment discrimination. *See e.g., Perry v. State Ins. Fund,* 83 Fed. Appx. 351, 354 n. 1 (2d Cir.2003) ("There remain questions regarding ... whether Title II ADA violations can be based on employment discrimination.... We need not, however, reach these questions at this time."); *Mullen v. Rieckhoff,* No. 98–7019, 189 F.3d 461 (table), 1999 WL 568040 at *1 (2d Cir. July 18, 1999) (noting "a split of authority over whether an employment discrimination plaintiff may avoid the ADA's requirement of an EEOC charge by filing under Title II of that Act," but not reaching the issue). District court decisions in this Circuit are split on this issue, but the better reasoned decisions have held that ADA Title I is the exclusive remedy for employment discrimination claims, and thus employment claims under Title II are precluded. *See, e.g., Chiesa v. N.Y.S. Dep't of Labor,* 638 F.Supp.2d 316, 321 (N.D.N.Y.2009); *Melrose v. N.Y.S. Dep't of Health Office of Prof'l Med. Conduct,* 05 Civ. 8778, 2009 WL 211029 at *9 (S.D.N.Y. Jan.26, 2009); *Fleming v. State Univ. of* N.Y., 502 F.Supp.2d 324, 333

(E.D.N.Y.2007); *Ayantola v. Cmty. Technical Colls. of the State of Conn. Bd. of Trs.,* No. 05 CV 957, 2007 WL 963178 at *2 (D.Conn. Mar. 30, 2007); *Cormier v. City of Meriden,* No. 03 CV 1819, 2004 WL 2377079 at *8 (D.Conn. Sept. 30, 2004); *Sworn v. W. N.Y. Children's Psychiatric Ctr.,* 269 F.Supp.2d 152, 157–58 (W.D.N.Y.2003); *Filush v. Town of Weston,* 266 F.Supp.2d 322, 326–31 (D.Conn.2003); *Syken v. State of N.Y., Executive Dep't, Div. of Hous. & Cmty. Renewal,* 02 Civ. 4673, 2003 WL 1787250 at *11 (S.D.N.Y. Apr.2, 2003). [16]

**\*8** Courts holding that ADA Title II permits employment discrimination claims generally have deferred to 28 C.F.R. § 35.140, a Department of Justice regulation interpreting Title II as prohibiting employment discrimination by public entities. [17] *E .g., Bledsoe v. Palm Beach County Soil & Water Conservation Dist.* 133 F.3d at 823 ("The DOJ regulations provide clearly that Title II encompasses employment actions against public entities.... [W]e cannot ignore the DOJ's reasonable construction of statutory language."); *Smith v. State Univ. of N.Y.,* 2003 WL 1937208 at *8, *Worthington v. City of New Haven,* 1999 WL 958627 at *7.

When faced with an administrative agency's interpretation of a statute, the Supreme Court has provided a two-step process for reviewing the agency's construction of the statute. *See, e.g., Chevron U.S.A. Inc., v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The first step is to determine whether Congressional intent is clear. *Id.* at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is then end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If Congressional intent is ambiguous, the second step is to determine if the agency's regulations are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

The structure of the ADA demonstrates Congress' clear intent for Title II not to apply to employment claims. First, ADA Title I, titled "Employment" by Congress, contains detailed employment provisions. *See* 42 U.S.C. § 12112. ADA Title II, titled "Public Services" by Congress, lacks any employment provisions. *See* 42 U.S.C. § 12132. Under

Title I, a " 'qualified individual' " with a disability "means an individual who ... can perform the essential functions of the employment position...." 42 U.S.C. § 12111(8). Title II, however, defines the same phrase as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Thus, while Title I defines a "qualified individual" with a disability in terms of employment, Title II defines it on the basis of a person's ability to receive services or participate in programs or activities. *See, e.g.,* Zimmerman v. Oregon Dep't of Justice, 170 F.3d at 1176. Congress' omission of any mention of employment in Title II is presumed to be an intentional exclusion. While the Supreme Court has not decided this issue, it certainly has indicated its views that Title I, and not Title II also, deals with ADA employment discrimination by governmental entities. *See* Bd. of Trs. of Univ. of Ala. v. Garrett 531 U.S. at 360 n. 1, 121 S.Ct. at 960 n. 1 (noting that Title I of the ADA "expressly deals" with claims of employment discrimination.); *see also, e.g.,* Zimmerman v. Oregon Dep't of Justice, 170 F.3d at 1172;Melrose v. N.Y.S. Dep't of Health Office of Prof'l Med. Conduct, 2009 WL 211029 at *8 (Supreme Court "seemed to indicate that a plaintiff" may not bring an employment discrimination claim under ADA Title II.); Fleming v. State Univ. of N.Y., 502 F.Supp.2d at 333 ("The ADA includes a title devoted exclusively to employment; it is Title I.... Title II, meanwhile, says nothing about ... employment practice[s]."); Cormier v. City of Meriden, 2004 WL 2377079 at *5 ("The headings of the ADA clearly distinguish between the titles governing disability discrimination in employment and disability discrimination in public services."); Syken v. State of N.Y. Executive Dep't, Div. of Hous. & Cmty. Renewal, 2003 WL 1787250 at *8;Filush v. Town of Weston, 266 F.Supp.2d at 329–30.

**\*9** Second, if employment discrimination claims were allowed to be brought under ADA Title II, Title I would become redundant. Under Title I, an "employer" is "a person engaged in an industry affecting commerce who has 15 or more employees." 42 U.S.C. § 12111(5). Holding Title II to apply to employment discrimination claims would render the particularity with which Congress defined an employer to be superfluous. *See, e. g.,* Chiesa v. N.Y.S. Dep't of Labor, 638 F.Supp.2d at 321 ("Given the specific steps taken by Congress to tailor Title I for employers, Title II is too generic for use against employers and is not intended for such use."); Syken v. State of N.Y., Executive Dep't, Div. of Hous. & Cmty. Renewal, 2003 WL 1787250 at *9 ("[A]llowing employment discrimination claims under Title II would make Title I redundant as applied to public employees."); Filush v. Town of Weston, 266 F.Supp.2d at 330.

Third, Title I incorporates the remedies and procedures of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 12117(a), while Title II incorporates provisions from the Rehabilitation Act, *see* 42 U.S.C. § 12133. *See, e.g.,* Syken v. State of N.Y., Executive Dep't, Div. of Hous. & Cmty. Renewal, 2003 WL 1787250 at *9 & n. 11. As Courts in this District have noted: "[u]nlike Title I, Title II does not require a plaintiff to exhaust his administrative remedies prior to filing suit. Therefore, allowing a plaintiff to bring an employment discrimination suit under Title II allows him to bypass the administrative exhaustion requirement of Title I." Syken v. State of N.Y., Executive Dep't, Div. of Hous. & Cmty. Renewal, 2003 WL 1787250 at *9 (citations & fn. omitted); *accord, e.g.,* Zimmerman v. Oregon Dep't of Justice, 170 F.3d at 1177–78;Melrose v. N.Y.S. Dep't of Health Office of Prof'l Med. Conduct, 2009 WL 211029 at *9;Cormier v. City of Meriden, 2004 WL 2377079 at *6–7;Sworn v. W.N.Y. Children's Psychiatric Ctr., 269 F.Supp.2d at 157 & n. 4;Filush v. Town of Weston, 266 F.Supp.2d at 330. Indeed, to read Title II to allow employment discrimination claims would violate the " 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.' " Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985).

Fourth, Congress delegated regulatory authority to promulgate regulations for ADA Title I and Title II to different agencies. Congress gave the EEOC authority to issue regulations to carry out Title I. *See* 42 U.S.C. § 12116. Title II, on the other hand, gave the Attorney General authority to promulgate regulations. *See* 42 U.S.C. § 12134(a). If both Title I and II apply to employment discrimination, "then it is possible for state and local governments to be subjected to conflicting regulations." Zimmerman v. Oregon Dep't of Justice, 170 F.3d at 1178;see Syken v. State of N.Y., Executive Dep't, Div. of Hous. & Cmty. Renewal, 2003 WL 1787250 at *9.

**\*10**  Because the overall structure and language of the ADA unambiguously expresses Congress' intent that employment discrimination claims be brought under Title I only, this Court can end its inquiry at the first step of the *Chevron* analysis, and should not consider the DOJ regulations. *See, e.g.,* 🚩*Zimmerman v. Oregon Dep't of Justice,* 170 F.3d at 1173; 🚩*Fleming v. State Univ. of N.Y.,* 502 F.Supp.2d at 333; *Cormier v. City of Meriden,* 2004 WL 2377079 at \*8; *Filush v. Town of Weston,* 266 F.Supp.2d at 328. Title II of the ADA does not apply to employment discrimination.

Accordingly, Scherman's employment discrimination claim under Title II of the ADA fails to state a claim upon which relief can be granted and should be dismissed.

### CONCLUSION

For the reasons stated above, the Banking Department's motion to dismiss (Dkt. No. 6) should be *GRANTED*.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 🚩28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Batts (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. 🚩*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 🚩*IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); 🚩*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); 🚩*Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); 🚩*McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 🚩28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 997378

---

### Footnotes

1    Scherman's complaint refers to several other instances of unfair treatment: in April 2006, the Banking Department reassigned Scherman to another location with "no reason given"; soon after, Scherman began receiving e-mails from her supervisor, Irving Leaf, intended to "embarrass" her; and in June 2006, Scherman's requests for personal leave were denied even though her father was seriously ill. (Compl. at 7–8.)

2    On July 15, 2009, after the Banking Department filed its motion to dismiss, Scherman requested an extension of her time to respond and indicated a desire to amend the complaint; on July 24, 2009, Judge Batts granted a two month extension for Scherman to oppose the motion and/or amend the complaint. (Dkt. No. 9: 7/24/09 Order.) Scherman failed to submit an amended complaint. Her opposition brief notes that it was filed with the assistance of counsel, although counsel has not formally appeared. (*See* Scherman Br. at 4.) Because Scherman technically is pro se, this Court will liberally construe her complaint as raising claims pursuant to ADA Titles I and II. (*See* cases cited at pages 8–9 below.)

3    *Accord, e.g., Harris v. Mills,* 572 F.3 d 66, 71–72 (2d Cir.2009); 🚩*Lindner v. Int'l Bus. Machs. Corp.,* 06 Civ. 4751, 2008 WL 2461934 at \*3 (S.D.N.Y. June 18, 2008); *Joseph v. Terrence Cardinal Cooke Health Care*

*Ctr.,* 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr.2, 2008); *Elektra Entm't Group, Inc. v. Barker,* 551 F.Supp.2d 234, 237 (S.D.N.Y.2008); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 216–17 (S.D.N.Y.2008); *Diana Allen Life Ins. Trust v. BP P.L.C.,* 06 Civ. 14209, 2008 WL 878190 at *3 (S.D.N.Y. Mar.31, 2008).

4    *Accord, e.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006); *Aniero Concrete Co. v. N.Y.C. Constr. Auth.,* 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar.9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. See Fed.R.Civ.P. 12(b); *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

5    *See also, e.g., Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,*503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

6    *See also, e.g., Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990) ("This Court has drawn upon principles of sovereign immunity to construe the [Eleventh] Amendment to 'establish that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." ' "); *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) ("While the [Eleventh] Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought by her own citizens as well as by citizens of another State.") (citing cases).

7    *See also, e.g., United States v. City of Yonkers,* 96 F.3d 600, 619 (2d Cir.1996) (New York State Education Department and State Board of Regents entitled to Eleventh Amendment immunity), *cert. denied,*521 U.S. 1104, 117 S.Ct. 2479, 138 L.Ed.2d 988 (1997); *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.) (New York State Department of Correctional Services entitled to Eleventh Amendment immunity, citing cases).

8    *See also, e.g., Jacobs v. Mostow,* 271 Fed. Appx. 85, 88 (2d Cir.2008); *Walker v. New York,* 150 Fed. Appx. 28, 30 (2d Cir.2005), *cert. denied,*549 U.S. 1265, 127 S.Ct. 1493, 167 L.Ed.2d 229 (2007); *Rosenberger v. N.Y.S. Office of Temp. & Disability Assistance,* 153 Fed. Appx. 753, 754 (2d Cir.2005); *Russell v. Dunston,* 896 F.2d 664, 667 (2d Cir.) ("An unconsenting state is immune not only from suits for damages but also from declaratory and equitable actions."), *cert. denied,*498 U.S. 813, 111 S.Ct. 50, 112 L.Ed.2d 26 (1990); *Dube v. State Univ. of N.Y.,* 900 F.2d at 594;*Harris v. N.Y.S. Educ. Dep't,* 419 F.Supp.2d at 533 ("This

bar to suit applies regardless of the relief sought."); *DiNapoli v. DiNapoli,* 95 Civ. 7872, 1995 WL 604607 at *1 (S.D.N.Y. Sept.22, 1995) (Sotomayor, D.J.).

9    *See also, e.g.,* 🚩*Gollomp v. Spitzer,* 568 F.3d at 366;*Gorton v. Gettel,* 554 F.3d at 62; 🚩*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d at 236–37.

10   *See also, e.g.,* 🚩*Close v. State of N.Y.,* 125 F.3d 31, 36 (2d Cir.1997); ⚠️*Gaynor v. Martin,* 77 F.Supp.2d 272, 281 (D.Conn.1999); *Nash v. N.Y.S. Executive Dep't, Div. of Parole,* 96 Civ. 8354, 1999 WL 959366 at *5 (S.D.N.Y. Oct.20, 1999).

11   "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [the Court] will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.' " 🚩⚠️*Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974) (quoting 🚩*Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909); *see also, e.g.,* 🚩*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. at 675–76, 119 S.Ct. at 2226; 🚩*Atascadero State Hosp. v. Scalon,* 473 U.S. 234, 239–40, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985).

12   Scherman's opposition brief sought leave to amend, in order to formally assert the Title II claim. (Scherman Br. at 2.) The Court liberally construes Scherman's existing pro se complaint and addresses the Title II claim.

13   Title II's operative section reads: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 🚩42 U.S.C. § 12132.

14   While the Supreme Court has declined to rule on whether an employment discrimination claim can be brought under Title II of the ADA, it noted that Title I of the ADA exclusively deals with employment discrimination claims. 🚩*Bd. of Trs. of Univ. of Ala. v. Garrett* 531 U.S. at 360 n. 1, 121 S.Ct. at 960 n. 1 (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ").

15   The Fourth, Fifth, and Tenth Circuits have assumed without deciding that ADA Title II applies to employment discrimination claims against public entities. *See* 🚩*Davoll v. Webb,* 194 F.3d 1116, 1130 (10th Cir.1999); 🚩*Holmes v. Texas A & M Univ.,* 145 F.3d 681, 684 (5th Cir.1998); 🚩*Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 n. 8 (4th Cir.1995).

16   District court decisions in this Circuit reaching a contrary conclusion include, *e.g., Olsen v. State of N.Y.,* No. 04 CV 0419, 2005 WL 5885368 at *5 (E.D.N.Y. Mar. 9, 2005) (siding with those cases that permit employment discrimination claims under Title II); 🚩*Transp. Workers Union of Am. v. N.Y.C. Transit Auth.,* 342 F.Supp.2d 160, 170–75 (S.D.N.Y.2004) (exploring the history and language of ADA Title II and concluding that it applies to employment discrimination); *Smith v. State Univ. of N.Y.,* No. 00–CV–1454, 2003 WL 1937208 at *8 (N.D.N.Y. Apr.23, 2003) (Title II applicable to employment discrimination despite acknowledging that the Supreme Court "certainly hinted that it was skeptical that Title II would cover such claims."); 🚩*Worthington v. City of New Haven,* No. 94–CV–00609, 1999 WL 958627 at *7 (D.Conn. Oct.5, 1999) (employment discrimination is covered by Title II).

17      🚩 28 C.F.R. § 35.140(a) states:

> No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity. 🚩 28 C.F.R. § 35.140(a).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 9967833
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Priscilla CHAVOUS, Plaintiff,

v.

HOUSING VISIONS UNLIMITED, INC., Mary
A. Marrone, and Jennifer St. Marks, Defendants.

5:22-cv-00811 (LEK/TWD)
|
Signed October 17, 2022

**Attorneys and Law Firms**

PRISCILLA CHAVOUS, Plaintiff, pro se, 139 Maple Ter.,
Syracuse, NY 13210.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent to the Court for review a complaint
filed by Priscilla Chavous ("Plaintiff"). (Dkt. No. 1.) Plaintiff
has also moved to proceed *in forma pauperis* ("IFP"). (Dkt.
No. 2.)

**I. IFP APPLICATION**

Plaintiff declares she is unable to pay the filing fee for this
action. (Dkt. No. 2.) After reviewing Plaintiff's application,
this Court finds she is financially eligible for IFP status.
Therefore, Plaintiff's IFP application is granted for purposes
of filing only. [1]

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Legal Standard**

This Court must conduct an initial review of complaints filed
IFP. 28 U.S.C. § 1915(e). When conducting this review,
"the court shall dismiss the case at any time if the court
determines ... the action ... is frivolous or malicious ... [or]
fails to state a claim on which relief may be granted." 28
U.S.C. §§ 1915(e)(2)(B)(i), (ii); *see also Allen v. Stringer*, No.
20-3953, 2021 WL 4472667, at \*1 (2d Cir. Sept. 30, 2021).
The Court must also dismiss a complaint, or portion thereof,

when the Court lacks subject matter jurisdiction. *See* Fed.
R. Civ. P. 12(h)(3). While the law mandates dismissal on
any of these grounds, the Court is obliged to construe *pro se*
pleadings liberally. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.
2009); *see also Haines v. Kerner*, 404 U.S. 519, 520-21
(1972) (holding that a *pro se* litigant's complaint is to be held
"to less stringent standards than formal pleadings drafted by
lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*,
537 F.3d 185, 191 (2d Cir. 2008).

"An action is frivolous when either: (1) the factual
contentions are clearly baseless such as when the claims are
the product of delusion or fantasy; or (2) the claim is based
on an indisputably meritless legal theory." *Livingston
v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir.
1998). "A claim is based on an indisputably meritless legal
theory when either the claim lacks an arguable basis in law,
or a dispositive defense clearly exists on the face of the
complaint." *Id.*

To survive dismissal for failure to state a claim, a complaint
must contain a short and plain statement of the claim showing
that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2).
This short and plain statement of the claim must be "plausible
on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007). "A claim has facial plausibility when the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009). The statement of the claim must do more than present
"an unadorned, the-defendant-harmed-me accusation." *Id.* It
must "give the defendant fair notice of what the claim is and
the grounds upon which it rests." *Twombly*, 550 U.S. at
555; *see also* Fed. R. Civ. P. 8(a)(2).

**\*2** In determining whether a complaint states a claim upon
which relief may be granted, "the court must accept the
material facts alleged in the complaint as true and construe all
reasonable inferences in the plaintiff's favor." *Hernandez
v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that
a court must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." *Iqbal*, 556
U.S. at 678. "Threadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice." *Id.*

**B. Summary of Complaint**

On August 1, 2022, Plaintiff commenced this action against Housing Visions Unlimited Inc., Mary A. Marrone, Manager, and Jennifer St. Marks, Supervisor (collectively, "Defendants"). (Dkt. No. 1.[2]) The complaint is a form-complaint pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. Id.* Plaintiff alleges she has cancer and glaucoma, and complains of the following conduct: "failure to make alterations to accommodate disability", "retaliation", and "other acts" in that "Housing Visions and its staff harass and intimidate. They want the apartment to get more rent. They are trying to evict me from the apartment. They do not identify themselves." *Id.* at 4.

In December 2009, Plaintiff moved into a "Housing Visions house ... because they were offering incentives for rent to own." *Id.* at 5. She paid $490.00 in rent, along with a $490.00 security deposit. *Id.* Specifically, "[t]he offer was if you pay rent consecutively for 10 years you will be able to own your 1st home with the security deposit interest as a down payment and Housing Vision will help with the process." *Id.*

In May 2016, Supervisor St. Marks and the police searched Plaintiff's home when she was not present. *Id.* They found Plaintiff's "medical use" "cannabis trees" in a locked box, and she was arrested. *Id.* Supervisor St. Marks told the police "this was a landlord-tenant dispute." *Id.* "This is when [Plaintiff] learned that they wanted [her] evicted." *Id.*

In December 2016, Plaintiff asked for a rent reduction. *Id.* Supervisor St. Marks told Plaintiff "that she would have to move to a smaller place. This was not the truth." *Id.* In July 2021, Plaintiff put a "copy of a discontinuance letter from social security in the rent drop box." *Id.* at 6. Nevertheless, her rent was increased. *Id.* Plaintiff complains she is "unable to communicate with management" because they do not answer her calls, and the office door is always locked. *Id.*

In April 2022, Plaintiff "got an infraction in the mail" from Manager Marrone. *Id.* Plaintiff was told to "take down" her greenhouse that had been "up" for about a year. *Id.* In June 2022, Plaintiff received another "infraction in the mail" because she would not allow maintenance to take down her greenhouse. *Id.* Later that month, she received another "infraction in the mail" signed by Defendant Marrone for "harassment of neighbor with violence." *Id.* Yet it was the neighbor's sister who "threatened" Plaintiff's life. *Id.* Plaintiff

is afraid to sleep, and her health has deteriorated. *Id.* "The police don't come!" *Id.*

**\*3** Plaintiff claims "they" are "trying to remove" her from the Housing Visions property by issuing the infractions, "which can lead to eviction." *Id.* "They used this tactic once before." *Id.* "They" are trying to get Plaintiff to "leave and walk away from a house that [she] can live in forever as long as [she] pays rent on time." *Id.* Additionally, trees are blocking the front windows, and there are no lights on the front porch or back porch. *Id.* at 8. She does not feel safe in her home. *Id.* She has to do all of her own repairs. *Id.* She is afraid of Housing Visions and their management, which changes often. *Id.* They do not wear nametags to identify themselves, and they have spare keys to her home. *Id.*

As for relief, Plaintiff wants to own her first home. *Id.* at 9. She wants to be compensated for the gardens that were destroyed, all of her repair work, and for pain and suffering because her health has declined due to the stress caused by Housing Visions and their management team. *Id.*

**C. Analysis**

Although Plaintiff utilizes a form complaint for violations of the ADA, she has failed to allege facts plausibly suggesting a claim for relief pursuant to the ADA. (Dkt. No. 1.)

The complaint refers to the ADA generally. Based on the facts alleged, Plaintiff cannot proceed with a claim under Title I of the ADA, which addresses employment discrimination, because she has not alleged that she was employed by Defendants. 42 U.S.C. § 12117; *see also Mary Jo C. v. New York State Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, n.1 (2001)) (" 'Title I of the ADA expressly deals with th[e] subject' of employment discrimination.").

"Title II of the ADA proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).[3] To plead a violation of Title II of the ADA, a plaintiff must allege "(1) that [she] is a qualified individual with a disability; (2) that [she] was excluded from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [her] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir.

2009) (quoting 🔖 *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)) (internal quotation marks omitted). The public entities defined in the ADA are state or local governments and their instrumentalities. 42 U.S.C. § 12131(1). Private entities are not subject to the provisions of Title II even if they receive government funding. *Brennan v. NCAComp Inc.*, No. 3:22-CV-0127 (GTS/ML), 2022 WL 4290660, at \*7 (N.D.N.Y. Apr. 25, 2022), *report-recommendation adopted*, 2022 WL 3097843 (N.D.N.Y. Aug. 4, 2022) (citations omitted). Further, "individuals cannot be held liable under the ADA." *Walker v. Flynn*, No. 5:22-CV-0400 (GLS/ML), 2022 WL 2304169, at \*6 (N.D.N.Y. June 27, 2022) (collecting cases), *report-recommendation adopted*, 2022 WL 2789355 (N.D.N.Y. July 15, 2022); *see* 🔖 *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals).

**\*4** Here, the complaint is devoid of factual allegations plausibly suggesting Defendants are public entities. Further, the complaint is devoid of factual allegations plausibly suggesting Plaintiff was unable to access public programs due to her disability, how her disability prevented her from accessing those programs, or what accommodations she sought and was denied by Defendants. Thus, Plaintiff has failed to state a claim upon which relief may be granted pursuant to Title II of the ADA.

Title III of the ADA prevents discrimination based on a disability in places of public accommodation. 42 U.S.C. § 12182. [4] To plead a claim under Title III of the ADA, a plaintiff must allege "(1) that [she] is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against [her] by denying [her] a full and equal opportunity to enjoy the services defendants provide." 🔖 *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). The term "public accommodation" includes "an inn, hotel, motel, or other place of lodging...." 42 U.S.C. § 12181(7)(A). "However, the legislative history of the ADA clarifies that 'other place of lodging' does not include residential facilities." *Alston v. Jarrell*, No. 3:14-CV-132, 2015 WL 418153, at \*4 (D. Conn. Jan. 30, 2015) (citation omitted); *see also* 🔖 *Reid v. Zackenbaum*, No. 05-CV-1569, 2005 WL 1993394, at \*4 (E.D.N.Y. Aug. 17, 2005) ("Because [the plaintiff] is alleging discrimination in connection with a place of residence, he fails to state a claim that is subject to

the ADA under the public accommodation provision of that act.").

Here, the complaint does not allege facts plausibly suggesting that Defendants' actions constituted discrimination under Title III of the ADA or resulted in the discriminatory provision of services to Plaintiff. Thus, Plaintiff has failed to state a claim upon which relief may be granted pursuant to Title III of the ADA.

Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at \*3 n.5 (W.D.N.Y. June 4, 2018).

Finally, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that she engaged in activity protected by the ADA, that Defendants were aware of that activity, or that Defendants took any adverse action against Plaintiff causally related to that protected activity. [5] 🔖 *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009); *see also Constantine v. Merola*, No. 20-CV-1012 (DNH/ML), 2020 WL 8450544, at \*5 (N.D.N.Y. Nov. 6, 2020) (recommending dismissal of the plaintiff's Title V ADA claims where the complaint failed to allege that the plaintiff "engaged in any protected activity, that any [d]efendant knew that [p]laintiff was involved in the protected activity, or that any adverse decision or course of action taken by [d]efendants was causally connected to that protected activity."), *report-recommendation adopted*, 2021 WL 392487 (N.D.N.Y. Feb. 4, 2021).

**\*5** As a result, the Court recommends dismissing the complaint for failure to state a claim upon which relief may be granted. [6]

### D. Opportunity to Amend

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."

🔖 *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with

[the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

This Court has serious doubts about whether Plaintiff can amend to assert any form of federal jurisdiction over the situation that she describes in her complaint. Nevertheless, in deference to Plaintiff's *pro se* status and out of an abundance of caution, the Court recommends affording Plaintiff an opportunity to file an amended complaint.[7]

**\*6 WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED** solely for purposes of initial review; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 9967833

---

## Footnotes

1    Plaintiff should also note that although her IFP application has been granted, she will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

2    According to its website, Housing Vision Unlimited, Inc. ("Housing Visions") is a not-for-profit Developer, General Contractor, and Property Manager with a mission to be the catalyst for substantiable positive change in neighborhoods through real estate development and community collaboration. Based out of Syracuse, New York, Housing Visions works throughout Upstate New York and Pennsylvania. Housing Visions owns and manages approximately 1,600 rental units for individuals and families, including special populations. *See* https://www.housingvisions.org (last visited Oct. 17, 2022).

3    "Monetary damages are available under Title II of the ADA only where the plaintiff is able to 'demonstrate intentional discrimination.' " *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)), aff'd, 633 F. App'x 14 (2d Cir. 2016) (summary order). To prevail on a claim for intentional discrimination under Title II, "a plaintiff must prove a policymaker's 'deliberate indifference to the rights secured the disabled by those statutes,' in addition to the other elements of a Title II claim." *Gershanow v. City of Rockland*, No. 11-CV-8174 (CS), 2014 WL

Chavous v. Housing Visions Unlimited, Inc., Slip Copy (2022)

1099821, at *4 (S.D.N.Y. Mar. 20, 2014) (quoting *KM ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005)).

4    Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188; *see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages."); *Powell*, 364 F.3d at 86 ("Monetary relief ... is not available to private individuals under Title III of the ADA.").

5    Title V "does not provide for punitive or compensatory damages under the ADA." *Jones v. Volunteers of Am. Greater New York*, No. 20-CV-5581, 2022 WL 768681, at *6 n.8 (S.D.N.Y. Mar. 14, 2022) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010); *Shipman v. New York State Office of Persons with Developmental Disabilities*, No. 11-CV-2780, 2012 WL 897790, at *9 (S.D.N.Y. Mar. 12, 2012) (even in the retaliation context, "individuals cannot be held liable for money damages under the ADA in either their personal or official capacities."), *report and recommendation adopted*, 2012 WL 3704837, at *3 (S.D.N.Y. Mar. 26, 2012) (money damages unavailable under the ADA)).

6    While the Court is not unsympathetic to Plaintiff's alleged predicament, even when liberally construed, it appears the complaint sounds in state common law. (*See, e.g.*, Dkt. No. 1 at 4 ("Housing Visions and its staff harass and intimidate. They want the apartment to get more rent. They are trying to evict me from the apartment. They do not identify themselves."), 6 ("they" are "trying to remove me" from the Housing Visions property by issuing infractions, "which can lead to eviction."). "Federal courts, unlike state courts, have no jurisdiction over landlord-tenant matters." *Burke v. Vonnard*, No. 5:15-CV-1133 (MAD/TWD), 2015 WL 13744417, at *5 (N.D.N.Y. Sept. 28, 2015) (citations omitted), *report-recommendation adopted*, 2016 WL 3176653 (N.D.N.Y. June 7, 2016); *see also Rosen v. Shore Towers Apartments, Inc.*, No. 11-CV-0752, 2011 WL 2550733, at *5 (E.D.N.Y. June 27, 2011) (noting that courts in this Circuit "routinely dismiss for lack of subject matter jurisdiction" claims concerning eviction) (collecting cases).

7    Should Plaintiff be permitted to file an amended complaint, and if she chooses to avail herself of an opportunity to amend, any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant that Plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by Plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

8    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1775699
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Priscilla CHAVOUS, Plaintiff,

v.

HOUSING VISIONS UNLIMITED, INC., Mary
A. Marrone, and Jennifer St. Marks, Defendants.

5:22-cv-811 (AMN/TWD)
|
Signed February 6, 2023

**Attorneys and Law Firms**

PRISCILLA CHAVOUS, 139 Maple Ter., Syracuse, NY
13210, Plaintiff, Pro Se.

**ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

**\*1** On August 1, 2022, Plaintiff *pro se* Priscilla Chavous
commenced this action against Housing Visions Unlimited
Inc., Mary A. Marrone, and Jennifer St. Marks (collectively
"Defendants"). Plaintiff filed a form-complaint pursuant to
the Americans with Disabilities Act ("ADA"), 42 U.S.C. §
12101 *et seq.* ("Complaint"). *See* Dkt. No. 1. Specifically,
Plaintiff alleges violations of the ADA that stem from
the following conduct: "failure to make alterations to
accommodate disability," "retaliation," and "other acts" in
that "Housing Visions and its staff harass and intimidate. They
want the apartment to get more rent. They are trying to evict
me from the apartment. They do not identify themselves." *Id.*
at 4.

Plaintiff sought leave to proceed *in forma pauperis* ("IFP").
Dkt. No. 2. This matter was referred to United States
Magistrate Judge Thérèse Wiley Dancks, who, on October
17, 2022, issued an Order and Report-Recommendation
("Report-Recommendation") granting Plaintiff's application
to proceed IFP for purposes of initial review, and
recommending that Plaintiff's Complaint be dismissed with
leave to amend. *See* Dkt. No. 3 at 10.[1] Magistrate Judge
Dancks advised Plaintiff that under 28 U.S.C. § 636(b)(1),
she had fourteen days within which to file written objections

and that failure to object to the Report-Recommendation
within fourteen days would preclude appellate review. *Id.*
at 10 & n.8. Plaintiff has not filed any objections to the
Report-Recommendation and the time for filing objections
has expired.

For the reasons set forth below, the Court adopts the Report-
Recommendation in its entirety, and orders that the Complaint
be dismissed without prejudice and with leave to amend
within 30 days.

**II. STANDARD OF REVIEW**

This court reviews *de novo* those portions of a magistrate
judge's report-recommendations that have been properly
preserved with a specific objection. *Petersen v. Astrue,* 2
F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. §
636(b)(1)(C). If no specific objections have been filed, this
court reviews a magistrate judge's report-recommendations
for clear error. *See Petersen,* 2 F. Supp. 3d at 229 (citing Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition).
After appropriate review, "the court may accept, reject or
modify, in whole or in part, the findings or recommendations
made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**III. DISCUSSION**

Because Plaintiff has not filed any objections to the
Report-Recommendation, the Court reviews the Report-
Recommendation for clear error.

The Report-Recommendation appropriately applied the legal
standard for review of a *pro se* complaint under 28 U.S.C.
§ 1915(e)(2)(B) and Rule 12(h)(3) of the Federal Rules of
Civil Procedure. *See* Dkt. No. 3 at 2-3 (citing, *inter alia,*
*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) and
*Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191
(2d Cir. 2008)). Magistrate Judge Dancks determined that the
allegations in Plaintiff's Complaint do not state a claim for
discrimination under the ADA on the basis of employment
(Title I),[2] access to public services (Title II),[3] enjoyment
of the services provided by a public accommodation (Title
III),[4] or telecommunications (Title IV).[5] Dkt. No. 3 at 5-8.
Magistrate Judge Dancks further determined that Plaintiff's
Complaint does not allege facts to support a claim that
Defendants retaliated against her in violation of Title V of
the ADA.[6] *Id.* at 8. The Court agrees with Magistrate Judge

Dancks' analysis of Plaintiff's claims pursuant to Titles I-V of the ADA.

**\*2** Furthermore, Magistrate Judge Dancks correctly reasoned that "even when liberally construed it appears the Complaint sounds in state common law." *Id.* at 9 n.6; *see* Dkt. No. 1 at 4, 6; *see also* Burke v. Vonnard, No. 5:15-CV-1133 (MAD/TWD), 2015 WL 13744417, at \*5 (N.D.N.Y. Sept. 28, 2015) ("Federal courts, unlike state courts, have no jurisdiction over landlord-tenant matters.") (citations omitted), *report-recommendation adopted*, 2016 WL 3176653 (N.D.N.Y. June 7, 2016); Rosen v. Shore Towers Apartments, Inc., No. 11-CV-0752, 2011 WL 2550733, at \*5 (E.D.N.Y. June 27, 2011) (noting that courts in this Circuit "routinely dismiss for lack of subject matter jurisdiction" claims concerning eviction) (collecting cases).

Magistrate Judge Dancks expressed "serious doubts" that Plaintiff can amend the Complaint to state a claim over which the Court would have jurisdiction. Dkt. No. 3 at 10. Nevertheless, in deference to Plaintiff's *pro se* status, she recommended that Plaintiff's Complaint be dismissed with leave to amend. *Id.* The Court agrees that Plaintiff should be granted an opportunity to amend the complaint in light of her *pro se* status. *See* Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) ("Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim.") (citation omitted); Bruce v. Tompkins Cty. Dep't of Soc. Servs. ex rel. Kephart, No. 5:14-CV-0941 (GTS/DEP), 2015 WL 151029, at \*4 (N.D.N.Y. Jan. 7, 2015) ("a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once 'when a liberal reading of the complaint gives any indication that a valid

claim might be stated' ") (quoting Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991)).

Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety. [7]

### IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation, Dkt. No. 3, is **ADOPTED** in its entirety; and the Court further

**ORDERS** that the Complaint, Dkt. No. 1, is **DISMISSED** without prejudice and with leave to amend; and the Court further

**ORDERS** that Plaintiff shall file an amended complaint within **THIRTY (30) DAYS** of the filing date of this Order; and the Court further

**ORDERS** that, if Plaintiff fails to file an amended complaint within thirty (30) days of this Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case without further order of this Court; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 1775699

### Footnotes

1    For a complete recitation of Plaintiff's allegations of wrongful conduct, the parties are referred to the Report-Recommendation. *See* Dkt. No. 3 at 3-5.

2    *See* Dkt. No. 3 at 5 (citing 42 U.S.C. § 12117 and Mary Jo C. v. New York State Local Retirement Sys., 707 F.3d 144, 169 (2d Cir. 2013)).

3    *See* Dkt. No. 3 at 6 (citing *Brennan v. NCAComp Inc.*, No. 3:22-CV-0127 (GTS/ML), 2022 WL 4290660, at *7 (N.D.N.Y. Apr. 25, 2022), *report-recommendation adopted*, 2022 WL 3097843 (N.D.N.Y. Aug. 4, 2022)).

4    *See* Dkt. No. 3 at 7-8 (citing 42 U.S.C. §§ 12181(7)(A), 12182; *Alston v. Jarrell*, No. 3:14-CV-132, 2015 WL 418153, at *4 (D. Conn. Jan. 30, 2015) and ⚐ *Reid v. Zackenbaum*, No. 05-CV-1569, 2005 WL 1993394, at *4 (E.D.N.Y. Aug. 17, 2005)).

5    *See* Dkt. No. 3 at 8 (citing *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3 n.5 (W.D.N.Y. June 4, 2018)).

6    *See* Dkt. No. 3 at 8 (citing ⚐ *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) and *Constantine v. Merola*, No. 20-CV-1012 (DNH/ML), 2020 WL 8450544, at *5 (N.D.N.Y. Nov. 6, 2020), *report-recommendation adopted*, 2021 WL 392487 (N.D.N.Y. Feb. 4, 2021)).

7    The Court reiterates Magistrate Judge Dancks' admonition to Plaintiff that any amended complaint or submission to this Court must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure, including by specifically identifying the facts and legal theory or theories that form the basis of any claim. *See* Dkt. No. 3 at 10 n.7.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00761-BKS-ML   Document 12   Filed 02/27/23   Page 74 of 331

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4440532
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Fabian WADE, Plaintiff,
v.
KAY JEWELERS, INC., Sterling Jewelers, Inc.,
GGP, Inc., and Jane & John Does, 1–5, Defendant.

No. 3:17-cv-990 (MPS)
|
Signed September 17, 2018

**Attorneys and Law Firms**

Nitor V. Egbarin, Law Office of Nitor V. Egbarin, LLC, Hartford, CT, for Plaintiff.

Daniel I. Prywes, Morris, Manning & Martin, LLP, Washington, DC, Joshua A. Mize, Mize Law, PLLC, Jupiter, FL, Colleen J. Vellturo, Stephen P. Brown, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Stamford, CT, Dawn M. Neborsky, Bonner Kiernan Trebach & Crociata, LLP, Boston, MA, for Defendant.

Jane Does, pro se.

John Does, pro se.

**RULING ON MOTIONS TO DISMISS**

Michael P. Shea, U.S.D.J.

**\*1** Plaintiff Fabian Wade ("Wade") brings this suit based on an incident at the Buckland Hills Mall where he was identified by employees of Kay Jewelers as a suspect in a prior theft and credit card fraud and questioned by mall security personnel and police. (ECF No. 36.) Wade sued the owner of the Kay Jewelers store, defendant Sterling Jewelers, Inc. ("Sterling"),[1] the mall owner, GGP, Inc. ("GGP"), and numerous Jane and John Does, asserting six claims arising from the incident: (1) violation of ⚑ 42 U.S.C. § 1981; (2) false imprisonment; (3) defamation *per se*; (4) intentional infliction of emotional distress; (5) negligent infliction of emotional distress; and (6) negligent supervision. Defendant GGP impleaded Professional Security Consultants, Inc. ("PSC") as the alleged employer of mall security personnel and asserted claims for

negligence, common law indemnification, and contractual indemnification. (ECF No. 57.) Sterling and GGP now move to dismiss Wade's amended complaint under Rule 12(b)(6) (ECF Nos. 42, 45), and PSC moves to dismiss part of GGP's third-party complaint under Rule 12(b)(6). (ECF No. 70.) For the reasons that follow, I GRANT in part and DENY in part all three motions.

**I. Factual Background**
I briefly recite the relevant factual background as set forth in Wade's amended complaint. (ECF No. 36 (hereinafter "Am. Compl.").) Wade, a black, African-American male, went to the Kay Jewelers store/booth at Buckland Hills Mall in Manchester, CT on Saturday, March 18, 2017. (Am. Compl. at ¶¶ 13–15.) Wade asked an employee if he could look at some earrings, which the attending employee showed him but refused to take out of their glass case. (*Id.* at ¶¶ 16–18.) Wade decided not to buy the earrings and walked away from the Kay Jewelers store/booth. (*Id.* at ¶ 19.)

Within a few minutes, an undercover security or loss prevention officer for the mall, Jane Doe 3, stopped Wade and told him that one of the Kay Jewelers Individual Defendants[2] (either defendant Jane Doe 1 or Jane Doe 2) had identified Wade as an individual they suspected had been robbing Kay Jewelers over the past few months. (*Id.* at ¶¶ 20–22.) According to the police report of the incident, one of the Kay Jewelers Individual Defendants had called mall security, who in turn called the police, to report Wade for possible ID theft and credit card fraud. (*Id.* at ¶ 35.) Wade believed that the Kay Jewelers Individual Defendants had "identified [Wade] because of his skin color and because [he] fit their idea of a shoplifter." (*Id.* at ¶ 41.)

**\*2** Shortly after Wade was stopped, Jane Doe 3 was joined by another mall security officer, John Doe 1, and Officer Decker of the Manchester Police. (*Id.* at ¶ 23.) Jane Doe 3, John Doe 1, and Officer Decker surrounded Wade, "with Officer Decker in front facing [Wade] and Jane Doe 3 on one side of [Wade] and John Doe 1 on the other side of [Wade], confining [Wade] ... [and] forcing [Wade] to stay in the space, from where he could not leave." (*Id.* at ¶ 26.) Officer Decker told that Wade that a Kay Jewelers employee had told Officer Decker when he responded to the call that Wade was the suspect. (*Id.* at ¶ 27.) Officer Decker demanded to see Wade's ID and asked about Wade's credit cards. (*Id.* at ¶ 28.) Officer Decker radioed in Wade's ID and, while holding onto the ID, "forc[ed] [Wade] to walk downstairs with him" to the

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 75 of 331

Kay Jewelers booth/store, despite Wade's repeated requests to return his ID. (*Id.* at ¶¶ 29–31.) At some point, Wade called his lawyer, soon after which the stop ended and Wade left. (*Id.* at ¶ 34.). Wade was shaken up by the incident, has had flashbacks, believes his reputation has been harmed, and alleges that he now has a public record as a result Officer Decker running his ID through the Manchester Police system. (*Id.* at ¶¶ 47–51.)

The amended complaint pleads on information and belief that Kay Jewelers "top management practice and believe in discrimination ... creating a corporate culture where Kay Jewelers store employees routinely and disproportionately" discriminate against African-Americans for suspicion of criminal activity. (*Id.* at ¶ 52.) The amended complaint further asserts that the Kay Jewelers' "employees and loss prevention/security personnel were not properly trained or supervised to prevent Kay Jewelers' employees from targeting African-Americans and people of color" for suspected criminal activity, and were also not "properly trained or supervised" in connection with "accusing customers" of criminal activity and alerting law enforcement personnel of the same. (*Id.* at ¶ 53.)

Sterling deposed Wade about the incident before Wade filed the complaint; Wade was represented by his counsel at the deposition. (*See, e.g.*, ECF No. 43-1 at 2–147 ("Wade Tr.").) After Wade filed suit, Wade amended his complaint, and Sterling and GGP moved to dismiss. (ECF Nos. 36, 42, 45.) GGP filed a third party complaint against PSC, and PSC then moved to dismiss part of the GGP's third party complaint against it. (ECF No. 57, 70.)

## II. Legal Standard

On a motion to dismiss, I take the plaintiff's factual allegations in the complaint "to be true and [draw] all reasonable inferences in" his favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In addition, the "court need not feel constrained to accept as truth conflicting pleadings

that ... are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely." *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir. 2013) (citation omitted). In the last category, a document is deemed integral to the complaint, and thus appropriately considered on a motion to dismiss, "where the complaint relies heavily upon its terms and effect."

*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *see Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016) ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough.").

## III. Discussion

**\*3** As a threshold issue, both Sterling and GGP attach the transcript of Wade's sworn pre-suit deposition testimony to their motions to dismiss and argue that the Court should treat the transcript as incorporated because the amended complaint heavily relies on it. (ECF No. 43 at 7–19; ECF No. 45-1 at 2–3.) Wade concedes that the transcript should be incorporated for the purposes of the parties' motion to dismiss. (ECF No. 50 at 4 ("GGP correctly argues Mr. Wade's sworn deposition is proper for consideration for GGP's Motion to dismiss.").) The amended complaint does not cite or reference the deposition transcript itself; however, large portions of the complaint either quote without attribution (Am. Compl. at ¶¶ 14, 16, 17, 18, 20, 21, 22, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 46, 47, 48, 49, 50, 51) or paraphrase Wade's deposition testimony (*id.* at ¶¶ 13, 15, 19, 23, 27, 29, 41, 47). In other words, not only does Wade agree that he heavily relied on the transcript in drafting the complaint, but the deposition transcript supplies almost one-third of the allegations in the complaint either verbatim or in paraphrased form. Though usually incorporation of "integral" documents is applied to legal documents like contracts, I conclude that the transcript should be considered here because of Wade's extensive reliance on it in drafting the complaint. *See Washington v. Gonyea,* 538 F. App'x 23, 26 n.3 (2d Cir. 2013) ("[I]ncorporation of the transcript is proper because the complaint relies heavily on the hearing transcript."); *cf.*

*Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 254, 268 (E.D.N.Y. 2011) (declining to consider deposition transcript because the complaint did not make any reference to it and the plaintiffs did not "purport to have relied on [the] deposition in crafting the allegations").

However, I only consider the transcript for a limited purpose: if the complaint incorrectly quotes or paraphrases the transcript, I may consider Wade's testimony for the contents of his statements, but I may not consider Wade's deposition testimony for its truth or to contravene a statement in the amended complaint. *See Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007) ("[S]uch documents may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents."); *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (reversing district court's dismissal where district court considered non-integrated transcript "to make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint"). A lawyer is not confined to the personal knowledge of his client when he drafts a complaint. He may also rely on other sources of evidence, and he may further investigate a claim after his client testifies to correct or supplement his client's own personal knowledge of the facts. Thus, the Court is not free to disregard an allegation in a complaint simply because it contradicts the plaintiff's pre-complaint testimony. Nonetheless, because I may consider the transcript, I decline Sterling's alternative request to convert its motion into one for summary judgment. [3]

Wade's amended complaint asserts six causes of action against Sterling and GGP: (1) an "equal benefit" claim under 42 U.S.C. § 1981; (2) false imprisonment; (3) defamation *per se*; (4) intentional infliction of emotional distress ("IIED"); (5) negligent infliction of emotional distress ("NIED"); and (6) negligent supervision. (Am. Compl. at ¶¶ 54–97.) Sterling and GGP have moved to dismiss the six counts for failure to state a claim. (ECF Nos. 42, 45.) GGP also moves to dismiss on the grounds that Wade has not properly pleaded that GGP is vicariously liable for the mall security personnel, who were independent contractors and not employees of GGP. (ECF No. 45-1 at 4–6.) After GGP filed its motion to dismiss, Wade withdrew his 42 U.S.C. § 1981 and IIED claims against GGP. (*See* ECF No. 50 at 5–6, *id.* at n.1.) After addressing the issue of GGP's vicarious liability, I will address the remaining claims against each defendant.

**A. Vicarious Liability (GGP)**

GGP argues that three of the state law tort claims pending against it should be dismissed because the Amended Complaint does not properly plead vicarious liability against GGP, and the only basis for liability against GGP on those counts consists of the actions of defendants John Doe 1, John Doe 2, and Jane Doe 3 as alleged mall "security/loss prevention personnel and/or agents of the Defendants Kay Jewelers and/or GGP...." (ECF No. 45-1 at 5 (citing Am. Compl. at ¶ 12).) [4] Under Connecticut law, "a master is liable for the willful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business" under the doctrine of *respondeat superior. Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500 (1995). On the other hand, "an employer is not liable for the negligence of its independent contractors" as a general rule. *See Pelletier v. Sordoni/Skanska Const. Co.*, 264 Conn. 509, 517 (2003). GGP attaches to its motion to dismiss a copy of an agreement purporting to demonstrate that defendants John Doe 1, John Doe 2, and Jane Doe 3 were independent contractors, not employees, of GGP. (ECF No. 45-1 at 5, 192–194.) This exhibit is not a document the Court may consider on a motion to dismiss, however, as the Court is limited to the well-pleaded allegations in Wade's complaint and documents incorporated or relied on therein. The Amended Complaint alleges that these defendants were "security/loss prevention personnel and/or agents" of Sterling and GGP, and asserts claims against GGP based on their role as employees or agents of GGP. (Am. Compl. at ¶ 12); *id.* at ¶¶ 65 (alleging in Count 2 that "the security/loss prevention personnel for Kay Jewelers and GGP, Jane Doe 3, who stopped Plaintiff, pulled him aside and with John Doe 1, along with Police Officer Decker, surrounded Plaintiff ..."), 73 (alleging in Count 3 that the "direct and proximate cause of the injuries and damages suffered by the Plaintiff as hereinafter described were the actions of the Defendants and their agents, servants and/or employees"). Of note, GGP does *not* argue that Wade has insufficiently pleaded the existence of an agency or employee relationship, but in effect argues that Wade's pleading must be read in light of its agreement. Since the Court may not consider the agreement, I must reject GGP's argument and assess the claims against GGP on their merits.

**B. False Imprisonment (Sterling and GGP)**

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 77 of 331

**\*4**  "[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another." *Berry v. Loiseau,* 223 Conn. 786, 820 (1992) (citation omitted). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Id.* In addition, "the detention must be wholly unlawful...." *Lo Sacco v. Young,* 20 Conn. App. 6, 19 (1989). "Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." *Green v. Donroe,* 186 Conn. 265, 267 (1982) ("The fact that there was no formal arrest of the plaintiff ... and that he remained in the custody of the police for only ten minutes would not necessarily defeat his cause of action for false imprisonment."). However, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Rivera v. Double A Transp., Inc.,* 248 Conn. 21, 31 (1999) (citing *Donroe,* 186 Conn. at 268). "Nothing less than a rather extreme brand of recklessness will substitute for the standard requirement of intention in false imprisonment cases." *Id.*

### 1. Sterling

Sterling moves to dismiss the false imprisonment claim on the grounds that (1) the amended complaint does not allege that Sterling detained Wade, because the Kay Jewelers Individual Defendants did not call the police or themselves detain Wade; and (2) the amended complaint does not allege that the Kay Jewelers Individual Defendants acted with the requisite intent in misidentifying Wade to mall security. (ECF No. 43 at 27–31.) Wade responds that the amended complaint alleges that Sterling detained Wade because the Mall Security Individual Defendants are Sterling's employees or agents, and in any event the complaint alleges that Kay Jewelers Individual Defendants acted with the requisite intent in identifying Wade to both mall security and the police as a suspect in previous incident of attempted credit card fraud. (ECF No. 46 at 19–21 (citing Am. Compl. at ¶¶ 20–22, 27).)

First, drawing all inferences in Wade's favor, I conclude that the Amended Complaint alleges that Sterling detained Wade. Although the Amended Complaint does not affirmatively allege that the Kay Jewelers Individual Defendants detained Wade, it does allege that the Mall Security Individual Defendants are employees or agents of Sterling. (*See* Am. Compl. at ¶ 12 (the Mall Security Individual Defendants are "security/loss prevention personnel and/or agents of the Defendants Kay Jewelers and/or GGP....."); *id.* at ¶¶ 24, 25 (identifying Jane Doe 3 and John Doe one as "providing [ ] security/loss prevention services to Kay Jewelers").)[5]  The amended complaint alleges that the Mall Security Individual Defendants (specifically Jane Doe 3 and John Doe 1) detained Wade. (Am. Compl. at ¶¶ 23, 44, 49.) The amended complaint thus adequately pleads that Sterling detained Wade.

Second and in any event, the Amended Complaint alleges that the Kay Jewelers Individual Defendants acted "for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Donroe,* 186 Conn. at 268. When all inferences are drawn in Wade's favor, the Amended Complaint alleges that: (1) the Kay Jewelers Individual Defendants called mall security to identify Wade as a suspect who had attempted to commit credit card fraud the previous week (Am. Compl. at ¶¶ 20–22, 35), and mall security called the police (Am. Compl. at ¶¶ 35, 51);[6] (2) a Kay Jewelers employee "directed the security/loss prevention personnel for Kay Jewelers and GGP, Jane Doe 3, who stopped Plaintiff" (Am. Compl. at ¶ 65) and that (3) the Kay Jewelers Defendants "intended for Plaintiff to be stopped or detained" because they "had to know" he would be detained as a result of the police being called. (Am. Compl. at ¶¶ 38–40.) Though allegations (2) and (3) would be conclusory on their own, they are supported by specific acts the Kay Jewelers Individual Defendants took, namely: (4) after leaving Kay Jewelers, defendant Jane Doe 3 informed Wade that one of the Kay Jewelers Individual Defendants had identified him as the suspect (Am. Compl. at ¶¶ 20–22); and (5) after Wade was allegedly confined, Officer Decker told Wade that "a Kay Jeweler employee downstairs told [Officer Decker] that Plaintiff, Wade, was the suspect and that he and others were walking around the mall looking for Plaintiff, Wade, until they found him." (*Id.* at ¶ 27.)[7]

**\*5**  *Bryans v. Cossette,* which Sterling relies on, is distinguishable. No. 3:11-CV-01263 JCH, 2013 WL 4737310 (D. Conn. Sept. 3, 2013). *Bryans* addressed a motion for summary judgment, not a motion to dismiss. In addition, the undisputed facts there showed that a hospital's medical staff asked its security personnel to stop a patient leaving the hospital, but did *not* ask the police officers who were solely responsible for arresting him to do so. *See* 2013

WL 4737310, at *13 (D. Conn. Sept. 3, 2013). Drawing all inferences in his favor, I conclude that Wade has plausibly alleged that the Kay Jewelers Individual Defendants directed the Mall Security Individual Defendants to stop plaintiff (Am. Compl. ¶¶ 20–22, 65), informed the police that he was the suspect (Am. Compl. ¶ 27), and *both* the Mall Security Individual Defendants and police detained him. (*See* Am. Compl. at ¶ 26.) Accordingly, I deny Sterling's motion to dismiss the false imprisonment count.

### 2. GGP

GGP argues that the false imprisonment claim against it should be dismissed because Wade fails to plead that the Mall Security Individual Defendants actually confined Wade or possessed the requisite intent to do so. (ECF No. 45-1 at 14.) GGP's first argument rests entirely on admissions in Wade's pre-deposition suit, which the Court may not consider to the extent they contradict the allegations of the complaint. (*Id.*) In any event, those admissions—that Wade was not handcuffed, placed under arrest, or told he could not leave—do not foreclose a false imprisonment claim. *See* Donroe, 186 Conn. at 267 (formal arrest and lengthy detention not required). Wade's complaint alleges facts showing that the Mall Security Individual Defendants confined him, specifically:

> Jane Doe 3 and John Doe 1 and Police Officer Decker surrounded Plaintiff, with Officer Decker in front facing Plaintiff and Jane Doe 3 on one side of Plaintiff and John Doe 1 on the other side of Plaintiff, confining Plaintiff within a space at Buckland Hills Mall, forcing Plaintiff to stay in the space, from where he could not leave

(Am. Compl. at ¶ 26.) The case GGP cites, *Richardson v. Costco Wholesale Corp.*, also addressed a motion for summary judgment, which the Court granted because the undisputed evidence showed that the plaintiffs knew that they could leave their supposed confinement by exiting through the employee door, notwithstanding the fact it would set off an alarm. *See* 169 F. Supp. 2d 56, 61 (D. Conn. 2001).

By contrast, GGP does not point to any allegations in the complaint indicating that Wade's confinement was voluntary.

GGP's second argument about its lack of intent is easily addressed. As discussed above, the complaint alleges that the Mall Security Individual Defendants, along with Officer Decker, confined Wade. Accordingly, Wade has sufficiently alleged that GGP acted with the "purpose of imposing a confinement" on Wade. Accordingly, I will not dismiss the false imprisonment claim against GGP.

### C. Defamation *Per Se* (Sterling and GGP)

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."

Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627 (2009). For defamation *per se*, "the [defamation] must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached," in other words, "that the crime be a chargeable offense which is punishable by imprisonment." Skakel v. Grace, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (citation omitted). "In the case of a statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it." Id. at 207. "Whether a statement is defamatory per se is a question of law for the court." *Id.* (citation omitted). "[T]ruth is an affirmative defense to defamation."

Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 228–229 (2004).

**\*6** Sterling first argues that Wade has not alleged any harm to his reputation. (ECF No. 43 at 38.) But the complaint alleges that Sterling made the defamatory statements that Wade had "been robbing [Kay Jewelers store] for three months" and "ATTEMPTED TO ILLEGALLY USE A CREDIT CARD IN [KAY JEWELERS] STORE." (ECF No. 36 at ¶ 73.)[8] Sterling's argument must fail because Wade has alleged defamatory statements accusing him of crimes potentially punishable by imprisonment, *i.e.* larceny or illegal use of a credit card, *see* Conn. Gen. Stat. §§ 53a-119, 53a-128c *et seq.*, and thus reputational harm is conclusively presumed.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 79 of 331

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Sterling next argues that Wade does not allege a defamatory statement was published about him, reasoning that "[c]onfusing an innocent person with a guilty person does not constitute a defamatory statement identifying the innocent person." (ECF No. 43 at 38–39.) While it is true that Wade has not alleged any facts showing that the Kay Jewelers Individual Defendants *lied* in reporting their suspicions, deliberate falsity is not required to prove defamation *per se* where the plaintiff is not a public figure or is not seeking punitive damages. [9] *See Gambardella*, 291 Conn. at 628, 630 (noting that a plaintiff who is a public figure or who is seeking punitive damages must show that the defendant published a defamatory statement with at least "reckless disregard for its truth"). Moreover, Sterling's brief does not adequately argue that Wade failed to allege the required mental state, because Sterling squarely raised the issue for the first time only on reply. (ECF No. 53 at 6.) [10] *See United States v. Pepin*, 514 F.3d 195, 203 n.13 (2d Cir. 2008) (stating that generally, a court does "not consider issues raised in a reply brief for the first time because if a [party] raises a new argument in a reply brief [the opposing party] may not have an adequate opportunity to respond to it."). Further, none of the cases cited by Sterling stand for the proposition that a defamatory statement about a wrongly identified plaintiff is inactionable, as opposed to statements that do not mention the plaintiff at all. *See Sorensen v. Fayerweather Yacht Club, Inc.*, No. CV136033440S, 2013 WL 6989418, at *10 (Conn. Super. Ct. Dec. 13, 2013) (dismissing defamation claims brought by two plaintiffs where "there are no allegations of defamatory communications made to third parties concerning anyone other than [a third plaintiff]"); *Devone v. Finley*, No. 3:13-CV-00377 CSH, 2014 WL 1153773, at *9 (D. Conn. Mar. 20, 2014) (dismissing defamation claim to the extent the defamatory statements were about plaintiff's son or the police department, not the plaintiff); *Glover v. Glover*, No. CV085025507S, 2011 WL 3211180, at *2 (Conn. Super. Ct. June 22, 2011) (email "to the effect that the author agrees with his sister, that the property should not be sold" did not identify plaintiff). Both allegedly defamatory statements, read in full, do identify *Wade* (albeit not by name) as a suspect in the robberies, credit card fraud, and possible ID theft at the Kay Jewelers Store. (*See* Am. Compl. at ¶¶ 20, 35, 73.) Accordingly, the defamatory statements were about Wade.

**\*7** The defamatory statements alleged against GGP, however, were literally true and thus are not actionable. (*See* ECF No. 45-1 at 15.) Wade's defamation count against GGP, read in light of the rest of the complaint, is premised on two statements: (1) that Jane Doe 3 told Wade that

"a Kay Jewelers' employee ... called with a description of Plaintiff, Wade as the one that's been robbing them for three months" (Am. Compl. at ¶¶ 20, 73), and (2) the police were "CALLED BY THE MALL SECURITY BECAUSE A MALE WAS IDENTIFIED BY AN EMPLOYEE OF KAYS JEWELERS AS A SUSPECT WHO ATTEMPTED TO ILLEGALLY USE A CREDIT CARD IN THEIR STORE LAST WEEK AND POSSIBLY ID THEFT." (Am. Compl. at ¶¶ 51, 73.) Drawing all inferences in Wade's favor, both statements are true, as these allegations state that the Kay Jewelers Individual Defendants identified Wade to the Mall Security Individual Defendants, who reported to the police the fact of Wade's identification. [11] (*Id.*) Although truth is ordinarily an affirmative defense to a defamation action, I find that the facts Wade alleges show that the statements made by the Mall Security Individual Defendants—allegedly GGP's agents—were true. *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) ("[W]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer."). Accordingly, I DISMISS Wade's defamation *per se* claim against GGP, but Wade may proceed on his claim against Sterling.

### D. 42 U.S.C. § 1981 "Equal Benefits" Claim (Sterling)

42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. To state a § 1981 claim, "plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 80 of 331

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

(3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). When the enumerated activity is plaintiff's deprivation of the "full and equal benefit of all laws and proceedings," plaintiff must (1) allege racial animus; (2) "identify a relevant law or proceeding for the 'security of persons and property;' " and (3) allege "that defendants have deprived them of 'the full and equal benefit' of this law or proceeding." *Phillips v. Univ. of Rochester*, 316 F.3d 291, 298 (2d Cir. 2003) (citing 42 U.S.C. § 1981(a) ).

Sterling argues that Wade's "equal benefits" claim under 42 U.S.C. § 1981 must be dismissed because Wade does not allege specific facts showing racial animus or allege that Sterling deprived him of any law for the security of persons. (ECF No. 43 at 24–31.) Wade responds that he has sufficiently alleged discriminatory intent and that his false imprisonment and defamation *per se* tort claims supply the legal basis for his claim. (ECF No. 46 at 6–15.) Because Wade has alleged that he is member of a racial minority (Am. Comp. at ¶¶ 7, 13), and because I have found Wade has sufficiently alleged the torts of both false imprisonment and defamation *per se* against Sterling, which I assume without deciding supply a sufficient basis to meet the second and third elements of the *Phillips* test, I examine only whether Wade has sufficiently pleaded racial animus. *See* Bishop v. Best Buy, Co. Inc., No. 08 CIV. 8427 LBS, 2010 WL 4159566, at *5 (S.D.N.Y. Oct. 13, 2010) (denying motion to dismiss 1981 claim where plaintiff "sufficiently allege[d] the torts of assault and false imprisonment"), *reconsideration on other grounds,* 2011 WL 4011449 (S.D.N.Y. Sept. 8, 2011).

In order to survive a motion to dismiss on a section 1981 claim, a plaintiff must specifically allege the "circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994). "A plaintiff's 'naked allegation' of racial discrimination on the part of a defendant is too conclusory to survive a motion to dismiss." *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988); *see also Fouche v. St. Charles Hosp.*, 64 F. Supp. 3d 452, 457 (E.D.N.Y. 2014) ("[B]ald assertions of discrimination—unsupported by any meaningful comments, actions, or examples of similarly-situated persons outside of the Plaintiff's protected class being

treated differently—are insufficient to survive a motion to dismiss").

**\*8** Wade has made only conclusory allegations concerning the discriminatory intent of the Kay Jewelers Individual Defendants (the only defendants against whom he asserts his § 1981 claim). Wade's allegations of the Kay Jewelers Individual Defendants' racial animus are essentially that (1) "even though [they] were blacks," they identified Wade as the suspect because "they ... saw him as criminal because of the color of his skin and ... Plaintiff fit their idea of a shoplifter," and (2) they "describ[ed] the shoplifter who attempted to illegally use a credit card and who has been robbing Kay Jewelers for three months, as [Wade], the description consisting solely of Plaintiff, himself, a black, African-American, male, constitute racial profiling and intent to discriminate." (ECF No. 36 at ¶¶ 41, 57 (alterations omitted).) These allegations are not sufficient to plead racial animus, because they simply recast *Wade's belief* that the Kay Jewelers Individual Defendants singled him out because of his race. *See Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (affirming dismissal of § 1981 claim containing only "conclusory allegations that the defendants violated [plaintiff's] rights 'because of their discriminatory intent' and 'based on his race and color.' "). Wade alleges no specific facts to support this conclusion, such as "meaningful comments, actions, or examples of similarly-situated persons outside of the Plaintiff's protected class being treated differently." *Fouche,* 64 F. Supp. 3d at 457; *cf.* *Bishop,* 2010 WL 4159566, at *6 (denying motion to dismiss on equal benefit claim where plaintiff alleged that Caucasian and non-African American were not subjected to discriminatory treatment and cited specific, racially-motivated comments by defendants). Nor does he allege anything the Kay Jewelers Individual Defendants did or said that suggests that they "saw him as a criminal because of the color of his skin" or that he "fit their idea of a shoplifter." Moreover, even his conclusory allegations are expressly contradicted by other allegations that suggest that the Kay Jewelers Individual Defendants identified Wade because he fit the description of a particular suspect, not because of his race. (*See* Am. Compl. ¶¶ 20, 22, 42.)

Wade also points to his allegation that "Kay Jewelers' top management practice and believe in discrimination (see, e.g., Jock *et al. v. Sterling Jewelers Inc.*, before the American Arbitration Association), creating a corporate culture where Kay Jewelers store employees routinely and

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 81 of 331

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

disproportionately discriminate leading to racial profiling of African-Americans and people of color for suspicion of criminal activity." (ECF No. 46 at 9 (citing Am. Compl. at ¶ 52).) This allegation fares no better, because, in addition to pleading a vague "corporate culture" of racial discrimination without specific examples, Wade does not supply any facts alleging a causal link between the alleged "corporate culture" and the specific discriminatory actions taken by the Kay Jewelers Individual Defendants. *See* Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (citation omitted) ("[I]n order to make out a claim for individual liability under Section 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.' "). [12]

Wade cites *Martin v. J.C. Penney Corp.*, 28 F. Supp. 3d 153 (E.D.N.Y. 2014), and *Phillip*, 316 F.3d 291, in support of his argument that the amended complaint sufficiently pleads racial animus. (ECF No. 46 at 7–8.) *Martin* involved a summary judgment motion, and the Court concluded that the jury could infer that "defendants' surveillance of plaintiffs and their alleged failure to conform with store policy" prior to detaining a suspected shoplifter could support a finding of discriminatory intent. *Id.* at 157–58. Even if *Martin* had applicability to pleading standards, the Kay Jewelers Individual Defendants are not alleged to have surveilled Wade, and Wade does not allege any policy that the Kay Jewelers Individual Defendants failed to follow. Moreover, *Phillip*, though pre-*Twombly*, actually supports my conclusion that Wade's § 1981 claim fails. There, the Second Circuit vacated a grant of a motion to dismiss where the plaintiff had specifically alleged that "the plaintiffs were singled out of a group that apparently also contained non-minority students." *Phillip*, 316 F.3d at 299. As discussed above, Wade makes no allegations at all that he was singled out for disparate treatment relative to shoppers of other racial groups.

Accordingly, Wade has not sufficiently pleaded racial animus, and so his "equal benefit" claim against Sterling is DISMISSED.

### E. IIED (Sterling)

To prevail on a claim for intentional infliction of emotional distress under Connecticut law, a plaintiff must show "(1)

that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). Sterling argues that the Amended Complaint does not allege the Sterling employees' intent or allege that Sterling's employees committed extreme and outrageous conduct by calling mall security. (ECF No. 43 at 34–36; ECF No. 53 at 6–7.) Wade argues that the amended complaint adequately pleads intent, and submitting a false police report constitutes extreme and outrageous conduct. (ECF No. 46 at 25–28.)

**\*9** Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. *See* Appleton, 254 Conn. at 210. Only where reasonable minds disagree does it become an issue for the jury. *Id.* The general rule is that the conduct must "be[ ] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 211.

Connecticut courts have held that a report to the police typically does not constitute the type of "extreme and outrageous" conduct necessary to support a claim for intentional infliction of emotional distress. *See* Crocco v. Advance Stores Co. Inc., 421 F. Supp. 2d 485, 504 (D. Conn. 2006) (collecting cases*); see* Pantaleo v. Ravski, No. CV 920326931, 1997 WL 94103, at \*5 (Sup. Ct. Feb. 14, 1997) ("[C]ourts in Connecticut and elsewhere have concluded that calling the police to report suspected wrongdoing normally does not constitute 'extreme and outrageous' conduct sufficient to impose liability for intentional infliction of emotional distress."). There is of course no bright line rule, and "the court must look to the specific facts and circumstances of each case in making its decisions." *Menon v. Frinton*, 170 F. Supp. 2d 190, 198 (D. Conn. 2001). Here, all the complaint alleges is that the Kay Jewelers Individual Defendants made a report to mall security that they believed Wade was the individual who they suspected committed various crimes in their store and directed the police to Wade. (*See, e.g.*, Am. Compl. at ¶¶ 20, 27, 35.) As discussed above, there are no facts pled to suggest that the Kay Jewelers Individual Defendants deliberately made

false statements to anyone to induce Wade's detention or arrest. Even if their report was incorrect and negligently made, that conduct was not so extreme or outrageous to offend societal norms. Stores must regularly report suspected shoplifters or other crimes, and no arrest or other action against Wade allegedly resulted from the report. *See Bozelko v. Milici*, No. NNHCV115033844S, 2013 WL 1277295, at *14 (Conn. Super. Ct. Mar. 11, 2013) (collecting cases for the proposition that "[w]hether such allegations are sufficiently extreme and outrageous to survive a motion to strike depends, at least in part, on the seriousness of the offense reported to the police"); *Bremmer-McLain v. City of New London*, No. CV115014142S, 2012 WL 2477921, at *10 (Conn. Super. Ct. June 1, 2012) (granting motion to strike where plaintiffs did not allege facts showing that the "report to the police was false and misleading" or "that either plaintiff was arrested or that any other action was taken as a result of the false police report."), *aff'd*, 143 Conn. App. 904 (2013).

The two cases Wade cites in his complaint and opposition are not to the contrary. (Am. Compl. at 15 n.3; ECF No. 46 at 27–28.) In *Crocco*, the Court found that reasonable minds could differ on whether the undisputed evidence that defendants had "*knowingly* report[ed] false information to [the police] so as to give the impression that [plaintiff] was stalking or threatening them would constitute extreme and outrageous conduct" where plaintiff was ultimately arrested. *Crocco*, 421 F. Supp. 2d at 505 (emphasis added). In *Jezierny*, the defendant made false harassment report to the police "to achieve a vindictive goal," *i.e.* to get plaintiff arrested and criminally prosecuted for a dispute over a chicken coop. 2005 WL 2496525, at *3 (Conn. Super. Ct. Aug. 24, 2005). Here, Wade has not alleged that the Kay Jewelers knowingly made a false police report, or that any arrest or prosecution occurred as a result of that report. Because Wade does not allege outrageous conduct, I grant the motion to dismiss his IIED claim.

### F. NIED (Sterling and GGP)

**\*10** To show negligent infliction of emotion distress under Connecticut law, plaintiff must prove "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). "The foreseeability requirement in a negligent infliction of

emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm." *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010). "In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." *Id.*

Both Sterling and GGP argue that Wade does not allege that they should have foreseen that their conduct was likely to cause emotional distress severe enough that it might result in illness or bodily harm. (ECF No. 43 at 43; ECF No. 45-1 at 17–18.) [13] Wade responds that the complaint alleges that his emotional distress was foreseeable because both the Kay Jewelers Individual Defendants and Mall Security Individual Defendants had to know that the police would come when they reported his supposed crimes (ECF No. 46 at 29; ECF No. 50 at 16; Am. Compl. at ¶¶ 36, 38, 40; *see also id.* at ¶¶ 27, 39, 40, 44, 46–49.)

Although the Court acknowledges that Wade's allegations are thin, they sufficiently allege that it was foreseeable that the defendants' conduct would cause Wade emotional distress likely to lead to illness or bodily harm. Wade has alleged (1) that both the Kay Jewelers Individual Defendants and the Mall Security Individual Defendants knew or should have known that Wade's detention was likely to result from their conduct (Am. Compl. at ¶¶ 38–40); (2) that at the time of his detention, "[Wade] was shaking, shaking the whole entire time. Anxiety was [sic] take over. [Wade] was so shaken...." (*id.* at ¶ 49); (3) that Wade has "been scarred" and "look[s] [back at the incident] at every day," (*id.* at ¶ 48); and (4) that Wade suffers as a result of the incident, among other things, "embarrassment, anxiety, stress, flashbacks, anger and emotional distress" requiring medical attention. (*Id.* at ¶¶ 88, 90.) In combination with Wade's allegation that the defendants' conduct "was reasonably foreseeable to cause emotional distress and in fact caused emotional distress to [Wade]," (*id.* at ¶ 86), I conclude that Wade has sufficiently pleaded that defendants should have foreseen that their conduct was likely to cause emotional distress severe enough that it might result in illness or bodily harm.

I therefore reject Sterling and GGP's arguments to dismiss the count for negligent infliction of emotional distress against them.

### G. Negligent Supervision (Sterling and GGP)

To state a negligent supervision claim under Connecticut law, "plaintiff must plead and prove that she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise." *Brooks v. Sweeney*, 299 Conn. 196, 209 n.12 (2010) (citing *Roberts v. Circuit–Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001) ). "Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action." *Doe v. Saint Francis Hosp. & Med. Center*, 309 Conn. 146, 174 (2013) (citation omitted). The "general rule" is that one has "no legal obligation to protect another," but an exception "may arise when the defendant's own conduct creates or increases the foreseeable risk that such other person will be harmed by the conduct of a third party." *Id.*

**\*11** Sterling argues that the amended complaint does not allege any facts to show that Sterling knew or reasonably should have known of any of its employees' propensity to engage in tortious conduct. (ECF No. 43 at 39–40; *see also* ECF No. 54 at 8 (GGP raises same argument on reply).) Wade responds that the Amended Complaint alleges that Sterling Jewelers "created a corporate culture where Kay Jewelers store employees routinely and disproportionately discriminate leading to racial profiling of African-Americans and people of color for suspicion of criminal activity." (ECF No. 46 at 32 (citing Am. Compl. at ¶ 51).) Accordingly, Wade argues that "Sterling Jewelers knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." (*Id.*) [14]

Both parties are mistaken that Wade must plead that the defendants knew or should have known of an employee's "propensity" to engage in that type of tortious conduct to establish that such conduct was foreseeable, and thus that the defendants had a duty to prevent it. In *Saint Francis Hosp. & Med. Ctr.*, the Connecticut Supreme Court held that the trial court did not need to give a jury instruction on propensity in a negligent supervision claim against an employer because "[t]he criminal misconduct of a third party may be foreseeable under the facts of a particular case ... without a showing that the defendant had such actual or constructive knowledge of the third party's criminal propensity." 309 Conn. at 172. In other words, "proof of actual or constructive knowledge of propensity is but one way to establish that the criminal misconduct of the third party was foreseeable." *Id.* at

173. Accordingly, Wade did not need to plead that the defendants knew or should have known its employees had a "propensity" for the type of tortious conduct alleged to establish defendants' duty to prevent such conduct.

For its part, GGP argues that the Mall Security Individual Defendants are not GGP employees, and both Sterling and GGP also assert that Wade has not adequately pleaded that their employees committed any tortious conduct. (ECF No. 43 at 45; ECF No. 45 at 22–23.) Because I have already concluded that Wade has pleaded that the Mall Security Individual Defendants were the "security/loss prevention personnel and/or agents" of GGP (Am. Compl. ¶ 12), and that Wade states false imprisonment and NIED claims against both defendants, I reject these arguments.

### H. PSC's Third-Party Motion to Dismiss

GGP impleaded PSC as the alleged employer of the Mall Security Individual Defendants and asserted claims for negligence, common law indemnification, and contractual indemnification. (ECF No. 57.) PSC moves to dismiss the negligence and common law indemnification counts for failure to state a claim. (ECF No. 70.)

First, PSC argues that the negligence count does not state a claim because that count asserts that PSC is liable to *Wade*, not GGP. (ECF No. 70-1 at 4; *see also* ECF No. 57 at ¶¶ 10–11 (alleging that "if the plaintiff [Wade]" was harmed, "it was due to the negligence ... of PSC" and any losses were "directly and caused proximately caused" by PSC).) I agree. While Rule 14 authorizes third-party complaints where the "third party's liability must be dependent upon the outcome of the main claim or the third party must be 'secondarily liable to the defending party,' " such claims must still assert that the third-party defendant is liable to the *third-party plaintiff*. See *Hopkins v. Kawasaki Rail Car, Inc.*, No. 3:17-CV-839 (CSH), 2017 WL 3715247, at *10 (D. Conn. Aug. 28, 2017) (asserting claims for indemnification, contribution, and apportionment to the third-party plaintiff); *Am. Nat. Fire Ins. Co. v. A. Secondino & Sons*, No. CIV.A. 3:92-629(JAC), 1995 WL 253085, at *3 (D. Conn. Apr. 28, 1995) ("[A] third-party plaintiff seeking to implead a third party must allege that a third-party defendant is liable to the third-party plaintiff."). Because GGP asserts a direct negligence claim against PSC, but does not actually assert that PSC is liable to GGP, GGP fails to state a claim. *See, e.g.*, *Toberman v. Copas*, 800 F. Supp. 1239, 1242 (M.D. Pa. 1992) ("A defendant sued for negligence, for example, cannot implead a third

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 84 of 331

party whose negligence was totally responsible for plaintiff's injury. When a third party's conduct furnishes a complete defense against the defendant's liability, the defendant may raise that conduct defensively in his answer but may not use it as a foundation for impleader." (internal quotation marks and citation omitted).). GGP's negligence claim is therefore dismissed.

**\*12** Second, PSC argues that GGP's common law indemnification claim should be dismissed because the third party complaint does not contain any allegation about exclusive control by PSC. (ECF No. 70-1 at 3.) To assert a common law indemnification claim under Connecticut law, a defendant/third-party plaintiff must allege that: "(1) the party against whom the indemnification is sought was negligent; (2) that party's active negligence, rather than the defendant's own passive negligence, was the direct, immediate cause of the accident and the resulting injuries and death; (3) the other party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the other party's negligence, had no reason to anticipate it, and reasonably could rely on the other party not to be negligent." *Smith v. City of New Haven*, 258 Conn. 56, 66 (2001) (citing *Kaplan v. Merberg Wrecking Corp.*, 152 Conn. 405, 416 (1965) ). "While the question of exclusive control is ordinarily a question of fact to be determined by a jury," a claim may be dismissed as a matter of law where the allegations, evaluated against the backdrop of the plaintiff's complaint, "could not result in a jury finding that the third-party defendants were in exclusive control over the situation." *Pennsylvania Mfrs. Indem. Co. v. Cintas Fire Prot. & Fire Sys. of Springfield, CT*, No. 3:11-CV-650 VLB, 2012 WL 3779140, at \*5 (D. Conn. Aug. 30, 2012) (citations omitted).

This is not such a case. The Third-Party Complaint alleges that each count of Wade's complaint "alleges acts or omissions of security officers" who were "employed by, trained by, and worked at the direction of PSC." (ECF No. 57 at ¶¶ 16, 17.) If proven, the allegations in GGP's third-party complaint could result in a jury finding that PSC, not GGP, was in exclusive control of the Mall Security Individual Defendants who committed the tortious conduct

alleged in the Amended Complaint. I further agree with GGP that this case is distinguishable from *Pennsylvania Mfrs. Indem. Co. v. Cintas Fire Prot. & Fire Sys. of Springfield.* In that case, the court dismissed an indemnification claim against the installer of a deficient sprinkler system where parties did not dispute that the installer had no contact with the sprinkler system for almost a decade, and the plaintiff's negligence claims were premised on acts by the third-party plaintiff that would be inconsistent with the installer's exclusive control. *Pennsylvania Mfrs. Indem. Co.*, No. 3:11-CV-650 VLB, 2012 WL 3779140, at \*6 (D. Conn. Aug. 30, 2012). Here, the parties actively dispute PSC's role, and Wade's claims are not premised on any specific conduct by GGP that is inconsistent with PSC's exclusive control—in other words, Wade's proving his allegations that the Mall Security Individual Defendants falsely imprisoned him would not necessarily preclude a finding that PSC had exclusive control of them. (*See* Am. Compl. at ¶ 12 (alleging only that the Mall Security Individual Defendants were "security/loss prevention personnel and/or agents of ... GGP") ). I therefore deny PSC's motion to dismiss as to this count.

## IV. CONCLUSION

For the foregoing reasons, Sterling's (ECF No. 42) and GGP's (ECF No. 45) motions to dismiss the amended complaint (ECF No. 36) are GRANTED in part and DENIED in part.

The claims for violation of 42 U.S.C. § 1981 (Count One) and intentional infliction of emotional distress (Count Four) are DISMISSED in full. The defamation *per se* claim against GGP (Count Three) is DISMISSED. In addition, PSC's motion to dismiss the third-party complaint is GRANTED in part and DENIED in part. (ECF No. 70.) GGP's negligence claim (Count One) against PSC is DISMISSED. Finally, the Clerk is directed to terminate Kay Jewelers, Inc. as a defendant.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4440532

**Footnotes**

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 85 of 331

1    Sterling has repeatedly asserted that there is no such entity as "Kay Jewelers, Inc.," which is simply a trade name for Sterling. The Amended Complaint likewise alleges that Kay Jewelers, Inc. is a "non-existent" entity (ECF No. 36 at ¶ 9). Accordingly, the Clerk is directed to terminate Kay Jewelers, Inc. as a defendant.

2    For ease of reference, I refer to defendants Jane Doe 1 and Jane Doe 2 as the "Kay Jewelers Individual Defendants" and defendants Jane Doe 3, John Doe 1, and John Doe 2 as the "Mall Security Individual Defendants." (Am. Compl. at ¶¶ 11–12, 24–25.)

3    I also decline that invitation because the plaintiff had not had a full opportunity to conduct discovery when Sterling's motion was filed. (*See* Fed. R. Civ. P. 56(d); *see* ECF Nos. 48, 51 (listing necessary discovery to oppose summary judgment motion).)

4    GGP also argues that the negligent supervision claim (Count 6) should be dismissed on similar grounds, which I address in the discussion of that claim. (ECF No. 45 at 6.)

5    Sterling argues that Wade conceded in his pre-suit deposition that none of individuals involved in detaining him worked for Kay Jewelers, but as discussed above the Court may not use the transcript to contravene Wade's complaint. (ECF No. 53 at 7.)

6    Although some allegations imply that a Kay Jewelers Individual Defendant called the police (Am. Comp. at ¶¶ 38–40), others contradict that assertion and state that mall security called. (Am. Compl. at ¶¶ 20, 35.) Moreover, these particular allegations (Am. Compl. at ¶¶ 38–40) quote Wade's testimony, which he acknowledges is based exclusively on the police report of the incident. (*See* ECF No. 43-1, Wade Tr. 27:2–29:23.) The police report, which Wade's amended complaint adopts, states that the police were "CALLED BY THE MALL SECURITY." (Am. Compl. at ¶ 35.) Accordingly, I need not accept these particular allegations as true. *See* In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that ... are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely.").

7    Wade also argues in his opposition that the Kay Jewelers Individual Defendants "directed the police to find and stop or detain the Plaintiff," but this statement is not supported by the cited portion of the complaint. (ECF No. 46 at 21.)

8    The Court notes that this paragraph selectively edits the statement provided in full elsewhere in the complaint, but the distinction does not matter for these purposes.

9    Thus, while the lack of allegations suggesting deliberate falsity or reckless disregard forecloses the plaintiff's request for punitive damages (*see* Am. Compl. at 17, ¶ 3), it does not defeat his claim altogether.

10   I do not find that Sterling raised this argument in response to Wade's opposition, and it clearly differs from the "statements *about* Wade" argument raised in Sterling's opening brief. (ECF No. 43 at 39–40.)

11   Jane Doe 3 made the first statement to Wade, not a third party, and so the defamation claim against GGP based on that statement fails on this ground too.

12   The cited arbitration also appears to concern discrimination on the basis of gender, not race. *See* Jock v. Sterling Jewelers Inc., 284 F. Supp. 3d 566, 568 (S.D.N.Y. 2018) (noting allegations that "Sterling discriminated against them in pay and promotion on the basis of their gender").

13   Sterling makes additional arguments that Wade does not allege the Kay Jeweler Individual Defendants' conduct created an "unreasonable risk" of harm or that such conduct caused Wade's injuries, but such arguments appear to be premised on Wade's deposition admissions. (*See* ECF No. 43 at 43.) GGP similarly

Wade v. Kay Jewelers, Inc., Not Reported in Fed. Supp. (2018)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 86 of 331

argues that Wade's reaction was "unreasonable" in light of the Mall Security Individual Defendants' good faith conduct, but in light of Wade's specific pleadings about the reasonable foreseeability of severe emotional distress discussed below, it would be premature to decide this argument on a motion to dismiss. (ECF No. 45-1 at 22.)

14    Sterling also argues that the amended complaint does not allege any facts to show that Sterling inadequately supervised its employees, but does not press this argument on reply (ECF No. 53 at 9–10). In any event, notwithstanding Wade's conclusory "corporate culture" allegation, the amended complaint does plausibly allege that defendants failed to adequately train or supervise its employees on how to prevent "targeting African-American or people of color ... for suspected criminal activity" or falsely accusing, reporting to law enforcement, or detaining customers for shoplifting, credit card fraud, or other criminal activity. (*See* Am. Compl. at ¶¶ 53, 92, 93.)

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1666918
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY,
UCATS Local 3882, Defendants.

No. 20-CV-10802 (JPO) (OTW)
|
Signed 04/29/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree
Deakins, New York, NY, for Defendant New York University.

Gregory Ainsley, Robert T. Reilly, Serge Ambroise,
Ambroise Law, Rachel Sonia Paster, Cohen, Weiss and Simon
LLP, New York, NY, for Defendant Ucats Local 3882.

### REPORT AND RECOMMENDATION

ONA T. WANG, United States Magistrate Judge:

**\*1  To the Honorable J. PAUL OETKEN, United States
District Judge:**

### I. INTRODUCTION

Plaintiff Darwyn M. Morren brings this action against the
defendants, New York University ("NYU"), and UCATS
Local 3882 ("UCATS"). (ECF 2). Plaintiff alleges that: (1)
Defendants discriminated against Plaintiff on the basis of race
and national origin under Title VII of the Civil Rights Act
of 1964, 🚩42 U.S.C. § 1981, the New York City Human
Rights Law ("NYCHRL"), and the New York State Human
Rights Law ("NYSHRL"); (2) Defendants discriminated
against Plaintiff under the Americans with Disabilities Act
("ADA"), the NYCHRL, and the NYSHRL; (3) Defendants
violated the Family and Medical Leave Act of 1993; (4)
NYU breached a contract by terminating him; (5) UCATS
breached the Collective Bargaining Agreement ("CBA") with
NYU by failing to submit grievances on his behalf; (6)
UCATS breached their duty of fair representation to Plaintiff
(ECF 2, ECF 25); (7) Defendants conspired to deprive

Plaintiff of equal protection under 🚩42 U.S.C. § 1985 (ECF
25); (8) Defendants violated Plaintiff's Civil Rights under
🚩Civil Rights Law § 79-n (ECF 25); and (9) negligent
infliction of emotional distress against both Defendants. (ECF
25). Plaintiff seeks "compensatory damages in the sum of
$100,000,000 [f]or emotional and psychological distress.
[P]lus any punitive damages which is exclusive of the
$100,000,000 demand." (Am. Compl. 6).

### II. PROCEDURAL HISTORY

Plaintiff filed a Charge with the U.S. Equal Employment
Opportunity Commission ("EEOC") on August 25, 2020.
(ECF 2). Plaintiff alleges that he received his Rights of
Notice to Sue from the EEOC, dated September 21, 2020, on
September 28, 2020. (ECF 2).

On December 18, 2020, Plaintiff filed his *pro se* Complaint
against Defendants NYU and UCATS. (ECF 2). The
Honorable John P. Cronan referred this case to me for General
Pretrial Management and Dispositive Motion on April 14,
2021.[1] (ECF 15). Plaintiff filed his First Amended Complaint
on June 4, 2021, which adds additional details, but no
additional claims. (ECF 25 (hereinafter "Am. Compl.")). On
June 9, 2021, the parties agreed to a briefing schedule for
Defendants' motions to dismiss the Amended Complaint.
(ECF 29, 33). Plaintiff requested a 31-day extension of
the briefing schedule because of health concerns, which I
granted on July 7, 2021. (ECF 37, 38). The day Defendants'
submissions were due (August 9, 2021), Plaintiff attempted
to amend his First Amended Complaint, without the Court's
leave and without Defendants' consent. (ECF 40, 43). I denied
this request as untimely.[2] (ECF 43).

Defendants filed their respective Motions to Dismiss on
August 9, 2021, in accordance with the amended briefing
schedule. (ECF 46, 48). Ten days later, Plaintiff sought
another extension to file his opposition, which I granted.[3]
(ECF 55, 60). Plaintiff filed his opposition on October 7,
2021, and Defendants filed their replies on October 28, 2021.
(ECF 65, 68, 70).

### III. FACTUAL BACKGROUND[4]
**\*2**  Plaintiff identifies as an "Afro-Caribbean male (black/
[A]frican descent), of Trinidadian [n]ational [o]rigin" with
ADHD. (Am. Compl. 22).[5] He began working at NYU's
Bobst Library in November 2016 as an "ADRSS" (Access

Delivery Resource Sharing Services) assistant. (Am. Compl. at 22). His job responsibilities included "various administrative tasks in the library, including checking out, shelving, unshelving, and stacking books; creating and managing patrons' accounts; working in the course reserves section amongst other responsibilities." (Am. Compl. 23 at ¶ 1). Upon starting work, Plaintiff joined UCATS, where Linda Wambaugh was his union representative. (Am. Compl. 23 at ¶ 2). NYU terminated Plaintiff's employment effective on December 13, 2019. (Am. Compl. 33 at ¶ 49).

### *1. Plaintiff is Assigned a Less Convenient Work Schedule.*

Plaintiff reported to several individuals when he worked at NYU. (Am. Compl. at 23 ¶ 1). His immediate supervisor was Patricia Warrington. (Am. Compl. 23 at ¶ 1). Plaintiff and Warrington both reported to the circulation manager, Deborah Caesar, who was later replaced by Frances Rodriguez. (Am. Compl. 23 at ¶ 1).

In December 2016, Plaintiff met with "management" [6] and was told that he "exceeded expectations" in performance and attendance. (Am. Compl. 23 at ¶ 3). At this meeting, Plaintiff complained that two coworkers were "affecting teamwork/morale," and were "ma[king] [the workplace] a hostile work environment." [7] (Am. Compl. 23 at ¶ 3). "Management" responded by telling Plaintiff, "don't worry about it, and just worry about yourself." [8] (Am. Compl. 23 at ¶ 3).

Around December 2016 or January 2017, Gary Speizale, Plaintiff's coworker, complained about the shift schedule. (Am. Compl. 23 at ¶ 4). Plaintiff alleges that, as a result, Plaintiff's schedule was changed so that he no longer had consecutive days off, while his coworkers, including Speizale, did. (Am. Compl. 23 at ¶ 4). Plaintiff complained to Warrington, Caesar, and Rodriguez that the new schedule was unfair, but "they" told Plaintiff that the schedule was based on seniority, and Plaintiff had the "least amount of seniority" among his coworkers because he was "the most recent hire." (Am. Compl. 23 at ¶ 4). Plaintiff complained to Wambaugh about the schedule, explaining that he was not the most recent hire, but she also said that Speizale was senior to Plaintiff. [9] (Am. Compl. 23–24 at ¶ 4). The Union did not file a grievance on Plaintiff's behalf. [10] (Am. Compl. 24 at ¶ 4).

### *2. Plaintiff is Reprimanded for Taking a Previously-Scheduled Trip to a "Religious Festival."*

**\*3** Plaintiff told his employer "[b]efore [he] [s]tarted employment" in November 2016 that he had plans to attend an annual "Cultural and Religious Festival/carnival [sic]" in Trinidad. (Am. Compl. 24 at ¶ 6). Before he began working, Plaintiff alleges that he was told that he could attend this event, and that he would be paid during his absence. [11] (Am. Compl. 24 at ¶ 6). Then, in February 2017, days before attending the "Cultural and Religious Festival/carnival in Trinidad," "they" told Plaintiff that he would not be paid for the time off he was taking. [12] (Am. Compl. 24 at ¶ 6). Plaintiff went to the festival, but "was accused of misusing sick time" and upon his return, was told that he would be terminated. (Am. Compl. 24 at ¶ 8). "[Plaintiff] explained that [he] was only doing what Rodriguez told [him] to do, and that in any event, [he] had a doctor's note." (Am. Compl. 24 at ¶ 8). Ultimately, Plaintiff was not "disciplined." (Am. Compl. 24 at ¶ 8).

Plaintiff also alleges that in July 2019, he requested time off for his vacation to Trinidad in February 2020, which Rodriguez denied. (Am. Compl. 15). Plaintiff alleges that Caesar had approved Plaintiff's request the past three years (which is inconsistent with his earlier allegations). (Am. Compl. 15). Plaintiff halved the vacation days he initially requested and later cancelled his flight because with fewer days, the cost was higher. (Am. Compl. 15).

### *3. Plaintiff's Probation is Extended.*

In February 2017, Plaintiff complained to NYU and UCATS "that [his] probation period had been extended." (Am. Compl. 24 at ¶ 7). Caeser and Rodriguez told Plaintiff that the extension was because of his "performance issues." (Am. Compl. 24 at ¶ 7). Plaintiff was unaware of any performance issues because he had allegedly been told "numerous of times [sic] that [he] performed [his] job duties beyond expectations and [his] attendance was perfect, unlike others on probation and ... their probation wasn't extended." (Am. Compl. 24 at ¶ 7). Plaintiff also complained about his "coworkers not getting along with one another" at this time. (Am. Compl. 24 at ¶ 7). In response, Rodriguez told Plaintiff, "You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around." (Am. Compl. 24

at ¶ 7). Plaintiff alleges that at the time, Warrington added, "Why don't you just go back to Trinidad to live since you['re] always complaining about what we do here?" (Am. Compl. 15). When Plaintiff told Wambaugh about this interaction, she told him that "the Employer would have fired [him]," and only had not because Plaintiff "had ADHD, [and] they did not want any complaints."[13] (Am. Compl. 24 at ¶ 7). Plaintiff ultimately completed his probationary period in April 2017. (Am. Compl. 24 at ¶ 7).

### 4. Plaintiff Grows Increasingly Suspicious of His Coworkers and Others.

**\*4** Plaintiff alleges that one to two months into his employment (in December 2016 or January 2017), Plaintiff "complained numerous times about coworkers making false statements and claims in order to get [him] fired and sabotage [his probation]." (Am. Compl. 24 at ¶ 5). Between 2017 and 2018, Plaintiff "repeatedly complained to Caesar that Rodriguez" was trying to get him "disciplined or fired." (Am. Compl. 24 at ¶ 8). Caesar's response was that Plaintiff should "not worry about it." (Am. Compl. 24 at ¶ 8). Plaintiff does not state who else, if anyone, tried to get him fired or what statements Rodriguez or others made.

On three occasions between late 2018 and April 1, 2019, Plaintiff complained to Rodriguez and Caesar that "some full-time coworkers seemed to be manipulating students and student-workers to do illegal things, who worked in the library, to look at [him] and treat [him] in a different or suspicious way." (Am. Compl. 25 at ¶¶ 10–12). Plaintiff also complained about Chris Crowe, a Union Representative (who also allegedly lived with Speizale), engaging in this behavior. (Am. Compl. 25 at ¶ 11). Plaintiff further complained that on multiple occasions he was being "stalked" by coworkers and students, and mistreated by students, staff, and professors. (Am. Compl. 25 at ¶ 13). This included allegations that: (1) "students came into the library and pointed and laughed at [Plaintiff]"; (2) students "were recording [Plaintiff]"; and (3) a student bumped into him and another student recorded the incident, "almost as if to catch [Plaintiff] doing something to the student who bumped [him]." (Am. Compl. 25 at ¶ 13). Plaintiff verbally reiterated these complaints to Rodriguez and Caesar for the next two months. (Am. Compl. 25 at ¶ 14). Rodriguez and Caesar did not escalate the complaints; rather, Caesar called Plaintiff "paranoid." (Am. Compl. 25 at ¶ 14). Plaintiff also complained to Wambaugh, who told Plaintiff that there was "no grievance[s] that could be filed

about [his] coworkers, students, and professors doing this to [him]." (Am. Compl. 25 at ¶ 14).

At some unspecified time, Plaintiff alleges that he complained to Wambaugh about his coworkers stalking him, sabotaging his work, and making derogatory comments to him. In response, Wambaugh allegedly said, "they just don't like you" and "they don't have to be nice to you." (Am. Compl. 9). Wambaugh did not file a grievance about Plaintiff's complaint. (Am. Compl. 9).

Plaintiff filed formal written complaints about the above actions in June and July 2019 to Rodriguez and Caesar, which complaints were then forwarded to Human Resources ("HR"). (Am. Compl. 25–26 at ¶ 15). Plaintiff did not feel comfortable discussing the matter with HR, however, because he "believed[d] that management was involved in the mistreatment." (Am. Compl. 26 at ¶ 15). Around this time, Plaintiff also complained to Wambaugh that: (1) a new student coworker was stalking Plaintiff; and (2) Caesar was dating a coworker who was harassing Plaintiff.[14] (Am. Compl. 26 at ¶¶ 16, 17). Wambaugh said that the Union could not file a grievance about the stalking, and that the Union and NYU knew about Caesar's relationship, but "there was nothing that could be done." (Am. Compl. 26 at ¶¶ 16, 17). A few weeks later, Rodriguez took over Caesar's role as circulation manager and Caesar began working in HR. (Am. Compl. 26 at ¶ 18).

"At around the same time," Plaintiff alleges "that [his] electronic devices and personal, NYU email accounts and other accounts had been hacked by the Employer."[15] (Am. Compl. 26 at ¶ 19). Plaintiff believes he was hacked because on one occasion Plaintiff could not log into his NYU email, and on another occasion, he "learned that an NYU VPN had been created with [his] work ID and password" when he was not at work. (Am. Compl. 26 at ¶ 19).

**\*5** After moving apartments in July 2019, Plaintiff alleges that NYU was sending people to stalk his whereabouts.[16] (Am. Compl. 26–27 at ¶ 20). In response to Plaintiff's complaints about this behavior, Warrington told Plaintiff "that [he] was paranoid," and Wambaugh "asked [Plaintiff] what this had to do with the Union." (Am. Compl. 27 at ¶ 20). Wambaugh did not file a grievance. (Am. Compl. 27 at ¶ 20). Plaintiff alleges, however, that after he complained about the stalking, "the Employer changed [his] address in its system back to [his] old address in the Bronx" even though he "never gave them [his] Queens address, but [he] ha[s] mailings from

the Union [a]nd NYU with [his] Queens [a]ddress." (Am. Compl. 27 at ¶ 21).

At some unspecified time, Plaintiff told Rodriguez that he was having sleeping issues. (Am. Compl. 28 at ¶ 26). Plaintiff then alleges that in July or August 2019, Rodriguez recommended that Plaintiff receive treatment from his psychiatrist regarding his sleeping issues. [17] (Am. Compl. 38 at ¶ 72).

### 5. Plaintiff Arrives at Work Late and Takes Time Off.

On September 30, 2019, Rodriguez told Plaintiff that he noticed Plaintiff had been "late a couple times" and warned Plaintiff that if it continued he would be "disciplined." (Am. Compl. 27 at ¶ 23). Plaintiff responded that he "always got to the desk on time, as per [his] schedule, to deal with library patrons," but Rodriguez said that "didn't matter." (Am. Compl. 27 at ¶ 23). Plaintiff told Rodriguez "that other employees had more late arrivals than [he] did, [and] were not disciplined," but Rodriguez "told [Plaintiff] not to worry about other workers." (Am. Compl. 27 at ¶ 23). Plaintiff expressed to Rodriguez that he was "going through a lot," including that he was being stalked to and from work, his devices were being hacked, and he was "traumatized by the harassment at work." [18] (Am. Compl. 27 at ¶ 23). Rodriguez suggested that Plaintiff apply for FMLA leave. [19] (Am. Compl. 27 at ¶ 23). Plaintiff alleges that he applied for FMLA leave in early October 2019. (Am. Compl. 28 at ¶ 25).

At another unspecified time, Plaintiff received "troubling texts" from a number he believes was "pretending to be someone else in [his] contacts." (Am. Compl. 28 at ¶ 26). The texts made "derogatory statement[s], [20] "question[ed]" whether Plaintiff was actually sick, and "stat[ed] that [his] meds are the reason [he] can't get any sleep." (Am. Compl. 28 at ¶ 26). Plaintiff intimates that Rodriguez is the unidentified sender because he told Rodriguez he was not getting any sleep "because of the ongoing harassment from NYU." (Am. Compl. 28 at ¶ 26).

**\*6** In early October 2019, Plaintiff took some sick days. (Am. Compl. 28 at ¶ 27). On October 12, 2019, Plaintiff's coworker, Freddie Olivia, approached Plaintiff, "put [him] in a chokehold from behind," and asked him where he had been the past few days. [21] (Am. Compl. 28 at ¶ 27). Plaintiff told Olivia that he was "concerned" that he was being harassed at work, and also complained that his "work

in the Course Reserve Department ... was not being used effectively" because no one would "ever take the books outor [sic] barely." (Am. Compl. 28 at ¶ 27). Plaintiff does not describe what his "work in the Course Reserve Department" entails.

In the days following this interaction, Plaintiff alleges that "faculty members came up to [him] on several occasions and nervously told [him] why they weren't using their Course Reserve items." (Am. Compl. 28 at ¶ 28). Plaintiff also alleges that items were showing up "on [his] account when [he] wasn't doing Course Reserve work." [22] (Am. Compl. 28 at ¶ 28).

### 6. Plaintiff is Suspended for Fighting at Work.

On November 1, 2019, Plaintiff alleges that Olivia was "staring over [his] shoulder and following [his] movements." (Am. Compl. 28–29 at ¶ 29). Plaintiff confronted Olivia about this behavior and Olivia responded by "aggressively trying to [i]ncite a fight [with Plaintiff] and [saying], 'So [w]hat's up?!' " (Am. Compl. 29 at ¶ 29). Plaintiff began to walk away when another coworker, Robert Jameson, ran toward Plaintiff and "grabbed and/or pushed [Plaintiff]." (Am. Compl. at 29 ¶ 29). Plaintiff claims to have self-recorded audio of this interaction. (Am. Compl. 29 at ¶ 31).

That same day, Plaintiff was working alongside Adjoa Walker, a student-worker. (Am. Compl. 29 at ¶ 30). Plaintiff repeatedly asked Walker to help him check out customers until Walker began crying. (Am. Compl. 29 at ¶ 30). Plaintiff asked whether Walker was okay, and "suspect[ed] that she was crying because she was torn between harassing and agitating [him], at the request of the Employer, and doing her job." (Am. Compl. 29 at ¶ 30). Later that day, Plaintiff was called to HR where he met with Katie O'Brien, the Assistant Director of HR, and Enrique Yanez, the Director of HR. [23] (Am. Compl. 29 at ¶ 31). The exact order of the following events is unclear:

- O'Brien and Yanez left the room during the meeting because a security guard asked to speak with Plaintiff alone. (Am. Compl. 29 at ¶ 31).

- Plaintiff told the security guard that "[he] had a legal right to union representation if they were going to discipline

[him], and that [he] didn't want to start the meeting" without representation. (Am. Compl. 29 at ¶ 31).

• When Plaintiff requested his Union Representative join the meeting, the meeting "was called to an end." (Am. Compl. 29 at ¶ 31).

• The security guard escorted Plaintiff out of the room. (Am. Compl. 29 at ¶ 31).

No grievance was filed by Wambaugh following this incident.[24] (Am. Compl. 29 at ¶ 32).

**\*7** Plaintiff then alleges a series of HR meetings involving Yanez, O'Brien, Rodriguez and possibly others, but does not coherently state the topic of each meeting or the events at each meeting. (Am. Compl. 30). On November 6, 2019, a meeting was scheduled between Plaintiff, Yanez, O'Brien, and a shop steward to discuss the November 1, 2019 incident with Jameson. (Am. Compl. 29–30 at ¶ 33). Plaintiff sent an audio file of the incident to those present. (Am. Compl. 30 at ¶ 33).

From November 6 to November 19, Plaintiff does not state whether he was working, suspended, or on unpaid leave. On November 14, 2019, Yanez and O'Brien asked to meet with Plaintiff because they "had new information on the case." (Am. Compl. 30 at ¶ 34). Plaintiff responded that he was not comfortable coming to the building because of the "[r]egular harassment [he] had been suffering from NYU", and that he "was under the weather[ ]." (Am. Compl. 30 at ¶ 34). On November 18, 2019, Plaintiff was called into a scheduled meeting via conference call with Wambaugh and O'Brien to discuss a complaint Rodriguez made about Plaintiff "ma[king]" Walker cry. (Am. Compl. 30 at ¶ 35). At the meeting, Plaintiff explained to O'Brien "that [he] just asked the student to help with the long line which is her job." (Am. Compl. 30 at ¶ 35). O'Brien reminded Plaintiff of the policy regarding how many patrons must be present for him to ask for help (which Plaintiff argued was incorrect). (Am. Comp. 30 at ¶ 35). Plaintiff additionally notes that "O'Brien stated that [Rodriguez] said she thinks [Plaintiff] felt guilty about what [he] did to the student, and labeled [his] concerns about the student as 'small talk.' " (Am. Compl. 30 at ¶ 35). At some point, O'Brien sent Plaintiff an email allowing him to return to work the next day. (Am. Compl. 30 at ¶ 36). In this email, Plaintiff was given a "final" warning.[25] (Am. Compl. 30 at ¶ 36). Plaintiff claims that aside from the warning about his attendance, "this is the only warning [he] had ever received." (Am. Compl. 30 at ¶ 36).

On November 19, 2019, Plaintiff returned to work. (Am. Compl. 30 at ¶ 37). Plaintiff "immediately" attended a meeting with O'Brien, Yanez, and Wambaugh at which O'Brien told Plaintiff that he was suspended for three days because [Plaintiff] exhibited threatening and violent behavior."[26] (Am. Compl. 30 at ¶ 36). Plaintiff does not clearly allege whether his suspension was because of the fight with Jameson or his interaction with Walker. (Am. Compl. 30 at ¶ 36). Wambaugh also informed O'Brien "that the Union was filing a grievance over [his] suspension." (Am. Compl. 30 at ¶ 38). The grievance concerned the November 19, 2019 suspension and the final written warning. HR notified Plaintiff on December 9, 2019 that "the November 19 grievance had been closed, and that the Employer was denying the grievance." (Am. Compl. 31 at ¶ 41). (ECF 49-2, Exhibit 2 (November 21, 2019 Step 2 Grievance) at 59).

### 7. Plaintiff Suspects Additional
### Foul Play from Coworkers.

On November 30, 2019, Plaintiff recognized an application ("app") on his phone that was also on his NYU work computer, although he claims that *he* never installed the app. (Am. Compl. 31 at ¶ 39).[27]

**\*8** On December 10, 2019, Plaintiff asked Warrington if he could leave early that day "because [he] wasn't feeling good as [he was] being harassed by [his] coworkers, who were stalking [him]." (Am. Compl. 31 at ¶ 43). Warrington said no. (Am. Compl. 31 at ¶ 43). Rodriguez then asked Plaintiff to attend a meeting with HR. (Am. Compl. 31 at ¶ 43). Plaintiff said he needed Wambaugh to represent him, and the meeting was rescheduled for the next day. (Am. Compl. 31 at ¶ 44). Plaintiff asked to reschedule to either a different time the next day, or to December 16. (Am. Compl. 31–32 at ¶ 44). Neither O'Brien, Yanez, nor Rodriguez responded to this request. (Am. Compl. 32 at ¶ 44).

### 8. Plaintiff's Employment is Suspended at
### Least a Second Time, and then Terminated.

Plaintiff does not clearly allege the order of the following events:

• On December 11, 2019, Plaintiff "saw some of the same suspicious Amazon IP addresses."[28] (Am. Compl. 32

at ¶ 47). Plaintiff alleges, however, that one of the "IP addresses" was "traceable to the Massachusetts Institute of Technology, which is an NYU partner [and that] (this IP hacked [Plaintiff's] personal email again on 5/21/20)." (Am. Compl. 32 at ¶ 47).

- At some point between December 10 and 12, 2019, Plaintiff was emailing "multiple parties" about "the harassment and retaliation that was ongoing" when Rodriguez approached Plaintiff and told him he could leave and would be paid for the rest of the time that he was scheduled to work. (Am. Compl. 32 at ¶ 45). Plaintiff again asked Rodriguez the time of the December 11 meeting.[29] (Am. Compl. 32 at ¶ 45). Rodriguez walked away and "about two minutes later [Plaintiff] heard her speaking by the entrance of the circulation Dept and use the words 'black man being aggressive.' " (Am. Compl. 32 at ¶ 45). Fifteen minutes later, two security guards and two NYPD officers arrived at the scene and stated that there was a complaint about Plaintiff "being aggressive, and trespassing." (Am. Compl. 32 at ¶ 45). Plaintiff responded that he worked there and that he was being harassed. (Am. Compl. 32 at ¶ 45). O'Brien cancelled the tentatively set December 11, 2019 HR meeting. (Am. Compl. 32 at ¶ 47).

- Plaintiff states that he was suspended because "the Employer knew, through its control of [his] devices, [he] discovered the Amazon web IP addresses logged into [his] personal and NYU email accounts." (Am. Compl. 32 at ¶ 47).

- Plaintiff asked Wambaugh "how [he] could be suspended without a meeting." (Am. Compl. 32 at ¶ 47).

On December 14, 2019, Plaintiff saw an email regarding his termination effective on December 13, 2019. (Am. Compl. 33 at ¶ 49). The email stated that "[Plaintiff] denied [a] meeting with management and HR ... and that [he] was aggressive and insubordinate ... which required the Employer to call the police to escort [him] out of the building." (Am. Compl. 33 at ¶ 49). Plaintiff alleges that "[his] suspension was converted to a termination because the Employer, having hacked [his] phone, knew that [he] had gone to the doctor to start FMLA leave, which would have given [him] job protection, and also went [to] a lawyer on December 12." (Am. Compl. 33 at ¶ 49).

### 9. Plaintiff Engaged in a Post-Termination Grievance Process.

On December 19, 2019, Plaintiff asked Wambaugh "how [he] could be terminated without even having the suspension meeting." (Am. Compl. 33 at ¶ 51). Wambaugh told Plaintiff that she would file a grievance about Plaintiff's suspension and termination.[30] (Am. Compl. 33 at ¶ 52). Plaintiff also asked Wambaugh to "file a grievance alleging ADHD discrimination," which Wambaugh said she would do. (Am. Compl. at 33 ¶ 51); (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance)). Plaintiff alleges that he "turned down" severance and unemployment benefits. (Am. Compl. 33 at ¶ 51).

**\*9** On December 20, 2019, Plaintiff reached out to Wambaugh about the status of his suspension and termination grievances. (Am. Compl. 33 at ¶ 52). Plaintiff requested a grievance be filed about the grievance process along with an ADHD discrimination grievance.[31] (Am. Compl. 34 at ¶¶ 51, 53, 57) On the same day, Peter Lanzo, a New York State United Teachers representative, was assigned to Plaintiff's case. (Am. Compl. 34 at ¶ 54). Plaintiff asked Lanzo to give him access to his NYU email records,[32] which Plaintiff was initially denied because he was "rightfully terminated." (Am. Compl. 34 at ¶ 53); (Am. Compl. 36 at ¶ 62). Lanzo responded that he would speak with NYU regarding the email account access. (Am. Compl. 36 at ¶ 62).

On January 6, 2020, Plaintiff informed Lanzo that the grievances UCATS filed were missing important information; on January 22, 2020, Plaintiff asked that they be corrected.[33] (Am. Compl. 34 at ¶ 56); (Am. Compl. 35 at ¶ 58). The grievances were amended to reflect this missing information[34] on January 23, 2020. (Am. Compl. 35 at ¶ 58).

In May 2020, Plaintiff spoke with Lanzo and Marc Laffer, Lanzo's supervisor, who assured Plaintiff that the grievances were filed on time. (Am. Compl. 36 at ¶ 64). Lanzo and Laffer suggested that Plaintiff start the grievance process without the emails. (Am. Compl. 36 at ¶ 64). Plaintiff does not plead any facts about the grievance process, its timing, or any other details. Plaintiff alleges that he had wanted to set up a meeting with "management," which Lanzo suggested was not a good idea. (Am. Compl. 36 at ¶ 64).

A few days later, Plaintiff received an email from O'Brien asking Plaintiff to confirm a grievance meeting that Lanzo had attempted to schedule. (Am. Compl. 36–37 at ¶ 65). Plaintiff declined the meeting because he did not want to move forward with the meeting without his emails. (Am. Compl. 37 at ¶ 65).

Around the end of May or beginning of June 2020, Plaintiff alleges that he emailed Lanzo alerting him that the grievances were filed late. (Am. Compl. 37 at ¶ 66). Plaintiff alleges that Lanzo said, "let's see if the employer notices." (Am. Compl. 37 at ¶ 66). Lanzo "took responsibility for the grievances being filed late." (Am. Compl. 37 at ¶ 66).

Plaintiff alleges that his suspension and termination grievances are still open and that the grievances he asked Wambaugh to file were never filed. (Am. Compl. 37 at ¶ 67).

### 10. Plaintiff's Other Factual Allegations

On or about September 30, 2019, Rodriguez suggested that Plaintiff take FMLA leave. (Am. Compl. 27 at ¶ 23). Plaintiff asked Rodriguez for instructions, and Rodriguez told Plaintiff that he needed "to get certification" from his medical provider. (Am. Compl. 27 at ¶ 23). Wambaugh told Plaintiff the same thing. (Am. Compl. 27 at ¶ 24). Plaintiff also alleges that both Rodriguez and Wambaugh incorrectly gave him FMLA instructions that applied to non-union employees. (Am. Compl. 28 at 17). Plaintiff alleges that he applied for FMLA leave through "Lincoln Financial" in early October, but did not hear anything back for several months. (Am. Compl. 29 at ¶ 25).

**\*10**  On December 12, 2019, Plaintiff was "in the process" of pursuing FMLA leave and visited a health care provider. (Am. Compl. 32–33 at ¶ 48). Plaintiff mentions that he has a diagnosis of ADHD, but that the doctor also "wanted to include a diagnosis of insomnia and major depression," which Plaintiff avers he had "never been tested for or diagnosed with." (Am. Compl. 32–33 at ¶ 48). Plaintiff's medical provider said that he would send Plaintiff's diagnosis to the insurance company so that Plaintiff could pursue FMLA leave. (Am. Compl. 32–33 at ¶ 48). On or about December 24, 2019, Plaintiff called Lincoln Financial to see if they received his FMLA leave request, which they said they did not. (Am. Compl. 34 at ¶ 54).

On December 26, 2019, however, Lincoln Financial notified Plaintiff that his claim had been denied "because [he] was

no longer employed." [35] (Am. Compl. 34 at ¶ 54). Then in February 2020, Plaintiff "learned that Lincoln Financial ... without [his] permission, opened up another claim for [him], and approved a leave claim, which [he] wasn't qualified for or asked for ([i]nsurance fraud)." (Am. Compl. 35 at ¶ 61). Through his own research, Plaintiff "learned the FMLA instructions given to [him] by [NYU] and [UCATS] was [sic] in fact incorrect information, which was later confirmed by Lanzo." (Am. Compl. 36 at ¶ 61). Plaintiff confronted Lincoln Financial and NYU. Plaintiff alleges Lincoln Financial apologized; NYU never responded. [36] (Am. Compl. 36 at ¶ 61).

### 11. Plaintiff's Other Allegations of Stalking, Harassment, and Spying.

Plaintiff alleges that from April 2019 to February 4, 2020, several unidentified individuals had acted on Defendants' behalf to stalk and harass Plaintiff, but does not tie these allegations to any Defendants:

- On February 4, 2020, Plaintiff went to T-Mobile, where the representative helping him engaged in "unusual conversation" and had spent an hour setting up Plaintiff's phone when it should have only taken 10 minutes. (Am. Compl. 35 at ¶ 59).

  - During this interaction, a man with sunglasses standing across the street kept looking at Plaintiff, and got into his car when Plaintiff walked past him. (Am. Compl. 35 at ¶ 59).

- On February 5, 2020, Plaintiff's phone had "the same amazon.com [IP] addresses that were being used by [NYU] in [his] phone[.]" (Am. Compl. 35 at ¶ 59).

- On February 9, 2020, Plaintiff was at a store across from a different T-Mobile store where someone "follow[ed] ... and harass[ed]" him in the store, which other patrons allegedly noticed. (Am. Compl. 35 at ¶ 60).

- Plaintiff's landlord, Tevia Clarke, who is an NYU alumna, has "harass[ed] ... and agitat[ed]" Plaintiff from July 2019 to April 2020, by "hacking [Plaintiff's] electronic devices and taking and/or tampering with ... packages sent to [his] house ... calling [him] 'weird' or stating [he is] crazy ... [and] constantly trying to start arguments in the apartment to get a violent reaction out of [him]." (Am. Compl. 37 at ¶ 68).

**\*11** • Plaintiff alleges that one time he had not been receiving messages from Clarke and when he made her aware of this, "she pressed something on her phone and all of the text messages from her and other people, voicemails came thr[ough] at the exact same time." (Am. Compl. 37 at ¶ 68).

• On April 27, 2020, Plaintiff alleges "[he] saw Tevia Clarke Verizon IP address in [his] personal VPN account ... which is linked to [his] personal email address and is password protected." (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that Clarke is being bribed by Defendants to retaliate against him. (Am. Compl. 37 at ¶ 68). To support this allegation, Plaintiff notes that "[he] received mailings from the Union in May 2019 or June 2019, which had the Queens address on it, even though [he] did not move or change [his] address until mid July 2019." (Am. Compl. 37 at ¶ 68). Further, Plaintiff alleges Clarke gave Plaintiff's address to NYU UCATS. (Am. Compl. 37 at ¶ 68).

• Plaintiff alleges that "NYU has been contacting lawyers to either not take or diminish [his] case at[ ]least since December 2019 ... since filing [his] case on 12/18/20." (Am. Compl. 38 at ¶ 74).

• On January 31, 2021, Plaintiff discovered text messages from Cindy Morren (his sister and an NYU student) and his mother, in which Cindy was texting from Plaintiff's phone number through iMessage and "pretending to be [Plaintiff] and pretending to have a good relationship with [his] mother." (Am. Compl. at 38). Plaintiff alleges that his sister got his Apple ID through his ex-girlfriend, who also worked at NYU. (Am. Compl. 38 at ¶ 74).

• Plaintiff alleges that on June 3, 2021, his mother "called mental help officials." (Am. Compl. 39 at ¶ 74). Plaintiff alleges that "[he] was not mentally ill and that she was just trying to harass [him] and deter [him] from making further complaints ...." (Am. Compl. 39 at ¶ 74).

• Plaintiff alleges in 2019-2020, Defendant NYU contacted his psychiatrist Dr. Rudoy "to diminish [his] complaints, and prescribe [him] wrong medication for illness he or his other doctors never diagnosed [Plaintiff] with." (Am. Compl. 39 at ¶ 74). Plaintiff was prescribed the medication in August 2019 following his complaints to Defendant NYU. (Am. Compl. 39 at ¶ 74). According to

Plaintiff, Dr. Rudoy did not document any of Plaintiff's complaints and did not tell Plaintiff why. (Am. Compl. 39 at ¶ 74).

## IV. DISCUSSION

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* " '[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

**\*12** As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Therefore, this Court must interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal citations omitted). "However, the liberal treatment afforded to *pro se* litigants does not excuse a *pro se* party 'from compliance with relevant rules of procedural and substantive law.' " *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (quoting *Maisonet v. Metro Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009)). Accordingly, the Court may not "invent factual allegations that a plaintiff has not pled." *Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-4642 (PMH), 2021 WL 229672, at *4 (S.D.N.Y. Jan. 22, 2021) (alterations and quotations omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). As mentioned, however, the Court may consider facts raised in opposition papers, depending on the circumstances. *Davila v. Lang,* 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018).

In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.,* 930 F.Supp.2d 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss....").

### *1. Breach of Duty of Fair Representation*

Plaintiff brings a "hybrid" claim against UCATS and NYU under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and based on a union's duty of fair representation, arising from the National Labor Relations Act ("NLRA"). Liberally construed, Plaintiff alleges that NYU violated the CBA when it discriminated against him, and that UCATS breached its duty of fair representation when it: (1) failed to file grievances on Plaintiff's behalf, and (2) misled Plaintiff about the deadline for filing grievances. (Am. Compl. 12–14).

#### i. Applicable Law

The duty of fair representation arises out of a union's status as the exclusive bargaining agent with the employer. *See Greco v. Commc'ns Workers of Am., Loc.,* 1104, 824 F.Supp. 2d 351, 356 (E.D.N.Y. 2011). Accordingly, the duty requires a labor organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998) (quotation marks omitted).

It is well established that an employee can sue their employer for breach of a CBA. *Smith v. Evening News Ass'n.,* 371 U.S. 195 (1962). Usually, an employee must exhaust any grievance or arbitration process set forth in the CBA before bringing suit. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652 (1965). In *DelCostello v. International Brotherhood of Teamsters,* however, the Supreme Court recognized that such an exhaustion requirement may result in an "unacceptable injustice" when the union representing the employee in these processes acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello,* 462 U.S. at 164. In such a case, an employee can sue both the employer and the union, regardless of the grievance or arbitration proceeding. *Id.* In doing so, the plaintiff must allege that the union has breached its duty of fair representation and that the employer has breached its CBA. *Id.* A plaintiff has six months from the time he "knew or should have known of the breach of the duty of fair representation" to bring suit. *See White v. White Rose Food a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir. 1997).

**\*13**  Breach of duty of fair representation is difficult to plead because "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," subject to good faith and honesty in exercising its discretion. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953). A breach of this duty only occurs if a union's conduct toward a member of the collective bargaining unit are "shown to have arbitrarily, discriminatorily, or in bad faith foreclosed the employee's opportunities to vindicate such wrong through the grievance process." *Castro v. New York City Bd. of Educ.,* 777 F. Supp. 1113, 1118 (S.D.N.Y.), No. 89-CV-4114 (KTD), *aff'd,* 923 F.2d 844 (2d Cir. 1990). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson,* 495 U.S. 362, 372–73 (1990).

To support allegations of discrimination in a breach of duty of fair representation claim, a plaintiff must plead facts that show a defendant's conduct was motivated by discriminatory animus. *Rivera v. Communications Workers of America,* No. 16-CV-1673, 2017 WL 4338754, at *5 (E.D.N.Y. Sept. 29, 2017). A plaintiff must then allege "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Div. of DiGiorgio Corp.,* 237 F.3d 174, 179 (quoting *Spellaco,* 156 F.3d at 126).

#### ii. Plaintiff's Fair Representation Claims are Time-Barred.

As an initial matter, all of Plaintiff's claims for breach of duty of fair representation are time-barred. This Circuit has established that a plaintiff's duty of fair representation claim accrues "at the latest" by the date of his National Labor Relations Board ("NLRB") charge. *Kawowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003) ("His bringing of the NLRB charge establishes that he had actual knowledge of the breach by [the date of his NLRB filing]. It is beyond dispute that his claim had accrued by that date.").

Plaintiff filed an unfair labor practice ("ULP") charge with the NLRB on **June 15, 2020**, alleging that UCATS failed to fairly represent him. (See ECF 65, Ex. 5 (Plaintiff's filed EEOC Charge)). As a matter of law, Plaintiff knew or should have known of UCATS's alleged breach of the duty of fair representation when he filed his ULP. Plaintiff filed his Complaint on **December 18, 2020**. Thus, any alleged breaches that Plaintiff knew or should have known about before **June 18, 2020** (6 months prior to the date of this action), are time-barred. Plaintiff does not argue that this statute of limitations should be tolled. Accordingly, his claim of a breach of duty of fair representation stemming from his June 15, 2020 NLRB charge should be dismissed. *See Kawowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003).[37] Accordingly, I recommend that Plaintiff's claims against UCATS for breach of their duty of fair representation be dismissed. Additionally, because Plaintiff's claims against UCATS are "inextricably interdependent" with his claim against NYU, I recommend that Plaintiff's claim for breach of the CBA against NYU also be dismissed. *See DelCostello*, 462 U.S. at 164; *Tomney v. Int'l Ctr. For Disabled*, 357 F.Supp. 2d 721, 738 ("The Union did not violate its DFR, and so Tomney's claims against [the employer] for violating the CBA are dismissed.").

#### 2. Breach of Contract

**\*14** Reading the Complaint most liberally, Plaintiff may be seeking to bring additional breach of contract claim(s) against NYU and UCATS. Plaintiff makes references to the "Union" or "Ucats" contract, but does not include any other facts about, or even references to, any other contracts. (Am. Compl. 20) ("WRONGFUL TERMINATION PURUSANT

TO ... BREACH OF CONTRACT"); (Am. Compl. 24 at ¶ 5) ("I complained about potential contract violations to the Employer and to the Union ...."); (Am. Compl. 23 at ¶ 4) ("which it states in the Ucats Contract"); (Am. Compl. at 14) ("The Union Contract does not contain a clear and unmistakable waiver of my right to sue.").

NYU is correct that any state-law breach of contract claim Plaintiff brings against NYU is preempted by Section 301 of the LMRA. (ECF 46 at 20). Although the LMRA does not preempt claims for a violation of the CBA, if Plaintiff is claiming that Defendants violated the CBA, those claims are time barred. *See* Section V. *Cunningham v. Local 30, Int'l Union of Operating Eng'rs*, 234 F.Supp.2d 383, 395 (S.D.N.Y. 2002). Similarly, to the extent Plaintiff complains about UCATS's failure to pursue grievances on his behalf, these would be claims for breach of fair duty of representation, addressed in Section 1, *supra*.

#### 3. Employment Discrimination

To state a claim for employment discrimination, a plaintiff must allege that: (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action ("AEA"), and (iv) there are facts suggesting an inference of discriminatory motivation.[38] *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Specifically, Plaintiff must show either that he "suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ... demonstrat[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)). Similarly, to state a claim for disability discrimination, Plaintiff would need to plausibly allege that (1) Defendants are subject to the relevant statutes; (2) he suffers from a disability within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.[39]

**\*15** To survive a motion to dismiss, a plaintiff must allege facts that plausibly suggest that the employer discriminated against him *because of* his race, national origin, or disability.

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The evidence necessary to satisfy this initial burden is "minimal and *de minimis*." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotations omitted). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If defendant does so, the burden shifts back to the plaintiff to demonstrate that defendant's reason is merely a pretext for discrimination or retaliation. *Id.* In other words, the Court only evaluates "pretext" if Plaintiff adequately alleges a *prima facie* case.

Evaluating his claims under those laws, Plaintiff fails to allege that he experienced any adverse employment action under circumstances that give rise to an inference of discrimination. (Am. Compl. 13). Plaintiff complains that: (1) he was unable to take vacations or sick leave for "religious/cultural event[s]" in Trinidad; (2) his seniority was miscalculated resulting in a less convenient schedule; (3) he experienced a "hostile work environment" because he had been subjected to derogatory comments, was "mocked daily," "ostracized," harassed, cyberstalked, and stalked; (4) NYU "retaliated" against Plaintiff for complaining about these events by "wrongfully suspend[ing] [him] twice" and eventually terminating his employment; and (5) NYU failed to provide him reasonable accommodations for his ADHD (Am. Compl. 14). I evaluate all of Plaintiff's claims for discrimination on the basis of race or national origin first, and then turn to Plaintiff's disability discrimination claim.

### i. Plaintiff Does not Allege Discrimination on the Basis of Race or National Origin

I evaluate Plaintiff's first two discrimination claims under a disparate treatment analysis, and in the alternative, a disparate impact analysis. *See Gonzalez v. Police Com'r Bratton*, 2000 WL 1191558, at *20 (S.D.N.Y. Aug. 22, 2000) (acknowledging hostile work environment and disparate treatment claims are "distinct" from one another and "require[ ] different pleading and proof"); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 n.10 (S.D.N.Y. 2009) ("[I]t bears emphasis that the analysis of adverse employment actions involving disparate treatment claims is different [from] that involving retaliation claims."). Notwithstanding the differences between disparate treatment and retaliation, "[t]he burden of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp.* ..." *Shah v. New York State Dep't of Civ. Serv.*, 341 F. App'x 670, 673 (2d Cir. 2009).

### a. Plaintiff does not Allege Defendants Had a Full Prohibition on Vacation or Restricted his Sick Leave.

Plaintiff alleges that in 2017 or 2018, Plaintiff went to a "Religious/Cultural" festival in Trinidad. Rodriguez instructed Plaintiff to use sick leave during his absence and said Plaintiff would not need a doctor's note. (Am. Compl. 10 & 24 at ¶ 8). Plaintiff alleges that he complained that his coworker, Speziale was treated differently because he "gets religious requests approved" while he did not. Upon return, Caesar told Plaintiff NYU "will have to let [him] go if [he doesn't] have a doctor's note" for the time he was out. (Am. Compl. 10). Ultimately, Plaintiff reported that he was sick, produced a doctor's note, and therefore was not terminated for taking his trip[s] to Trinidad. (Am. Compl. 10).

**\*16** Although it is unclear whether Plaintiff actually lost or was denied vacation time, a loss or denial of vacation time "does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F.Supp. 2d 256, 261 (S.D.N.Y. 2011); *see Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019). Courts in this District have declined to recognize an employer's denial of a vacation request as an adverse employment action where this denial did not constitute a "complete bar" on a plaintiff's taking vacation. *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *see also Roff v. Low Surgical*

*& Med. Supply, Inc.*, No. CV-033655 (SJF) (JMA), 2004 WL 5544995, at \*4 (E.D.N.Y. May 11, 2004). Plaintiff here did not allege that NYU completely forbade him from taking vacation; indeed, Plaintiff states at one point that NYU approved Plaintiff's request to go to Trinidad for this event three years in a row. (Am. Compl. 15).

### b. Plaintiff's Seniority Miscalculation Does Not Result in an AEA.

Plaintiff alleges that he was given a worse work schedule than his coworkers, who were less senior to him. (Am. Compl. 23 at ¶ 4). Plaintiff states that both NYU supervisors and UCATS's representative Wambaugh believed Speizale to be senior to Plaintiff, which Plaintiff disputed. Loss of "seniority" in this context is not an adverse employment action because unfavorable work schedules are not an adverse employment action, and Plaintiff alleges no other ramifications or less favorable treatment because of the seniority miscalculation. *See Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CV-7735, 2008 WL 4444609, at \*14 (S.D.N.Y. Sept. 29, 2008) (finding denial of transfer to position with better hours was not an adverse employment action) *aff'd*, 514 F. App'x 33 (2d Cir. 2013); *Daniels v. Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at \*8 (D. Conn. Aug. 17, 2015) ("[Plaintiff] also suggests that the ... position is a 'preferred working schedule for officers,' but an unfavorable schedule is not an adverse employment action.") (citing *Albuja v. Nat'l Broad. Co. Universal*, 851 F.Supp. 2d 599, 608 (S.D.N.Y. 2012)).

### c. None of the Alleged Adverse Employment Actions Give Rise to an Inference of Discrimination.

Even if changes to Plaintiff's vacation time and work schedule were considered adverse employment actions, Plaintiff still does not state a claim for employment discrimination because none of Plaintiff's alleged AEAs —including suspension, termination, and hostile work environment—occurred under circumstances that give rise to an inference in discrimination. [40] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees

who are 'similarly situated in all material respects.' " *Id.* "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.' " *Sollazzo v. Just Salad Rest.*, No. 15-CV-252 (ER), 2018 WL 1273661, at \*6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03-CV-1298 (RJH), 2004 WL 2181403, at \*9 (S.D.N.Y. Sept. 27, 2004)). A plaintiff also "must show that [his] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). While "all material respects" varies, a plaintiff must typically "plead comparators' relevant experience and length of employment in order to raise an inference of discrimination." *LeeHim v. New York City Dep't of Educ.*, No. 17-CV-3838 (PAE), 2017 WL 5634128, at \*6 (S.D.N.Y. Nov. 21, 2017).

\*17 The Amended Complaint lacks factual allegations to support an infererence that similarly situated non-Black or non-disabled employees were treated differently from Plaintiff. The only comparator Plaintiff alleges is Gary Speizale, who he alleges is white, less senior to him, and gets his holiday vacation time approved. (Am. Compl. 10). Plaintiff conclusorily alleges that Speizale is "similarly situated" to him in "all material respects," and does not identify any other comparator. *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815 (KPF), 2016 WL 827780, at \*10 (S.D.N.Y. Mar. 2, 2016) (finding plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenure, or experiences). Accordingly, the Complaint's conclusory allegations of differential treatment are insufficient to plausibly suggest an inference of discrimination with regard to work schedule or denial of travel to Trinidad. *See id.*; *see also Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68–69 (2d Cir. 2015); *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 408 (S.D.N.Y. 2014).

Similarly, Plaintiff does not allege discrimination under a disparate impact theory. To do so, Plaintiff must allege that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This requires: (i) identifying a specific employment practice or policy; (ii) demonstrate that a disparity exists; and (iii)

alleging a causal relationship between the two. 🚩 *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). To demonstrate a disparity sufficient to withstand a motion to dismiss, plaintiffs must allege statistical evidence or allege that a "neutral employment practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues." *Gordon v. City of N.Y.*, No. 14-CV-6115 (JPO) (JCF), 2016 WL 4618969, at *23 (S.D.N.Y. Sept. 2, 2016).

Plaintiff has not identified any employment practice or policy related to vacation time or his work schedule.[41] *See*

🚩 *African Am. Legal Defense Fund v. N.Y. State Dep't of Educ.*, 8 F.Supp. 2d 330 (S.D.N.Y. 1998) (dismissing Title VII disparate impact claim where plaintiff failed to allege any statistics to support allegations that facially neutral hold-harmless provisions had a disparate impact on minorities). Accordingly, I recommend Plaintiff's race and national origin discrimination claims be dismissed.

ii. Plaintiff Fails to Allege a Hostile Work Environment.

To state a claim for a hostile work environment under § 1983, § 1981, Title VII, or the NYSHRL, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." 🚩 *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." 🚩 *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or

even decency." 🚩 *Bermudez v. City of New York*, 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

**\*18** The standards for a union's liability for hostile work environment are different from those governing the liability of an employer. Under Title VII, a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." 🚩 42 U.S.C. § 2000e–2(c)(3). To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union.[42] *See* 🚩 *Agosto v. Correctional Officers Benevolent Ass'n*, 107 F.Supp. 2d 294, 307 (S.D.N.Y. 2000); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *21–22 (S.D.N.Y. Sept. 26, 2018).

*a. Plaintiff Does Not Adequately Allege that NYU or UCATS Stalked or Harassed Plaintiff, or Hacked Plaintiff's Electronic Devices.*

Plaintiff's allegations that he was stalked, harassed, and hacked are conclusory. *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 3757120, at *10 (S.D.N.Y. June 17, 2015), *R&R adopted*, No. 14-CV-3592 RA, 2015 WL 4579147 (S.D.N.Y. July 29, 2015) (finding plaintiff's allegations that certain conduct "allow[ed] 'criminal host(s) to steal the site content' ... 'manipulate users' web activity," "lose control of her email account, and [ ] be subject to email spam" conclusory). Plaintiff's allegations here—that numerous people, including T-Mobile employees; Plaintiff's roommate/landlord, psychiatrist, sister, or mother; and/or strangers on the subway were hired by Defendants to stalk and harass him—are wholly unsupported by facts and do not state a claim for a hostile work environment.[43] The Court understands that Plaintiff describes these instances in support of his *belief* that there is an ongoing conspiracy against Plaintiff to create a hostile work environment for him. Plaintiff's beliefs—however strongly he may hold them—are not facts. *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic' or 'delusional.' ") (quoting

🚩 *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)); *Tessema v. Env't Prot. Agency*, No. 1:20-CV-9700 (MKV), 2021 WL

2666855, at *4 (S.D.N.Y. June 29, 2021), *appeal dismissed sub nom. Tessema v. United States Env't Prot. Agency,* No. 21-1729, 2021 WL 6427942 (2d Cir. Dec. 16, 2021) (finding that Plaintiff's claims that the EPA has tortured him and subjected him to human experiments involving exposure to hazardous pollutants were "fanciful" in nature and "clearly warrants dismissal"); *Mercier v. Mercier,* No. 07-CV-0523, 2007 WL 1582267, at *1–2 (N.D.N.Y. May 25, 2007) (Kahn, J.); 🔶 *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."); *see also Banks v. Mental Health Clinicians,* No. 11–CV–7848, 2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, *inter alia,* that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with "punitive intentions") (internal quotation marks omitted).

**\*19** Additionally, Plaintiff has failed to allege sufficient facts from which one could reasonably conclude that the alleged hostile conduct was *because of* Plaintiff's membership in protected classes. *See Wilson v. JPMorgan Chase Bank, N.A.,* No. 20-CV-4558 (JMF), 2021 WL 918770, at *5 (S.D.N.Y. Mar. 10, 2021).

### b. *Plaintiff Does Not Adequately Allege Discriminatory Comments That Rise to a Hostile Work Environment.*

Plaintiff also does not plead sufficient facts to support a hostile work environment claim against NYU (and therefore UCATS) arising from allegedly discriminatory comments because the conduct about which Plaintiff complains is not severe or pervasive.[44] *See Benzinger v. Lukoil Pan Americas, LLC,* 447 F. Supp. 3d at 99. Plaintiff alleges he was subject to several derogatory statements and was "ostracized," stalked, harassed, and hacked at work. (Am. Compl. 20). *See also* Am. Compl. 22 ("was labeled a criminal, threatening, violent, aggressive, unprofessional all which are racial sterotypes[sic]/profiles for person(s) of [A]frican descent"); Am. Compl. 20 ("Management and my coworkers would say things like 'why don't you go back to your country since you keep complaining', or 'you don't fit the culture here.' "); Am. Compl. 24 at ¶ 7 (" 'You don't fit the culture here, You have to fit the culture, you got another chance,

you better not mess it up this time around' "); Am. Compl. 15 ("Why don't you just go back to Trinidad to live since [you're] always complaining about what we do here."); Am. Compl. 32 at ¶ 45 (Rodriguez used the words 'black man being aggressive' "); Am. Compl. 11 ("subjected to numerous disparaging comments from 4/2/19 to 12/10/19").

Because Plaintiff's Complaint is at times vague and repetitive, I cannot discern for many of the claims the speaker, context, or frequency of these comments. Accordingly, Plaintiff fails to state a claim for hostile work environment based on the comments identified here.

### iii. Plaintiff Does not Adequately Allege Retaliation.

To establish a claim of retaliation under § 1981, Title VII and the NYSHRL, Plaintiff must allege facts that plausibly suggest that: (i) he participated in protected activity, (ii) he suffered an adverse employment action, and (iii) there was a causal connection between his engaging in the protected activity and the adverse employment action.[45] 🔶 *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir. 2010); *see also Wilson,* 2021 U.S. Dist. LEXIS 45132, at *13.

**\*20** Liberally construing the Complaint, Plaintiff claims that he was suspended and fired for seeking to file grievances (or otherwise complaining) about mistreatment in the workplace. *See* Am. Compl. 12 ("[Plaintiff has] complained about a hostile workplace, Harassment, Retaliation, Discrimination and my complaints were either wrongfully labeled as meritless or I was deceitfully told they were filed when they were not.").[46] It is well settled that filing "[a] union grievance can constitute protected activity if it concerns discrimination, but union grievances that complain of matters other than discrimination do not constitute protected activity for purposes of Title VII." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.,* No. 18-CV-01790 (PMH), 2020 WL 2131771, at *4 (S.D.N.Y. May 4, 2020) (quoting 🔶 *Mack v. Paris Maint. Co. Inc.,* No. 14-CV-6955, 2016 WL 8650461, at *9 (S.D.N.Y. Feb. 22, 2016), *R&R adopted,* No. 14-CV-6955, 2016 WL 1071030 (S.D.N.Y. Mar. 17, 2016)).

Plaintiff does not adequately allege that he engaged in protected activity. Although Plaintiff alleges that coworkers made racially charged comments to him, Plaintiff does not provide facts about when he sought to file a grievance for this conduct, or for any other **discriminatory conduct** that

he endured based on his race or national origin. Although Plaintiff sought to file many grievances with UCATS, in the majority of the alleged instances, Plaintiff only states that UCATS did not or could not file a grievance—not that he sought to file a grievance because of discrimination on the basis of race or national origin. (Am. Compl. 24 at ¶ 4); (Am. Compl. 25 at ¶ 14); (Am. Compl. 9); (Am. Compl. 26 at ¶ 17); (Am. Compl. 27 at ¶ 20); (Am. Compl. at 30 ¶ 32). Only on three occasions does Plaintiff plead slightly more. Specifically, Plaintiff alleges that: (1) Defendants "maliciously misled [him] into thinking the grievances were filed when they weren't" so that both parties could avoid a breach of a duty of fair representation claim (Am. Compl. 9); (2) Wambaugh "did not file a grievance for racial discrimination, which *she should have known* to [do because] she had the audio evidence" of the fight between Plaintiff, Olivia, and Jameson (Am. Compl. 29 at ¶ 32) (emphasis added); and (3) UCATS violated their duty of fair representation in May 2020 because some grievances UCATS allegedly filed were "not actual grievances and lack sig[ ]natures by all parties." (ECF 68). Plaintiff does not allege any facts that suggest UCATS's decision not to file a grievance for Plaintiff was motivated by discriminatory animus.[47] Accordingly, I recommend that Plaintiff's Retaliation claim be dismissed.

#### iv. Plaintiff's Disability Discrimination Claim Fails.

Plaintiff does not adequately plead disability discrimination under the ADA, the NYCHRL or the NYSHRL. Plaintiff does not allege that the Defendants are subject to the ADA, that he was in fact disabled under the ADA, or that he suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination.[48]

**\*21** A person has a "disability" within the meaning of the ADA if he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;" or if he is (C) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Plaintiff has not alleged that his ADHD has impacted him in any way.[49]

Moreover, Plaintiff does not plead any facts that support his allegation that Defendants denied him any reasonable accommodation. To state a claim for failure to accommodate, "a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." *Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), *aff'd sub nom. Howard v. United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016). Here, Plaintiff merely restates the legal standard that employer generally have a duty to accommodate employees with disabilities and checks a box that the Defendants denied him accommodations. (Am. Compl. 5, 14). This is conclusory and insufficient.

Although Plaintiff's November 21, 2019 Step 2 Grievance states that he "was discriminated against based on having a disability," his supporting reasons include that he was "stalked, bullied, harassed[ ], character defamed, privacy breached," among other things. (ECF 49-3 at 3). As addressed above, these allegations are fanciful and should be dismissed. *Gallop*, 642 F.3d at 368 (2d Cir. 2011). Accordingly, I recommend that the Court dismiss Plaintiff's disability discrimination claims.

#### 4. FMLA Interference

Plaintiff believes that UCATS and NYU violated the FMLA because they denied his initial claim, but then approved an FMLA application for Plaintiff that Plaintiff claims he never made. These allegations do not support a claim for FMLA violations against either defendant. To state an FMLA interference claim, Plaintiff must establish: (i) that he is an eligible employee under the FMLA; (ii) that the defendant is an employer as defined by the FMLA; (iii) that he was entitled to take leave under the FMLA; (iv) that he gave adequate notice to the defendant of his intention to take leave; **and** (v) that he was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff's claim against UCATS fails because Plaintiff has not (and cannot) allege that UCATS is an "employer" within the meaning of the FMLA. *Eckert v. United Auto. Workers Loc. Union 897*, No. 04-CV-538S, 2005 WL 2126295, at \*9 (W.D.N.Y. Sept. 1, 2005) (concluding that a

union that represented plaintiff's interests and acted on his behalf "relative to [Plaintiff's] employment" is "precisely the opposite" of an employer under the FMLA); *see also Latella v. Nat'l Passenger R.R. Corp. (Amtrak)*, 94 F. Supp. 2d 186, 190 (D. Conn. 1999) (rejecting an argument for breach of duty of fair representation against a union for "not advising him of his rights under the FMLA" because "no private right of action exists for a violation of the FMLA's notice requirements against an employer or a union."). Accordingly, Plaintiff's FMLA claim is not applicable against UCATS, and I recommend that it be dismissed.

**\*22** Plaintiff's claim against NYU also fails. Plaintiff does not allege any facts that identify how NYU interfered with his FMLA rights or resulted in a denial of Plaintiff's benefits. Plaintiff alleges that he applied for FMLA leave in early October 2019, after a September 30, 2019 conversation between Plaintiff and Rodriguez. (Am. Compl. 28 at ¶¶ 23, 25). Plaintiff also alleges that on December 12, 2019 he visited a doctor in "pursu[it] [of] FMLA leave." (Am. Compl. 32–33 at ¶ 48). Plaintiff does not allege whether the FMLA leave he was pursuing in December 2019 was a part of the same request or not. Plaintiff's operative complaint is devoid of any allegations regarding his FMLA process for the two months immediately preceding Plaintiff's termination. NYU terminated Plaintiff's employment on December 13, 2019. (Am. Compl. 33 at ¶ 49). At most, Plaintiff alleges that Rodriguez "deliberately" gave him "the wrong Fmla [sic] request instructions ... which interfered with [his] FMLA rights entitlement." (Am. Compl. 17).

NYU is correct, however, that failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). Plaintiff makes the conclusory statement that Rodriguez's and Wambaugh's errors "interfered with [his] FMLA rights entitlement," but does not allege how being provided non-union employee instructions affected Plaintiff's pursuit of FMLA leave when he knew that he was a union employee. (Am. Compl. 17). Because of conflicting and incoherent allegations, I cannot discern from Plaintiff's pleadings: (1) what Rodriguez's FMLA instructions were; (2) when he requested FMLA leave; or (3) any October 2019 request was approved or denied. Accordingly, I recommend that his FMLA interference claim be dismissed.

**5. Conspiracy under Section 1985(3).**

Plaintiff fails to assert a § 1985 claim against both defendants for the same reason: he fails to allege any facts that suggest either defendant acted in agreement with anyone, or acted with an intent to deprive Plaintiff of any of his rights under the law. As stated in Section VII, Plaintiff also does not allege that any party acted with discriminatory animus.

To state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privileges of a citizen of the United States." *Trautz v. Weisman,* 819 F. Supp. 282, 290 (S.D.N.Y. 1993). The conspiracy must further be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Cuoco v. U.S. Bureau of Prisons*, No. 98-CV-9009 (WHP), 2001 WL 167694, at \*3 (S.D.N.Y. Feb. 16, 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The claim must be pleaded with "at least some degree of particularity ... [to] establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014). This requires "establish[ing] the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Id.* (quoting *Roach*, at 147 (2d Cir. 1999). An explicit agreement is not necessary but may be shown through a "general conspiratorial objective" among the participants in the conspiracy. *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1999) (quoting *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir. 1990)). A plaintiff must further allege that the defendant's "overt acts ... were reasonably related to the promotion of the claimed conspiracy." *Id.* (quoting *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999)). In making this claim, a plaintiff must adequately allege "the most fundamental aspect of a conspiracy: an agreement." *Gropper*, 12 F. Supp. 3d at 671. The Court will not simply infer an agreement from violations of the laws because that would essentially "permit every civil rights case to become

a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts." 🚩 *Id.* at 671.

**\*23** Plaintiff alleges that he complained to UCATS about the hostile work environment he experienced, but UCATS told him his concerns were meritless, or told Plaintiff they filed grievances when they had not. (Am. Compl. 9, 12). Defendants' "dishonesty," Plaintiff alleges, is a "clear sign of a conspiracy to deprive [him] of [his] rights." (Am. Compl. 12). While Plaintiff was upset by UCATS's responses that they either would not or could not file a grievance for some of the events about which Plaintiff complained, Plaintiff does not allege sufficient facts to withstand a motion to dismiss. Plaintiff fails to state any facts with particularity that suggest UCATS and NYU employees worked *in concert* (either totally within UCATS, totally within NYU, or some combination of UCATS and NYU) to *deprive* Plaintiff of his constitutional rights.

Plaintiff's allegations are limited to conclusory statements. Complaints that state "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2017 WL 4011395, at \*8, (S.D.N.Y. Sept. 11, 2017); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic.' or 'delusional.' ") (quoting 🚩 *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Evidence to support a conspiracy may be "when, where or with whom an unlawful agreement was made" or "any specific acts performed in furtherance of the alleged unlawful agreement. *Almonte v. Florio*, No. 02-CV-6722 (SAS), 2004 WL 60306, at \*5 (S.D.N.Y. Jan. 13, 2004). None of that is present. Plaintiff does not adequately allege that UCATS or NYU acted in furtherance of a conspiracy to deprive him of his constitutional rights because his allegations are conclusory. As discussed, the Complaint does not adequately allege that NYU or UCATS's actions were motivated by a racial animus. *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at \*16 (S.D.N.Y. Mar. 1, 2018). Accordingly, I recommend that Plaintiff's 🚩 § 1985 claim against UCATS be dismissed.

### 6. Civil Rights Violation Under
### 🚩 *Civil Rights Law Section 79-n.*

🚩 Civil Rights Law § 79-n creates a cause of action against anyone who "summons a police officer ... without reason to suspect a violation of the penal law, any other criminal conduct, or an imminent threat to a person or property," "because of a belief or perception regarding," *inter alia*, race or disability. 🚩 Civil Rights Law § 79-n. To state a claim under 🚩 CRL § 79-n, a plaintiff must allege that a defendant (1) intentionally committed, (2) damage to a person or property, (3) 'because of a belief or perception regarding [that person's] ... [protected characteristic].' " *Le v. Triza Elec. Corp.*, No. 19-CV-5134 (ARR) (PK), 2020 WL 1274977, at \*3 (E.D.N.Y. Mar. 16, 2020). 🚩 Section 79-n does not provide a remedy "where existing discrimination laws already provide protection, such as in employment ... decisions. Unless a plaintiff could show bias-related violence or intimidation in the hiring ... decision ... [they] could not bring an action under this new section." *Governor's Approval Memorandum*, No. 7, ch. 227, filed with Assembly Bill Number 529.

Plaintiff's 🚩 Section 79-n claim fails because of the availability of other statutory remedies in the employment context. Even if it did not, Plaintiff would still fail to state a claim. Plaintiff alleges that Rodriguez "falsely summoned" an NYPD officer "to arrest [him] and or escort [him] out for criminal trespassing" as he was writing an email about the hostile work environment he was experiencing. (Am. Compl. 12 at ¶ 6). Rodriguez is not a defendant in this action. [50] Even if this behavior extended to NYU, Plaintiff does not assert that NYU intentionally threatened Plaintiff *because of* his protected characteristics. [51] As best as I can discern, Plaintiff alleges that he was suspended on or before December 11, 2019 because NYU knew, "through its control of [Plaintiff's] devices," that Plaintiff knew NYU hacked his devices. (Am. Compl. 32 at ¶ 47). By Plaintiff's own account, his employment was suspended, and his supervisor suggested he leave. When he did not leave, he overheard Rodriguez say, "black man being aggressive" and NYPD officers appeared to "arrest [him] for criminally trespassing." [52]

### 7. Negligent Infliction of Emotional Distress.

**\*24**  Plaintiff brings claims against both NYU and UCATS for negligent infliction of emotional distress ("NIED"). Plaintiff alleges that he experienced emotional distress because of the "employment discrimination" he experienced at NYU. (Am. Compl. 13).

As an initial matter, Plaintiff's NIED claim against NYU is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"). *See* N.Y. Work. Comp. Law § 11. The WCL provides the exclusive remedy for an employee who is injured "by the negligence or wrong of another in the same employ." *Rivera v. Baccarat, Inc.*, No. 95-CIV-9478 (MBM), 1996 WL 251850, at \*4, (S.D.N.Y. May 10, 1996). WCL precludes Plaintiff from recovering from claims of NIED that arise out of workplace conduct. *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014); *Stevens v. New York*, 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009); *see* Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997) (finding negligence claim for hostile work environment barred by exclusivity of workers compensation). While the Court is sympathetic to Plaintiff's distress, Plaintiff's allegations arise out of alleged workplace conduct. Accordingly, the claim is barred by the WCL and must be dismissed.

Plaintiff's NIED claim against UCATS also fails. First, while Plaintiff makes this claim against "NYU **and UCATS**" (Am. Compl. 25 at 13), he does not provide facts that support any allegation that UCATS as an entity or a UCATS employee did anything that would support a claim for negligent infliction of emotional distress. (Am. Compl. 25 at 13–14). While Plaintiff alleges that he was being stalked and is experienced a hostile work environment (allegations that appear to be targeted at NYU, not UCATS), these allegations are conclusory. *See* *Goodrich v. Long Island R.R. Co.*, No. 10 Civ. 2195 (SAS), 2010 WL 2473593, at \*1, (S.D.N.Y. June 17, 2010) (following Plaintiff's coworker posting on a public bulletin board his positive HIV status, Plaintiff withdrew his NIED claim, conceding he " 'was never placed in fear of imminent bodily harm, nor did he ever suffer any physical impact' "). To the extent Plaintiff is alleging UCATS acted negligently by failing to file grievances for Plaintiff, as discussed, UCATS has wide discretion in those decisions, and Plaintiff does not adequately allege that they abused their discretion. *See supra* Section 1.

## V. Conclusion and Recommendation

For the reasons stated above, I recommend that the Motion be **GRANTED**. Although *pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated," *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002), amendment may be denied upon a finding of futility. *See* Chill v. Gen. Elec. Co., 101 F.3d 263, 271–72 (2d Cir. 1996). I do not recommend that Plaintiff be given leave to amend his conspiracy claim because his allegations, even liberally construed, are still fanciful and factually frivolous. *See* *Kraemer v. City of New York*, No. 19-CV-6671 (VEC), 2020 WL 1974204, at \*4 (S.D.N.Y. Apr. 24, 2020) ("While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources.") (finding Plaintiff's allegations of coordinated efforts by police, AMC movie theaters, T-Mobile, Starbucks, NYU and others to "surveil, mock, and harass Plaintiff" frivolous). Similarly, because Plaintiff's fair representation claims are time-barred, leave to amend would also be futile.

**\*25**  Because Plaintiff is proceeding *pro se*, however, I recommend that he be given **one final opportunity** to replead only his **Discrimination Claims for Hostile Work Environment and Retaliation, and his FMLA Claims,** and that he be directed to file a proposed second amended complaint within 30 days of Your Honor's final disposition of this motion. To the greatest extent possible, Plaintiff's amended complaint must allege facts to support that his claims, including:

(1) Identifying the NYU or UCATS employees, if any, who engaged in the specific discriminatory conduct; and

(2) Identifying and describing the specific acts by the NYU or UCATS employees that constitute discriminatory acts.

## VI. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served.

Such objections, and any responses to objections, shall be addressed to the Honorable J. Paul Oetken, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Oetken.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 🔖 *Thomas v. Arn*, 474 U.S. 140, 155 (1985); 🔖 *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); 🔖 *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff

wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Defendants. *See* 🔖 *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by mail and file proof of service on the docket within seven days. Alternatively, if circumstances related to the ongoing COVID-19 pandemic prevents their service, they must file a letter on the docket instead.

**All Citations**

Slip Copy, 2022 WL 1666918

---

### Footnotes

1    The case was reassigned earlier this year to Judge Oetken.

2    I reviewed ECF 40, Plaintiff's Proposed Second Amended Complaint, and do not find that Plaintiff's Proposed Second Amended Complaint alleges additional facts that would have been material to this Report & Recommendation.

3    Plaintiff alleged on October 7, 2021 that NYU was continuing to retaliate against him by sending the "answer to [his] complaint to his old address." (ECF 65 at 1). NYU filed an Affirmation and a "true and correct copy of the confirmation that Defendant's Motion to Dismiss papers were delivered" to Plaintiff's address listed on the docket. (ECF 71).

4    For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, *see* 🔖 *Krassner v. 2nd Ave Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and draws all inferences in the Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

5    To reduce the likelihood of confusion, all citations to the Amended Complaint reference PDF page numbers, ranging from one (1) to thirty-nine (39) (the entirety of ECF 25 in one PDF). Plaintiff did not include paragraph numbers until page 22. Accordingly, citations to the Amended Complaint on or after page 22 will also include paragraph citations.

6    Plaintiff does not identify or define "management," nor does he identify subsequent work reviews at which he was informed he was performing adequately.

7    Plaintiff does not identify these individuals nor does he detail any incidents in connection with this complaint.

8    Management also asked that Plaintiff not wear his coat/jacket while working, even though he was cold, because the security guard had complained about the way "it looked" on Plaintiff. (Am. Compl. 23 at ¶ 3).

9    Plaintiff does not allege whether Speizale was in fact senior to him, nor does he allege why his supervisors and union representative thought Speizale was senior to Plaintiff. Plaintiff also does not allege facts about other similarly situated coworkers and their work schedules.

10    Article 34 of the CBA governs the Grievance and Arbitration Procedure with UCATS. (ECF 49-1, CBA at 27).

11    Plaintiff alleges extremely similar facts occurred in 2018. (Am. Compl. 10). It is unclear whether these facts are for the same event in 2017 and Plaintiff misstates the date, or whether this is a different event entirely.

Plaintiff alleges that in 2018, he asked Rodriguez for unpaid time off to attend a "religious holiday," and his request was denied. (Am. Compl. 10). Plaintiff "brought up the fact that Gary Speizale gets his religious requests approved" but Plaintiff was told "to worry about [himself]." (Am. Compl. 10). Plaintiff alleges that Rodriguez told Plaintiff to "call out sick for those days," and told Plaintiff that he would not need a doctor's note. (Am. Compl. 10). Plaintiff followed Rodriguez's suggestion and upon returning, Caesar told Plaintiff that he had abused sick days and NYU "will have to let [him] go if [he doesn't] have a doctor's note." (Am. Compl. 10). Plaintiff alleges that he reported he was sick, produced a doctor's note, and therefore was not terminated. (Am. Compl. 10).

Plaintiff does not allege any additional facts about what Rodriguez advised him to do regarding his sick time and the festival, what doctor he saw, or what sickness, if any, he experienced.

12    Plaintiff does not identify "they," or whether "they" were supervisors.

13    Plaintiff does not provide any facts about when or to whom he disclosed his ADHD disability. He also does not plead the original length of his probationary period.

14    Plaintiff does not identify any of these individuals.

15    Plaintiff alleges that he "heard people in the library discussing videos [he] had watched, or things on [his] social media [ac]counts and email accounts and electronic devices, that no one but [Plaintiff] should have knowledge of." (Am. Compl. 26 at ¶ 19). He also alleges that "Amazon web IP addresses [were] popping up on [his] phone and laptop that weren't there before." (Am. Compl. 26 at ¶ 19).

16    Plaintiff said that "[he] noticed people on the train looking at [him], standing next to [him], raising their phones at [him] as if they were recording [him], stomping in front of [him], and engaging in other activity that [he] viewed as an effort to agitate [him]. [He] suspected that the Employer was involved in this because it was the same behavior [he] was experiencing at the library [a]nd only started after [his] initial complaints." (Am. Compl. 27 at ¶ 20).

17    Plaintiff alleges "[t]he meds the psychiatrist prescribed [Plaintiff], shouldn't have been prescribed, as [he] wasn't diagnosed with any of the ailments [that mandated] the medication." (Am. Compl. 38 at ¶ 72). Plaintiff further alleges that the psychiatrist had omitted all of his "confessions of the stalking from NYU" and other misconduct by Defendants but Plaintiff does not say why the psychiatrist did this. (Am. Compl. 38 at ¶ 72).

18    Plaintiff does not identify or describe specific acts that he believes constitute harassment other than the stalking and hacking events, and specific arguments and altercations, described in this section and Section III.11.

19    At this meeting, Rodriguez asked Plaintiff to sign "the verbal warning," but Plaintiff said he wanted to speak with a Union representative first. (Am. Compl. 27 at ¶ 23). Rodriguez then "shredded the verbal warning she asked [Plaintiff] to sign." (Am. Compl. 27 at ¶ 23).

20    The text messages stated "[N _ _ _ S] are not even human no more" and accused Plaintiff of being "involved in 'a whole lot of gang shit.'" (Am. Compl. 28 at ¶ 26).

21    Plaintiff thinks NYU "was using Olivia to spy on [him] to see why [he] wasn't at work." (Am. Compl. 28 at ¶ 27).

22    Plaintiff further "suspect[ed] that this was all part of the Employer's campaign to retaliate against [him]." (Am. Compl. 28 at ¶ 28). Plaintiff does not explain the nature of his "Course Reserve" work, the relevance or significance of his conversations with these faculty members, or how these alleged facts constitute retaliation.

23    Plaintiff does not "recall if they told [him] that it was because of the incident with Freddy [O]livia, but in the event they didn't, [he] understood that was what the meeting was about, because it was the only incident that happened that day." (Am. Compl. 29 at ¶ 31).

24    Plaintiff alleges that Wambaugh "should have known to file a grievance" for "racial discrimination," for him, since she "had the audio evidence" of the fight with Jameson. (Am. Compl. at 29 ¶ 32).

25    Plaintiff does not explain what the "final warning" threatened. Plaintiff states that he told O'Brian that "[he] didn't understand how [he] was getting a final warning and suspension, when [he] had audio of the incident which proves that [he] didn't threaten or touch anyone." (Am. Compl. 30 at ¶¶ 36–38).

26    It is unclear whether this was a new suspension, or a continuation of another suspension.

27    Plaintiff additionally notes that on December 9, 2019, his "phone(s) had been installed as a modems [sic]," (Am. Compl. 31 at ¶ 41), but Plaintiff does not explain what this means.

28    Plaintiff does not explain, and the Court cannot discern, the significance of the "suspicious Amazon IP addresses."

29    Plaintiff does not allege the purpose of the December 11 meeting with the Union and Human Resources. This meeting was previously scheduled for December 10, 2021, where Plaintiff requested Human Resources be present, and Human Resources rescheduled it. (Am. Compl. 31 at ¶ 43).

30    Plaintiff also asked Wambaugh about "the final warning grievance, and the Employer's failure to respond to the information request in time." (Am. Compl. 33 at ¶ 51). Plaintiff does not clarify what information he sought and whether any information was conveyed by Wambaugh.

31    Plaintiff alleges that Wambaugh told Plaintiff that she was not going to file the ADHD discrimination grievance and that she had not known that Plaintiff had ADHD. (Am. Compl. 33–34 at ¶ 52).

32    Plaintiff wanted his NYU emails because he sought proof that Defendants were being dishonest about the grievances they filed. (Am. Compl. 13). Plaintiff suggests that Defendants withheld his emails so that he "wouldn't have proof during arbitration." (Am. Compl. 13).

33    Plaintiff also had intended to file a grievance about the grievance process, which Lanzo allowed, but Wambaugh said was not done. (Am. Compl. 33 at ¶ 51); (Am. Compl. 34 at ¶ 57).

34    The amended document shows the provision violated changed from "Article 5 – No Discrimination and all other Articles that apply" to "Article 37 – Health and Safety." The nature of grievance was further amended from "Mr. Morren was discriminated against based on having a disability" to "The university failed in its obligation and policy's [sic] to maintain a healthy and safe working conditions [sic]." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance) (Amended 1/22/2020 Step 1 Grievance)).

35    Plaintiff further alleges:

"[T]hey said I requested FMLA while I was employed, they said that was false. Lincoln Financial also informed me that their point of contact at the Employer was Enrique Yanez. NYU, between the 24th and the 26th, how did they get in contact with Enrique Yanez, At home on his personal time? [A]nd, I note that Yanez is not the person who handles leave claims at NYU. As such, I believe that my claim was denied because the Employer is retaliating against me." (Am. Compl. 34 at ¶ 54).

36    Plaintiff then alleges:

"I believe that the approval of the short-term claim was part of the Employer's retaliation against me. I also believe that the Employer was engaged in a conspiracy with my doctor to retaliate against me, which led to medical malpractice, doctoring of my medical records, and prescribing me with medication for ailments I was not diagnosed with, which causes suicide and other life threatening diseases. Maliciously [i]nciting a suicide attempt is attempted murder." (Am. Compl. 36 at ¶ 61).

37    Allegations about Wambaugh allegedly giving Plaintiff the "incorrect FMLA leave Request Instructions (Am. Compl. at 6), and UCATS' failure to file a grievance—all of which occurred before June 18, 2020 (Am. Compl. at ¶¶ 7, 9, 14–16, 17, 20, 37–38, 40, 41) (Am. Compl. at 6)—are time barred.

Even if these claims were not time-barred, however, Plaintiff has not alleged any facts that support his claim that UCATS declined to file grievances on Plaintiff's request *with an improper intent, purpose, or motive.* Without any supporting facts, this assertion is conclusory, and insufficient to state a claim for breach of the duty of fair representation. *See Stoner v. Walsh,* 772 F. Supp. 790, 806–07 (S.D.N.Y. 1991) (Mukasey, J.). Where Plaintiff alleges slightly more, the allegations are still conclusory and circular, and should be dismissed.

38    Employment discrimination claims under Section 1981 and the NYSHRL are analyzed under the same framework as Title VII. *McGill v. University of Rochester,* 600 F. App'x 789, 790 (2d Cir. 2015). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination [to] plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks omitted). "[T]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Carter v. Verizon,* No. 13-CV-7579 (KPF), 2015 WL 247344, at *5 (S.D.N.Y. Jan. 20, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.,* 552 F. App'x 100, 102 (2d Cir. 2014)).

39    Aside from the NYSHRL and NYCHRL having a broader definition of "disability," "[t]he standard for pleading a claim for disability discrimination under the NYSHRL and the NYCHRL is virtually identical to the ADA." *Marquez v. Starrett City Assocs.,* 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017).

40    Indeed, "[b]eing forced to endure a hostile work environment is one type of adverse employment action." *Dietrich v. City of New York,* No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020).

41    While Plaintiff alleges that he sought to file a grievance about the grievance process, he does not allege any facts about the process and procedure for filing grievances, or how the process was allegedly different for him due to his membership in a protected class. (Am. Compl. 34–35 at ¶ 53, 57).

42    The case law governing a union's liability for hostile work environment under the NYSHRL and NYCHRL is less clear. Most cases, however, hold that NYSHRL and NYCHRL claims against a union "are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and

non-discriminatory manner." *Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16-CV-4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (collecting cases).

43    Generally, an employer is not liable as a matter of law for harassment resulting "from nonwork-related, off-duty interactions between co-employees, because those actions are not part of the work environment." *See* *Devlin v. Teachers' Ins. & Annuity Ass'n of Am.,* No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion for summary judgment on the plaintiff's sexual harassment claim because, *inter alia,* the plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).

44    To the extent any part of Plaintiff's claims under the NYSHRL fall under the less demanding NYCHRL standard, his claims also fail for the reasons discussed herein. The burden to state a claim under the NYCHRL is somewhat less demanding, requiring the plaintiff to allege: (i) that the plaintiff was "treated less well than other employees;" and (ii) that such treatment was because of the plaintiff's protected class. *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558, 2021 U.S. Dist. LEXIS 45132, at *13 (S.D.N.Y. Mar. 10, 2021).

45    Plaintiff must also establish these elements under the NYCHRL, except that instead of an adverse employment action, he need only prove that "something happened that would be reasonably likely to deter a person from engaging in protected activity." Wilson, 2021 U.S. Dist. LEXIS 45132, at *20.

46    Even though Plaintiff has not pleaded a *prima facie* case for discrimination that would, under *McDonnell Douglas*, shift the burden to Defendants to provide a legitimate non-discriminatory reason for Plaintiff's suspension and termination, Plaintiff nonetheless acknowledges that NYU's proffered reasons for his suspensions and termination were because of Plaintiff's interpersonal conflicts with coworkers. (Am. Compl. 30 at ¶ 37, 38).

47    In fact, only Plaintiff's January 16, 2020 Grievance Form states that Plaintiff "was discriminated against based on having a disability." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance). The Grievance does not reference Plaintiff's race or national origin, at all.

48    Among other things, Plaintiff neither pleads when he made his employer aware of his ADHD nor how his ADHD is related to any alleged adverse employment action.

49    Even if Plaintiff has a disability under the broader NYSHRL definition in light of his ADHD diagnosis (ECF 65-7 at 1), it is unnecessary for me to evaluate this since Plaintiff fails to allege any adverse employment action giving rise to an inference of disability discrimination. *See* *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109 (JCF), 2007 WL 1149979, at *19 (S.D.N.Y. Apr. 18, 2007), *aff'd sub nom.* *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008).

50    Plaintiff does not allege any facts involving UCATS and the Court cannot discern any Civil Rights § 79-n claim against them.

51    As Defendants point out, at least one court has dismissed a Section 79-n claim because it was brought against an organization and not an individual. *Morrison v. Shalach*, 67 Misc. 3d 451, 457, 124 N.Y.S.3d 512 (N.Y. Sup. Ct. Westchester Cty. 2020).

52    Plaintiff compares his experience to that of his coworkers Speizale and Wambold, who he alleges could come into the building "on their days off," use the workstations, and were "never asked to leave" or have NYPD "called to arrest them for criminally trespassing. (Am. Compl. 32 at ¶ 46). But Plaintiff's comparison falls short

in this instance because Plaintiff was not given a day off when he was told to leave—he had already been suspended from working at NYU.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1665013
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,

v.

NEW YORK UNIVERSITY, et al., Defendant.

20-CV-10802 (JPO)
|
Signed 05/25/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New York, NY, for Defendant.

ORDER ADOPTING REPORT
AND RECOMMENDATION

J. PAUL OETKEN, District Judge:

**\*1** *Pro se* Plaintiff Darwyn M. Morren sues New York University and UCATS Local 3382 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*; the Labor Management Relations Act, 29 U.S.C. § 185; 42 U.S.C. § 1985; the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 *et seq*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq*; and New York Civil Rights Law § 79-n. Plaintiff also brings claims for breach of contract and negligent infliction of emotional distress. (*See* Dkt. No. 25 ("Am. Compl"); Dkt. No. 25-1 ("Pl.'s Memo") 4-14.) Defendants have each moved to dismiss the amended complaint for failure to state a claim. (*See* Dkt. No. 47 ("UCATS Mot."); Dkt. No. 53 ("NYU Mot.").) In a report and recommendation, Magistrate Judge Ona T. Wang has recommended that Defendants' motions to dismiss be granted. (*See* Dkt. No. 76 ("R. & R.") at 49.)

Plaintiff objects to the report and recommendation only on the grounds that (i) he did not file a motion to amend his complaint; (ii) he did not receive Defendants' motions to dismiss; and (iii) UCATS Local 3882 did not process his grievances. (*See* Dkt. No. 79 ("Pl.'s Objections") at 1-2.) In reviewing a report and recommendation, a district judge "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b). In reviewing a *pro se* party's submissions, the court is "obligated to afford a special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), so such submissions are read "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam).

Plaintiff's objections here are without merit. Magistrate Judge Wang's report and recommendation concerns Defendants' motions to dismiss the amended complaint, not any motion to further amend the complaint. (*See* R. & R. at 49.) Defendants filed these motions on ECF, and Plaintiff had consented to the electronic service of court documents through ECF. (*See* Dkt. No. 3.) Finally, Plaintiff does not meaningfully contest that his claims against UCATS Local 3882 relating to the failure to process his grievances are time-barred. Plaintiff brings a claim that UCATS breached its duty of representation, but a plaintiff has only six months to bring suit from the time he "knew or should have known of the breach of the duty of fair representation." *White v. White Rose Food a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997). Such a claim accrues "at the latest" by the date of a National Labor Relations Board ("NLRB") charge. *Kovowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003). Plaintiff filed an unfair labor practice charge with the NLRB on June 15, 2020. (*See* Dkt. No. 49-5 ("NLRB Charge").) In that charge, he alleged that UCATS failed to fairly represent him. (*See id.* at 2.) Plaintiff had until December 15, 2020, to bring suit, but he did not do so. (*See* Dkt. No. 1 ("Compl").) Accordingly, even if Plaintiff's allegations are true, his claim must be dismissed.

**\*2** The remainder of the report and recommendation is adopted in full. Where there is no objection, a district court reviews for clear error. *See* Fed. R. Civ. P. 72(b), Advisory Committee's Notes (1983) ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."); *see also Borcsok v. Early*, 299 F. App'x

76, 77 (2d Cir. 2008). Magistrate Judge Wang's thorough and well-reasoned report presents no errors, clear or otherwise.

For the foregoing reasons, Plaintiff's objections are overruled and Judge Wang's Report and Recommendation (Dkt. No. 76) is ADOPTED in full. Defendants' motions to dismiss are GRANTED. Further, for the reasons explained by Judge Wang, Plaintiff is granted leave to amend his discrimination claims for hostile work environment and retaliation and his FMLA claims, provided that he must file a proposed second amended complaint repleading those claims within thirty days after the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 47 and 53.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1665013

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 113 of 331

Goldson v. Kral, Not Reported in Fed. Supp. (2016)

2016 WL 1241526
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Marcia GOLDSON, Plaintiff,

v.

KRAL, Clerkin, Redmond, Ryan,
Perry & Van Etten, LLP, Defendant.

13 Civ. 2747 (GBD) (FM)
|
Signed 03/24/2016

**Attorneys and Law Firms**

Marcia Goldson, Bushkill, PA, pro se.

Kevin Richard Brady, Rhonda Lisa Epstein, Gregory Ross Bennett, Hoey, King,Epstein, Prezioso & Marquez, New York, NY, for Defendant.

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge

**\*1**  *Pro se* plaintiff Marcia Goldson ("Plaintiff") brings this action against Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP ("Defendant"). (*See* Am. Compl., ECF No. 18.) According to Plaintiff, Defendant, her former employer, discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*,[1] because she is an African American female who was fifty-two years old at the time of her termination. (Am. Compl., at 3-4.) Plaintiff, who worked as a paralegal for the defendant law firm from March 2003 until her January 22, 2013 termination, argues that Defendant subjected her to retaliation and disparate treatment because of her race, national origin, gender, and age. (*See id.*)

Plaintiff filed Charges of Discrimination with both the New York State Division of Human Rights and the Equal Employment Opportunity Commission, complaining of discrimination based on her race, color, national origin, and gender on April 27, 2012. (*See* Am. Compl., at 14 ("First Charge."))

This matter was referred to Magistrate Judge Frank Maas on May 7, 2013. (ECF No. 8.) Defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure Rule 56 on April 15, 2015. (*See* ECF No. 84). Before this Court is Magistrate Judge Maas' February 22, 2016 Report and Recommendation ("Report," ECF No. 102), recommending that Defendant's motion for summary judgment be granted as to Plaintiff's ADEA and Title VII discrimination claims, and denied as to Plaintiff's retaliation claim.[2] (Report at 29.) This Court adopts those recommendations.

## I. LEGAL STANDARD

This Court may accept, reject, or modify, in whole or in part, the findings set forth in the Report. 28 U.S.C. § 636(b)(1)(C). When there are objections to the Report, the Court must make a *de novo* determination of those portions of the Report to which objections are made. *Id.*; *see also Rivera v. Barnhart*, 423 F. Supp. 2d 271, 273 (S.D.N.Y. 2006). The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). The Court need not conduct a *de novo* hearing on the matter. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions of the Report to which objections were made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 1985) (quoting *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983) (internal quotation marks omitted)). When no party files objections to a Report, the Court may adopt the Report if "there is no clear error on the face of the record." *Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d 250, 253 (S.D.N.Y. 2005) (quoting *Nelson*, 618 F. Supp. at 1189).

**\*2**  Magistrate Judge Maas advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections on appeal. (Report at 30); *see also* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Defendant filed timely objections to the Report (Def.'s Obj., ECF No. 104.) As of the date of this Order, Plaintiff neither responded to Defendant's objections nor filed her own objections to the Report. This Court has considered the issues raised in these objections and reviews *de novo* the objected-to portions of the Report.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 114 of 331

Goldson v. Kral, Not Reported in Fed. Supp. (2016)

Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a fact is genuinely disputed, the district court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996); see also Mormol v. Costco Wholesale Corp., 364 F.3d 54, 56 n. 1 (2d Cir. 2004) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (internal quotation marks omitted)).

However, to show a genuine dispute of material fact, the nonmoving party must provide "hard evidence," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [her] favor may be drawn," Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal citation omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. To the extent that these affidavits contain bald assertions and legal conclusions—for example, that [a co-worker] 'was always making racial slurs about minorities,' and that [the plaintiff] 'was working in a hostile or abusive working environment'—the district court [can] properly refuse[ ] to rely on them." Schwapp, 118 F.3d at 111 (internal citations omitted); accord Hicks v. Baines, 593 F.3d 159, 167 (2d Cir. 2010) ("[A] party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove.") (internal citations omitted).

*Pro se* submissions are read liberally and interpreted to "raise the strongest arguments that they suggest." Burgos v.

Hopkins, 14 F. 3d 787, 790 (2d Cir. 1994) (internal citation omitted). However, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." Rodriguez v. Hahn, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal citation omitted).

## II. TITLE VII AND ADEA CLAIMS

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that individual's "race, color, religion, sex, or national origin." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e-2(a)). A plaintiff may base a discrimination claim on two types of prohibited acts: (1) the employer's disparate treatment, or (2) the employer's maintenance of a hostile work environment. See Littlejohn v. City of N. Y., 795 F.3d 297, 312, 320 (2d Cir. 2015). Title VII also provides that an employer may not retaliate against or punish an employee's opposition to employment discrimination. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013) (citing Title VII, § 2000e-3(a)).

**\*3** Similarly, the ADEA forbids employers from discriminating in hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" by reason of the age of an employee. 29 U.S.C. § 623(a)(1); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993). The ADEA's protection extends only to those individuals who, like Plaintiff, are over 40 years old. 29 U.S.C. § 631(a); see Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997). Claims under the ADEA receive the same analysis as claims under Title VII. See, e.g., Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119 (2d Cir. 2012); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 913 (2d Cir. 1997).

### A. DISPARATE TREATMENT

To defeat a motion for summary judgment under either statute, a plaintiff must first establish a prima facie case

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 115 of 331

Goldson v. Kral, Not Reported in Fed. Supp. (2016)

of discrimination. 🚩 *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To establish a prima facie case of discrimination under Title VII and the ADEA, a plaintiff must show (1) membership in a protected class, (2) qualification for the position she held, (3) an adverse employment action,[3] and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See* 🚩 *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). The Report properly found that Plaintiff failed to establish a prima facie case of discrimination based on her age, race, or gender. (Report, at 17-24.)

The parties do not dispute that Plaintiff has alleged the first three elements of a prima facie case of discrimination. First, Plaintiff is a member of at least three protected classes as an African American female of Jamaican national origin under Title VII. 🚩 *Ruiz*, 609 F.3d at 491. She was over forty at the time the allegedly adverse employment actions occurred for ADEA purpose. (*See* Am. Compl., at 3.) As to the second element, it is undisputed that Plaintiff was qualified as a paralegal. (*See* Report, at 18.) Third, the Report found that Plaintiff provided proof of two[4] timely adverse employment actions. (Report, at 18-21.) Specifically, Defendant reduced her job responsibilities on August 16, 2012, (*id.* at 6), and Plaintiff was terminated on January 22, 2013. (*Id.* at 7); *see* 🚩 *Ruiz*, 609 F.3d at 491.

### 1. ADEA

**\*4** With regard to Plaintiff's age discrimination claim, Magistrate Judge Maas properly found that Plaintiff proffered no facts supporting her contention that the adverse employment actions occurred under circumstances that gave rise to an inference of age discrimination. 🚩 *Ruiz*, 609 F.3d at 491; (*see* Report, at 17.) Plaintiff, a paralegal, did not provide any evidence suggesting that Defendant's decision to hire a younger male for a billing clerk and law clerk position with significantly different duties and responsibilities sometime between 2012 and 2013 was motivated by age. (*Id.* at 18.) Nor did Plaintiff provide any evidence that her age was a but-for cause of any of the adverse employment actions she has alleged. (*Id.* citing *Sklar v. N. Y. Life Ins. Co.*, No. 00 Civ. 2254, 2001 WL 984724, at \*5 (S.D.N.Y. Aug. 27, 2001 (finding that "mere fact" of plaintiff's age (fifty-two) does not raise inference of age discrimination).)

Neither party objected to the Report's recommendation to grant summary judgment to Defendant on Plaintiff's ADEA discrimination claim. Having found no clear error, this Court accepts that recommendation.

### 2. TITLE VII

The Report also properly found that Plaintiff failed to establish that the adverse employment actions occurred under circumstances that give rise to an inference of discrimination on the basis of her race, color, gender, or national origin. *See* 🚩 *Ruiz*, 609 F.3d at 491. Plaintiff offered no evidence to support her contentions that her change in job responsibilities[5] and termination were motivated by unlawful discrimination. (*See* Report, at 22.) During her deposition, Plaintiff could not name witnesses who could corroborate her discrimination claims. (*See id.*) Plaintiff's sole fact on which she hangs her case of unlawful discrimination is that she is "the only Black female employee of Jamaican ancestry" at the defendant Firm. (*See* Report, at 23.) Without more contextual information about how she came to be the only Black female employee of Jamaican ancestry working for Defendant, a rational jury could not find in Plaintiff's favor regarding an inference of discrimination. (*See id.* (citing 🚩 *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012) (internal quotation marks and citations omitted)).)

Other than this fact, the Report properly concluded that Plaintiff merely proffered "conclusory statements that [Defendant's] actions were motivated by animus toward her race, color, gender, or national origin." (Report, at 21.) As this Circuit has recognized, "a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove." 🚩 *Hicks*, 593 F.3d at 167. "To the extent that [Plaintiff's papers] contain bald assertions and legal conclusions[,] ... the district court [can] properly refuse[ ] to rely on them." 🚩 *Schwapp*, 118 F.3d at 111 (citations omitted). Magistrate Judge Maas found that Plaintiff failed to establish a prima facie case of unlawful discrimination under Title VII, and accordingly recommended that this Court grant Defendant's motion for summary judgment as to Plaintiff's Title VII discrimination claim. (Report, at 24, 28.)

**\*5** Neither party objected to the Report's recommendation. Having found no clear error, this Court accepts that recommendation.

## B. RETALIATION

Title VII and the ADEA prohibits an employer from retaliating against employees for opposing any practice of unlawful employment discrimination. *See* *Littlejohn*, 795 F.3d at 315 (citing 42 U.S.C. § 2000e-3(a)). Retaliation claims, like disparate treatment claims, are analyzed using the three-part burden-shifting test. *See id.* To demonstrate a prima facie case of retaliation,

> a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity ... ; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity.

*Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (internal citation omitted).

Once a plaintiff establishes her prima facie case, the burden of production shifts to the employer to put forth evidence of a non-retaliatory rationale for the adverse action. *See id* (citing *Holt v. KMI-Continental*, 95 F.3d 123, 130 (2d Cir. 1996)). Once the defendant has done so, the plaintiff may prevail by demonstrating that the stated rationale is pretextual. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173, 179-80 (2d Cir. 2005). The employee at all times bears the burden of persuasion to show a retaliatory motive. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

The parties do not dispute the first three elements of Plaintiff's prima facie case of retaliation. First, Plaintiff clearly engaged in protected activity when she dually filed her EEOC and Division of Human Rights charge of discrimination on April 27, 2012. (Def.'s Rule 56.1 Statement ("Def.'s 56.1 Stmt."), ECF No. 86, at ¶ 17.) Magistrate Judge Maas properly found that both Plaintiff's termination and her reduction in responsibilities constituted an adverse employment action. (*See* Report, at 28 (referencing Report, at 21 ("The reorganization may well have created a situation in which Goldson became less valuable to the firm than [the other paralegal], and therefore, vulnerable to termination ... [T]he reorganization of her responsibilities [ ] may rise to the level of an adverse employment action.")).)

## 1. CAUSATION

Defendant first objects to the Report's finding that Plaintiff was able to demonstrate causation because of the temporal proximity between her April 27, 2012 filing of the charge of discrimination and the August 16, 2012 change in her job duties. (Def.'s Objs., at 1; Report, at 29.) While the Report concluded that the nine months between Plaintiff's protected activity and her January 2013 termination "would likely pose a temporal proximity hurdle," the Report also concluded that three and a half months (at most) between the protected activity and the change in Plaintiff's responsibilities is sufficiently close in time as to demonstrate causation as part of the prima facie case. (Report, at 29.) Furthermore, the Report accurately noted that Defendant had failed to contest the causal connection between these two events in its moving papers, which only focused on the causal relationship between the protected activity and Plaintiff's termination. (*Id.*)

**\*6** Defendant further contends that when, as here, "more than three months have passed between a protected activity and an allegedly retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation." (Def.'s Objs., at 4 (citing *Jiminez v. City of N.Y.*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009)).) However, the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case [of retaliation], the outer limits beyond which a temporal relationship is too attenuated to establish causation ...." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). Indeed, this Circuit has held that periods as long as eight months have been sufficiently close in time to establish causation. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 4 5-6 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady*

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 117 of 331

Goldson v. Kral, Not Reported in Fed. Supp. (2016)

*Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (noting that five months was sufficiently proximate in time to demonstrate causation). Furthermore, at the prima facie stage, "temporal proximity [between the protected activity and the adverse action] alone may still be sufficient" to show causation. *See Smith v. Town of Hempstead Dept. of Sanitation*, 982 F. Supp. 2d 225, 232 (E.D.N.Y. 2013). This Court finds that the Report properly held that Plaintiff made out a prima facie case of retaliation.[6]

### 2. PRETEXT

Defendant next contends that the Report's finding that Plaintiff has sufficiently established pretext as to her retaliation claim is improper because the Report found that Plaintiff failed to establish pretext as to her Title VII claim. However, as courts in this Circuit have routinely found that a plaintiff's retaliation claim may proceed while granting summary judgment on a discrimination claim. An adverse employment action that may not be discriminatory may still be retaliatory, and therefore unlawful. *See, e.g., Orlando*, 2015 WL 6387531, at *12; *Chan v. Donahoe*, 63 F. Supp. 3d 271, 300 (E.D.N.Y. 2014); *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 351 (S.D.N.Y. 2001); *Kornblatt v. Beth Israel Med. Or.*, No. 97 CIV. 8630, 1998 WL 483457, at *4 (S.D.N.Y. Aug. 17, 1998).

Here, Defendant claims that the purpose of the Reorganization Email was "to limit firm expenses" and "clarify to attorneys and non-attorney staff the parameters of paralegal and staff responsibilities," (Objs., at 2). There exists, however, a genuine issue of material fact as to pretext, as the Report found. (Report, at 29.) "Plaintiff's may establish pretext and thereby successfully oppose summary judgment, ... by demonstrating] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." *Ramos*, 134 F. Supp. 2d at 343 (internal quotation marks and citations omitted). Here, Plaintiff notes that Defendant's managing partner and the author of the Reorganization Email, Gerald Ryan, never responded to her

email inquiries about her new responsibilities. (Pl.'s Aff. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Aff"), ECF No. 94, at ¶ 5; Pl.'s Aff, Ex. C, at 1.) Defendant claims that Plaintiff's termination was "part of a broad cost reduction plan in an effort to improve the firm's profitability." (Def.'s Mem., at 13.) However, Defendant fails to address how the Reorganization Email was part of that effort, or if that effort was even in place in August 2012, when Ryan sent the e-mail. Even if Defendant argued that the email was part of a firm-wide "cost-saving" effort, (*see* Report, at 25 (citing Ryan Decl., ECF No. 87, at ¶ 9)), Defendant has not proffered any evidence showing that emails were sent about secretarial responsibilities or about attorney responsibilities in the New York office. Nor does Defendant demonstrate how making a salaried employee, such as Plaintiff, do less billable work, could save Defendant money. In fact, reducing Plaintiff's billable hours would have saved a client money, but not Defendant. Taken together, the circumstances raise an inference that there was no other purpose to the email that applied only to Plaintiff than to set up a pretext for retaliatory motives. Therefore, Magistrate Judge Maas properly recommended that Defendant's motion for summary judgment be denied as to Plaintiff's retaliation claim. (*See* Report, at 30.)

### III. CONCLUSION

**\*7** Magistrate Judge Maas' Report and Recommendation is adopted. Defendant's motion for summary judgment as to Plaintiff's Title VII and ADEA discrimination claims is GRANTED. Defendant's motion for summary judgment on Plaintiff's retaliation claim is DENIED.

The Clerk of Court is directed to close the motion at ECF No. 84.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1241526

### Footnotes

1    This Court previously issued an order adopting Magistrate Judge Maas' recommendation to dismiss Plaintiff's New York City and New York State Human Rights Laws claims, leaving only Plaintiff's Title VII and ADEA claims. (August 13, 2014 Order, ECF No. 46.)

2    The relevant procedural and factual background is set forth in greater detail in the Report, and incorporated herein. (*See Report*, at 2-10.)

3    The Report properly found that from the list of Plaintiff's alleged adverse employment actions, only the incidents occurring after July 2, 2011, three hundred days prior to Plaintiff's filing of her first discrimination charge, are timely. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Report also properly found that Plaintiff had failed to show that any of the pre-July 2, 2011 adverse employment actions were part of a continuing policy of discrimination at the defendant law firm, so as to fall under the "continuing violation" exception in discrimination cases. (*See* Report, at 17.) *See also Lightfoot*, 110 F.3d at 907 (internal citations omitted) (defining "continuing violation" exception).

4    Plaintiff also contended that Defendant failed to give her a raise or pay her commensurately with other employees during the justiciable time period, (Report, at 16), and that Defendant failed to provide her with a written job reference, even though Plaintiff requested a reference twice over a ten-month period. (*Id.* at 5, 6.) The Report properly found that for the purposes of disparate treatment analysis, Plaintiff did not meet her burden of proof to show that these incidents constitute adverse employment actions. (*See id.*, at 19, 21 n.7.)

5    The Report did not specifically find that Plaintiff's change in duties constituted an adverse employment action cognizable under Title VII, stating that the change "may rise to the level of an adverse employment action." (*See* Report, at 21.) The Report reasoned that the reduction in Plaintiff's billable tasks may well have led to her later termination. (*Id.* at 20-21.) The Report also notes that Defendant does not dispute Plaintiff's assertion that the reorganization reduced her billable hours. (*See id.* at 20.) Indeed, Defendant only addresses Plaintiff's termination, contending that Plaintiff was terminated because she generated less revenue than the only other paralegal at the firm. (*See* Def.'s Mem. at 13.)

6    Defendant also appears to argue that apart from timing, the Reorganization Email had no "connection whatsoever to the Plaintiff's filing of her Charge," (Objs., at 4), and contest "Plaintiff's reliance on the mere existence of the Reorganization Email to bolster her temporal proximity argument to establish causation." (*Id.* at 5.) This argument is conclusory and without merit, as Plaintiff's burden at the prima facie stage is *de minimis. Tomassi v. Insignia Fin. Grp., Inc., 478* F.3d 111, 114 (2d Cir. 2007). Furthermore, "[a] showing of causation 'tend[s] to collapse as a practical matter under the *McDonnell Douglas* framework' with a showing of pretext," as Plaintiff has made here. *Orlando v. BNP Paribus N. Am., Inc.*, No. 14 CIV. 4102, 2015 WL 6387531, at *13 (S.D.N.Y. Oct. 22, 2015) (internal quotation marks and citation omitted).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2986588
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Erin MCKENNA, Plaintiff,

v.

SANTANDER INVESTMENT
SECURITIES, INC., et al., Defendants.

21cv941 (DLC)
|
Signed July 28, 2022

**Attorneys and Law Firms**

For the plaintiff: Wigdor LLP, Valdi Licul, John S. Crain, 85 Fifth Ave., Ste. Fifth Floor, New York, NY 10003.

For the defendants: Nelson Mullins Riley & Scarborough LLP, Mitchell Boyarsky, Nicole Phe, 280 Park Ave 15 Floor West, New York, NY 10017.

OPINION AND ORDER

DENISE COTE, District Judge:

 **\*1** Defendants Santander Investment Securities, Inc., Santander Holdings USA, Inc. ("SHUSA") (together, "Santander") and Omar Kariuki ("Kariuki") (collectively "Defendants") have moved for summary judgment on all claims asserted against them by plaintiff Erin McKenna ("McKenna" or "Plaintiff"). McKenna alleges that the Defendants failed to provide her with a reasonable accommodation for her high-risk pregnancy, subjected her to pregnancy discrimination, and retaliated against her in violation of federal, state, and city antidiscrimination statutes. For the reasons set forth below, the motion is granted in part.

**Background**

The following facts are undisputed or taken in the light most favorable to the Plaintiff, unless otherwise noted. McKenna began working at Santander Investment Securities, Inc. in May 2018 as a salesperson on the Fixed Income sales desk. McKenna was part of the Investment Grade ("IG") Sales team and a "primary and essential function" of McKenna's role was to execute trades.

As a member of the Fixed Income Sales team, McKenna was expected to work from Santander's offices in Manhattan. Under the Santander Investment Securities ("SIS") Fixed Income Sales & Trading Front Office Manual, off-premises trading is defined as "the execution of trades through telephone lines (e.g., trading over cellular or personal telephone lines or via on or off-site e-mail) whereby the execution is not recorded on the SIS voice systems or the execution of trades is off site of SIS." Off-premises trading is "generally not permitted." The enumerated events in which it may occur include

> (1) Times of financial emergency; (2) Acts of God; (3) Contingency or unexpected development in the global financial markets; (4) On holidays in NY (when Latam markets are open) or; (4) after hours which could adversely affect [Santander]'s position whereby a trader (or Salesperson, at their client's request) needs to execute a trade off-premise he/she must be authorized to do so prior to closing the transaction by the Head of Fixed Income (approval must be obtained in writing).

The Front Office Manual describes the "appropriate procedures" to follow to execute off-premises trades.

In late 2018, McKenna disclosed her pregnancy to William ("Bill") Garvey, the Head of Investment Grade Trading and her manager at the time. During the early months of 2019, McKenna contends that Garvey allowed her to come into the Santander office whenever she could and to otherwise work remotely. Defendants contend that Garvey did not give McKenna permission to work remotely.

In early 2019, McKenna received a bonus of $170,000 for the year 2018. According to the terms of McKenna's offer letter, she was eligible "to receive a discretionary bonus with a reference of $200,000, payable in accordance with SIS policy with respect to the payment of bonuses" for 2018. Accordingly, for 2018, McKenna received $30,000 less than the amount listed in the offer letter.

On March 7, 2019, Garvey sent McKenna a text message requesting "[a]ny word on whether or not you can come back to work?" McKenna responded that she was still advised not to return to the office because of concerns that "stairs and train" could cause labor. On March 8, Garvey emailed Human Resources,

> **\*2** Erin has been instructed by her doctor that she cannot take the train in to work due to complications from her pregnancy. It's likely this will remain the case until she has the baby (due date first week of June). I have instructed her that she is unable to execute any transactions while she is out of the office.

On March 12, Catherine Baer from Human Resources emailed McKenna to request that she get in touch with the benefits team and send Human Resources a copy of her doctor's instructions. The next day, Baer emailed McKenna to thank her for talking earlier and referenced a meeting set to occur later in the day. On Tuesday, March 19, Baer wrote that she had not heard back from McKenna. Baer noted in the email that McKenna's position "is not one that has the ability to work remote" and asked McKenna whether there were "any other accommodations" her doctor was requesting. McKenna responded on the same day that she was going to see the doctor on Thursday and would get a note at that time. Baer responded that "everyone is trying to figure out a solution that will work" and asked whether "Uber or another ride share service" is an option.

On March 21, McKenna requested that Santander provide a car service two days a week. She noted that her husband could drive her into work twice a week if Santander could provide a car service the other two days. Baer responded that, until the completed forms are received, Human Resources wouldn't be able to review her request.

McKenna procured a physician's certification for a pregnancy related accommodation that same day. McKenna's doctor stated that McKenna "needs to be provided with transportation and has been cleared to return to work 4 days a week." The form describes several medical conditions related to McKenna's pregnancy that "restrict her ability to perform at full capacity." The doctor notes that McKenna "should not be

lifting anything at all, climbing or pushing/pulling." A second note from the same doctor, also dated March 21, states that McKenna "has been cleared to go back to work 4 days a week as long as she is provided with transportation."

On April 2, Beatriz Retamar from Human Resources emailed McKenna to say she "had some news, but still figuring out before telling you." Retamar requested McKenna's help with "one thing" and asked whether McKenna could "figure out if you have any branch near your home comfortable for you to go." Retamar noted that "remote working is not an option even with the fingerprint, and CITRIX ... because we can't control the 'environment', meaning who can have access to that non public information." On April 3, McKenna responded to Retamar's email and said "I think I am all good now to commute. I just have to take it easy but I am out of the critical time for the baby." McKenna noted that there did not seem to be any branches near her house but that she "should be back to a regular schedule." Retamar forwarded the email to others in Human Resources. On April 3, Molinari responded to the email thread, "Case is closed".

Omar Kariuki assumed responsibility for both the Emerging Markets and Fixed Income Sales teams around March 2019 and became McKenna's supervisor. On April 5, McKenna emailed Minuesa, the Head of Markets in the U.S. and Kariuki's manager, and Kariuki regarding coverage for her Midwestern accounts while she was on maternity leave. In the April 5 email, McKenna wrote,

> **\*3** I sat down with Jeff Barker yesterday to discuss his helping to back me up on my Midwest accounts while I am out on maternity leave. Omar asked me to do this last week before he left and I was more than happy to do so to make sure my accounts are efficiently covered in my absence. However, it left me concerned that my client list was going to be substantially changed as a result of my time off after having a baby.... [W]hen Jeff mentioned that he would be covering IG accounts in addition to EM going forward and that he specifically covers Northwestern Mutual I was concerned. For instance, this is one [of] my biggest accounts

that I opened.... I have done both EM and IG trades with Northwestern Mutual since I have been here. From our conversations, I was under the impression that Jeff would be helping back me up while I was out, but now it seems like he's going to be taking over some of my accounts even when I come back.

(Emphasis supplied). Kariuki responded that the message Barker relayed was wrong and McKenna's account list would remain intact while she was out on leave.

On April 29, McKenna told the Defendants that she had obtained a doctor's note. The note, which is dated April 24, advises McKenna "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all. This is due to medical complications of her pregnancy." There is no evidence that McKenna provided this note to the Defendants. McKenna gave birth on May 6, and began her maternity leave.

McKenna returned from maternity leave on August 12, 2019. A week earlier, on August 4, Minuesa emailed Kariuki about undertaking a restructuring of the sales team. In his email, he said that "[l]ooking at the activity in secondary markets and the 2H of the year, our priorities should be focused in ... restructuring of team (low-production sales persons)."

In February 2020, McKenna received a bonus for the year 2019 of $165,000. This was $5,000 less than her 2018 bonus.

In February 2020, Santander returned to the discussion of restructuring the Investment Grade Sales team. In a February 24 email, Christina Yahn, Vice President of Human Resources, refers to a meeting with Juan Minuesa and Kariuki about "a proposed restructure to the Institutional Sales team." Yahn states that "[g]iven the client/revenue focus of the team, we need to begin the recruitment process and secure final candidates before we can notify the current employees of the impacts to their roles." The Plaintiff contends that she was identified at that time as a "current employee" who would lose employment in this restructuring. Beginning in March 2020, Santander transitioned to remote work in response to the COVID-19 Pandemic.

On August 25, 2020, Kariuki and Minuesa emailed Yahn to set aside time to discuss "personnel changes to the sales team." The parties agree that in those discussions Santander identified McKenna as a person who would lose her job in the restructuring. Documents reflect that the three individuals met on September 1 at 10:30 a.m., and that the next day Yahn sent Kariuki a template for a new organization chart.

On September 2, Santander held a meeting, attended by McKenna, regarding "the new protocol" for returning to work in the office during the pandemic. McKenna emailed Yahn after the meeting to explain that she had "just found out" she was again pregnant. McKenna requested that they wait to discuss her return to the Santander office until after her September 17 doctor's appointment. Yahn responded that it "ma[de] sense to revisit" her return to the office after the September 17 appointment. Yahn wrote "I assume you haven't yet told the team of your good news, so I can just mention to Omar that you and I discussed a return to be confirmed after 9/17 without mentioning any details."

On September 16, Yahn sent a text message to Shannon Cruz, another employee on Yahn's Human Resources team, detailing the sequence of events leading up to McKenna's pregnancy announcement. Yahn stated that

> **\*4** Omar told me like 2 weeks ago he wanted to [l]et go Jeff Barker and Erin McKenna.... I cannot tell Omar she's pregnant bc it's her thing to do, but need to factor in the implications of it with letting her go.

On September 17, McKenna wrote to Yahn that she "was going back to the doctor in 2 weeks to be monitored" because she is "high risk." McKenna noted that her doctor had asked if they "could revisit a return to work after my first trimester (end of October) since this is a critical time." McKenna said she would receive a note from her doctor shortly. Yahn responded that she did "not need to see the note at this time."

On October 12, Kariuki sent an email to Yahn noting that he and Minuesa had "decided to ... exit the two people in IG discussed." On October 19, McKenna sent Kariuki a Bloomberg message and disclosed her pregnancy. Having just learned that McKenna was pregnant, Kariuki sent Yahn an email with the subject "Does this change anything?" and included McKenna's message regarding her pregnancy in the body of the text.

Santander proceeded with its decision to terminate McKenna's employment. A "Severance Decision Form" dated October 28, prepared by Yahn and Kariuki, lists McKenna and Barker as the "impacted" team members. An October 28 draft of the restructuring documents includes a request by Yahn regarding McKenna. She asks Omar to "talk through the business results that you provided at the end of September? I want to understand Tom Steckroth's mandate and current volume and YTD results when compared to Erin's."

On November 4, Yahn sent Molinari a description of the revised business rationale for the organizational changes being made to the Investment Sales team. The document notes that

> [w]e have identified that we have a need to enhance the focus of the IC3s to of course be Sales centric, including a need for stronger secondary sales results.... Therefore, based on assessment of the remaining IC3 incumbents, one of the IC3 level positions will be impacted to undergo an upgrade to help build the existing credit business including driving up secondary sales while also excelling in working in a matrixed and manual operations dependent environment.... Erin McKenna's role has been identified to be upgraded with an incumbent with the above skills and competencies.

(Emphasis supplied.) The document lists McKenna as one of the "impacted team member(s)." On November 6, 2020, McKenna was fired.

On February 3, 2021, McKenna filed this lawsuit. The complaint asserts claims against all Defendants for interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), discrimination and retaliation under the New York State Human Rights Law, Executive Law § 290 et seq. (the "NYSHRL"), and discrimination and retaliation under the

Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL"). It also asserts claims under NYSHRL and NYCHRL against Kariuki for aiding and abetting.

On February 4, 2021, McKenna filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") as amended by the Pregnancy Discrimination Act of 1978 ("PDA") and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"). On April 26, McKenna received a Notice of Right to Sue from the EEOC.

**\*5** On May 24, McKenna filed an amended complaint adding claims against Santander for discrimination and retaliation under the ADA and Title VII. Following that amendment, McKenna principally claims (1) a failure to accommodate her pregnancy beginning on March 8, 2019 by rescinding permission for her to work from home and refusing to provide or reimburse car transportation to work; (2) discrimination against her for her 2019 pregnancy and pregnancy leave by reducing two bonuses, refusing to return certain accounts to her portfolio when she returned to work in 2019, and terminating her employment in 2020; (3) discrimination against her for her 2020 pregnancy by terminating her employment; and (4) permanently reassigning many of her accounts, lowering her bonuses, and terminating her employment in retaliation for two statements she made in early 2019.

On March 28, 2022, the Defendants moved for summary judgment on all claims. The motion became fully submitted on May 11. [1]

### Discussion

Summary judgment may only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing

law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). In the context of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). See also Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016).

### I. The Statutes of Limitations

Among her claims, McKenna alleges that the Defendants violated her rights under the ADA and Title VII. A claim under Title VII or the ADA must be dismissed as untimely if a plaintiff has not filed a complaint with the EEOC within 180 days of the alleged discriminatory or retaliatory act or filed a complaint with an appropriate state or local agency within 300 days of the occurrence of the alleged illegal act.[2] The Second Circuit has held that Title VII and ADA charges filed with the EEOC in New York are deemed to be simultaneously filed with the appropriate New York state agency pursuant to the EEOC's regulations and are therefore entitled to the 300 day limitations period. Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 327-28 (2d Cir. 1999).

The Plaintiff also brings a federal claim under the FMLA. The statute of limitations for interference and retaliation claims under the FMLA is two years. See 29 U.S.C. § 2617(c)(1). A three-year statute of limitations period applies, however, if a plaintiff proves a "willful" violation of the FMLA. See id. § 2617(c)(2).

**\*6** Finally, the Plaintiff brings various state and city law claims. "[C]laims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).

Generally, each discrete discriminatory or retaliatory act that violates federal law "gives rise to a freestanding [federal]

claim with its own filing deadline." Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir. 2012). Therefore, where a plaintiff's claims are premised on "discrete discriminatory or retaliatory acts such as termination, failure to promote, denial of transfer, or refusal to hire," those claims may be barred by the statute of limitations "if they occurred prior to the 300-day period even though they may be related to acts that occurred within the permissible 300-day period." Davis-Garett v. Urb. Outfitters, Inc., 921 F.3d 30, 42 (2d Cir. 2019) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002)).

### A. Application

McKenna filed her EEOC complaint on February 4, 2021. Therefore, any claims under the ADA and Title VII arising from acts occurring before April 10, 2020 -- 300 days before she filed her complaint with the EEOC -- are time barred. Since McKenna's ADA claim relates to her 2019 pregnancy, it is time-barred. Any Title VII claims arising from the 2019 reassignment of McKenna's accounts or her 2018 and 2019 bonuses are also time-barred. Her Title VII claim arising from the termination of her employment is timely. All of McKenna's claims under the FMLA, NYSHRL, and NYCHRL are timely.

### II. Disability Discrimination

McKenna asserts that the Defendants, in violation of the ADA, NYSHRL, and NYCHRL, failed to provide her in the period following March 7, 2019 with a reasonable accommodation in connection with her 2019 pregnancy. The Defendants move for summary judgment on these claims because McKenna does not qualify as disabled, has failed to show that a reasonable accommodation existed that would have allowed her to perform the essential functions of her job at home, and has failed to show that the Defendants refused a request for an accommodation. This motion is granted on the ground that McKenna has failed to show that Santander refused to reasonably accommodate her pregnancy.

### A. Legal Standard

The ADA prohibits "discriminat[ion] against a qualified individual" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This provision "requires employers to take certain affirmative steps to

assist employees with disabilities," which include reasonably accommodating "the known physical or mental limitations of an otherwise qualified individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." Bey v. City of New York, 999 F.3d 157, 165 (2d Cir. 2021) (quoting 📁 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, a disability is defined "to include, inter alia, a physical or mental impairment that substantially limits one or more major life activities." Hamilton v. Westchester Cnty., 3 F.4th 86, 92 (2d Cir. 2021) (citation omitted). Pursuant to the ADA Amendments Act ("ADAAA"), passed by Congress in 2008, "the term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(d)(1)(i)(2016). "[T]he term 'substantially limits' is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA." Hamilton, 3 F.4th at 92. "[F]or purposes of an actual disability claim, a 'disability' shorter than six months in duration now can be actionable under the ADA." Id.

**\*7** Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques ..." N.Y. Exec. Law § 292(21). The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. The term "physical, medical mental, or psychological impairment means ... [a]n impairment of any system of the body; including, ... the reproductive system." N.Y.C. Admin. Code § 8-102.

To establish a prima facie case for failure to provide a reasonable accommodation, the plaintiff must establish: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the employer refused to make such accommodations. See Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020).

"Where the employee's disability is known to the employer, the ADA envisions an 'interactive process' by which

employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Stevens v. Rite Aid Corp., 851 F.3d 224, 231 (2d Cir. 2017) (citation omitted). "[T]he ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 98 (2d Cir. 2015).

Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims. See Fox v. Costco Wholesale Corp., 918 F.3d 65, 76 (2d Cir. 2019). The NYCHRL provides "greater protection against disability-based discrimination." Jacobsen v. New York City Health & Hosps. Corp., 22 N.Y.3d 824, 833–34 (N.Y. 2014). Under both the NYSHRL and NYCHRL, however, "the employer's response to the employee's request and any ensuing dialogue about the impact of the proposed accommodation on the employer's business inform the determination of whether a reasonable accommodation exists." Id. at 835.

### B. Application

Due to the medical complications arising from her 2019 pregnancy, McKenna has presented evidence that she was disabled for the purposes of the NYSHRL and NYCHRL.[3]

> Although pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended.... [I]t is likely that a number of pregnancy-related impairments that impose work-related restrictions will be substantially limiting, even though they are only temporary.

EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues (EEOC, June 25, 2015).

The Defendants assert that McKenna is required to establish a long-term or permanent impact on her health to show that she had a disability. But a "short-term injury can qualify as an actionable disability under the ADA." Hamilton, 3 F.4th at 93. See also 28 C.F.R. § 35.108(d)(ix)(2016).

McKenna, however, has failed to show that the Defendants refused to afford her a reasonable accommodation for her disability beginning on March 8, 2019. According to McKenna, Garvey allowed her to work from home in the period between January and March 7, 2019. [4] On March 7, Garvey texted McKenna to inquire whether she could return to work. After McKenna advised Garvey that her doctor told her she could not commute by train, Human Resources became involved and asked for a copy of the doctor's instructions. The doctor's note that McKenna provided to Santander on March 21 did not indicate that McKenna was unable to leave her home to work. It indicated instead that McKenna could work four days a week at an office so long as she was provided with transportation.

*8  The Plaintiff has not presented evidence to raise a question of fact that at any point in the weeks that followed March 21 that the Defendants refused the requested accommodation. The Human Resources personnel asked McKenna whether there was a Santander branch near her home. The next day, on April 3, McKenna responded and said "I think I am all good now to commute" and she could be back to her "regular schedule." With that response, McKenna effectively withdrew her request for an accommodation.

McKenna appears to make two arguments to support her disability claim. First, she appears to argue that she should have been allowed to work from home until she gave birth. She contends she was permitted by her supervisor to do so between January and March of 2019. The Defendants dispute that McKenna was ever permitted to work from home and point to Santander's strict prohibition against out-of-office trading in its Manual. In any event, McKenna's disability claim is premised on the period following March 7, 2019, and McKenna's evidence is that her doctor permitted her to work in an office during this period so long as she used appropriate transportation. As explained, the Plaintiff has not proffered evidence that the Defendants failed to reasonably accommodate her disability in this period.

Second, McKenna appears to rely on an April 24, 2019 doctor's note that advised her "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all." The

Plaintiff advised the Defendants on April 29 that she had a doctor's note, but there is no evidence that the Plaintiff ever presented the note to the Defendants. Instead, she describes it as evidence of her state of mind. If McKenna wanted an accommodation of her disability on April 29, having told Santander on April 3 that her need for an accommodation had ended, she had to provide the doctor's note to Santander. McKenna has failed to offer evidence that the Defendants refused a request for an accommodation at any time between April 29 and May 6, the date on which McKenna gave birth to her child.

### III. Pregnancy Discrimination

McKenna asserts that the Defendants discriminated against her due to her pregnancies, in violation of Title VII, NYSHRL, and NYCHRL. The adverse actions she identifies as following her 2019 pregnancy are the refusal to return all of her accounts to her when she returned to work in 2019 from her pregnancy leave, reducing her bonuses for the years 2018 and 2019, and firing her in 2020. She asserts that the adverse action taken against her in connection with her 2020 pregnancy was the termination of her employment.

The Defendants contend that McKenna has failed to establish a prima facie case for pregnancy discrimination related to either her 2019 or 2020 pregnancy and that she has not refuted the legitimate business reasons they have given for their business decisions. The Defendants' motion is granted in part. The Title VII claim related to the 2019 pregnancy is time barred. The motion is also granted as to all claims arising from the 2020 pregnancy. The motion is denied with respect to the 2019 pregnancy for claims brought under NYSHRL and NYCHRL.

#### A. Legal Standard

Title VII makes it unlawful for an employer to "fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII was amended by the Pregnancy Discrimination Act ("PDA") to enact Congress's determination that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684 (1983).

**\*9** Claims brought under Title VII are "analyzed using the familiar burden-shifting scheme adopted by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Walsh v. N.Y.C. Housing Auth., 828 F.3d 70, 75 (2d Cir. 2016) (citation omitted). To establish a prima facie case of discrimination, a plaintiff need only allege: "(1) that she is a member of a protected class, (2) that she was qualified for the position ..., (3) that she suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). Under Title VII, an employer is liable where the employee's pregnancy or related condition at least "partly ... motivated" an employment decision. Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008). "It suffices ... to show that the motive to discriminate was one of the employer's motives, even if the employer had other, lawful motives that were causative of the employer's decision." Lenzi v. Systemax, Inc., 944 F.3d 97, 107 (2d Cir. 2019) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013)).

A "denial or reduction of a bonus" can constitute an adverse employment action. Davis v. New York City Dep't of Educ., 804 F.3d 231, 236 (2d Cir. 2015). "The fact that the employer has discretion whether to grant bonuses or raises does not support the conclusion that an employer may freely allocate them on the basis of" discrimination. Id. at 235–36.

"If the plaintiff establishes a prima facie case, a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." Lenzi, 944 F.3d at 107 (citation omitted). "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." Id. at 107–08 (citation omitted).

Discrimination claims brought under the NYSHRL are "analytically identical" to Title VII claims. Id. at 107 n.7 (2d Cir. 2019). Claims brought under the NYCHRL are analyzed using the same framework as Title VII and

NYSHRL claims, Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009), but "must be reviewed independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted). The NYCHRL does not require that a plaintiff prove an adverse employment action. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). Rather, "the plaintiff need only show differential treatment -- that she is treated 'less well' -- because of a discriminatory intent." Id. at 110 (citation omitted).

B. Application

McKenna has presented sufficient evidence to raise a question of fact as to whether the Defendants discriminated against her as a result of her 2019 pregnancy by reducing her bonuses below the amount she would otherwise have been given, by failing to return some of her accounts to her when she returned from maternity leave, and by planning for and then implementing the termination of her employment in 2020. While the Defendants have provided legitimate reasons for each of those decisions, the disputed issues of fact must be resolved at trial.

McKenna's claims related to her 2020 pregnancy, however, must be dismissed. McKenna cannot show that her 2020 pregnancy motivated, even partly, the decision to fire her. Santander began to work on a restructuring plan for McKenna's position many months before McKenna became pregnant and many months before she advised anyone at Santander that she was pregnant. McKenna contends that Santander had identified her as someone to fire in February 2020. The parties agree that by August 2020, Santander had identified McKenna as someone who would lose her job in the restructuring. McKenna did not advise the Santander Human Resources department of her pregnancy until September and her supervisor until October 19. Because McKenna has identified no evidence to support a claim that her 2020 pregnancy played any role on Santander's decision to terminate her employment, her claims based on her 2020 pregnancy must be dismissed.

**\*10** McKenna argues that, although Santander employees took steps "to coordinate McKenna's ouster" in August, Kariuki did not "actually" terminate her employment until November 6, 2020, eighteen days after she told him about her pregnancy. To prove discrimination, McKenna must show

that the Defendants' decision to terminate her employment was motivated by discriminatory intent. In this case, the date on which she was actually informed on their decision is not relevant. Therefore, the Defendants are entitled to summary judgment on the Title VII, NYSHRL and NYCHRL discrimination claims arising from the 2020 pregnancy.

### IV. Retaliation

McKenna asserts that the Defendants retaliated against her in violation of the ADA, Title VII, NYSHRL, and NYCHRL for protesting unequal treatment. The Defendants contend that these claims fail. They assert that the federal claims are time-barred and that McKenna cannot demonstrate the causal connection between any protected activity and any alleged adverse action. The NYSHRL and NYCHRL claims survive in part; the federal claims are dismissed as time-barred.

#### A. Legal Standard

To make out a prima facie retaliation case under Title VII, the ADA, or NYSHRL the plaintiff "must show that (1) [s]he was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." Agosto v. New York City Dep't of Educ., 982 F.3d 86, 104 (2d Cir. 2020) (citation omitted); see Fox v. Costco Wholesale Corp., 918 F.3d 65, 72–73 (2d Cir. 2019) (ADA retaliation claim); Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL). Once the plaintiff has established a prima facie case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013). If the defendant does so, the plaintiff must then show that this "non-retaliatory reason is a mere pretext for retaliation." Id.

An employee's complaint "may qualify as protected activity" under Title VII "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted). Protected activity need not consist of a formal complaint of discrimination; an "internal complaint to company management" can constitute a protected activity under Title VII. Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992). The plaintiff's

complaint, however, cannot have been so generalized that the employer "could not reasonably have understood that she was complaining of conduct prohibited by Title VII." Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (citation omitted).

For a retaliation claim to survive summary judgment, the plaintiff must show "a causal connection between the protected activity" and the "adverse action" complained of. Agosto, 982 F.3d at 104 (citation omitted). Causation must be proved "according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Zann Kwan, 737 F.3d at 845 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

The adverse-action standard for retaliation "covers a broader range of conduct than does the adverse-action standard for claims of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015). It is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). With respect to adverse actions in the retaliation context, the Supreme Court has cautioned that:

> **\*11** Context maters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the

employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) (citation omitted).

The NYCHRL prohibits "retaliat[ion] or discriminat[ion] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Leroy v. Delta Air Lines, Inc., 36 F.4th 469, 474 (2d Cir. 2022) (citation omitted). "[C]ourts must analyze NYCHRL claims separately and independently from any federal ... claims," because the NYCHRL is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Mihalik, 715 F.3d at 109 (citation omitted).

B. Application

McKenna has presented evidence that she was retaliated against for purposes of the NYSHRL and NYCHRL in connection with her April 5, 2019 statement to Santander.[5] She may pursue these claims with respect to the Defendants' decision on what clients should be returned to her portfolio upon her return from maternity leave.

In opposing the motion for summary judgment, McKenna identifies two occasions on which she contends she engaged in protected activity. McKenna first claims that she engaged in protected activity in early 2019 when she asked to work from home during her pregnancy. Next, McKenna asserts that she engaged in a protected activity on April 5, 2019, when she sent an email to Minuesa and Kariuki, expressing concern that she may permanently lose her accounts "as a result of my time off after having a baby."

While the April 5 email qualifies as a protected activity, McKenna fails to show that she engaged in any other protected activity in early 2019. At no point in the FAC or in the evidence submitted in opposition to this motion for

summary judgment does McKenna explain what she said in early 2019 that might qualify as protected activity. She does not report what she said in making a request to work from home and, in fact, does not cite any specific conversation in which she complained of discrimination or unfair treatment, even in the most general terms. While informal protests of discrimination can constitute protected activity, McKenna fails to show that she made even an informal protest.

McKenna's retaliation claims under the NYSHRL and NYCHRL appear to rest on an assertion that she suffered four materially adverse actions as a result of the April 5 email. They are (1) the permanent reallocation of some of her accounts during her 2019 pregnancy leave; (2) the payment in early 2020 of a diminished bonus for the year 2019; (3) identification of the plaintiff for termination of employment beginning on February 25, 2020; and (4) the termination of employment in October 2020.[6]

*12 Each of these four actions is a materially adverse employment action for purposes of a retaliation claim. They are also adverse actions with respect to the surviving discrimination claims. Of the four actions, however, only the permanent reallocation of her accounts is sufficiently tethered to her April 5 protected activity to support a retaliation claim. While the Defendants have provided legitimate business reasons for the account allocations in 2019, the Plaintiff has presented evidence to raise a question of fact to support her retaliation claims and those disputed issue of fact must be resolved at trial.

The Plaintiff does not make any developed argument in support of her claim that the 2020 decisions regarding her bonus and the termination of her employment were motivated, at least in part, by the April 5, 2019 email. The Plaintiff's evidence links these actions, if at all, to her 2019 pregnancy and maternity leave, not to the email. While all of these events are to some extent interwoven, the length of time between the single expression of McKenna's fear about the reallocation of her accounts in her April 5, 2019 email and the 2020 events is too great to permit a jury to link the events through anything but speculation.

V. Interference and Retaliation Under the Family Medical Leave Act

McKenna asserts that the Defendants interfered with her rights under the FMLA and retaliated against her for exercising those rights. The Defendants contend that both

of McKenna's claims under the FMLA fail because she continued to work for over a year after her FMLA leave and has not presented evidence to refute the legitimate business reasons it has given for the termination of her employment.

### A. Legal Standard

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016) (citation omitted).

> [T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

Id. Denial of FMLA benefits is interpreted flexibly. "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Interference also includes "discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA]," Id. § 825.220(a)(2), and "induc[ing] employees to waive[ ] their prospective rights under FMLA." Id. § 825.220(d).

"To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Graziadio, 817 F.3d at 429 (citation omitted). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-

discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." Id.

> In a general sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. 'Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as ex ante and ex post protections for employees who seek to avail themselves of rights granted by the FMLA.

**\*13** Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d Cir. 2017).

### B. Application

McKenna's FMLA interference claim must be dismissed. She has identified no action by the Defendants that interfered with her taking any FMLA-protected leave or obtaining other FMLA benefits. McKenna argues that the Defendants interfered with her FMLA rights when they reallocated her accounts. But, as the Defendants observe, that contention is actually a retaliation claim.

McKenna has presented evidence to raise a question of fact as to her FMLA retaliation claim. She has presented sufficient evidence from which a jury could find that the Defendants retaliated against her for her absences from the workplace in 2019 by permanently reallocating some of her accounts, reducing her 2019 bonus and terminating her employment. While the Defendants have explained each of these actions, the disputed issues of fact must be resolved at trial.

### VI. Aiding and Abetting

McKenna argues that Kariuki can be liable under NYSHRL and NYCHRL for discrimination as both a primary and a secondary actor. "[A]n individual cannot aid and abet his or her own violation of the Human Rights Law." [Hardwick v. Auriemma, 983 N.Y.S.2d 509, 513 (1st Dep't. N.Y. 2014)](). As plaintiff sued Kariuki personally, and those claims remain in the lawsuit, he cannot have aided and abetted his own alleged acts of discrimination and retaliation. The Defendants' motion for summary judgment on McKenna's aiding and abetting claims is granted.

### Conclusion

The Defendants' March 28 motion for summary judgment is granted in part. The Defendants are granted summary judgment on the following claims: (1) Discrimination in violation of Title VII and the PDA against Santander; (2) Retaliation in violation of Title VII against Santander; (3) Discrimination in violation of ADA against Santander; (4) Retaliation in violation of ADA against Santander; (5) Aiding and abetting claim in violation of NYSHRL against Kariuki; (6) Aiding and abetting under NYCHRL against Kariuki; (7) Disability discrimination in violation of NYSHRL against all Defendants; (8) Disability discrimination in violation of NYCHRL against all Defendants; (9) Interference under the FMLA against all Defendants.

The following claims will proceed to trial: (1) Discrimination in violation of NYSHRL as to the 2019 pregnancy against all Defendants; (2) Retaliation in violation of NYSHRL against all Defendants; (3) Discrimination in violation of NYCHRL as to the 2019 pregnancy against all Defendants; (4) Retaliation in violation of the NYCHRL against all Defendants; (5) Retaliation under the FMLA against all Defendants.

**All Citations**

Slip Copy, 2022 WL 2986588

## Footnotes

1    On June 21, Plaintiff filed a motion to strike certain documents from the summary judgment record. The motion to strike is moot given the rulings in this Opinion.

2    Under Title VII and the ADA, a plaintiff may only benefit from the 300 day limitations period for such claims -- as opposed to the 180 day limitations period -- if she has first sought relief from an appropriate state or local administrative agency. See 🚩42 U.S.C. § 2000e-5(e)(1); 🚩42 U.S.C. § 12117(a).

3    McKenna's ADA claim is time barred.

4    The Defendants, supported by Garvey's deposition testimony, dispute McKenna's assertion that Garvey ever permitted McKenna to work from home in early 2019.

5    McKenna's Title VII and ADA claims are time barred.

6    McKenna also cites as an adverse action the receipt of a less than expected bonus for the year 2018. Since that bonus was decided upon and distributed before April 5, 2019, the retaliation claims based on that bonus must be dismissed.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2668211

Only the Westlaw citation is currently available.

NOT FOR PRINT PUBLICATION

United States District Court,

E.D. New York.

Sheila Barnes WILLIAMS, Plaintiff,

v.

THE CITY OF NEW YORK, The Board of Education
of the City of New York, and Elton Jackson, Defendants.

No. 99 CV 2697(ARR)(LB).

|

Sept. 11, 2006.

**Attorneys and Law Firms**

Sheila Barnes Williams, pro se.

Jeffrey M. Motelson, Moskowitz, Passman & Edelman, New
York, NY, Robert Marinelli, Buffalo, NY, for Plaintiff.

Deborah Sharp, The City of New York Law Department
Office Of Corporation Counsel, New York, NY, for
Defendants.

OPINION AND ORDER

ROSS, United States District Judge:

**\*1** Plaintiff Sheila Barnes Williams brings this action
pursuant to Title VII, 42 U.S.C. §§ 2000e, et seq.; 42
U.S.C. § 1983; the Thirteenth and Fourteenth Amendments
to the U.S. Constitution; the New York State Constitution;
New York Human Rights Law, Executive Law §§ 290,
et seq.; New York City Human Rights Law, New York
City Administrative Code §§ 8-101, et seq.; and state
common law. (Am.Compl., 1.) Specifically, plaintiff alleges
that she has been subjected to sexual harassment; sexually
assaulted and abused; denied a gender- and race-neutral
work environment; subjected to employment discrimination;
denied equal protection under the Fourteenth Amendment;
and retaliated against in numerous ways-including, *inter
alia,* transfers to other schools and termination-for filing
grievances, asserting her civil rights, and reporting to
the police that she was sexually assaulted. (*Id.* at 3-10.)
Additionally, plaintiff raises pendant claims for common law

negligence, assault, and intentional infliction of emotional
distress. (*Id.* at 1, 13.)

Defendants the City of New York ("the City"), the Board
of Education of the City of New York ("BOE"), and Elton
Jackson move for summary judgment on the grounds that:

(1) all of plaintiff's claims that accrued prior to April 5,
1998 are time-barred;

(2) plaintiff's State and City Human Rights law claims are
time-barred;

(3) plaintiff has failed to establish that she was subjected
to a gender-based hostile work environment because
prompt and effective remedial action was taken
immediately after she complained;

(4) plaintiff cannot establish a prima facie case of
retaliation and, even if she could, defendants have
legitimate, non-discriminatory reasons for all of the
alleged acts of retaliation;

(5) plaintiff fails to establish municipal liability as to
defendants the City of New York and the BOE; and

(6) plaintiff fails to establish that defendant Jackson acted
under color of state law.

(*See* Defs.' Mem., 2.) Plaintiff has not responded to
defendant's motion for summary judgment.[1] For the reasons
discussed below, the court grants defendants' motion in part
and denies it in part.

I. BACKGROUND

The following facts are undisputed unless otherwise
indicated.[2]

A. *BOE Non-Discrimination Policy*

The BOE has a policy and procedure to prevent and correct
discriminatory behavior. (*See* Defs.' Rule 56.1 Statement of
Undisputed Facts [hereinafter Defs.' Fact Statement], ¶ 24.)
BOE policy requires the posting of a public notification
poster and of Chancellor's Regulation A-830, which describes
the grievance procedures used to resolve complaints of
alleged discrimination. (*See id.* citing Ex. BB[3].) Prior to
March 24, 1998, the BOE posted (1) a "Public Notification
of Non-Discrimination Policy," which instructs individuals
who believe they have experienced discrimination to contact

their Local Equal Opportunity Coordinator ("LEOC"), and identifies Joseph L. Key as the LEOC for the Office of School Food and Nutrition Services ("OSFNS"), and (2) notification of Chancellor's Regulation A-830. (*See id.,* ¶ 25; BOE Policy Poster, *submitted as* Ex. CC; BOE Chancellor's Reg. A-830, *submitted as* Ex. DD.)

**B.** *Events Prior to 1993*

 **\*2**  Plaintiff began working for defendant BOE as a substitute school lunch helper at P.S. 274 Annex on February 23, 1984. (*See* Defs.' Fact Statement, ¶ 1.) Plaintiff's title was changed from substitute to permanent school lunch helper on November 2, 1984. (*See id.* at ¶ 2.) While working at P.S. 274 Annex, plaintiff received three written warnings-on November 4, 1984, November 18, 1985, and June 17, 1986-regarding her tardiness, absences from work, and inappropriate workplace behavior. (*See id.* at ¶ 3 (citing Ex. I).)

At some point prior to March 1987, plaintiff was transferred to St. Marks Lutheran School. (*Id.* at ¶ 4.) On March 12, 1987, plaintiff was transferred to J.H.S. 111 because the St. Marks Lutheran School Lunch Program was overstaffed. (*Id.; see also* Ex. J.)

Plaintiff worked at J.H.S. 111 from March 1987 until November 30, 1988. (*See* Defs.' Fact Statement, ¶ 4-8.) During this time, plaintiff received several written warnings about her workplace behavior. On October 17, 1988, plaintiff was asked to stop "making derogatory statements about the food to the students while [she was] serving." (*Id.* at ¶ 5 (citing Ex. K).) On November 18, 1988, supervisor Clara May notified plaintiff that she was concerned about plaintiff's repeated absences and late arrivals, and an incident in which plaintiff allegedly harassed and threatened the school cook and used obscene language. (*See id.* at ¶ 6; Ex. L.) After eight of plaintiff's coworkers signed a petition stating that they were unable to work with her "due to constant threats, verbal abuse, and unbecoming behavior," plaintiff accepted an administrative transfer from J.H.S. 111 to I.S. 291 effective December 1, 1988. (Defs.' Fact Statement, ¶¶ 7-8 (citing Ex. M, Ex. N).)

Plaintiff worked at I.S. 291 from December 1988 through October 1993. (*See id.* at ¶¶ 8-12.) During that time, she received several warnings about her conduct, including her failure to follow the OSFNS dress code, excessive absenteeism, and "frequent outbursts." (*Id.* at ¶ 9; Ex. O.) On April 15, 1991, plaintiff's supervisor notified plaintiff that she

was requesting a "Personnel Performance Hearing" to discuss plaintiff's "behavioral problem," after plaintiff "was part of a degrading disturbance in I.S. 291 which resulted in verbal abuse and threats to a co-worker." (Defs.' Fact Statement, ¶ 9 (citing Ex. O).) There is no record of any hearing regarding this incident in the record currently before the court.

**C.** *1993 Promotion Grievances & Dispute with I.S. 291 Cook & Supervisor*

At some point in 1993, plaintiff applied for the position of school lunch helper assigned to the I.S. 291 teacher's cafeteria. (*See id.* at ¶ 10; Ex. P.) Although plaintiff was the most senior applicant, she was initially denied the position based on her poor attendance. (*See* Am. Compl., ¶ 23; Defs.' Fact Statement, ¶ 10; Ex. P.) Plaintiff filed several grievances regarding the denial of this promotion through her union, District Council 37. (*See* Am. Compl., ¶ 24.) During a Chancellor's Conference on January 13, 1994, plaintiff explained that her attendance problems had been due to past injuries. (*See* Ex. P.) By decision dated March 3, 1994, plaintiff was awarded the position and back-pay for the additional hour of work involved in the teacher's cafeteria position (8:00am to 2:30pm rather than 9:00am to 2:30pm). (*See id.*) Plaintiff was informed, however, that "if she maintained the same or similar attendance record that she [had] maintained in the past she would face disciplinary action which may include discharge." (*Id.*)

 **\*3**  Plaintiff alleges that the BOE and the City of New York retaliated against her for filing grievances regarding this promotion by transferring her to another school against her wishes. (Am.Compl., ¶ 25.) According to plaintiff, she was returned to I.S. 291 after she filed another grievance and "the retaliatory transfer was overturned." [4] (*Id.* at ¶ 26.) Plaintiff further alleges that the BOE continued to retaliate against her by "making her work harder, by disciplining her for little or no reason, where other workers were not disciplined, and by ignoring her requests for promotion, and by failing to post job openings where she could see them." (*Id.* at ¶ 27.)

Defendants, however, claim that plaintiff's temporary transfer to P.S. 274 was motivated by a complaint about plaintiff's behavior filed by her manager at I.S. 291, Esther Weekes. (*See* Defs.' Fact Statement, ¶¶ 11-12 (citing Ex. Q, Ex. R).) After Ms. Weekes asked plaintiff to return to her assigned workstation on October 21, 1993, plaintiff allegedly used obscene language in front of students, and threatened and made racist remarks to Ms. Weekes. (*See* Ex. Q.)

Plaintiff's supervisor, Ms. May, advised her in writing that "[t]alking to [her] manager in such a manner is considered insubordination" and would be dealt with by the personnel department. (*Id.*) On October 26, 1993, plaintiff was temporarily transferred to P.S. 274, with the same work schedule (9:00am to 2:30pm), pending a hearing on Ms. Weekes' complaint. (*See* Defs.' Fact Statement, ¶ 12; Ex. R.)

A Personnel Performance Conference ("PPC") regarding the October 1993 incident was held on November 10, 1993. (*See* PPC Decision, LR# 7018-1A (Jan. 11, 1994), *submitted as* Ex. T [hereinafter Jan. 1994 PPC Dec.], 1.) In addition to the allegations described above, the PPC hearing officer considered:

(1) statements by petitioner and Ms. Weekes;

(2) an October 1, 1993 petition from the "Food Service Staff of I.S. 291" regarding "Esther Weekes, Food Service Dietician, and Gloria Fields, Food Service Cook," which requested, *inter alia,* that Ms. Weekes be removed from her supervisory position due to her "poor disposition," "poor interactions with colleagues," and "disrespectful" attitude; and

(3) statements by I.S. 291 food service staff regarding Ms. Weekes' conduct.

(*Id.* at 1-2.) The PPC hearing officer concluded that plaintiff and Ms. Weekes had argued on October 21, 1993, there were discrepancies in both women's statements, and, more generally, there were "problem(s) between management and the employe[es] of I.S. 291." (*Id.* at 2.) The PPC hearing officer recommended (1) reassignment of plaintiff to I.S. 291, following a warning that "unsatisfactory work performance and/or conduct can lead to disciplinary action ... and/or the termination of her services," and (2) implementation of "management changes" to improve OSFNS operations at I.S. 291. (*Id.* at 3.) Accordingly, petitioner was reassigned to I.S. 291 as of January 24, 1994. (*See* Memo (Jan. 20, 1994), *submitted as* Ex. T.)

D. *Disciplinary Problems at 1993 Temporary Assignment*
**\*4** Plaintiff was the subject of one disciplinary action while she was temporarily assigned to P.S. 274 during the fall/winter 1993. (*See* Defs.' Fact Statement, ¶ 13.) On December 9, 1993, the OSFNS manager at P.S. 274 reported that plaintiff, while on duty, had been involved in an argument and physical altercation with a co-worker in front of students on December 2, 1993. (*Id.;* Ex. S.) Plaintiff refused to sign the manager's

report, and wrote a note disputing the factual allegations at the bottom of Ms. May's disciplinary letter. (*See* Ex. S.)

A PPC regarding this incident was held on March 15, 1994. (*See* Ex. U.) The PPC hearing officer concluded that "[a]lthough the incident was not initiated by Ms. Williams, she [was] equally wrong for the conduct that was displayed in front of students and her co-workers. Ms Williams should have walked away and reported the problem to her supervisor." (*Id.*) The hearing officer encouraged plaintiff's supervisor to review the OSFNS conduct policy with her, and warned plaintiff that continued unsatisfactory conduct could lead to termination. (*See id.*)

E. *Alleged Retaliation & Sexual Harassment at I.S. 291 between 1994 and March 1998*
As noted above, plaintiff was reassigned to I.S. 291 as of January 24, 1994. (*See* Ex. T.) Based upon the Chancellor's March 3, 1994 decision regarding plaintiff's promotion grievances, plaintiff began working as a school lunch helper in the teachers' cafeteria on approximately March 22, 1994. (*See* Ex. P.) Plaintiff held the position of school lunch helper in the teachers' cafeteria at I.S. 291 from approximately March 22, 1994 through March 24, 1998. Defendant Elton Jackson was also employed at I.S. 291 during this time. [5]

*1. Alleged Retaliatory Hiring of Elton Jackson*
Plaintiff alleges that the BOE hired defendant Elton Jackson to retaliate against plaintiff and her co-workers for filing a joint grievance seeking removal of the former I.S. 291 cook, Gloria Fields, and her supervisor and manager, Esther Weekes. (*See* Am. Compl., ¶ 28; N.Y. State Div. of Human Rights ("SDHR") Compl. No. 9S-E-S-99-7941868-E, *Williams v. City of New York, et al.* (Jan. 27, 1999), *submitted as* Ex. C [hereinafter SDHR Compl.], 3; Jan.1994 PPC Dec.) Specifically, plaintiff claims that Ms. Fields and Ms. Weekes were transferred to another school in 1994 as a result of the joint grievance which she and other I.S. 291 workers filed in October 1993 (described *supra,* Section I(C)). (*See* Am. Compl., ¶ 28; SDHR Compl., 3.) According to plaintiff, the school retaliated against the I.S. 291 staff by "deliberately [bringing] in a new cook, the defendant Elton Jackson, who had a known history of abusing co-workers in his last assignment, where he had been assistant cook." (Am.Compl., ¶ 28.)

Plaintiff alleges that Jackson began "verbally abusing his coworkers with profanities, name calling, and extremely

unprofessional behavior" immediately upon his arrival at I.S. 291. (*Id.* at ¶ 29.) Although plaintiff and her coworkers apparently complained about Jackson to their supervisors, manager, and union, nothing was done to stop Jackson's behavior. (*Id.* at ¶ 30.)

### 2. Alleged Sexual Harassment by Elton Jackson

**\*5** Plaintiff further alleges that, at some point before October 1996, Jackson "expanded his abuses to include physical touching of the plaintiff" and other forms of sexual harassment, including verbal abuse and "touch[ing] and fondl[ing] his genitalia, in plaintiff's presence, while calling out her name," despite plaintiff's repeated requests that he "leave her alone." (*Id.* at ¶ 31; *see also* SDHR Compl., 3). Although plaintiff allegedly complained to Jackson himself, school management, her manager and her supervisors, and union representatives, they took no action to stop the harassment. (*See* Am. Compl., ¶¶ 31-32; SDHR Compl., 3-4.)

During her deposition, plaintiff described numerous specific instances of unwanted physical touching. For example, plaintiff claims that Jackson cornered her in the storage room, turned off the lights, and touched her breasts in October 1996:

> Q: What happened [in October 1996]?
>
> A: "The same thing with the storage room ... [H]e clicked the light off and I stood there saying-I was trying to get out and he was in the storage room with me inside. He was saying that he was the bogey man. I was trying to get out. The more I came to the door, the more his hands were moving. That is when I hit the cans and threw them off the shelf and ran out. He ran out behind me. I told him, you think you're funny, what do you call yourself doing. Edna was telling him to stop playing with me, what did you do to her. He just started laughing-oh, she is scared of the bogey man ...
>
> ...
>
> Q: Well, but did he actually touch you?
>
> A: Yes. That is when I actually threw the cans off the shelf and he touched my chest.

(Williams Dep., 38-39.) Plaintiff also described a similar incident in November 1996, which began when plaintiff went into the storage room to get supplies:

> He was in the storage room with me. He closed the door with both me and him in there and I was swinging the cans to get out of there ... He touched my chest. It was while I was swinging back at him this time. I was going right back at him. I wanted to get back at him ... He was trying to restrain me, to keep me from going out-oh, I'm the bogey man. He was putting his hands over me.

(*Id.* at 39-41.)

Plaintiff testified that she reported the October 1996 incident to supervisor Yolanda Ogarra, OSFNS Associate School Food Services Manager (*id.* at 41 ("I spoke to her on the phone and she said she would speak to Elton [Jackson] when she would get there.")), and reported the November 1996 incident to both Ms. Ogarra and her on-site manager, Joanne Philip-Gayle [6] (*id.* at 40-43.). [7] Plaintiff claims that, after hearing about the November 1996 incident, "Miss Phillips told [Jackson], what do you think, are you funny, I don't want anybody to be closed up in things. She said, Sheila said you put your hands on her and you said you were the bogey man, you better stop doing that, Elton, you better stop playing." (*Id.* at 40.)

**\*6** According to plaintiff, the harassment continued in 1997. After the Christmas recess, for example, Jackson kissed plaintiff without her permission:

> [Jackson] put his mouth to my mouth. He said, give me a kiss for the holiday. I said, I'm not kissing you, saying Happy New Year, it's good enough. I walked away and he went to turn. When I turned, he turned and he put his mouth right on my mouth. He said, now you can tell your husband what I did. I slapped him, right. I said, what I did was reaction and he said, yes, yes reaction.

(*Id.* at 44-45.) Plaintiff claims that she told both Ms. Phillips and Ms. Ogarra about this incident, and that Ms. Ogarra agreed to talk to Jackson. (*Id.* at 45-46.) Plaintiff explained that she did not report this incident to Marie Figueroa, the Borough Regional Coordinator & Administrator of School Food and the Service Manager for OSFNS, because she "didn't want to go over Miss Ogarra's head." (*Id.* at 46.) Plaintiff also testified that, in February 1997, Jackson "ran up and grabbed me and I could not move my arms, right in the middle of the kitchen ... He grabbed me from behind and both his hands were just across my chest. I could not get [loose] from him ... I eventually wiggled and got away." (*Id.* at 51.) Plaintiff says that she reported this incident to numerous supervisors, including Ms. Phillips, Ms. Ogarra, and Ms. Figueroa; Ms. Phillips allegedly responded only by telling Jackson, "you need to control your hormones." (*Id.* at 52.)

Plaintiff also testified that Jackson often masturbated while staring at her and saying her name:

> A: Part of his routine if ... he is on the phone or he is sitting at the desk, he is mesmerized, he can see me when I'm at my post. You could feel him staring or looking and I turned around, he is standing there, his hand is moving up and down, Sheil, Sheil-and he called me some nickname that he gave me one time ...
>
> ...
>
> Q: Describe for the record what he is doing.
>
> A: Okay. Every time that I see him, I'm not going to say all the time, he is from the desk, all the time his arm is going up and down, up and down.
>
> Q: What part of his body are you referring to?
>
> A: He is caressing his bottom part going up and down.
>
> Q: His male genitalia?
>
> A: He gets comfortable and lies back. This is how Miss Phillips sees it, too. He is in another world. He was stroking himself ...

(*Id.* at 59-60, 65.) Plaintiff is certain that Ms. Phillips was not only aware of Jackson's behavior, but had actually witnessed Jackson masturbating while staring at plaintiff on several occasions. (*See id.* at 60 ("[Jackson] was sitting there again doing it but Miss Phillips seen it."); *id.* at 60-61 ("I can't say what other people seen it outside the kitchen but it has

been brought to my attention, as well as Miss Phillips['], Elton Jackson caressing himself."); *id.* at 61 (Ms. Phillips "started moving her eyes. I looked and followed her eyes and Elton was staring at my vaginal area ... Miss Phillips called Elton, Elton, Elton-three times before he responded.").)

**\*7** Plaintiff testified that on one occasion, Jackson brushed his fingers against her vagina. [8] (*See id.* at 58.) Plaintiff also described several incidents in which Jackson made sexually suggestive comments to her, such as telling her, in front of co-workers, "that he [was] going to kidnap [her] and take [her] upstate and tie [her] up," and describing a dream in which he tied plaintiff up. (*Id.* at 63.) Similarly, plaintiff stated that Jackson often harassed her when she was leaving work: "[H]e would meet me at the door. He was looking me up and down. He would rub his tongue across his lips. He would say, we would have fun in bed." (*Id.* at 88.)

In addition to the oral complaints described above, plaintiff testified that she submitted at least two written complaints about Jackson's sexual harassment to her supervisors at the BOE OSFNS. (*Id.* at 80 ("So in terms of the Board of Ed employees of food and nutrition service, they received at least two letters that were written of Mr. Jackson's sexual nature ... I made two complaints to them, yes.").) Although it is not clear from the truncated portions of plaintiff's deposition in the record, it appears that she also submitted at least one additional complaint about the ongoing sexual harassment to Barbara Wehner, a union representative. (*Id.*) Additionally, plaintiff alleges that her union shop steward initiated a petition to have Jackson removed, which was signed by various I.S. 291 staff members. (*See* Am. Compl., ¶ 32; SDHR Compl., 4.)

Defendants dispute the allegations that plaintiff was sexually harassed by Jackson; in fact, they suggest that plaintiff made numerous sexual advances to Jackson. (*See* Defs.' Fact Statement, ¶ 30.) Defendants also contend that plaintiff neither spoke to any of her supervisors nor filed any complaints about harassment by Jackson prior to March 24, 1998. (*See id.* at ¶ 29; Philip-Gayle Decl., ¶¶ 5-6; Decl. of Yolanda Ogarra in Supp. of Defs.' Mot. for Summ. J. [hereinafter Ogarra Decl.], ¶¶ 5-6; Decl. of Marie Figueroa in Supp. of Defs.' Mot. for Summ. J. [hereinafter Figueroa Decl.], ¶¶ 5-6.)

**F. *Alleged Sexual Assault on March 24, 1998***
Plaintiff alleges that on March 24, 1998, Jackson cornered her in the cafeteria storage room, attempted to close and lock

the door, attempted to prevent her from leaving the storage room, and touched or grabbed her breasts. (*See* Am. Compl., ¶¶ 15, 33-34; SDHR Compl., 4.) Plaintiff testified that she asked Jackson to retrieve some tea from the storeroom; when Jackson did not respond, she went to the storage room to request the tea. (*See* Williams Dep., 23-24.) Plaintiff says that she called out "anyone in there?," then entered the storage room. (*Id.* at 24, 18.) Once plaintiff was inside the storage room, Jackson allegedly approached her while talking about his past sexual experiences, then tried to lock the door:

   **\*8** I said it again, Jackson, I need tea. He started coming to me, not answering, still not responding, came around, stood near the door and started telling me people doing things, as far as himself, people doing things to him, Elton Jackson ... As he was talking, I heard the door, the lock on the door click.

   When I heard that door lock click, I tried to get out ... I experienced something like that twice before March 24 th, 1998 and I was not going to get with that again.

   As I tried to get out, Elton Jackson, half of my body was out and half of my body was inside. I was still inside. I had my left hand on the door, my right hand free. I eventually pushed the door ... When he realized I was getting out of the door, he just reached and just brushed his hand right across my chest.

(*Id.* at 19-20; *see also id.* at 23-28.)

After she got out of the storage area, plaintiff tried to call Ms. Phillips but the line was busy. (Williams Dep., 30, 33-34.) Plaintiff believes that she also tried to call Ms. Figueroa. [9] (*See id.* at 30, 32-33 ("I do remember ... When this incident happened, I did call Miss Figueroa, I called Miss Phillips ... I tried to call again-protocol. When I went to call again, they said, Sheila, Miss Figueroa knows what is going on and she is on her way ... This was Miss Martin, I spoke to Miss Figueroa's office.").) Plaintiff then went to report the incident to Arthur Pennisi, the I.S. 291 principal. (*See id.* at 28, 30-31; Am. Compl., ¶ 35; SDHR Compl., 4.) However, when plaintiff arrived at the principal's office, a security guard named Tina informed plaintiff that Mr. Pennisi was out of the buliding. (Williams Dep., 32.) Plaintiff walked back to the kitchen with Tina. (*Id.* at 34.) Someone, possibly Tina, suggested that plaintiff should call the police herself since the principal was not available; plaintiff did so. (*Id.* at 34-36.) When the police arrived, plaintiff told them that Jackson had violated her. (*Id.* at 36-37.) Plaintiff also told the police that

her supervisors were aware of this incident, and that Jackson had done something similar twice before, in October 1996 and November 1996. (*Id.* at 36-39.) Jackson was arrested by the police. (*See* Am. Compl., ¶ 36; Defs.' Fact Statement, ¶ 17.)

## G. *Administrative Transfer of Both Plaintiff and Jackson to Different Schools*

Plaintiff was temporarily transferred to P.S. 145 on March 25, 1998, the day after she called the police to report that Jackson had sexually assaulted her. (*See* Defs.' Fact Statement, ¶ 18 (citing Ex. V).) Supervisor Yolanda Ogarra informed plaintiff that, while at P.S. 145, she would regularly work from 7:45am to 2:15pm; she would also work from 2:15pm to 3:15pm on Tuesdays, Wednesdays, and Thursdays and from 8:00am to 12:30pm on Saturdays for Project Read. (*See id.;* Ex. V.) Although plaintiff had worked in the I.S. 291 teacher's cafeteria since her 1993-94 promotion, she was assigned to the student cafeteria at P.S. 145. (*See* Am. Compl., ¶ 38; SDHR Compl., 5.) Plaintiff alleges that she suffered "loss of pay and promotion" due to this transfer, since she was "demoted" to the student cafeteria and earned less because fewer work hours were available to her. (Am. Compl., ¶¶ 19, 38; SDHR Compl., 5.) Plaintiff's transfer was made permanent on September 9, 1998. (Defs.' Fact Statement, ¶ 23 (citing Ex. AA).)

   **\*9** Plaintiff claims that she was transferred in retaliation for reporting the sexual harassment and sexual assault. (*See* Am. Compl., ¶¶ 19, 37-38, 43, 56-60; SDHR Compl., 4-5.) Specifically, plaintiff alleges that I.S. 291 principal, Arthur Pennisi, demanded that she be transferred to retaliate against her for calling the police to report that she had been sexually assaulted by Jackson. [10] (*See* Am. Compl., ¶¶ 19, 37, 43; SDHR Compl., 4 ("The school principal retaliated, after his absence come to light, for my calling for police assistance, saying that I had no right to call the police.").) Plaintiff also suggests that her OSFSN supervisors were involved in the decision to transfer her. (*See* Williams Dep., 147.)

Elton Jackson was also temporarily transferred to a different school on March 25, 1998, "pending a Personnel Performance Conference regarding the incident that occurred on Tuesday, March 24, 1998 at I.S. 291." (Defs.' Fact Statement, ¶ 19; Ex. W.) On March 26, 1998, OSFNS Executive Director Kevin Gill notified Jackson that, given his involvement in "an alleged criminal offense which resulted in [his] arrest," Jackson was "suspended without pay pending further investigation." (Ex. X.)

H. *BOE Investigation of Allegations of Sexual Assault*
In addition to calling the police, plaintiff filed an official complaint of sexual harassment with the BOE on March 27, 1998. Specifically, plaintiff submitted a "Request for Conciliation Form" to Joseph L. Key, the Local Equal Opportunity Coordinator ("LEOC") for the OSFNS. (*See* Defs.' Fact Statement, ¶ 27; Request for Conciliation, *submitted as* Ex. EE; Decl. of Joseph Key in Supp. of Defs.' Mot. for Summ. J. [hereinafter Key Decl.], ¶ 11.)

Key interviewed plaintiff, Jackson, and various witnesses, including supervisors Joanne Phillips, Yolanda Ogarra, and Marie Figueroa; union representative Barbara Wehner; school lunch helpers Edna Postles, Luis Aponte, and Carmen Cruz. (*See* Defs.' Fact Statement, ¶ 28; LEOC Determination, No. 97-98-04-02-01 SH (Apr. 21, 1998), *submitted as* Ex. FF [hereinafter LEOC Determination], 3; Key Decl., ¶ 12.) Based upon this investigation, Key concluded that there was "no reasonable evidence to find that sexual harassment occurred" and no evidence supporting plaintiff's claim that she reported harassment by Jackson prior to March 24, 1998. (LEOC Determination, 7.) Key noted that, in fact, "[i]t was a consensus of the witnesses that Ms. Williams was the aggressor and ma[d]e frequent unwelcome sexual advances to Mr. Jackson and other male staff members at I.S. 291." (*Id.*) Key notified plaintiff and Jackson of his determination in late April. (*See* LEOC Letter to Williams (Apr. 24, 1998), *submitted as* Ex. GG; LEOC Letter to Jackson (Apr. 29, 1998), *submitted as* Ex. HH.)

Following the LEOC determination and the dismissal of criminal charges, [11] Jackson was cleared by the BOE Office of Personnel Investigation to return to work on September 25, 1998. (*See* Defs.' Fact Statement, ¶ 22 (citing Ex. Z).) Jackson was "reinstated to [his] position as School Lunch Aide," and awarded back pay and benefits. (*Id.*) The record currently before the court does not indicate whether Jackson returned to work at I.S. 291 or whether he was assigned to a different school. On September 9, 1998, plaintiff was notified that her temporary assignment to P.S. 145 had been converted to a permanent reassignment, and that she was scheduled to work from 7:45am to 2:15pm. (*Id.* at ¶ 23 (citing Ex. AA).)

I. *Co-Worker Conflict & Disciplinary Actions at P.S. 145*
 **\*10** Plaintiff alleges that the BOE and the City continued to retaliate against her following her transfer to P.S. 145. (*See* Am. Compl., ¶¶ 45-47.) She claims that the BOE and the City

"label[ed] her as a 'problem' employee" and "oppress[ed] her with [ ] intolerable work condition[s]" in her new post. (*Id.* at ¶ 45.) According to plaintiff, following her transfer to P.S. 145, she was "ostracized and treated as a 'second class citizen' who arrived under a 'penalty' and in shame." (*Id.* at ¶ 39.) Although plaintiff apparently repeatedly requested that she be reassigned to I.S. 291, the BOE and the City ignored or denied her requests. (*See id.* at ¶ 40.) Plaintiff alleges that the BOE and the City continued to retaliate against her after her assignment to P.S. 145 was made permanent; in particular, they "cited, punished and disciplined [her] at P.S. 145 for pretextual and/or alleged trivial offenses," which resulted in further "shame, humiliation, and ridicule" of plaintiff. (*Id.* at ¶ 46.) Finally, plaintiff claims that, following "two written admonishments for ... pretextual and/or trivial misbehavior" in February 2000, she was unlawfully terminated based upon the aforementioned "pretextual and/or trivial" disciplinary charges, false accusations of insubordination and physical violence, and her protected actions in calling the police to report that Jackson had sexually assaulted her. (*Id.* at ¶¶ 47-51.)

Defendants have submitted copies of several written admonishments to plaintiff from Rowena Jeffrey, her direct supervisor at P.S. 145, dated January and February 2000. (*See* Defs.' Fact Statement, ¶¶ 36-39.) By letter dated January 27, 2000, Ms. Jeffrey notified plaintiff that, on two occasions in mid-January, she had been observed wearing jewelry while on duty in violation of OSFNS policy. (*See id.* at ¶ 36 (citing Ex. JJ).) The second, undated memorandum reports that, after Ms. Jeffrey warned plaintiff not to eat in the manager's office on Thursday, January 20, 2000, she discovered plaintiff "eating breakfast at the manager's desk in the manager's office" on Friday, January 21, 2000, in "blatant disregard for rules and authority." (*Id.* at ¶ 37 (citing Ex. KK).)

Plaintiff received a third written admonishment from supervisor Yolanda Ogarra on February 16, 2000, regarding plaintiff's behavior on February 15, 2000, when she was given the admonishments described above. (*See id.* at ¶ 38 (citing Ex. LL).) Ms. Ogarra stated that plaintiff was verbally abusive and used profanity towards two managers, Ms. Jeffrey and Ms. Blijden, and made a threatening statement and a threatening gesture towards Ms. Jeffrey. (*See id.* at ¶¶ 38-39 (citing Ex. LL).) Ms. Ogarra referred this matter for a PPC. (*See id.* at ¶ 40 (citing Ex. LL).) In a memorandum dated February 28, 2000, Ms. Ogarra advised OSFSN Regional Coordinator Marie Figueroa of additional details of the February 16, 2000 incident, including the fact

that plaintiff "stormed out [of] the Manager's office" during a discussion of the written admonishments described above, then returned and made several "hostile" comments to Ms. Ogarra, including "Maybe you need to stay in the hospital, you sick bitch." (*See* Ex. NN.)

## J. *Suspension & Termination*

**\*11** Following the February 16, 2000 incident, plaintiff was suspended due to "conduct unbecoming," effective February 18, 2000, pending the outcome of the PPC. (*See* Defs.' Fact Statement, ¶ 41 (citing Ex. MM).) The PPC was held on February 28, 2000 and March 10, 2000. (*Id.* at ¶ 43 (citing Ex. OO).) At the conclusion of the PPC, the hearing officer recommended that plaintiff be terminated effective February 18, 2000 for insubordination and gross misconduct. (*See id.;* Ex. OO.) In addition to reports of the above-described incidents, the hearing officer considered allegations that:

(1) plaintiff intentionally bumped into Ms. Jeffrey's chair on February 15, 2000;

(2) plaintiff made threatening statements such as "You don't know what I have in store for you" to Ms. Jeffery;

(3) management falsified the signature of a staff member who purportedly witnessed plaintiff's refusal to sign documents; and

(4) plaintiff had coerced this staff member into saying that she had not witnessed plaintiff refusing to sign anything, by threatening that "her people on the outside [ ] know how to handle these kinds of problems," which the staff member interpreted to mean that plaintiff was threatening her with violence.

(*See* Ex. OO.) The hearing officer also considered information not included in the record before this court regarding a PPC as to plaintiff held on November 25, 1998. (*Id.*) By letter dated March 15, 2000, Executive Director Kevin Gill informed plaintiff that "due to insubordination and gross misconduct, her services with the Office of School Food and Nutrition Services have been terminated effective February 18, 2000." (Defs.' Fact Statement, ¶ 41 (citing Ex. PP).)

Plaintiff filed grievances challenging her termination. (*Id.* (citing Ex. QQ).) A Step II Discharge Review conference was held on February 29, 2000; by decision dated March 15, 2000, the hearing officer recommended that plaintiff's grievance be denied. (*See* Ex. QQ, 2-4.) A Step II Grievance Discharge Review Conference was held on April 4, 2000; the

hearing officer again recommended that plaintiff's grievance be denied. (*Id.* at 5-10.) A final conference was held on April 7, 2000. (*Id.* at 11-14.) In a decision dated May 31, 2000, the Chancellor's Representative concluded that OSFSN had demonstrated that it had good and sufficient reason to discharge plaintiff. (*Id.*) In addition to the reasons listed above, the Chancellor's Representative mentioned that plaintiff had gone to her work site on February 28, 2000 "to have her supervisors falsely arrested on charges of menacing with a weapon;" these charges were apparently later dropped by the District Attorney for lack of evidence. (*Id.* at 13.)

Plaintiff appealed her termination to a Step IV grievance panel. (*See* Defs.' Fact Statement, ¶ 46, citing Arbitration Op. & Award, Re: Sheila Williams, No. 14098 (Nov. 25, 2000), *submitted as* Ex. RR [hereinafter Arbitration Op.].) The issue under consideration was whether plaintiff "was discharged for good and sufficient reason pursuant to Article XXII." (*Id.*) Following hearings on May 15, June 6, and June 12, 2000, the arbitrator concluded that:

**\*12** [T]he termination of grievant's employment is appropriate discipline. While the insubordination charges would warrant a lesser penalty, threats of violence cannot be tolerated because they disrupt the workplace and undermine management's capacity to manage. The Arbitrator discerns no basis to mitigate the penalty imposed. Grievant displayed no remorse at the hearing but rather her demeanor was fraught with erratic conduct and evasive testimony. Moreover, grievant, despite her 18 years of intermittent employment, has avoided termination for similar threats of violence in the past.

Given the fact that grievant's continued presence in the workplace poses an unacceptable risk of harm to her co-workers and supervisors, termination is the only feasible penalty. Considering the totality of grievant's misconduct and her employment record, the Arbitrator has no alternative but to sustain the penalty of termination imposed by the Board of Education.

(Arbitration Op., 41.)

## K. *Plaintiff's Administrative Filings and Federal Complaints*

In addition to the Request for Conciliation filed with the BOE LEOC (*see supra,* Section I(H)), plaintiff filed a Notice of Claim with the City and the BOE on June 18, 1998. (*See* Defs.' Fact Statement, ¶ 47; Notice of Claim (June 18, 1998),

*submitted as* Ex. F.) In this Notice of Claim, plaintiff alleges, *inter alia,* sexual harassment, employment discrimination, creation of and failure to resolve a hostile work environment, and sexual assault. (*See* Notice of Claim.)

Plaintiff also filed a charge of discrimination with the EEOC. (*See* Am. Compl., ¶ 8.) Although plaintiff does not specify the date on which she filed this charge, she states that she "timely filed her complaint" with the EEOC. (*Id.*) Defendants are also unable to provide the exact date of plaintiff's EEOC filing; they explain that, because "plaintiff's actual EEOC charge was destroyed in the September 11, 2001 attacks, it is unclear on what actual date plaintiff filed her EEOC charge." (Defs.' Mem., 4 n. 1.) Additionally, plaintiff filed a charge of discrimination with the New York State Division of Human Rights on approximately January 29, 1999. (*See* Defs.' Fact Statement, ¶ 48; SDHR Compl.)

On March 23, 1999, the EEOC sent plaintiff a right-to-sue letter, informing her that the EEOC would be unable to investigate and conciliate her charge within 180 days, and therefore that she could institute a civil action under Title VII within 60 days of receipt of the letter. (*See* Defs.' Fact Statement, ¶ 49; Notice of Right to Sue (March 23, 1999), *submitted as* Ex. D.) Plaintiff initiated this action by filing a complaint in federal court on May 13, 1999. (*See* Defs.' Fact Statement, ¶ 50.) The SDHR dismissed plaintiff's charge on the grounds of administrative convenience on July 28, 2000, because plaintiff's pending federal court suit provided a forum for the resolution of all issues of discrimination. (*See id.* at ¶ 51; SDHR Determination & Order, *Williams v. Bd. of Educ. of the City of New York,* Compl. No. 9S-E-S-99-7941868-E, Federal Charge No. 16G999165 (July 28, 2000), *submitted as* Ex. E.) Plaintiff filed an amended complaint in the instant matter on November 14, 2001. (*See* Am. Compl.).

## II. DISCUSSION

A. *Standard for Summary Judgment*

**\*13** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" to the outcome of the litigation if they must be determined in order to apply the relevant substantive law. *See* Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue

of fact is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment should only be granted when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.2d 1219, 1223 (2d Cir.1994).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*citing* U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Therefore, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. To defeat a properly supported motion for summary judgment, the opposing party must set forth specific facts indicating that a genuine issue of material fact exists; "[s]tatements that are devoid of any specifics, but replete with conclusions" are insufficient to defeat a motion for summary judgment. Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir.1999).

The Second Circuit has cautioned that the standard for summary judgment in employment discrimination cases must be applied with "added rigor" and "sparingly" because intent and credibility are often at issue. *See, e.g.,* Feingold v. State of New York, 366 F.3d 138, 149 (2d Cir.2004); Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir.2003); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir.1996). In addition, the burden of

proof in such cases is often described as *de minimis. See, e.g.,* 🚩 *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000). Since there are frequently questions of fact as to whether the reasons proffered by employers for actions taken against employees are credible or merely pretexts for discrimination, summary judgment is often inappropriate in employment discrimination cases. *See* 🚩 *Chertkova,* 92 F.3d at 87; 🚩 *Quarantino v. Tiffany & Co.,* 71 F.3d 58 (2d Cir.1995).

### B. *Summary of Plaintiff's Claims*

**\*14** Plaintiff's amended complaint may be read to include numerous allegations spanning her entire period of employment with the Office of School Food and Nutrition Services, including:

- discriminatory failure to promote (1993),

- transfer in retaliation for grievances filed regarding failure to promote (1993),

- unwarranted discipline in retaliation for grievance regarding failure to promote and retaliatory transfer (1993-1994),

- hiring of defendant Jackson in retaliation for grievance regarding former I.S. 291 cook and supervisor (1994),

- sexual harassment by defendant Jackson (approximately 1995 to March 24, 1998),

- sexual assault by Jackson (March 24, 1998),

- hostile work environment due to sexual harassment and failure to discipline Jackson (approximately 1995 to March 24, 1998),

- transfer in retaliation for reporting sexual assault (March 25, 1998),

- poor treatment by co-workers after transfer (1998-2000),

- excessive discipline in retaliation for reporting sexual assault (1999-2000),

- termination due to retaliatory discipline and in retaliation for reporting sexual assault (2000).

Each of these claims will be analyzed below.

### C. *Claims Against Defendant City of New York*

Defendants assert, in a brief footnote, that all plaintiff's claims against the City of New York must be dismissed because the Board of Education is an entity separate from the City. (*See* Defs.' Mem., 5 n. 2 (citing 🚩 *Titusville Iron Co. v. New York,* 207 N.Y. 203, 207-208, 100 N.E. 806 (1912) and *Campbell v. City of New York,* 203 A.D.2d 504, 611 N.Y.S.2d 248, 249 (2d Dep't 1994)).)

However, New York lower courts have recently noted that amendments to the New York Education law enacted in 2002 "radically restructure[d] the governance of the school district of the city of New York," providing for greater mayoral control of the schools by effecting "a wholesale transfer of power from the Board of Education to a chancellor, hired by and serving at the pleasure of the mayor." 🚩 *Perez v. City of New York,* 9 Misc.3d 934, 804 N.Y.S.2d 632, 633 (N.Y. Sup.Ct., Bronx Co.2005) (citing L 2002, c. 91); *see also Matter of P.I. v. New York City Bd. of Educ.,* 814 N.Y.S.2d 891, 2006 N.Y. Slip Op 50051U, at 2 (N.Y. Sup.Ct., New York Co., Jan. 17, 2006) (noting that the 2002 "amendments to the Education Law transferring control over the City public schools to the Chancellor controlled by the Mayor" have created significant "ambiguity" as to the relationship between the City and the former Board of Education). Given this reorganization of the New York City school system, at least two New York Supreme Courts have denied similar motions to dismiss claims against the City. *See Matter of P.I.,* 814 N.Y.S.2d 891, 2006 N.Y. Slip Op 50051U, at 4; *Perez,* 804 N.Y.S.2d at 644 (noting that, "in light of the wholesale transfer of power and responsibility from the Board of Education to the Mayor, the City may not now shield itself from liability by claiming that the Board of Education is the responsible party.").

**\*15** Defendants have not addressed this recent line of New York state authority in their motion for summary judgment, and the two cases cited in support of their request for dismissal of claims against the City predate the 2002 amendments to New York education law. [12] (*See* Defs.' Mem., 5.) Given defendants' failure to address the implications of the 2002 amendments to New York education law, and the uncertainty of current New York law on this issue, the court denies defendants' request to dismiss plaintiff's claims against the City of New York at this time.

### D. *Title VII Claims*

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The inclusion of gender in the Title VII list of prohibited bases of discrimination "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted).

1. Claims Against Defendant Elton Jackson

Title VII does not create individual liability for violations of its terms. See, e.g., Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 (2d Cir.2006); Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir.2004); Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir.1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Therefore, plaintiff's Title VII claims must be dismissed against defendant Jackson.

2. Claims Against Defendants City of New York and BOE

a. Timeliness

The filing of a timely administrative complaint with the EEOC is a prerequisite to filing suit under Title VII. [13] See 42 U.S.C. §§ 2000e-5(e), (f). A complaint is timely filed with the EEOC only if it is filed within 300 days of the last alleged discriminatory act. See 42 U.S.C. § 2000e-5(e); Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 327 (2d Cir.1999) (under work-sharing agreement between EEOC and New York State Division of Human Rights, initial filing with EEOC entitles plaintiff to 300-day period); Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir.1993).

The Supreme Court has differentiated between "discrete discriminatory acts," such as termination, failure to promote, denial of transfer, or refusal to hire, and "continuing violations," such as hostile work environment claims. See Morgan, 536 U.S. at 113-114. Because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,' " every such act "starts a new clock for filing charges alleging that act." Id. at 113. Therefore, each discrete discriminatory act alleged must fall within the limitations period to be considered timely. Id. Title VII claims regarding hostile work environments, however, are considered "continuing violations," because a hostile work environment claim " 'is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " Nakis v. Potter, 422 F.Supp.2d 398, 410 (S.D.N.Y.2006) (quoting Morgan, 536 U.S. at 117). Under the continuing violations doctrine, as long as at least one act contributing to a plaintiff's claim occurred less than 300 days prior to the filing of the EEOC charge, the court may consider alleged component acts which occurred outside of the statutory time period. See Morgan, 536 U.S. at 117; see also Patterson, 375 F.3d at 220; Trinidad v. New York City Dep't of Corr., 423 F.Supp.2d 151, 165 (S.D.N.Y.2006) (quoting Cobian v. City of New York, 04 Civ.1941, 2006 U.S. Dist. LEXIS 3127, at *5 (S.D.N.Y. Jan. 24, 2006) ("Acts occurring outside the limitations period may be considered in support of continuing violation claims, such as hostile environment claims, where one act contributing to the claim occurred within the limitations period.")).

**\*16** Defendants allege that all of plaintiff's claims which accrued prior to April 5, 1998-which is 300 days prior to January 29, 1999, the date on which plaintiff filed her charge of discrimination with the State Division of Human Rights-must be dismissed as time-barred. (See Defs.' Mem., 4.) However, defendants admit that, due to the destruction of EEOC documents in the September 11th attacks, they do not know when plaintiff filed her EEOC charge. (See id. at 4 n. 1.) The court therefore cannot be sure that plaintiff did not file a charge of discrimination with the EEOC before she filed her SDHR complaint on January 29, 1999. Since the court draws all reasonable inferences in favor of the plaintiff in assessing a motion for summary judgment, the court must assume that plaintiff filed her EEOC complaint at the earliest date possible given the record before the court. Because the EEOC Notice of Right to Sue, which was sent to plaintiff on March 23, 1999, states that the EEOC "has determined that it will not be able to investigate and conciliate [plaintiff's] charge within 180 days of the day that the Commission assumed jurisdiction over the charge" (Notice of Right to Sue, Ex. D), the court concludes that plaintiff's EEOC charge could not have been filed more than 180 days prior to March 23, 1999. The court

therefore assumes that plaintiff filed her EEOC charge on September 24, 1998. Accordingly, any of plaintiff's Title VII claims which accrued after November 28, 1997-300 days before September 24, 1998-are timely.

Plaintiff's Title VII claims as to the following incidents are therefore dismissed as untimely, as they accrued prior to November 28, 1997:

> (1) the BOE and NYC discriminatorily failed to promote plaintiff in 1993;
>
> (2) the BOE and NYC transferred plaintiff in 1993 to retaliate against her for filing grievances regarding the failure to promote;
>
> (3) the BOE and NYC retaliated against plaintiff for filing grievances regarding the failure to promote and allegedly retaliatory transfer by disciplining her excessively in 1993 and 1994; and
>
> (4) the BOE and NYC hired defendant Jackson in 1994 to retaliate against I.S. 291 staff, including plaintiff, for filing a grievance regarding the former I.S. 291 cook and supervisor.

Plaintiff's remaining Title VII claims, however, are timely. Although some of the incidents of sexual harassment by Jackson described by plaintiff are alleged to have occurred prior to November 1997, they form part of plaintiff's hostile work environment claim, which includes events occurring as late as March 24, 1998, and are therefore timely under the continuing violation doctrine. *See* *Morgan,* 536 U.S. at 117. Similarly, plaintiff's claims regarding the alleged retaliatory actions that occurred after she filed her Notice of Claim and SDHR and EEOC complaints are appropriately before this court because they are "reasonably related" to those raised before the SDHR and EEOC. *Shah v. N.Y. State Dep't of Civil Serv.,* 168 F.3d 610, 614 (2d Cir.1999). The Second Circuit has recognized that the primary purpose of EEOC charges is to "alert the EEOC to the discrimination that a plaintiff claims she is suffering" and has therefore permitted claims to be brought when the conduct complained of "would have fallen within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge.' " *Fitzgerald v. Henderson,* 251 F.3d 345, 359-360 (2d Cir.2001) (quoting *Butts,* 990 F.2d at 1401-1402).

*b. Sex Discrimination Claim: Hostile Work Environment*

**\*17** Disparate treatment prohibited by Title VII encompasses sexual harassment that results in a "hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *See also* EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11 (2000); *id.* § 1604.11(a) (noting that sexual harassment includes "conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment"). In order to prevail on a hostile work environment claim based on sexual harassment, a plaintiff must establish two elements.

First, she must demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fairbrother v. Morrison,* 412 F.3d 39, 48 (2d Cir.2005) (internal citations omitted); *see also* *Meritor Sav. Bank,* 477 U.S. at 67; *Harris,* 510 U.S. at 21. The Second Circuit has explained that a plaintiff alleging hostile-work-environment gender discrimination "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Fairbrother,* 412 F.3d at 49. Although incidents of sexual harassment generally be "sufficiently continuous and concerted in order to be deemed pervasive," isolated acts or even a single extraordinarily severe incident can meet the threshold if such acts can and do work a transformation of the plaintiff's workplace. *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002); *Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 437 (2d Cir.1999). In evaluating the severity of alleged incidents, courts typically consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

Second, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to her employer. *See* *Fairbrother,* 412 F.3d at 48-49. The employer is generally presumed responsible where the harasser was the victim's supervisor and the harassment culminated in a "tangible

employment action." *See, e.g.,* 🚩 *Burlington Indus.,* 524 U.S. at 765; 🚩 *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Where, however, as in the instant case, a plaintiff alleges sexual harassment by non-supervisory co-worker(s), the employer's liability depends on whether the plaintiff has shown that her employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.[14] *See* ⚠️ *Petrosino v. Bell Atlantic,* 385 F.3d 210, 225 (2d Cir.2004); 🚩 *Kotcher v. Rosa & Sullivan Appliance Ctr.,* 957 F.2d 59, 63 (2d Cir.1992) ( "[W]here a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.").

**\*18** One of plaintiff's timely claims is a hostile work environment claim.[15] Plaintiff alleges that she was sexually harassed and sexually assaulted by defendant Jackson over a period of time from approximately 1995 until March 24, 1998. (*See* Am. Compl., ¶¶ 12-13, 15, 31, 33-34.) She further alleges that her employer, the Board of Education of the City of New York, was aware of this ongoing harassment and failed to take any steps to stop the harassment. The court finds that plaintiff has alleged sufficient facts to make out a hostile work environment claim based upon sexual harassment, and to attribute this harassment to the BOE.

Defendants argue that plaintiff's hostile work environment claim must be dismissed because (a) "not an iota of evidence has been adduced during the discovery phase of this litigation to support plaintiff's claims regarding the manner in which defendant Jackson allegedly touched her on March 24, 1998" (Defs.' Mem., 10-11), and (b) even if plaintiff's allegations regarding the March 24, 1998 incident were true, the BOE "exercised reasonable care to promptly address and correct any sexually harassing behavior" by immediately transferring both plaintiff and Jackson to different schools and conducting a thorough investigation (*id.* at 11-13). Defendants admit that plaintiff testified at her deposition that she was sexually harassed by Jackson on numerous occasions prior to March 24, 1998, and that she reported many if not all of this instances to her immediate supervisors. (*Id.* at 13-14.) However, defendants dismiss these allegations offhand, arguing that "there is simply no credible evidence in the record that defendant Jackson had previously engaged

in any other type of inappropriate sexually harassing conduct known to defendants, other than plaintiff's own self-serving contentions" (*id.* at 14-15) and that plaintiff's claims that she reported the alleged ongoing harassment to her supervisors are "wholly unsupported by the credible evidence and insufficient to sustain a claim that the BOE failed to discharge its duty" (*id.* at 15).

A party opposing a motion for summary judgment cannot rely solely on the allegations in her pleading, but rather must show that there is admissible evidence sufficient to support a finding in her favor. *See* Fed.R.Civ.P. 56(e). "Ordinarily, this means that a plaintiff must present affidavits, based on 'personal knowledge, ... setting forth such facts as would be admissible in evidence,' and as to which the affiant would be competent to testify." 🚩 *Fitzgerald,* 251 F.3d at 361. However, despite the fact that plaintiff did not submit an affidavit in opposition to defendants' motion for summary judgment, the record currently before the court includes significant portions of plaintiff's sworn deposition testimony. (*See* Williams Dep., Ex. SS.) During her deposition, plaintiff described, in significant detail, both the sexual assault which allegedly occurred on March 24, 1998 and numerous additional incidents of sexual harassment by Jackson-including verbal comments, unwanted physical touching, and behaviors designed to make plaintiff feel uncomfortable-which she says occurred over the preceding two or three years. (*See id.,* summarized *supra,* Section I(E)(2) & I(F).) Furthermore, with respect to virtually every incident described, plaintiff testified that she reported Jackson's behavior to her supervisors but that they failed to took little or no action to remedy the ongoing harassment. (*See id.*)

**\*19** The court is required to consider plaintiff's sworn deposition testimony in evaluating whether there is a genuine issue of material fact to be decided at trial. As the Second Circuit recently noted in *Fitzgerald,*

> The fact that [evidentiary submissions] were submitted by [defendant] did not mean that they could not be relied on by [plaintiff]. To the extent that the [ ] documents that were sworn to by [plaintiff], and that were before the court on the motion for summary judgment, stated, other than on information and belief, facts as

Williams v. City of New York, Not Reported in F.Supp.2d (2006)

to which [plaintiff] was competent to testify, the court was required to accept their factual assertions as true and to draw from them all inferences that could reasonably be drawn in [plaintiff]'s favor.

*Fitzgerald,* 251 F.3d at 361. Although defendants insist that plaintiff's testimony is not credible, it is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255. Based upon the evidence on record, and drawing all inferences in favor of the plaintiff, it is clear that defendants are not entitled to summary judgment on plaintiff's hostile work environment claim.

### c. Retaliation Claims

The anti-retaliation provision of Title VII further forbids employers from "discriminating against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VI proceeding or investigation." Id. at § 2000e-3(a); *cf. Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999) ("[A] plaintiff need not establish that the conduct she opposed was actually a violation of the statute so long as she can establish that she possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law.") (internal quotation marks and alteration omitted).

Retaliation claims under Title VII are assessed under the familiar three-step burden-shifting analysis. First, plaintiff must make out a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity; (2) the employer was aware of the activity; (3) the employer took adverse action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998); *Tomka,* 66 F.3d at

1308. The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged action. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (describing defendant's burden as a burden of production, not persuasion). Finally, if defendant successfully meets its burden of production, plaintiff must adduce evidence sufficient to raise an issue of fact as to whether the employer's reason was merely a pretext for retaliation. *See Quinn,* 159 F.3d at 769. A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action or when there were other objectively valid grounds for the action, so long as a retaliatory motive was "at least a substantial or motivating factor behind the adverse action." *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001). A plaintiff may prove that retaliation was a "substantial" or "motivating" factor behind an adverse employment action either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant. *Id.*

**\*20** Plaintiff's complaint may be read to allege that the following actions by defendants were undertaken, at least in part, in retaliation for reporting that she had been sexually assaulted by Jackson to the police; filing LEOC, SDHR, and EEOC complaints; and filing the instant lawsuit:

(i) transfer from I.S. 291 to P.S. 145 and associated demotion from teacher's cafeteria to student cafeteria;

(ii) poor treatment at P.S. 145;

(iii) unwarranted and excessive discipline at P.S. 145; and

(iv) termination of employment.

### (i) Transfer to P.S. 145 & Demotion to Student Cafeteria

Plaintiff has successfully established a *prima facie* case with regard to her claims that she was retaliatorily transferred to P.S. 145 and demoted from her previous position as a school lunch helper in the teacher's cafeteria to work in the student cafeteria.

First, plaintiff engaged in a statutorily protected activity when she called the police to report that Jackson had sexually assaulted her on March 24, 1998. Although the most common "protected activities" are filing an EEOC complaint or a lawsuit, the Second Circuit has recognized that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Grant v. Hazelet Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989); *see also Kotcher,* 957 F.2d at 64 (internal complaint to company management was protected activity). Courts in the Eastern and Southern Districts of New York have consistently held that reporting harassment to the police and initiating criminal proceedings against alleged harassers are protected activities. *See, e.g., Patrick v. Local Union No. 282,* No. 99-CV-8314, 2005 U.S. Dist. LEXIS 32399, at *13-14 (E.D.N.Y. Sept. 9, 2005) (reporting racially-motivated assault to police and pursuing criminal charges were protected activities); *Borrero v. Collins Bldg. Servs.,* No. 01 Civ. 6885, 2002 U.S. Dist. LEXIS 20605, at *14 (S.D.N.Y. October 25, 2002) (calling the police to report harassment by a co-worker was a protected activity); *DeWitt v. Lieberman,* 48 F.Supp.2d 280, 292 (S.D.N.Y.1999) ("Pursuing a criminal proceeding against an alleged harasser is also a form of 'protected activity' for purposes of [a Title VII] retaliation claim.").

Second, it is clear that plaintiff's employer was almost immediately aware that she had engaged in the protected activity of calling the police to report that she had been assaulted. Plaintiff alleges that she called her supervisors either immediately before or immediately after she went to look for the principal and called the police. (*See* Williams Dep., 29-30, 32-34.) Affidavits submitted by plaintiff's supervisors confirm that Ms. Figueroa and Ms. Phillips were aware on March 24, 2998 that Ms. Williams had reported the alleged assault to the police. (*See* Figueroa Decl., ¶ 4; Philip-Gayle Decl., ¶ 4.) Ms. Ogarra was out of the office on March 24, 1998, but was informed that Ms. Williams had reported the assault when she returned on March 25th. (*See* Ogarra Decl., ¶ 4.) Furthermore, defendants were clearly aware of both the alleged sexual assault and plaintiff's report thereof by March 25, 2006, when plaintiff and Jackson were transferred to different schools. (*See* Defs.' Fact Statement, ¶¶ 18 (citing Ex. V), 19 (citing Ex. W).)

**\*21** The court also finds that plaintiff has satisfied the third prong of the *prima facie* retaliation claim, as her transfer to P.S. 145 constitutes an adverse action within the meaning of Title VII. Defendants argue that neither a transfer to a different work location nor a demotion, absent a decrease in wage or salary, constitutes an adverse action.[16] Although the Second Circuit had previously held that neither transfers nor reassignments, without a change in hours, pay, or responsibilities, were adverse actions within the meaning of Title VII (*see, e.g. Weeks v. N.Y. State,* 273 F.3d 76, 85 (2d Cir.2001); *Galabaya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)), the Supreme Court has since clarified the standard for actionable retaliation. *See Burlington N. & Santa Fe Ry. Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Specifically, the Supreme Court held that a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal citations omitted) (finding a reassignment of duties to be actionable retaliation, even though both former and present duties fell within the same job description). In articulating this standard, the Supreme Court reiterated that the Title VII anti-retaliation provision "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms ... by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.*

A reasonable employee might well be dissuaded from complaining about or reporting prohibited harassment if she believed that she risked being transferred away from the school in which she had worked-and the co-workers and staff with whom she had worked-for more than four years. Accordingly, such a transfer might, under *Burlington Northern,* be "materially adverse" in and of itself. *Id.* Furthermore, plaintiff alleges that her assignment to work in the student cafeteria at P.S. 145 was a "demotion" from her position in the teacher's cafeteria at I.S. 291, and alleges that this reassignment caused her "loss of pay and position." (Am.Compl., ¶¶ 19, 38, 56, 57(f), 57(k); SDHR Compl., 5). Plaintiff's characterization of this reassignment as a "demotion" which resulted in "loss of position" is supported by the fact that she consistently referred to her assignment to the teacher's cafeteria position as a "promotion." (*See* Am. Compl., ¶¶ 23-24, 38; SDHR Compl., 2, 5.) Additionally, the record currently before the court demonstrates that the transfer to the teacher's cafeteria was of such importance to plaintiff that she filed numerous grievances in 1993 and

1994 challenging the award of the promotion to a less-senior employee. (*See* Am. Compl., 24; SDHR Compl., 2.) Under the *Burlington Northern* standard, therefore, the court concludes that plaintiff's transfer and reassignment may also have been "materially adverse," constituting actionable retaliation, because a reasonable employee might not report prohibited harassment if such complaints were likely to result in a "demotion" from the teacher's cafeteria to the student cafeteria. *See* 🏳 *Burlington N., 126 S.Ct. at 2415; see also* 🏳 *De La Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 21 (2d Cir.1996)* (concluding that transfer to a "less prestigious" work assignment, even absent a change in pay or title, may constitute an adverse employment action).

**\*22** Finally, the extremely close temporal connection between plaintiff's police report and her involuntary transfer and demotion provides a sufficient basis for inferring a causal connection for the purposes of the *prima facie* case. *See, e.g.,* 🏳 *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590 (2d Cir.1988);* 🚩 *Quinn, 159 F.3d at 769.* As noted above, plaintiff summoned the police to report that she had been sexually assaulted on March 24, 1998 and was transferred only one day later, on March 25, 1998. Therefore, I find that plaintiff has established a *prima facie* case of retaliation with regard to her transfer and demotion.

The burden then shifts to defendants to articulate a legitimate, non-retaliatory reason for transferring plaintiff to P.S. 145 and assigning her to the student cafeteria. Defendants state that plaintiff's retaliatory transfer claim "is simply belied by the record evidence, which shows that plaintiff was temporarily transferred by her supervisor, Ms. Ogarra, pending an investigation into plaintiff's complaint." (Defs.' Mem., 26.) The court assumes that defendants are stating that the supervisors involved in the decision to transfer plaintiff determined that the best course of action, following a significant conflict between employees, was to separate those employees to prevent further conflict while the BOE is conducting a thorough investigation.

However, plaintiff's allegations raise sufficient questions as to the sufficiency of defendants' proffered legitimate rationale for plaintiff's transfer. (*See* Am. Compl., ¶¶ 37, 42, 54, 57(h); SDHR Compl., 4-5.) It is not clear why defendants found it necessary to transfer *both* plaintiff and Jackson to different schools pending an investigation of the "incident." (*See* Defs.' Fact Statement, ¶¶ 18-19.) If, in fact, defendants' goal was

to separate plaintiff and Jackson-presumably both (1) to prevent further disruptive conflict between them and (2) to protect plaintiff from further incidents of sexual harassment and sexual assault, at least until the BOE completed its investigation into the veracity of her allegations-it seems that transferring Jackson, the accused harasser, to another school would have accomplished that goal. Similarly, it is not clear why defendants assigned her to the student cafeteria at P.S. 145 rather than the teacher's cafeteria; if, for example, no teacher's cafeteria position was available at P.S. 145, it is not clear why defendants' did not transfer plaintiff-if in fact there was a non-retaliatory reason to transfer her at all-to a school in which she could be assigned to the teacher's cafeteria.

Defendants' motion for summary judgment is therefore denied with respect to plaintiff's claim of retaliatory transfer and demotion, as a reasonable jury could find that defendants' decision to transfer plaintiff to a different school and assign her to work in the student cafeteria her was motivated, at least in part, by retaliatory animus.

### (ii) *Poor treatment at P.S. 145*

**\*23** Plaintiff also alleges that she was "labeled as a 'problem' employee (Am.Compl., ¶ 45) and "ostracized and treated as a 'second class citizen' who arrived at P.S. 145 under a 'penalty' and in shame" (Am.Compl., ¶ 39). However, the record contains no further information about the treatment of which plaintiff complains. As above, plaintiff satisfies the first and second elements of a *prima facie* case: she engaged in protected activities, and her employer was aware of those activities. However, plaintiff is unable to satisfy the third requirement, as she has not establish a materially adverse employment action. The allegations in her complaint are insufficient to support her claim that this treatment was sufficiently severe and pervasive to constitute a materially adverse change in the terms and conditions of her employment. Furthermore, it is well-established that ostracism and impolite behavior by supervisors or co-workers does not constitute an adverse employment action. *See, e.g., Carpenter v. City of Torrington, 100 Fed. Appx. 858, 860 (2d Cir.2004)* ("silent treatment"); *Boyd v. Presbyterian Hosp., 160 F.Supp.2d 522, 537 (S.D.N.Y.2001)* (office gossip); 🏳 *Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir.2000)* (ostracism). Therefore, the court grants summary judgment with respect to this claim.

### (iii) *Unwarranted and Excessive Discipline*

Plaintiff next alleges that the BOE retaliated against her by disciplining her for "pretextual and/or alleged trivial offenses such as wearing jewelry (earrings) at work or eating in an allegedly improper location," and that the BOE relied on these disciplinary write-ups to support their decision to terminate her employment. (Am.Compl., ¶¶ 46-51.) Again, plaintiff satisfies the first and second elements of a *prima facie* case: she engaged in protected activities, and her employer was aware of those activities. The excessive disciplinary actions of which plaintiff complains may also qualify as materially adverse employment actions. Although negative evaluations and disciplinary warnings, without clearly adverse employment consequences, are not considered adverse employment actions (*see, e.g., Lumhoo v. Home Depot,* 229 F.Supp.2d 121, 150 (E.D.N.Y.2002); *Bennet v. Watson Wyatt & Co.,* 136 F.Supp.2d 276 (S.D.N.Y.2000)), in the instant case plaintiff clearly suffered an adverse employment event-termination-based at least partially on these evaluations.

However, plaintiff is unable to establish a *prima facie* case because she has not demonstrated a causal connection between her protected activities and the alleged unwarranted or excessive discipline. She has not presented direct evidence of a causal connection, and the events are not sufficiently close in time to provide indirect evidence of a causal connection. The only instances of excessive discipline mentioned by plaintiff occurred in January and February 2000, significantly after her participation in protected activities (almost two years after plaintiff summoned the police to I.S. 291, eighteen months after she served her Notice of Claim on the BOE, one year after she filed her SDHR complaint, and approximately eight months after she filed the instant lawsuit). Therefore, the court grants summary judgment with respect to this claim.

(iv) *Termination*

**\*24** Finally, plaintiff alleges that she was terminated in retaliation for her participation in activities protected by Title VII. (*See* Am. Compl., ¶¶ 49-51.) As above, plaintiff engaged in protected activities and her employer was aware of those activities. She has also established the third required element, as termination is clearly a materially adverse employment action. However, plaintiff is unable to establish the fourth element of a *prima facie* case of retaliatory discharge; she has not presented any direct evidence of a causal connection, and her termination was too distant in time from the protected activities described above to provide indirect evidence of a causal connection.

Even if plaintiff had succeeded in presenting a *prima facie* case of retaliatory termination, she has not established that the numerous legitimate non-retaliatory reasons for her termination cited by her employer were pretextual. This conclusion is particularly clear in light of the fact that plaintiff's termination was examined and upheld by a panel of independent arbitrators, following a series of hearings and thorough examination of evidence. (*See* Arbitration Op., Ex. RR.) The Second Circuit has held that, "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive." *Collins v. N.Y.C. Transit Auth.,* 305 F.3d 113, 115 (2d Cir.2002). To survive a motion for summary judgment following such an arbitration decision, a Title VII plaintiff must "present strong evidence that the decision was wrong as a matter of fact-e.g. new evidence not before the tribunal-or that the impartiality of the proceeding was somehow compromised." *Id.* at 119. Plaintiff has made no such showing. Therefore, the court grants summary judgment with respect to plaintiff's claim of retaliatory termination.

E. *Claims Under New York State & City Human Rights Laws*

Plaintiff also brings all of the above claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. NYSHRL makes it unlawful for an employer to discriminate on the basis of, *inter alia,* race, creed, color, or sex. *See* N.Y. Exec. Law § 296. Similarly, NYCHRL makes it unlawful "for an employer or an employee or agent thereof, because of the actual or perceived ... race, creed, color, national origin, gender ... to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

Hostile work environment and retaliation claims under NYSHRL and NYCHRL are generally governed by the same standards as federal claims under Title VII. *See Schiano*

*v. Quality Payroll Sys.,* 445 F.3d 597, 609 (2d Cir.2006); *Smith v. Xerox Corp.,* 196 F.3d 358, 363 n. 1 (2d Cir.1999). Therefore, summary judgment is granted under NYSHRL and NYCHRL on those claims which were dismissed on the merits under Title VII: retaliatory treatment by co-workers following her transfer to P.S. 145, retaliatory unwarranted and excessive discipline at P.S. 145, and retaliatory termination.

**1. Timeliness**

**\*25** *Section 3813 of the Education Law* establishes conditions precedent to bringing legal claims against "any school district, board of education, board of cooperative educational services, school provided for in [various state statutes] or any officer [thereof]." *N.Y. Educ. Law § 3813(1).* [17] The provision relevant to the instant case, *§ 3813(2-b),* specifies that "[e]xcept as provided in subdivision two of this section, ... no action or special proceeding shall be commenced against any entity specified in subdivision one of this section more than one year after the cause of action arose." [18] *Id.* at § 3813(2-b).

The instant lawsuit was filed on May 13, 1999. (*See* Compl., Ex. A.) Defendants therefore assert that plaintiff's NYSHRL and NYCHRL claims regarding the alleged sexual harassment, sexual assault, and retaliatory transfer, all of which occurred prior to May 13, 1998, must be dismissed as time-barred under *N.Y. Educ. Law § 3813(2-b).* (*See* Defs.' Mem., 5-7.)

*a. Against Defendant BOE and the City of New York*

The court agrees that plaintiff's NYSHRL and NYCHRL claims against defendant BOE which accrued prior to May 1998 are time-barred under *§ 3813(2-b),* as boards of education are among the parties listed in *§ 3813(1). See N.Y. Educ. Law § 3813(1).* Furthermore, since the City of New York continues to be a defendant in this lawsuit only inasmuch as it is currently functioning as the supervisor of the City school system (*see* Section II(C), *supra* ), the court concludes that the statute of limitations contained in § 3913(2-b) also applies to the City of New York as either a "school district" or a "board of education." *N.Y. Educ. Law § 3813(1).* Therefore, plaintiff's NYSHRL and NYCHRL claims against defendants the BOE and the City regarding alleged discriminatory and retaliatory actions before 1995,

alleged sexual harassment and sexual assault resulting in a hostile work environment, and alleged retaliatory transfer are dismissed as untimely.

*b. Against Defendant Jackson*

However, the statute of limitations established by *§ 3813* does not similarly require the dismissal of plaintiff's claims against defendant Elton Jackson, as he is not a "school district, board of education, board of cooperative educational services, school provided for in [various state statutes] or any officer [thereof]." *Id.* Actions under NYSHRL and NYCHRL are governed by a three-year statute of limitations. *See, e.g., Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005). The court therefore finds that plaintiff's claims against Jackson regarding events that occurred after May 13, 1995 are timely. Accordingly, only plaintiff's NYSHRL and NYCHRL claims regarding the allegedly discriminatory and retaliatory actions before 1995 are dismissed against Jackson.

**2. Individual Liability: Claims as to Defendant Jackson**

In contrast to Title VII, individual defendants such as Jackson may be sued in their personal capacities for sexual harassment under these laws. *See Schiano,* 445 F.3d at 608 (citing *Tomka,* 66 F.3d at 1313). Under NYSHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." *N.Y. Exec. Law § 296(6).* The Second Circuit has interpreted this language to allow "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold,* 366 F.3d at 158 (quoting *Tomka,* 66 F.3d at 1317 n. 19). Because the language of NYSHRL and NYCHRL is "virtually identical," the same standards used to evaluate aiding and abetting claims under NYSHRL are applied to NYCHRL claims. *Id.* (citing *Dunson v. Tri-Maintenance & Contractors, Inc.,* 171 F.Supp.2d 103, 113-114 (E.D.N.Y.2001)).

**\*26** In the instant case, plaintiff clearly alleges that Jackson participated in the conduct giving rise to plaintiff's claim of unlawful sex discrimination. The court finds that a genuine issue of material fact exists as to Jackson's involvement in discriminating against and harassing plaintiff on the basis

of her sex. Therefore, summary judgment is denied as to defendant Jackson with respect to plaintiff's claims of sex discrimination and sexual harassment under NYSHRL and NYCHRL.

Plaintiff has not, however, presented any evidence which would suggest that Jackson was involved in the decision to transfer her to P.S. 145 and demote her to the student cafeteria. The court therefore grants summary judgment as to defendant Jackson with respect to plaintiff's claims of retaliatory transfer and demotion under NYSHRL and NYCHRL.

F. *Section 1983 Claims*

Plaintiff also brings all of the above claims under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Section 1983 provides for actions against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 does not itself grant substantive rights; rather, it provides "a method for vindicating federal rights elsewhere conferred." *Patterson,* 375 F.3d at 225 (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Although an action under Section 1983 may not be brought to vindicate rights conferred by a statute that contains its own enforcement structure, a Title VII plaintiff may also bring a Section 1983 cause of action, such as a claim for denial of equal protection, "so long as the § 1983 claim is based on a distinct violation of a constitutional right." *Id.*

Many of the substantive standards that apply to Title VII claims of discriminatory conduct are also applicable to claims under Section 1983. *See id.* However, there are several significant differences. Individuals may be held liable under Section 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment. *See id.* at 226. However, all claims under Section 1983 must allege that the plaintiff was injured by a state actor or a private party acting "under color of state law." *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994).

Municipal defendants and individuals sued in their official capacities may be held liable under Section 1983 only when the deprivation of rights is caused pursuant to municipal policy or custom. *See Patterson,* 375 F.3d at 226. A plaintiff may show such a policy, custom, or practice by identifying an express rule or regulation, or by demonstrating that "a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law' or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* (quoting *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870-871 (2d Cir.1992). The Second Circuit has held that "Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer." *Gierlinger v. N.Y. State Police,* 15 F.3d 32, 34 (2d Cir.1994); *see also Jemmott v. Coughlin,* 85 F.3d 61, 68 (2d Cir.1996). However, because municipalities cannot be sued under Section 1983 based upon respondeat superior liability, municipalities and individuals sued in their individual capacities cannot be held liable under Section 1983 "simply for the isolated unconstitutional acts of [their] employees." *Sorlucco,* 971 F.2d at 870 (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

1. Timeliness

 **\*27** New-York-based § 1983 claims are subject to a three-year statute of limitations from the date of accrual. *Owens v. Okure,* 488 U.S. 235, 236, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001). It is well established that "a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct." *Flaherty v. Metromail Corp.,* 235 F.3d 133, 137 (2d Cir.2000).

As noted above, plaintiff filed the instant lawsuit in May 1999. Plaintiff was clearly aware of the pre-1995 actions by the BOE of which she now complains before 1995; she filed grievances

related to her promotion and transfer in 1993, and states in her complaint that Jackson began verbally harassing the food service staff at I.S. 291 "immediately" after he began working at I.S. 291. *See* Am. Compl., ¶ 29. Since more than three years elapsed between the accrual of these claims and the filing of plaintiff's complaint, they are now time-barred. However, plaintiff's claims regarding sex discrimination and retaliation for reporting that discrimination are timely.

**2. Claims Against Defendants City of New York and BOE**
As discussed in Section II(D)(2)(b), *supra,* plaintiff has sufficiently demonstrated that there is a genuine issue of material fact for trial regarding her hostile work environment claim, as she has alleged sexual harassment and sexual assault by defendant Jackson which was sufficiently severe and pervasive as to create an objectively hostile or abusive work environment. She has also sufficiently alleged that her supervisors knew or should have known about this sexual harassment, and did not take appropriate steps to remedy the situation. However, she has not alleged that the sexual harassment she suffered occurred pursuant to an established policy or custom of behavior within the City or BOE, or that supervisors within the City or BOE so often failed to investigate or remedy complaints of sexual harassment that sexual harassment became accepted conduct within those organizations. Since the City and the BOE cannot be held liable under Section 1983 for what may have been unconstitutional conduct by Jackson and negligence by plaintiff's individual supervisors, the court grants summary judgment to defendants the City and the BOE on plaintiff's Section 1983 claims.

**3. Claims Against Defendant Jackson**
Individuals may only be held liable for their own conduct under Section 1983 if they are shown to be acting under color of state law: "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins,* 487 U.S. 42, 49-50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Courts agree that "[m]ere employment by a state ... does not automatically mean that a defendant's actions are taken under the color of state law." *Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996). Moreover, where the harassment in question does not involve use of state authority or position, the harasser is generally found not to

be acting under color of state law. *See, e.g., Ottman v. City of Independence,* 341 F.3d 751, 762 (8th Cir.2003) (alleged sexual harassment by non-supervisory co-worker held not state action); *Anthony v. County of Sacramento Sheriff's Dep't,* 845 F.Supp. 1396, 1401 (E.D.Cal.1994) (co-worker harassment actionable "when the abuse is related to state-conferred authority or duties"). The Second Circuit has further held that "acts of officers in the ambit of their personal pursuits are plainly excluded" from Section 1983 liability. *Pitchell,* 13 F.3d at 548.

 **\*28**  Plaintiff has not suggested that Jackson held supervisory authority over her, or that he utilized his authority or position in sexually harassing her. Therefore, the court concludes that Jackson was not acting under color of state law, and grants summary judgment as to plaintiff's Section 1983 claim of sexual harassment against Jackson.

**G.** *Thirteenth Amendment Claims*
Plaintiff's Amended Complaint suggests that she is raising a Thirteenth Amendment claim. (Am.Compl., ¶ 1.) However, to state a claim under the Thirteenth Amendment, a plaintiff must demonstrate that "he has been subjected to compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Ford v. Nassau County Exec.,* 41 F.Supp.2d 392, 400-01 (E.D.N.Y.1999) (internal citation omitted). Allegations of employment discrimination alone do not trigger Thirteenth Amendment concerns. *See Matthews v. Freedman,* 128 F.R.D. 194, 202 n. 2 (E.D.Pa.1989) (holding that "courts across the country have uniformly rejected the existence of a Thirteenth Amendment cause of action in the context of employment discrimination."). Therefore, plaintiff's Thirteenth Amendment claim is dismissed.

**H.** *Other State Law Claims*
Because plaintiff's Title VII hostile work environment and retaliatory transfer survive summary judgment, the court retains jurisdiction over plaintiff's pendant state law claims, including claims for assault and intentional infliction of emotional distress.

**III. CONCLUSION**
For the foregoing reasons, the court grants the defendant's motion for summary judgment in part and denies it in part.

Summary judgment is granted on behalf of defendants the City of New York and the Board of Education of the City of New York on the following claims:

(1) plaintiff's Title VII claims regarding (a) all incidents which occurred before 1995, (b) retaliatory treatment at P.S. 145 following her transfer, (c) retaliatory unwarranted and excessive discipline at P.S. 145, and (d) retaliatory termination;

(2) all of plaintiff's NYSHRL and NYCHRL claims;

(3) all of plaintiff's 🚩 Section 1983 claims; and

(4) all of plaintiff's claims under the Thirteenth Amendment.

Summary judgment is granted on behalf of defendant Elton Jackson with regard to:

(1) all of plaintiff's Title VII claims;

(2) plaintiff's NYSHRL and NYCHRL claims regarding (a) all incidents which occurred before 1995, (b) retaliatory transfer & demotion, (c) retaliatory treatment at P.S. 145 following her transfer, (d) retaliatory unwarranted and excessive discipline at P.S. 145, and (e) retaliatory termination;

(3) all of plaintiff's 🚩 Section 1983 claims; and

(4) all of plaintiff's claims under the Thirteenth Amendment.

The following claims survive defendants' motion for summary judgment:

(1) Plaintiff's sex discrimination, hostile work environment, and retaliatory transfer and demotion claims against defendants the City of New York and the Board of Education of the City of New York under Title VII, 🚩 42 U.S.C. § 2000e-2(a)(1);

**\*29** (2) Plaintiff's sex discrimination claims against defendant Elton Jackson under New York State Human Rights Law, 🚩 N.Y. Executive Law § 296, and New York City Human Rights Law, N.Y.C. Administrative Code § 8-107; and

(3) Plaintiff's pendant state law claims, the merits of which were not addressed in this motion for summary judgment.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2668211

## Footnotes

1    On August 8, 2005, plaintiff was served with defendants' motion, accompanied by the "Notice to *pro se* litigant" required by Local Rule 56.2, which informed plaintiff that defendants had filed a motion for summary judgment and explained that her claims could be dismissed without a trial if she failed to oppose the motion and file affidavits and/or documentary evidence contradicting the facts asserted by the defendant. *See* Loc. R. 56.2. Plaintiff requested and was granted two extensions of time to oppose defendants' motion. (*See* Order dated Oct. 7, 2005, Docket # 62 (extending time until Nov. 1, 2005); Order dated October 25, 2005, Docket # 64 (extending time until December 1, 2005).) Additionally, plaintiff was granted a further extension of time, until February 10, 2006, to file her opposition after the court denied her request to reopen settlement discussions. (*See* Order dated Jan. 20, 2006, Docket # 75.) Plaintiff has neither requested any additional extensions of time nor submitted any opposition to defendants' motion.

2    Since plaintiff did not reply to defendants' motion and therefore did not contest any of the facts alleged in defendants' statement of material facts, the court may deem all the facts in defendant's Rule 56.1 Statement admitted. *See* Loc. R. 56.1(c). Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts,

and those facts are accepted as being undisputed." 🚩 *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504-05 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)); *see also* 🚩 *Millus v. D'Angelo,* 224 F.3d 137, 138 (2d Cir.2000). However, given plaintiff's pro se status, the court will deem admitted only those facts in defendant's Rule 56.1 Statement that are supported and verified by admissible evidence in the record and not controverted by other admissible evidence in the record. *See* 🚩 *Jessamy,* 292 F.Supp.2d at 504.

3    References to "Ex. X" refer to exhibits attached to the Declaration of Assistant Corporation Counsel Rippi Gill (Aug. 8, 2005).

4    Plaintiff does not provide information about the dates on which these transfers occurred or the school(s) to which she was transferred, and there is no information in the record currently before the court about the grievance which plaintiff claims she filed regarding this transfer. The court believes that it is likely that plaintiff is referring to the transfer to P.S. 274 on October 26, 1993, which defendants allege resulted from a conflict between plaintiff and her supervisor. Because the court finds that plaintiff's claims about potentially retaliatory actions which occurred in 1993 and 1994 are time-barred, the court need not inquire too closely into the details of this transfer.

5    It is not clear from the current record whether defendant Elton Jackson was employed at I.S. 291 as a cook or as a school lunch helper, and correspondingly, whether Jackson was in fact plaintiff's co-worker or whether he held a supervisory position.

   Defendants describe Jackson as plaintiff's "co-worker" (*see* Defs.' Fact Statement, ¶ 16; Defs.' Mem., 16 ("the alleged assault was committed by a co-worker and not by a supervisor"); *id.* at 36 ("Jackson was only a co-employee of plaintiff') and suggest that Jackson was a school lunch aide, like plaintiff, rather than a cook (*see* Defs.' Fact Statement, ¶ 22 (Jackson was "reinstated to his position as school lunch aide")). However, OSFNS documents inconsistently identify Jackson as a school lunch aide and a cook. (*Compare* Suspension Letter, LR# 0209 (Mar. 26, 1998), *submitted as* Ex. X; Reinstatement Letter, LR# 0209-A (undated), *submitted as* Ex. Z (referring to Jackson as "School Lunch Aide") *and* LEOC Determination, No. 97-98-04-02-01 SH (Apr. 21, 1998), *submitted as* Ex. FF [hereinafter LEOC Determination] (assessing complaint of sexual harassment by "Mr. Elton Jackson, Cook.").) The court also notes that Mr. Jackson's criminal lawyer described Mr. Jackson as "a chef" who had "risen in his profession to being the head of the kitchen at P.S. 291, and in charge of all of these people in the kitchen." (Transcript, *New York v. Jackson,* NYC Crim. Ct. No. 98K024017 (Aug. 6, 1998), 4, *submitted as* Ex. Y.)

   Plaintiff consistently asserts that Jackson was employed at I.S. 291 as a cook. (*See* Am. Compl., ¶¶ 7, 13, 28-29; N.Y. State Div. of Human Rights Compl. No. 9S-E-S-99-7941868-E, *Williams v. City of New York, et al.* (Jan. 27, 1999), *submitted as* Ex. C [hereinafter SDHR Compl.].) However, plaintiff refers to Jackson as a "co-worker." (*See, e.g.* Am. Compl., ¶ 13 (referring to Jackson's harassment of "various female co-workers"); *id.* at ¶ 29, ¶ 57 (referring to Jackson as plaintiff's "co-worker who abused her"); SDHR Compl., 3 ("Jackson immediately began verbally abusing his co-workers"); Notice of Claim, *submitted as* Ex. F ("her co-worker, Elton Jackson").) Because plaintiff does not allege that Jackson held any supervisory authority, the court will assume that plaintiff and Jackson were co-workers.

6    Plaintiff's direct, on-site supervisor at I.S. 291 from 1994 to March 24, 1998 was Joanne Philip-Gayle. (*See* Decl. of Joanne Philip-Gayle in Supp. of Defs.' Mot. for Summ. J. [hereinafter Philip-Gayle Decl.].) However, both plaintiff and the questioning attorney referred to plaintiff's direct supervisor as "Miss Phillips" throughout plaintiff's deposition (*see, e.g.,* Williams Dep., 30, 32-33, 34, 40), and the Local Equal Opportunity Coordinator ("LEOC"), Joseph Key, refers to plaintiff's supervisor as "Ms. Phillip" (*see* Ex. FF). The court assumes that Ms.

Philip-Gayle, Miss Phillips, and Ms. Phillip are the same person. Because I will be quoting extensively from plaintiff's deposition, I will refer to plaintiff's direct supervisor as "Miss" or "Ms. Phillips" throughout this opinion.

7   The court notes that plaintiff's deposition testimony is somewhat garbled as to exactly which conversations occurred at what time (*see* Williams Dep., 40-44); however, in deciding a motion for summary judgment the court interprets any inconsistencies or gaps in the record in the light most favorable to the plaintiff.

8   Defendants provided only selected portions of plaintiff's deposition to the court. Unfortunately, any information plaintiff may have provided about approximately when this incident happened was not included in the portions of her deposition testimony submitted to the court. (*See* Williams Dep., 49-52, 58-61.)

9   During her deposition, defendants' counsel repeatedly asked plaintiff if she made any phone calls before attempting to find Mr. Pennisi. (*See* Williams Dep., 29-30, 32-35.) Plaintiff stated that she didn't remember the exact sequence of events: "I don't want to guess how I did this. I'm not too clear right now. I am a little upset right now. I don't want to guess. I'm not too sure." (*Id.* at 29-30.)

10  Plaintiff originally alleged that Mr. Pennisi arranged that she be transferred to a different school due to both retaliatory and discriminatory motives. (*See* Am. Compl., ¶¶ 19, 37, 42-43.) In addition to her allegations of retaliation, plaintiff's Amended Complaint alleges that Mr. Pennisi wanted both plaintiff and Jackson to be transferred for racially discriminatory reasons: "I.S. 291's principal demanded the transfer of both the perpetrator of the assault, defendant Jackson, and the victim of the assault, plaintiff Williams, upon his evaluation that the conduct of 'those people' in his school would not be tolerated, implying that plaintiff's race was indicative of her voluntary participation in an assault by an assailant of like color." (*Id.* at ¶¶ 42-43.)

However, plaintiff's deposition testimony suggests that she is withdrawing her original claims of racial discrimination by the I.S. 291 principal:

Q: Do you think [Mr. Pennisi] transferred you because you're black?

A: No, no way. Mr. Pennisi transferred me. This is the way it is. Because I am black, by no means did I think that. I never thought that way. I don't think he is that kind of a person. I never thought that way about Mr. Pennisi. I don't know who told you that-no way did he do that because I'm black.

(Williams Dep., 108.) Therefore, the court deems plaintiff's claims of race discrimination to be withdrawn.

11  The charges against Jackson were dismissed with prejudice on August 7, 1998, after the District Attorney's office determined that there was no credible evidence to proceed against Jackson. (*See* Defs.' Fact Statement, ¶ 21; Ex. Y.)

12  The court notes that several federal courts have dismissed tort claims against New York City while allowing claims against the Board of Education to proceed since the passage of the 2002 amendments to the Education Law,. *See, e.g., Gonzalez v. Esparza,* 2003 U.S. Dist. LEXIS 13711, at *5 (S.D.N.Y. Aug. 6, 2003) (characterizing changes in the statutory scheme regarding the powers of the City and the BOE as "political"); *Marrero v. City of New York,* 2004 U.S. Dist. LEXIS 3529, at *6 (S.D.N.Y. Mar. 10, 2004) (concluding that the BOE remains a separate and distinct entity which continues to " 'for all purposes, be the government or public employer of all persons appointed or assigned by the city board or the community districts ...' ") (quoting N.Y. C.L.S. Educ. § 2590-g(2)). However, these decisions predate the recent New York state court decisions which call into question the autonomy of the BOE. *See* 🚩*Perez,* 9 Misc.3d 934, 804 N.Y.S.2d 632; *Matter of P.I.,* 814 N.Y.S.2d 891.

13  The court notes that filing a timely charge of discrimination with the EEOC is " 'not a jurisdictional prerequisite to suit in federal court," ' but rather " 'a requirement that, like a statute of limitations, is subject to waiver,

estoppel, and equitable tolling." ' *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting *Zipes v. Trans World Airlines,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)).

14    The court assumes for the purposes of this motion that Jackson was merely plaintiff's non-supervisory co-worker.

15    Although plaintiff's claim that her co-workers at P.S. 145 ostracized her and treated her as a "problem employee" suggests that she found that environment hostile, she does not allege that her co-workers treated her in such a manner due to her gender, race, or other protected characteristic. Therefore, this claim is best interpreted as a claim of retaliation.

16    The court notes that the parties disagree about whether plaintiff's assignment to the student cafeteria at P.S. 145, as opposed to the teacher's cafeteria, involved a reduction in work hours and therefore a loss of pay.

Defendants allege that plaintiff was assigned to work the same number of hours at P.S. 145 (7:45am to 2:15pm) as she had worked at I.S. 291 (8:00am to 2:30pm). (*See* Defs.' Mem., 21 (citing Ex. P; Ex. V).) However, plaintiff testified during her deposition that fewer work hours were available to her at P.S. 145 after she was transferred. (*See* Williams Dep., 113 ("Yes, one hour was cut ...").) Plaintiff also appears to allege that the work schedule presented in the transfer notice she received on March 25, 1998 (*see* Ex. V) was not accurate:

I spoke to Andy Frazier, the cook. He said, Sheil, I don't know how Miss Ogarra-that you could have the same hours and put it in writing where she knows there is no snack program on this day. Andy called her for me ... When I spoke to Ms. Ogarra, she said, don't worry about an hour, don't worry about it, we will work with it. Then Andy said, Sheil, I don't know what is going on-[page break; next pages excluded from deposition submitted to court]

(Williams Dep., 113.)

If, as she alleges, plaintiff's transfer and reassignment resulted in a decrease in her wages, then it would clearly constitute an adverse employment action. *See, e.g., Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.")). However, the court need not evaluate whether plaintiff has demonstrated a genuine issue of fact as to whether she suffered a loss of wages, as the court finds that plaintiff's transfer and reassignment were materially adverse, regardless of the pay issue, under the standard recently articulated by the Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

17    Most discussions of § 3813 center on the notice of claim requirement contained in § 3813(1), which requires that "a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim." N.Y. Educ. Law § 3813(1). Plaintiff, however, satisfied this requirement; her Notice of Claim against the City of New York, the BOE, and Jackson was presented on June 18, 1998, less than three months after she was allegedly sexually assaulted by Jackson on March 24, 1998. (*See* Notice of Claim, Ex. F.)

18    Subdivision two of ⚑ § 3813, which is excepted from the requirements of ⚑ § 3813(2-b), relates specifically to tort actions:

> [N]o action or special proceeding founded upon tort shall be prosecuted or maintained against any of the parties named in this section or against any teacher or member of the supervisory or administrative staff or employee where the alleged tort was committed by such teacher or member or employee acting in the discharge of his duties within the scope of his employment and/or under the direction of the board of education, trustee or trustees, or governing body of the school unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law. Every such action shall be commenced pursuant to the provisions of section fifty-i of the general municipal law.

⚑ N.Y. Educ. Law § 3813(2). ⚑ General Municipal Law § 50-i provides that such a tort "action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based." ⚑ Gen. Mun. Law § 50-i(1)(c).

However, the New York courts have held that employment discrimination claims brought pursuant to ⚑ N.Y. Executive Law § 296 and N.Y.C. Administrative Code § 8-1073 are not tort actions under ⚑ Education Law § 3813(2) and ⚑ General Municipal Law §§ 50-e and ⚑ 50-i. *See, e.g.,* ⚑ *Dortz v. City of New York, et al.,* 904 F.Supp. 127, (S.D.N.Y.1995) (citing ⚑ *Mills v. Co. of Monroe,* 89 A.D.2d 776, 453 N.Y.S.2d 486, 487 (4 [th] Dept.), aff'd, ⚑ 59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456 (1982)); *Hilow v. Rome City Sch. Dist.,* No. 91-CV-567, 1994 U.S. Dist LEXIS 8953, at *26-27 (N.D.N.Y. June 29, 1994). Therefore, plaintiff's claims against the BOE and the City are subject to the one-year statute of limitations established in ⚑ Educ. Law § 3813(2-b).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 156 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

2002 WL 31415511
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mahagany BORRERO, Plaintiff,
v.
COLLINS BUILDING SERVICES, INC. Defendant.

No. 01 Civ. 6885(AGS)
|
Oct. 25, 2002.

**Synopsis**

Terminated female employee brought action against former employer, alleging sexual harassment and retaliation under Title VII, New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL). On employer's motion for summary judgment, the District Court, Schwartz, J., held that: (1) male harasser's sexual conduct towards female employee was sufficiently severe to alter conditions of her employment and create sexually abusive working environment; (2) male harasser was not employee's supervisor, as would support holding employer absolutely liable for allegedly sexually hostile work environment that harasser created; (3) employer was not vicariously liable for harasser's sexually harassing conduct; (4) employee established prima facie case of retaliation; and (5) fact questions as to whether employer's proffered reasons for reducing female employee's assignments immediately after she complained of sexual harassment, and for subsequently terminating employee, were pretexts for retaliation, precluded summary judgment.

Motion granted in part, and denied in part.

West Headnotes (9)

[1]    **Civil Rights** ☛ Hostile environment;
severity, pervasiveness, and frequency

Male harasser's sexual conduct towards female employee, of allegedly trapping her in bathroom, physically restraining her, unbuttoning some of his clothing, forcing employee to touch his chest, and forcing her to feel his erection against her leg, was sufficiently severe to alter conditions of her employment and create sexually abusive

working environment in violation of Title VII; harassing conduct was objectively and subjectively offensive. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[2]    **Civil Rights** ☛ Vicarious liability;
respondeat superior

Male harasser, who allegedly sexually harassed female employee, was not employee's supervisor, as would support holding employer absolutely liable, under Title VII, for allegedly sexually hostile work environment that harasser created; harasser lacked authority to make tangible employment decisions with regards to employee's conditions of employment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Case that cites this headnote

[3]    **Civil Rights** ☛ Knowledge or notice;
preventive or remedial measures
**Civil Rights** ☛ Vicarious liability;
respondeat superior

Employer was not vicariously liable, under Title VII, for alleged sexual harassment by male co-worker towards female employee; even if employer did not have written anti-harassment policy, employer provided reasonable avenue of complaint to employee, in that, she knew to, and was able to, contact management shortly after alleged harassing incident occurred, and employer took swift remedial action as soon as it learned of the harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

4 Cases that cite this headnote

[4]    **Civil Rights** ☛ Activities protected

Female employee's complaint to management, as well as her complaint to police, about male co-worker's alleged sexually harassing conduct towards her, constituted protected activity, as would support prima facie case of retaliation under Title VII; management was aware of

complaint to police. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[5]    Civil Rights    Particular cases**

Employer's alleged failure to provide employee with opportunities to partake in work assignments, and its subsequent termination of female employee after she complained of sexual harassment by male co-worker, constituted adverse employment actions, as would support prima facie case of retaliation under Title VII.

Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6]    Civil Rights    Causal connection; temporal proximity**

Employer's alleged immediate failure to provide female employee with opportunities to partake in work assignments after she complained to management and police about sexual harassment by male co-worker, as well as employer's subsequent termination of employee six weeks later, supported inference that there was causal connection between employee's complaints and decreased opportunities to earn income and subsequent termination, as required for prima facie case of retaliation under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[7]    Civil Rights    Questions of law or fact**

**Summary Judgment    Employment Practices; Discrimination**

Fact questions as to whether employer's proffered reasons for reducing female employee's assignments immediately after she complained of sexual harassment, and for subsequently terminating employee, were pretexts for retaliation, precluded summary judgment in Title VII action. Civil Rights Act of

1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8]    Summary Judgment    Form and Requisites**

Employee's opposition to summary judgment in employment discrimination action was not procedurally deficient, although employee did not offer affidavit; employee's attorney swore to affidavit that introduced employee's sworn deposition testimony in opposition to motion, and thus opposition included sworn testimony of individual with personal knowledge. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[9]    Civil Rights    Sexual Harassment; Work Environment**

**Civil Rights    Retaliation for Exercise of Rights**

Analysis of sexual harassment and retaliation claims brought under New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL) directly parallels Title VII analysis of such claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; McKinney's Executive Law § 296 et seq.; New York City Administrative Code, § 8–101 et seq.

*MEMORANDUM ORDER*

SCHWARTZ, J.

I. INTRODUCTION

**\*1** Plaintiff Mahagany Borrero, a temporary office cleaner for defendant Collins Building Services, Inc., brings this action for harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as well as for violations of various New York state and municipal laws. Defendant has moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendant's motion is granted in part and denied in part.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 158 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

## II. FACTUAL BACKGROUND [1]

*Defendant's Practice of Hiring Temporary Cleaners*
Defendant Collins Building Services, Inc. ("Collins") provides office-cleaning services to commercial buildings in the metropolitan New York area. Its employees are "predominately [sic] porters who dust and vacuum offices, remove trash from offices and buildings, clean lavatories, replenish lavatory supplies and [perform] related activities." Statement of Defendant Pursuant to Local Civil Rule 56 .1 ("Defendant's 56.1 Statement") at ¶ 1; Counter 56.1 Statement of Material Facts ("Plaintiff's 56.1 Statement") at ¶ 1.

Collins hires two types of temporary office cleaners, "Vacation Replacements" and "Day-to-Day Replacements." *See* Plaintiff's 56.1 Statement at ¶¶ 6, 27–28; Defendant's 56.1 Statement at ¶¶ 6, 27. Collins' unionized employees typically take vacations between April and September. *See* Affidavit of Jason Sardinas ("J. Sardinas Affidavit"), appended to Defendant's Notice of Motion at ¶ 3. Collins hires temporary non-union workers, known as "Vacation Replacements," to fulfill the duties of the vacationing employees. *Id.* The duties of a Vacation Replacement generally end in September, at the conclusion of the vacation season. *See* Plaintiff's 56.1 Statement at ¶ 27; J. Sardinas Affidavit at ¶ 3.

Similarly, Collins hires "Day-to-Day" replacements to fulfill the duties of unionized employees who call in sick or are otherwise unable to report to work on a particular day. *See* J. Sardinas Affidavit at ¶ 26. Collins does not dispute that, in contrast to the Vacation Replacement position, the Day-to-Day position lacks a natural ending point in the calendar year. *See* Defendant's Reply Memorandum of Law in Support of Collins' Motion for Summary Judgment ("Defendant's Reply Brief") at 2. In addition, the Day-to-Day position commands a higher pay rate than that of the Vacation Replacement position. *See* Deposition of Mahagany Borrero ("Borrero Dep.") appended to Affidavit of Louis Ginsberg in support of Plaintiff's opposition to summary judgment ("Ginsberg Affidavit") as Exhibit ("Exh.") 6, at 140–41; Defendant's Memorandum of Law in Support of Collins Building Services, Inc.'s Motion for Summary Judgment ("Defendant's Brief") at 11. [2]

According to Collins, staff members distribute assignments by telephone to Day-to-Day Replacements and Vacation Replacements on a random basis. *See* Defendant's 56.1 Statement at ¶ 27; Villacis Affidavit at ¶ 5; Cruz Affidavit at ¶ 5; Plaintiff's 56.1 Statement at ¶ 27. Collins further contends that, of the individuals eligible for Day-to-Day assignments, those who are able to work on short notice receive the majority of assignments. Defendant's 56.1 Statement at ¶ 27; Villacis Affidavit at ¶ 5; Cruz Affidavit at ¶ 5; Plaintiff's 56.1 Statement at ¶ 27.

*Plaintiff's Employment With Collins Prior to the July 28, 2000 Incident*
 **\*2**  On June 28, 2000, Jason Sardinas, a manager in Collins' Human Resources Department, interviewed and hired Mahagany Borrero as a Vacation Replacement. *See* Defendant's 56.1 Statement at ¶¶ 1, 6; Plaintiff's 56.1 Statement at ¶¶ 1, 6. Borrero disputes Collins' contention that, at the time of her interview, Borrero requested the Day-to-Day position, but accepted the Vacation Replacement position when no openings in the Day-to-Day role were available. *See* Plaintiff's 56.1 Statement at ¶ 6; Defendant's 56.1 Statement at ¶ 6. At the time of her hiring, Borrero signed a document that read, in part:

> This acknowledges that I am being hired as a vacation or Day-today [sic] replacement, and it is understood that this is a temporary position. CBS [Collins] can terminate my temporary position when my services are no longer needed.

Defendant's 56.1 Statement at ¶ 6; Plaintiff's 56.1 Statement at ¶ 6; Borrero Dep. at 17–18; "Some Employee Work Rules" appended to Ginsberg Affidavit as Exh. 5.

Borrero disputes Collins' contention that Sardinas provided her with a telephone number for the purpose of speaking with a Collins supervisor or to report any difficulty with respect to her work. *See* Defendant's 56.1 Statement at ¶ 7; Plaintiff's 56.1 Statement at ¶ 7. Borrero claims that she was led to believe that her supervisors would be located at her assigned buildings. *See* Plaintiff's 56.1 Statement at ¶ 7. At her deposition, Borrero recounted her interaction with people she described as supervisors:

A. Typical day I would come in on time, more or less I had to be at work at nine or ten o'clock. I punch in, change in my

uniform. Stock up—I had a cart I had to stock it up with toilet tissue and napkins and garbage bags and I would go to each floor that I'm assigned to and clean up the ladies room.

Q. And how would you get the assignment to each particular floor?

A. The supervisor normally give [sic] it to me

Q. You're talking about supervisors on the job site -

A. Yes.

Q. at the buildings? And you change in your uniform in what, a locker room of some type or room set aside for Collins employees?

A. Yes.

Q. Was there such a room in each building you worked in?

A. Yes.

Q. And who would be in charge of that room, would there be somebody stationed there all the time?

A. Being that I was a vacation replacement normally the lady that I'm replacing that was like her room [sic] and they would give me the keys and I would change my clothes.

Q. Who would give you the keys?

A. A supervisor.

Borrero Dep. at 27–29.

Borrero commenced work as a Vacation Replacement on July 3, 2000. She completed assignments at three buildings over the course of four weeks during the month of July. From July 3–7, she worked four eight-hour shifts at 125 Park Avenue; from July 10–14, she worked one eight-hour shift at 125 Park Avenue; from July 17–21, she worked four 4–hour shifts at 660 Madison; and from July 24–28, she worked four four-hour shifts at 660 Madison and three three-hour shifts at 919 Third Avenue. *See* Plaintiff's 56.1 Statement at ¶¶ 9, 10, 13; Defendant's 56.1 Statement at ¶¶ 9, 10, 13; "Weekly Payroll" records appended to Defendant's Notice of Motion as Exhibits ("Exhs.") E–H.

*Plaintiff's Initial Encounters with Oscar Uribe at 660 Madison*

**\*3**  Borrero met Oscar Uribe on Monday, July 17, 2000, the first day of her two-week assignment to 660 Madison Avenue ("660 Madison"). *See* Plaintiff's 56.1 Statement at ¶ 10; Defendant's 56.1 Statement at ¶ 10; Borrero Dep. at 44. Plaintiff contends that when Aris Pacheco, a Collins staff member, telephoned with this assignment, Pacheco identified Uribe as Borrero's supervisor at 660 Madison. *See* Borrero Dep. at 30; Plaintiff's 56.1 Statement at 14. Pacheco further instructed Borrero to ask for Uribe upon her arrival. *See* Borrero Dep. at 44. Borrero recounted her first encounter with Uribe in her deposition:

> When I walked in the morning [sic] he told me to wait for him downstairs. It was [ ... ] like a little locker room [ ... ], like a janitor room and I waited for him downstairs. He came, he told me, you know, what it's [sic] expected of me, where I can get the supplies downstairs in the basement and the cart and that was about it.

*See* Borrero Dep. at 44. Of the two weeks Borrero worked at 660 Madison, July 17th was the only day Borrero checked in with Uribe prior to beginning her duties. *Id.* at 60. Collins denies that Uribe was Borrero's supervisor, describing him as a Day Porter "responsible for various cleaning tasks as needed throughout the building." *See* Defendant's 56.1 Statement at ¶ 14; "Weekly Payroll" appended to Defendant's Notice of Motion as Exh. F at 0105.

Initially, Borrero's alleged encounters with Uribe were pleasant. *See* Borrero Dep. at 52. While Borrero lunched alone in the basement supply room on July 17th, Uribe entered and chatted with her for about twenty minutes, making "small talk." *See id.* The next time she encountered Uribe was Friday, July 19th. *See* Borrero Dep. at 60–61. Their conversation lasted only a few minutes, and Uribe told Borrero that she was beautiful. *See id.* Borrero testified that this encounter did not cause her to feel uncomfortable. *See id.*

During the following week, Uribe's overtures towards Borrero escalated. On Monday, July 24th, Borrero encountered Uribe

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 160 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

in the basement supply room. *See* Borrero Dep. at 67–69. During a fifteen-minute conversation, he again told Borrero that she was beautiful, and asked her out on a date. *See id.* at 67. She declined, telling Uribe that she was married. *See id.* When Uribe kept pressuring Borrero to go out with him, she cut the conversation short and left the room. *See id.* Borrero testified that this conversation made her uncomfortable because "[she] was telling him all the things [she] was telling him and to [her] he seemed like he didn't want to back off." *Id.* at 69. Borrero did not report the conversation to anyone at Collins. *See id.* She felt that since she had clearly communicated her lack of interest to Uribe, she did not expect him to proposition her again. *See id.*

The next day, however, Uribe renewed his advances. During Borrero's lunch break on July 25th, Uribe entered the room with another Collins employee. *See id.* at 72. When the third individual left the room, Uribe repeatedly asked Borrero to go out with him. *See id.* at 73. Again, she declined, this time asking him to leave her alone. *See id.* At one point, he put his arm across her shoulders, which she shrugged off. *See id.* In addition, he gave her a piece of paper with his phone and beeper numbers written on it. *See id.* at 73–74. She told him she would not call him, took the paper "so he wouldn't bother [her] about the situation any more," and threw away the paper later that day. *See id.* at 74.

**\*4** Borrero described this incident and her general discomfort with Uribe's persistent advances to a co-worker identified only as "Thomas." *See id.* at 77. Thomas advised her to try to stay away from Uribe during the conclusion of her assignment at 660 Madison. *See id.* at 82.

*The July 28th Incident*

Borrero did not encounter Uribe again until Friday, July 28, 2000. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. Borrero noticed a water leak in the 17th floor ladies' room. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. She informed another Collins employee about the leak, who said he would page Uribe to attend to it. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. Borrero claims that the employee instructed her to wait at the scene of the leak, clear the bathroom of visitors, and await Uribe's arrival. *See* Borrero Dep. at 93. Borrero further understood that the employee with whom she spoke would come up to the ladies room with Uribe. *See id.*

According to Borrero, Uribe arrived at the ladies' room alone. *See id.* at 94. As Borrero tried to leave the bathroom, Uribe allegedly blocked the door. *See id.* at 95. Borrero recalls that Uribe was carrying a mop, which he put on the floor. *See id.* at 95, 97. When Borrero told him to move out of the way, she contends that he continued to block her exit. *See id.* at 95. Uribe allegedly told Borrero that "he love[d] looking at [her] face and his heart starts pounding every time he sees [her]." *Id.* While saying this, he allegedly began to back Borrero further into the bathroom. *See id.* As Borrero tried to evade him, she claims she unbuttoned two or three buttons from the top of his work shirt. *See id.* at 95, 98. Uribe allegedly "grabbed" her hand and placed it on his chest, urging her to feel his racing heart. *See id.* at 95. Cursing at him to free her, Borrero contends she tried to pull away:

> I told him to get the F away from me
> and not to F'g touch me. And he still
> had my hand there and he didn't want
> to let it go. I was using a lot of force
> to get my hand off, to get him from
> holding my hand and with the other
> hand I was just trying to push him
> away and it didn't work.

Borrero Dep. at 96. At this point, Uribe had allegedly stepped close enough to Borrero such that his body was in physical contact with hers. *See* Borrero Dep. at 97.

> At that moment he told me look, and I
> didn't know what he was talking about
> and as he kept coming closer towards
> me, I felt his penis on my leg, and I was
> telling him, you know, what the hell is
> wrong with you. I told him you don't
> have no respect for women, and I was
> still trying to push him away being that
> he's a big man I couldn't. And at that
> moment his penis was erected [sic].

Borrero Dep. at 96. Borrero claims she "used all [her] might to push him away." *See id.* Uribe allegedly "stepped back a little with one leg" and Borrero left the room immediately. *Id.* The alleged incident occurred entirely inside the ladies' room. *See*

Borrero Dep. at 97. No one else was present in the bathroom. *See id.* at 99.

**\*5**  After the alleged incident, Borrero immediately went to the basement supply room. *See id.* She was "kind of scared" and "just thinking of what to do." *Id.* She decided to go upstairs to speak with someone. *See id.* She spoke with her co-employee, Thomas, who advised her to call both the company and the police. *See id.* Borrero then called Jason Sardinas from the lobby of 660 Madison, at approximately 12:05pm. *See* Borrero Dep. at 100; Defendant's 56.1 Statement at ¶ 19; Plaintiff's 56.1 Statement at ¶ 19.

During the phone call, Borrero reported to Jason Sardinas that Uribe had made unwanted sexual advances. *See* Plaintiff's 56.1 Statement at ¶ 19; Defendant's 56.1 Statement at ¶ 19. Jason Sardinas said he would send someone from Collins to 660 Madison, and instructed Borrero to avoid Uribe. *See* Plaintiff's 56.1 Statement at ¶ 20; Defendant's 56.1 Statement at ¶ 20; Borrero Dep. at 100. Borrero contends that during their telephone conversation, Sardinas begged her not to call the police, citing the need to protect the company's reputation. *See* Borrero Dep. at 100; Plaintiff's 56.1 Statement at ¶ 20.

Borrero called the police immediately after speaking to Jason Sardinas. *See* Borrero Dep. at 101. Police arrested Uribe at 660 Madison and took him into custody. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24; Borrero Dep. at 101, 103–07. Uribe was eventually charged with the violation offense of disorderly conduct under section 240.20 of the New York City Penal Law. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. That charge was subsequently adjourned in contemplation of dismissal. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Uribe both agreed to and complied with an order of protection prohibiting any contact with Borrero. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Following the July 28, 2000 incident, Borrero did not encounter Uribe again. *See* Borrero. Dep. at 175.

### The Meeting at Collins' Offices on the Afternoon of the Incident

Approximately twenty minutes after receiving Borrero's phone call about the bathroom incident, Sardinas contacted George Droesch, a "route supervisor," and instructed Droesch to report to 660 Madison. *See* Plaintiff's 56.1 Statement at ¶ 21; Defendant's 56.1 Statement at ¶ 21. When Droesch arrived at 660 Madison at approximately 1:10 pm, he telephoned Sardinas to advise him that Borrero was speaking to the

police. *See* Plaintiff's 56.1 Statement at ¶ 21; Defendant's 56.1 Statement at ¶ 21. After Borrero finished speaking with the police, Droesch and Borrero returned to Collins' offices. *See* Plaintiff's 56.1 Statement at ¶ 22; Defendant's 56.1 Statement at ¶ 22.

Plaintiff claims she met with Jason Sardinas' father, Andres Sardinas, an Executive Vice President at Collins. *See* Borrero Dep. at 135; April 20, 1998 "Memorandum" appended to Ginsberg Affidavit as Exh. 3. Plaintiff contends Andres Sardinas offered to "get her more money" by changing her position from the Vacation Replacement role to the Day–to–Day position, in order to prevent the situation from "escalating" and to "keep [her] quiet." *See* Borrero Dep. at 135–36, 138–40. Borrero alleges that after he made this offer to change her position and salary, she told him that she had already informed the police. *Id.* at 140. Collins disputes her characterization of the meeting, claiming that it was Borrero who reiterated a previous request to change her current position to that of Day–To–Day. *See* Defendant's 56.1 Statement at ¶ 26; J. Sardinas Affidavit at ¶ 26. Collins has not submitted an affidavit by Andres Sardinas describing the meeting.

### Collins' Sexual Harassment Policy

**\*6**  Collins claims that it had a sexual harassment policy in place prior to June 2000. *See* Defendant's 56.1 Statement at ¶ 2. In addition to hiring an outside consultant to train Collins' supervisory personnel on the subject of sexual harassment, all supervisors are required to inform employees of the company's policy. *See* Defendant's 56.1 Statement at ¶ 2; J. Sardinas Affidavit at ¶ 4. A memorandum describing the policy is supposed to be "conspicuously posted in areas where the staff will see it." *See* Defendant's 56.1 Statement at ¶ 4.

The memorandum announces Collins' "zero tolerance" for sexual harassment, defining sexual harassment as including:

> any unwanted physical contact such as touching, pinching or blocking movements; [ ... ] joking or teasing of a sexual nature; [ ... ] [and] continuing to express personal interest after being informed that the interest is unwelcome.

April 20, 1998 "Memorandum" appended to Ginsberg Affidavit as Exh. 3. The memo directs employees who either witness or experience such harassment to advise a Labor Relations Manager at a telephone number provided in the memorandum, and states that any such complaints will be treated confidentially and investigated promptly. *See id.*

Borrero disputes that Collins had a policy in place prior to June of 2000. *See* Plaintiff's 56.1 Statement at ¶ 2. She further claims that she did not see the memo posted in any of her assigned buildings, nor did she see the policy posted in Collins' headquarters when she visited that location to retrieve her paychecks. *See* Borrero Dep. at 20–22; Plaintiff's 56.1 Statement at ¶ 4.

Borrero does not dispute that prior to her July 28, 2000 phone call to Jason Sardinas, neither she, nor anyone else had complained to Collins about any form of harassment or misconduct by Uribe. *See* Plaintiff's 56.1 Statement at ¶ 23; Defendant's 56.1 Statement at ¶ 23. On Monday, July 30, 2000, Collins suspended Uribe without pay for two weeks during the course of Collins' internal investigation of the incident. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Collins has not submitted evidence describing the results of the investigation. When Uribe returned to work, he was assigned to a separate building. *See* Plaintiff's 56.1 Statement at ¶ 25; Defendant's 56.1 Statement at ¶ 25. After July 28, 2000, Borrero did not encounter Uribe again. *See* Borrero Dep. at 175.

*Plaintiff's Employment With Collins After July 28, 2000*
The record reflects that during the six weeks following the July 28, 2000 incident, Borrero completed two work assignments at two buildings. On August 14 th, she worked one eight-hour shift at 75 Wall Street; on September 6 th, she worked one eight-hour shift at 2 Chase Manhattan Plaza. *See* "Weekly Payroll" records appended to Defendant's Notice of Motion as Exh. J. [3]

Borrero claims that, other than three occasions, she stopped receiving phone assignments from Collins after the July 28 incident. *See* Borrero Dep. at 187. She admits to turning down one assignment because she could not arrange childcare in time. *Id.* at 170. She contends that she received her first assignment after the incident only after calling the Collins office to ask for work. *Id.* at 169. Borrero further alleges that her paycheck did not reflect her salary increase from that of

the Vacation Replacement to that of the Day-to-Day position. *Id.* at 168, 171; "Earnings Statement" appended to Ginsberg Affidavit as Exh. 2. Borrero alleges that when she called the office to inquire about her incomplete paycheck, a Collins staff member informed Borrero of her termination. *Id.* at 171. Borrero's September 6, 2000 termination notice reflects no reason other than "your services are no longer needed." *See* "Termination Notice" appended to Ginsberg Affidavit as Exh. 4.

**\*7** Collins disputes Borrero's characterization of the six weeks between the July 28, 2000 incident and her termination. Collins contends that Borrero refused not one but "several" additional offers for Day-to-Day assignments. *See* Defendant's 56.1 Statement at ¶ 28; Villacis Affidavit at ¶ 6. One staff member testified that Borrero's mother called on one occasion to notify Collins of Borrero's unavailability for work; *see* Cruz Affidavit at ¶ 6. According to Collins, after several attempts to contact Borrero with a Day-to-Day assignment, Collins would occasionally receive no response at all. *Id.* at ¶ 7. Collins contends that "eventually, it was determined that her services were no longer needed and she was terminated for administrative reasons." *See* Defendant's 56.1 Statement at ¶ 29.

*Plaintiff's Claims in the Instant Action*
In light of the foregoing allegations, Borrero has filed the instant action against Collins pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* claiming sexual harassment and termination in retaliation for her sexual harassment complaint. In addition, she has filed similar claims under N.Y. Exec. Law § 296 *et seq.* and N.Y.C.Code § 8–101 *et seq.* Borrero seeks fifteen million dollars in compensatory and punitive damages, attorney's fees, and the option to be reinstated to her former position. Collins moves for summary judgment pursuant to Fed.R.Civ.P. 56.

### III. LEGAL STANDARD
Summary judgment "shall be rendered forthwith" when the pleadings, depositions, answers to interrogatories, filed admissions, and affidavits together demonstrate "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact and all inferences and ambiguities are to be resolved in favor of the nonmoving party. *See, e.g., Cruz v. Coach Stores, Inc.,* 202 F.3d 560,

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 163 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

567 (2d Cir.2000); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir.1999).

In the context of discrimination cases, the appropriateness of summary judgment is "a particularly delicate subject." Feliciano v. Alpha Sector, Inc., No. 00 CIV. 9309, 2002 WL 1492119, at *5 (S.D.N.Y. July 12, 2002). The Second Circuit has recognized that a "smoking gun" rarely exists in employment discrimination actions, and that the discrimination "is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991). A discrimination victim, therefore, is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." Id. at 533. Consequently, courts must be "especially cautious in deciding whether to grant this drastic provisional remedy [i.e., summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." Belfi, 191 F.3d at 135. Nonetheless, to survive summary judgment in a discrimination case, a plaintiff "must come forward with at least some credible evidence that the actions of the [defendants] were motivated by [ ... ] animus or ill will." Grillo v. New York City Transit Auth., 291 F.3d 231, 234 (2d Cir.2002).

## IV. LEGAL ANALYSIS—FEDERAL CLAIMS

## A. SUMMARY JUDGMENT IS WARRANTED FOR BORRERO'S FEDERAL SEXUAL HARASSMENT CLAIMS

**\*8** Borrero's first federal cause of action is for sexual harassment in violation of 42 U.S.C. § 2000e et seq. ("Title VII"). The statute provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin [ ... ]

42 U.S.C. § 2000e–2(a). To prevail on a claim that sexual harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish three elements. The plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (citing Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997)); Howley v. Town of Stratford, 217 F.3d 141, 153–54 (2d Cir.2000). Finally, the plaintiff must demonstrate that the conduct occurred because of her sex. Alfano, 294 F.3d at 374. Because Borrero has failed to establish the second of these three required elements of a Title VII harassment claim, her claim must be dismissed.

### 1. A Factfinder Could Find that the Alleged Harassment Sufficed to Create an Abusive Working Environment

**[1]** A plaintiff alleging a hostile work environment must show "either that a single incident of harassment was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Alfano, 294 F.3d at 374 (quoting Cruz, 202 F.3d at 570); Howley, 217 F.3d at 153. Considerations include "the frequency of the discriminatory conduct; its severity; *whether it is physically threatening* or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (emphasis added).

An isolated incident, if severe enough, can meet the threshold for a sexually hostile environment. See Howley, 217 F.3d at 154 (finding actionable claim when a public incident of sexually explicit verbal abuse challenged the competence of a female firefighter in hearing of her subordinates, creating a justifiable fear that she would be imperiled at fire scenes).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 164 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

*See also* *Faragher,* 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment."); *Alfano,* 294 F.3d at 374 ("[I]t is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace.").

**\*9** Courts must examine "all the circumstances" to assess whether an environment is sufficiently "hostile" or "abusive" to be actionable under Title VII. *Faragher,* 524 U.S. at 787 (citing *Harris,* 510 U.S. at 23). The sexually objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787; *Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999) (quoting *Pisano v. Torres,* 116 F.3d 625, 632 (2d Cir.1997)) (" 'Whenever the harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment." ').[4]

The Supreme Court has emphasized, however, that Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Faragher,* 524 U.S. at 788. "Ordinary" workplace socializing, such as "male-on-male horseplay or intersexual flirtation" do not constitute discriminatory conditions of employment. *Oncale,* 523 U.S. at 81. *Compare* *Cruz,* 202 F.3d at 571 (finding actionable sex harassment claim when, in addition to making sexually derogatory remarks, plaintiff's supervisor repeatedly backed plaintiff against a wall, while looking her up and down "in a way that's very uncomfortable," such that plaintiff had "to cut the conversation short" in order to extricate herself) *with* *O'Dell v. Trans World Entm't Co.,* 153 F.Supp.2d 378, 387 (S.D.N.Y.2001), *aff'd* 2002 U.S.App. LEXIS 14446 (2d Cir. July 16, 2002) (granting summary judgment to employer when co-worker and subsequent supervisor made unwelcome advances by inviting her out, professing his love via e-mail, and commenting on her appearance, and where plaintiff failed to allege any "inappropriate touching" or "a pattern of verbal abuse"). A "proper" application of

the standards for judging hostility under Title VII should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher,* 524 U.S. at 788 (internal quotations and citations omitted).

As alleged, Uribe's conduct on July 28, 2000 is objectively severe enough to satisfy the first element of an actionable sexual harassment claim under Title VII. Uribe allegedly blocked the door, trapping Borrero alone with him in the bathroom. According to Borrero, he physically restrained her, unbuttoned some of his clothing, forced her to touch his chest, and by compelling her to remain in contact with his body, forced her to feel his erection against her leg.

Even construing Uribe's language accompanying his actions as romantic or passionate, a reasonable factfinder could conclude that Uribe's conduct crossed the line from "merely offensive or boorish" to actionable harassment. *Cf.* *Cruz,* 202 F.3d at 571 (finding triable issue of fact where the physically threatening nature of the behavior at issue brought the case "over the line" from merely offensive behavior to actionable sexual harassment).

**\*10** Under *Faragher,* the sexually objectionable conduct must be both "objectively and subjectively offensive." 524 U.S. at 787. As stated above, a reasonable person could find that Uribe's conduct was offensive, thereby satisfying the objective prong of the sexually objectionable environment analysis. The evidence adduced satisfies the subjective prong of the analysis as well. Borrero's call to the police almost immediately after the alleged incident supports the inference that she subjectively found his conduct to have gone beyond "ordinary" flirtation to physically threatening her in a sexual manner.

A factfinder could further find that the alleged incident was extreme enough to "work a transformation of her workplace." An examination of all the circumstances reveals that prior to the July 28 incident, Uribe had consistently demonstrated unwillingness to accept Borrero's rejections of his overtures. The bathroom encounter marked a physical escalation of his advances. The nature of her work as an office cleaner for Collins required her to be alone in various rooms, including a small basement supply room. In the aftermath of this incident, Borrero could justifiably fear fulfilling the duties that might force her to be alone with Uribe once again. While a factfinder might reasonably conclude that Uribe's conduct

was insufficiently extreme "to amount to a change in the terms and conditions of employment," the evidence does not compel that result.

### 2. *Borrero Fails to Allege a Specific Basis for Imputing Liability To Her Employer*

Though Borrero has alleged facts sufficient to satisfy the first element of an actionable sexual harassment claim under Title VII, she has failed to demonstrate that a specific basis exists for imputing the objectionable conduct to her employer. Thus, the federal sex harassment claim must be dismissed.

#### a. The Standard for Imputing Employer Liability

An actionable sex harassment claim under Title VII requires a plaintiff to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Alfano,* 294 F.3d at 373 (citing *Perry,* 115 F.3d at 149); *Howley,* 217 F.3d at 154 (2d Cir.2000); *Feliciano,* 2002 WL 1492139, at *9. An employer is presumed absolutely liable if the victim's supervisor perpetrated the harassment, though the employer may interpose an affirmative defense to rebut that presumption. *Richardson,* 180 F.3d at 441 (citing *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Feliciano,* 2002 WL 1492139, at *9. When the alleged harasser is a co-worker, however, the plaintiff must demonstrate that the employer " 'failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." ' *Howley,* 217 F.3d at 154 (quoting *Richardson,* 180 F.3d at 441).

#### b. Uribe Was Not Borrero's Supervisor Within the Meaning of Title VII

***11** **[2]** In *Burlington Industries, Inc. v. Ellerth,* the Supreme Court established that an employer is presumed liable for harassment perpetrated by an employee's supervisor. 524 U.S. at 765. The rationale for subjecting an employer to vicarious liability for a supervisor's harassment rests on the assumption that a supervisor may have power to make a "tangible employment decision" with regards to the employee. *Id.* at 761–762. Tangible actions include "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. Thus, a supervisor has some power to alter the terms or conditions of their victim's employment:

> [O]ne co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

*Feliciano,* 2002 WL 1492139, at *10 (quoting *Burlington,* 524 U.S. at 762). *See also* *Faragher,* 524 U.S. at 803 ("[A] supervisor, whose 'power to supervise—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear [ ... ] when he chooses to harass through insults and offensive gestures than directly with threats of firing or promises of promotion." ').

Borrero alleges that Uribe was her supervisor when she worked at 660 Madison. Borrero testified that at her initial interview, Jason Sardinas led her to believe that her supervisors would be located at each of the buildings that she worked. These supervisors would give her keys to the supply room and give her the assignments for the floors she was to clean.

Borrero testified that a Collins staff member identified Uribe as her supervisor when giving Borrero her assignment to 660 Madison and instructed her to ask for Uribe upon her arrival at the building. When she met Uribe on July 17, 2000, "he told [her] ... what it's [sic] expected of me, where I can get the supplies downstairs in the basement and the cart." *See* Borrero Dep. at 44. Of the two weeks Borrero worked at that building, July 17 was the only day Borrero checked in with Uribe prior to beginning her duties. At one point, a fellow employee instructed her to page Uribe in order to attend to the flooded bathroom.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 166 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

Collins disputes that Uribe was her supervisor. According to Collins, Uribe's job title was that of Day Porter and his duties included "various cleaning tasks as needed throughout the building." See Defendant's 56.1 Statement at ¶ 4.

Borrero has failed to allege facts sufficient to qualify Uribe as a supervisor within the meaning of Title VII. Even construing all facts in favor of the non-moving party, Uribe lacked the authority to make tangible employment decisions with regards to her conditions of employment. She has failed to allege facts supporting the inference that Uribe could shift her work schedule, alter her benefits, or change any other "tangible" condition of her employment. Thus, Uribe lacked the relevant supervisory powers that would qualify him as a supervisor within the meaning of Title VII. Cf. *Feliciano,* 2002 WL 1492139, at *10 (finding a co-worker was not a supervisor despite having some "oversight responsibility" over the plaintiff). Accordingly, for the purposes of a Title VII hostile environment analysis, Uribe was Borrero's co-worker.

*c. Collins is Not Liable for Uribe's Conduct*

**\*12** **[3]** When a co-worker is the source of alleged harassment, a plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley,* 217 F.3d at 154 (quoting *Richardson,* 180 F.3d 441). *See also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (1998) ("When a co-employee—as distinct from a supervisor—is alleged to have engaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.") (Internal quotations omitted). Borrero has failed to raise a triable issue of fact regarding either the complaint procedure or Collins' response to her complaint. Accordingly, her federal hostile environment claim must fail.

Borrero admits that Collins had not received complaints about Uribe prior to that date. Borrero further admits that she did not inform Collins management about Uribe's intensifying advances or that Uribe was making her increasingly uncomfortable. Prior to the incident, the sole person she told was another co-worker. Thus, there is no evidence that Collins knew or should have known of the harassment in advance of the July 28, 2000 incident.

Immediately upon learning about the incident, Collins promptly suspended Uribe without pay for two weeks during the course of an internal investigation, and then reassigned him to a different building. Borrero did not encounter Uribe again during the remainder of her employment with Collins. Thus, as soon as Collins learned of the alleged harassment, swift remedial action occurred. *Cf. Howley,* 217 F.3d at 156 (finding triable issue of inadequate employer response to a public incident of co-worker sex harassment when employer failed to mete discipline for five weeks, issued only a two-day suspension, and merely recommended that the harasser apologize to the complainant, but failed to take action to persuade him to do so).

Borrero also alleges that Collins lacked a sex harassment policy prior to June, 2000. However, she has not provided any evidence to support this conclusory assertion. Borrero further alleges that she did not see a sex harassment policy memo posted in either the main office or in any of her assigned buildings. However, there is no *per se* rule that the absence of a written sexual harassment policy, standing alone, requires a finding that the employer failed to provide a reasonable avenue for complaint or knew of the harassment but did nothing of it. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1180 (1996).

Here, there is no allegation that Borrero was confused or concerned about her ability to reach Collins management to tell them about the incident. In fact, she called Jason Sardinas shortly after leaving the scene of the incident. In addition, there is no evidence that Borrero feared that her complaint would trigger any retaliatory animus against her. *Cf. Reed,* 95 F.3d at 1181 n. 2 (finding evidence of an unreasonable complaint procedure when plaintiff had "heard stories" about what happened to people in the company who complained of sex harassment). In addition, the presence of a viable retaliation claim does not preclude summary judgment on the issue of an employer's liability for a hostile work environment. *See Quinn,* 159 F.3d at 762 ("It sometimes happens [ ... ] that an employee whose primary claim of discrimination cannot survive pretrial dispositive motions is able to take to trial the secondary claim that he or she was fired or adversely affected in retaliation for asserting the primary claim.").

**\*13** In sum, though Borrero has successfully alleged conduct by a co-worker sufficiently severe to support an actionable sexual harassment claim under Title VII, she has

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 167 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

failed to allege a specific basis for imputing that conduct to Collins. Accordingly, her federal sex harassment claim must be dismissed.

## B. SUMMARY JUDGMENT IS NOT WARRANTED AS TO BORRERO'S FEDERAL RETALIATION CLAIM

Borrero's second federal claim (listed as her fourth cause of action in the Complaint) is for retaliatory discharge. The statute reads in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees [ ... ] because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The evaluation of retaliation claims requires a three-step burden shifting analysis under the standards enunciated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Richardson*, 180 F.3d at 443; *Cruz*, 202 F.3d at 567–68.

First, the plaintiff must make out a *prima facie* case of retaliation. [ ... ] Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained-of action. [ ... ] Third, if the defendant meets its burden, plaintiff must adduce evidence "sufficient to raise a fact issue as to whether the employer's reason was merely a pretext" for retaliation. [ ... ]

*Quinn*, 159 F.3d at 768–69 (internal citations omitted).

### 1. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision."

*Richardson*, 180 F.3d at 443; *e.g.*, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2000); *Cruz*, 202 F.3d at 566; *Quinn*, 159 F.3d at 769; *Reed*, 95 F.3d at 1178; *Feliciano*, 2002 WL 1492139, at *11. A plaintiff's burden at the prima facie stage of the burden-shifting analysis "is not onerous." *Richardson*, 180 F.3d at 444 n. 4; *see Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (describing the burden of proof on an employment-discrimination plaintiff at the prima facie stage as *de minimus*).

#### a. Participation in a Protected Activity Known to the Defendant

To establish participation in a protected activity, a plaintiff "need not prove that the conditions against which [she] protested actually amounted to a violation of Title VII." *Wimmer v. Suffolk County Police Dep't.*, 176 F.3d 125, 134 (2d Cir.1999). Rather, the plaintiff must demonstrate only a "good faith, reasonable belief" that the underlying challenged actions by the employer violated the law. *Id*. Furthermore, a plaintiff may state a prima facie case of retaliation even when her primary claim for discrimination does not suffice to survive summary judgment. *Wimmer*, 176 F.3d at 136; *See Quinn*, 159 F.3d at 769 ("[I]t is possible for an employee to reasonably believe that the specified conduct amounts to harassment, even when that conduct would not actually qualify as harassment under the law.").

**\*14** **[4]** Borrero's complaint to Collins management regarding Uribe's alleged conduct suffices as a protected activity within the meaning of the statute. *Cf. Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (holding that the discrimination statute applies not only to formal discrimination complaints, but also to "informal protests of discriminatory employment practices, including making complaints to management"). Borrero's complaint to the police regarding Uribe's alleged conduct was also a protected activity. *See DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (holding that pursuing a criminal proceeding against an alleged harasser is a protected activity because " 'Congress sought to protect a wide range of activity in addition to the filing of a formal complaint' ") (quoting

*Grant v. Hazlett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989)).

There is no dispute that one member of Collins management, Jason Sardinas, knew of Borrero's call to the police following the July 28 incident. Borrero further testified that she informed Andres Sardinas about speaking to the police during their meeting a few hours after the incident. In sum, Borrero has satisfied the first prong of the prima facie burden.

### b. Adverse Employment Action

**[5]**    The Second Circuit has recognized that Title VII does not "define adverse employment action solely in terms of job termination or reduced wages and benefits, and that less flagrant reprisals may indeed be adverse."

*Richardson,* 180 F.3d at 446 (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). A plaintiff must demonstrate that the employment action was a "materially adverse change in the terms and conditions of her employment." *Richardson,* 180 F.3d at 446. The case law of this Circuit has established several relevant factors:

> [T]o be "materially adverse" a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*O'Dell,* 153 F.Supp.2d at 395 (citing *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (omissions in original). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Richardson,* 180 F.3d at 446 (quoting *Wanamaker,* 108 F.3d at 466).

Borrero has alleged sufficient facts to make a prima facie showing of an adverse employment action. Prior to the incident, Borrero worked as a Vacation Replacement. She worked multiple days a week for several weeks. In the hours immediately following the bathroom incident and her subsequent call to the police, Andres Sardinas offered Borrero a putatively better position, that of the Day–to–Day Replacement. The Day–to–Day position commands a higher salary than that of the Vacation Replacement. Furthermore, unlike the Vacation Replacement position, the Day–to–Day job does not necessarily end in September, but has the potential to continue to provide opportunities for assignments throughout the year.

**\*15**    Borrero alleges that in the weeks following her complaint to the police that, aside from three occasions, she ceased receiving phone calls from Collins providing opportunities to partake in work assignments. She alleges that she only received the first assignment by calling the office directly. Borrero contends that Collins failed to increase Borrero's salary to the rate associated with the new position. Finally, the parties do not dispute that her position was terminated six weeks after the incident. These allegations, if proven, are sufficient indicia of an adverse employment action to satisfy the second prong of the prima facie burden.

### c. Causal Connection

**[6]**    A plaintiff may show a causal connection between the protected activity and the adverse employment action in a variety of ways. Evidence of "retaliatory animus directed against the plaintiff" may establish the causal connection directly. *Richardson,* 180 F.3d at 447. A plaintiff may also demonstrate a causal connection indirectly "by showing that the protected activity was followed closely by the discriminatory treatment [ ... ] or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Id.* at 444, 447 (quoting *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987). *Compare Quinn,* 159 F.3d at 769 (finding causal connection prong of prima facie case of retaliatory discharge satisfied when defendant employer discharged the plaintiff less than two months after she filed a harassment complaint) *with Richardson,* 180 F.3d at 447 (finding a "two year gap is too wide to support the inference that she was terminated in retaliation for complaining about the discrimination"). A Title VII violation occurs if "a retaliatory motive played a part

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 169 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

in the adverse employment actions even if it was not the sole cause." *Sumner,* 899 F.3d at 209.

Here, Borrero alleges that when she phoned Collins after the July 28 incident, Jason Sardinas pleaded with her not to call the police, citing the need to protect the reputation of the company. The parties do not dispute that he knew of her subsequent call to the police. However, Borrero alleges that when Andres Sardinas offered her a better job to "keep [her] quiet" and to prevent things from "escalating," he did not yet know of her contact with the police. Rather, she allegedly informed him of her decision to contact the police after he had already offered to improve her position and salary.

Borrero allegedly ceased receiving calls for work assignments in the weeks immediately following her complaint to the police and to Collins. Approximately six weeks later, Collins discharged her. This short time-frame supports an inference that there was a causal connection between her complaints to the police and to Collins management and her decreased opportunities to earn income and subsequent termination. Accordingly, Borrero has satisfied the final prong of her prima facie claim of retaliation.

### 2. *A Legitimate, Non–Retaliatory Reason for the Adverse Employment Action*

**\*16**  **[7]**  Once a plaintiff demonstrates a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason why the adverse action occurred.

*See, e.g., Cruz,* 202 F.3d at 576; *Richardson,* 180 F.3d at 445; *Quinn,* 159 F.3d at 769–70. Borrero has raised a prima facie case of two adverse employment actions, (1) that Collins essentially stopped calling her with work assignments after the July 28 incident, and (2) terminated her employment six weeks later.

With regard to Borrero's contention that Collins stopped calling her with work assignments, Collins contends that the nature of Borrero's new position inherently entailed fewer days of work per week than her prior position. Vacation Replacements replace vacationing employees who are likely to take consecutive days of vacation, while Day–To–Day cleaners replace those who call in sick on a day by day basis, resulting in fewer days of work per week for the Day–to–Day replacements. *See* Defendant's Reply Brief at 11. According to Collins, therefore, a Day–to–Day replacement is only needed "sporadically." *See Id.*

With respect to Borrero's termination, Collins alleges that Borrero was fired because she did not take the assignments offered to her. Two of the Collins staff members responsible for distributing assignments affirmed that Borrero did not respond to several phone calls offering new assignments and that she declined two assignments. *See* Villacis Affidavit at ¶¶ 6–7; Cruz Affidavit at ¶¶ 6–7. Both staff members deny that Borrero contacted them for new assignments. *See* Villacis Affidavit at ¶ 8; Cruz Affidavit at ¶ 8. Collins argues that Borrero's apparent unavailability to work motivated the decision to terminate her employment.

Collins' offer of proof satisfies Collins' burden of articulating a legitimate, non-retaliatory reasons for the substantial reduction in Borrero's assignments, as well as for her subsequent termination.

### 3. *Pretext*

The evidence raises triable issues of fact as to whether Collins' proffered reasons for Borrero's reduction in assignments and eventual termination were merely pretext for retaliation. The parties do not dispute that the incident with Uribe triggered the initial alteration in Borrero's terms of employment. There is a strong temporal correlation, however, between her call to the police and to Collins management and her subsequent termination. *See* Quinn, 159 F.3d at 770 (finding "strong temporal correlation" sufficient to raise a triable issue of pretextual retaliation where plaintiff's discharge occurred less than two months following her harassment complaint to management and "just ten days after filing a complaint with the [New York Division of Human Rights]"). Borrero has introduced evidence that despite Andres Sardinas' promise of a higher paying position, she was not actually paid at that rate. *See* "Earnings Statement" appended to Plaintiff's Brief as Exh. 2.

**\*17**  In light of the factual disputes, such as whether Collins actually attempted to reach Borrero with new assignments, a reasonable factfinder could infer an improper retaliatory motive behind Borrero's reduction in assignments and subsequent termination. Accordingly, Collins' motion for summary judgment on the federal retaliation claim is denied.

### C. COLLINS' CLAIM OF PROCEDURAL DEFICIENCY IS MERITLESS

**[8]**  Collins argues that summary judgment should also be granted because of a procedural deficiency in Borrero's

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 170 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

opposition to summary judgment. Collins contends that Borrero's opposition to summary judgment is legally deficient, because "the only affidavit that Plaintiff has put forth in opposition to [defendant's] motion is that of her attorney, Louis Ginsberg." Defendant's Reply Brief at 1. Collins further claims that Borrero failed to oppose summary judgment with an affidavit of Borrero herself, or anyone with personal knowledge of the underlying facts of the matter. *See id.* at 3.

Collins' argument is without merit. In opposing summary judgment, plaintiff has submitted excerpts of Borrero's sworn deposition testimony from December 5, 2001. Plaintiff's attorney, Louis Ginsberg, swore to an affidavit that simply introduced the evidence submitted in opposition to summary judgment. Notably, defendant's attorney, Frank Occhipinti, also swore to an affidavit introducing the defendant's evidence. Furthermore, defendant's evidence includes excerpts from the same December 5, 2001 deposition of Borrero. Contrary to the defendant's assertion, therefore, the plaintiff's evidence in opposition to summary judgment included the sworn testimony of an individual with personal knowledge of the matter. *Cf. Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986) (finding attorney affidavit insufficient to defeat summary judgment when accompanied by unsworn documents). Accordingly, this Court finds defendant's procedural claim to be without merit.

## V. LEGAL ANALYSIS—STATE AND MUNICIPAL LAW CLAIMS

 **[9]**    Borrero's remaining claims arise under the Human Rights laws of New York state and New York city. The analysis of claims brought under the state and municipal human rights laws directly parallels the Title VII analysis; thus, the balance of Borrero's claims may be considered in tandem with her federal law claims. *See, e.g., Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001); *Cruz,* 202 F.3d at 565 n. 1; *O'Sullivan v. N.Y. Times,* 37 F.Supp.2d 307, 313 (S.D.N.Y.1999); *Landwehr v. Grey Adver. Inc.,* 211 A.D.2d 583, 583, 622 N.Y.S.2d 17 (1st Dept.1995) (applying *McDonnell Douglas* burden-shifting standards to state and municipal law discrimination claims).

Pursuant to 28 U.S.C. § 1367, a district court shall have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Accordingly, for the reasons set forth above dismissing the federal sex harassment claim, the state and municipal sexual harassment claims are dismissed with prejudice. Similarly, as this Court finds that the parties have raised triable issues of fact associated with the federal retaliation claim, for the reasons set forth above this Court exercises supplemental jurisdiction over the remaining state and city retaliation claims.

## VI. CONCLUSION

 **\*18**   For the reasons set forth above, defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is GRANTED IN PART and DENIED IN PART. Accordingly, defendant's motion is GRANTED with respect to the federal, state, and municipal law sexual harassment claims, and is DENIED with respect to the federal, state, and municipal law retaliation claims.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 31415511

## Footnotes

1    Unless otherwise stated, the facts discussed herein are undisputed and are drawn from the parties' submissions, including statements pursuant to Local Rule 56.1 (Statements of Material Fact on Motion for Summary Judgment). According to Local Rule 56.1(c), all material facts set forth in the moving party's statement of facts will be deemed admitted unless controverted by the opposing party.

2    Both plaintiff and defendant have submitted excerpts of the December 5, 2001 Borrero Deposition. Defendant's excerpts are appended to Defendant's Notice of Motion as Exh. D; other excerpts are appended

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

to the Affidavit of Frank S. Occhipinti in support of Defendant's motion for summary judgment ("Occhipinti Affidavit") as Exh. C.

3      Defendant's 56.1 Statement at ¶ 28 alleges that Borrero's August assignment was on August 7, 2000. This claim is not reflected in the defendant's appended payroll records, which instead reflect the date of August 14, 2000.

4      *Richardson* addresses a race-based hostile environment claim under Title VII. The analysis of race-based hostile environment claims parallels the analysis applied to sex-based hostile environment claims. *See* 🚩 *Richardson,* 180 F.3d at 436 n. 2.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31415511
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mahagany BORRERO, Plaintiff,

v.

COLLINS BUILDING SERVICES, INC. Defendant.

No. 01 Civ. 6885(AGS)

|

Oct. 25, 2002.

**Synopsis**

Terminated female employee brought action against former employer, alleging sexual harassment and retaliation under Title VII, New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL). On employer's motion for summary judgment, the District Court, Schwartz, J., held that: (1) male harasser's sexual conduct towards female employee was sufficiently severe to alter conditions of her employment and create sexually abusive working environment; (2) male harasser was not employee's supervisor, as would support holding employer absolutely liable for allegedly sexually hostile work environment that harasser created; (3) employer was not vicariously liable for harasser's sexually harassing conduct; (4) employee established prima facie case of retaliation; and (5) fact questions as to whether employer's proffered reasons for reducing female employee's assignments immediately after she complained of sexual harassment, and for subsequently terminating employee, were pretexts for retaliation, precluded summary judgment.

Motion granted in part, and denied in part.

West Headnotes (9)

[1]    **Civil Rights** 🔑 Hostile environment;
       severity, pervasiveness, and frequency

       Male harasser's sexual conduct towards female employee, of allegedly trapping her in bathroom, physically restraining her, unbuttoning some of his clothing, forcing employee to touch his chest, and forcing her to feel his erection against her leg, was sufficiently severe to alter conditions of her employment and create sexually abusive

working environment in violation of Title VII; harassing conduct was objectively and subjectively offensive. Civil Rights Act of 1964, § 701 et seq., 🚩42 U.S.C.A. § 2000e et seq.

[2]    **Civil Rights** 🔑 Vicarious liability;
       respondeat superior

       Male harasser, who allegedly sexually harassed female employee, was not employee's supervisor, as would support holding employer absolutely liable, under Title VII, for allegedly sexually hostile work environment that harasser created; harasser lacked authority to make tangible employment decisions with regards to employee's conditions of employment. Civil Rights Act of 1964, § 701 et seq., 🚩42 U.S.C.A. § 2000e et seq.

       1 Case that cites this headnote

[3]    **Civil Rights** 🔑 Knowledge or notice;
       preventive or remedial measures
       **Civil Rights** 🔑 Vicarious liability;
       respondeat superior

       Employer was not vicariously liable, under Title VII, for alleged sexual harassment by male co-worker towards female employee; even if employer did not have written anti-harassment policy, employer provided reasonable avenue of complaint to employee, in that, she knew to, and was able to, contact management shortly after alleged harassing incident occurred, and employer took swift remedial action as soon as it learned of the harassment. Civil Rights Act of 1964, § 701 et seq., 🚩42 U.S.C.A. § 2000e et seq.

       4 Cases that cite this headnote

[4]    **Civil Rights** 🔑 Activities protected

       Female employee's complaint to management, as well as her complaint to police, about male co-worker's alleged sexually harassing conduct towards her, constituted protected activity, as would support prima facie case of retaliation under Title VII; management was aware of

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 173 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

complaint to police. Civil Rights Act of 1964, § 701 et seq., ⚑ 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[5]** **Civil Rights** 🗝 Particular cases

Employer's alleged failure to provide employee with opportunities to partake in work assignments, and its subsequent termination of female employee after she complained of sexual harassment by male co-worker, constituted adverse employment actions, as would support prima facie case of retaliation under Title VII. Civil Rights Act of 1964, § 701 et seq., ⚑ 42 U.S.C.A. § 2000e et seq.

**[6]** **Civil Rights** 🗝 Causal connection; temporal proximity

Employer's alleged immediate failure to provide female employee with opportunities to partake in work assignments after she complained to management and police about sexual harassment by male co-worker, as well as employer's subsequent termination of employee six weeks later, supported inference that there was causal connection between employee's complaints and decreased opportunities to earn income and subsequent termination, as required for prima facie case of retaliation under Title VII. Civil Rights Act of 1964, § 701 et seq., ⚑ 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[7]** **Civil Rights** 🗝 Questions of law or fact

**Summary Judgment** 🗝 Employment Practices; Discrimination

Fact questions as to whether employer's proffered reasons for reducing female employee's assignments immediately after she complained of sexual harassment, and for subsequently terminating employee, were pretexts for retaliation, precluded summary judgment in Title VII action. Civil Rights Act of

1964, § 701 et seq., ⚑ 42 U.S.C.A. § 2000e et seq.

**[8]** **Summary Judgment** 🗝 Form and Requisites

Employee's opposition to summary judgment in employment discrimination action was not procedurally deficient, although employee did not offer affidavit; employee's attorney swore to affidavit that introduced employee's sworn deposition testimony in opposition to motion, and thus opposition included sworn testimony of individual with personal knowledge. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[9]** **Civil Rights** 🗝 Sexual Harassment; Work Environment

**Civil Rights** 🗝 Retaliation for Exercise of Rights

Analysis of sexual harassment and retaliation claims brought under New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL) directly parallels Title VII analysis of such claims. Civil Rights Act of 1964, § 701 et seq., ⚑ 42 U.S.C.A. § 2000e et seq.; ⚑ McKinney's Executive Law § 296 et seq.; New York City Administrative Code, § 8–101 et seq.

---

*MEMORANDUM ORDER*

SCHWARTZ, J.

**I. INTRODUCTION**

 **\*1** Plaintiff Mahagany Borrero, a temporary office cleaner for defendant Collins Building Services, Inc., brings this action for harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, ⚑ 42 U.S.C. § 2000e *et seq.,* as well as for violations of various New York state and municipal laws. Defendant has moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendant's motion is granted in part and denied in part.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 174 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

## II. FACTUAL BACKGROUND [1]

*Defendant's Practice of Hiring Temporary Cleaners*
Defendant Collins Building Services, Inc. ("Collins") provides office-cleaning services to commercial buildings in the metropolitan New York area. Its employees are "predominately [sic] porters who dust and vacuum offices, remove trash from offices and buildings, clean lavatories, replenish lavatory supplies and [perform] related activities." Statement of Defendant Pursuant to Local Civil Rule 56 .1 ("Defendant's 56.1 Statement") at ¶ 1; Counter 56.1 Statement of Material Facts ("Plaintiff's 56.1 Statement") at ¶ 1.

Collins hires two types of temporary office cleaners, "Vacation Replacements" and "Day-to-Day Replacements." *See* Plaintiff's 56.1 Statement at ¶¶ 6, 27–28; Defendant's 56.1 Statement at ¶¶ 6, 27. Collins' unionized employees typically take vacations between April and September. *See* Affidavit of Jason Sardinas ("J. Sardinas Affidavit"), appended to Defendant's Notice of Motion at ¶ 3. Collins hires temporary non-union workers, known as "Vacation Replacements," to fulfill the duties of the vacationing employees. *Id.* The duties of a Vacation Replacement generally end in September, at the conclusion of the vacation season. *See* Plaintiff's 56.1 Statement at ¶ 27; J. Sardinas Affidavit at ¶ 3.

Similarly, Collins hires "Day-to-Day" replacements to fulfill the duties of unionized employees who call in sick or are otherwise unable to report to work on a particular day. *See* J. Sardinas Affidavit at ¶ 26. Collins does not dispute that, in contrast to the Vacation Replacement position, the Day-to-Day position lacks a natural ending point in the calendar year. *See* Defendant's Reply Memorandum of Law in Support of Collins' Motion for Summary Judgment ("Defendant's Reply Brief") at 2. In addition, the Day-to-Day position commands a higher pay rate than that of the Vacation Replacement position. *See* Deposition of Mahagany Borrero ("Borrero Dep.") appended to Affidavit of Louis Ginsberg in support of Plaintiff's opposition to summary judgment ("Ginsberg Affidavit") as Exhibit ("Exh.") 6, at 140–41; Defendant's Memorandum of Law in Support of Collins Building Services, Inc.'s Motion for Summary Judgment ("Defendant's Brief") at 11. [2]

According to Collins, staff members distribute assignments by telephone to Day-to-Day Replacements and Vacation Replacements on a random basis. *See* Defendant's 56.1

Statement at ¶ 27; Villacis Affidavit at ¶ 5; Cruz Affidavit at ¶ 5; Plaintiff's 56.1 Statement at ¶ 27. Collins further contends that, of the individuals eligible for Day-to-Day assignments, those who are able to work on short notice receive the majority of assignments. Defendant's 56.1 Statement at ¶ 27; Villacis Affidavit at ¶ 5; Cruz Affidavit at ¶ 5; Plaintiff's 56.1 Statement at ¶ 27.

*Plaintiff's Employment With Collins Prior to the July 28, 2000 Incident*
 **\*2**  On June 28, 2000, Jason Sardinas, a manager in Collins' Human Resources Department, interviewed and hired Mahagany Borrero as a Vacation Replacement. *See* Defendant's 56.1 Statement at ¶¶ 1, 6; Plaintiff's 56.1 Statement at ¶¶ 1, 6. Borrero disputes Collins' contention that, at the time of her interview, Borrero requested the Day-to-Day position, but accepted the Vacation Replacement position when no openings in the Day-to-Day role were available. *See* Plaintiff's 56.1 Statement at ¶ 6; Defendant's 56.1 Statement at ¶ 6. At the time of her hiring, Borrero signed a document that read, in part:

> This acknowledges that I am being hired as a vacation or Day-today [sic] replacement, and it is understood that this is a temporary position. CBS [Collins] can terminate my temporary position when my services are no longer needed.

Defendant's 56.1 Statement at ¶ 6; Plaintiff's 56.1 Statement at ¶ 6; Borrero Dep. at 17–18; "Some Employee Work Rules" appended to Ginsberg Affidavit as Exh. 5.

Borrero disputes Collins' contention that Sardinas provided her with a telephone number for the purpose of speaking with a Collins supervisor or to report any difficulty with respect to her work. *See* Defendant's 56.1 Statement at ¶ 7; Plaintiff's 56.1 Statement at ¶ 7. Borrero claims that she was led to believe that her supervisors would be located at her assigned buildings. *See* Plaintiff's 56.1 Statement at ¶ 7. At her deposition, Borrero recounted her interaction with people she described as supervisors:

A. Typical day I would come in on time, more or less I had to be at work at nine or ten o'clock. I punch in, change in my

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 175 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

uniform. Stock up—I had a cart I had to stock it up with toilet tissue and napkins and garbage bags and I would go to each floor that I'm assigned to and clean up the ladies room.

Q. And how would you get the assignment to each particular floor?

A. The supervisor normally give [sic] it to me

Q. You're talking about supervisors on the job site -

A. Yes.

Q. at the buildings? And you change in your uniform in what, a locker room of some type or room set aside for Collins employees?

A. Yes.

Q. Was there such a room in each building you worked in?

A. Yes.

Q. And who would be in charge of that room, would there be somebody stationed there all the time?

A. Being that I was a vacation replacement normally the lady that I'm replacing that was like her room [sic] and they would give me the keys and I would change my clothes.

Q. Who would give you the keys?

A. A supervisor.

Borrero Dep. at 27–29.

Borrero commenced work as a Vacation Replacement on July 3, 2000. She completed assignments at three buildings over the course of four weeks during the month of July. From July 3–7, she worked four eight-hour shifts at 125 Park Avenue; from July 10–14, she worked one eight-hour shift at 125 Park Avenue; from July 17–21, she worked four 4–hour shifts at 660 Madison; and from July 24–28, she worked four four-hour shifts at 660 Madison and three three-hour shifts at 919 Third Avenue. *See* Plaintiff's 56.1 Statement at ¶¶ 9, 10, 13; Defendant's 56.1 Statement at ¶¶ 9, 10, 13; "Weekly Payroll" records appended to Defendant's Notice of Motion as Exhibits ("Exhs.") E–H.

*Plaintiff's Initial Encounters with Oscar Uribe at 660 Madison*

**\*3** Borrero met Oscar Uribe on Monday, July 17, 2000, the first day of her two-week assignment to 660 Madison Avenue ("660 Madison"). *See* Plaintiff's 56.1 Statement at ¶ 10; Defendant's 56.1 Statement at ¶ 10; Borrero Dep. at 44. Plaintiff contends that when Aris Pacheco, a Collins staff member, telephoned with this assignment, Pacheco identified Uribe as Borrero's supervisor at 660 Madison. *See* Borrero Dep. at 30; Plaintiff's 56.1 Statement at 14. Pacheco further instructed Borrero to ask for Uribe upon her arrival. *See* Borrero Dep. at 44. Borrero recounted her first encounter with Uribe in her deposition:

> When I walked in the morning [sic] he told me to wait for him downstairs. It was [ ... ] like a little locker room [ ... ], like a janitor room and I waited for him downstairs. He came, he told me, you know, what it's [sic] expected of me, where I can get the supplies downstairs in the basement and the cart and that was about it.

*See* Borrero Dep. at 44. Of the two weeks Borrero worked at 660 Madison, July 17th was the only day Borrero checked in with Uribe prior to beginning her duties. *Id.* at 60. Collins denies that Uribe was Borrero's supervisor, describing him as a Day Porter "responsible for various cleaning tasks as needed throughout the building." *See* Defendant's 56.1 Statement at ¶ 14; "Weekly Payroll" appended to Defendant's Notice of Motion as Exh. F at 0105.

Initially, Borrero's alleged encounters with Uribe were pleasant. *See* Borrero Dep. at 52. While Borrero lunched alone in the basement supply room on July 17th, Uribe entered and chatted with her for about twenty minutes, making "small talk." *See id.* The next time she encountered Uribe was Friday, July 19th. *See* Borrero Dep. at 60–61. Their conversation lasted only a few minutes, and Uribe told Borrero that she was beautiful. *See id.* Borrero testified that this encounter did not cause her to feel uncomfortable. *See id.*

During the following week, Uribe's overtures towards Borrero escalated. On Monday, July 24th, Borrero encountered Uribe

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 176 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

in the basement supply room. *See* Borrero Dep. at 67–69. During a fifteen-minute conversation, he again told Borrero that she was beautiful, and asked her out on a date. *See id.* at 67. She declined, telling Uribe that she was married. *See id.* When Uribe kept pressuring Borrero to go out with him, she cut the conversation short and left the room. *See id.* Borrero testified that this conversation made her uncomfortable because "[she] was telling him all the things [she] was telling him and to [her] he seemed like he didn't want to back off." *Id.* at 69. Borrero did not report the conversation to anyone at Collins. *See id.* She felt that since she had clearly communicated her lack of interest to Uribe, she did not expect him to proposition her again. *See id.*

The next day, however, Uribe renewed his advances. During Borrero's lunch break on July 25 [th], Uribe entered the room with another Collins employee. *See id.* at 72. When the third individual left the room, Uribe repeatedly asked Borrero to go out with him. *See id.* at 73. Again, she declined, this time asking him to leave her alone. *See id.* At one point, he put his arm across her shoulders, which she shrugged off. *See id.* In addition, he gave her a piece of paper with his phone and beeper numbers written on it. *See id.* at 73–74. She told him she would not call him, took the paper "so he wouldn't bother [her] about the situation any more," and threw away the paper later that day. *See id.* at 74.

 **\*4** Borrero described this incident and her general discomfort with Uribe's persistent advances to a co-worker identified only as "Thomas." *See id.* at 77. Thomas advised her to try to stay away from Uribe during the conclusion of her assignment at 660 Madison. *See id.* at 82.

### The July 28 [th] Incident

Borrero did not encounter Uribe again until Friday, July 28, 2000. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. Borrero noticed a water leak in the 17 [th] floor ladies' room. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. She informed another Collins employee about the leak, who said he would page Uribe to attend to it. *See* Defendant's 56.1 Statement at ¶ 15; Plaintiff's 56.1 Statement at ¶ 15. Borrero claims that the employee instructed her to wait at the scene of the leak, clear the bathroom of visitors, and await Uribe's arrival. *See* Borrero Dep. at 93. Borrero further understood that the employee with whom she spoke would come up to the ladies room with Uribe. *See id.*

According to Borrero, Uribe arrived at the ladies' room alone. *See id.* at 94. As Borrero tried to leave the bathroom, Uribe allegedly blocked the door. *See id.* at 95. Borrero recalls that Uribe was carrying a mop, which he put on the floor. *See id.* at 95, 97. When Borrero told him to move out of the way, she contends that he continued to block her exit. *See id.* at 95. Uribe allegedly told Borrero that "he love[d] looking at [her] face and his heart starts pounding every time he sees [her]." *Id.* While saying this, he allegedly began to back Borrero further into the bathroom. *See id.* As Borrero tried to evade him, she claims she unbuttoned two or three buttons from the top of his work shirt. *See id.* at 95, 98. Uribe allegedly "grabbed" her hand and placed it on his chest, urging her to feel his racing heart. *See id.* at 95. Cursing at him to free her, Borrero contends she tried to pull away:

> I told him to get the F away from me and not to F'g touch me. And he still had my hand there and he didn't want to let it go. I was using a lot of force to get my hand off, to get him from holding my hand and with the other hand I was just trying to push him away and it didn't work.

Borrero Dep. at 96. At this point, Uribe had allegedly stepped close enough to Borrero such that his body was in physical contact with hers. *See* Borrero Dep. at 97.

> At that moment he told me look, and I didn't know what he was talking about and as he kept coming closer towards me, I felt his penis on my leg, and I was telling him, you know, what the hell is wrong with you. I told him you don't have no respect for women, and I was still trying to push him away being that he's a big man I couldn't. And at that moment his penis was erected [sic].

Borrero Dep. at 96. Borrero claims she "used all [her] might to push him away." *See id.* Uribe allegedly "stepped back a little with one leg" and Borrero left the room immediately. *Id.* The alleged incident occurred entirely inside the ladies' room. *See*

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 177 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

Borrero Dep. at 97. No one else was present in the bathroom. *See id.* at 99.

**\*5** After the alleged incident, Borrero immediately went to the basement supply room. *See id.* She was "kind of scared" and "just thinking of what to do." *Id.* She decided to go upstairs to speak with someone. *See id.* She spoke with her co-employee, Thomas, who advised her to call both the company and the police. *See id.* Borrero then called Jason Sardinas from the lobby of 660 Madison, at approximately 12:05pm. *See* Borrero Dep. at 100; Defendant's 56.1 Statement at ¶ 19; Plaintiff's 56.1 Statement at ¶ 19.

During the phone call, Borrero reported to Jason Sardinas that Uribe had made unwanted sexual advances. *See* Plaintiff's 56.1 Statement at ¶ 19; Defendant's 56.1 Statement at ¶ 19. Jason Sardinas said he would send someone from Collins to 660 Madison, and instructed Borrero to avoid Uribe. *See* Plaintiff's 56.1 Statement at ¶ 20; Defendant's 56.1 Statement at ¶ 20; Borrero Dep. at 100. Borrero contends that during their telephone conversation, Sardinas begged her not to call the police, citing the need to protect the company's reputation. *See* Borrero Dep. at 100; Plaintiff's 56.1 Statement at ¶ 20.

Borrero called the police immediately after speaking to Jason Sardinas. *See* Borrero Dep. at 101. Police arrested Uribe at 660 Madison and took him into custody. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24; Borrero Dep. at 101, 103–07. Uribe was eventually charged with the violation offense of disorderly conduct under section 240.20 of the New York Penal Law. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. That charge was subsequently adjourned in contemplation of dismissal. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Uribe both agreed to and complied with an order of protection prohibiting any contact with Borrero. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Following the July 28, 2000 incident, Borrero did not encounter Uribe again. *See* Borrero. Dep. at 175.

### The Meeting at Collins' Offices on the Afternoon of the Incident

Approximately twenty minutes after receiving Borrero's phone call about the bathroom incident, Sardinas contacted George Droesch, a "route supervisor," and instructed Droesch to report to 660 Madison. *See* Plaintiff's 56.1 Statement at ¶ 21; Defendant's 56.1 Statement at ¶ 21. When Droesch arrived at 660 Madison at approximately 1:10 pm, he telephoned Sardinas to advise him that Borrero was speaking to the

police. *See* Plaintiff's 56.1 Statement at ¶ 21; Defendant's 56.1 Statement at ¶ 21. After Borrero finished speaking with the police, Droesch and Borrero returned to Collins' offices. *See* Plaintiff's 56.1 Statement at ¶ 22; Defendant's 56.1 Statement at ¶ 22.

Plaintiff claims she met with Jason Sardinas' father, Andres Sardinas, an Executive Vice President at Collins. *See* Borrero Dep. at 135; April 20, 1998 "Memorandum" appended to Ginsberg Affidavit as Exh. 3. Plaintiff contends Andres Sardinas offered to "get her more money" by changing her position from the Vacation Replacement role to the Day–to–Day position, in order to prevent the situation from "escalating" and to "keep [her] quiet." *See* Borrero Dep. at 135–36, 138–40. Borrero alleges that after he made this offer to change her position and salary, she told him that she had already informed the police. *Id.* at 140. Collins disputes her characterization of the meeting, claiming that it was Borrero who reiterated a previous request to change her current position to that of Day–To–Day. *See* Defendant's 56.1 Statement at ¶ 26; J. Sardinas Affidavit at ¶ 26. Collins has not submitted an affidavit by Andres Sardinas describing the meeting.

### Collins' Sexual Harassment Policy

**\*6** Collins claims that it had a sexual harassment policy in place prior to June 2000. *See* Defendant's 56.1 Statement at ¶ 2. In addition to hiring an outside consultant to train Collins' supervisory personnel on the subject of sexual harassment, all supervisors are required to inform employees of the company's policy. *See* Defendant's 56.1 Statement at ¶ 2; J. Sardinas Affidavit at ¶ 4. A memorandum describing the policy is supposed to be "conspicuously posted in areas where the staff will see it." *See* Defendant's 56.1 Statement at ¶ 4.

The memorandum announces Collins' "zero tolerance" for sexual harassment, defining sexual harassment as including:

> any unwanted physical contact such as touching, pinching or blocking movements; [ ... ] joking or teasing of a sexual nature; [ ... ] [and] continuing to express personal interest after being informed that the interest is unwelcome.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 178 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

April 20, 1998 "Memorandum" appended to Ginsberg Affidavit as Exh. 3. The memo directs employees who either witness or experience such harassment to advise a Labor Relations Manager at a telephone number provided in the memorandum, and states that any such complaints will be treated confidentially and investigated promptly. *See id.*

Borrero disputes that Collins had a policy in place prior to June of 2000. *See* Plaintiff's 56.1 Statement at ¶ 2. She further claims that she did not see the memo posted in any of her assigned buildings, nor did she see the policy posted in Collins' headquarters when she visited that location to retrieve her paychecks. *See* Borrero Dep. at 20–22; Plaintiff's 56.1 Statement at ¶ 4.

Borrero does not dispute that prior to her July 28, 2000 phone call to Jason Sardinas, neither she, nor anyone else had complained to Collins about any form of harassment or misconduct by Uribe. *See* Plaintiff's 56.1 Statement at ¶ 23; Defendant's 56.1 Statement at ¶ 23. On Monday, July 30, 2000, Collins suspended Uribe without pay for two weeks during the course of Collins' internal investigation of the incident. *See* Plaintiff's 56.1 Statement at ¶ 24; Defendant's 56.1 Statement at ¶ 24. Collins has not submitted evidence describing the results of the investigation. When Uribe returned to work, he was assigned to a separate building. *See* Plaintiff's 56.1 Statement at ¶ 25; Defendant's 56.1 Statement at ¶ 25. After July 28, 2000, Borrero did not encounter Uribe again. *See* Borrero Dep. at 175.

*Plaintiff's Employment With Collins After July 28, 2000*
The record reflects that during the six weeks following the July 28, 2000 incident, Borrero completed two work assignments at two buildings. On August 14 [th], she worked one eight-hour shift at 75 Wall Street; on September 6 [th], she worked one eight-hour shift at 2 Chase Manhattan Plaza. *See* "Weekly Payroll" records appended to Defendant's Notice of Motion as Exh. J. [3]

Borrero claims that, other than three occasions, she stopped receiving phone assignments from Collins after the July 28 incident. *See* Borrero Dep. at 187. She admits to turning down one assignment because she could not arrange childcare in time. *Id.* at 170. She contends that she received her first assignment after the incident only after calling the Collins office to ask for work. *Id.* at 169. Borrero further alleges that her paycheck did not reflect her salary increase from that of

the Vacation Replacement to that of the Day–to–Day position. *Id.* at 168, 171; "Earnings Statement" appended to Ginsberg Affidavit as Exh. 2. Borrero alleges that when she called the office to inquire about her incomplete paycheck, a Collins staff member informed Borrero of her termination. *Id.* at 171. Borrero's September 6, 2000 termination notice reflects no reason other than "your services are no longer needed." *See* "Termination Notice" appended to Ginsberg Affidavit as Exh. 4.

**\*7** Collins disputes Borrero's characterization of the six weeks between the July 28, 2000 incident and her termination. Collins contends that Borrero refused not one but "several" additional offers for Day–to–Day assignments. *See* Defendant's 56.1 Statement at ¶ 28; Villacis Affidavit at ¶ 6. One staff member testified that Borrero's mother called on one occasion to notify Collins of Borrero's unavailability for work; *see* Cruz Affidavit at ¶ 6. According to Collins, after several attempts to contact Borrero with a Day–to–Day assignment, Collins would occasionally receive no response at all. *Id.* at ¶ 7. Collins contends that "eventually, it was determined that her services were no longer needed and she was terminated for administrative reasons." *See* Defendant's 56.1 Statement at ¶ 29.

*Plaintiff's Claims in the Instant Action*
In light of the foregoing allegations, Borrero has filed the instant action against Collins pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming sexual harassment and termination in retaliation for her sexual harassment complaint. In addition, she has filed similar claims under N.Y. Exec. Law § 296 *et seq.* and N.Y.C.Code § 8–101 *et seq.* Borrero seeks fifteen million dollars in compensatory and punitive damages, attorney's fees, and the option to be reinstated to her former position. Collins moves for summary judgment pursuant to Fed.R.Civ.P. 56.

### III. LEGAL STANDARD
Summary judgment "shall be rendered forthwith" when the pleadings, depositions, answers to interrogatories, filed admissions, and affidavits together demonstrate "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact and all inferences and ambiguities are to be resolved in favor of the nonmoving party. *See, e.g., Cruz v. Coach Stores, Inc.,* 202 F.3d 560,

567 (2d Cir.2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

In the context of discrimination cases, the appropriateness of summary judgment is "a particularly delicate subject."

*Feliciano v. Alpha Sector, Inc.,* No. 00 CIV. 9309, 2002 WL 1492119, at *5 (S.D.N.Y. July 12, 2002). The Second Circuit has recognized that a "smoking gun" rarely exists in employment discrimination actions, and that the discrimination "is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). A discrimination victim, therefore, is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." *Id.* at 533. Consequently, courts must be "especially cautious in deciding whether to grant this drastic provisional remedy [i.e., summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi,* 191 F.3d at 135. Nonetheless, to survive summary judgment in a discrimination case, a plaintiff "must come forward with at least some credible evidence that the actions of the [defendants] were motivated by [ ... ] animus or ill will." *Grillo v. New York City Transit Auth.,* 291 F.3d 231, 234 (2d Cir.2002).

## IV. LEGAL ANALYSIS—FEDERAL CLAIMS

## A. SUMMARY JUDGMENT IS WARRANTED FOR BORRERO'S FEDERAL SEXUAL HARASSMENT CLAIMS

**\*8** Borrero's first federal cause of action is for sexual harassment in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"). The statute provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

> individual's race, color, religion, sex, or national origin [ ... ]

42 U.S.C § 2000e–2(a). To prevail on a claim that sexual harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish three elements. The plaintiff must show "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (citing *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)); *Howley v. Town of Stratford,* 217 F.3d 141, 153–54 (2d Cir.2000). Finally, the plaintiff must demonstrate that the conduct occurred because of her sex. *Alfano,* 294 F.3d at 374. Because Borrero has failed to establish the second of these three required elements of a Title VII harassment claim, her claim must be dismissed.

### 1. *A Factfinder Could Find that the Alleged Harassment Sufficed to Create an Abusive Working Environment*

**[1]**    A plaintiff alleging a hostile work environment must show "either that a single incident of harassment was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Alfano,* 294 F.3d at 374 (quoting *Cruz,* 202 F.3d at 570); *Howley,* 217 F.3d at 153. Considerations include "the frequency of the discriminatory conduct; its severity; *whether it is physically threatening* or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (emphasis added).

An isolated incident, if severe enough, can meet the threshold for a sexually hostile environment. *See Howley,* 217 F.3d at 154 (finding actionable claim when a public incident of sexually explicit verbal abuse challenged the competence of a female firefighter in hearing of her subordinates, creating a justifiable fear that she would be imperiled at fire scenes).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 180 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

*See also* *Faragher,* 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment."); *Alfano,* 294 F.3d at 374 ("[I]t is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace.").

**\*9** Courts must examine "all the circumstances" to assess whether an environment is sufficiently "hostile" or "abusive" to be actionable under Title VII. *Faragher,* 524 U.S. at 787 (citing *Harris,* 510 U.S. at 23). The sexually objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787; *Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999) (quoting *Pisano v. Torres,* 116 F.3d 625, 632 (2d Cir.1997)) (" 'Whenever the harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment." '). [4]

The Supreme Court has emphasized, however, that Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Faragher,* 524 U.S. at 788. "Ordinary" workplace socializing, such as "male-on-male horseplay or intersexual flirtation" do not constitute discriminatory conditions of employment. *Oncale,* 523 U.S. at 81. *Compare* *Cruz,* 202 F.3d at 571 (finding actionable sex harassment claim when, in addition to making sexually derogatory remarks, plaintiff's supervisor repeatedly backed plaintiff against a wall, while looking her up and down "in a way that's very uncomfortable," such that plaintiff had "to cut the conversation short" in order to extricate herself) *with* *O'Dell v. Trans World Entm't Co.,* 153 F.Supp.2d 378, 387 (S.D.N.Y.2001), *aff'd* 2002 U.S.App. LEXIS 14446 (2d Cir. July 16, 2002) (granting summary judgment to employer when co-worker and subsequent supervisor made unwelcome advances by inviting her out, professing his love via e-mail, and commenting on her appearance, and where plaintiff failed to allege any "inappropriate touching" or "a pattern of verbal abuse"). A "proper" application of

the standards for judging hostility under Title VII should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher,* 524 U.S. at 788 (internal quotations and citations omitted).

As alleged, Uribe's conduct on July 28, 2000 is objectively severe enough to satisfy the first element of an actionable sexual harassment claim under Title VII. Uribe allegedly blocked the door, trapping Borrero alone with him in the bathroom. According to Borrero, he physically restrained her, unbuttoned some of his clothing, forced her to touch his chest, and by compelling her to remain in contact with his body, forced her to feel his erection against her leg.

Even construing Uribe's language accompanying his actions as romantic or passionate, a reasonable factfinder could conclude that Uribe's conduct crossed the line from "merely offensive or boorish" to actionable harassment. *Cf.* *Cruz,* 202 F.3d at 571 (finding triable issue of fact where the physically threatening nature of the behavior at issue brought the case "over the line" from merely offensive behavior to actionable sexual harassment).

**\*10** Under *Faragher,* the sexually objectionable conduct must be both "objectively and subjectively offensive." 524 U.S. at 787. As stated above, a reasonable person could find that Uribe's conduct was offensive, thereby satisfying the objective prong of the sexually objectionable environment analysis. The evidence adduced satisfies the subjective prong of the analysis as well. Borrero's call to the police almost immediately after the alleged incident supports the inference that she subjectively found his conduct to have gone beyond "ordinary" flirtation to physically threatening her in a sexual manner.

A factfinder could further find that the alleged incident was extreme enough to "work a transformation of her workplace." An examination of all the circumstances reveals that prior to the July 28 incident, Uribe had consistently demonstrated unwillingness to accept Borrero's rejections of his overtures. The bathroom encounter marked a physical escalation of his advances. The nature of her work as an office cleaner for Collins required her to be alone in various rooms, including a small basement supply room. In the aftermath of this incident, Borrero could justifiably fear fulfilling the duties that might force her to be alone with Uribe once again. While a factfinder might reasonably conclude that Uribe's conduct

was insufficiently extreme "to amount to a change in the terms and conditions of employment," the evidence does not compel that result.

### 2. *Borrero Fails to Allege a Specific Basis for Imputing Liability To Her Employer*

Though Borrero has alleged facts sufficient to satisfy the first element of an actionable sexual harassment claim under Title VII, she has failed to demonstrate that a specific basis exists for imputing the objectionable conduct to her employer. Thus, the federal sex harassment claim must be dismissed.

#### a. The Standard for Imputing Employer Liability

An actionable sex harassment claim under Title VII requires a plaintiff to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Alfano,* 294 F.3d at 373 (citing *Perry,* 115 F.3d at 149); *Howley,* 217 F.3d at 154 (2d Cir.2000); *Feliciano,* 2002 WL 1492139, at *9. An employer is presumed absolutely liable if the victim's supervisor perpetrated the harassment, though the employer may interpose an affirmative defense to rebut that presumption. *Richardson,* 180 F.3d at 441 (citing *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Feliciano,* 2002 WL 1492139, at *9. When the alleged harasser is a co-worker, however, the plaintiff must demonstrate that the employer " 'failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." ' *Howley,* 217 F.3d at 154 (quoting *Richardson,* 180 F.3d at 441).

#### b. Uribe Was Not Borrero's Supervisor Within the Meaning of Title VII

**\*11**  **[2]**  In *Burlington Industries, Inc. v. Ellerth,* the Supreme Court established that an employer is presumed liable for harassment perpetrated by an employee's supervisor. 524 U.S. at 765. The rationale for subjecting an employer to vicarious liability for a supervisor's harassment rests on the assumption that a supervisor may have power to make a "tangible employment decision" with regards to the employee. *Id.* at 761–762. Tangible actions include "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. Thus, a supervisor has some power to alter the terms or conditions of their victim's employment:

> [O]ne co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

*Feliciano,* 2002 WL 1492139, at *10 (quoting *Burlington,* 524 U.S. at 762). *See also Faragher,* 524 U.S. at 803 ("[A] supervisor, whose 'power to supervise— [which may be] to hire and fire, and to set work schedules and pay rates—does not disappear [ ... ] when he chooses to harass through insults and offensive gestures than directly with threats of firing or promises of promotion." ').

Borrero alleges that Uribe was her supervisor when she worked at 660 Madison. Borrero testified that at her initial interview, Jason Sardinas led her to believe that her supervisors would be located at each of the buildings that she worked. These supervisors would give her keys to the supply room and give her the assignments for the floors she was to clean.

Borrero testified that a Collins staff member identified Uribe as her supervisor when giving Borrero her assignment to 660 Madison and instructed her to ask for Uribe upon her arrival at the building. When she met Uribe on July 17, 2000, "he told [her] ... what it's [sic] expected of me, where I can get the supplies downstairs in the basement and the cart." *See* Borrero Dep. at 44. Of the two weeks Borrero worked at that building, July 17 was the only day Borrero checked in with Uribe prior to beginning her duties. At one point, a fellow employee instructed her to page Uribe in order to attend to the flooded bathroom.

Collins disputes that Uribe was her supervisor. According to Collins, Uribe's job title was that of Day Porter and his duties included "various cleaning tasks as needed throughout the building." See Defendant's 56.1 Statement at ¶ 4.

Borrero has failed to allege facts sufficient to qualify Uribe as a supervisor within the meaning of Title VII. Even construing all facts in favor of the non-moving party, Uribe lacked the authority to make tangible employment decisions with regards to her conditions of employment. She has failed to allege facts supporting the inference that Uribe could shift her work schedule, alter her benefits, or change any other "tangible" condition of her employment. Thus, Uribe lacked the relevant supervisory powers that would qualify him as a supervisor within the meaning of Title VII. Cf. *Feliciano, 2002 WL 1492139, at \*10* (finding a co-worker was not a supervisor despite having some "oversight responsibility" over the plaintiff). Accordingly, for the purposes of a Title VII hostile environment analysis, Uribe was Borrero's co-worker.

*c. Collins is Not Liable for Uribe's Conduct*

**\*12** **[3]** When a co-worker is the source of alleged harassment, a plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley, 217 F.3d at 154* (quoting *Richardson,* 180 F.3d 441). *See also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (1998) ("When a co-employee—as distinct from a supervisor—is alleged to have engaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.") (Internal quotations omitted). Borrero has failed to raise a triable issue of fact regarding either the complaint procedure or Collins' response to her complaint. Accordingly, her federal hostile environment claim must fail.

Borrero admits that Collins had not received complaints about Uribe prior to that date. Borrero further admits that she did not inform Collins management about Uribe's intensifying advances or that Uribe was making her increasingly uncomfortable. Prior to the incident, the sole person she told was another co-worker. Thus, there is no evidence that Collins knew or should have known of the harassment in advance of the July 28, 2000 incident.

Immediately upon learning about the incident, Collins promptly suspended Uribe without pay for two weeks during the course of an internal investigation, and then reassigned him to a different building. Borrero did not encounter Uribe again during the remainder of her employment with Collins. Thus, as soon as Collins learned of the alleged harassment, swift remedial action occurred. Cf. *Howley, 217 F.3d at 156* (finding triable issue of inadequate employer response to a public incident of co-worker sex harassment when employer failed to mete discipline for five weeks, issued only a two-day suspension, and merely recommended that the harasser apologize to the complainant, but failed to take action to persuade him to do so).

Borrero also alleges that Collins lacked a sex harassment policy prior to June, 2000. However, she has not provided any evidence to support this conclusory assertion. Borrero further alleges that she did not see a sex harassment policy memo posted in either the main office or in any of her assigned buildings. However, there is no *per se* rule that the absence of a written sexual harassment policy, standing alone, requires a finding that the employer failed to provide a reasonable avenue for complaint or knew of the harassment but did nothing of it. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1180 (1996).

Here, there is no allegation that Borrero was confused or concerned about her ability to reach Collins management to tell them about the incident. In fact, she called Jason Sardinas shortly after leaving the scene of the incident. In addition, there is no evidence that Borrero feared that her complaint would trigger any retaliatory animus against her. Cf. *Reed, 95 F.3d at 1181 n. 2* (finding evidence of an unreasonable complaint procedure when plaintiff had "heard stories" about what happened to people in the company who complained of sex harassment). In addition, the presence of a viable retaliation claim does not preclude summary judgment on the issue of an employer's liability for a hostile work environment. *See Quinn, 159 F.3d at 762* ("It sometimes happens [ ... ] that an employee whose primary claim of discrimination cannot survive pretrial dispositive motions is able to take to trial the secondary claim that he or she was fired or adversely affected in retaliation for asserting the primary claim.").

**\*13** In sum, though Borrero has successfully alleged conduct by a co-worker sufficiently severe to support an actionable sexual harassment claim under Title VII, she has

failed to allege a specific basis for imputing that conduct to Collins. Accordingly, her federal sex harassment claim must be dismissed.

## B. SUMMARY JUDGMENT IS NOT WARRANTED AS TO BORRERO'S FEDERAL RETALIATION CLAIM

Borrero's second federal claim (listed as her fourth cause of action in the Complaint) is for retaliatory discharge. The statute reads in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees [ ... ] because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The evaluation of retaliation claims requires a three-step burden shifting analysis under the standards enunciated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Richardson*, 180 F.3d at 443; *Cruz*, 202 F.3d at 567–68.

First, the plaintiff must make out a *prima facie* case of retaliation. [ ... ] Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained-of-action. [ ... ] Third, if the defendant meets its burden, plaintiff must adduce evidence "sufficient to raise a fact issue as to whether the employer's reason was merely a pretext" for retaliation. [ ... ]

*Quinn*, 159 F.3d at 768–69 (internal citations omitted).

### 1. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision."

*Richardson*, 180 F.3d at 443; *e.g., Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2000); *Cruz*, 202 F.3d at 566; *Quinn*, 159 F.3d at 769; *Reed*, 95 F.3d at 1178; *Feliciano*, 2002 WL 1492139, at *11. A plaintiff's burden at the prima facie stage of the burden-shifting analysis "is not onerous." *Richardson*, 180 F.3d at 444 n. 4; *see Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (describing the burden of proof on an employment-discrimination plaintiff at the prima facie stage as *de minimus* ).

#### a. Participation in a Protected Activity Known to the Defendant

To establish participation in a protected activity, a plaintiff "need not prove that the conditions against which [she] protested actually amounted to a violation of Title VII." *Wimmer v. Suffolk County Police Dep't.*, 176 F.3d 125, 134 (2d Cir.1999). Rather, the plaintiff must demonstrate only a "good faith, reasonable belief" that the underlying challenged actions by the employer violated the law. *Id.* Furthermore, a plaintiff may state a prima facie case of retaliation even when her primary claim for discrimination does not suffice to survive summary judgment. *Wimmer,* 176 F.3d at 136; *See Quinn,* 159 F.3d at 769 ("[I]t is possible for an employee to reasonably believe that the specified conduct amounts to harassment, even when that conduct would not actually qualify as harassment under the law.").

*\*14* **[4]** Borrero's complaint to Collins management regarding Uribe's alleged conduct suffices as a protected activity within the meaning of the statute. *Cf. Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (holding that the discrimination statute applies not only to formal discrimination complaints, but also to "informal protests of discriminatory employment practices, including making complaints to management"). Borrero's complaint to the police regarding Uribe's alleged conduct was also a protected activity. *See DeWitt v. Lieberman,* 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (holding that pursuing a criminal proceeding against an alleged harasser is a protected activity because " 'Congress sought to protect a wide range of activity in addition to the filing of a formal complaint' ") (quoting

*Grant v. Hazlett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989)).

There is no dispute that one member of Collins management, Jason Sardinas, knew of Borrero's call to the police following the July 28 incident. Borrero further testified that she informed Andres Sardinas about speaking to the police during their meeting a few hours after the incident. In sum, Borrero has satisfied the first prong of the prima facie burden.

### b. Adverse Employment Action

**[5]**    The Second Circuit has recognized that Title VII does not "define adverse employment action solely in terms of job termination or reduced wages and benefits, and that less flagrant reprisals may indeed be adverse."

*Richardson,* 180 F.3d at 446 (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). A plaintiff must demonstrate that the employment action was a "materially adverse change in the terms and conditions of her employment." *Richardson,* 180 F.3d at 446. The case law of this Circuit has established several relevant factors:

> [T]o be "materially adverse" a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*O'Dell,* 153 F.Supp.2d at 395 (citing *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (omissions in original). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Richardson,* 180 F.3d at 446 (quoting *Wanamaker,* 108 F.3d at 466).

Borrero has alleged sufficient facts to make a prima facie showing of an adverse employment action. Prior to the incident, Borrero worked as a Vacation Replacement. She worked multiple days a week for several weeks. In the hours immediately following the bathroom incident and her subsequent call to the police, Andres Sardinas offered Borrero a putatively better position, that of the Day–to–Day Replacement. The Day–to–Day position commands a higher salary than that of the Vacation Replacement. Furthermore, unlike the Vacation Replacement position, the Day–to–Day job does not necessarily end in September, but has the potential to continue to provide opportunities for assignments throughout the year.

**\*15**    Borrero alleges that in the weeks following her complaint to the police that, aside from three occasions, she ceased receiving phone calls from Collins providing opportunities to partake in work assignments. She alleges that she only received the first assignment by calling the office directly. Borrero contends that Collins failed to increase Borrero's salary to the rate associated with the new position. Finally, the parties do not dispute that her position was terminated six weeks after the incident. These allegations, if proven, are sufficient indicia of an adverse employment action to satisfy the second prong of the prima facie burden.

### c. Causal Connection

**[6]**    A plaintiff may show a causal connection between the protected activity and the adverse employment action in a variety of ways. Evidence of "retaliatory animus directed against the plaintiff" may establish the causal connection directly. *Richardson,* 180 F.3d at 447. A plaintiff may also demonstrate a causal connection indirectly "by showing that the protected activity was followed closely by the discriminatory treatment [ ... ] or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Id.* at 444, 447 (quoting *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987). *Compare Quinn,* 159 F.3d at 769 (finding causal connection prong of prima facie case of retaliatory discharge satisfied when defendant employer discharged the plaintiff less than two months after she filed a harassment complaint) *with Richardson,* 180 F.3d at 447 (finding a "two year gap is too wide to support the inference that she was terminated in retaliation for complaining about the discrimination"). A Title VII violation occurs if "a retaliatory motive played a part

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 185 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

in the adverse employment actions even if it was not the sole cause." *Sumner,* 899 F.3d at 209.

Here, Borrero alleges that when she phoned Collins after the July 28 incident, Jason Sardinas pleaded with her not to call the police, citing the need to protect the reputation of the company. The parties do not dispute that he knew of her subsequent call to the police. However, Borrero alleges that when Andres Sardinas offered her a better job to "keep [her] quiet" and to prevent things from "escalating," he did not yet know of her contact with the police. Rather, she allegedly informed him of her decision to contact the police after he had already offered to improve her position and salary.

Borrero allegedly ceased receiving calls for work assignments in the weeks immediately following her complaint to the police and to Collins. Approximately six weeks later, Collins discharged her. This short time-frame supports an inference that there was a causal connection between her complaints to the police and to Collins management and her decreased opportunities to earn income and subsequent termination. Accordingly, Borrero has satisfied the final prong of her prima facie claim of retaliation.

### 2. *A Legitimate, Non–Retaliatory Reason for the Adverse Employment Action*

**\*16** **[7]** Once a plaintiff demonstrates a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason why the adverse action occurred.

*See, e.g., Cruz,* 202 F.3d at 576; Richardson, 180 F.3d at 445; Quinn, 159 F.3d at 769–70. Borrero has raised a prima facie case of two adverse employment actions, (1) that Collins essentially stopped calling her with work assignments after the July 28 incident, and (2) terminated her employment six weeks later.

With regard to Borrero's contention that Collins stopped calling her with work assignments, Collins contends that the nature of Borrero's new position inherently entailed fewer days of work per week than her prior position. Vacation Replacements replace vacationing employees who are likely to take consecutive days of vacation, while Day–To–Day cleaners replace those who call in sick on a day by day basis, resulting in fewer days of work per week for the Day–to–Day replacements. *See* Defendant's Reply Brief at 11. According to Collins, therefore, a Day–to–Day replacement is only needed "sporadically." *See Id.*

With respect to Borrero's termination, Collins alleges that Borrero was fired because she did not take the assignments offered to her. Two of the Collins staff members responsible for distributing assignments affirmed that Borrero did not respond to several phone calls offering new assignments and that she declined two assignments. *See* Villacis Affidavit at ¶¶ 6–7; Cruz Affidavit at ¶¶ 6–7. Both staff members deny that Borrero contacted them for new assignments. *See* Villacis Affidavit at ¶ 8; Cruz Affidavit at ¶ 8. Collins argues that Borrero's apparent unavailability to work motivated the decision to terminate her employment.

Collins' offer of proof satisfies Collins' burden of articulating a legitimate, non-retaliatory reasons for the substantial reduction in Borrero's assignments, as well as for her subsequent termination.

### 3. *Pretext*

The evidence raises triable issues of fact as to whether Collins' proffered reasons for Borrero's reduction in assignments and eventual termination were merely pretext for retaliation. The parties do not dispute that the incident with Uribe triggered the initial alteration in Borrero's terms of employment. There is a strong temporal correlation, however, between her call to the police and to Collins management and her subsequent termination. *See* Quinn, 159 F.3d at 770 (finding "strong temporal correlation" sufficient to raise a triable issue of pretextual retaliation where plaintiff's discharge occurred less than two months following her harassment complaint to management and "just ten days after filing a complaint with the [New York Division of Human Rights]"). Borrero has introduced evidence that despite Andres Sardinas' promise of a higher paying position, she was not actually paid at that rate. *See* "Earnings Statement" appended to Plaintiff's Brief as Exh. 2.

**\*17** In light of the factual disputes, such as whether Collins actually attempted to reach Borrero with new assignments, a reasonable factfinder could infer an improper retaliatory motive behind Borrero's reduction in assignments and subsequent termination. Accordingly, Collins' motion for summary judgment on the federal retaliation claim is denied.

### C. COLLINS' CLAIM OF PROCEDURAL DEFICIENCY IS MERITLESS

**[8]** Collins argues that summary judgment should also be granted because of a procedural deficiency in Borrero's

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 186 of 331

Borrero v. Collins Bldg. Services, Inc., Not Reported in Fed. Supp. (2002)

opposition to summary judgment. Collins contends that Borrero's opposition to summary judgment is legally deficient, because "the only affidavit that Plaintiff has put forth in opposition to [defendant's] motion is that of her attorney, Louis Ginsberg." Defendant's Reply Brief at 1. Collins further claims that Borrero failed to oppose summary judgment with an affidavit of Borrero herself, or anyone with personal knowledge of the underlying facts of the matter. *See id.* at 3.

Collins' argument is without merit. In opposing summary judgment, plaintiff has submitted excerpts of Borrero's sworn deposition testimony from December 5, 2001. Plaintiff's attorney, Louis Ginsberg, swore to an affidavit that simply introduced the evidence submitted in opposition to summary judgment. Notably, defendant's attorney, Frank Occhipinti, also swore to an affidavit introducing the defendant's evidence. Furthermore, defendant's evidence includes excerpts from the same December 5, 2001 deposition of Borrero. Contrary to the defendant's assertion, therefore, the plaintiff's evidence in opposition to summary judgment included the sworn testimony of an individual with personal knowledge of the matter. *Cf. Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986) (finding attorney affidavit insufficient to defeat summary judgment when accompanied by unsworn documents). Accordingly, this Court finds defendant's procedural claim to be without merit.

## V. LEGAL ANALYSIS—STATE AND MUNICIPAL LAW CLAIMS

[9]  Borrero's remaining claims arise under the Human Rights laws of New York state and New York city. The analysis of claims brought under the state and municipal human rights laws directly parallels the Title VII analysis; thus, the balance of Borrero's claims may be considered in tandem with her federal law claims. *See, e.g., Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001); *Cruz,* 202 F.3d at 565 n. 1; *O'Sullivan v. N.Y. Times,* 37 F.Supp.2d 307, 313 (S.D.N.Y.1999); *Landwehr v. Grey Adver. Inc.,* 211 A.D.2d 583, 583, 622 N.Y.S.2d 17 (1st Dept.1995) (applying *McDonnell Douglas* burden-shifting standards to state and municipal law discrimination claims).

Pursuant to 28 U.S.C. § 1367, a district court shall have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Accordingly, for the reasons set forth above dismissing the federal sex harassment claim, the state and municipal sexual harassment claims are dismissed with prejudice. Similarly, as this Court finds that the parties have raised triable issues of fact associated with the federal retaliation claim, for the reasons set forth above this Court exercises supplemental jurisdiction over the remaining state and city retaliation claims.

## VI. CONCLUSION

**\*18**  For the reasons set forth above, defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is GRANTED IN PART and DENIED IN PART. Accordingly, defendant's motion is GRANTED with respect to the federal, state, and municipal law sexual harassment claims, and is DENIED with respect to the federal, state, and municipal law retaliation claims.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 31415511

## Footnotes

1  Unless otherwise stated, the facts discussed herein are undisputed and are drawn from the parties' submissions, including statements pursuant to Local Rule 56.1 (Statements of Material Fact on Motion for Summary Judgment). According to Local Rule 56.1(c), all material facts set forth in the moving party's statement of facts will be deemed admitted unless controverted by the opposing party.

2  Both plaintiff and defendant have submitted excerpts of the December 5, 2001 Borrero Deposition. Defendant's excerpts are appended to Defendant's Notice of Motion as Exh. D; other excerpts are appended

to the Affidavit of Frank S. Occhipinti in support of Defendant's motion for summary judgment ("Occhipinti Affidavit") as Exh. C.

3    Defendant's 56.1 Statement at ¶ 28 alleges that Borrero's August assignment was on August 7, 2000. This claim is not reflected in the defendant's appended payroll records, which instead reflect the date of August 14, 2000.

4    *Richardson* addresses a race-based hostile environment claim under Title VII. The analysis of race-based hostile environment claims parallels the analysis applied to sex-based hostile environment claims. *See* ⚑ *Richardson,* 180 F.3d at 436 n. 2.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by   Ramos v. SimplexGrinnell LP,   E.D.N.Y.,   June 21, 2011

2011 WL 1584593
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Patricia CASTAGNA and Nick Sarracco, Plaintiffs,

v.

Bill LUCENO and Majestic Kitchens, Inc., Defendants.

No. 09–CV–9332 (CS).
|
April 26, 2011.

**Attorneys and Law Firms**

E. Christopher Murray, Ruskin Moscou Faltischek, P.C., Uniondale, NY, for Plaintiffs.

Costantino Fragale, Law Office of Costantino Fragale, Eastchester, NY, for Defendants.

**OPINION AND ORDER**

SEIBEL, District Judge.

**\*1** Before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. (Doc. 13.)

**I. BACKGROUND**

**A. Facts**

For the purposes of the instant motion, the Court assumes the facts, although not the legal conclusions, in the Second Amended Complaint to be true. This case concerns alleged discriminatory and retaliatory practices by Defendants Majestic Kitchens, Inc. ("Majestic"), and its President and owner, Bill Luceno, against Plaintiff employees Patricia Castagna and Nick Sarracco. (SAC ¶¶ 1, 6.) [1]

**1. Castagna's Allegations**

Castagna began working for Majestic on April 1, 2005, at Luceno's request. (Id. ¶ 8.) She was first assigned to work for Majestic's comptroller, and after four to five months became the front desk receptionist. (Id. ¶¶ 10–11.) "Almost from the inception of her employment and continuing throughout the remainder of her employment," Castagna was subjected to "a regular, frequent, unwanted, and abusive pattern of behavior directed against her and other women, in contrast to male employees," and Luceno created "a working environment characterized by lewd, racial and sexual comments and innuendos, profanity, offensive physical contact and other inappropriate behavior." (Id. ¶ 9.) Luceno also failed to reduce to writing Majestic's "rules, regulations, [and] policies on vacation time, sick time, break notices, raises, lunch time, disciplinary policies, etc.," or to display "official posters ... with respect to minimum wage or labor law provisions ." (Id. ¶ 13.) Castagna "urg[ed]" Luceno to adhere to labor law provisions regarding such rules and regulations, resulting in "little" being done. (Id.) As a result of such urging, Luceno "mocked and ridiculed" Castagna, and referred to her as "Ms. Corporation." (Id. ¶ 14.) Luceno never spoke to male employees in this fashion. (Id.)

After Castagna had worked at Majestic for approximately two years, Luceno elevated her salary to $20/hour (after having started her at $15/hour and elevated her to $16/hour a year into her employment) and both "admitt[ed] that she was underpaid" and "threatened [her] that if she talked to anyone about her raise she would be fired." (Id. ¶ 15.) Plaintiffs allege that this was so that Castagna would not learn that Majestic's female employees were earning less than its male employees. (Id.) Luceno also made "incessant personal complaints" about Castagna to others, including complaints about her "laughing, her voice, her breathing too loud, her coffee breaks and her bathroom breaks." (Id. ¶ 16.) Luceno's complaints regarding Castagna's bathroom breaks were "particularly difficult and humiliating," and his "tone and body gestures made clear that this topic related to Castagna's gender." (Id. ¶ 18.) These complaints eventually led to Castagna being "forced to schedule her bathroom requirements at 11 AM, during her 1:30 PM lunch break and at 3:30 PM, but then only if someone was available to cover her desk"; "[o]therwise, she had to wait until after 5 PM." (Id. ¶ 17.) As an example of Luceno's complaints regarding Castagna's laugh, "while Castagna was greeting new customers one day who told her a joke, she laughed," and "[w]ithin 20 seconds her phone rang and [Luceno] ... berated [her] and told [her] that it sounded like a bunch of kindergarteners." (Id. ¶ 19.) The customers "overheard Luceno yelling at her from the corner office." (Id.) In contrast to female employees, male employees were not subjected

to "personally demeaning comments," "public abuse," or "monitor[ing]" of bathroom breaks. (*Id.* ¶¶ 16, 18, 19.)

**\*2** Plaintiffs provide examples of other female employees to whom Luceno directed his "harsh comments and abuse treatment." (*Id.* ¶ 21.) On one instance, when Luceno was displeased with a price quote that a female employee provided to a customer, Luceno remarked that "f_____women give it away." (*Id.*) On another instance, when a new female employee requested that she be able to take two weeks' vacation for her honeymoon, Luceno "yelled at her so intensely ... sometimes in front of customers" because "[h]e wanted her to cancel it and work instead." (*Id.* ¶ 22.) On the Saturday of the wedding, Luceno "directed employees to work, instead of attending the marriage ceremony and reception." (*Id.*) On another occasion, in May 2008, when a female employee was covering the front desk telephone during one of Castagna's bathroom breaks, she "lost an important phone call for Luceno," in response to which Luceno "blew up and yelled and swore for all to see," and later yelled again at the employee in her office. (*Id.* ¶ 23.) Luceno verbally abused another female employee, "constantly criticiz[ing] her in front of other employees about being absent too much and her inability to use a computer," and on at least one occasion remarked regarding both that employee and a fellow female employee that there is "nothing worse than a female Jew." (*Id.* ¶ 24.) Luceno also "has been known to throw a coffee mug" at his wife, "which narrowly missed her, shattering on the wall with pieces flying all over the place." (*Id.* ¶ 25.) Luceno directed no such behavior toward any of Majestic's male employees. (*Id.* ¶¶ 21–24.)

Castagna quit her job at Majestic on July 9, 2008. (*Id.* ¶¶ 26–27.) On that morning, Castagna was working at the receptionist's desk, and Luceno asked her to shorten her lunch for the entire week and spend that time covering the front desk telephone, as Majestic was short-handed. (*Id.* ¶ 26.) Not expecting that Luceno would provide her with overtime pay, Castagna asked if she could leave early and be credited for the extra time worked during lunch. (*Id.*) In response, Luceno "started yelling at her in a voice that all could hear throughout the showroom," "walked back to his office, still yelling," and then returned "[t]wenty minutes later ... screaming as he called her 'Ms. Corporate' and yelling that she was selfish." (*Id.* ¶¶ 26–27.) Luceno then reached over Castagna's desk and shoved her computer monitor at her. (*Id.* ¶ 27.) He "proceeded to scream at her, swearing that that was not enough notice" and "further threatened Castagna by saying that she should wait to see what would happen the

next time she would ask for a day off." (*Id.*) At that point, "fear[ing] for her personal and physical safety," and feeling "scared, alone, humiliated, embarrassed and really upset," Castagna "packed up her items and left." (*Id.*) That same day, she went to the house of her coworker Plaintiff Nick Sarracco, who had witnessed part of the incident earlier that day. (*Id.* ¶ 28.) At Sarracco's suggestion, the two proceeded to the Mamaroneck Police station, where Castagna filled out a police report describing "the conditions of her employ and what Luceno had done to her that day." (*Id.*) Castagna filed a charge of discrimination, harassment, and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about October 21, 2008, and received a "right to sue" letter on or about August 14, 2009. (*Id.* ¶¶ 2, 32, 33.)

### 2. Sarracco's Allegations

**\*3** Sarracco began working for Majestic in September 1996 as a salesman. (*Id.* ¶ 43.) "Almost from the inception of his employment and continuing throughout the remainder of his employment," Sarracco witnessed Luceno "publicly demean[ ] and verbally abuse[ ]" Majestic's female employees. (*Id.* ¶ 42.) Luceno was not demeaning or abusive to male employees in the same way that he was to female employees, but he was "abusive to them in the sense of 'playing games' with their compensation and classification as an employee [versus] an independent contractor." (*Id.*) For example, Sarracco was placed on and off the books throughout his employment at Majestic: when he started in September 1996, he was a salesman; he then left and was re-hired in December 1996 as an independent contractor; he was placed "on the books" as an employee in 2002 when he requested to participate in (and was denied participation in) a 401(k) program; and he was reclassified as an independent contractor in 2003 and, at Luceno's insistence, paid through a corporate entity. (*Id.* ¶ 43.)

In 1997, Luceno promised Sarracco that Majestic would fund his retirement in the amount of $700/month, or $8400/year, both because other employees received a car allowance, while Sarracco did not, and in exchange for Sarracco's helping other Majestic employees with their kitchen design skills. (*Id.* ¶ 45.) On an annual basis, usually around the holidays, Luceno "[took] out a sheet of paper and show[ed] Sarracco the value of the retirement account, telling him that the account earned no interest and that if Sarracco ever made an official inquiry into this matter, that it would be denied that he had any retirement whatsoever." (*Id.* ¶ 46.) Luceno assured Sarracco that the retirement package amounted to approximately $100,000. (*Id.* ¶ 49.) Luceno has since refused

to turn over the retirement money and has not provided Sarracco with any associated disclosures. (*Id.* ¶ 47.)

On July 9, 2008, when Luceno became verbally abusive toward Castagna, Sarracco confronted Luceno, upon which the confrontation ended. (*Id.* ¶ 48.) In addition to suggesting that Castagna file a police report, and accompanying Castagna to the police station, Sarracco also had his lawyer send a letter to Luceno notifying Luceno that he was violating anti-discrimination laws. (*Id.* ¶¶ 29, 48, 49.) That letter, dated July 12, 2008, also complained about Luceno's mischaracterization of Sarracco and other employees as independent contractors, as well as Sarracco's retirement package, the funds of which had not been "qualified" under applicable law nor paid out to Sarracco. (*Id.* ¶ 49.) Immediately thereafter, Sarracco was fired. (*Id.* ¶¶ 29, 49 .) Sarracco filed a charge of retaliation with the EEOC on or about September 12, 2008, and received a "notice of right to sue" on or about August 14, 2009. (*Id.* ¶¶ 2, 50, 51.)

**B. Procedural History**

**\*4** Plaintiffs filed the instant case on November 10, 2009. (Doc. 1.) An Amended Complaint followed on January 25, 2010. (Doc. 4.) The parties appeared before this Court for a pre-motion conference on April 27, 2010 to discuss Defendants' proposed motion to dismiss. (*See* Docket Entry dated April 27, 2010.) Plaintiffs filed a Second Amended Complaint on May 25, 2010. (Doc. 12.) The Second Amended Complaint asserts the following claims against both Defendants: (1) hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), by Castagna; (2) retaliation under Title VII, by Castagna; (3) retaliation, age discrimination, and sex discrimination under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), by Castagna; (4) violation of New York Labor Law, by Castagna; (5) intentional infliction of emotional distress, by Castagna; (6) assault, by Castagna; (7) battery, by Castagna; (8) retaliation, under Title VII, by Sarracco; (9) violation of the U.S. Employee Retirement Income Security Act ("ERISA"), by Sarracco; (10) violation of New York Labor Law, by Sarracco; and (11) retaliation, age discrimination, and sex discrimination under the NYSHRL, by Sarracco. (SAC ¶¶ 57–125.) Defendants moved to dismiss the Second Amended Complaint on June 25, 2010. (Doc. 13.)

**II. DISCUSSION**

**A. Motion to Dismiss Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ---- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 129 S.Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (second alteration in original) (quoting Fed.R.Civ.P. 8(a)(2)).

**B. Documents the Court May Consider on a Motion to Dismiss**

**\*5** When deciding a motion to dismiss based on Rule 12(b)(6), the Court is entitled to consider the following:

(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not

attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor,* No. 10–2603, 2011 WL 222480, at *4 (E.D.N.Y. Jan.24, 2011) (internal quotation marks omitted); *accord Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). A document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers,* 282 F.3d at 153 (emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.; see Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (integral documents may include documents that are partially quoted in the complaint or on which plaintiff relied in drafting the complaint). A district court may exercise its discretion in considering materials that do not fall within any of the above-mentioned categories, although in such instances it must convert the motion to dismiss to a motion for summary judgment, *see In re WorldCom, Inc. Sec. Litig.,* 382 F.Supp.2d 549, 556 (S.D.N.Y.2005), and ensure that the nonmoving party has sufficient notice of the conversion as well as an opportunity to respond, *see Mathie v. Dennison,* 381 F. App'x 26, 26 (2d Cir.2010).

Defendants have submitted various documents with their memorandum that are outside the Second Amended Complaint. Defendants have submitted a transcript of the April 27, 2010 pre-motion conference in this case, a copy of Defendants' letter to the Court dated April 12, 2010 requesting a pre-motion conference, and a copy of the First Amended Complaint in this case. (Fragale Decl. Exs. B–D.)[2] The Court may take judicial notice of these documents and consider them on a motion to dismiss. *See, e.g., Obilo v. City Univ.*

*of City of N.Y.,* No. 01–5118, 2003 WL 1809471, at *3 n. 10 (E.D.N.Y. Apr.7, 2003) ("[D]efendants have attached to their memorandum an excerpt of the ... pre-motion conference, of which judicial notice may be taken."); *Reisner v. Stoller,* 51 F.Supp.2d 430, 440 (S.D.N.Y.1999) ("The court may ... take judicial notice of matters of public record, such as pleadings and court orders from prior litigation between the parties."). Defendants have also submitted copies of Plaintiffs' EEOC charges. (Fragale Decl. Exs. F–G.) As Plaintiffs reference the charges several times in their Second Amended Complaint, the Court deems them incorporated by reference and may therefore consider them. *See Morris v. Broadridge Fin. Servs., Inc.,* No. 10–1707, 2010 WL 5187669, at *3 n. 2 (E.D.N.Y. Dec.14, 2010). Finally, Defendants have submitted an Affidavit of Vito (Bill) Luceno (Fragale Decl. Ex. E.) This is the only document the submission of which Plaintiffs contest in their Opposition memorandum. As the Luceno Affidavit was neither referred to in the Second Amended Complaint, nor integral to it, I decline to consider it in deciding Defendants' motion to dismiss. *See, e.g., Hoy v. Inc. Vill. of Bayville,* No. 10–0094, 2011 WL 679907, at *4 (E.D.N.Y. Feb.25, 2011) (declining to consider defendants' affidavits because they "are not referred to in the complaint, nor are they integral to the complaint").

### C. Plaintiffs' Claims

#### 1. Castagna's Hostile Work Environment Claim (Count 1)

**\*6** Castagna's first claim is for a hostile work environment. Castagna alleges that "Luceno singled out female employees for public humiliation, verbal harassment, assault and other publicly demeaning actions because of Luceno's hatred toward women," and that "[t]he hostile work environment was sufficiently severe and pervasive such that it altered the condition of Castagna's employment, affected the terms, conditions and privileges thereof in violation of Title VII, and resulted in Castagna's constructive discharge or forced resignation from her position." (SAC ¶¶ 59, 62.)

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive—that is, ...

creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.' " *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007) (quoting *Gregory v. Daly,* 243 F.3d 687, 691–92 (2d Cir.2001)); *accord Murdaugh v. City of N.Y.,* No. 10–7218, 2011 WL 798844, at *4 (S.D.N.Y. Mar.8, 2011). The objective hostility of a given work environment should be assessed based on the "totality of the circumstances." *Patane,* 508 F.3d at 113 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Factors that courts consider in making this assessment include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.' " *Id.* (quoting *Harris,* 510 U.S. at 23); *see Murdaugh,* 2011 WL 798844, at *4. As a general rule, incidents must be more than merely episodic to be deemed "severe or pervasive," though a single act can meet the threshold "if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002) (internal quotation marks omitted). Since the focus in a hostile work environment claim is on the nature of the workplace, instances of hostility and discriminatory harassment of other co-workers can support the claim. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000). "Ultimately, to avoid dismissal under [Rule] 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse,' and '[the Second Circuit has] repeatedly cautioned against setting the bar too high' in this context." *Patane,* 508 F.3d at 113 (second alteration in original) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003)).

**\*7** Defendants put forth three arguments regarding Castagna's hostile work environment claim: first, that the allegations in Plaintiffs' First Amended Complaint contradict those in their Second Amended Complaint and thus dispel any inference of gender-based discriminatory conduct; second, that the allegations in the Second Amended Complaint depict mere "stray" events, not a pattern of conduct sufficient to give rise to a hostile work environment; and third, that some of the allegations in the Second Amended Complaint did not appear in Castagna's EEOC charge. These arguments fail.

As an initial matter, there is no substantive contradiction between the First and Second Amended Complaints. Defendants argue that the First Amended Complaint alleges sex-based discrimination against both men and women, (Defs.' Mem. at 11),[3] but the paragraph in the First Amended Complaint to which Defendants point does not allege that Luceno made sex-based comments toward men specifically, but rather alleges that he made "lewd, racial, and sexual" comments in general, (Fragale Decl. Ex. D ¶ 44). To the extent that the First Amended Complaint alleged any disparate treatment toward men, Plaintiffs have clarified in their Second Amended Complaint that "male employees were not publicly demeaned or mocked like the female employees," and, instead, Luceno improperly classified and paid male employees as independent contractors. (SAC ¶ 42.)

Defendants raised this same argument at the April 27, 2010 pre-motion conference, and the Court directed Defendants to provide the Court with caselaw as to whether the purported contradiction between the First and Second Amended Complaints "is a contradiction that requires dismissal or just one that would be the subject of cross-examination later on." (Fragale Decl. Ex. B, at 10.) Defendants have been unable to demonstrate that dismissal is warranted on this ground. Defendants cite to *United States v. McKeon,* 738 F.2d 26 (2d Cir.1984), (Defs.' Mem. at 12), but that very case undermines Defendants' argument. As the Court in *McKeon* stated,

> When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extra-judicial admission made by a party or his agent.

738 F.2d at 31 (internal quotation marks omitted) (quoting

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter Inc.,* 32 F.2d 195, 198 (2d Cir.1929)). In other words, while the First Amended Complaint may be the subject of cross-examination should this case proceed to trial, it does not preclude Plaintiffs from advancing amended claims. The well-established law of this Circuit dictates that Plaintiffs' Second Amended Complaint "supersedes all previous amended complaints ... giving them no legal effect," *Valle v. YMCA of Greater N.Y.,* No. 05–5318, 2006 WL 2583073, at *1 (S.D.N.Y. Sept.6, 2006) (citing *Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999)), and at the motion to dismiss stage, the Court must assume the truth of the facts alleged in the operative complaint and draw all reasonable inferences in Plaintiffs' favor, *see Papelino v. Albany Coll. of Pharmacy of Union Univ.,* No. 09–4248, 2011 WL 199124, at *1 n. 1 (2d Cir. Jan.24, 2011).

**\*8** As for the allegations in the Second Amended Complaint, they depict more than mere "stray" remarks, but rather a pattern of behavior sufficient to state a claim for a hostile work environment. Castagna alleges that Luceno: mocked her for asking that Majestic post notices on company policy and practices, calling her "Ms. Corporation," (SAC ¶¶ 13–14); made demeaning remarks regarding Castagna's laugh, her voice, and her loud breathing, (*id.* ¶¶ 16, 19); complained about Castagna's coffee breaks and frequent visits to the restroom, repeatedly screamed that Castagna "peed too much," and restricted the number of times she could visit the restroom daily, (*id.* ¶¶ 17–18); and frequently berated her in front of co-workers and customers alike, (*id.* ¶¶ 19, 26–27). Castagna alleges that Luceno's treatment of her was emblematic of how he treated other female employees, and that he made "personally demeaning comments," used "sexual and ethnic slurs," and was otherwise verbally and physically abusive toward Castagna's female coworkers as well. (*Id.* ¶¶ 16, 21, 23). By way of example, Castagna alleges that Luceno: remarked that "f_____ women give it away," when he was displeased with a female employee's price quote, (*id.* ¶ 21); yelled at a female coworker in front of other employees for requesting two weeks off for her honeymoon, and directed other employees to work on the day of her wedding, (*id.* ¶ 22); criticized a female employee for her absence and inability to use a computer, and remarked that there is "nothing worse than a female Jew," (*id.* ¶ 24); and threw a coffee mug at a female employee—his wife—narrowly missing her, before the mug shattered against a wall, (*id.* ¶ 25). Importantly, Castagna alleges that male employees

were never subjected to this kind of abuse. (*Id.* ¶¶ 14–16, 18–19, 21–24.)

Defendants focus upon the two specifically quoted remarks in the Second Amended Complaint, to the exclusion of the other myriad allegations, in arguing that Plaintiffs' allegations of a hostile work environment are insufficient. (Defs.' Mem. at 12–13.) Further, the only case to which Defendants point, *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87 (2d Cir.2001), is inapposite. The case did not involve a hostile work environment claim but rather an allegedly age-discriminatory discharge. *Id.* at 88. The comments were considered "stray" because they were unrelated to the discharge. *Id.* at 89, 92 n. 2. They were not analyzed as contributing to an allegedly hostile work environment, and in any event, the case was before the Court on summary judgment, after the Court had been presented with evidence regarding the statements' relevance with respect to the plaintiff's discharge. *Id.* at 88–89. Defendants appear to attempt to fit this case under the rubric of various cases dismissing hostile work environment claims premised on one or two allegedly discriminatory remarks and nothing more, but Defendants ignore that those cases lack the allegations of other discriminatory conduct provided here. *See, e.g., MacEntee v. IBM,* No. 08–7491, 2011 WL 812395, at *7 (S.D.N.Y. Mar.3, 2011) (dismissing hostile work environment claim under Americans with Disabilities Act where "Plaintiff's sole allegation supporting her disability harassment claim [was] that her supervisor made a single comment ridiculing her disability"); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 184 (W.D.N.Y. Sept.8, 2010) (dismissing gender-based hostile work environment claim where female deputy sheriff jailor was subjected to offensive comments by male coworkers on only one occasion); *Milne v. Navigant Consulting,* No. 08–8964, 2009 WL 4437412, at *8 (S.D.N.Y. Nov.30, 2009) (dismissing gender-based hostile work environment claim under Title VII where claim based on one event involving "inappropriate comments coupled with the grabbing of [plaintiff's] arm"); *Vilien v. Dep't of Educ.,* No. 06–3491, 2009 WL 857458, at *6 (S.D.N.Y. Mar.31, 2009) (dismissing national-origin-based hostile work environment claim based only on "a comment referring to Haitians as good swimmers" and another comment by defendant "discussing [plaintiff teacher's] power over the Haitian students"); *Faison v. Leonard St., LLC,* No. 08–2192, 2009 WL 636724, at *3 (S.D.N.Y. Mar.9, 2009) (dismissing religion-based hostile work environment claim

where "[t]he Amended Complaint allege[d] one remark by [defendant] that raised the issue of the plaintiff's religion").

**\*9** Defendants also appear to focus upon the two statements because they are the only statements directly referencing women in a derogatory fashion. (Defs.' Mem. at 12.) Defendants thereby implicitly argue that Plaintiffs' remaining allegations are insufficient because the remaining remarks were facially gender-neutral. But " 'neither sex-specific and derogatory terms' nor any evidence that 'sexual desire' motivated the harassment is needed to prove an actionable hostile work environment." *Gregory,* 243 F.3d at 695 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Rather, "[t]he critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale,* 523 U.S. at 80 (internal quotation marks omitted). Defendants ignore that Plaintiffs have repeatedly alleged that Luceno did not subject Castagna's male co-workers to the same verbally abusive and personally demeaning treatment to which she and her female co-workers were subjected. Those allegations are sufficient to give rise to a reasonable inference that Luceno's conduct was motivated by gender. *See, e.g., Malone v. City of N.Y.,* No. 05–2882, 2006 WL 2524197, at \*5 (E.D.N.Y. Aug.30, 2006) (plaintiff satisfied gender-motivation prong of hostile work environment claim where he "allege[d] that his superiors would not have treated female or minority employees as harshly as he was treated"; "[w]hile [plaintiff] would be required to establish at trial that race or gender bias was the actual motive for his supervisors' conduct, at the pleading stage, it is sufficient to allege that female and minority employees were treated more favorably").[4]

Defendants also argue that Castagna cannot base her Title VII claim on the facially gender-discriminatory comments quoted above because she did not mention them in her EEOC charge. (Defs.' Mem. at 12.) There is no requirement that a Plaintiff detail in her EEOC charge every fact on which she may later rely to prove her charge. *See Teal v. Potter,* 559 F.3d 687, 691 (7th Cir.2009). While Defendants may later argue that the omission of such obviously offensive comments undermines Castagna's credibility, credibility issues are not resolved on motions to dismiss. *See Field Day, LLC v. Cnty. of Sufolk,* No. 04–2202, 2005 WL 2445794, at \*21 (E.D.N.Y. Sept.30, 2005).

Moreover, a district court has jurisdiction over a Title VII claim if it has been included in an EEOC charge or if it is "reasonably related" to the claim actually filed with the Agency. *Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (per curium). One way for a Title VII claim to be considered "reasonably related" to the claim contained in the EEOC charge is if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (internal quotation marks omitted). "The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Id.* (citation and internal quotation marks omitted). "Essentially, this exception is an allowance of loose pleading, in recognition of the fact that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination' allegedly suffered by the employee." *Skalafuris v. City of N.Y.,* No. 09–5165, 2010 WL 4273286, at \*3 (S.D.N.Y. Oct.28, 2010) (quoting *Williams,* 458 F.3d at 70). Normally, courts deem a Title VII claim to be outside the scope of the investigation that could reasonably be expected to grow out of the EEOC charge when the basis for discrimination alleged in the charge is a different basis than that alleged in the complaint (*e.g.,* racial vs. gender discrimination). *See, e.g., Marshall v. N.Y.C. Bd. of Elections,* 322 F. App'x 17, 18 (2d Cir.2009) (affirming dismissal of religious discrimination claim where EEOC complaint only alleged race and gender discrimination and did not "include any incidents that would have allowed ... [an] investigat[ion into] such allegations"); *Carter v. New Venture Gear, Inc.,* 310 F. App'x 454, 458 (2d Cir.2009) (affirming dismissal of gender discrimination claim where EEOC complaint only alleged race discrimination); *Wali v. One Source Co.,* 678 F.Supp.2d 170, 183–84 (S.D.N.Y.2009) (dismissing religious discrimination claim where EEOC complaint alleged racial discrimination; mere fact that plaintiff's "name may appear to be a Muslim name" was not enough to put the EEOC on notice of such claims).

**\*10** That is not the case here. While Luceno's specific comments that "f_____ women give it away" and that there is "nothing worse than a female Jew" were not included in the EEOC charge, the charge alleged sex discrimination, (Fragale Decl. Ex. F, at 1 (checking box

for sex discrimination)), and the complaint attached thereto put forth various allegations of verbally abusive behavior toward Castagna and her female coworkers, (*id.* Ex. F ¶¶ 10–11, 13–15.) Castagna's Title VII claim here is the same claim she advanced in her EEOC charge, and the omitted evidence is surely reasonably related to the claim in the EEOC charge, as the gender-discriminatory comments would fall within the scope of the EEOC investigation that could reasonably be expected to grow out of Castagna's EEOC charge for sex discrimination. *See, e.g., Gutierrez v. City of N.Y.,* No. 08–6537, 2010 WL 4823644, at *3 (S.D.N.Y. Nov.29, 2010) (finding plaintiffs' failure to promote claims were "based on the same allegations of race and national origin discrimination that underlie the EEOC claims" because "[p]laintiffs' EEOC claims addressed performance evaluations, denial of overtime, job assignments, transfers, and alleged harassing and discriminatory statements by supervisors").

Although Castagna has sufficiently alleged a hostile work environment claim, she cannot maintain that claim against both Defendants—only against Majestic. For the purposes of Title VII, an employee's allegedly harassing conduct may be imputed to an employer-company if the plaintiff alleges that the employee held a supervisory position with respect to the plaintiff. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *accord Phanco v. R.J.M. Rest., Inc.,* No. 07–0687, 2010 WL 1418088, at *5 (W.D.N.Y. Apr.6, 2010) ("When, as in this case, the alleged harasser is the owner of the business or is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."). Castagna has sufficiently alleged that here: she has alleged that Luceno was the president and owner of Majestic, that he directly corresponded with her regarding—and exercised control over—her daily work schedule, and that, as the front desk receptionist, she performed work directly for him. (SAC ¶¶ 6, 12, 17, 26–27.) Castagna cannot, however, maintain her claim against Luceno, as individuals are not subject to liability under Title VII. *See Sassaman v. Gamache,* 566 F.3d 307, 315 (2d Cir.2009); *Smith v. Westchester Cnty.,* No. 09–5866, 2011 WL 570141, at *1 n. 1 (S.D.N.Y. Feb.15, 2011). [5] I therefore grant Defendants' motion to dismiss Castagna's hostile work environment claim against Luceno, but deny the

motion to dismiss the hostile work environment claim against Majestic. [6]

**2. Castagna's Title VII Retaliation Claim (Count 2)**

Castagna next claims that "Luceno and the Company retaliated against [her] for her complaints in violation of the anti-retaliation provisions of Title VII." (SAC ¶ 68.) Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). In order to state a claim for retaliation, a plaintiff must demonstrate that (1) she was engaged in activities protected under Title VII; (2) the employer was aware of these activities; (3) the employer took adverse employment action against the plaintiff; and (4) a causal connection exists between the protected activities and the alleged adverse employment action. *Fincher,* 604 F.3d at 720. The protected activity that a plaintiff must allege to sustain a retaliation claim is "action taken to protest or oppose statutorily prohibited discrimination." *Cruz,* 202 F.3d at 566. In other words, "the protected activity alleged must involve some sort of complaint about a type of discrimination that Title VII forbids." *Brands–Kousaros v. Banco Di Napoli S.P.A.,* No. 97–1673, 1997 WL 790748, at *5 (S.D.N.Y. Dec.23, 1997).

**\*11** The only "protected activity" that the Second Amended Complaint can be construed as alleging for the purposes of this claim is Castagna's police report "describing the conditions of her employ and what Luceno had done to her that day." (SAC ¶ 28.) Castagna does not specify that she told the police anything about discrimination, as opposed to assault and abuse, so it is dubious that the report would constitute protected activity. [7] Assuming for the sake of argument that it does, [8] Castagna does not plausibly allege that Luceno took any adverse employment action against her because of the police report. Indeed, Castagna has alleged that she filled out the police report only *after* she had already quit her job at Majestic. (*Id.* ¶¶ 27–28 ("Not knowing what [Luceno] would do to her during the next tirade and assault, Castagna packed up her items and left. Fearful for her safety, she was forced to quit.... *After the above-described incident,* Castagna drove to fellow employee Sarracco's home. Sarracco had seen part of the screaming incident earlier in the day. After he suggested that she fill out a police report, they went to the Mamaroneck Police station where

she filed a report ....") (emphasis added).) And while some conduct toward former employees may nonetheless constitute an "adverse employment action" under Title VII, *see, e.g.,* *Beckett v. Prudential Ins. Co. of Am.,* 893 F.Supp. 234, 240 (S.D.N.Y.1995) ( "Poor recommendations, refusals to furnish recommendations, or threats to future employers may be discriminatory practices if done in direct retaliation ..."), Castagna has made no allegations whatsoever concerning Luceno's conduct after she filed the police report on July 9, 2008. Nor has she alleged any complaints of discrimination that preceded her resignation. As such, Castagna's Title VII retaliation claim must be dismissed.

### 3. Castagna's NYSHRL Discrimination and Retaliation Claims (Count 3)

Castagna asserts claims for sex discrimination and retaliation under the NYSHRL, basing those claims on the same facts that form the basis of her discrimination and retaliation claims under Title VII. It is well-settled that claims of discrimination and retaliation under the NYSHRL are subject to the same analysis as discrimination and retaliation claims brought under Title VII. *Cruz,* 202 F.3d at 565 n. 1; *Schiano v. Quality Payroll Sys. Inc.,* 445 F.3d 597, 609 (2d Cir.2006). Unlike Title VII, however, individuals who actually participate in the discriminatory conduct at issue may be held liable under the NYSHRL. *Feingold v. New York,* 366 F.3d 138, 157 (2d Cir.2004). Accordingly, per the analysis above, Castagna has adequately alleged a claim for sex discrimination under the NYSHRL against Majestic and Luceno, but she has failed to allege a claim for retaliation.

Castagna also asserts a claim for age discrimination under the NYSHRL. To state a claim for age discrimination under the NYSHRL, Plaintiff must adequately allege that (1) she was within the protected age group, (2) she was qualified for the job, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of age discrimination. *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005); *see* *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 n. 1 (2d Cir.2009) (age discrimination claims under NYSHRL subject to same analysis as claims under Age Discrimination in Employment Act). Castagna's claim for age discrimination must fail because, at a minimum, she fails to allege any facts that would support the inference that Luceno's conduct was in any way related to her age. Instead, the allegations relating

to Castagna focus exclusively upon Luceno's selective abuse of female employees. The Second Amended Complaint is bereft of allegations that Luceno, or anyone else at Majestic for that matter, made facially age-discriminatory comments or treated older employees differently than younger employees. In fact, the only allegation even potentially related to the age discrimination claim is the allegation that Castagna "was born in 1949." (SAC ¶ 4.) Such an allegation cannot possibly support a claim for age discrimination. *See, e.g., Avgerinos v. Palmyra–Macedon Cent. Sch. Dist.,* 690 F.Supp.2d 115, 130 (W.D.N.Y.2010) (granting motion to dismiss age discrimination claim where "[t]here were no allegations by plaintiff that any member of the [defendant school district] made any discriminatory comments relating to his age" and "the Complaint does not allege that any member of the [defendant school district] engaged in any overt discriminatory conduct toward the plaintiff concerning plaintiff's age"; "plaintiff's claims do not give rise to an inference of discriminatory intent because there are no allegations from which such an inference can be made").

**\*12** I therefore deny Defendants' motion to dismiss Castagna's claim for sex discrimination under the NYSHRL as to Majestic and Luceno, and grant the motion to dismiss Castagna's claims for retaliation and age discrimination as to Majestic and Luceno.

### 4. Castagna's N.Y. Labor Law Claim (Count 4)

Castagna next brings a claim under New York Labor Law Section 215. Section 215(1)(a) prohibits employers from discharging, penalizing, discriminating, or retaliating against any employee "because such employee has made a complaint to his or her employer ... that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter," N.Y. Lab. Law § 215(1)(a)(i)—that is, because the employee has made a complaint about violations of any other statutory section of the state labor law, *Kelly v. Xerox Corp.,* 256 A.D.2d 311, 681 N.Y.S.2d 322, 323 (2d Dep't 1998). Section 215(2) provides for a private cause of action by an employee against an employer alleged to have violated any of Section 215(1)'s provisions on unlawful discrimination and retaliation. N.Y. Lab. Law § 215(2). To state a claim for relief under Section 215, a plaintiff must allege that (1) "while employed by the defendant, he or she made a complaint about the employer's violation of

New York Labor Law," and (2) he or she was "terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result." *Higueros v. N.Y. State Catholic Health Plan, Inc.,* 526 F.Supp.2d 342, 347 (E.D.N.Y.2007). A plaintiff must show that she "complained about a specific violation of the Labor Law." *Epifani v. Johnson,* 65 A.D.3d 224, 882 N.Y.S.2d 234, 244 (2d Dep't 2009). "An informal complaint to an employer that the employer is violating a provision of the Labor Law suffices." *Ting Yao Lin v. Hayashi Ya II, Inc.,* No. 08–6071, 2009 WL 289653, at *7 (S.D.N.Y. Jan.30, 2009) (citations omitted). Moreover, such complaint does not require citation to the statute; "[a]ll that is required is that the complaint to the employer be a colorable violation of the statute." *Weiss v. Kaufman,* No. 103473/2010, 2010 N.Y. Slip Op. 33261(U), 2010 N.Y. Misc. LEXIS 5699, at *4, 2010 WL 4858896 (Sup.Ct.N.Y.Cnty. Nov. 18, 2010).

Plaintiff Castagna premises her Section 215 claim on Defendants' violation of New York Labor Law Section 195, which requires, *inter alia,* that employer policies on sick leave, vacation, personal leave, holidays, and hours be either publicly posted or provided to employees in writing. *See* N.Y. Lab. Law § 195(5). Castagna adequately alleges that she complained of violations to Section 195(5): she alleges that Luceno failed to reduce to writing Majestic's "rules, regulations, [and] policies on vacation time, sick time, break notices, raises, lunch time, disciplinary policies, etc.," or to hang "official posters ... with respect to minimum wage or labor law provisions," (SAC ¶ 13), and that she urged Luceno to resolve such failures, (*id.* ¶¶ 13–14). Castagna also alleges that, as a result of her urging Luceno to comply with Section 195, Luceno "mocked and ridiculed" her and referred to her as "Ms. Corporation." (*Id.* ¶ 14.) This final allegation, however, fails to satisfy the second requirement of Section 215—namely, that Castagna was "terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result" of her complaint. *Higueros,* 526 F.Supp.2d at 347.

 **\*13** The majority of cases involving Section 215 claims are premised on the employee's termination or discharge. *See, e.g., Hai Ming Lu v. Jing Fong Rest., Inc.,* 503 F.Supp.2d 706, 712 n. 6 (S.D.N.Y.2007) ("Although the majority of successful retaliation claims under N.Y. Labor Law § 215 are premised on employment termination, this is not the only action that may constitute an 'adverse employment action.' There is however little precedent for claims involving an action less adverse than termination.");

*Shaw v. Baldowski,* 192 Misc.2d 635, 747 N.Y.S.2d 136, 145 (Sup.Ct. Albany Cnty.2002) ("The only reported decisions concerning violations of Labor Law § 215 involve claims of improper discharge."). Courts have noted, however, that employment actions less severe than outright termination may nonetheless serve as the basis for a valid Section 215 claim. For example, the court in *Shaw v. Baldowski,* looking to federal standards in First Amendment retaliation cases, observed that, for Section 215 claims, " '[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand,' " and that " 'using an objective standard ... the total circumstances of [a plaintiff's] working environment [must have] changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.' " 747 N.Y.S.2d at 144 (quoting *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002)). The court in *Shaw* further observed that " '[i]ncidents that are relatively minor and infrequent will not meet [this] standard, but otherwise minor incidents that occur often and over a long period of time may be actionable if they attain the critical mass of unreasonable inferiority.' " *Id.* (quoting *Phillips,* 278 F.3d at 109). The allegedly retaliatory employment actions to which plaintiff pointed in that case were being forbidden to talk to her co-workers and forced to work in a separate office area. *Id.* at 145. Applying federal standards, the court held that this did not constitute adverse employment action. *Id.*

To be sure, other courts have held employment actions less severe than outright termination to be actionable under Section 215, but in those cases the action at issue seemed to implicate some legal, financial, or significant reputational harm for the plaintiff. *See, e.g., Kreinik v. Showbran Photo, Inc.,* No. 02–1172, 2003 WL 22339268, at *9 (S.D.N.Y. Oct.14, 2003) (defendant's filing of counterclaims constituted sufficient adverse employment action under § 215 because "counterclaims asserted against [plaintiff] could harm his reputation in his industry and negatively affect his prospective employment or business opportunities"); *cf. Electchester*

*Hous. Project, Inc. v. Rosa,* 225 A.D.2d 772, 639 N.Y.S.2d 848, 849 (2d Dep't 1996) (under analogous provision of New York Executive Law, defendant's contesting of plaintiff's unemployment benefits, in response to former employee's filing of a complaint with State Division of Human Rights, constituted retaliation). Luceno's occasional ridiculing and name-calling does not implicate those same concerns and cannot be said to rise to that level of severity. The situation with which the Court is presented here is much closer in nature to the employment actions in *Shaw. See Shaw,* 747 N.Y.S.2d at 145–46; *see also Hai Ming Lu,* 503 F.Supp.2d at 713 (waiter's assignment to most difficult section of restaurant for two consecutive nights after initiating an employment discrimination action "too trivial" to qualify as an adverse employment action). As Castagna has failed to adequately allege an adverse employment action in connection with her complaints regarding Defendants' failure to adhere to New York Labor Law Section 195, her state labor law claim must be dismissed.

### 5. Castagna's Claims for Intentional Infliction of Emotional Distress, Assault, and Battery (Counts 5, 6, and 7)

**\*14** Castagna's final three claims are for intentional infliction of emotional distress, assault, and battery in connection with the July 9, 2008 incident during which Luceno shoved a computer monitor at Castagna. Federal courts apply state statutes of limitations to intentional tort claims such as these. *Rock v. Mustich,* No. 08–4976, 2009 WL 2391776, at \*5 (S.D.N.Y. Aug.3, 2009). The statute of limitations for each of the tort claims that Castagna asserts here is one year. N.Y. C.P.L.R. § 215(3); *see Gallagher v. Dirs. Guild of Am., Inc.,* 144 A.D.2d 261, 533 N.Y.S.2d 863, 865 (1st Dep't 1988) (§ 215(3) extends to intentional infliction of emotional distress). Defendants correctly argue that all three claims are time-barred, as the acts giving rise to the torts occurred more than one year prior to the day on which this case was filed—November 10, 2009.

Castagna argues that the statute was tolled in at least one of two ways, but neither tolling rule applies to the facts of this case. Castagna first points to N.Y. C.P.L.R. § 215(8)(a), which provides that "[w]henever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, the plaintiff shall have at

least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action." N.Y. C.P.L.R. § 215(8); *accord Maher v. Alliance Mortg. Banking Corp.,* 650 F.Supp.2d 249, 269 (E.D.N.Y.2009). For the purposes of Section 215(8)(a), a "criminal action" "commences with the filing of an accusatory instrument against a defendant in a criminal court." N.Y.Crim. Proc. Law § 1.20(16), (17); *accord Von Bulow v. Von Bulow,* 634 F.Supp. 1284, 1299 (S.D.N.Y.1986). Cases applying the tolling provisions of Section 215(8)(a) make clear that the plaintiff had previously filed a criminal complaint in state court, or, at the very least, that a criminal court proceeding had been carried out. *See, e.g., Maher,* 650 F.Supp.2d at 269 (applying tolling statute where it was "undisputed that [p]laintiff filed a criminal complaint against [defendant] ... in the First District Court Nassau County"); *Cordero v. Epstein,* 22 Misc.3d 161, 869 N.Y.S.2d 725, 729 (Sup.Ct.N.Y.Cnty.2008) (refusing to toll statute where "no criminal proceeding had ever been commenced against [defendant]"); *Robinson v. Franklin Gen. Hosp.,* 160 Misc.2d 893, 611 N.Y.S.2d 778, 779–80 (Sup.Ct. Nassau Cnty.1994) (refusing to apply § 215(8) to a "plaintiff [who] was not a complainant in the criminal case prosecuted against [the] defendant"). This application is consistent with the policy underlying Section 215(8)(a), which is to "relieve the criminal victim of the burden of participating [simultaneously] in two trials based on identical facts in order to avoid the expiration of the statute of limitations on the civil claim." *Courtman v. Hudson Valley Bank,* 816 N.Y.S.2d 694 (Table), No. 109891/2005, 2006 WL 734389, at \*2 (Sup.Ct.N.Y.Cnty. Jan. 6, 2006) (alternation in original) (internal quotation marks omitted); *accord Robinson,* 611 N.Y.S.2d at 779.

**\*15** Castagna attempts to fit the facts of this case under Section 215(8)(a) by arguing that the statute was tolled when she "filed a criminal complaint against Luceno for the same conduct that is at issue in her assault, battery, and intentional tort claim." (Pls.' Opp'n at 15–16.) [9] In support of this argument, however, she points to paragraph 28 of the Second Amended Complaint, which discusses only the police report she filed on July 9, 2008. Neither that paragraph nor any other paragraph in the Second Amended Complaint alleges that Castagna or anyone else filed an accusatory

instrument against Luceno in criminal court, or otherwise discusses any sort of criminal proceeding that was initiated against Luceno. And Castagna's allegation that she filed a police report is not sufficient to give rise to such inferences. There is simply no reason to believe that Castagna would have had to participate in two simultaneous proceedings in order to avoid the expiration of the statute of limitations on her civil state-law claims. [10]   As such, I hold that the one-year statute of limitations for Castagna's tort claims was not tolled under Section 215(8).

Castagna next argues that the statute of limitations was tolled by the filing of her EEOC charge on October 21, 2008. The Second Circuit has not yet addressed whether the statute of limitations on a state-law tort claim is tolled when the claim arises from the same set of facts as a Title VII claim filed with the EEOC. Castagna supports her argument by citing to *Forbes v. Merrill Lynch, Fenner & Smith, Inc., 957 F.Supp. 450 (S.D.N.Y.1997)*, in which the Court held that the statute was tolled, *id. at 456*. (Pls.' Opp'n at 16.) But *Forbes* also acknowledged that "[t]here is a clear split of authority in this District on the question of whether filing a complaint with the EEOC tolls the statute of limitations for independent state law claims such as the intentional infliction of emotional distress." *Forbes, 957 F.Supp. at 455*. Despite the split in District Court caselaw, however, "the weight of authority ... has held that state common law claims are *not* tolled during the pendency of an ... EEOC claim." *Duran v. Jamaica Hosp., 216 F.Supp.2d 63, 67 (E.D.N.Y.2002)* (emphasis added) (holding statute of limitations for slander claim not tolled during pendency of EEOC charge). Indeed, the overwhelming majority of cases decided in New York federal courts—0and all such cases considering the issue post-*Forbes*—have held that state-law statutes of limitations are not tolled by a plaintiff's filing of a claim with the EEOC or an equivalent state agency. *See, e.g., Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F.Supp.2d 98, 123 (S.D.N.Y.2009)* (reversing magistrate judge's recommendation to toll statute of limitations for intentional infliction of emotional distress, assault, and battery claims during pendency of complaint with New York State Department of Human Rights ("NYSDHR") because "the weight of authority in this District overwhelmingly supports holding that [plaintiff's] state law tort claims are time-barred"); *Pasqualini v. Mortg. IT, Inc., 498 F.Supp.2d 659, 668 (S.D.N.Y.2007)* (statute of limitations for intentional

infliction of emotional distress, battery, and assault claims not tolled by filing of EEOC complaint); *Johnson v. Smarte Carte, Inc., No. 04–5573, 2007 WL 1176736, at *5 n. 5 (E.D.N.Y. Apr.20, 2007)* (statute of limitations for intentional infliction of emotional distress claim not tolled by filing of complaint with NYSDHR); *Gardner v. St. Bonaventure Univ., 171 F.Supp.2d 118, 131 (W.D.N.Y.2001)* (statute of limitations for intentional infliction of emotional distress claim not tolled during pendency of EEOC charge); *King v. Friend of a Farmer, Corp., No. 97–9264, 2001 WL 849460, at *4 (S.D.N.Y. July 26, 2001)* (intentional infliction of emotional distress claim not tolled during pendency of plaintiff's EEOC claims).

**\*16**  The rationale for not tolling the statute of limitations in this context is derived from *Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)*, in which the Supreme Court held that a plaintiff's time to file a discrimination claim under 42 U.S.C. § 1981, which is governed by the applicable state-law statute of limitations, is not tolled during the pendency of an EEOC charge relating to the same claim of discrimination. *Id. at 457, 467*. The Court in *Johnson* observed that "[t]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently [her] rights under both Title VII and other applicable state and federal statutes," *id. at 459* (citation and internal quotation marks omitted), and found that there existed "no policy reason that excuses [a plaintiff's] failure to take the minimal steps necessary to preserve each [of her] claim[s] independently," *id. at 465–66; see Kolesnikow, 622 F.Supp.2d at 122–23; King, 2001 WL 849460, at *4*. While the Second Circuit has not addressed the question of whether *Johnson* is applicable to state-law tort claims, other circuit courts have addressed the question and held that the statute of limitations is not tolled with respect to such claims. *See, e.g., Juarez v. Ameritech Mobile Commc'ns, Inc., 957 F.2d 317, 322–23 (7th Cir.1992)* (citing *Johnson* in holding that filing of EEOC claim did not toll statute of limitations on state-law claim for invasion of privacy, and noting that "[t]he state-law claim does not vindicate [plaintiff's] right to be free from discriminatory treatment based on her sex, but rather her right to be free from 'offensive or objectionable' intrusion into her seclusion"); *Arnold v. United States, 816 F.2d 1306, 1312–13 (9th Cir.1987)* (citing *Johnson* in rejecting tolling argument for state-law assault, battery, and intentional

infliction of emotional distress claims, and noting that "the wrong underlying ... [the] Title VII claim is distinct from that underlying [the] state-law tort claims"). As one Court in this District has noted,

> It appears that only three district court decisions in the Second Circuit reached a contrary result. In those cases, which all date from the 1990s, the courts' holdings were based on considerations of judicial efficiency and the concern that a rule against tolling would undermine the purposes of Title VII. However, these decisions do not discuss *Johnson,* which rejected those considerations in analogous circumstances.

*Kolesnikow,* 622 F.Supp.2d at 123 (citation and internal quotation marks omitted). Given the Court's holding in *Johnson,* and the overwhelming weight of authority in this Circuit, I hold that the statutes of limitations for Castagna's state-law intentional tort claims were not tolled by the filing of her EEOC charge. The claims are therefore untimely and must be dismissed.

### 6. Sarracco's Title VII Retaliation Claim (Count 8)

**\*17** Sarracco's first claim is for retaliation under Title VII. As noted above, to state a claim for retaliation under Title VII, Sarracco must demonstrate that (1) he was engaged in a protected activity under Title VII; (2) Luceno was aware of this activity; (3) Luceno took adverse employment action against Sarracco; and (4) a causal connection exists between the protected activity and the adverse employment action. *Fincher,* 604 F.3d at 720. The protected activity must be an "action taken to protest or oppose statutorily prohibited discrimination," *Cruz,* 202 F.3d at 566—that is, it must involve "some sort of complaint about a type of discrimination that Title VII forbids." *Brands–Kousaros,* 1997 WL 790748, at \*5.

Sarracco's termination from Majestic fulfills the "adverse employment action" requirement of his claim. *See, e.g., Miller v. Praxair, Inc.,* No. 09–2962, 2010 WL 4751782, at \*2 (2d Cir. Nov.24, 2010). To fulfill the "protected activity"

prong of his claim, Sarracco points to (1) his assistance to Castagna in filling out the July 9, 2008 police report, and (2) his attorney's July 12, 2008 letter to Luceno. (Pls.' Opp'n at 14.) Defendants argue that neither of these constitute protected activity.

First, Defendants argue that "[i]t is clear beyond the shadow of a doubt that helping a coworker file a police report does not constitute 'protected activity.' " (Defs.' Mem. at 15.) Defendants provide no support for this assertion, and, as indicated above, I decline to address whether the filing of a police report—or, in this instance, aiding in the filing of a police report—constitutes protected activity. But assuming for the sake of argument that it does, the Second Amended Complaint alleges no facts suggesting that Luceno was aware of the police report when he fired Sarracco. As such, the police report cannot serve as the basis for his retaliation claim. *See, e.g., Khaleel v. Metro One Loss Prevention Serv. Grps.,* 469 F.Supp.2d 130, 134 (S.D.N.Y.2007) (dismissing retaliation claim based on filing of EEOC charge where "[n]owhere in the complaint or in [plaintiff's] opposition to the [motion to dismiss] is there any allegation that he provided [defendant] with a copy of his EEOC charge, or that [defendant] otherwise had any notice about [plaintiff's] EEOC filing prior to his dismissal").

Defendants next argue that the letter from Sarracco's attorney cannot constitute the required protected activity because Sarracco did not base his EEOC retaliation charge on the letter. As noted above, a district court has jurisdiction over a Title VII claim that is "reasonably related" to an EEOC charge in that "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made"—that is, where "the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams,* 458 F.3d at 70 (citation and internal quotation marks omitted). [11] If the EEOC charge adequately set forth a claim for retaliation for opposing discrimination in violation of Title VII, it would not matter, as discussed above, that particular evidence of such opposition (*i.e.,* the letter) was not set forth. But here, the conduct complained of in the Second Amended Complaint cannot be said to fall within the scope of the EEOC investigation that could reasonably be expected to grow out of Sarracco's charge.

**\*18** As an initial matter, on his EEOC charge, Sarracco indicates that he suffered from religious discrimination only—not that he was he was the victim of retaliation.

(Fragale Decl. Ex. G, at 1 (checking "religion" box, but leaving "retaliation" box unchecked).) Although it is true that Sarracco alleges in the complaint attached to his EEOC charge that Luceno retaliated against him for his support of Castagna, the complaint fails to allege the type of discrimination directed toward Castagna about which Sarracco was complaining. The EEOC complaint alleges only that "Mr. Luceno has retaliated against me and fired me for my support of and assistance to a fellow worker, Patricia Castagna when and after he became verbally abusive and violent and assaulted her after she was told not to take her lunch and he refused her subsequent request to leave early." (*Id.* Ex. G ¶ 4.) This allegation suggests only that Sarracco stopped Luceno's assault of Castagna, (*see* SAC ¶ 48), not that he opposed gender-based or any other sort of discrimination. In other words, the EEOC complaint does not allege that Luceno was abusive toward Castagna *because* of her gender; for all one can tell from that complaint, Castagna was discriminated against because of her race, religion, national origin, sexual orientation, or pregnancy, or was mistreated simply because Luceno did not like her. Therefore, even assuming that Sarracco's EEOC charge and complaint can be read as alleging retaliation, they make no mention of the gender-based discrimination which Sarracco now claims he was retaliated against for opposing. His EEOC charge therefore would not have put the EEOC on notice to investigate gender-based discrimination, or retaliation for opposing the same, at Majestic. *See, e.g.,* 🚩 *Marshall,* 322 F. App'x at 18 (affirming dismissal of religious discrimination claim where plaintiff failed to include in EEOC charge "any incidents that would have allowed the [city human rights commission] to investigate such allegations"); 🚩 *Carter,* 310 F. App'x at 458 (affirming dismissal of sexual harassment claim where "[plaintiff's] charge to the EEOC made no reference whatsoever to gender bias at [defendant employer]," and concluding that "[t]he EEOC was thus not 'on notice' of [plaintiff's] gender-based complaints"). Sarracco's retaliation claim must therefore be dismissed.

### 7. Sarracco's ERISA Claim (Count 9)

Sarracco's second claim is for ERISA violations. Specifically, Sarracco seeks to recover the funds of the retirement plan that Luceno allegedly created for him while Sarracco worked at Majestic. Defendants argue that Sarracco's claim must fail because, first, Sarracco's claim for unspecified relief fails to state a claim under the applicable ERISA statutory section, and, second, Sarracco fails to allege that a retirement plan existed. (Defs.' Mem. at 16.) Although Defendants' first

argument is unavailing, their second argument demonstrates that Sarracco's claim must be dismissed.

**\*19** First, Defendants cite to 🚩 *Hall v. Kodak Retirement Income Plan,* 363 F. App'x 103 (2d Cir.2010), to support their argument that "a claim for 'unspecified' relief, where the gravamen of the complaint is a claim for damages and other monetary relief owing under a contractual obligation, no ERISA claim lies." (Defs.' Mem. at 16.) The plaintiff in *Hall* brought a breach of fiduciary duty claim under 🚩 29 U.S.C. § 1132(a)(3), which permits "injunctive relief against 'any act or practice which violates any provision of this subchapter or the terms of the plan' or 'other appropriate equitable relief' to redress such violations or to enforce any provision of ERISA or of the 🚩 plan." *Hall,* 363 F. App'x at 107 (quoting 🚩 29 U.S.C. § 1132(a)(3)). The plaintiff there sought "[a]ny and all appropriate equitable relief that is available to Plaintiff, without further specification," and the Court held that such "unspecified" relief was insufficient to state a claim for equitable relief under 🚩 29 U.S.C. § 1132(a)(3). 🚩 *Id.* at 107 (internal quotation marks omitted). *Hall* is inapposite, as Sarracco neither asserts a breach of fiduciary duty claim nor seeks injunctive relief under 🚩 Section 1132(a)(3). Instead, Sarracco asserts "a civil claim to recoup benefits pursuant to 🚩 29 U.S.C. Section 1132." (SAC ¶ 108.) His claim therefore seeks legal relief under 🚩 Section 1132(a)(1)(B), which permits a beneficiary, such as Sarracco, "to recover benefits due to him under the terms of his plan." 🚩 29 U.S.C. § 1132(a)(1)(B). [12]

There remains the question, however, as to whether Sarracco has sufficiently alleged the existence of an ERISA plan. "To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee benefit plan' that is governed by ERISA." 🚩 *Albers v. Guardian Life Ins. Co. of Am.,* No. 98–6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr.19, 1999) (citing 🚩 29 U.S.C. § 1003(a)). There are two types of plans under ERISA, "employee welfare benefit plans," *see* 🚩 29 U.S.C. § 1002(1), and "employee pension benefit plans," 🚩 *id.* § 1002(2)(A). Sarracco alleges the existence of an employee pension benefit plan, which ERISA defines as follows:

[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

(iii) regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

*Id.* § 1002(2)(A). "[A] 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield,* 34 F.3d 148, 151 (2d Cir.1994) (alteration in original) (internal quotation marks omitted); *accord Feifer v. Prudential Ins. Co. of Am.,* 306 F.3d 1202, 1209 (2d Cir.2002); *Laverty v. Savoy Indus., Inc.,* 954 F.Supp. 86, 89 (S.D.N.Y.1997). The term "establish" does not refer to the employer's decision to provide benefits; rather, "the reality of an employee pension benefit plan," as evidenced by acts or events that record, exemplify, or implement the decision, is determinative. *Guilbert v. Gardner,* 480 F.3d 140, 146 (2d Cir.2007) (internal quotation marks omitted). The plan "need not be a formal written document." *Grimo,* 34 F.3d at 151. Ultimately, "[t]he touchstone for determining the existence of an ERISA plan is whether a particular agreement creates an ongoing administrative scheme." *Eckardt v. Wiebel Tool Co., Inc.,* 965 F.Supp. 357, 363 (E.D.N.Y.1997) (internal quotation marks omitted); *see Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 565 (2d Cir.1998) ("[B]oth the Supreme Court and this court have emphasized that ERISA applies only where such an undertaking or obligation requires the creation of an ongoing administrative program.") (internal quotation marks omitted).

**\*20** Sarracco does not adequately allege a "plan, fund, or program" because, at a minimum, he does not allege any facts indicating that from the surrounding circumstances,

a reasonable person could ascertain the procedures for receiving benefits from the alleged plan. Sarracco alleges only that Luceno promised him that "the Company would fund his retirement in the amount of $700 per month" and that "[o]n an annual basis, typically around the Christmas holiday, Luceno would take out a sheet of paper and show [him] the value of the retirement account." (SAC ¶¶ 45–46.) Sarracco does not allege that Luceno ever indicated to him how he would later receive the funds from the account that Luceno had allegedly managed. To the contrary, the Second Amended Complaint suggests that Luceno may have restricted access to the plan's funds: Sarracco alleges that the account earned no interest and that "if [he] ever made an official inquiry into this matter, ... it would be denied that he had any retirement whatsoever." (*Id.* ¶ 46.) *See Guilbert,* 480 F.3d at 146 (affirming summary judgment dismissing ERISA claim because no reasonable fact-finder could find plan established where plaintiff alleged only that employer promised certain contributions, wrote terms on legal pad and said company would maintain them, assured plaintiff repeatedly that plan had been established, and took tax deductions for employee benefits).

The only cases to which Sarracco points in support of his ERISA claim support Defendants' position that Sarracco has failed to allege the existence of a plan. [13] In *Moeller v. Bertrang,* 801 F.Supp. 291 (D.S.D.1992), the court found that an oral promise by an employer to establish a retirement account for employees constituted an ERISA plan. *Id.* at 294. The court found that a reasonable person could ascertain the procedures for receiving benefits because "[a]fter working for defendant for five years, the employee would receive $1,000 for each year employed by defendant until the retirement age of 62 years," and the "[d]efendant promised to pay to the employee a lump-sum in the amount of the employee's accrued retirement benefit when the employee reached the retirement age of 62 years." *Id.* Similarly, in *Scott v. Gulf Oil Corp.,* 754 F.2d 1499 (9th Cir.1985), the Ninth Circuit Court of Appeals found that the plaintiff had adequately alleged an ERISA plan by alleging that the defendant promised to provide plaintiff with a severance payment in "a sum equal to two weeks of salary for each year of employment with defendant." *Id.* at 1504 n. 2, *abrogated on other grounds by Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). [14] Sarracco here makes no such allegations of graduated payments or severance payments by which he was to receive the benefits of the alleged plan. *See, e.g., Dutka v. Emp'rs Health Ins.*

*Co.,* 760 F.Supp. 660, 663 (E.D.Mich.1991) (ERISA claim not adequately alleged where "[d]efendant has not offered any evidence from which a reasonable person could ascertain the procedures for receiving benefits under an alleged Employee Welfare Benefit Plan established by plaintiff's employer"; "[w]hile defendant suggests that the cover sheet to the Employer Group Application completed by plaintiff provides the information necessary to conclude that a plan does in fact exist, defendant's motion and brief do not explicitly or implicitly indicate the procedures by which the intended beneficiaries of the alleged Employee Welfare Benefit Plan would receive benefits"); *Molyneux,* 616 F.Supp. at 243–44 (dismissing ERISA claim where plaintiff alleged only that he was "aware of the company's benefit plans" and was later offered severance payment; plaintiff failed to allege "established procedures (written or unwritten) ... or the method of financing or calculating benefits"). Here, Sarracco does not allege facts plausibly suggesting the procedures for receiving benefits from the alleged plan, and thus has not plausibly alleged the existence of such a plan.

**\*21** Similarly, Sarracco does not allege the creation of an ongoing administrative scheme or program sufficient to demonstrate the existence of an ERISA plan. He fails to plead any facts concerning the regulation or administration of the alleged plan's funds—whether, for example, the funds were held in trust, or whether fiduciaries were designated to control or manage the funds. This alone is sufficient ground for dismissal. *See, e.g., Keire v. Curtis, Morris & Safford, P.C.,* No. 98–0387, 1999 WL 173571, at *2 (S.D.N.Y. Mar.29, 1999) ("[T]he amended complaint does not allege an 'ongoing administrative program.' The amended complaint does not allege, and the By–Laws do not provide for, a 'plan, fund or program.' ... The By–Laws provided for no administrative scheme; they did not call for the creation of any trust funds; they did not appoint any fiduciaries."); *see also Laverty,* 954 F.Supp. at 90 (plan not governed by ERISA where "the Agreement contain[ed] none of the provisions which normally attend that creation and maintenance of an ERISA plan"; agreement "contain[ed] no administrative scheme for regulation and administration of plan funds," "name[d] no fiduciaries to control or manage the operations and administration of funds to be paid out under its terms," "[made] no arrangement for placing any assets in trust," and "fail[ed] to require plaintiff to contribute to any fund that would serve as the source of accrued benefits, or to specify the basis on which plaintiff's deferred contributions were to be made"). Sarracco's ERISA claim must therefore be dismissed for failure to plausibly allege an ERISA plan.

### 8. Sarracco's N.Y. Labor Law Claim (Count 10)

Sarracco brings claims under New York Labor Law Section 198–c for unpaid benefits and Section 215 for retaliation. Defendants argue that there is no private right of action under Section 198–c, which by its terms provides only that a wrongful refusal to pay agreed-upon benefits or wage supplements shall be a misdemeanor. N.Y. Lab. Law § 198–c. [15] There is "conflicting case law" and "considerable disagreement" as to whether a private right of action under the Labor Law may be implied. *Dzanis v. JPMorgan Chase & Co.,* No. 10–3384, 2011 WL 1210205, at *6 (S.D.N.Y. Mar.22, 2011) (declining to dismiss). I find more persuasive the cases finding a private right of action to be appropriate, *see Vysovsky v. Glassman,* No. 01–2531, 2007 WL 3130562, at * 17 (S.D.N.Y. Oct.23, 2007); *Chu Chung v. New Silver Palace Rests., Inc.,* 272 F.Supp.2d 314, 316–19 (S.D.N.Y.2003), [16] and accordingly decline to dismiss the claim for unpaid benefits. A private right of action comports with the remedial purposes of the Labor Law and the language of Section 198, which allows for attorneys' fees and the like for employees bringing private claims. *See Vysovsky,* 2007 WL 3130562, at *17.

Section 215(1)(a) prohibits employers from discharging, penalizing, discriminating against, or retaliating against an employee because that employee has complained of a violation of the state labor law. Sarracco alleges under this section that Luceno fired him for complaining, in his attorney's July 12, 2008 letter, that Luceno owed Sarracco approximately $100,000 in unpaid retirement benefits stemming from the $700–a–month retirement account. (SAC ¶¶ 49, 113–14.) The conduct of which Sarracco complained was Luceno's conduct in violation of Section 198–c, which indisputably can serve as the basis for a retaliation claim under Section 215. *See, e.g., Kelly,* 681 N.Y.S.2d at 323 (affirming denial of defendant's summary judgment motion seeking to dismiss plaintiff's Section 215 retaliation claim where plaintiff was fired for filing complaint with state department of labor regarding defendant's failure to pay earned commissions in violation of Section 198–c). Although it is unclear from the Second Amended Complaint whether the July 12, 2008 letter to Luceno specified that

he had violated 🚩 Section 198–c in particular, "[a]ll that is required is that the complaint to the employer be of a colorable violation of the statute." *Kaufman,* 2010 N.Y. Misc. LEXIS 5699, at \*4, 2010 WL 4858896. Sarracco therefore adequately states a claim under 🏷 New York Labor Law Section 215.

### 9. Sarracco's NYSHRL Retaliation and Discrimination Claims (Count 11)

**\*22** Sarracco's final claims are for retaliation, age discrimination, and sex discrimination under the NYSHRL. As noted above, claims of discrimination and retaliation under the NYSHRL are subject to the same analysis as discrimination and retaliation claims brought under Title VII. Given that Sarracco fails to state a retaliation claim under Title VII, he likewise fails to state a retaliation claim under the NYSHRL.

Sarracco also fails to state a claim for age discrimination. Like Castagna, Sarracco fails to allege any facts that would support the inference that Luceno's conduct was related to his age. The Second Amended Complaint is bereft of allegations that Luceno, or anyone else at Majestic for that matter, made facially age-discriminatory comments, or treated older employees differently than younger employees. In fact, the only allegation even potentially related to Sarracco's age discrimination claim is that he "was born in 1964," (SAC ¶ 5), and that is plainly insufficient.

Finally, Sarracco's claim for sex discrimination must fail. Sarracco does not specify either in the Second Amended Complaint or Plaintiffs' Opposition brief whether he brings his claim as a gender discrimination claim or as a hostile work environment claim. If he brings his claim as a gender discrimination claim, Sarracco must allege that (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances gave rise to an inference of discrimination. *See* 🏷 *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). If Sarracco brings his claim as a hostile work environment claim, as noted above, he must allege that (1) Luceno's conduct was objectively severe or pervasive, as based upon, for example, the conduct's frequency, severity, threatening and/or humiliating nature, and unreasonable interference with Sarracco's work performance; (2) Luceno created an environment that Sarracco subjectively perceived as hostile or abusive; and (3) Luceno created this environment because of Sarracco's sex. *See* 🏷 *Patane,* 508 F.3d at 113.

His claim fails under either theory. At a minimum, Sarracco fails to: (1) allege that he was qualified for the position of salesman; (2) characterize being placed "off the books" as an adverse employment action; (3) connect his alleged firing to his sex; (4) demonstrate that being placed "off the books" was objectively severe or pervasive discriminatory conduct —specifically, that such conduct was frequent rather than episodic, that it was threatening or humiliating in nature, or that it interfered with his work performance; or (5) demonstrate that he subjectively perceived it to be severe or pervasive. Such bare pleading is insufficient to state a claim for sex discrimination. Sarracco's NYSHRL claims must therefore be dismissed.

### D. Leave to Amend

Leave to amend a complaint should be freely given when justice so requires. Fed.R.Civ.P. 15(a)(2). It is within the sound discretion of the district court to grant or deny leave to amend. 🏷 *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " 🏷 *Ruotolo v. City of N.Y.,* 514 F.3d 184, 191 (2d Cir.2008) (quoting 🏷 *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Amendment is futile when the claim as amended cannot "withstand a motion to dismiss pursuant to Rule 12(b) (6)," and "[i]n deciding whether an amendment is futile, the court uses the same standard as those governing the adequacy of a filed pleading." *MacEntee,* 2011 WL 812395, at \*8 (internal quotation marks omitted). Where the problem with a claim "is substantive ... better pleading will not cure it," and "[r]epleading would thus be futile." 🏷 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

**\*23** In a letter to the Court and Plaintiffs dated April 12, 2010, Defendants identified several deficiencies in Plaintiffs' First Amended Complaint. (Doc. 11.) Namely, Defendants highlighted: (1) the legal implausibility of Castagna's retaliation claim based on a report filed after she quit, (*id.* at 2); (2) the lack of factual allegations to support Castagna's age discrimination claim, (*id.* at 3); (3) Castagna's failure to satisfy 🏷 N.Y. Labor Law Section 215, (*id.*); (4) the untimely nature of Castagna's intentional tort claims, (*id.*);

and (5) Sarracco's failure to allege a plan under ERISA, (*id.* at 4). At the April 27, 2010 pre-motion conference, the parties and the Court further discussed the deficiencies in the First Amended Complaint, including: (1) Title VII's prohibition on individual liability, (Fragale Decl. Ex. B, at 3); (2) Sarracco's "bald" claims of gender and age discrimination, (*id.* at 3–4); and (3) the lack of a connection between Sarracco's independent contractor status and discrimination law, (*id.* at 5). The Court gave leave to amend again and explicitly stated that it would not permit further amendments to the Complaint. (*Id.* at 7.) That Plaintiffs were provided notice of their pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte. See, e.g.,* ▯ *Ruotolo,* 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend"); ▯ *In re Eaton Vance Mut. Funds Fee Litig.,* 380 F.Supp.2d 222, 242 (S.D.N.Y.2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint"), *aff'd sub nom.* ▯ *Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 118 (2d Cir.2007) (plaintiffs "were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (citations and internal quotation marks omitted). Moreover, Plaintiffs have not suggested in their Opposition papers that they are in possession of additional facts that would cure the deficiencies identified in this opinion. Because the bases of the dismissals were raised prior to the most recent amendment or are substantive in nature—or both—leave to amend is denied.

### III. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The remaining claims are: (1) Castagna's Title VII hostile work environment claim, against Majestic only; (2) Castagna's NYSHRL hostile work environment claims; and (3) Sarracco's New York Labor Law claim. All other claims are DISMISSED without leave to replead. The Clerk of the Court is respectfully directed to terminate the pending motion. (Doc. 13.) The parties are directed to appear before this Court for a conference on **Tuesday, May 31, 2011, at 10:00 a.m.** A schedule for discovery will be discussed. Counsel for Plaintiff Sarracco and for Defendants should also be prepared to discuss whether this Court should retain jurisdiction over Sarracco's state-law claim when all of his federal claims have been dismissed and there is no factual overlap between his surviving claim and Plaintiff Castagna's surviving claims, or whether his claim should be dismissed without prejudice to refiling in state court.

**\*24  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1584593

### Footnotes

1    "SAC" refers to the Second Amended Complaint, filed May 25, 2010. (Doc. 12.)

2    "Fragale Decl." refers to the Declaration of Costantino Fragale in Support of Defendants' Motion to Dismiss. (Doc. 14.)

3    "Defs.' Mem." refers to Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint. (Doc. 15.)

4    Defendants also argue that no inference of discrimination should arise where the person accused of discrimination is the person who hired the plaintiff. (Defs.' Mem. at 13–14.) "[T]he same-actor inference typically applies to claims of discrimina[tory termination], rather than to hostile work environment claims." *Shannon v. Advance Stores Co.,* No. 08–0940, 2009 WL 2767039, at \*11 (M.D.Tenn. Aug.27, 2009). Moreover, even if it applied, it would not necessarily override other evidence supporting the claim. *See id.*

5    I advised Plaintiffs' counsel at the April 27, 2010 pre-motion conference that individuals cannot be named as defendants in a Title VII action. (*See* Fragale Decl. Ex. B, at 3.) I am baffled as to why Castagna advanced such a claim in the Second Amended Complaint.

6    Castagna notes in passing that that Luceno's conduct resulted in her "constructive discharge" from Majestic. (SAC ¶ 62.) A claim for hostile-work-environment constructive discharge is distinct from a garden-variety hostile work environment claim and has different legal standards altogether. *See, e.g.,* 🚩 *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 725 (2d Cir.2010). Castagna does not include a separate count in the Second Amended Complaint based upon constructive discharge, nor does she discuss in her Opposition papers the standards applicable to such a claim or whether or not her allegations satisfy such standards.

Notwithstanding such omissions, to the extent that the Second Amended Complaint can be read to assert a claim for constructive discharge on behalf of Castagna, the allegations contained therein are sufficient to state such a claim at this stage of the litigation. "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* (internal quotation marks omitted). The plaintiff must demonstrate that the employer acted deliberately in creating the allegedly intolerable conditions, rather than merely acting negligently or ineffectively. 🚩⚠ *Petrosino v. Bell Atl.,* 385 F.3d 210, 229–30 (2d Cir.2004). The plaintiff need not show, however, that the employer acted with the specific intent to cause the plaintiff to quit. *Id.* The allegations discussed above regarding Luceno's constant verbal harassment, in addition to Castagna's allegations that, on July 9, 2008, Luceno (1) "yell[ed] at her in a voice that all could hear throughout the showroom" for requesting to "leave early and take comp time," (2) returned "[t]wenty minutes later ... screaming as he called her 'Ms. Corporate' and yelling that she was selfish," and (3) "reached over her desk and shoved a computer monitor at her," (SAC ¶¶ 26–27), satisfy the plausibility standard for a constructive discharge claim, in that such conduct could constitute the "last straw" that prompted her to quit that same day. *See, e.g.,* 🚩 *Felton v. Katonah Lewisboro Sch. Dist.,* No. 08–9340, 2009 WL 2223853, at *6 n. 1 (S.D.N.Y. July 2, 2009) ("[a]lthough [plaintiff] certainly has not pled a strong claim of constructive discharge, the Court believes that it is sufficient to survive a motion to dismiss").

7    I decline to address whether the filing of a police report constitutes protected activity. "[T]he Second Circuit appears not to have addressed [the] issue" of whether "the filing of a police report can constitute protected activity" under Title VII. *Labonia v. Doran Assocs., LLC,* No. 01–2399, 2004 WL 1921005, at * 10 (D.Conn. Aug.25, 2004). The Court in *Labonia* noted, however, that various other circuit courts have considered the issue and held that a police report does qualify as protected activity. *Id.* (citing 🚩 *Worth v. Tyer,* 276 F.3d 249, 265 (7th Cir.2001); 🚩 *EEOC v. Dinuba Med. Clinic,* 222 F.3d 580, 586 (9th Cir.2000)). Notwithstanding such precedent, the court declined to consider the report protected activity, given that the plaintiff in that case expressly denied in her deposition that the police report was for an assault that constituted sexual harassment, and therefore she could not plausibly argue on summary judgment that the "assault was itself the culmination of a sexually hostile working environment permitted to continue." *Id.* at *11 (internal quotation marks omitted). This is consistent with *Williams v. City of N.Y.,* No. 99–2697, 2006 WL 2668211 (S.D.N.Y. Sept.11, 2006), a case decided after *Labonia.* In *Williams,* the court held that the plaintiff's police report did constitute protected activity, but unlike in *Labonia,* the plaintiff reported a sexual assault that was very clearly part of the alleged discriminatory conduct at issue. *See id.* at *20.

8    To the extent Castagna is alleging that Defendants retaliated against her for raising issues regarding minimum wage, overtime, or compensatory time, those complaints would not constitute "action taken to protest or

oppose statutorily prohibited discrimination," which is required for a Title VII retaliation claim. 🚩 *Cruz, 202 F.3d at 566*.

9    "Pls.' Opp'n" refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss. (Doc. 16.)

10    Castagna argues that "Defendants have not shown that [Castagna's police complaint] has been adjudicated," and thus they have not "established that the statute of limitations has run." (Pls.' Opp'n at 16.) She has it precisely backwards.

> [The] defendant must satisfy the threshold burden of demonstrating, prima facie, that the time within which to sue has expired, and once that showing has been made, the burden shifts to the opponent to establish that the statute of limitations has been tolled or that he or she actually commenced the action within the applicable limitations period.

> *Krichmar v. Scher,* Nos.2010–01117, 2011–02550, 2011 WL 1206164, at *1 (2d Dep't Mar.29, 2011). Defendants having shown that the case was filed more than one year after the alleged torts, it is Castagna's burden to show that a criminal action was in fact commenced. She has not done so.

11    The Title VII claim may also be considered "reasonably related" to the EEOC charge if (1) the claim alleges retaliation suffered by the employee as a result of the filing of the EEOC complaint or (2) the additional claim alleges further instances of discrimination carried out in the same exact manner as those instances included in the EEOC charge. *See* 🚩 *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1402–03 (2d Cir.1993), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071. Neither of those theories applies here.

12    Sarracco does not specify in his Second Amended Complaint the particular ERISA subsection under which he brings his claim, (*see* SAC ¶¶ 107–11), even though I directed him to do so at the pre-motion conference, (*see* Fragale Decl. Ex. B, at 4). Although he highlights 🚩 29 U.S.C. § 1132(a)(1)(A) is his Opposition papers, (*see* Pls.' Opp'n at 12, 14), that subsection clearly does not apply here.

13    Sarracco cites to these cases in arguing that an oral agreement can give rise to an ERISA plan—an argument that seems to be supported by cases within this Circuit, *see, e.g., Grimo,* 34 F.3d at 15; *Molyneux v. Arthur Guinness & Sons, P.L.C.,* 616 F.Supp. 240, 243 (S.D.N.Y.1985), and that Defendants do not contest.

14    The other case cited by Sarracco, 🏳 *Sawinski v. Bill Curries Ford, Inc.,* 866 F.Supp. 1383 (M.D.Fla.1994), involved an employee welfare benefit plan, not a pension plan, and the Court noted without elaboration that "[t]here are adequate factual allegations in [plaintiff's] Amended Complaint for this Court to conclude that the health insurance benefits provided by [defendant] to its employees were provided under a qualifying employee welfare benefit plan." 🏳 *Id.* at 1388.

15    🚩 Section 198–c provides that,

> any employer who is party to an agreement to pay or provide benefits or wage supplements to employees or to a third party or fund for the benefit of employees and who fails, neglects or refuses to pay the amount or amounts necessary to provide such benefits or furnish such supplements within thirty days after such payments are required to be made, shall be guilty of a misdemeanor ....

⚑ N.Y. Lab. Law § 198–c(1). The term "benefits or wage supplements" includes retirement benefits. ⚑ *Id.* § 198–c(2).

16    ⚐ *Moran v. GTL Construction, LLC,* No. 06–0168, 2007 WL 2142343, at *5 (S.D.N.Y. July 24, 2007), and ⚐ *Hammell v. Banque Paribas,* 780 F.Supp. 196, 200 (S.D.N.Y.1991), go the other way.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4567695
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Delroy ASKINS, Plaintiff,
v.
Philip WEINBERG et al., Defendants.

19-CV-8793 (ALC)
|
Signed September 29, 2022

**Attorneys and Law Firms**

Delroy Askins, New York, NY, Pro Se.

Brian Bienenfeld, Seyfarth Shaw LLP, New York, NY,
Ravindra Kumar Shaw, Laura Victorelli, Jackson Lewis, P.C.,
New York, NY, for Defendants.

**OPINION & ORDER**

ANDREW L. CARTER, JR., United States District Judge:

**\*1** *Pro se* plaintiff Delroy Askins brings this action
against Defendants Philip Weinberg, Erica Joshua, Ms.
Smith, Mr. Jackson, Ms. Diaz, and STRIVE International,
Inc. ("STRIVE"), alleging claims, construed liberally, of
disability discrimination under Title I, Title II, and Title III
of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §
12181 *et seq.*, and under the Rehabilitation Act, 29 U.S.C.
§ 794(a). Defendants now move to dismiss Plaintiff's claim
pursuant to Federal Rule of Civil Procedure 12(b)(6).
For the following reasons, the Court GRANTS Defendants'
motion.

**BACKGROUND**

**I. Factual Background**
When determining whether to dismiss a case, the court
accepts as true all well-pleaded factual allegations in the
Complaint and draws all reasonable inferences in the
plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98,
104 (2d Cir. 2011). Pursuant to that standard, this recitation
of facts is based on Plaintiff's first amended complaint.

Plaintiff is a paraplegic who requires the use of a wheelchair
for all daily activities. ECF No. 43 ("FAC") ¶ 1. Defendant
STRIVE is a non-profit corporation "in the business of
providing job training to the public." *Id.* ¶ 3. STRIVE
provides job training services that would otherwise be
provided by government agencies, and in 2019, 71 percent of
STRIVE'S funding came from government grants. *Id.* ¶ 4.

On April 30, 2018, Plaintiff attended an information session
for a job training program held at STRIVE's Harlem office. *Id.*
¶ 5. Upon entrance, Plaintiff "found it very difficult" to access
the office in his wheelchair. *Id.* ¶ 6. While the hallways were
wide enough to accommodate wheelchair-bound individuals
like Plaintiff, "the furniture in the lobby was arranged in
such a manner that there was no clear or practical path for
someone in a wheelchair to approach the reception desk."
*Id.* The complaint specifies that the tables and chairs in the
lobby "did not provide sufficient passageway for wheelchair-
bound individuals." *Id.* Further, STRIVE employees did not
"seem[ ] interested" in assisting Plaintiff to maneuver through
the office, and Plaintiff relied upon his caregiver to "remove
and replace furniture obstacles" and assist him around the
office. *Id.* ¶ 7.

The application process for the program involved an
examination and a group interview in front of a panel
of interviewers. *Id.* ¶¶ 8, 11. Plaintiff alleges that
Defendant Joshua, whom Plaintiff identifies as "staff person,"
interrupted his exam, "made him very uncomfortable," and
yelled at him "to hurry up and finish the exam." *Id.* ¶ 9.
After passing the exam, Plaintiff returned to STRIVE on
May 9, 2018 for the panel interview. *Id.* ¶ 10. The STRIVE
staff treated him with "an attitude of hostility and disparate
treatment." *Id.* ¶ 11. Defendant Joshua asked Plaintiff to
remain in the lobby while she brought the other interviewees
to a different location within the office; and when she
brought Plaintiff to the location, she "placed [Plaintiff] in a
space that was confining," which also "made [Plaintiff] feel
uncomfortable because it was separate and away from the
rest of the enrollees." *Id.* ¶¶ 12, 13. He alleges that he was
"separated out from the rest of the group based only on his
status as a wheelchair-bound person." *Id.* ¶ 13. When Plaintiff
asked if he could be moved closer to the group, Joshua "waved
her hands dismissively." *Id.* ¶ 14.

**\*2** Plaintiff alleges that the interviewers also "treated [him]
differently from the other enrollees." *Id.* ¶ 16. The panelists
posed follow-up questions to the other interviewees, but asked
no follow-up questions to Plaintiff. *Id.* ¶¶ 17–18. Further,

Plaintiff had two negative interactions with the interviewers. *Id.* ¶¶ 18–20. Plaintiff was not admitted into the program because, according to a STRIVE staff member, "the panelists believed Mr. Askins was looking for a job, not a training program." *Id.* ¶ 22.

### II. Procedural Background

On September 28, 2018, Plaintiff filed an administrative complaint against STRIVE with the New York State Division of Human Rights ("NYSDHR"). On March 16, 2019, the NYSDHR dismissed the complaint for lack of probable cause. Plaintiff did not appeal that decision. On September 20, 2019, Plaintiff initiated this action. After Defendants moved to dismiss the original complaint on October 8, 2020, Plaintiff filed an amended complaint on March 12, 2021.

### STANDARD OF REVIEW

Rule 12(b)(6) allows the court to dismiss a claim if a party fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, the court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims should be dismissed when a plaintiff has not pled enough facts that "plausibly give rise to an entitlement to relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Accordingly, where a plaintiff alleges facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 557 (2007)).

Considering this standard, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted). In particular, "the pleadings of a *pro se* plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal citations and quotation marks omitted).

### DISCUSSION

The Court understands the amended complaint as asserting claims of discrimination against Defendants under Titles I, II, and III of the ADA and the Rehabilitation Act. After careful review, the Court dismisses Plaintiff's claims for failure to state a claim upon which relief can be granted.

### I. Collateral Estoppel

As a preliminary matter, Plaintiff's claims are not collaterally estopped. Defendants argue that Plaintiff's claims are based on the same events and allegations at at issue in his NYSDHR complaint and therefore are barred. The Court disagrees. In the Second Circuit, "a claimant may bring federal ADA and Title VII claims even if they have been rejected in a state administrative proceeding," and federal courts in this district "do not give preclusive effect to state agency decisions unless they have been reviewed in a state court proceeding." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015). There is no collateral estoppel here as there was no state court review of the administrative dismissal of Plaintiff's case.

### II. ADA Title I Claim

**\*3** Defendants argue that Plaintiff's Title I claim must be dismissed for failure to exhaust administrative remedies. The Court agrees. "Title I explicitly addresses employment discrimination, prohibiting discrimination based on a person's disability with respect to 'job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.' " *Transp. Workers Union of Am., Loc. 100, AFL-CIO v. New York City Transit Auth.*, 342 F. Supp. 2d 160, 164 (S.D.N.Y. 2004) (quoting 42 U.S.C. § 12112(a)). ADA Title I plaintiffs, like Title VII Plaintiffs, are required to exhaust their administrative remedies before bringing a claim in federal court—among other things,

they must receive a right-to-sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.*; *see* 42 § 12117(a) (incorporating "[t]he powers, remedies, and procedures set forth in [42 U.S.C.] sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9").

Plaintiff concedes in his opposition that he did not receive a right-to-sue letter. In such situations and in Title I's analogue under Title VII, courts will dismiss the unexhausted claim. *See, e.g., Davis v. Metro N. Commuter R.R.*, No. 21-CV-387, 2022 WL 2223018, at *8 (S.D.N.Y. June 21, 2022) ("Where a plaintiff fails to provide a right-to-sue letter from the EEOC and does not allege that plaintiff received or attempted to procure such letter, courts have dismissed the Title VII claims."); *Staten v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 282 F. Supp. 3d 734, 742 (S.D.N.Y. 2017) (dismissing claims where plaintiff did not receive a right-to-sue letter before bringing suit) *aff'd*, 736 F. App'x 17 (2d Cir. 2018).

Additionally, Title I is only applicable to employees and the discriminatory practices of their employers. *See, e.g., Karupaiyan v. CVS Health Corp.*, No. 19-CV-8814, 2021 WL 4341132, at *9 (S.D.N.Y. Sept. 23, 2021) ("It is well established that an employer-employee relationship is a primary element of an employment discrimination claim under ... the ADA...."). "An individual is not an 'employee' within the meaning of Title I of the ADA and the Rehabilitation Act, and cannot state a plausible claim for employment discrimination under those statutes, in the absence of either direct or indirect economic remuneration or the promise thereof." *Sandler v. Benden*, No. 15-CV-1193, 2016 WL 9944017, at *15 (E.D.N.Y. Aug. 19, 2016), *aff'd*, 715 F. App'x 40 (2d Cir. 2017) (quoting *O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997)); *see also United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004) ("Th[e] remuneration need not be a salary, but must consist of substantial benefits not merely incidental to the activity performed." (internal quotation marks and citations omitted)).

Here, Plaintiff has not alleged that he is an employee of STRIVE, nor could he as he does not receive compensation or benefits from STRIVE. Thus, Plaintiff cannot state a claim for employment discrimination under Title I. *See Heller v. Consol. Rail Corp.*, 331 F. App'x 766, 768 (2d Cir. 2009)("[A]s appellant did not allege that either the EEOC or the Railroad Retirement Board was his employer, he could not state a claim against them under the provisions of ...

the Americans with Disabilities Act ... which apply only to discriminatory practices by an employer."); *Sandler*, 2016 WL 9944017, at *15 ("Since plaintiff did not receive any such compensation or benefits from either [defendants], she cannot state a plausible claim for employment discrimination ... under either the ADA or the Rehabilitation Act against them.").

Defendants also argue that Plaintiff has failed to allege an adverse action. Under Title I, a plaintiff must demonstrate that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (internal quotation marks and citations omitted).

**\*4** To the extent that Plaintiff can establish an otherwise sufficient Title I claim, the Court finds that Plaintiff's allegations regarding an adverse action pass muster at this stage. An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002) (internal quotation marks and citations omitted). Construing Plaintiff's claim liberally as it must, the Court concludes that Plaintiff alleges that his rejection from the job employment program is the adverse action. Assuming *arguendo* that Plaintiff is considered an employee and is not barred from bringing this claim due to his failure to exhaust administrative remedies, then this allegation suffices. Indeed, in this context, rejection from the program is perhaps the most adverse action a plaintiff could suffer.

However, as Plaintiff has failed to exhaust his administrative remedies and has failed to allege an employer-employee relationship, the Court dismisses Plaintiff's Title I claim.

### III. ADA Title II Claim

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 § 12132. As defined in the ADA, a "public entity" is "any State or local government," "any department, agency, special purpose district, or other instrumentality of a State or States or local government," or "any commuter authority." 42 U.S.C. § 12131(1)(A)-(C); *accord Pierce v. Fordham Univ., Inc.*, No. 16-CV-2078, 2017 WL 2589378 at *2 (2d Cir. June 15, 2017) ("Title II applies only to state and local governments, their instrumentalities, and commuter authorities.").

Plaintiff argues that STRIVE is an "instrumentality" of government because it is "a non-profit contracted by government entities to provide job training that government entities would otherwise need to provide." ECF No. 67 at 4. Plaintiff offers no support for this claim and the Court declines to sustain it.

To qualify as a "public entity," it is not enough to receive government funding and provide services that the government also or would otherwise provide. *See, e.g.,* 🚩⚠️ *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006) (concluding that " 'instrumentality' is ... best read as referring to a creature of a state or municipality" and upholding dismissal of Title II claim because a "private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity"); *Wiltz v. New York Univ.*, No. 19-CV-03406, 2019 WL 8437456, at *7 (S.D.N.Y. Dec. 23, 2019), *report and recommendation adopted*, 2020 WL 614658 (S.D.N.Y. Feb. 10, 2020) ("It is well settled that private universities and private hospitals are not public entities subject to Title II, even if they receive government funding."); *Sandler*, 2016 WL 9944017, at *16 (holding that "not-for-profit corporation organized under the laws of the State of New York ... [and] a recipient of federal financial assistance" was not a public entity); *Lopez v. City of New York*, No. 17-CV-3014, 2017 WL 4342203, at *14 & n.23 (S.D.N.Y. Sept. 28, 2017), *report and recommendation adopted*, 2018 WL 1371164 (S.D.N.Y. Mar. 15, 2018) (holding that non-profit shelter operator that contracted with the New York City Department of Homeless Services to operate a shelter was not a public entity).

Thus, as Plaintiff has failed to adequately allege that STRIVE is a public entity, the Court dismisses Plaintiff's Title II claim.

## IV. ADA Title III CLAIM

Title III of the ADA prohibits discrimination against disabled individuals "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Under Title III, a plaintiff must demonstrate that "(1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94–95 (2d Cir. 2012) (internal quotation marks and citation omitted). Discrimination under the third prong includes "a failure to make reasonable modifications in policies, practices, or procedures." 42 U.S.C. § 12182(b)(2)(A)(ii).

**\*5** As Plaintiff acknowledges in his opposition, Plaintiff seeks only monetary damages, and injunctive relief is the only available remedy under Title III. *See* 🚩 *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("Monetary relief ... is not available to private individuals under Title III of the ADA."). Plaintiff's opposition re-lists STRIVE's alleged discriminatory acts, but does not request specific injunctive relief. Plaintiff's Title III claim is dismissed for failure to request the proper relief.

As the Court grants *pro se* Plaintiff permission to file an amended complaint and thus amend this deficiency, the Court will continue to analyze Plaintiff's Title III claim.

Plaintiff's opposition appears to advance a "failure to accommodate" theory of discrimination under Title III. However, Plaintiff does not identify specific accommodations, and more importantly, Plaintiff does not allege that he requested, and was subsequently denied, an accommodation from Defendants. For this reason, the Court denies Plaintiff's failure to accommodate claim. *See* 🚩 *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466, 69 (S.D.N.Y. 2012) ("Indeed, Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing ... what accommodations the examinee was seeking.... [T]he Court can find no evidence in the record that [the plaintiff] notified [the defendant] of his disability or requested accommodation.... Thus, the Court concludes that no rational jury could find that [the defendant] discriminated against [the plaintiff].").

Defendants also argue that Plaintiff fails to establish a claim of disparate impact discrimination under Title III. The Court disagrees and finds that notwithstanding the Title III claim's other deficiencies at this point, Plaintiff's allegations survive at this stage under the liberal standard afforded to *pro se* plaintiffs.

In order to establish a prima facie case of disparate impact, the plaintiff must demonstrate "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (internal quotation marks and citations omitted). A plaintiff need not prove discriminatory intent and must only show that the neutral practice "actually or predictably results in ... discrimination." *Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 206 (2d Cir. 2010) (internal quotation marks and citations omitted).

Here, Plaintiff has alleged a number of neutral practices carried out by Defendants: for example, separating Plaintiff from the other interviewees while the interviewees were brought into the examination room, placing Plaintiff in a location that was physically uncomfortable to inhabit and apart from his peers, and asking limited follow-up questions of Plaintiff. While the complaint does not consistently and explicitly state the effect of these practices upon Plaintiff, Plaintiff "essentially claims that due to his disability, this practice caused an adverse impact on Plaintiff". *Williams v. Barometre*, No. 20-CV-7644, 2022 WL 903068, at *17 (S.D.N.Y. Mar. 28, 2022) (cleaned up). Thus, at this early stage, Plaintiff satisfies both elements.

Further, "at the pleadings stage, it is reasonable to expect that plaintiffs pleading disparate impact claims must only include at least one allegation that raises an inference of such disparity —one sufficient to put the defendants on notice regarding the basis for the plaintiffs' belief in a disparate effect." *Id.* (cleaned up). Thus, even though the Complaint only specifies Plaintiff, "it is a reasonable inference that [interviewees] with his particular type of disability were adversely affected in an analogous way by [STRIVE]'s alleged practice." *Id.* (cleaned up). Accordingly, the Court finds that Plaintiff's disparate impact claim survives—albeit barely—Defendants' motion to dismiss in the event Plaintiff provides an appropriate request for relief.

**\*6** However, as Plaintiff has not alleged the proper relief, Plaintiff's ADA claims are dismissed in their entirety.

### V. Rehabilitation Act

Plaintiff also brings his claims under the Rehabilitation Act. The Court construes Plaintiff's Rehabilitation Act claim as arising under Section 504, which protects a "qualified individual with a disability" from exclusion of participation, denial of benefits, or subjection to discrimination based on the individual's disability "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Courts often do not analyze Rehabilitation Act claims separately from ADA claims because the Rehabilitation Act "prohibits the same type of discrimination" as the ADA. *Francis v. City of Meriden*, 129 F.3d 281, 283 (2d Cir. 1997). However, the two statutes do differ in scope. Title II applies to public entities while Section 504 applies to institutions "receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, like with Title II, "to state a *prima face* claim under [Section 504 of the Rehabilitation Act], a plaintiff must establish (1) that she is a qualified individual with a disability; (2) that she was excluded from participation in ... programs or activities [of an entity receiving federal financial assistance] or was otherwise discriminated against ...; and (3) that such exclusion or discrimination was due to her disability." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (internal quotation marks and citation omitted).

As discussed above, Plaintiff has not established that STRIVE is a public entity and thus Title II of the ADA does not apply. However, it is possible that STRIVE would be covered by Section 504, if it receives federal financial aid. The Complaint alleges that "STRIVE participates in several federal ... programs" and that STRIVE receives "Government Grants." Compl. ¶ 4. Liberally construing the allegations in the Complaint to allege federal support received by STRIVE, the Court finds that, at this stage, Plaintiff has sufficiently alleged that STRIVE is an entity governed by the Rehabilitation Act.

However, Plaintiff's Rehabilitation Act claim fails with respect to the second difference between the ADA and the Rehabilitation Act. A plaintiff is only entitled to relief under the Rehabilitation Act if the plaintiff, "*solely* by reason of her or his disability [is] excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022)

(quoting 29 U.S.C. § 794(a)) (emphasis added). Here, the complaint does not allege that the violations occurred solely because of Plaintiff's disability. In fact, Plaintiff alleges that STRIVE informed him that STRIVE rejected him because "the panelists believed Mr. Askins was looking for a job, not a training program." *Id.* ¶ 22.

Accordingly, the Court denies Plaintiff's Rehabilitation Act Claim.

## VI. Individual Defendants

The Court dismisses Plaintiff's claims against the individual defendants as there is no individual liability under Titles I and II of the ADA or the Rehabilitation Act. *See Fox v. State Univ. of New York*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("The plaintiff's claims against the individual defendants in their individual capacity must be dismissed because there is no individual liability under Title I or Title II of the ADA...."); *Zucker,* 43 F.4th at 35 (dismissing claims against individual defendants under the Rehabilitation Act).

**\*7** Under Title III of the ADA, "the question of whether a person is a proper defendant under the ADA turns [ ] on ... whether the defendant *owns, leases,* or *operates* a place of public accommodation within the meaning of the ADA." *Coddington v. Adelphi University,* 45 F.Supp.2d 211, 215 (E.D.N.Y. 1999). To operate a place of public accommodation, an individual must be "responsible for making decisions regarding disabled [persons]." *Id.* at 217. Plaintiff has not alleged any facts demonstrating that any of the individual defendants "exerted any influence over [STRIVE]'s accommodation policies," or that it is an individual, rather than the "institution that has the power to make any accommodations required by law." *Schenk v. Verizon,* No. 10-CV-6281, 2011 WL 1044560, at *1 (S.D.N.Y. Mar. 17, 2011); *see also Coddington,* 45 F. Supp. at 217.

Accordingly, the Court dismisses Plaintiff's claims against the individual defendants under the ADA and the Rehabilitation Act for failure to state a claim on which relief may be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. As courts should, "as a general matter, liberally permit *pro se* litigants to amend their pleadings unless amendment would be futile," and as Plaintiff has yet to amend his complaint following a decision on the merits, this dismissal is without prejudice. *Terry v. Inc. Vill. Of Patchogue,* 826 F.3d 631, 633 (2d Cir. 2016). If Plaintiff opts to file an amended complaint, he must do so within 30 days of this Opinion. The amended complaint shall address the deficiencies addressed in this opinion, and, as it will replace the current complaint, must include all claims and factual allegations, not only new claims and allegations. Failure to file an amended complaint within 30 days will result in a dismissal with prejudice.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 4567695

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 167559
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lazar FELBERBAUM, Plaintiff,
v.
SEQUIUM ASSET SOLUTIONS and
LVNV Funding LLC, Defendants.

21-cv-9513 (NSR)
|
Signed January 11, 2023

**Attorneys and Law Firms**

Eliyahu R. Babad, Stein Saks, PLLC, Hackensack, NJ, for
Plaintiff.

Brendan Hoffman Little, Lippes Mathias LLP, Buffalo, NY,
for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Lazar Felberbaum ("Plaintiff") commenced the
instant action against Defendants Sequium Asset Solutions,
LLC ("Defendant Sequium") and LVNV Funding LLC
("Defendant LVNV") (collectively, "Defendants") alleging
claims arising under the Fair Debt Collection Practices
Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"). (Complaint
("Compl.") (ECF No. 1).) Before the Court is Defendants'
motion pursuant to 🔖 Federal Rule of Civil Procedure 12(c)
for judgment on the pleadings. For the following reasons,
Defendants' motion is GRANTED, and Plaintiff's Complaint
is dismissed.

**BACKGROUND**

The following facts are derived from the Complaint and are
accepted as true for the purposes of this motion except as
otherwise noted.

Plaintiff is a New York resident who "allegedly" incurred a
debt to non-party Citibank, N.A. ("Citibank"), which arose
primarily out of personal credit transactions. (Compl. at ¶¶ 7,
16.) The debt became "deliquen[t]" on January 15, 2009. (*Id.*

at Ex. A.) Defendant LVNV later purchased this delinquent
debt and contracted with Defendant Sequium to collect the
debt originally owed to Citibank and now owed to Defendant
LVNV. (*Id.* at ¶¶ 19, 23.)

On or around December 4, 2020, Defendants sent Plaintiff
a collection letter (the "Letter") regarding the alleged debt,
which read as follows:

> This notice is being sent to you by a collection
> agency. Please be advised that LVNV Funding LLC,
> the Current Creditor-Debt Purchaser, has purchased the
> account referenced above. Our records further indicate that
> the judgment that was awarded on 12/13/2013 remains
> unresolved. This is the date on which the balance became
> due.

> (*Id.* at ¶ 24, Ex. A.)

The judgment referenced in the Letter totaled $27,212.94. (*Id.*
at ¶ 25, Ex. A.) The Letter stated a "Total Due" in the amount
of $27,212.94 (*id.* at ¶ 26.), but the Letter did not state whether
interest was accruing on this amount (*id.* at ¶¶ 27–29.). In the
Letter, Defendants offered to settle the existing debt for 65%
of the "Total Due." (*Id.* at ¶ 45.) Defendants, however, did
not (1) include a deadline by which Plaintiff had to accept the
offer or (2) otherwise state that the offer would expire at a
later unspecified date. (*Id.* at ¶¶ 46–47.)

Plaintiff alleges the "amount stated as due is ... false,
deceptive, misleading, and unfair." (*Id.* at ¶ 39.) In particular,
Plaintiff asserts that Defendants did not disclose that interest
was accruing on the balance at the New York post-judgment
rate of "nine per centum per annum." (*Id.* at ¶ 31.) As a
result, the actual amount due was $49,051.33. [1] (*Id.* at ¶
33.) Plaintiff further avers that Defendants would "not have
allowed Plaintiff to accept the settlement offer at any time"
and would "refuse to honor the offer" should Plaintiff accept.
(*Id.* at ¶¶ 49, 57.) The offer, alleges Plaintiff, was "illusory"
and "merely a collection tactic" "to coerce" Plaintiff into
paying the debt or to "sow ... confusion." (*Id.* at ¶¶ 62–63.)

**\*2** Defendants answered the Complaint (ECF Nos. 9 & 11)
and now move for judgment on the pleadings pursuant to Rule
12(c) of the Federal Rules of Civil Procedure. (ECF No. 19.)

Defendants also move to strike Plaintiff's sur-reply (ECF
No. 24), which Plaintiff styled as a "Notice of Supplemental
Authority" and filed in opposition to Defendants' 🔖 Rule

12(c) motion (ECF No. 23-1). Although Plaintiff did not seek leave to file a sur-reply, *see* Rule 3(B) of this Court's Individual Practices in Civil Cases, this Court nonetheless DENIES Defendant's Motion to Strike Plaintiff's Sur-Reply and deems Plaintiff's sur-reply papers accepted for the purposes of adjudicating the present 🚩 Rule 12(c) motion.

## LEGAL STANDARDS

Under 🚩 Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial— a party may move for judgment on the pleadings." 🚩 Fed. R. Civ. P. 12(c). [2] "To survive a 🚩 Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.' " 🚩 *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (quoting 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The standard for analyzing a motion for judgment on the pleadings under 🚩 Rule 12(c) is identical to the standard for a motion to dismiss for failure to state a claim under 🚩 Rule 12(b)(6). 🚩 *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *see also* 🚩 Fed. R. Civ. P. 12(b)(6).

Under 🚩 Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting 🚩 *Twombly*, 550 U.S. at 570); *accord* 🚩 *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." 🚩 *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " 🚩 *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting 🚩 *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the

elements of a cause of action." 🚩 *Iqbal*, 556 U.S. at 678 (quoting 🚩 *Twombly*, 550 U.S. at 555). Likewise, "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." 🚩 *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." 🚩 *Iqbal*, 556 U.S. at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 *Id.* at 678.

## DISCUSSION

**\*3** The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 🚩 15 U.S.C. § 1692e. To achieve this, the FDCPA imposes, "among other things, certain notice and timing requirements on efforts by 'debt collectors' to recover outstanding obligations." 🚩 *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 58 (2d Cir. 2004). Section 1692k of the FDCPA provides that "any debt collector who fails to comply with any provision of [the FDCPA] with respect to any person is liable to such person...." 🚩 15 U.S.C. § 1692k.

Moreover, a single violation is sufficient to establish liability under the FDCPA. 🚩 *Wiener v. Bloomfield*, 901 F. Supp. 771, 778 (S.D.N.Y. 1995) (citing 🚩 *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993)). "The court considers the frequency or number of violations only in calculating damages." *Id.* (citing 🚩 15 U.S.C. § 1692k(b)(1)). "The court may not, however, regardless of the number of violations, impose more than the $1,000 statutory penalty provided for actions such as these in the absence of actual damages." *Id.* (citing 🚩 15 U.S.C. § 1692k(a)(2)(A)).

To state a claim under the FDCPA, a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA. [3] *See Cohen v. Ditech Fin. LLC*, 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y. Mar. 24, 2017). Plaintiff alleges that Defendants violated Sections 1692e, 1692e(2), e(10), 1692f, and 1692g of the FDCPA. *See* Compl. ¶¶ 79–93. For the reasons articulated below, the Court dismisses all of Plaintiff's claims.

Section 1692e of the FDCPA prohibits a debt collector from making a "false, deceptive, or misleading representation." 15 U.S.C. § 1692e. In particular, Section 1692e(2) prohibits "the false representation of the character, amount, or legal status of any debt," and Section 1692e(10) prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." "It is well established that the FDCPA imposes strict liability on debt collectors," meaning that Plaintiff "need not prove that the prohibited conduct was intentional." *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 528 (S.D.N.Y. 2013); *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector."); *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages.").

In the Second Circuit, two principles of statutory construction guide courts' assessments of alleged violations of Section 1692e: (1) the FDCPA is liberally construed to effectuate its purpose of consumer protection, and (2) collection notices are analyzed from the perspective of the "least sophisticated consumer." *Taylor v. Fin. Recovery Servs.*, 886 F.3d 212, 214 (2d Cir. 2018) (internal citation omitted). The least sophisticated consumer test is an objective one that "pays no attention to the circumstances of the particular debtor in question." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 234 (2d Cir. 2012). Despite the name, the least sophisticated consumer is not wholly unsophisticated; they are "presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Kolbasyuk v. Capital Mgmt. Servs. LP*, 918 F.3d 236, 239 (2d Cir. 2019) (internal quotations and citation omitted). Applying the standard of the least sophisticated consumer, a debt collector's representation is misleading or deceptive "if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.' " *Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993)). There is also a materiality requirement, where courts focus on "whether the false statement would frustrate a consumer's ability to intelligently choose his or her response." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 86 (2d Cir. 2018) ("[M]ere technical falsehoods that mislead no one are immaterial and consequently not actionable under § 1692e.") (internal quotations and citations omitted).

**\*4** Before this Court is a narrow question: whether a debt collector violates the FDCPA when it fails to state that the interest clock is (or is not) running when offering to settle a debt for a sum certain. The Second Circuit recently addressed an identical question, holding that "debtors faced with a settlement offer are not misled by the failure to disclose that interest is accruing because ... payment of the amount indicated in a collection notice would extinguish the debt." *Cortez v. Forster & Garbus, LLP*, 999 F.3d 151, 155 (2d Cir. 2021). In so doing, the Second Circuit concluded "a settlement offer need not enumerate the consequences of failing to meet its deadline or rejecting it outright so long as it clearly and accurately informs a debtor that payment of a specified sum by a specified date will satisfy the debt." *Id.* at 156. At first glance, the Second Circuit's reasoning in *Cortez* appears to control the result in the instant case; here, as in *Cortez*, Defendants offered to settle the debt for a percentage of the amount shown as due and owing. If Plaintiff availed himself of Defendants' settlement offer, his "payment ... would extinguish the debt." *Id.* at 155.

In his sur-reply, Plaintiff argues *Cortez* is inapplicable because the offer letter at issue in *Cortez* included a *specific* date by which the debtor needed to avail himself of the offer. (ECF No. 23-1 at 1–2.) In effect, including a specific date in the offer notified the debtor as to how long the offer would remain open. By not including a specific date in the Letter, Plaintiff contends the Defendants were employing a "coercive collection tactic" in which Defendants would "not honor" Plaintiff's acceptance of their offer. (*Id.* at 2.)

Plaintiff alleges as much in the Complaint, asserting that Defendants would not have honored Plaintiff's acceptance of their settlement offer in 1, 5, 10, 20, or 50 years. (Compl. at ¶¶ 49–54.) In other words, Plaintiff is concerned he will pay the settlement amount and then later find out Defendants (or their successors) have pocketed the payment without discharging Plaintiff's debt. (*See id.* at ¶¶ 57–63.) Plaintiff concludes Defendants' offer is "illusory" (id. at ¶ 62), and thus the Letter "violates the FDCPA." (ECF No. 23-1 at 2; *see generally* Compl.)

Plaintiff is incorrect. The Second Circuit in *Cortez* did not establish a bright line rule that every settlement offer must include a specific deadline for acceptance. The *Cortez* Court was not concerned with whether the offer included a specific acceptance date; instead, it was concerned with whether the settlement offer would mislead a debtor because "the offer set forth a payment deadline *but failed to disclose whether interest or fees would accrue if payment were tendered after the deadline.*" *Cortez, 999 F.3d at 156* (emphasis added). Ultimately, the Court reasoned that a settlement offer "need not enumerate" post-deadline interest and fees so long as the offer "clearly and accurately informs a debtor that payment of a specified sum by a specified date will satisfy the debt." *Id.* Put differently, so long as the offer has not lapsed and a debtor is entitled to pay a specified sum to satisfy a debt, a debt collector is not bound to "anticipate every potential collateral consequence that could arise in connection with the payment or nonpayment of a debt." *See id.*; *Avila v. Riexinger & Assocs., LLC, 817 F.3d 72, 77 (2d Cir. 2016)* ("We hold that a debt collector will not be subject to liability under Section 1692e for failing to disclose that the consumer's balance may increase due to interest and fees if the collection notice ... clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date."); *Altman v. J.C. Christensen & Assocs., Inc., 786 F.3d 191, 194 (2d Cir. 2015)* ("The Letter at issue here plainly states that the percentage saved is 'on your outstanding account balance.' The fact that a debtor may then have to pay tax on the amount saved is simply not deceptive in the context of what the savings are on a debtor's outstanding account balance.") (internal quotations omitted);

see also *Taylor v. Fin. Recovery Servs., Inc., 886 F.3d 212, 215 (2d Cir. 2018)* ("Construing the FDCPA in light of its consumer protection purpose, we hold that a collection notice that fails to disclose that interest and fees are not currently accruing on a debt is not misleading within the meaning of Section 1692e.").

**\*5** Here, Defendants' offer remains open, and as a result, Defendants have no present duty to inform Plaintiff of the amount of interest due on the account. [4] Plaintiff does not allege the settlement offer is closed at present. Instead, Plaintiff speculates that Defendants, who "retain[ ] the right to rescind the settlement offer at any time," "would not have allowed Plaintiff to accept the settlement offer." (Compl. at ¶¶ 48–61.) Plaintiff's allegations, however, are speculative and incorrect as a matter of law. Should Plaintiff accept Defendants' offer by paying the specified sum, Defendants cannot then revoke their offer. [5] See *Altman v. Zwicker & Assocs., P.C., No. 20 CV 6622 (VB), 2021 WL 3774120, at \*4 (S.D.N.Y. Aug. 25, 2021)* ("In other words, defendant could not have withdrawn the offer of sending an application if the consumer paid the allegedly outstanding debt without communicating such withdrawal to the consumer."). Until such time as Plaintiff accepts Defendants' offer by paying the specified sum, Defendants may revoke the offer, but only if they first give unambiguous notice of revocation to Plaintiff. *See, e.g., Cumis Ins. Soc., Inc. v. Citibank, N.A., 921 F. Supp. 1100, 1106 (S.D.N.Y. 1996)* ("A revocation is a clear manifestation of an intent not to perform, and once communicated to the offeree, terminates the offeree's power to accept the offer.") (citing Restatement (Second) of Contracts § 42 (1981)). Because Defendants cannot revoke the offer without first giving Plaintiff notice of their intent to do so, the Letter is not misleading. In fact, the Letter "clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date,"—here any date prior to Defendants giving notice of their intent to revoke the offer.

See *Avila, 817 F.3d at 77*; *see also Weiss v. Sequium Asset Sols., LLC, No. 21-CV-218(EK)(TAM), 2022 WL 1046260, at \*3 (E.D.N.Y. Apr. 7, 2022)* ("Indeed, the open-ended offer from the Defendants was more generous to [Plaintiff] than the defined expiration in *Cortez*, in that it gave [Plaintiff] longer than Mr. Cortez was afforded to accept the settlement offer."). In sum, Defendants' offer remains open, and Plaintiff is still entitled to pay $27,212.94—a sum certain—to extinguish all debts associated with his account.

Plaintiff's claim under Section 1692e fails. So too do Plaintiff's claims under Sections 1692f and 1692g. Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt any debt." "Unconscionable" here means "shockingly unjust or unfair" or "affronting the sense of justice, decency, or

reasonableness." 🚩 *Gallego v. Northland Group, Inc.*, 814 F.3d 123, 127–28 (2d Cir. 2016). Meanwhile, Section 1692g requires Defendants to state "the amount of the debt." For the reasons stated above, Plaintiff's allegations fail to show Defendants' collection notice containing an open offer— which has remained open for over two years and settles Plaintiff's debt interest-free at a sum certain—is "[s]hockingly unjust or unfair," or "affronting the sense of justice, decency, or reasonableness." *Id.* Accordingly, Defendants' Letter does not violate Section 1692f.

Insofar as Defendants' offer remains open and represents the sum certain owed by Plaintiff to extinguish the debt, Defendants also abide by the requirements of Section 1692g. *See Weiss*, 2022 WL 1046260, at *4 (E.D.N.Y. Apr. 7, 2022) (finding Defendants "comport[ed]" with requirements of Section 1692g where Defendants extended an open offer for Plaintiff to pay a specified amount to extinguish Plaintiff's debt).

## CONCLUSION

**\*6** For the foregoing reasons, Defendants' motion for judgment on the pleadings is GRANTED. Defendants' motion to strike Plaintiff's sur-reply is DENIED.

### All Citations

Slip Copy, 2023 WL 167559

## Footnotes

1    This estimated balance represents the accrued interest as of November 17, 2021, when Plaintiff filed the Complaint. (Compl. at ¶ 33.)

2    Defendant Sequium attaches two exhibits to its answer. (*See* ECF Nos. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).) Because Plaintiff had no notice of the exhibits prior to their filing, this Court declines to consider them in adjudicating the present 12(c) motion. *See* 🚩*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing 🚩*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders *they had notice* and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion.") (emphasis added)).

3    Plaintiff adequately alleges the first two requirements. (*See* Compl. at ¶¶ 8–13, 23.)

4    Defendants' duty to report interest attaches when (1) Defendants revoke the open offer to accept payment of a sum certain to extinguish the debt, and (2) Defendants indeed charge interest on the principal balance. *See* 🚩*Avila*, 817 F.3d at 76 ("Because the statement of an amount due, without notice that the amount is already increasing due to accruing interest or other charges, can mislead the least sophisticated consumer into believing that payment of the amount stated will clear her account, we hold that the FDCPA requires debt collectors, when they notify consumers of their account balance, to disclose that the balance may increase due to interest and fees."). In any event, it appears Defendants are estopped from charging interest on the balance-to-date. (*See* ECF No. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).)

5    Plaintiff alleges Defendant Sequium acts "on behalf of Defendant LVNV." (*See* Compl. at ¶ 23.) As such, Defendant LVNV is bound to honor the contract proposed to Plaintiff by Defendant Sequium on Defendant LVNV's behalf. *See, e.g.,* 🚩*Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) ("Under general principles of agency, the authority of an agent is the power of the agent to do an act or to

conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.") (internal quotations omitted).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Cohen v. Rosicki, Rosicki & Associates, P.C., 897 F.3d 75 (2018)

KeyCite Yellow Flag - Negative Treatment

Disagreed With by  Trichell v. Midland Credit Management, Inc.,   11th Cir.
(Ala.),   July 6, 2020

897 F.3d 75

United States Court of Appeals, Second Circuit.

Aaron COHEN, on behalf of himself and all
others similarly situated, Plaintiff-Appellant,
v.
ROSICKI, ROSICKI & ASSOCIATES, P.C.,
Ditech Financial LLC, Defendants-Appellees.

Docket No. 17-950-cv
|
August Term, 2017
|
Argued: October 2, 2017
|
Decided: July 23, 2018

**Synopsis**

**Background:** Mortgagor brought putative class action
against mortgage-loan servicer and its law firm, alleging
violations of Fair Debt Collection Practices Act (FDCPA).
The United States District Court for the Eastern District
of New York, Leonard D. Wexler, J., 2017 WL **1134723**,
dismissed. Mortgagor appealed.


**Holdings:** The Court of Appeals, Sack, Circuit Judge, held
that:

[1] mortgagor had standing;

[2] identification of servicer as creditor was not material
misrepresentation under FDCPA; and

[3] certificate of merit and request for judicial intervention
were not initial communications under FDCPA.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (19)

**[1]    Federal Courts** 🔑 Dismissal or nonsuit in
general

Appellate court reviews de novo a district court's
grant of a defendant's motion to dismiss.

2 Cases that cite this headnote

**[2]    Federal Civil Procedure** 🔑 Insufficiency in
general

**Federal Civil Procedure** 🔑 Matters deemed
admitted;  acceptance as true of allegations in
complaint

To survive a motion to dismiss for failure to
state a claim, a complaint must contain sufficient
factual matter, accepted as true, to state a claim
to relief that is plausible on its face. Fed. R.
Civ. P. 12(b)(6).

35 Cases that cite this headnote

**[3]    Federal Civil Procedure** 🔑 Matters
considered in general

On motion to dismiss for failure to state a claim,
a complaint is deemed to include any written
instrument attached to it as an exhibit, materials
incorporated in it by reference, and documents
that, although not incorporated by reference, are
integral to the complaint. Fed. R. Civ. P. 12(b)
(6).

23 Cases that cite this headnote

**[4]    Finance, Banking, and Credit** 🔑 Debt
collection practices

Mortgagor sufficiently alleged injury in fact
and, thus, had standing to bring action against
mortgage-loan service and its law firm for
violations of Fair Debt Collection Practices
Act (FDCPA); claims were based on allegedly
incorrect identification of servicer as creditor
in foreclosure complaint, certificate of merit,
and request for judicial intervention, and taken
as true, misrepresentation might have deprived

mortgagor of information relevant to debt prompting foreclosure proceeding, posing risk of real harm insofar as it could hinder exercise of his right to defend or otherwise litigate that action. Consumer Credit Protection Act §§ 807, 809,

🚩 15 U.S.C.A. §§ 1692e, 🏳 1692g.

4 Cases that cite this headnote

**[5]**    **Federal Civil Procedure**  ☞  In general; injury or interest

Standing is a threshold matter in determining whether a district court had jurisdiction to hear and decide case.

6 Cases that cite this headnote

**[6]**    **Federal Civil Procedure**  ☞  In general; injury or interest

**Federal Civil Procedure**  ☞  Causation; redressability

To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the complained-of conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

14 Cases that cite this headnote

**[7]**    **Federal Civil Procedure**  ☞  In general; injury or interest

In order to determine whether a procedural violation manifests injury in fact, as required for standing, a court properly considers whether Congress conferred the procedural right in order to protect an individual's concrete interests.

12 Cases that cite this headnote

**[8]**    **Federal Civil Procedure**  ☞  In general; injury or interest

In the absence of a connection between a procedural violation and a concrete interest, a bare violation of the former does not manifest injury in fact, as required for standing; however,

where Congress confers a procedural right in order to protect a concrete interest, a violation of the procedure may demonstrate a sufficient risk of real harm to the underlying interest to establish concrete injury without need to allege any additional harm beyond the one Congress has identified.

21 Cases that cite this headnote

**[9]**    **Finance, Banking, and Credit**  ☞  Debt in general

Focus of provision of Fair Debt Collection Practices Act (FDCPA) defining "debt" on the underlying transaction indicates that whether an obligation is a debt depends not on whether the obligation is secured, but rather upon the purpose for which it was incurred. Consumer Credit Protection Act § 803, 🏳 15 U.S.C.A. § 1692a(5).

8 Cases that cite this headnote

**[10]**    **Finance, Banking, and Credit**  ☞  Debt collectors and debt collection in general

Mortgage foreclosure constitutes debt collection under the Fair Debt Collection Practices Act (FDCPA). Consumer Credit Protection Act, § 802 et seq., 15 U.S.C.A. § 1692 et seq.

48 Cases that cite this headnote

**[11]**    **Finance, Banking, and Credit**  ☞  Summons, complaints, and other process and filings

Even if identification of mortgage-loan servicer as creditor in foreclosure complaint, certificate of merit, and request for judicial intervention was false or misleading, it was not material misrepresentation under Fair Debt Collection Practices Act (FDCPA); identification of servicer as creditor was not deceptive as to nature or legal status of mortgagor's debt, nor would it have prevented least sophisticated consumer from responding to or disputing action. Consumer Credit Protection Act § 807, 🚩 15 U.S.C.A. § 1692e.

12 Cases that cite this headnote

**[12]  Finance, Banking, and Credit** 🔑 "Least sophisticated consumer" test in general

Whether a communication is false, deceptive, or misleading under Fair Debt Collection Practices Act (FDCPA) is determined from the perspective of the objective least sophisticated consumer.

Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

51 Cases that cite this headnote

**[13]  Finance, Banking, and Credit** 🔑 "Least sophisticated consumer" test in general

Under least sophisticated consumer standard of Fair Debt Collection Practices Act (FDCPA), collection notices can be deceptive if they are open to more than one reasonable interpretation, at least one of which is inaccurate. Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

45 Cases that cite this headnote

**[14]  Finance, Banking, and Credit** 🔑 "Least sophisticated consumer" test in general

A false statement is only actionable under the Fair Debt Collection Practices Act (FDCPA) if it has the potential to affect the decision-making process of the least sophisticated consumer.

Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

33 Cases that cite this headnote

**[15]  Finance, Banking, and Credit** 🔑 Communications, Representations, and Notices; Debtor's Response

The materiality inquiry, in action under Fair Debt Collection Practices Act (FDCPA), focuses on whether the false statement would frustrate a consumer's ability to intelligently choose his or her response. Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

**[16]  Finance, Banking, and Credit** 🔑 Communications, Representations, and Notices; Debtor's Response

Communications and practices that could mislead a putative-debtor as to the nature and legal status of the underlying debt, or that could impede a consumer's ability to respond to or dispute collection, violate the Fair Debt Collection Practices Act (FDCPA). Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

24 Cases that cite this headnote

**[17]  Finance, Banking, and Credit** 🔑 Communications, Representations, and Notices; Debtor's Response
**Finance, Banking, and Credit** 🔑 Technical or minor violations

Mere technical falsehoods that mislead no one are immaterial and consequently not actionable under Fair Debt Collection Practices Act (FDCPA). Consumer Credit Protection Act § 807, 🚩15 U.S.C.A. § 1692e.

18 Cases that cite this headnote

**[18]  Finance, Banking, and Credit** 🔑 Summons, complaints, and other process and filings

Certificate of merit and request for judicial intervention (RJI) were not initial communications under Fair Debt Collection Practices Act (FDCPA), and thus mortgagor could not bring claim against mortgage-loan servicer or its law firm for violation of section of FDCPA requiring debt collector, in its initial communication with debtor, to identify creditor to whom debt was owed; certificate fell within pleading exclusion because servicer and firm were legally obligated to file document with foreclosure complaint, and New York law required RJI as part of initial assertion of complaint seeking foreclosure order, so RJI could be viewed as forming part of pleading.

Consumer Credit Protection Act § 809, 🚩 15 U.S.C.A. § 1692g; N.Y. CPLR § 3012-b(a).

26 Cases that cite this headnote

[19]  **Finance, Banking, and Credit** 👉 Summons, complaints, and other process and filings

Fair Debt Collection Practices Act's (FDCPA) exclusion of communication in form of formal pleading in civil action from definition of initial communications applies not only to the formal documents that make up a standard pleading, but also to any communication forming any part thereof, including exhibits attached to a complaint. Consumer Credit Protection Act § 809, 🚩 15 U.S.C.A. § 1692g(d).

8 Cases that cite this headnote

**\*77** Appeal from a judgment of the United States District Court for the Eastern District of New York

**Attorneys and Law Firms**

Daniel A. Edelman, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, Illinois (Tiffany N. Hardy, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, Illinois; Shimshon Wexler, The Law Office of Shimshon Wexler, PC, Decatur, Georgia, on the brief ), for Plaintiff-Appellant.

Henry Mascia (Cheryl F. Korman, on the brief ), Rivkin Radler LLP, Uniondale, New York, for Defendant-Appellee Rosicki, Rosicki & Associates, P.C.

Martin C. Bryce, Jr. (Adam P. Hartley, Alexander Kommatas, on the brief ), Ballard Spahr LLP, New York, New York, for Defendant-Appellee Ditech Financial, LLC.

Mary McLeod, General Counsel, John R. Coleman, Deputy General Counsel, Steven Bressler, Assistant General Counsel, Nandan M. Joshi, Joseph Frisone, Counsel, Consumer Financial Protection Bureau, Washington, D.C., for Amicus Curiae Consumer Financial Protection Bureau, in support of Plaintiff-Appellant.

Before: Sack, Raggi, and Carney, Circuit Judges.

**Opinion**

Sack, Circuit Judge:

**\*78** The plaintiff, Aaron Cohen, brings this putative class action against Ditech Financial LLC ("Ditech"), Cohen's mortgage-loan servicer, and Rosicki, Rosicki & Associates, P.C. ("Rosicki"), the servicer's law firm, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., in connection with their attempt to initiate foreclosure proceedings on his home. The district court (the late Leonard D. Wexler, *Judge*) granted the defendants' motions to dismiss. We conclude that the district court erred in dismissing Cohen's FDCPA claims on the ground that the enforcement of a security interest through foreclosure proceedings is not debt collection for purposes of the FDCPA. We nevertheless affirm because Cohen has failed to plausibly allege that the defendants violated the FDCPA.

**BACKGROUND**

*Factual Background*[1]

On or about August 11, 2005, Cohen obtained a mortgage loan of $359,650 from Sterling Empire Funding Associates, Ltd. ("Sterling") to finance the purchase of his personal residence in Pomona, Rockland County, New York. Cohen has been in default on this mortgage since 2009. On June 1, 2010, Cohen's mortgage and note was assigned to Countrywide/Bank of America, which on June 10, 2013, transferred its rights in the mortgage and note to Green Tree Servicing LLC ("Green Tree"). Green Tree, through its attorney Rosicki, filed a foreclosure action summons and complaint with respect to the mortgaged property against Cohen in New York Supreme Court Rockland County on March 11, 2015. After the foreclosure action was filed, Green Tree changed its name to Ditech.[2] The defendants mailed copies of the summons and foreclosure complaint to Cohen.

The complaint in the foreclosure action asserts that Green Tree is the "holder of the subject note and mortgage, or has been delegated the authority to institute a mortgage foreclosure action by the owner and holder of the subject mortgage and note." App'x at 37. The summons states that Green Tree is "the creditor to whom **\*79** the debt is owed" and provides that "[u]pon your written request within 30 days after receipt of this notice, Rosicki, Rosicki & Associates P.C.

will provide you with the name and address of the original creditor if different from the current creditor." App'x at 34.

New York law requires foreclosure plaintiffs to file two additional documents at the onset of a foreclosure proceeding. First, such a plaintiff must attach to the complaint a "Certificate of Merit" signed by the plaintiff's attorney that "certif[ies] that the attorney has reviewed the facts of the case and that ... to the best of such attorney's knowledge, information and belief there is a reasonable basis for the commencement of such action and that the plaintiff is currently the creditor entitled to enforce rights under such documents." N.Y. C.P.L.R. § 3012-b(a). Second, "[a]t the time that proof of service of the summons and complaint is filed with the county clerk, plaintiff shall file with the county clerk a specialized request for judicial intervention (RJI), on a form prescribed by the Chief Administrator of the Courts." N.Y. Comp. Codes R. & Regs. tit. 22, § 202.12a(b)(1). The RJI must contain, *inter alia*, "the name of the mortgage servicer," and "shall request that a settlement conference be scheduled." *Id.*

Here, Green Tree filed in Supreme Court the Certificate of Merit (the "Certificate") on March 11, 2015, the same date that the foreclosure complaint was filed there. The Certificate was signed by Green Tree's attorney and certified that Green Tree "is the creditor entitled to enforce rights" under the mortgage note and related documents. App'x at 93–94. Green Tree subsequently filed the RJI with the court on March 26, 2015. App'x at 99–101. The RJI identifies the nature of the action as a mortgage foreclosure proceeding and seeks a "Residential Mortgage Foreclosure Settlement Conference." App'x at 99–100. Cohen received copies of the Certificate and RJI from the defendants.

Cohen subsequently submitted a "qualified written request" to Ditech requesting information relating to the servicing of the loan.[3] On September 23, 2015, Ditech sent Cohen a letter in response, which states that "[t]he servicing of the above account was transferred from Bank of America, N.A. to Ditech effective June 1, 2013" and that the account is owned by "Fannie Mae."[4] App'x at 110. The letter further explains, "Please be aware Ditech did not originate nor owns [sic] the account; it merely services it for a third party and can provide information from the servicing transfer date forward." *Id.* Finally, the letter advises Cohen that "the owner does not service the account. All correspondence and inquiries concerning the account should be addressed to the account servicer, Ditech .... The servicer has authority to act

on the owner's behalf with regard to the administration of the account and respond to any questions about the account." *Id.*

*Procedural History*

On December 1, 2015, Cohen filed this putative class action against Ditech and its foreclosure counsel, Rosicki, seeking to recover statutory damages under the FDCPA. *See* 15 U.S.C. § 1692k(a) (providing **\*80** that a court may award up to $1,000 in statutory damages for violation of the FDCPA). Cohen alleges that the defendants violated two different provisions of the FDCPA by identifying Green Tree, and not the Federal National Mortgage Association ("Fannie Mae"), as the creditor in the foreclosure complaint, Certificate, and RJI. Specifically, Cohen alleges that the defendants violated 15 U.S.C. § 1692e, which prohibits false, deceptive, or misleading representations made in connection with collecting a debt, and 15 U.S.C. § 1692g(a), which requires debt collectors to provide debtors with the name of the "creditor to whom the debt is owed" within five days of an "initial communication with a consumer in connection with the collection of any debt."

The defendants moved to dismiss Cohen's complaint under Federal Rule of Civil Procedure 12(b)(6). On March 24, 2017, the district court dismissed Cohen's complaint, concluding that Cohen had failed to state a claim upon which relief can be granted because the "enforcement of a security interest through foreclosure proceedings that do not seek monetary judgments against debtors" does not qualify as debt collection within the scope of the FDCPA. *Cohen v. Ditech Fin. LLC*, No. 15-CV-6828 (LDW), 2017 WL **1134723**, at \*3, 2017 U.S. Dist. LEXIS 43443 (E.D.N.Y. Mar. 24, 2017). The district court reasoned that because "Green Tree elected to commence an action to foreclose on the mortgage and the 'communications' at issue were made in the context of enforcing its security interest ... there was no attempt to enforce a debt actionable under the FDCPA." *Id.* Cohen then timely filed this appeal.

## DISCUSSION

### I. Standard of Review

[1] [2] [3] "We review *de novo* a district court's grant of a defendant's motion to dismiss." *City of Pontiac Gen. Emps' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir.

2011). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "A complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011) (brackets and internal quotation marks omitted).

**II. Standing**

[4]    [5]    Ditech argues that Cohen lacks standing under Article III of the Constitution to bring this action. Because standing is a "threshold matter" in determining whether the district court had jurisdiction to hear and decide this case, *Anderson Grp., LLC v. City of Saratoga Springs,* 805 F.3d 34, 44 (2d Cir. 2015) (internal quotation marks omitted), we address standing at the outset of our analysis.

[6]    To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate (1) "injury in fact," (2) a "causal connection" between that injury and the complained-of-conduct, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).

[7]    [8]    According to Ditech, Cohen lacks standing because he has alleged only a "bare [statutory] procedural violation, divorced from any concrete harm," which is **\*81** insufficient to satisfy the injury-in-fact requirement under *Spokeo, Inc. v. Robins,* — U.S. ——, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016). Ditech Br. at 51. However, *Spokeo* does not "categorically ... preclude[ ] violations of statutorily mandated procedures from qualifying as concrete injuries supporting standing." *Strubel v. Comenity Bank,* 842 F.3d 181, 189 (2d Cir. 2016) (citing *Spokeo,* 136 S.Ct. at 1550). It teaches, instead, that in order "to determine whether a procedural violation manifests injury in fact, a court properly considers whether Congress conferred the procedural right in order to protect an individual's concrete interests." *Id.* "[I]n the absence of a connection between a procedural violation and a concrete interest, a bare violation of the former does not manifest injury in fact." *Id.* However, "where Congress confers a procedural right in order to protect a concrete interest, a violation of the procedure may demonstrate a sufficient 'risk of real harm' to the underlying interest to establish concrete injury without 'need [to] allege any *additional* harm beyond the one Congress has identified.' " *Id.* (emphasis and brackets in original) (quoting *Spokeo,* 136 S.Ct. at 1549).

Here, Cohen alleges that the defendants violated 15 U.S.C. §§ 1692e and 1692g. We have held in the wake of *Spokeo,* albeit in non-binding summary orders,[5] that §§ 1692e and 1692g protect an individual's concrete interests, so that an alleged violation of these provisions satisfies the injury-in-fact requirement of Article III. *See Zirogiannis v. Seterus, Inc.,* 707 F. App'x 724, 727 (2d Cir. Sept. 12, 2017) (summary order) ("[W]e have no trouble concluding that § 1692g of the FDCPA protects an individual's concrete interests" (internal quotation marks and brackets omitted) ); *Papetti v. Does 1-25,* 691 F. App'x 24, 26 (2d Cir. May 26, 2017) (summary order) (concluding that plaintiff's allegations of violations of §§ 1692e and 1692g by themselves entailed the concrete injury necessary for standing). We reach the same conclusion here.

Congress enacted the FDCPA "to protect against the abusive debt collection practices likely to disrupt a debtor's life." *Simmons v. Roundup Funding, LLC,* 622 F.3d 93, 96 (2d Cir. 2010) (internal quotation marks omitted). Sections 1692e and 1692g further this purpose: the former secures a consumer's right to be free from "false, deceptive, or misleading" practices by debt collectors, 15 U.S.C. § 1692e, and the latter requires a debt collector who solicits payment from a consumer to provide the consumer with "a detailed validation notice" so that he may confirm that he indeed owes the debt and its amount before paying it, *Russell v. Equifax A.R.S.,* 74 F.3d 30, 34 (2d Cir. 1996). Congress thus sought to protect consumers' concrete economic interests in enacting these provisions.

Both of Cohen's FDCPA claims are based on the defendants' allegedly incorrect identification of Green Tree as the creditor in the foreclosure complaint, Certificate, and RJI. Taken as

*Cohen v. Rosicki, Rosicki & Associates, P.C., 897 F.3d 75 (2018)*

true, this misrepresentation might have deprived Cohen of information relevant to the debt prompting the foreclosure proceeding, posing a "risk of real harm" insofar as it could hinder the exercise of his right to defend **\*82** or otherwise litigate that action.[6] *See* 🚩 *Strubel*, 842 F.3d at 190 (explaining that "consumer who is not given notice of his obligations is likely ... unwittingly to lose the very ... rights that the law affords him" (emphasis omitted) ). We conclude that Cohen has alleged an injury-in-fact and therefore has standing. Accordingly, we proceed to the merits of this appeal.

### III. The FDCPA and Mortgage Foreclosure Proceedings

We next address the district court's conclusion that actions taken within a foreclosure action do not categorically constitute debt collection within the scope of the FDCPA. We disagree and join those of our sister circuits that have concluded that a foreclosure action is an "attempt to collect a debt" as defined by the FDCPA. *See* 🚩 *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 174–79 (3d Cir. 2015); 🚩 *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 460–65 (6th Cir. 2013); 🚩 *Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 376–78 (4th Cir. 2006); *see also* 🚩⚠ *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216–18 (11th Cir. 2012) (concluding that letters threatening foreclosure are not exempt from the FDCPA because "communication related to debt collection does not become unrelated to debt collection simply because it also relates to the enforcement of a security interest"); 🚩 *Kaltenbach v. Richards*, 464 F.3d 524, 527–29 (5th Cir. 2006) (same).[7]

 **[9]**   We begin with the "language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." 🚩 *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (internal quotation marks omitted). The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."[8] 🚩 15 U.S.C. § 1692a(5). This provision's **\*83** "focus on the underlying transaction indicates that whether an obligation is a 'debt' depends not on whether the obligation is secured, but rather

upon the purpose for which it was incurred." 🚩 *Glazer*, 704 F.3d at 461. Cohen's payment obligations under the mortgage note fall within the plain language of 🚩 § 1692a(5): Cohen is a consumer who must pay money to the mortgagee, and his obligation to do so arose from a transaction involving property that is for Cohen's personal, family, or household purposes (the mortgage note financed the purchase of his personal residence). *See* 🚩⚠ *Reese*, 678 F.3d at 1216–17; 🚩 *Wilson*, 443 F.3d at 376. Cohen's obligation to pay off the mortgage note is therefore a "debt" for purposes of the FDCPA.

The defendants argue that the foreclosure action and the foreclosure filings at issue here—the complaint, summons, Certificate, and RJI—do not constitute an attempt to "collect" that debt. We disagree. To be liable under the relevant substantive provisions of the FDCPA, 🚩 §§ 1692e and 🚩 1692g, a debt collector's targeted conduct must have been taken "in connection with the collection of any debt," 🚩 15 U.S.C. §§ 1692e, 🚩 1692g(a), *i.e.*, "any obligation or alleged obligation of a consumer to pay money," *id.* 🚩 § 1692a(5). Thus, FDCPA liability is defined not in terms of whether the relief sought is money or property, but in terms of whether the debt collector's communication with the consumer is *in connection with* that consumer's obligation to pay money. In other words, the FDCPA does not make a distinction between an obligation itself grounded in money or property, and an obligation the breach of which can give rise to an award of money damages at law or of a property interest at equity.

Here, the purpose of the defendants' foreclosure proceeding was to obtain payment of the underlying mortgage note. Indeed, "*every* mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (*i.e.*, forcing a settlement) or compulsion (*i.e.*, obtaining a judgment of foreclosure, selling the house at auction, and applying the proceeds from the sale to pay down the outstanding debt)." 🚩 *Glazer*, 704 F.3d at 461 (emphasis in original). Moreover, mortgage foreclosure is contemplated in another portion of the statute. *See* 🚩 15 U.S.C. § 1692i(a)(1) (establishing venue requirements for a debt collector "in the case of an action [brought by the debt collector] to enforce an interest in real property securing the consumer's obligation").

We therefore conclude that mortgage foreclosure meets the FDCPA's broad definition of "debt collection."

The defendants counter that the foreclosure proceeding was not an attempt to collect a debt because the purpose of the proceeding was to enforce a security interest and obtain possession of property, rather than to obtain payment on a debt. However, New York law gives mortgagors redemption rights, N.Y. Real Prop. Acts § 1352, and allows mortgagees to obtain deficiency judgments if the proceeds from the foreclosure sale are less than the outstanding debt, *id.* § 1371. These provisions indicate that the purpose of foreclosure is to obtain payment on the underlying loan, rather than mere possession of the subject property. Indeed, "[s]uch remedies would not exist if foreclosure were not undertaken for the purpose of obtaining payment." *Glazer, 704 F.3d at 461.*

Moreover, contrary to the defendants' assertions, a foreclosure proceeding does not fall outside the scope of the FDCPA solely because it is an *in rem* legal proceeding. As an initial matter, we have determined in previous cases that debt collectors can be subject to FDCPA liability **\*84** based on actions taken in legal proceedings. *See, e.g., Romea v. Heiberger & Assocs.*, 163 F.3d 111, 116 (2d Cir. 1998) (holding that a rent demand notice, required by New York law as a condition precedent to a summary eviction proceeding, was a "communication" to collect a debt within the meaning of the FDCPA); *cf. Heintz v. Jenkins*, 514 U.S. 291, 292, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995) (concluding that "a lawyer who 'regularly,' *through litigation*, tries to collect consumer debts" is a "debt collector" under the Act (emphasis in original) ). Second, to accept the defendants' argument and exclude *in rem* proceedings from the scope of the FDCPA "would create an enormous loophole in the [FDCPA] immunizing any debt from coverage if that debt happened to be secured by a real property interest and foreclosure proceedings were used to collect the debt." *Wilson, 443 F.3d at 376*; *see also Kaymark, 783 F.3d at 179*; *Reese, 678 F.3d at 1217–18.* We therefore find it irrelevant that a mortgage foreclosure action is an *in rem* action in equity rather than an *in personam* action at law.

 [10]  We conclude that mortgage foreclosure, at least under the circumstances presented here, constitutes debt collection under the FDCPA.

## IV. Failure to State a Claim Under 15 U.S.C. § 1692e

 [11]  We nonetheless affirm the dismissal of Cohen's § 1692e claim for failure to state a claim. Section 1692e prohibits debt collectors from making "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Cohen's principal allegation is that the defendants violated § 1692e by falsely identifying Green Tree as the creditor with respect to Cohen's mortgage in the foreclosure complaint, the Certificate, and RJI. The defendants contend that Cohen failed to plausibly allege a violation of § 1692e for two reasons. First, the defendants argue that the Certificate and RJI accurately identified Green Tree as the creditor, so the defendants did not make any false or misleading statements in connection with the collection of a debt. In the alternative, the defendants contend that even if the identification of Green Tree as the creditor is false or misleading, it is not a *material* misrepresentation and therefore not actionable under the FDCPA.

The defendants' first argument requires us to consider whether the defendants' statement in the foreclosure documents that Green Tree is the "creditor" to whom Cohen's debt is owed was false or misleading. The FDCPA excludes from its definition of creditor "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692a(4). Here, Green Tree received the assignment of Cohen's loan on June 1, 2013, which was after Cohen defaulted, in order to facilitate the collection of Cohen's mortgage payments, suggesting that Green Tree falls within § 1692a(4)'s exclusion and therefore is not a creditor as defined by the FDCPA.

Green Tree nevertheless qualifies as a "creditor" under New York law and has standing to foreclose on Cohen's mortgage. New York law defines "creditor" as a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. Law § 270. A servicer entitled to receive mortgage payments and to pursue foreclosure—even on behalf of a third party—is a person having such a claim. *See N.Y. U.C.C. § 3-301* ("The holder of an instrument whether or not he is the owner may ... enforce payment in his own name."); **\*85** *Aurora Loan Servs., LLC v. Taylor, 25*

N.Y.3d 355, 360–61, 12 N.Y.S.3d 612, 34 N.E.3d 363 (2015) (concluding that mortgage servicer in possession of note at time foreclosure action commenced "was vested with standing to foreclose"). Accordingly, to determine whether the defendants' identification of Green Tree as the creditor was false or misleading, we would need to resolve this tension between the different definitions of "creditor" under the FDCPA and New York law.

[12]  [13]  We do not resolve this issue here because even if the defendants' creditor statement was inaccurate, it would not be material and Cohen's 🚩 § 1692e claim therefore fails. Whether a communication is "false, deceptive, or misleading" under 🚩 § 1692e "is determined from the perspective of the objective least sophisticated consumer." 🔖 *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233 (2d Cir. 2012) (internal quotation marks omitted). Under this standard, "collection notices can be deceptive if they are open to more than one reasonable interpretation, at least one of which is inaccurate." 🔖 *Id.* (internal quotation marks omitted). However, we have explained that "not every technically false representation by a debt collector amounts to a violation of the FDCPA," 🔖 *Gabriele v. Am. Home Mortg. Serv., Inc.*, 503 F. App'x 89, 94 (2d Cir. 2012) (summary order), and "FDCPA protection does not extend to every bizarre or idiosyncratic interpretation of a collection notice," 🔖 *Easterling*, 692 F.3d at 233–34 (internal quotation marks omitted).

Several of our sister circuits have held that the least sophisticated consumer standard encompasses a materiality requirement; that is, statements must be materially false or misleading to be actionable under the FDCPA. *See Jensen v. Pressler & Pressler*, 791 F.3d 413, 421 (3d Cir. 2015); 🔖 *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 234 (4th Cir. 2015); 🔖 *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033–34 (9th Cir. 2010); 🔖 *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009); 🔖 *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757–58 (7th Cir. 2009). These courts have determined that a statement is material "if it is capable of influencing the decision of the least sophisticated [consumer]." *Jensen*, 791 F.3d at 421; *see also* 🔖 *Hahn*, 557 F.3d at 758 ("A statement cannot mislead unless it is material, so a false but non-material statement is not actionable.").

[14]  We cited this line of cases with approval in a summary order without explicitly deciding that 🚩 § 1692e incorporates a materiality requirement. *See* 🔖 *Gabriele*, 503 F. App'x at 94. We reach that conclusion here, adopting the persuasive reasoning of these courts of appeals. As the Seventh Circuit observed, "[m]ateriality is an ordinary element of any federal claim based on a false or misleading statement," and there is no "reason why materiality should not equally be required in an action based on 🚩 § 1692e." 🔖 *Hahn*, 557 F.3d at 757. The FDCPA was designed to give consumers reliable information so that they can make informed decisions about how to address debts, and "by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)." 🔖 *Id.* at 757–58. The materiality requirement is thus a corollary to the well-established proposition that "[i]f a statement would not mislead the unsophisticated consumer, it does not violate the [FDCPA]—even if it is false in some technical sense." 🔖 *Id.* at 758 (first brackets in original) (internal quotation marks omitted). In other words, "a false statement is only actionable under the FDCPA if it has the potential to affect the decision-making process of the least sophisticated [consumer]." *Jensen*, 791 F.3d at 421. This materiality requirement furthers the dual purposes of the least sophisticated consumer **\*86** standard: the need to protect unsuspecting consumers from unscrupulous debt collectors and the need to ensure that debt collectors are not held liable "for unreasonable misinterpretations of collection notices." 🔖 *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993).

[15]  [16]  [17]  Applying this standard to the alleged misrepresentation here—the defendants' identification of Green Tree as the "creditor"—we conclude that it was immaterial and therefore not actionable under 🚩 § 1692e. The materiality inquiry focuses on whether the false statement would "frustrate a consumer's ability to intelligently choose his or her response." 🔖 *Donohue*, 592 F.3d at 1034. As we have explained, "[o]ur case law demonstrates that communications and practices that could mislead a putative-debtor as to the nature and legal status of the underlying debt, or that could impede a consumer's ability to respond to or dispute collection, violate the FDCPA." 🔖 *Gabriele*, 503 F. App'x at 94. By contrast, "mere technical falsehoods that mislead no one" are immaterial and consequently not actionable under 🚩 § 1692e. 🔖 *Donohue*, 592 F.3d at 1034.

Here, there is no indication that the identification of Green Tree as the creditor misrepresented the nature or legal status of the debt or undermined Cohen's ability to respond to the debt collection. Although Ditech's response to the qualified written request stated that Fannie Mae owned Cohen's mortgage account, Green Tree was responsible for servicing the account. As the account servicer, Green Tree had the right to collect mortgage payments and to pursue foreclosure under New York law. Moreover, it is undisputed that the entity to whom Cohen's payments on his debt were owed in the first instance was Green Tree and that Green Tree was also the primary point of contact for any questions Cohen may have had about his mortgage. *See* App'x at 110 (instructions to Cohen in Ditech's response to Cohen's qualified written request that "[a]ll correspondence and inquiries concerning the account should be addressed to the account servicer, Ditech"). On the facts reflected in the complaint and attached documents, the false identification of Green Tree as the creditor would not have caused even a highly unsophisticated consumer to suffer a disadvantage in charting a course of action in response to the collection effort. Indeed, stating *accurately* that Fannie Mae was the creditor to whom the debt is owed likely would have *caused* confusion inasmuch as Cohen might then have been led to believe—wrongly, of course—that he should make his monthly mortgage payments to Fannie Mae.

We also think it significant that the challenged statements identifying Green Tree as the creditor were made in filings in a foreclosure action in state court. The "state foreclosure process is highly regulated and court controlled," and the "state court's authority to discipline will usually be sufficient to protect putative-debtors like [Cohen] from legitimately abusive or harassing litigation conduct." *Gabriele*, 503 F. App'x at 96 n.1. Moreover, as we have noted, Green Tree met the state law definition of "creditor." The identification of Green Tree as the creditor in the foreclosure filings was therefore accurate within the context of New York foreclosure law. Under these circumstances, we think that the identification of Green Tree as the "creditor" should be viewed as false only insofar as it results from the different definitions of "creditor" in the FDCPA and New York law.

Accordingly, although it may have technically been legally inaccurate to say that Green Tree was the "creditor" of Cohen's mortgage, considering the definition of the term in § 1692a(4), this statement was not **\*87** false or

misleading in any material way. The defendants' identification of Green Tree as the creditor was not deceptive as to the nature or legal status of Cohen's debt, nor would it have prevented the least sophisticated consumer from responding to or disputing the action.

We reach this conclusion based on the specific facts and circumstances of this case, *i.e.* a mortgage servicer that qualifies as a creditor under state law and that acts on behalf of a mortgage owner. We do not suggest that misrepresentations concerning the identity of the creditor are categorically immaterial. The identity of the creditor in debt collection communications can be a "serious matter." *Bourff v. Rubin Lublin, LLC*, 674 F.3d 1238, 1241 (11th Cir. 2012). The "entity to which a debtor owes money potentially affects the debtor in the most basic ways, such as what the debtor should write after 'pay to the order of' on the payment check to ensure that the debt is satisfied." *Eun Joo Lee v. Forster & Garbus LLP*, 926 F.Supp.2d 482, 488 (E.D.N.Y. 2013). A misrepresentation concerning the creditor's identity in debt collection notices can cause a debtor "confusion and delay in trying to contact the proper party concerning payment on her loan and resolution of the problem." *Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 327 (6th Cir. 2012); *see also Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1121–22 (9th Cir. 2014) (similar). Here, however, the facts and circumstances of the foreclosure proceeding and the foreclosure filings at issue in this lawsuit admit no plausible claim that the challenged misrepresentation of Green Tree rather than Fannie Mae as the creditor undermined Cohen's —or any other similarly situated mortgagor's—ability to respond to the debt.

**V. Failure to State a Claim Under 15 U.S.C. § 1692g**

[18]   [19]   We also affirm the district court's dismissal of Cohen's § 1692g claim for failure to state a claim upon which relief can be granted. Cohen claims that the defendants violated § 1692g(a)(2), which requires a debt collector, in its initial communication with the debtor, to identify the creditor to whom the debt is owed. Cohen contends that the Certificate and RJI [9] were initial communications as defined by § 1692g(a) and that because the defendants failed to identify the correct creditor in these documents, they are liable for damages under the FDCPA. The defendants counter

that Cohen failed to state a § 1692g claim because the Certificate and RJI are exempt from the FDCPA's definition of initial communications. The defendants rely on § 1692g(d), which provides that "[a] communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a)." This "broad exclusion" applies not only to "the formal documents that make up a standard pleading," but also to "any communication forming any part" thereof, including "exhibits attached to a complaint." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 213 (2d Cir. 2017).

We conclude that the Certificate falls within § 1692g(d)'s pleading exclusion, and is therefore not an initial communication, because the defendants were legally obligated to file this document with the foreclosure complaint. *See* **\*88** N.Y. C.P.L.R. § 3012-b(a) ("In any residential foreclosure action involving a home loan ... the complaint shall be accompanied by a certificate ... certifying that the attorney has reviewed the facts of the case and that ... the plaintiff is currently the creditor entitled to enforce rights under such documents."). In *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 213 (2d Cir. 2017), we held that documents attached to a foreclosure complaint —even a superfluous attachment—are covered by § 1692g(d)'s pleading exclusion. Therefore, under *Carlin*, legally required filings accompanying a complaint are also exempt. The fact that the Certificate is not denominated a "pleading" under the Federal Rules of Civil Procedure or the New York Civil Practice Law and Rules warrants no different conclusion. As *Carlin* instructs, Congress adopted a "broad exclusion that, on its face, applies to

any communication *forming any part* of a pleading." *Id.* (emphasis added).

We also conclude that the RJI is not an initial communication as defined by the FDCPA. The RJI is dated fifteen days later than the foreclosure complaint, summons, and Certificate and it was not filed and served with the foreclosure complaint, summons, and Certificate. New York law nevertheless requires a foreclosure plaintiff to file the RJI at the time that proof of service of the summons and foreclosure complaint is filed. *See* 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 202.12a. New York law thus requires the RJI as part of the initial assertion of a complaint seeking a foreclosure order, so the RJI can be viewed as "forming [a] part of a pleading." *Carlin*, 852 F.3d at 213. We conclude that *Carlin*'s reasoning applies not only to documents attached to an initial pleading but also to those documents that state law mandates a plaintiff to file shortly thereafter, and in relation to that pleading, to complete the initiation of the case.

Cohen's § 1692g claim therefore fails because the documents Cohen has identified as defective initial communications—the Certificate and RJI—are not initial communications as defined by the FDCPA.

### CONCLUSION

We have considered the parties' remaining arguments on appeal and find them to be without merit. For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

897 F.3d 75

### Footnotes

1    Because Cohen's complaint was dismissed under Federal Rule of Civil Procedure 12(b)(6), we accept the facts alleged in the complaint as true for purposes of our review. *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F.3d 479, 481 (2d Cir. 2011). We also consider on review "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference"; here, those include documents filed by Rosicki in its state mortgage foreclosure suit against Cohen. *Id.*

2    We use "Ditech" and "Green Tree" to refer to the same entity.

3    Under the Real Estate Settlement Procedures Act, a borrower who has a federally related mortgage loan may submit a written request to the servicer of the loan requesting information relating to the servicing of the loan. Such a request for information is termed a "qualified written request" and may impose on the loan servicer a duty to respond to the borrower's inquiry. 12 U.S.C. § 2605(e)(1)(B).

4    The record does not appear to reflect the date on which Cohen's loan was sold to Fannie Mae or by whom.

5    Although this Court's rulings by summary order do not have precedential effect, *see* 2d Cir. Local R. 32.1.1(a), "denying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases," *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (brackets omitted) (internal quotation marks omitted). In *Jackler* itself, though, we declined to follow the summary order in connection with which we made this observation.

6    Ditech argues that Cohen "has failed to demonstrate any injury that could have possibly resulted from Ditech's failure to identify Fannie Mae as the creditor" and that this misinformation is too "trivial" to cause harm. Ditech Br. at 53 (quoting *Strubel*, 842 F.3d at 190). This argument goes to the materiality of the allegedly false information in the defendants' communications. As discussed *infra* in Part IV, materiality is a requirement for a successful § 1692e cause of action. We do not consider this merits issue as part of our standing analysis. *See*, *e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal ...." (alteration in original) (internal quotation marks omitted) ).

7    The Ninth Circuit has concluded that "enforcement of security interests is not always debt collection" within the scope of the FDCPA. *Vien-Phuong Thi Ho v. ReconTrust Co., NA*, 858 F.3d 568, 573 (9th Cir. 2016). In *Ho*, the court decided that a trustee in a non-judicial foreclosure scheme that does not allow for deficiency judgments was not engaged in "debt collection" under the FDCPA. *Id.* at 571–74. In *McNair v. Maxwell & Morgan PC*, 893 F.3d 680 (9th Cir. 2018), however, the court subsequently observed that "*Ho* does not ... preclude FDCPA liability for an entity that seeks to collect a debt through a *judicial* foreclosure scheme that allows for deficiency judgments" and concluded that actions taken by a law firm within a judicial foreclosure proceeding constitute debt collection under the FDCPA. *Id.* at 683 (emphasis in original). The instant case is like *McNair*, rather than *Ho*, because it involves a judicial foreclosure and as discussed below, the applicable state law (New York) permits mortgagees to seek deficiency judgments. Thus, we have no occasion to decide here if we would follow *Ho* in the circumstances presented there.

8    "The term 'consumer' means any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3).

9    Cohen's complaint alleges that the foreclosure complaint itself is a "communication[ ]" as defined by the FDCPA, App'x at 11, but he does not raise this argument on appeal so we consider it abandoned, *see LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995). In any event, the foreclosure complaint falls squarely within § 1692g(d)'s exclusion for "formal pleadings." *See Carlin v. Davidson Fink LLP*, 852 F.3d 207, 213 (2d Cir. 2017).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 419699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Towaki KOMATSU, Plaintiff,

v.

URBAN PATHWAYS, INC.; Daniels Norelli Cecere
& Tavel PC; Neighborhood Association for Inter-
Cultural Affairs, Inc.; The City of New York; Ronald
Abad; Steven Banks; Barbara Beirne; Kristen Benjamin-
Solis; Martha Calhoun; Sharon Coates; Gary Cohen;
Marin Gerber; Allison Gill-Lambert; Anthony M.
Gonzalez; Allison Heilbraun; Joni Kletter; Lisa
Lombardi; Julio Manjarrez; Nigel Marks; Jeffrey
Mosczyc; Andrew Nastachowski; Molly Park; Kishea
Paulemont; Pinny Ringel; Harold Rosenthal; Ariana
Saunders; Ann Marie Scalia; Frederick Shack; Nancy
Southwell; Samuel Spitzberg; Eric Tavel, all sued in
their individual and official capacities. Nancy Bannon;
Anthony Cannataro; Lyle Frank; Shorab Ibrahim;
Gary Jenkins; Lawrence Marks; Maura Noll; Daniel
Tietz, all sued in their official capacities, Defendants.

22-CV-9080 (LTS)
|
Signed January 26, 2023

**Attorneys and Law Firms**

Towaki Komatsu, Bronx, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

**\*1** Plaintiff, appearing *pro se*, brings this 338-page
complaint asserting violations of federal and state law.
Specifically, he seeks relief under 42 U.S.C. § 1983; the
Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.
§ 1692; the civil provision of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964;
and New York State and City law.

By order dated November 22, 2022, the Court granted
Plaintiff's request to proceed without prepayment of fees,

that is, *in forma pauperis*. For the reasons set forth below,
the Court dismisses the claims brought against all of the
defendants except the FDCPA claims, which are brought
against Defendants Daniels Norelli Cecere & Tavel PC
("DNCT"), Harold Rosenthal, Allison Heilbraun, and Eric
Tavel.

STANDARD OF REVIEW

The Court must dismiss an *in forma pauperis* complaint, or
any portion of the complaint, that is frivolous or malicious,
fails to state a claim on which relief may be granted, or seeks
monetary relief from a defendant who is immune from such
relief. 28 U.S.C. § 1915(e)(2)(B); *see* Livingston v.
Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998).
The Court must also dismiss a complaint when the Court lacks
subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds,
the Court is obliged to construe *pro se* pleadings liberally,
Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and
interpret them to raise the "strongest [claims] that they
suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d
471, 474 (2d Cir. 2006) (internal quotation marks and
citations omitted, emphasis in original). But the "special
solicitude" in *pro se* cases, id. at 475 (citation omitted), has
its limits – to state a claim, *pro se* pleadings still must comply
with Rule 8 of the Federal Rules of Civil Procedure, which
requires a complaint to make a short and plain statement
showing that the pleader is entitled to relief.

Moreover, in circumstances where "a court considers whether
to withdraw a *pro se* litigant's special status, it should
consider not only that litigant's lifetime participation in all
forms of civil litigation, but also his experience with the
particular procedural setting presented." Sledge v. Kooi,
564 F.3d 105, 109 (2d Cir. 2009). Thus, courts may "limit the
withdrawal of special status to specific contexts in which the
litigant's experience indicates that he may be fairly deemed
knowledgeable and experienced." *Id.*

BACKGROUND

**A. Plaintiff's Procedural History in This Court**

Plaintiff Towaki Komatsu has brought numerous actions in this court, including an action recently dismissed by the undersigned. *See Komatsu v. The City of New York*, ECF 1:22-CV-0424, 42 (S.D.N.Y. Jan. 3, 2023). That action, as well as other actions Plaintiff filed in this court, concern Plaintiff's alleged unlawful exclusion from participating in public meetings held by the City of New York. *See, e.g., Komatsu v. The City of New York*, ECF 1:20-CV-7046 (ER) (S.D.N.Y.), *lv denied*, 22-1996 (2d Cir. Dec. 22, 2022) (denying leave to appeal, based on leave-to file sanction, "because the appeals do not depart from Petitioner's 'prior pattern of vexatious filings.' "); *Komatsu v. The City of New York*, ECF 1:18-CV-03698 (LGS) (GWG) (S.D.N.Y. Sept. 27, 2021) (ECF 627) (order involuntarily dismissing suit due to Plaintiff's vexatious conduct, including his repetitive voluminous and irrelevant filings), *aff'd*, 21-2479 (2d Cir. Mar. 1, 2022) ("[T]he appeal is DISMISSED because it 'lacks an arguable basis either in law or in fact.' 🚩 *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)."). In the 20-CV-7046 action, Plaintiff was ordered to show cause why the action "should not be dismissed pursuant to the Court's inherent power to sanction vexatious litigants and/or failure to comply with court orders." *Id.* (ECF 208, at 4.) That matter has been briefed but to date is unresolved.

**\*2** Since December 20, 2020, Plaintiff has been subject to a prefiling injunction requiring him to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu,* ECF 1:20-CV-07046 (ER) (ECF 45).

### B. Plaintiff's Prior Litigation Involving Claims Raised in This New Action

In addition to the litigation Plaintiff has pursued against the City of New York concerning his alleged exclusion from public meetings, Plaintiff also has pursued litigation against individuals employed by the City of New York, the State of New York, and private individuals regarding his lease agreement with Urban Pathways ("Urban"), subsequent state court litigation brought by Urban against Plaintiff, interactions with employees of New York City's Human Resources Administration ("HRA"), and interactions with employees of the New York State Office of Temporary and Disability Assistance ("OTDA"). Before filing this lawsuit, Plaintiff filed a similar action asserting claims against Urban and, as discussed below, naming many of the same

defendants named here. *See Komatsu v. City of New York*, ECF 1:20-CV-6510, 2 (S.D.N.Y. Oct. 22, 2020) ("*Komatsu I*"). Accordingly, the Court will first describe the facts alleged in *Komatsu I*, and then turn to the facts alleged in this new action ("*Komatsu II*").

### C. Komatsu I

#### 1. Defendants

On August 14, 2020, Plaintiff filed *Komatsu I*, where he asserted many of the claims that are re-asserted in *Komatsu II* and named many of the same defendants. The first group of defendants includes Urban, described by Plaintiff as "a private entity, business partner of HRA" (ECF 2, at 13), and the following six Urban employees: Frederick Shack, Chief Executive Officer; Lisa Lombardi and Nancy Southwell, Deputy Executive Directors; Ronald Abad, Chief Operating Officer; Kishea Paulemont, Program Director; and Sharon Coates, an employee. Plaintiff also sued DNCT, the law firm representing Urban in its litigation brought against Plaintiff in the Bronx County Housing Court, as well as two of the firm's lawyers, Allison Heilbraun and Eric Tavel.

Plaintiff also sued individuals employed with the City's HRA, including Steven Banks, the former Commissioner; three HRA lawyers, Marin Gerber, Jeffrey Mosczyc, and Ann Marie Scalia; and Kristin Benjamin-Solis, an HRA employee.

The final defendant whom Plaintiff also names in *Komatsu II* is Nancy Bannon, a New York State Supreme Court Justice. [1]

#### 2. Allegations

The following facts are taken from the complaint filed in *Komatsu I.* [2]

In 2016, Plaintiff signed a lease with Urban to rent an apartment in the Bronx. Subsequent to Plaintiff's signing the lease, Urban initiated two Housing Court proceedings in the Bronx County Housing Court ("Housing Court"). DNTC represented Urban in these two proceedings.

**\*3** In January 2017, HRA agreed to pay Plaintiff's storage expenses, incurred at CubeSmart, while Plaintiff resided in his Urban apartment. HRA later contested its agreement to pay for those expenses or to reimburse Plaintiff for the storage expenses he had already paid. Plaintiff litigated that issue in fair hearings before the OTDA, and then in the state courts in proceedings that he initiated under Article 78 of the New

York Civil Practice Law and Rules ("Article 78"). On or about January 31, 2018, Defendant Judge Bannon dismissed Plaintiff's initial Article 78 proceeding. Plaintiff brought another proceeding that was pending before Defendant Judge Frank.

In addition to seeking damages, Plaintiff sought various forms of injunctive relief, including orders (1) directing the City of New York and Defendant Mosczyc to provide discovery in Plaintiff's state-court litigation, (2) staying his Housing Court proceedings, or in the alterative, transferring the state court action to this court; (3) directing Judge Bannon to provide an explanation regarding one of her decisions; and (4) directing the City of New York to cease all of its business with Urban.

### 3. Litigation History

On October 22, 2020, the Honorable Louis L. Stanton dismissed the complaint as frivolous, for failure to state a claim on which relief may be granted, for seeking monetary relief from defendants who are immune from such relief, and under the Anti-Injunction Act. *See* 28 U.S.C. § 1915(e)(2) (B)(i)-(iii); 28 U.S.C. § 2283. Plaintiff appealed the decision, and the United States Court of Appeals for the Second Circuit affirmed. *See Komatsu v. CubeSmart*, No. 20-3676-cv (2d Cir. Dec. 20, 2021) (mandate issued Jan. 31, 2022).

### D. *Komatsu II*

#### 1. Defendants

In this new action, Plaintiff brings the same claims, as well as new claims against the following defendants, whom he named in *Komatsu I*: (1) Urban and Urban employees Shack, Lombardi, Abad, Coates, Paulemont, and Southwell; (2) DNCT and DNCT lawyers Heilbraun and Tavel; (3) former Commissioner Banks, HRA employee Benjamin-Solis, and HRA lawyers Gerber, Mosczyc, and Scalia; and (4) Judge Bannon.

Plaintiff also brings new claims against additional defendants, who fall into the following seven categories: (1) additional HRA defendants – Gary Jenkins, HRA's Commissioner; Martha Calhoun, HRA's General Counsel; Allison Gil-Lambert, an HRA lawyer; Barbara Beirne, Deputy Chief Agency Contacting Officer for HRA, who is a lawyer; and Molly Park, an HRA employee; (2) additional Urban defendants - Ariana Saunders, Urban's Chief Compliance Officer, and Andrew Nastachowski and Gary Cohen, Urban employees; (3) the Neighborhood Association for Inter-

Cultural Affairs, Inc. ("NAICA") and Julio Manjarrez, a NAICA lawyer, who represented Plaintiff during his Urban litigation in Housing Court; (4) a licensed process server, Anthony Gonzalez, who allegedly did not serve Plaintiff with legal papers; (5) individuals employed with the OTDA - Daniel Tietz, OTDA Commissioner; Nigel Marks and Samuel Spitzberg, OTDA lawyers; and Maura Noll, OTDA Administrative Law Judge; (6) an employee of the Community Affairs Unit of the Mayor's Office, Pinny Ringel; and (7) another DNCT lawyer, Harold Rosenthal.

Finally, Plaintiff names as defendants the following individuals, but only in their official capacities: (1) Anthony Cannotora, Acting Chief Judge of the State of New York; (2) Judge Lyle Frank, New York State Supreme Court; (3) Judge Shorab Ibrahim, Bronx County Housing Court; (4) Gary Jenkins, Commissioner of the New York City Department of Social Services ("DSS"); (5) Lawrence Marks, Chief Administrative Judge of the UCS; and (6) Joni Kletter, Administrative Law Judge and New York City attorney, and employee of former Mayor Bill de Blasio.

#### 2. Allegations

##### a. Urban and DNCT Defendants

**\*4** Plaintiff's allegations against the Urban and DNCT Defendants concern his litigation in Housing Court. He alleges that on August 16, 2019, Urban employee Coates "lied by fraudulently claiming that I owed Urban more than $30,000 in rent for my Urban apartment." (ECF 2, at 76.) "Urban used attorneys for DNCT to illegally commence [two lawsuits] as nonpayment proceedings against me. Due to mootness, [these lawsuits] must be dismissed with prejudice." (*Id.*)

Plaintiff alleges that more recently, on March 3, 2022, Plaintiff informed a representative at the Housing Court that Urban failed to provide him with legal papers; he seeks dismissal of a third action brought by Urban for failure to serve him such papers. He also seeks "a subpoena that would order Urban to provide me the video recordings that were recorded on 3/8/22 both in the lobby and stairwells in my building" to show that Defendant Gonzalez, a process server, did not in fact serve Plaintiff legal papers. (*Id.*)

Plaintiff contends that DNCT lawyers "committed continuing violations against me as they committed wire fraud ... and

otherwise violated RICO ... the FDCPA," and New York State statutes. (*Id.* at 77.) He also contends that "Urban, DNCT, and their personnel committed multiple acts of wire fraud against me through legal filings that were filed by attorneys for Urban[.]" (*Id.*)

Finally, Plaintiff claims that the HRA and Urban Defendants are so intertwined as to suggest that Urban is "an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA." (*Id.* at 181.)

### b. HRA Defendants

Plaintiff's claims against the HRA Defendants concern HRA's alleged involvement in Plaintiff's litigation against Urban, that is: (1) Urban's alleged objection of justice; (2) interference with Plaintiff's ability to obtain counsel; (3) violation of his rights related to receiving discovery material; and (4) alleged fraud on the court by HRA lawyers. The majority of these claims arose on or before August 14, 2020, including nearly all of the claims against Banks and the claims against Benjamin-Solis. These claims include Plaintiff's CubeSmart litigation, which was the subject of Plaintiff's claims against HRA in *Komatsu I.*

With respect to the *pro bono* counsel allegation, Plaintiff asserts that, before former Commissioner Banks "resigned from HRA near the state of 2022 ... he repeatedly told me that he and HRA would" assist Plaintiff in securing *pro bono* counsel. (*Id.*) These efforts, Plaintiff contends, were unsuccessful in part because the HRA Defendants "engag[ed] in illegal acts against me pertaining to public meetings that have been public forums that include town hall meetings, resource fair meetings, and public hearings by illegally preventing [me] from lawfully attending them in the rooms in which members of the public conducted them with Mr. Banks and other personnel[.]" (*Id.*)

The allegations against the HRA lawyers concern their representation of the City during Plaintiff's litigation against the City. These government lawyers include Beirne, Gil-Lambert, Gerber, Moscyzc, and Scalia. The claims against Park concern Park's informing Plaintiff, on September 13, 2022, that Plaintiff would not receive discovery in his OTDA proceeding. (*See id.* at 118.)

### c. OTDA Defendants

Plaintiff's claims against the OTDA Defendants concern Plaintiff's litigation with the OTDA, over which Judge Bannon presided and in which HRA lawyers represented the City of New York. These incidents occurred in 2017. (*See id.* at 128.) The Defendants involved in the alleged incidents include: OTDA Commissioner Tietz, sued in his official capacity; OTDA lawyers Marks and Spitzberg; and Administrative Law Judge Noll.

### d. Defendants former Commissioner Banks, Pinny Ringel, and Lori Kletter

**\*5** Plaintiff's claims against former Commissioner Banks also concern New York City public meetings involving public officials. For example, Plaintiff asserts that "I twice testified ... during City Council public hearings on 9/20/18 and 2/4/19 .... Mr. Banks was present on 2/4/19 while I testified about Mr. Vargas and deliberately turned the screen of my laptop to face Mr. Banks as I played a relevant video in conjunction with and support of my testimony." (*Id.* at 187.)

Those claims brought against Ringel and Kletter also arise rise out of interactions with City officials at public meetings, including on such meeting on November 16, 2021, when Ringel and Kletter "illegally prevented me from having a conversation with Mr. Banks during that meeting right after I talked with Mr. de Blasio during it while he stood next to Mr. [Eric] Adams." (*Id.* at 89.)

### e. NAICA Defendants

Plaintiff brings legal malpractice claims against NAICA and NAICA lawyer Manjarrez, who represented Plaintiff during one of the proceedings brought by Urban. (*Id.* at 79) ("Mr. Manjarrez confirmed that he was defying a directive that I had issued to him to obtain the video recordings that were recorded on 3/8/22 by video security cameras that are installed in public areas in my building" to prove that Defendant Gonzalez did not serve Plaintiff with legal papers.).

### f. Process Server Gonzalez

Plaintiff brings claims against a process server who allegedly failed to serve legal papers relating to the Urban litigation. (*Id.* at 76) ("I wasn't served legal papers for Urban3 then by Defendant Anthony Gonzalez who claimed that he serve me legal papers[.]").

### 3. Claims

Plaintiff asserts 🚩Section 1983 Claims against: (1) The City of New York; (2) Urban and Urban employees Ronald Abad, Lisa Lombardi, Andrew Nastachowski, Ariana Saunders, Frederick Shack, Nancy Southwell, and Kishea Paulemont; (3) HRA Commissioner Gary Cohen, former HRA Commissioner Steven Banks, HRA lawyers Marin Gerber, Ann Marie Scalia, Jeffrey Mosczyc, and Allison Gill-Lambert, HRA employee Kristen Benjamin-Solis, HRA General Counsel Martha Calhoun, (4) Judges Nancy Bannon, Lyle Frank, Shorab Ibrahim, Joni Kletter, and Maura Noll; (5) OTDA lawyers Nigel Marks and Samuel Spitzberg; (6) HRA employee Molly Park; and (7) Mayor's Office employee Pinny Ringel.

Plaintiff's FDCPA claims are brought against the Urban and DNCT Defendants, that is, (1) Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, Nancy Southwell; and (2) DNCT and DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun.

Plaintiff's RICO claims are brought against City officials, NAIC Defendants, Urban Defendants, and DNCT Defendants.

Plaintiff also asserts various state law claims.

### DISCUSSION

#### A. Claims Brought Against State Defendants in Their Official Capacity Are Dismissed Under the Eleventh Amendment

Plaintiff brings claims against Judges Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim; Chief Administrative Judge Lawrence Marks; Administrative Law Judge Maura Noll, and Commissioner Daniel Tietz, in their official capacities. In *Komatsu I*, Plaintiff also brought several claims against New York State officials, in their official capacity. In dismissing those claims under the Eleventh Amendment, Judge Stanton explained that the claims brought

against these State officials were not permitted under the Eleventh Amendment. *See Komatsu I*, 1:20-CV-6510, 10 ("Accordingly, the Court dismisses Plaintiff's claims under federal law against ... Justice Bannon, Judge Spears, and Defendant Vaughan, in their official capacities, under the doctrine of Eleventh Amendment immunity. 🚩28 U.S.C. § 1915(e)(2)(B)(iii).")). Here, Plaintiff again brings official capacity claims against Judges Bannon, Cannataro, Frank, Ibrahim, Chief Administrative Judge Marks, Administrative Law Judge Noll, and Commissioner Tietz, notwithstanding his prior experience with this specific context. 🚩*Sledge, 564 F.3d at 109*. Because these claims are barred under the Eleventh Amendment, the Court dismisses all federal claims brought against these Defendants. 🚩28 U.S.C. § 1915(e)(2)(B)(iii).

#### B. Plaintiff's Claims Against Government Attorneys Are Dismissed

**\*6** Plaintiff's federal claims brought against Defendants Calhoun, Beirne, Gil-Lambert, Mosczyc, Gerber, Scalia, Marks, and Sptizberg arise from those defendants' legal advocacy representing the HRA and OTDA. In *Komatsu I*, Plaintiff brought similar claims against Mosczyc and Gerber, and Judge Stanton dismissed the claims because these two Defendants, as government lawyers, were absolutely immune from the relief Plaintiff sought from them. Undeterred by the dismissal of those claims in *Komatsu I*, Plaintiff continues to seek relief against government attorneys who are his adversaries in his state court litigation. As explained in *Komatsu I*, however, government attorneys are immune from suit under 🚩Section 1983 "when functioning as an advocate of the state [or local government] in a way that is intimately associated with the judicial process." 🚩*Mangiafico v. Blumenthal, 471 F.3d 391, 396 (2d Cir. 2006)*; *see* 🚩*Barrett v. United States, 798 F.2d 565, 572–73 (2d Cir. 1986)* (absolute immunity for government attorney defending state in a civil lawsuit). Accordingly, the Court dismisses Plaintiff's federal claims against the government attorneys because they are immune from such relief. *See* 🚩28 U.S.C. § 1915(e)(2)(B)(iii).

#### C. Claims Brought Against HRA Employee Park

The Court also dismissed the claims brought against Park, an HRA employee who allegedly informed Plaintiff that he was not entitled to discovery, because this Defendant is also

immune from the relief Plaintiff seeks. Like the HRA lawyers, who are absolutely immune as government advocates, Parks is absolutely immune for damages where her conduct as an HRA employee was "intimately associated with the judicial process." *Mangiafico, 471 F.3d at 396.* Accordingly, the Court dismisses all claims against this Defendant. 28 U.S.C. § 1915(e)(2)(B)(iii).

### D. Claims Brought Against Administrative Law Judge Noll

Plaintiff's claims under federal law against Judge Noll are barred under the doctrine of judicial immunity. Under this doctrine, judges are absolutely immune from suit for claims against them in their individual capacities for damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco, 502 U.S. 9, 11-12 (1991)* (applying judicial immunity to claims under § 1983); *Deem v. DiMella-Deem, 941 F.3d 618, 620-21 (2d Cir. 2019)* (same as to claims under § 1983 and § 1985), *cert denied, 140 S. Ct. 2763 (2020).* Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt, 579 F.3d 204, 210 (2d Cir. 2009).* "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209. This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation ...." *Young v. Selsky, 41 F.3d 47, 51 (2d Cir. 1994).*

Judicial immunity does not apply when a judge acts outside of his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles, 502 U.S. at 11-12; see also Bliven, 579 F.3d at 209-10* (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman, 435 U.S. 349, 356 (1978).*

Plaintiff's claims against Judge Noll arise from her actions and decisions in OTDA proceedings, conduct that is well within the scope of judicial duties. Judge Noll is therefore immune from suit as to Plaintiff's claims against her under the doctrine of judicial immunity. The Court dismisses Plaintiff's claims against Judge Noll because Plaintiff seeks monetary relief

against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer, 645 F.3d 176, 177 (2d Cir. 2011)* ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

### E. Claims Brought Against Former HRA Commissioner Banks and HRA employee Benjamin-Solis

#### 1. Claims that arose before August 10, 2020 against Banks and Benjamin-Solis

**\*7** In *Komatsu I*, Plaintiff brought several claims against Banks and Benjamin-Solis that were considered on the merits by Judge Stanton and dismissed for failure to state a claim. *See § 1915(e)(2)(B)(ii).* In *Komatsu II*, Plaintiff brings the same claims against these Defendants, as well as new claims arising from the same conduct, that is, Plaintiff's litigation with HRA. These claims are barred under the doctrine of claim preclusion. [3]

Under the doctrine of claim preclusion, also known as "*res judicata,*" a litigant may not bring a new case that includes claims or defenses that were or could have been raised in an earlier case in which the same parties were involved if that case resulted in a judgment on the merits. *Brown v. Felsen, 442 U.S. 127, 131 (1979).* Claim preclusion "prevents parties from raising issues that could have been raised and decided in a prior action – even if they were not actually litigated." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1594, 206 L. Ed. 2d 893 (2020).*

Claim preclusion generally applies if: "(1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *In re Motors Liquidation Co., 943 F.3d 125, 130 (2d Cir. 2019)* (citation and internal quotation marks omitted).

To determine if a claim could have been raised in an earlier action, courts look to whether the present claim arises out of the same transaction or series of transactions asserted in the earlier action, *see Pike v. Freeman, 266 F.3d 78, 91 (2d Cir. 2001),* or, in other words, whether facts essential to the second suit were present in the first suit, *NLRB v. United Techs. Corp., 706 F.2d 1254, 1260 (2d Cir. 1983).* "A party

cannot avoid the preclusive effect *of res judicata* by asserting a new theory or a different remedy." *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017) (internal quotation marks and citation omitted).

All of Plaintiff's claims brought against Benjamin-Solis, and some of the claims brought against Banks, accrued before Plaintiff filed *Komatsu I*. Further, all of the claims brought against Benjamin-Solis and some of the claims brought against Banks in *Komatsu II* arise from the same series of transactions as the claims asserted against them in *Komatsu I*. Because Plaintiff did bring those claims, or could have brought those claims in *Komatsu I*, those claims are barred under the doctrine of claim preclusion.

### 2. Claims against Banks that accrued after August 14, 2020

Plaintiff brings new claims against Banks regarding his interactions with Banks at public meetings. Plaintiff is barred from bringing new claims against City officials regarding incidents occurring at public meetings, unless he receives permission to do so. Because Plaintiff did not seek permission to file new claims against these individuals, as discussed below in Section J, these claims are dismissed without prejudice.

**\*8** With respect to Bank's alleged interference with Plaintiff's retaining *pro bono* counsel, Plaintiff does not suggest a violation of a constitutional right. The Sixth Amendment, which provides a right to counsel in criminal cases, "does not govern civil cases." *Turner v. Rogers*, 564 U.S. 431, 441 (2011). Thus, to the extent Banks interfered with Plaintiff's retaining counsel, such interference does not implicate Plaintiff's rights under the United States Constitution. Accordingly, the claims against Banks concerning *pro bono* counsel are dismissed for failure to state a claim.

### F. The City of New York and HRA Commissioner Jenkins

The Court dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, who is sued in his official capacity. When a plaintiff sues a municipality under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

To state a Section 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff alleges no facts showing that the City of New York violated any of his federal constitutional or statutory rights because of one of the City's policies, customs, or practices. The Court therefore dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, sued in his official capacity, for failure to state a claim on which relief may be granted.

### G. Section 1983 Claims Brought Against Private Defendants

Plaintiff brings Section 1983 claims against private individuals and entities, also named in *Komatsu I*, that is: Urban, Abad, Coates, Lombardi, Paulemont, Shack, and Southwell. Judge Stanton dismissed these claims for failure to state a claim because Plaintiff failed to show that any conduct by these private individuals could be considered state action. Now, Plaintiff reasserts similar claims against these same private individuals and also names additional private individuals, not named in *Komatsu I*, that is: Saunders, Nastachowski, and Cohen. Plaintiff still does not show, however, that these defendants' conduct can be considered state action. Thus, for the reasons set forth in Judge Stanton's order, dismissing the Section 1983 claims against the private individuals, the Court dismisses Plaintiff's claims against the individual defendants named in this action for failure to state a claim.

**H. Claims Under Civil RICO**

Plaintiff asserts that Defendants have conspired against him, in violation of the civil provision of RICO. Plaintiff brought similar claims in *Komatsu I*, and Judge Stanton dismissed those claims because Plaintiff failed to show that Defendants engaged in any activity that would support any claim under civil RICO. In this action, Plaintiff also fails to state any facts suggesting a RICO violation. The Court therefore dismisses Plaintiff's claims under civil RICO for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**I. Claims Under the Fair Debt Collection Practices Act ("FDCPA")**

**\*9** Plaintiff brings claims against the Urban and DNCT Defendants, asserting that they violated the FDCPA. He alleges that they falsely claimed in court that Plaintiff owed rent. He relies on a district court decision, in which a consumer sued a law firm that was a debt collector. *Lee v. Kucker & Bruh*, LLP, 958 F. Supp. 2d 524, 526 (S.D.N.Y. 2013) ("Defendant K & B is a law firm that primarily represents landlords in New York City. K & B is a debt collector as defined by the FDCPA.").

The FDCPA applies to consumer debt "arising out of ... transaction[s] ... primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 551 (S.D.N.Y. 2013) ("[T]he FDCPA is triggered when the obligation is a debt arising out of a consumer transaction"). In cases where the FDCPA applies, it prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692e. A debt collector is defined in Section 1692a(6) as: (1) a person whose principal purpose is to collect debts; (2) a person who regularly collects debts owed to another; or (3) a person who collects its own debts, using a name other than its own as if it were a debt collector. *See also* *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) (holding that entities that regularly purchase debts originated by someone else and then seek to collect those debts for their own account are not necessarily debt collectors subject to the FDCPA).

Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Conduct in violation of the statute includes, among other examples and without limitation, using violence or the threat of violence or other criminal means; using obscene or profane language "the natural consequence of which is to abuse the hearer or reader"; publishing a list of consumers who refuse to pay debts; or "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass" the person called. 15 U.S.C. § 1692d.

Plaintiff's claims against the Urban Defendants fails to state claims upon which relief may be granted because Plaintiff does not state facts suggesting that they are debt collectors. His claims against the DNCT Defendants, however, may state claims, if he can show that these defendants engaged in harassing conduct with respect to the alleged debt owed to Urban.

As discussed below, the Court grants Plaintiff leave to file an amended complaint as to his FDCPA claims against DNCT and the DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun. His FDCPA claims brought against Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, and Nancy Southwell are dismissed for failure to state a claim upon which relief may be granted.

**J. Claims Against former Commissioner Banks, Pinny Ringel, and Lori Kletter**

Plaintiff's claims against former Commissioner Banks, Ringel and Kletter, that arise out of alleged conduct by New York City officials at public meetings, fall within the scope of Judge Ramos's order requiring Plaintiff to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45). These claims are therefore dismissed without prejudice because Plaintiff has not obtained permission to bring these claims against these defendants.

**K. Claims Under State Law**

**\*10** A district court may decline to exercise supplemental jurisdiction over claims under state law when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court

should decline the exercise of jurisdiction ...." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). At this stage, it is premature to determine whether the Court will decline to exercise its supplemental jurisdiction over any claims under state law that Plaintiff is asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### LEAVE TO AMEND

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). The Court, having dismissed all of the claims brought against the DNCT Defendants except the FDCPA claims, finds that it would be futile to grant him leave to amend the non-FDCPA claims. Accordingly, the Court grants Plaintiff leave to file an amended complaint to assert his FDCPA claims against the DNCT Defendants. The amended complaint must only name the DNCT Defendants and only assert the FDCPA claims, and it may not exceed 20 pages. These limitations are imposed based on Plaintiff's litigation history in this court, where he reasserts the same claims against the same defendants following dismissal of such claims on the merits. The page-limitation is imposed because Plaintiff's pleadings, both in this action and prior actions, do not comply with Rule 8's requirement that his complaint consist of short and plain statements. *See Fed. R. Civ. P. 8(a)*.

Should Plaintiff submit an amended complaint that fails to comply with these requirements, the Court will direct the Clerk of Court to return Plaintiff's pleading and will provide him one more opportunity to submit an amended complaint that does not exceed 20 pages, names DNCT Defendants, and asserts FDCPA claims. If he fails to comply with the requirements a second time, the Court will dismiss the action for failure to comply with the Court's order.

### CONCLUSION

The Court dismisses Plaintiff's federal claims brought against Urban Pathways, Inc., Neighborhood Association For Inter-Cultural Affairs, Inc., The City Of New York, Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Moscyzc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Ariana Saundersm, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim, Gary Jenkins, Lawrence Marks, Maura Noll, and Daniel Tietz, as frivolous, for failure to state a claim on which relief may be granted, and for seeking monetary relief from defendants that are immune from such relief. *See* 28 U.S.C. § 1915(e)(B)(i)-(iii).

Those claims brought against Steve Banks, Penny Ringel, and Lorri Kletter that arise out of public meetings are dismissed without prejudice, pursuant to the prefiling injunction issued in *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45).

The Court grants Plaintiff leave to file an amended complaint that complies with the standards set forth above.

**\*11**  Plaintiff must submit the amended complaint, which may not exceed 20 pages, to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 22-CV-9080 (LTS).

An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____
Write the full name of each plaintiff.            (include case number if one has been
                                                  assigned)

                    -against-                     AMENDED

_____          COMPLAINT

_____          Do you want a jury trial?
_____              ☐ Yes    ☐ No

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore not contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include only: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

---

Rev. 2/10/17

---

**I.   BASIS FOR JURISDICTION**

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of
cases can be heard in federal court: cases involving a federal question and cases involving
diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United
States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332,
a case in which a citizen of one State sues a citizen of another State or nation, and the amount
in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may
be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

    ☐   Federal Question

    ☐   Diversity of Citizenship

**A.   If you checked Federal Question**

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

**B.   If you checked Diversity of Citizenship**

    **1.   Citizenship of the parties**

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                    (Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing
information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____ , is a citizen of the State of
                    (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____ , is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____ .

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

**II.   PARTIES**

**A.   Plaintiff Information**

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____
First Name          Middle Initial          Last Name

_____
Street Address

_____
County, City                         State          Zip Code

_____
Telephone Number                     Email Address (if available)

Page 3

**B.  Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Defendant 4:

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

**III. STATEMENT OF CLAIM**

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

**V.  PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature | |
|---|---|---|---|

| First Name | Middle Initial | Last Name | |
|---|---|---|---|

| Street Address | | | |
|---|---|---|---|

| County, City | | State | Zip Code |
|---|---|---|---|

| Telephone Number | | Email Address (if available) | |
|---|---|---|---|

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    11

**All Citations**

Slip Copy, 2023 WL 419699

# Footnotes

1    Plaintiff named the following defendants in *Komatsu I* but not in *Komatsu II:* Marilyn Andzeski, Urban management agent; Molly McCracken, an employee with Services for the Underserved, Inc.; Avraham Schmeidler, an HRA employee; Wendell Vaughan, a law clerk; the New York State Office off Court Administration; the New York State Unified Court System; and Judge Brenda Spears, from the Bronx County Housing Court.

2    The allegations from *Komatsu I*, described in this order, relate to the allegations set forth in *Komatsu II*, and do not include each allegation set forth in *Komatsu I.*

3    Although claim preclusion is an affirmative defense to be pleaded in a defendant's answer, *see* Fed. R. Civ. P. 8(c), the Court may, on its own initiative, raise the issue. *See, e.g.,* ⚑ *Grieve v. Tamerin*, 269 F.3d 149, 154 (2d Cir. 2001) (affirming district court's dismissal on grounds of issue preclusion even though defendant failed to plead that defense, and noting that "principles of preclusion involve" not only "the rights and interests of the parties," but also "important interests of the public and the courts in avoiding repetitive litigation and potentially inconsistent decisions").

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    12

2023 WL 419699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Towaki KOMATSU, Plaintiff,

v.

URBAN PATHWAYS, INC.; Daniels Norelli Cecere
& Tavel PC; Neighborhood Association for Inter-
Cultural Affairs, Inc.; The City of New York; Ronald
Abad; Steven Banks; Barbara Beirne; Kristen Benjamin-
Solis; Martha Calhoun; Sharon Coates; Gary Cohen;
Marin Gerber; Allison Gill-Lambert; Anthony M.
Gonzalez; Allison Heilbraun; Joni Kletter; Lisa
Lombardi; Julio Manjarrez; Nigel Marks; Jeffrey
Moszcyc; Andrew Nastachowski; Molly Park; Kishea
Paulemont; Pinny Ringel; Harold Rosenthal; Ariana
Saunders; Ann Marie Scalia; Frederick Shack; Nancy
Southwell; Samuel Spitzberg; Eric Tavel, all sued in
their individual and official capacities. Nancy Bannon;
Anthony Cannataro; Lyle Frank; Shorab Ibrahim;
Gary Jenkins; Lawrence Marks; Maura Noll; Daniel
Tietz, all sued in their official capacities, Defendants.

22-CV-9080 (LTS)
|
Signed January 26, 2023

**Attorneys and Law Firms**

Towaki Komatsu, Bronx, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

*1 Plaintiff, appearing *pro se*, brings this 338-page
complaint asserting violations of federal and state law.
Specifically, he seeks relief under 42 U.S.C. § 1983; the
Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.
§ 1692; the civil provision of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964;
and New York State and City law.

By order dated November 22, 2022, the Court granted
Plaintiff's request to proceed without prepayment of fees,

that is, *in forma pauperis*. For the reasons set forth below,
the Court dismisses the claims brought against all of the
defendants except the FDCPA claims, which are brought
against Defendants Daniels Norelli Cecere & Tavel PC
("DNCT"), Harold Rosenthal, Allison Heilbraun, and Eric
Tavel.

**STANDARD OF REVIEW**

The Court must dismiss an *in forma pauperis* complaint, or
any portion of the complaint, that is frivolous or malicious,
fails to state a claim on which relief may be granted, or seeks
monetary relief from a defendant who is immune from such
relief. 28 U.S.C. § 1915(e)(2)(B); *see* Livingston v.
Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998).
The Court must also dismiss a complaint when the Court lacks
subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds,
the Court is obliged to construe *pro se* pleadings liberally,
Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and
interpret them to raise the "strongest [claims] that they
suggest," Triestman v. Fed. Bureau of Prisons, 470 F.3d
471, 474 (2d Cir. 2006) (internal quotation marks and
citations omitted, emphasis in original). But the "special
solicitude" in *pro se* cases, id. at 475 (citation omitted), has
its limits – to state a claim, *pro se* pleadings still must comply
with Rule 8 of the Federal Rules of Civil Procedure, which
requires a complaint to make a short and plain statement
showing that the pleader is entitled to relief.

Moreover, in circumstances where "a court considers whether
to withdraw a *pro se* litigant's special status, it should
consider not only that litigant's lifetime participation in all
forms of civil litigation, but also his experience with the
particular procedural setting presented." Sledge v. Kooi,
564 F.3d 105, 109 (2d Cir. 2009). Thus, courts may "limit the
withdrawal of special status to specific contexts in which the
litigant's experience indicates that he may be fairly deemed
knowledgeable and experienced." *Id.*

**BACKGROUND**

**A. Plaintiff's Procedural History in This Court**

Plaintiff Towaki Komatsu has brought numerous actions in this court, including an action recently dismissed by the undersigned. *See Komatsu v. The City of New York*, ECF 1:22-CV-0424, 42 (S.D.N.Y. Jan. 3, 2023). That action, as well as other actions Plaintiff filed in this court, concern Plaintiff's alleged unlawful exclusion from participating in public meetings held by the City of New York. *See, e.g., Komatsu v. The City of New York*, ECF 1:20-CV-7046 (ER) (S.D.N.Y.), *lv denied*, 22-1996 (2d Cir. Dec. 22, 2022) (denying leave to appeal, based on leave-to file sanction, "because the appeals do not depart from Petitioner's 'prior pattern of vexatious filings.' "); *Komatsu v. The City of New York*, ECF 1:18-CV-03698 (LGS) (GWG) (S.D.N.Y. Sept. 27, 2021) (ECF 627) (order involuntarily dismissing suit due to Plaintiff's vexatious conduct, including his repetitive voluminous and irrelevant filings), *aff'd*, 21-2479 (2d Cir. Mar. 1, 2022) ("[T]he appeal is DISMISSED because it 'lacks an arguable basis either in law or in fact.' 🚩 *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).". In the 20-CV-7046 action, Plaintiff was ordered to show cause why the action "should not be dismissed pursuant to the Court's inherent power to sanction vexatious litigants and/or failure to comply with court orders." *Id.* (ECF 208, at 4.) That matter has been briefed but to date is unresolved.

**\*2** Since December 20, 2020, Plaintiff has been subject to a prefiling injunction requiring him to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu,* ECF 1:20-CV-07046 (ER) (ECF 45).

**B. Plaintiff's Prior Litigation Involving Claims Raised in This New Action**
In addition to the litigation Plaintiff has pursued against the City of New York concerning his alleged exclusion from public meetings, Plaintiff also has pursued litigation against individuals employed by the City of New York, the State of New York, and private individuals regarding his lease agreement with Urban Pathways ("Urban"), subsequent state court litigation brought by Urban against Plaintiff, interactions with employees of New York City's Human Resources Administration ("HRA"), and interactions with employees of the New York State Office of Temporary and Disability Assistance ("OTDA"). Before filing this lawsuit, Plaintiff filed a similar action asserting claims against Urban and, as discussed below, naming many of the same

defendants named here. *See Komatsu v. City of New York*, ECF 1:20-CV-6510, 2 (S.D.N.Y. Oct. 22, 2020) ("*Komatsu I*"). Accordingly, the Court will first describe the facts alleged in *Komatsu I*, and then turn to the facts alleged in this new action ("*Komatsu II*").

**C. Komatsu I**

**1. Defendants**
On August 14, 2020, Plaintiff filed *Komatsu I*, where he asserted many of the claims that are re-asserted in *Komatsu II* and named many of the same defendants. The first group of defendants includes Urban, described by Plaintiff as "a private entity, business partner of HRA" (ECF 2, at 13), and the following six Urban employees: Frederick Shack, Chief Executive Officer; Lisa Lombardi and Nancy Southwell, Deputy Executive Directors; Ronald Abad, Chief Operating Officer; Kishea Paulemont, Program Director; and Sharon Coates, an employee. Plaintiff also sued DNCT, the law firm representing Urban in its litigation brought against Plaintiff in the Bronx County Housing Court, as well as two of the firm's lawyers, Allison Heilbraun and Eric Tavel.

Plaintiff also sued individuals employed with the City's HRA, including Steven Banks, the former Commissioner; three HRA lawyers, Marin Gerber, Jeffrey Mosczyc, and Ann Marie Scalia; and Kristin Benjamin-Solis, an HRA employee.

The final defendant whom Plaintiff also names in *Komatsu II* is Nancy Bannon, a New York State Supreme Court Justice.[1]

**2. Allegations**
The following facts are taken from the complaint filed in *Komatsu I.*[2]

In 2016, Plaintiff signed a lease with Urban to rent an apartment in the Bronx. Subsequent to Plaintiff's signing the lease, Urban initiated two Housing Court proceedings in the Bronx County Housing Court ("Housing Court"). DNTC represented Urban in these two proceedings.

**\*3** In January 2017, HRA agreed to pay Plaintiff's storage expenses, incurred at CubeSmart, while Plaintiff resided in his Urban apartment. HRA later contested its agreement to pay for those expenses or to reimburse Plaintiff for the storage expenses he had already paid. Plaintiff litigated that issue in fair hearings before the OTDA, and then in the state courts in proceedings that he initiated under Article 78 of the New

York Civil Practice Law and Rules ("Article 78"). On or about January 31, 2018, Defendant Judge Bannon dismissed Plaintiff's initial Article 78 proceeding. Plaintiff brought another proceeding that was pending before Defendant Judge Frank.

In addition to seeking damages, Plaintiff sought various forms of injunctive relief, including orders (1) directing the City of New York and Defendant Mosczyc to provide discovery in Plaintiff's state-court litigation, (2) staying his Housing Court proceedings, or in the alterative, transferring the state court action to this court; (3) directing Judge Bannon to provide an explanation regarding one of her decisions; and (4) directing the City of New York to cease all of its business with Urban.

### 3. Litigation History

On October 22, 2020, the Honorable Louis L. Stanton dismissed the complaint as frivolous, for failure to state a claim on which relief may be granted, for seeking monetary relief from defendants who are immune from such relief, and under the Anti-Injunction Act. *See* 28 U.S.C. § 1915(e)(2) (B)(i)-(iii); 28 U.S.C. § 2283. Plaintiff appealed the decision, and the United States Court of Appeals for the Second Circuit affirmed. *See Komatsu v. CubeSmart*, No. 20-3676-cv (2d Cir. Dec. 20, 2021) (mandate issued Jan. 31, 2022).

### D. *Komatsu II*

#### 1. Defendants

In this new action, Plaintiff brings the same claims, as well as new claims against the following defendants, whom he named in *Komatsu I*: (1) Urban and Urban employees Shack, Lombardi, Abad, Coates, Paulemont, and Southwell; (2) DNCT and DNCT lawyers Heilbraun and Tavel; (3) former Commissioner Banks, HRA employee Benjamin-Solis, and HRA lawyers Gerber, Mosczyc, and Scalia; and (4) Judge Bannon.

Plaintiff also brings new claims against additional defendants, who fall into the following seven categories: (1) additional HRA defendants – Gary Jenkins, HRA's Commissioner; Martha Calhoun, HRA's General Counsel; Allison Gil-Lambert, an HRA lawyer; Barbara Beirne, Deputy Chief Agency Contacting Officer for HRA, who is a lawyer; and Molly Park, an HRA employee; (2) additional Urban defendants - Ariana Saunders, Urban's Chief Compliance Officer, and Andrew Nastachowski and Gary Cohen, Urban employees; (3) the Neighborhood Association for Inter-

Cultural Affairs, Inc. ("NAICA") and Julio Manjarrez, a NAICA lawyer, who represented Plaintiff during his Urban litigation in Housing Court; (4) a licensed process server, Anthony Gonzalez, who allegedly did not serve Plaintiff with legal papers; (5) individuals employed with the OTDA - Daniel Tietz, OTDA Commissioner; Nigel Marks and Samuel Spitzberg, OTDA lawyers; and Maura Noll, OTDA Administrative Law Judge; (6) an employee of the Community Affairs Unit of the Mayor's Office, Pinny Ringel; and (7) another DNCT lawyer, Harold Rosenthal.

Finally, Plaintiff names as defendants the following individuals, but only in their official capacities: (1) Anthony Cannotora, Acting Chief Judge of the State of New York; (2) Judge Lyle Frank, New York State Supreme Court; (3) Judge Shorab Ibrahim, Bronx County Housing Court; (4) Gary Jenkins, Commissioner of the New York City Department of Social Services ("DSS"); (5) Lawrence Marks, Chief Administrative Judge of the UCS; and (6) Joni Kletter, Administrative Law Judge and New York City attorney, and employee of former Mayor Bill de Blasio.

### 2. Allegations

#### a. Urban and DNCT Defendants

**\*4** Plaintiff's allegations against the Urban and DNCT Defendants concern his litigation in Housing Court. He alleges that on August 16, 2019, Urban employee Coates "lied by fraudulently claiming that I owed Urban more than $30,000 in rent for my Urban apartment." (ECF 2, at 76.) "Urban used attorneys for DNCT to illegally commence [two lawsuits] as nonpayment proceedings against me. Due to mootness, [these lawsuits] must be dismissed with prejudice." (*Id.*)

Plaintiff alleges that more recently, on March 3, 2022, Plaintiff informed a representative at the Housing Court that Urban failed to provide him with legal papers; he seeks dismissal of a third action brought by Urban for failure to serve him such papers. He also seeks "a subpoena that would order Urban to provide me the video recordings that were recorded on 3/8/22 both in the lobby and stairwells in my building" to show that Defendant Gonzalez, a process server, did not in fact serve Plaintiff legal papers. (*Id.*)

Plaintiff contends that DNCT lawyers "committed continuing violations against me as they committed wire fraud ... and

otherwise violated RICO ... the FDCPA," and New York State statutes. (*Id.* at 77.) He also contends that "Urban, DNCT, and their personnel committed multiple acts of wire fraud against me through legal filings that were filed by attorneys for Urban[.]" (*Id.*)

Finally, Plaintiff claims that the HRA and Urban Defendants are so intertwined as to suggest that Urban is "an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA." (*Id.* at 181.)

### b. HRA Defendants

Plaintiff's claims against the HRA Defendants concern HRA's alleged involvement in Plaintiff's litigation against Urban, that is: (1) Urban's alleged objection of justice; (2) interference with Plaintiff's ability to obtain counsel; (3) violation of his rights related to receiving discovery material; and (4) alleged fraud on the court by HRA lawyers. The majority of these claims arose on or before August 14, 2020, including nearly all of the claims against Banks and the claims against Benjamin-Solis. These claims include Plaintiff's CubeSmart litigation, which was the subject of Plaintiff's claims against HRA in *Komatsu I.*

With respect to the *pro bono* counsel allegation, Plaintiff asserts that, before former Commissioner Banks "resigned from HRA near the state of 2022 ... he repeatedly told me that he and HRA would" assist Plaintiff in securing *pro bono* counsel. (*Id.*) These efforts, Plaintiff contends, were unsuccessful in part because the HRA Defendants "engag[ed] in illegal acts against me pertaining to public meetings that have been public forums that include town hall meetings, resource fair meetings, and public hearings by illegally preventing [me] from lawfully attending them in the rooms in which members of the public conducted them with Mr. Banks and other personnel[.]" (*Id.*)

The allegations against the HRA lawyers concern their representation of the City during Plaintiff's litigation against the City. These government lawyers include Beirne, Gil-Lambert, Gerber, Mosczyc, and Scalia. The claims against Park concern Park's informing Plaintiff, on September 13, 2022, that Plaintiff would not receive discovery in his OTDA proceeding. (*See id.* at 118.)

### c. OTDA Defendants

Plaintiff's claims against the OTDA Defendants concern Plaintiff's litigation with the OTDA, over which Judge Bannon presided and in which HRA lawyers represented the City of New York. These incidents occurred in 2017. (*See id.* at 128.) The Defendants involved in the alleged incidents include: OTDA Commissioner Tietz, sued in his official capacity; OTDA lawyers Marks and Spitzberg; and Administrative Law Judge Noll.

### d. Defendants former Commissioner Banks, Pinny Ringel, and Lori Kletter

**\*5** Plaintiff's claims against former Commissioner Banks also concern New York City public meetings involving public officials. For example, Plaintiff asserts that "I twice testified ... during City Council public hearings on 9/20/18 and 2/4/19 .... Mr. Banks was present on 2/4/19 while I testified about Mr. Vargas and deliberately turned the screen of my laptop to face Mr. Banks as I played a relevant video in conjunction with and support of my testimony." (*Id.* at 187.)

Those claims brought against Ringel and Kletter also arise rise out of interactions with City officials at public meetings, including on such meeting on November 16, 2021, when Ringel and Kletter "illegally prevented me from having a conversation with Mr. Banks during that meeting right after I talked with Mr. de Blasio during it while he stood next to Mr. [Eric] Adams." (*Id.* at 89.)

### e. NAICA Defendants

Plaintiff brings legal malpractice claims against NAICA and NAICA lawyer Manjarrez, who represented Plaintiff during one of the proceedings brought by Urban. (*Id.* at 79) ("Mr. Manjarrez confirmed that he was defying a directive that I had issued to him to obtain the video recordings that were recorded on 3/8/22 by video security cameras that are installed in public areas in my building" to prove that Defendant Gonzalez did not serve Plaintiff with legal papers.).

### f. Process Server Gonzalez

Plaintiff brings claims against a process server who allegedly failed to serve legal papers relating to the Urban litigation. (*Id.* at 76) ("I wasn't served legal papers for Urban3 then by Defendant Anthony Gonzalez who claimed that he serve me legal papers[.]").

### 3. Claims

Plaintiff asserts 🚩Section 1983 Claims against: (1) The City of New York; (2) Urban and Urban employees Ronald Abad, Lisa Lombardi, Andrew Nastachowski, Ariana Saunders, Frederick Shack, Nancy Southwell, and Kishea Paulemont; (3) HRA Commissioner Gary Cohen, former HRA Commissioner Steven Banks, HRA lawyers Marin Gerber, Ann Marie Scalia, Jeffrey Mosczyc, and Allison Gill-Lambert, HRA employee Kristen Benjamin-Solis, HRA General Counsel Martha Calhoun, (4) Judges Nancy Bannon, Lyle Frank, Shorab Ibrahim, Joni Kletter, and Maura Noll; (5) OTDA lawyers Nigel Marks and Samuel Spitzberg; (6) HRA employee Molly Park; and (7) Mayor's Office employee Pinny Ringel.

Plaintiff's FDCPA claims are brought against the Urban and DNCT Defendants, that is, (1) Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, Nancy Southwell; and (2) DNCT and DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun.

Plaintiff's RICO claims are brought against City officials, NAIC Defendants, Urban Defendants, and DNCT Defendants.

Plaintiff also asserts various state law claims.

### DISCUSSION

### A. Claims Brought Against State Defendants in Their Official Capacity Are Dismissed Under the Eleventh Amendment

Plaintiff brings claims against Judges Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim; Chief Administrative Judge Lawrence Marks; Administrative Law Judge Maura Noll, and Commissioner Daniel Tietz, in their official capacities. In *Komatsu I*, Plaintiff also brought several claims against New York State officials, in their official capacity. In dismissing those claims under the Eleventh Amendment, Judge Stanton explained that the claims brought

against these State officials were not permitted under the Eleventh Amendment. *See Komatsu I*, 1:20-CV-6510, 10 ("Accordingly, the Court dismisses Plaintiff's claims under federal law against ... Justice Bannon, Judge Spears, and Defendant Vaughan, in their official capacities, under the doctrine of Eleventh Amendment immunity. 🚩28 U.S.C. § 1915(e)(2)(B)(iii)."). Here, Plaintiff again brings official capacity claims against Judges Bannon, Cannataro, Frank, Ibrahim, Chief Administrative Judge Marks, Administrative Law Judge Noll, and Commissioner Tietz, notwithstanding his prior experience with this specific context. 🚩*Sledge, 564 F.3d at 109*. Because these claims are barred under the Eleventh Amendment, the Court dismisses all federal claims brought against these Defendants. 🚩28 U.S.C. § 1915(e)(2)(B)(iii).

### B. Plaintiff's Claims Against Government Attorneys Are Dismissed

**\*6** Plaintiff's federal claims brought against Defendants Calhoun, Beirne, Gil-Lambert, Mosczyc, Gerber, Scalia, Marks, and Spitzberg arise from those defendants' legal advocacy representing the HRA and OTDA. In *Komatsu I*, Plaintiff brought similar claims against Mosczyc and Gerber, and Judge Stanton dismissed the claims because these two Defendants, as government lawyers, were absolutely immune from the relief Plaintiff sought from them. Undeterred by the dismissal of those claims in *Komatsu I*, Plaintiff continues to seek relief against government attorneys who are his adversaries in his state court litigation. As explained in *Komatsu I*, however, government attorneys are immune from suit under 🚩Section 1983 "when functioning as an advocate of the state [or local government] in a way that is intimately associated with the judicial process." 🚩*Mangifico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006); *see* 🚩*Barrett v. United States*, 798 F.2d 565, 572–73 (2d Cir.1986) (absolute immunity for government attorney defending state in a civil lawsuit). Accordingly, the Court dismisses Plaintiff's federal claims against the government attorneys because they are immune from such relief. *See* 🚩28 U.S.C. § 1915(e)(2)(B)(iii).

### C. Claims Brought Against HRA Employee Park

The Court also dismissed the claims brought against Park, an HRA employee who allegedly informed Plaintiff that he was not entitled to discovery, because this Defendant is also

immune from the relief Plaintiff seeks. Like the HRA lawyers, who are absolutely immune as government advocates, Parks is absolutely immune for damages where her conduct as an HRA employee was "intimately associated with the judicial process." *Mangiafico*, 471 F.3d at 396. Accordingly, the Court dismisses all claims against this Defendant. 28 U.S.C. § 1915(e)(2)(B)(iii).

**D. Claims Brought Against Administrative Law Judge Noll**

Plaintiff's claims under federal law against Judge Noll are barred under the doctrine of judicial immunity. Under this doctrine, judges are absolutely immune from suit for claims against them in their individual capacities for damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (applying judicial immunity to claims under § 1983); *Deem v. DiMella-Deem*, 941 F.3d 618, 620-21 (2d Cir. 2019) (same as to claims under § 1983 and § 1985), *cert denied*, 140 S. Ct. 2763 (2020). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209. This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation ...." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994).

Judicial immunity does not apply when a judge acts outside of his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff's claims against Judge Noll arise from her actions and decisions in OTDA proceedings, conduct that is well within the scope of judicial duties. Judge Noll is therefore immune from suit as to Plaintiff's claims against her under the doctrine of judicial immunity. The Court dismisses Plaintiff's claims against Judge Noll because Plaintiff seeks monetary relief

against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

**E. Claims Brought Against Former HRA Commissioner Banks and HRA employee Benjamin-Solis**

**1. Claims that arose before August 10, 2020 against Banks and Benjamin-Solis**

**\*7** In *Komatsu I*, Plaintiff brought several claims against Banks and Benjamin-Solis that were considered on the merits by Judge Stanton and dismissed for failure to state a claim. *See* § 1915(e)(2)(B)(ii). In *Komatsu II*, Plaintiff brings the same claims against these Defendants, as well as new claims arising from the same conduct, that is, Plaintiff's litigation with HRA. These claims are barred under the doctrine of claim preclusion. [3]

Under the doctrine of claim preclusion, also known as "*res judicata*," a litigant may not bring a new case that includes claims or defenses that were or could have been raised in an earlier case in which the same parties were involved if that case resulted in a judgment on the merits. *Brown v. Felsen*, 442 U.S. 127, 131 (1979). Claim preclusion "prevents parties from raising issues that could have been raised and decided in a prior action – even if they were not actually litigated." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594, 206 L. Ed. 2d 893 (2020).

Claim preclusion generally applies if: "(1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *In re Motors Liquidation Co.*, 943 F.3d 125, 130 (2d Cir. 2019) (citation and internal quotation marks omitted).

To determine if a claim could have been raised in an earlier action, courts look to whether the present claim arises out of the same transaction or series of transactions asserted in the earlier action, *see Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001), or, in other words, whether facts essential to the second suit were present in the first suit, *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983). "A party

cannot avoid the preclusive effect of *res judicata* by asserting a new theory or a different remedy." 🔖 *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017) (internal quotation marks and citation omitted).

All of Plaintiff's claims brought against Benjamin-Solis, and some of the claims brought against Banks, accrued before Plaintiff filed *Komatsu I*. Further, all of the claims brought against Benjamin-Solis and some of the claims brought against Banks in *Komatsu II* arise from the same series of transactions as the claims asserted against them in *Komatsu I*. Because Plaintiff did bring those claims, or could have brought those claims in *Komatsu I*, those claims are barred under the doctrine of claim preclusion.

### 2. Claims against Banks that accrued after August 14, 2020

Plaintiff brings new claims against Banks regarding his interactions with Banks at public meetings. Plaintiff is barred from bringing new claims against City officials regarding incidents occurring at public meetings, unless he receives permission to do so. Because Plaintiff did not seek permission to file new claims against these individuals, as discussed below in Section J, those claims are dismissed without prejudice.

**\*8** With respect to Bank's alleged interference with Plaintiff's retaining *pro bono* counsel, Plaintiff does not suggest a violation of a constitutional right. The Sixth Amendment, which provides a right to counsel in criminal cases, "does not govern civil cases." 🔖 *Turner v. Rogers*, 564 U.S. 431, 441 (2011). Thus, to the extent Banks interfered with Plaintiff's retaining counsel, such interference does not implicate Plaintiff's rights under the United States Constitution. Accordingly, the claims against Banks concerning *pro bono* counsel are dismissed for failure to state a claim.

### F. The City of New York and HRA Commissioner Jenkins

The Court dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, who is sued in his official capacity. When a plaintiff sues a municipality under 🔖 Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the

plaintiff's rights. *See* 🔖 *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting 🔖 *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)); ⚠️ *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

To state a 🔖 Section 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. 🔖 *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see* 🔖 *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff alleges no facts showing that the City of New York violated any of his federal constitutional or statutory rights because of one of the City's policies, customs, or practices. The Court therefore dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, sued in his official capacity, for failure to state a claim on which relief may be granted.

### G. 🔖 Section 1983 Claims Brought Against Private Defendants

Plaintiff brings 🔖 Section 1983 claims against private individuals and entities, also named in *Komatsu I*, that is: Urban, Abad, Coates, Lombardi, Paulemont, Shack, and Southwell. Judge Stanton dismissed these claims for failure to state a claim because Plaintiff failed to show that any conduct by these private individuals could be considered state action. Now, Plaintiff reasserts similar claims against these same private individuals and also names additional private individuals, not named in *Komatsu I*, that is: Saunders, Nastachowski, and Cohen. Plaintiff still does not show, however, that these defendants' conduct can be considered state action. Thus, for the reasons set forth in Judge Stanton's order, dismissing the 🔖 Section 1983 claims against the private individuals, the Court dismisses Plaintiff's claims against the individual defendants named in this action for failure to state a claim.

## H. Claims Under Civil RICO

Plaintiff asserts that Defendants have conspired against him, in violation of the civil provision of RICO. Plaintiff brought similar claims in *Komatsu I*, and Judge Stanton dismissed those claims because Plaintiff failed to show that Defendants engaged in any activity that would support any claim under civil RICO. In this action, Plaintiff also fails to state any facts suggesting a RICO violation. The Court therefore dismisses Plaintiff's claims under civil RICO for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

## I. Claims Under the Fair Debt Collection Practices Act ("FDCPA")

**\*9** Plaintiff brings claims against the Urban and DNCT Defendants, asserting that they violated the FDCPA. He alleges that they falsely claimed in court that Plaintiff owed rent. He relies on a district court decision, in which a consumer sued a law firm that was a debt collector. *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 526 (S.D.N.Y. 2013) ("Defendant K & B is a law firm that primarily represents landlords in New York City. K & B is a debt collector as defined by the FDCPA.").

The FDCPA applies to consumer debt "arising out of ... transaction[s] ... primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 551 (S.D.N.Y. 2013) ("[T]he FDCPA is triggered when the obligation is a debt arising out of a consumer transaction"). In cases where the FDCPA applies, it prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692e. A debt collector is defined in Section 1692a(6) as: (1) a person whose principal purpose is to collect debts; (2) a person who regularly collects debts owed to another; or (3) a person who collects its own debts, using a name other than its own as if it were a debt collector. *See also Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) (holding that entities that regularly purchase debts originated by someone else and then seek to collect those debts for their own account are not necessarily debt collectors subject to the FDCPA).

Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Conduct in violation of the statute includes, among other examples and without limitation, using violence or the threat of violence or other criminal means; using obscene or profane language "the natural consequence of which is to abuse the hearer or reader"; publishing a list of consumers who refuse to pay debts; or "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass" the person called. 15 U.S.C. § 1692d.

Plaintiff's claims against the Urban Defendants fails to state claims upon which relief may be granted because Plaintiff does not state facts suggesting that they are debt collectors. His claims against the DNCT Defendants, however, may state claims, if he can show that these defendants engaged in harassing conduct with respect to the alleged debt owed to Urban.

As discussed below, the Court grants Plaintiff leave to file an amended complaint as to his FDCPA claims against DNCT and the DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun. His FDCPA claims brought against Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, and Nancy Southwell are dismissed for failure to state a claim upon which relief may be granted.

## J. Claims Against former Commissioner Banks, Pinny Ringel, and Lori Kletter

Plaintiff's claims against former Commissioner Banks, Ringel and Kletter, that arise out of alleged conduct by New York City officials at public meetings, fall within the scope of Judge Ramos's order requiring Plaintiff to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45). These claims are therefore dismissed without prejudice because Plaintiff has not obtained permission to bring these claims against these defendants.

## K. Claims Under State Law

**\*10** A district court may decline to exercise supplemental jurisdiction over claims under state law when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court

should decline the exercise of jurisdiction ...." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). At this stage, it is premature to determine whether the Court will decline to exercise its supplemental jurisdiction over any claims under state law that Plaintiff is asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### LEAVE TO AMEND

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). The Court, having dismissed all of the claims brought against the DNCT Defendants except the FDCPA claims, finds that it would be futile to grant him leave to amend the non-FDCPA claims. Accordingly, the Court grants Plaintiff leave to file an amended complaint to assert his FDCPA claims against the DNCT Defendants. The amended complaint must only name the DNCT Defendants and only assert the FDCPA claims, and it may not exceed 20 pages. These limitations are imposed based on Plaintiff's litigation history in this court, where he reasserts the same claims against the same defendants following dismissal of such claims on the merits. The page-limitation is imposed because Plaintiff's pleadings, both in this action and prior actions, do not comply with Rule 8's requirement that his complaint consist of short and plain statements. *See Fed. R. Civ. P. 8(a)*.

Should Plaintiff submit an amended complaint that fails to comply with these requirements, the Court will direct the Clerk of Court to return Plaintiff's pleading and will provide him one more opportunity to submit an amended complaint that does not exceed 20 pages, names DNCT Defendants, and asserts FDCPA claims. If he fails to comply with the requirements a second time, the Court will dismiss the action for failure to comply with the Court's order.

### CONCLUSION

The Court dismisses Plaintiff's federal claims brought against Urban Pathways, Inc., Neighborhood Association For Inter-Cultural Affairs, Inc., The City Of New York, Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Moscyzc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Ariana Saundersm, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim, Gary Jenkins, Lawrence Marks, Maura Noll, and Daniel Tietz, as frivolous, for failure to state a claim on which relief may be granted, and for seeking monetary relief from defendants that are immune from such relief. *See* 28 U.S.C. § 1915(e)(B)(i)-(iii).

Those claims brought against Steve Banks, Penny Ringel, and Lorri Kletter that arise out of public meetings are dismissed without prejudice, pursuant to the prefiling injunction issued in *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45).

The Court grants Plaintiff leave to file an amended complaint that complies with the standards set forth above.

**\*11**   Plaintiff must submit the amended complaint, which may not exceed 20 pages, to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 22-CV-9080 (LTS).

An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

AMENDED

_____

COMPLAINT

_____

Do you want a jury trial?
☐ Yes   ☐ No

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore not contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include only: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 2/10/17

**I. BASIS FOR JURISDICTION**

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of
cases can be heard in federal court: cases involving a federal question and cases involving
diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United
States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332,
a case in which a citizen of one State sues a citizen of another State or nation, and the amount
in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may
be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐  **Federal Question**

☐  **Diversity of Citizenship**

**A.   If you checked Federal Question**

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

**B.   If you checked Diversity of Citizenship**

**1.   Citizenship of the parties**

Of what State is each party a citizen?

The plaintiff, _____, is a citizen of the State of
                        (Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing
information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                        (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

**II.  PARTIES**

**A.   Plaintiff Information**

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____
First Name            Middle Initial          Last Name

_____
Street Address

_____
County, City                        State              Zip Code

_____
Telephone Number                    Email Address (if available)

Page 3

**B.  Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

First Name _____ Last Name _____

Current Job Title (or other identifying information) _____

Current Work Address (or other address where defendant may be served) _____

County, City _____ State _____ Zip Code _____

Defendant 2:

First Name _____ Last Name _____

Current Job Title (or other identifying information) _____

Current Work Address (or other address where defendant may be served) _____

County, City _____ State _____ Zip Code _____

Defendant 3:

First Name _____ Last Name _____

Current Job Title (or other identifying information) _____

Current Work Address (or other address where defendant may be served) _____

County, City _____ State _____ Zip Code _____

Page 4

Defendant 4:

First Name _____ Last Name _____

Current Job Title (or other identifying information) _____

Current Work Address (or other address where defendant may be served) _____

County, City _____ State _____ Zip Code _____

**III. STATEMENT OF CLAIM**

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____

Page 5

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

_____

Page 6

**V.  PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated _____ Plaintiff's Signature _____

First Name _____ Middle Initial _____ Last Name _____

Street Address _____

County, City _____ State _____ Zip Code _____

Telephone Number _____ Email Address (if available) _____

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

**All Citations**

Slip Copy, 2023 WL 419699

## Footnotes

1      Plaintiff named the following defendants in *Komatsu I* but not in *Komatsu II:* Marilyn Andzeski, Urban management agent; Molly McCracken, an employee with Services for the Underserved, Inc.; Avraham Schmeidler, an HRA employee; Wendell Vaughan, a law clerk; the New York State Office off Court Administration; the New York State Unified Court System; and Judge Brenda Spears, from the Bronx County Housing Court.

2      The allegations from *Komatsu I*, described in this order, relate to the allegations set forth in *Komatsu II*, and do not include each allegation set forth in *Komatsu I.*

3      Although claim preclusion is an affirmative defense to be pleaded in a defendant's answer, *see* Fed. R. Civ. P. 8(c), the Court may, on its own initiative, raise the issue. *See, e.g.,* 🚩*Grieve v. Tamerin*, 269 F.3d 149, 154 (2d Cir. 2001) (affirming district court's dismissal on grounds of issue preclusion even though defendant failed to plead that defense, and noting that "principles of preclusion involve" not only "the rights and interests of the parties," but also "important interests of the public and the courts in avoiding repetitive litigation and potentially inconsistent decisions").

2014 WL 3952903
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Vincent P. McCRUDDEN, Plaintiff,

v.

E–TRADE FINANCIAL CORP, et al., Defendants.

No. 13cv8837.
|
Signed Aug. 12, 2014.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge.

**\*1** Plaintiff *pro se* Vincent P. McCrudden brings this action alleging violations of the Civil Rights Act of 1964, the Workforce Investment Act of 1998, and the. Sherman Act. Defendants [1] move to dismiss the second amended complaint for failure to state a claim. For the following reasons, the motion is granted.

*BACKGROUND*

The motion papers allege government conspiracies, death threats, and an ostensibly innocent man imprisoned after being framed by the NSA. [2] But the facts alleged in the complaint, and relevant for the purpose of this motion to dismiss, are far more mundane. In 2013, McCrudden opened or attempted to open securities or futures trading accounts with each Defendant. Those Defendants who did not deny his application in the first place closed his accounts soon after he opened them. McCrudden alleges that refusing to establish trading accounts in his name was unlawful discrimination and violated antitrust laws.

McCrudden opened a TD Ameritrade account in April 2013. In July 2013, he received a letter stating TD Ameritrade was closing his account. McCrudden was unable to learn why TD Ameritrade closed his account.

McCrudden opened E\*Trade accounts in May 2013. In June, E\*Trade sent him a letter informing it was closing his accounts.. McCrudden alleges a telephone customer service representative refused to give him any reason for the termination and did not release the funds from his accounts. A month later, a corporate manager called McCrudden to apologize and stated the customer service representative had not followed E\*Trade's protocol.

McCrudden opened an optionsXpress futures account in July 2013. In September, optionsXpress sent McCrudden an email stating it reserved the right to deny or retract business. McCrudden called the person who sent him the letter, but she would not give the reason she sent it.

Also in July 2013 McCrudden applied for a Tradestation account. A sales supervisor emailed him, stating Tradestation "made a business decision not to move forward" with his account. Second Am. Compl. ¶ 92. McCrudden attempted to follow up on Tradestation's reasons and was told in an email that "it is in keeping with firm policy that we do not reveal the reason we choose not to pursue or continue a business relationship with a client." Second Am. Compl. ¶ 93.

McCrudden opened an account with Lightspeed in September 2013. Three days later, Lightspeed told McCrudden it was an introducing broker for RJ O'Brien and asked him to open an account with RJ O'Brien, which he did. The next day, Lightspeed told McCrudden "several issues have come up from the compliance department" and asked him not to make trades, as his accounts had been restricted. Second Am. Compl. ¶ 80. Lightspeed later closed his accounts without providing a reason.

A broker at ATC Brokers solicited McCrudden to open a futures trading account in September 2013. McCrudden applied for an account, but ATC Brokers denied his application. McCrudden alleges ATC Brokers is an introducing broker for GAIN Capital. McCrudden requested financial information from ATC Brokers, which it did not provide.

**\*2** Also in September 2013, McCrudden applied for a futures trading account with MBF. He alleges MBF is an introducing broker for FCStone. About two weeks after McCrudden's application, MBF responded by email and stated that after performing "due diligence," it would not open an account for him. McCrudden requested further information, but MBF's vice president, acting on behalf of FCStone, told him that FCStone does not disclose its reasons for rejecting account applications.

McCrudden opened a futures account with Global Futures in October 2013, which McCrudden states is an introducing broker for AMP Global. AMP Global closed the account in December. McCrudden was told only that his account "does not meet our current risk parameters." Second Am. Compl. ¶ 83.

McCrudden also applied for an Insignia account in October 2013. McCrudden alleges Insignia is an introducing broker for Ironbeam. The day after McCrudden applied, Insignia sent him an email stating it could not give him an account because of "past or pending regulatory actions" by the National Futures Association and the Commodity Futures Trading Commission. Second Am. Compl. ¶ 85.

Finally, McCrudden opened an account with Velocity Futures on October 15, 2013. He alleges Velocity Futures is an introducing broker to Institutional Liquidity. On October 18, Velocity Futures gave him a different account number and delayed his ability to begin trading. When he inquired as to his account's status in December, he was told his "account was denied by compliance," but he was not told why. Second Am. Compl. ¶ 90. The next day, Institutional Liquidity's CEO called McCrudden and said they could terminate a business relationship for any reason.

### DISCUSSION

#### I. Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accented as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Iqbal,* 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (internal punctuation omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 679). On a motion to dismiss, courts may consider "facts stated on the face of

the complaint, in the documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

**\*3** A *pro se* complaint must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1980). Courts must liberally construe a *pro se* pleading "to raise the strongest arguments it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir.2014) (quoting *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013)).

#### II. Title VI of the Civil Rights Act of 1964

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a Title VI claim, a plaintiff must show (1) the defendants receive federal financial assistance, (2) their actions were discriminatory based on race, color, or national origin, (3) the discrimination was intentional, and (4) the discrimination was a "substantial or motivating factor" for defendants' actions. *Tolbert v. Queens College,* 242 F.3d 58, 69 (2d Cir.2001). A plaintiff alleging discrimination "must do more than recite conclusory assertions. In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994).

McCrudden does not allege his race, color, or national origin. He does not allege which of these was the basis of the Defendants' "discrimination." He does not allege any reason to believe he was discriminated against on the basis of race, color, or national origin, and in fact in his opposition brief states he has "no idea the exact reason he was discriminated against." ECF No. 90 at 10. This does not give "rise to a plausible inference of [ ] discriminatory intent." *Yusuf,* 35 F.3d at 713.

Nor does McCrudden allege that Defendants operate programs or activities receiving federal assistance. The Department of Health & Human Services's regulations interpreting Title VI state that

> Federal financial assistance includes (1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

**\*4** 45 C.F.R. § 80.13. A Title VI plaintiff must allege he is the intended beneficiary of a specific program or activity which receives federal financial assistance. *Kelly v. Rice,* 375 F.Supp.2d 203, 209 (S.D.N.Y.2005). McCrudden alleges only that "defendants benefit directly or indirectly by Government, low cost funding." This is insufficient to establish that McCrudden is the intended beneficiary of federally-assisted programs or activities run by Defendants.

Because McCrudden has not alleged any of the elements of a Title VI discrimination claim, that claim is dismissed.

### III. *Workforce Investment Act of 1998*

The non-discrimination provision of the Workforce Investment Act of 1998 provides that

> [n]o individual shall be excluded from participation in, denied the benefits of, subjected to discrimination under, or denied employment in the administration of or in connection

with, any [program or activity funded under the Workforce Investment Act] because of race, color, religion, sex (except as otherwise permitted under title IX of the Education Amendments of 1972), national origin, age, disability, or political affiliation or belief.

29 U.S.C. § 2938(a)(2). But there is no private right of action under this section. Instead, the Secretary of Labor and Attorney General are charged with enforcement. *See* 29 U.S.C. § 2938(b)-(c); *Machie v. Nguyen,* 824 F.Supp.2d 146, 151 (D.D.C.2011); *McGowan v. New Jersey,* Civil Action No. 08–5841, 2009 WL 1687663, at *8 (D.N.J. June 16, 2009); *Borrero–Rodriguez v.. Montalvo–Vazquez,* 275 F.Supp.2d 127, 132 (D.P.R.2003).

Moreover, McCrudden does not allege that any Defendant received funding under the Workforce Investment Act or that he was excluded from or denied employment in connection with any program or activity funded under the statute. This too is fatal to his claim. *Machie,* 824 F.Supp.2d at 151.

### IV. *Sherman Act*

McCrudden alleges violations of sections 1 and 2 of the Sherman Act. To have "antitrust standing," a plaintiff must have suffered "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). "The injury must reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp.,* 429 U.S. at 477.

McCrudden's alleged injury is the Defendants' refusal to conduct business with him. But refusing an individual customer's business is not anticompetitive. *See Ruotolo v. Fannie Mae,* 933 F.Supp.2d 512, 520 (S.D.N.Y.2013) ("[T]he antitrust laws were enacted for the protection of competition, not the protection of a single market participant like Plaintiff." (internal quotation marks and emphasis removed)). Because McCrudden has not suffered an injury the antitrust laws were intended to prevent, he does not have

antitrust standing. His Sherman Act claims must therefore be dismissed.

### V. *Leave to Replead*

**\*5** "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." 🚩*Hayden v. Cnty. of Nassau,* 180 F.3d 42, 53 (2d Cir.1999). In particular, a *pro se* complaint should not be dismissed without at least one opportunity to replead "when a liberal reading of the complaint gives any indication that a valid claim might be stated." 🚩*Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting 🚩*Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

McCrudden filed an amended complaint on February 6, 2014 (ECF No. 60). On February 27, 2014, Defendants sent this Court and McCrudden a pre-motion letter, as required by this Court's individual rules of practice, outlining their anticipated arguments for a motion to dismiss. (ECF No. 69). This Court held a pre-motion conference on March 28, 2014, where Defendants elaborated on their arguments for dismissing the amended complaint. This Court granted McCrudden leave to file a second amended complaint to address those arguments, but cautioned that he would not be given leave to replead if the motion to dismiss the second amended complaint was granted. (ECF No. 83). And even a liberal reading of McCrudden's complaint gives no indication that he has a valid claim, making leave to replead futile. His claims are therefore dismissed with prejudice.

### *CONCLUSION*

Defendants' motion to dismiss the second amended complaint is granted. McCrudden's claims are dismissed with prejudice. The Clerk of Court is directed to terminate all pending motions and mark this case closed.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3952903

---

### Footnotes

1    The many defendants in this action are AMP Global Clearing, LLC; Apex Clearing Corp.; Avail Trading Corp.; E*TRADE Financial Corp.; GAIN Capital Group, LLC; Insignia Futures & Options, Inc.; Institutional Liquidity, LLC; INTL FCStone Inc.; Ironbeam, Inc.; Lightspeed Trading, LLC; TD Ameritrade Holding Corp.; tradeMONSTER Group, Inc; and TradeStation Securities, Inc.

2    In short, McCrudden pleaded guilty in 2012 to threatening officials at various financial regulatory organizations and served 28 months in federal prison. McCrudden maintains his innocence, arguing the threats were authored by the NSA. None of this is relevant to Defendants' motion.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1687663

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Michael G. McGOWAN, Plaintiff,

v.

State of NEW JERSEY, et al., Defendants.

Civil Action No. 08–5841(FLW).
|
June 16, 2009.

West KeySummary

1    **Civil Rights** 🔑 Time for proceedings; limitations

An employer was entitled to dismissal of a job applicant's Title VII claim for race and age discrimination after it hired three younger, allegedly less qualified minorities over him. The applicant failed to file suit within 90 days of receipt of a right-to-sue letter from the Equal Employment Opportunity Commission. Thus, the applicant's claim was time-barred. Civil Rights Act of 1964, § 706(e)–(1), 42 U.S.C.A. § 2000e–5(e)–(1).

5 Cases that cite this headnote

**Attorneys and Law Firms**

Michael G. McGowan, Robbinsville, NJ, pro se.

Debra Marie McGarvey, Jane A. Greenfogel, Office of the New Jersey Attorney General, Trenton, NJ, William F. Maderer, David Andrew Cohen, Saiber LLC, Newark, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1** Before the Court are Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) brought by defendants, State of New Jersey, Office of the Attorney General, New Jersey Department of Community Affairs ("DCA"), and Jon Corzine, (collectively "State Defendants")[1] and Defendant New Jersey Housing and Mortgage Finance Agency ("HMFA"), to dismiss the claims of *pro se* Plaintiff Michael G. McGowan ("McGowan"). In his ten-count Complaint[2], McGowan alleges: (1) violations of the Civil Rights Act of 1991; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of Title VII of the Civil Rights Act of 1964 ("Title VII"); (4) violations of the New Jersey Law Against Discrimination ("NJLAD"); (5) intentional infliction of emotional distress; (6) tortious interference with economic advantage; (7) violations of the First Amendment; (8) violations of the Fifth Amendment; (9) violations of the Age Discrimination Employment Act ("ADEA"); and (10) and violations of the Workforce Investment Act ("WIA") and Age Discrimination Act of 1975 ("Age Act") arising from alleged discriminatory conduct in Defendants' hiring practices. The Court has reviewed Defendants' Motions, which McGowan has not opposed, and for the reasons set forth below, HMFA's Motion is granted while State Defendants' Motion is granted in part and denied in part. In particular, State Defendants' Motion is denied with respect to McGowan's NJLAD claims of discrimination with regard to the DCA hirings of September 18, 2006 and February 2007. The Motion is granted with respect to all other claims.

**I. FACTUAL BACKGROUND**

Since Defendants move to dismiss Plaintiff's claims pursuant to Fed.R.Civ.P. 12(b)(6), the following version of events assumes Plaintiff's allegations to be true; moreover, since Plaintiff is *pro se,* the Court will read his Complaint liberally. McGowan alleges that his employment with HMFA was "illegally terminated" by DCA commissioner Susan Bass–Levin in May of 2002. Compl. ¶ 11. He further alleges that, due to racial, political, and age-based discrimination, his subsequent attempts to gain new employment at DCA and to regain employment at HMFA were unsuccessful, despite outstanding qualifications. Compl. ¶ 27.

Specifically, McGowan alleges that Bass–Levin ordered the termination of his employment at HMFA in May of 2002, despite "stellar annual reviews" and significant achievements at his position. Compl. ¶ 11. He claims that Bass–Levin terminated numerous HMFA employees in order to make

room for individuals with influential connections in the New Jersey Democratic Party, and that McGowan in particular was terminated due to the fact that he is a registered Republican. Compl. ¶¶ 11–12, 27. McGowan appears to use these facts as background evidence to support his claims of discrimination, which relate exclusively to Defendants' conduct during the hiring process when he applied for employment at DCA and reapplied for employment at HMFA. None of McGowan's claims are based on his 2002 termination from HMFA.[3] McGowan alleges that in 2006 he applied to the New Jersey Department of Personnel for a position at DCA. Compl. ¶ 16. He took a competitive qualification exam and received a Notification of Certification that he had finished with the highest score on the exam among all candidates statewide, earning him the number one ranking for consideration for DCA job openings. Compl. ¶ 16. The DCA interviewed McGowan on July 12, 2006, and although he was told that a second interview with the Division Director would be scheduled, he was informed on September 13, 2006, that another candidate had been selected for the position. Compl. ¶¶ 19–21.

**\*2** McGowan later learned that the DCA positions for which he had interviewed had been filled by three younger, less qualified minorities. Compl. ¶¶ 21–22. McGowan asserts that these individuals were less qualified because they scored lower than McGowan on the competitive placement exam. Compl. ¶ 10. McGowan further asserts that these individuals were hired on September 11, 2006, September 18, 2006, and February 2007. Compl. ¶¶ 21–22. The reason that DCA failed to hire him, according to McGowan, is at least partially due to the influence of Bass–Levin who "black-balled" him for politically discriminatory reasons. Compl. ¶¶ 26, 38–42. McGowan also alleges that HMFA failed to even acknowledge his application for reemployment, initiated after his termination, because Bass–Levin had instructed HMFA personnel not to consider him. Compl. ¶¶ 52–62.

McGowan filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against DCA in July of 2007, alleging discrimination in its hiring practices (Compl. ¶¶ 63–74; State Defendants Ex. B), and the EEOC returned a dismissal of the charge and a right-to-sue letter to McGowan on March 3, 2008 (State Defendants Ex. C).

McGowan initiated this action in the Superior Court of New Jersey, Law Division, Mercer County on September 17, 2008. The case was then removed to this Court. Now,

Defendants move to dismiss McGowan's Complaint in its entirety. McGowan has not filed opposition to these Motions.

## II. DISCUSSION

### A. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 1968 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 545).

**\*3** When a party fails to oppose a motion to dismiss for failure to state a claim, a court is still obligated to address the motion on its merits; thus, this Court must determine whether Plaintiffs' claims fail to state a claim upon which relief can be granted pursuant to *Fed. R. Civ.* P. 12(b)(6). *West v. American Honda Motor Co.,* No. 08–0700, 2008 WL 4104683, at \*2 (D.N.J. Aug.28, 2008) (citing *Stackhouse v. Mazurkiewicz,* 951 F.2d 29, 30 (3d Cir.1991)).

McGowan v. New Jersey, Not Reported in F.Supp.2d (2009)

The Court is obligated to construe Plaintiff's *pro se* pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2004) ("[The Court will] apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."). However, *pro se* parties must still comply with the pleading standards as set forth in Federal Rule of Civil Procedure 8(a)(2), which requires the allegations in a complaint to set out a "short and plain statement of the claim." *Fed.R.Civ.P.* 8(a)(2). Notwithstanding this generous standard, a *pro se* party cannot rely on bald assertions or legal conclusions to survive a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). In applying 8(a), the Court "must determine whether, under any reasonable reading of the pleadings, the plaintiff[ ] may be entitled to relief, and ... must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citing *Holder v. Allentown,* 987 F.2d 188, 194 (3d Cir.1993)); *Eli Lily & Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 474 (D.N.J.1998) (citing *Nami* and *Holder* ).

**B. Plaintiff's Claims**

**1. Count One: Violation of the Civil Rights Act of 1991.**

McGowan alleges that DCA hiring practices discriminated against him in violation of the Civil Rights Act of 1991, Pub.L. 102–166. Compl. ¶¶ 28–37. The Act, however, provides no private right of action, as it merely amended previously existing statutes, including Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.,* the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.,* and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*

Indeed, the Act's stated purposes include, among others, an intention "to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964." Pub.L. 102–166. Defendants argue, and this Court agrees, that this statute merely amends certain terms of previously existing statutes; it did not create a separate statute under which relief can be sought. Accordingly, McGowan's claims under the Civil Rights Act of 1991 are dismissed. McGowan's proper

remedy lies within 42 U.S.C. § 1983. However, he did not plead such and the Court will not rewrite his claim for him, particularly where he has failed to oppose Defendants' Motions.

**2. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing**

**\*4** McGowan alleges that his application for employment failed, at least in part, because he was "black-balled" by Bass–Levin, subjected to unfair hiring practices, and passed-over in favor of younger, less qualified minority applicants. Compl. ¶¶ 38–42. These hiring practices, he alleges, represent a breach of the implied covenant of good faith and fair dealing. *Id.*

The Court agrees with Defendants that this claim must be dismissed, as Plaintiff alleges only that defendants failed to hire him. "The doctrine of good faith and fair dealing cannot ... create rights or obligations in the absence of a valid contract." *Pepe v. Rival Co.,* 85 F.Supp.2d 349, 390 (D.N.J.1999), *aff'd without opinion,* F.3d 1078 (3d. Cir.2001) (citations omitted). McGowan has failed to allege that a valid contract existed between himself and any of the Defendants; his claim, therefore, is dismissed.

**3. Count Three: Violation of Title VII**

McGowan alleges that Defendants failed to hire him based on his race and age by "target[ing] the hiring" of three younger, less qualified minorities over him, despite outstanding qualifications, in violation of Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.* Compl. ¶¶ 43–51.

Defendants move to dismiss this claim on the grounds that McGowan has failed to comply with certain procedural requirements of Title VII. A plaintiff filing a discrimination suit pursuant to Title VII is required to file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e–5(e)–(1). *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 108–11, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("An individual [filing suit under Title VII] *must* file a charge [with the EEOC] within the statutory time period and serve notice upon the person against whom the charge is made." (emphasis added)). Where the EEOC has decided to dismiss a plaintiff's charge of discrimination, it will issue to the plaintiff a right-to-sue letter, the receipt of which gives the plaintiff 90 days to file suit

against the party named in his charge of discrimination. 42 U.S.C.2000e–5(f)–(1). Title VII's requirement that a suit be filed within 90 days of receipt of the EEOC's right to sue letter acts as a statute of limitations on such claims, *Montecalvo v. Trump's Taj Mahal Casino,* No. 97–3876, 1997 WL 786985 at *1 (E.D.Pa. Nov.26, 1997) (citing *Mosel v. Hills Department Stores,* 789 F.2d 251, 253 (3d Cir.1986)), and the failure to timely comply with this requirement is cause for dismissal. *Phillippeaux v. County of Nassau,* 921 F.Supp. 1000, 1006 (E.D.N.Y.1996). *See e.g., Mosel, supra,* 789 F.2d at 253 (holding Title VII plaintiff's complaint untimely because it was filed 91 days after receipt of EEOC right-to-sue letter).

Though McGowan filed a charge of discrimination with the EEOC against DCA, he failed to file suit within 90 days of receipt of the right-to-sue letter. McGowan's EEOC right-to-sue letter was issued on March 3, 2008. Nowhere does McGowan allege when he received the letter. Nevertheless, *Fed.R.Civ.P.* 6(e) presumes that he received it three days after it was issued. *See* *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) (applying Rule 6(e) presumption to receipt of an EEOC right-to-sue letter). His 90 days, therefore, began on March 6, 2008, and ran on June 4, 2008. McGowan, however, did not file his Complaint until September 17, 2008, thus his claim under Title VII is time barred.

**\*5** With respect to McGowan's Title VII claim against HMFA, he has not alleged that he filed the required charge of discrimination with the EEOC. Failure to comply with the statutory requirements of Title VII preclude McGowan from bringing his Title VII claim against HMFA. Therefore, it is dismissed.

### 4. Count Five: Violation of NJLAD

McGowan alleges violations of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1, *et seq.,* through claims of discrimination and hostile work environment alleged in connection with Defendants' failure to hire him as an employee. Compl. ¶¶ 52–62. Specifically, he alleges that DCA's failure to hire him and HMFA's failure to re-hire him represented "an intentional, pervasive, and continuing pattern of employment discrimination." Compl. ¶ 53.

As a preliminary matter, it is important to note that all of McGowan's claims relate exclusively to Defendants' conduct occurring after his termination from HMFA. His claims against DCA and HMFA all arise from alleged discrimination in their failure to hire and re-hire him, respectively.

McGowan's hostile work environment claims are dismissed as he has failed to allege that he was employed by DCA or HMFA at the relevant times. In order to establish a cause of action for hostile work environment under NJLAD, a plaintiff must show that the defendant subjected him to conduct so severe or pervasive that a reasonable person would believe that *the conditions of employment* have become hostile or abusive. *Shepard v. Hunterdon Developmental Ctr. .,* 174 N.J. 1, 24, 803 A.2d 611 (2002) (emphasis added). In other words, McGowan would have to be employed in order to assert claims of hostile work environment. As he did not allege that he was employed by any of the Defendants during the alleged unlawful conduct, these claims are dismissed.

Alternatively, McGowan alleges discrimination, in violation of NJLAD, based on Defendants' failure to hire him. To the extent that McGowan's discrimination claims relate to acts occurring prior to September 17, 2006, they are barred by the statute of limitations under NJLAD. A two-year statute of limitations period applies to each of McGowan's failure to hire claims because they are based on discrete events. *See* *Montells v. Haynes,* 133 N.J. 282, 292, 627 A.2d 654 (1993). In *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court stated that a refusal to hire, as is alleged here, is a discrete act. As such, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' " *Id.* at 114. Moreover, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113.

Here, McGowan asserts that DCA discriminated against him by hiring less qualified, younger minorities. He asserts specifically that these individuals were hired on September 11, 2006, September 18, 2006, and February 2007. Compl. ¶¶ 10, 21–22. Because he filed his Complaint on September 17, 2008, McGowan's claim relating to the September 11, 2006 hire is dismissed as time barred. This Court finds, however, that McGowan's discrimination claims based on DCA's hirings of September 18, 2006 and February 2007 must survive State Defendant's Motion to Dismiss, as they fall within the relevant limitations period. State Defendants do not specifically address these claims in their Motion, but

rather, they summarily assert that all of McGowan's NJLAD discrimination claims are time barred. This Court finds, however, that McGowan has pled sufficient facts for these claims to survive the Motion. An employment discrimination plaintiff need not plead a prima facie case of discrimination. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Indeed, the Third Circuit has held that an employment discrimination plaintiff need only plead facts sufficient to satisfy the notice pleading standard of *Fed.R.Civ.P.* 8(a). *Thomas v. Independence Twp.,* 463 F.3d 285, 295 (3d Cir.2006). Although the Supreme Court's holding in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) heightened the pleading standard under Rule 8(a), the Court specifically reaffirmed the holding in *Swierkiewicz* that a plaintiff in an employment discrimination case need not plead a prima facie case. *Twombly,* 550 U.S. at 569–70; *see Bell v. KA Indus. Services, LLC,* 567 F.Supp.2d 701, 706–7 (D.N.J.2008). Therefore, "the elements of the prima facie claim do not have to be proven, but merely must be plausible." *Bell,* 567 F.Supp.2d at 706–7 (citing *Twombly,* 550 U.S. at 569–70). Here, McGowan alleges that DCA hiring practices subjected him to racial and age-based discrimination due to the fact that DCA failed to hire him and instead hired younger minorities who received lower scores on the competitive placement exam. Compl. ¶ 10. He further alleges that the State and its agencies, including DCA, specifically targeted the hiring of minorities and that these practices have a disparate impact on caucasians. Compl. ¶¶ 49–51. Whether McGowan may be able to establish a prima facie case of employment discrimination is not at issue, since this is a 12(b)(6) motion, and the Court finds that the facts alleged by McGowan make a plausible claim of employment discrimination. As such, Defendants' motion in this regard is denied.

**\*6** As they relate to HMFA, McGowan's claims of discrimination allege only that he applied for several positions at HMFA for which he was well qualified, but never got the job because Bass–Levin had made sure he would not be considered. Compl. ¶ 60. He makes no allegation that age or race had any bearing on the employment decisions at HMFA. He, instead, relies on statistics to show a disparate impact on caucasians in New Jersey State employment (Compl. ¶ 61), but fails to allege that any minorities or younger persons were hired over him or indeed that race or age had any bearing on the hiring practice. In fact, he specifically alleges that HMFA had no contact with him during the hiring process and

that it failed to acknowledge his application. Compl. ¶ 60. While the Court recognizes that McGowan need not establish a prima facie case in his pleadings, *Bell,* 567 F.Supp.2d at 706–7, he must still plead facts sufficient to meet the standard of *Fed.R.Civ.P.* 8(a). *Id.* McGowan has not pled any facts sufficient to raise his claims above a speculative level in this respect. Moreover, McGowan's claim as it relates to HMFA is based on the proposition that Bass–Levin adversely influenced the hiring process. His allegations, however, only support the inference that Bass–Levin discriminated against him based on political views and there is no indication of racial or age-based discrimination. "[T]he NJLAD prohibits employers from discriminating in employment on numerous bases, but these do not include political affiliation." *Siss v. County of Passaic,* 75 F.Supp.2d 325 (D.N.J.1999). Thus, McGowan's NJLAD claim of discrimination by HMFA is dismissed.

### 5. Counts Six and Seven: Tort Claims

McGowan alleges that Defendants intentionally inflicted upon him "a pervasive and routine discrimination in its hiring practices," thus subjecting him to intentional infliction of emotional distress. Compl. ¶¶ 63–65. He claims, further, that Defendants' subjected him to tortious interference with economic advantage through their hiring practices which allegedly discriminated against him based on his political affiliation, race, and age. Compl. ¶¶ 66–74.

Defendants move to dismiss these two tort claims for McGowan's failure to comply with the notice provisions of the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. § 59:1–1, *et seq.* The NJTCA provides the following with regard to notice of claims:

> A claim relating to a cause of action for ... injury or damage to person or to property shall be presented as provided in this chapter not later than the accrual of the cause of action ... *The claimant shall be forever barred from recovering against a public entity or public employee if: (a) He failed to file his claim with the public entity within 90 days of accrual of his claim* except

as otherwise provided in section 59:8–9

N.J. Stat. Ann. § 59:8–8 (emphasis added).

By its terms, the NJTCA requires that a notice of a claim be presented no later than 90 days after the accrual of the cause of action. "Accrual" of a claim occurs when, among other things, the tort is committed. N.J. Stat. Ann. § 59:8–1. Moreover, claims for intentional infliction of emotional distress and tortious interference with economic advantage are torts subject to the NJTCA. See Velez v. City of Jersey City, 180 N.J. 284, 286, 294–95, 850 A.2d 1238 (2004) (holding that the notice requirements of the of the NJTCA apply to common law intentional tort actions). Further, it is proper to dismiss a tort claim where plaintiff has failed to fulfill the notice requirements of the NJTCA. Wilson v. NJ State Police, No. 04–1523, 2006 WL 2358349 (D.N.J. Aug.15, 2006).

*7 Here, McGowan has not pled that he filed the required NJTCA notice within 90 days of the accrual of his cause of action. As such, McGowan's tort claims, Counts Six and Seven, are dismissed.

### 6. Counts Eight and Nine: Constitutional Claims

In Counts Eight and Nine of his Complaint, McGowan alleges that Defendants have violated his First and Fifth Amendment rights, respectively. Compl. ¶¶ 75–83. A claim that a party's Constitutional rights have been violated, however, must be pled under the statutory mechanism for such claims, 42 U.S.C. § 1983. See American General Life and Accident Ins. Co. v. Ward, 509 F.Supp.2d 1324, 1334–35 (N.D.Ga.2007) ("Where federal statutes provide a remedy to redress alleged constitutional violations, there can be no independent implied cause of action under the Constitution ." (internal citations omitted)).

McGowan has not pled his First Amendment claim under section 1983 and instead has pled violations of his constitutional rights directly under the Constitution. He has, therefore, failed to properly plead that claims and accordingly, it is dismissed without prejudice. Again, while the Court is aware of McGowan's pro se status, the Court will not discern a section 1983 claim for him because it appears that he has abandoned his claims by failing to oppose Defendants' Motions.

Furthermore, McGowan cannot bring a Fifth Amendment claim against Defendants because Defendants are State entities. The Fifth Amendment applies only to the Federal Government, Barron v. City of Baltimore, 32 U.S. 243, 7 Pet. 243, 8 L.Ed. 672 (1833), and as such, McGowan's Fifth Amendment claim is dismissed.

### 7. Count Ten: Violation of the ADEA

McGowan alleges that Defendants, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq., have wrongfully discriminated against him in their hiring practices due to the fact that he was over fifty years of age. Compl. ¶¶ 84–88.

Defendants move to dismiss McGowan's ADEA claim on the same grounds as his Title VII claim. Similar to a Title VII discrimination claim, an aggrieved party under the ADEA is required to file a charge of discrimination with the EEOC prior to instituting a civil action against an employer. 29 U.S.C. § 626(d). Specifically, the statute states that "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]. Id. McGowan has not alleged that he filed a charge of discrimination against the HMFA and therefore, his ADEA claim against HMFA is dismissed.

McGowan's ADEA claim against DCA is time barred and as such, it is also dismissed. Like a Title VII claim, an aggrieved party has 90 days to file suit from the date of his receipt of the EEOC's right-to-sue letter. 29 U.S.C. § 621–624. Though he filed the requisite charge of discrimination against DCA, EEOC mailed McGowan a right—to-sue letter on March 3, 2008 and his 90 day filing period therefore expired on June 4, 2008. McGowan untimely filed his Complaint on September 17, 2008, more than three months after the limitations period had run. As such, this claim is also dismissed.

### 8. Count Eleven: Violation of the WIA and the Age Act

*8 Lastly, McGowan alleges violations of the Workforce Investment Act of 1998, 29 U.S.C. § 2801, et seq., and the Age Act of 1975, 42 U.S.C. § 6101, et seq. because Defendants allegedly discriminated against him through their

hiring practices while they received federal funding. Compl. ¶¶ 89–93.

Defendants move to dismiss McGowan's WIA claim on the grounds that the WIA provides no private remedy. Indeed, the purpose of the WIA:

> is to provide workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation.

🚩 29 U.S.C. § 2811.

In order to achieve its goals, the WIA prohibits discrimination and the denial of employment on the basis of race, color, religion, sex, national origin, age, disability, or political affiliation or belief. 🚩 29 U.S.C. § 2938(a)(2). The provisions of the WIA provide for action to be taken by the Secretary of Labor when he/she finds that a State or recipient of funds has failed to comply with the discrimination provisions of 🚩 section 2938(a)(2). 🏳 *Borrero–Rodriguez v. Montalvo–Vasquez,* 275 F.Supp.2d 127, 130 (D.P.R.2003). Moreover, the WIA provides that the Secretary of Labor may refer the matter to the Attorney General, and the Attorney General may bring a civil action in any appropriate district court of the United States. *Id.* (citing 🚩 29 U.S.C. § 2938(c)).

In *Borrero–Rodriguez,* the court found that "neither the statute nor its regulations contain any private remedy through which the aggrieved persons can seek redress." More specifically, the court found that

> [a]lthough the regulations promulgated by the Secretary to implement the nondiscriminatory provisions of the WIA do establish administrative mechanisms meant to

> ensure compliance by the recipient, if compliance is not achieved because of the recipient's refusal, the only enforcement procedures are termination, denial or withholding of funds to the recipient or a possible referral of the matter to the Attorney General with a recommendation. These are the sole enforcement procedures. The statute does not give the alleged victim the right to sue.

*Id.* at 132. Therefore, because the WIA does not provide McGowan the right to sue, his claim under the WIA is dismissed.

Finally, Defendants move to dismiss McGowan's claim under the Age Act. The Age Act provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 🏳 42 U.S.C. § 6102. Nowhere does the Age Act provide that its prohibitions on discrimination shall apply to employment discrimination. In fact, the Age Act specifically states the contrary:

> **\*9** Nothing in this chapter shall be construed to authorize action under this chapter by any Federal department or agency with respect to any employment practice of any employer, employment agency, or labor organization, or with respect to any labor-management joint apprenticeship training program.

🏳 42 U.S.C. § 6103(c)(1). As employment discrimination is precisely the basis for McGowan's claim under the Age Act, his claim is dismissed.

**C. Supplemental Jurisdiction**

🏳 Title 28 of the United States Code, Section 1367(c) states in relevant part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the claim

substantially predominates over the claim or claims over which the district court has original jurisdiction, [or] the district court has dismissed all claims over which it has original jurisdiction [.]" 28 U.S.C. § 1367(c). Moreover, absent some compelling circumstances, it is generally proper for the district court to decline to exercise supplemental jurisdiction. *See Shaffer v. Albert Gallatin Area Sch. Dist.,* 730 F.2d 910, 912 (3d Cir.1984) (holding that "pendant jurisdiction [over state law claims] should be declined where the federal claims are no longer viable, absent 'absent circumstances' " (citation omitted)); *see also Hedge v. Musco,* 204 F.3d 109, 123 (3d Cir.2000) (recognized that if the district court has dismissed all claims over which it had original jurisdiction, the court must decline to decide pendent state claims unless "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").

Courts in this circuit have consistently declined to exercise supplemental jurisdiction over state claims when all federal claims have been decided. *See Hedge,* 204 F.3d at 122–23 (upholding district court's refusal to exercise supplemental jurisdiction over state law assault and battery claims after dismissing plaintiff's § 1983 claims); *V–Tech Serv., Inc. v. Street,* 215 Fed. Appx. 93, 96 (3d Cir.2007) (refusal to exercise supplemental jurisdiction over fraud, promissory estoppel, breach of contract, and unjust enrichment claims after dismissal of RICO claims); *Wall v. Dauphin County,* 167 Fed. Appx. 309, 313 (3d Cir.2006) (dismissal of state claims for lack of jurisdiction after dismissal of plaintiff's § 1983 and § 1985 claims); *Mosca v. Cole,* 384 F.Supp.2d 757, 770 (D.N.J.2005) (remanding remaining state LAD and other claims back to state court after plaintiff's § 1981, § 1985 and other federal claims were dismissed by the district court).

In this case, the only remaining claim is McGowan's NJLAD claim against the State Defendants arising out of two separate hiring decisions. In that regard, the Court declines to excercise supplemental jurisdiction. Thus, this claim is remanded to New Jersey Superior Court, Law Division, Mercer County.

### III. Conclusion

For the reasons stated herein, all of McGowan's claims against the HMFA are dismissed pursuant to *Fed.R.Civ.P.* 12(b)(6) and his claims against the State Defendants are dismissed with the exception of those claims under NJLAD not barred by the statute of limitations, as set forth herein.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1687663

---

## Footnotes

1    The claims, as they relate to State Defendants, allege discriminatory conduct almost exclusively by DCA. As such, the DCA and State Defendants will be discussed interchangeably.

2    The Complaint includes Counts numbered One through Eleven, but lacks a "Count Four."

3    McGowan alleges that six employees that were terminated by HMFA filed an employment discrimination lawsuit against DCA, the State of New Jersey, and Bass–Levin, and that he did not join that suit. Compl. ¶ 14. To the extent that his claim is based on his termination from HMFA, it is time barred. Certainly, McGowan may not invoke the discovery rule because he clearly knew the existence of his claims at that time and that a similar lawsuit had been filed by other terminated employees.

---

**End of Document**                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 270 of 331

2017 WL 2258374
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry GRIMES-JENKINS, Plaintiff,

v.

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Defendant.

16 Civ. 4897 (AT) (JCF)
|
Signed 05/22/2017

**Attorneys and Law Firms**

Hugh G. Jasne, Jasne & Florio, White Plains, NY, Victor
Anthony Carr, Stock & Carr, Esqs, Mineola, NY, for Plaintiff.

Lorie Elizabeth Almon, Scott Roblan Rabe, Joanna Suzan
Smith, Seyfarth Shaw LLP, New York, NY, for Defendant.

REPORT AND RECOMMENDATION

JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE
JUDGE

**\*1** TO THE HONORABLE ANALISA TORRES, U.S.D.J.:
The plaintiff, Sherry Grimes-Jenkins, brings this action
alleging employment discrimination, retaliation, and
harassment in violation of a panoply of anti-discrimination
statutes. The defendant has moved to dismiss the Amended
Complaint in part and the plaintiff has cross-moved for leave
to file a second amended complaint. For the reasons set forth
below, I recommend that both motions be granted in part and
denied in part.

Background

Ms. Grimes-Jenkins, a black West Indian woman, has been
an employee of the Consolidated Edison Company of New
York ("ConEd") since 1990. (Proposed Second Amended
Verified Complaint ("Proposed SAC"), attached as Exh. B to
Declaration of Hugh G. Jasne dated Dec. 23, 2016 ("Jasne
Decl."), ¶¶ 10, 14). [1] She alleges that throughout her tenure at
ConEd, she has been sexually harassed by ConEd employees
(Proposed SAC, ¶¶ 16, 20, 26, 29, 34, 47, 57); her colleagues
have made racist and sexist comments in the workplace
(Proposed SAC, ¶¶ 17, 19, 22, 25, 38-39, 44, 60); she has

been denied training opportunities, access to facilities, and
other favorable working conditions given to male employees
(Proposed SAC, ¶¶ 17, 24-26, 31-32, 40, 50); she has been
demoted, denied promotions, and denied wage increases
because of her race, sex, and pregnancy (Proposed SAC, ¶¶
38, 45, 52); she has been "written up," denied training, and
threatened with termination because of injuries suffered on
the job and medical conditions associated with her pregnancy
(Proposed SAC, ¶¶ 27, 35-36, 43); and she has been retaliated
against for reporting these alleged acts of discrimination and
harassment. (Proposed SAC, ¶¶ 20-21, 33, 42-44, 59). She
also alleges that she was sexually assaulted by a group of
ConEd employees in 1991. (Proposed SAC, ¶ 15).

On April 3, 2014, the plaintiff filed a charge with the
United States Equal Employment Opportunity Commission
("EEOC") alleging sex and national origin discrimination and
retaliation for reporting such discrimination under Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
("Title VII"). (Notice of Charge of Discrimination ("EEOC
Charge"), attached as Exh. A to Declaration of Lorie E.
Almon dated Nov. 18, 2016; Proposed SAC, ¶ 103). On April
12, 2016, the EEOC issued a Right to Sue Letter. (Proposed
SAC, ¶ 106). The plaintiff commenced this action on June 23,
2016.

On August 30, 2016, the parties entered into a stipulation
giving the plaintiff leave to file an amended complaint
(Stipulation to File an Amended Complaint dated Aug.
30, 2016 ("Stipulation")), which she did on September 13,
2016. The Amended Complaint alleges (1) discrimination
based on race, national origin, sex, and religion under
Title VII; the New York State Human Rights Law, N.Y.
Exec. Law § 296 et seq. (the "NYSHRL"); and the New
York City Human Rights Law, N.Y.C. Admin. Code §
8-107 (the "NYCHRL") (first, second, ninth, and twelfth
causes of action); [2] (2) quid pro quo harassment (sixth
cause of action); (3) hostile work environment (seventh
cause of action); (4) retaliation (eighth cause of action); (5)
punitive damages under Title VII (tenth cause of action) [3]
(6) intentional infliction of emotional distress (eleventh
cause of action); [4] (7) discrimination under the Pregnancy
Discrimination Act, 42 U.S.C. § 2000e(k) (the "PDA")
(twelfth cause of action); (8) discrimination under the
Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.
(the "ADA") (twelfth cause of action); (9) discrimination
under the Genetic Information Nondiscrimination Act, 42

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 271 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

U.S.C. § 2000ff et seq. ("GINA") (twelfth cause of action); (10) discrimination under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA") (twelfth cause of action); and (11) violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 et seq. ("ERISA") (twelfth cause of action).

**\*2** On November 18, 2016, the defendant moved to dismiss the Amended Complaint in part, seeking dismissal of all of the plaintiff's claims except (1) the Title VII retaliation claim and hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred on or after June 7, 2013; and (2) the NYSHRL and NYCHRL retaliation claims and hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred on or after June 23, 2013. (Def. Memo. at 3 n.1).

On December 23, 2016, together with her opposition to the motion to dismiss, the plaintiff cross-moved for leave to file a second amended complaint. The Proposed Second Amended Complaint replaces the plaintiff's religious discrimination claim with a discrimination claim based on her ethnicity. (Proposed SAC, ¶¶ 1, 14, 62, 99). It otherwise alleges the same causes of action as the Amended Complaint, though it reorganizes the claims under different headings, recharacterizes the discrimination claims under the FMLA, the ADA, and GINA as claims for "unlawful employment practices" (Compare FAC, ¶¶ 120-24, with Proposed SAC, ¶¶ 183-230), and clarifies that the quid pro quo harassment, hostile work environment, and retaliation claims are each brought pursuant to Title VII, the NYSHRL, the NYCHRL, the FMLA, the PDA, the ADA, and GINA. (Proposed SAC, ¶¶ 128, 139, 151-52, 158, 167).

Legal Standard

A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court's charge in ruling on a 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." GVA Market Neutral

Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)). The court must construe the complaint in the light most favorable to the plaintiff, "taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).

B. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure provides that courts should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); accord Foman v. Davis, 371 U.S. 178, 182 (1962); Aetna Casualty & Surety Co. v. Aniero Concrete Co., 404 F.3d 566, 603 (2d Cir. 2005). "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.' " Williams v. Citigroup Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)). The court has broad discretion over motions to amend, see McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007), and may deny such a motion for the following reasons: (1) undue prejudice to the non-moving party, (2) futility, (3) bad faith or dilatory motive, (4) repeated failure to cure deficiencies by previous amendments, or (5) undue delay. United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016).

Here, the defendant opposes leave to amend on the grounds of futility and undue prejudice. Leave to amend should be denied as futile when the amended pleading would not survive a motion to dismiss under Rule 12(b)(6). IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group, PLC, 783 F.3d 383, 389 (2d Cir. 2015). Thus, the standard governing leave to amend is whether the amended pleading states a claim on which relief can be granted when all facts pled are accepted as true and construed in the light most favorable to the plaintiff. See Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 119 (2d Cir. 2012) (citing Ashcroft, 556 U.S. at 678-80). The defendant bears the burden of demonstrating that the proposed amendment is futile. See Allison v. Clos-ette Too, LLC, No. 14 Civ. 1618, 2015 WL 136102, at \*2 (S.D.N.Y. Jan. 9, 2015).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 272 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

**\*3**  In deciding whether the party opposing amendment would suffer undue prejudice, courts evaluate whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." 🚩Hutter v. Countrywide Bank, N.A., 41 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) (quoting 🚩Monahan v. New York City Department of Corrections, 214 F.3d 275, 284 (2d Cir. 2000)). Courts also consider the particular procedural posture of the case. See, e.g., 🚩Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.' " (alteration in original) (quoting 🚩State Teachers Retirement Board v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981))); 🚩Grochowski v. Phoenix Construction, 318 F.3d 80, 86 (2d Cir. 2003) (upholding denial of leave to amend sought after discovery had closed and while summary judgment motion was pending). The non-moving party bears the burden of demonstrating that undue prejudice would result if the proposed amendment were granted. 🚩Oneida Indian Nation of New York State v. County of Oneida, 199 F.R.D. 61, 77 (S.D.N.Y. 2000).

Discussion

The plaintiff concedes that the Proposed Second Amended Complaint, rather than adding new causes of action or new factual allegations, "merely clarifies the allegations contained in the Amended Complaint" in order to plead the claims "more artfully." (Plaintiff's Memorandum of Law Submitted in Opposition to Defendant's Motion for Partial Dismissal of Plaintiff's Amended Complaint and in Support of Plaintiff's Cross-Motion to Further Amend the Complaint ("Pl. Memo.") at 32). With the exception of the plaintiff's replacement of her religious discrimination claim with an ethnicity discrimination claim, this characterization of the Proposed Second Amended Complaint is accurate. Accordingly, with that exception, the defendant's motion to dismiss and the plaintiff's cross-motion for leave to amend present the same question—whether the allegations in the pleadings, which are substantively identical, state claims on which relief can be granted. [5] Cf. 3801 Beach Channel, Inc. v. Schvartzman, No. 05 CV 207, 2007 WL 2891119, at \*11 (E.D.N.Y. Sept. 28, 2007) (denying leave to amend

where there were "serious substantive legal defects" in the original complaint and "plaintiffs' counsel [made] clear [that] an amendment would do no more than reorganize and clarify the factual allegations and legal theories already set forth in the existing Complaint").

The plaintiff alleges numerous incidents of discrimination, retaliation, and harassment dating back to 1990. For reasons that will be discussed below, the statutes of limitations on all of the plaintiff's claims—with the exception of the ERISA claim—bar consideration of conduct that occurred before June 7, 2013, at the earliest. Accordingly, before considering whether the allegations in the plaintiff's pleadings state claims on which relief can be granted, I will review the allegations concerning events that occurred since June 7, 2013.

The plaintiff alleges that certain conduct occurred "in 2013" without providing a specific month or day. [6] For example, in 2013, Devri Gibbs, another ConEd employee, asked a supervisor, Tye Barnes, in the plaintiff's presence if "he liked the plaintiff's 'big ass' " and "wants to fuck that big ass," to which Mr. Barnes responded, "Not everyone is into that." (Proposed SAC, ¶ 57). "Instead of action being taken in response to ... that episode, the plaintiff was isolated from other workers[ ] and told not to speak to anyone or she would be written up by management." (Proposed SAC, ¶ 57). That same year, four different supervisors—Tom McEnery, Thomas Nolan, Eric Galloza, and Cory Jaworsky—told the plaintiff that "they rated male mechanics higher than female mechanics," calling male mechanics "top of the barrel" and female mechanics "bottom of the barrel." (Proposed SAC, ¶ 58).

**\*4**  In 2014, the plaintiff alleges that she "was denied the opportunity to replace a supervisor who was leaving." (Proposed SAC, ¶ 52). The supervisor, named Vormittagg, told her, "[Y]ou don't want this job, you have young kids and[ ] cannot help your family." (Proposed SAC, ¶ 52). He then encouraged less qualified men to apply for the position. (Proposed SAC, ¶ 52). That same year, Mr. McEnery told other ConEd employees that the plaintiff "keeps getting pregnant so that she can get time off the job." (Proposed SAC, ¶ 60). Meanwhile, a manager named Howie Sheard told the plaintiff that she was "put into isolation" because she was "a trouble maker" who "turns people into the EEO." (Proposed SAC, ¶ 59). Mr. Sheard also stated, "I do not trust your ass ... because I do not want you running to the EEO saying I tried to grab you." (Proposed SAC, ¶ 59).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 273 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

In April 2015, the plaintiff was denied a request to be transferred to the Bronx—the "most recent[ ]" of numerous requests to be transferred there, all of which "have been summarily and arbitrarily denied." (Proposed SAC, ¶ 21). The plaintiff alleges that she has been making these requests regularly since 1993, when she was involuntarily transferred away from the Bronx for reporting sexual harassment by a supervisor named Nick Febrizio. (Proposed SAC, ¶¶ 20-21).

The remainder of the plaintiff's allegations either concern conduct before June 7, 2013, or allege that certain types of conduct occurred throughout the duration of her employment without discussing specific incidents since June 7, 2013. For example, she alleges that "for more than 20 years, [she] has been subjected to retaliation, harassment and hostile work environment" for reporting the 1991 sexual assault (Proposed SAC, ¶ 16); that "[b]eginning in 1993 and continuing to the present time," numerous supervisors referred to black female mechanics as "going to the fields" while referring to white male mechanics as "going to the job" (Proposed SAC, ¶ 22); and that "[t]hroughout [her] employment, the standard practice at the company was to keep the medical conditions of male employees strictly confidential, while opening, revealing and discussing in public the medical conditions of female employees." (Proposed SAC, ¶ 23).

### A. Exhaustion of Administrative Remedies

As a prerequisite to bringing suit under Title VII, GINA, or the ADA, a plaintiff must first file a timely charge with the EEOC. See Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 146 (2d Cir. 2012) (Title VII); Yajaira Bezares C. v. Donna Karan Company Store LLC, Nos. 13 Civ. 8560, 13 Civ. 9123, 2014 WL 2134600, at *5 (S.D.N.Y. May 22, 2014) (GINA); Benjamin v. Brookhaven Science Associates, LLC, 387 F. Supp. 2d 146, 154-55 (E.D.N.Y. 2005) (ADA). Accordingly, a plaintiff may only raise claims under these statutes if they were included in the EEOC charge or are "reasonably related" to it. Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003). Because the defendant bears the burden of proving the plaintiff's failure to exhaust administrative remedies, Broich v. Incorporated Village of Southampton, 650 F. Supp. 2d 234, 246 (E.D.N.Y. 2009), "a plaintiff is not required to explicitly plead or demonstrate exhaustion at the pleading stage," Arnold v. Research Foundation for the State University of New York, ___ F. Supp. 3d ___, ___, 2016 WL 6126314, at *8 (E.D.N.Y. 2016).

The EEOC charge in this case, which the defendant attached as an exhibit to its motion to dismiss, only alleges sex and national origin discrimination and retaliation under Title VII. (EEOC Charge). It does not allege discrimination under GINA, the ADA, or Title VII based on race, religion, or ethnicity. Accordingly, the defendant argues that those claims are barred by the plaintiff's failure to exhaust administrative remedies. (Def. Memo. at 9-10; Defendant's Memorandum of Law in Opposition to Plaintiff's Cross-Motion to Further Amend the Amended Complaint ("Def. Opp. Memo.") at 7-8).

**\*5** The plaintiff counters that the Right to Sue Letter, which she attached as an exhibit to her opposition to the motion to dismiss and cross-motion for leave to amend, satisfies the exhaustion requirement because it states that it is "issued under Title VII, the ADA, or GINA." (Right to Sue Letter, attached as Exh. A to Jasne Decl.; Pl. Memo. at 5-10). In the alternative, she argues that the claims not explicitly mentioned in the EEOC charge are reasonably related to those in the charge. (Pl. Memo. at 5-10).

Although the plaintiff is not required to plead exhaustion, a court may in its discretion to convert a motion to dismiss into a motion for partial summary judgment on the issue of exhaustion of administrative remedies where both parties "submit[ ] and reference[ ] documents outside of the pleadings." Clemmer v. Fordham Bedford Community Services, No. 14 Civ. 2343, 2015 WL 273657, at *3 n.1 (S.D.N.Y. Jan. 16, 2015). As both parties have submitted such documents and briefed the issue, I exercise my discretion to reach the issue here.

First, the plaintiff's attempt to rely on what appears to be boilerplate language in the Right to Sue Letter is without merit. As stated above, whether a plaintiff properly exhausted administrative remedies depends on the claims contained in the EEOC charge, not the Right to Sue Letter. There is no dispute that the charge did not raise claims under GINA, the ADA, or Title VII based on race, religion, or ethnicity.

Second, a claim is "reasonably related" to those in an EEOC charge when "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Littlejohn v. City of New York, 795 F.3d 297, 322 (2d Cir. 2015) (quoting Deravin, 335 F.3d at 200-01). This

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 274 of 331

analysis focuses on "the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." Id. (alteration in original) (quoting 🔖 Deravin, 335 F.3d at 201). Here, the EEOC charge does not describe the discriminatory conduct suffered by the plaintiff, such that it could have put the EEOC on notice to investigate claims of discrimination based on disability, genetic information, race, religion, or ethnicity. The mere assertion of claims based on sex and national origin is insufficient to give the EEOC notice to investigate claims based on different characteristics.[7] See Buksha v. New York City Dep't of Corrections, No. 06 Civ. 5363, 2007 WL 2947982, at *2 (S.D.N.Y. Oct. 9, 2007) (discrimination claims "based on different characteristics" and "different acts of alleged discrimination" are not " 'reasonably related' to the subject matter" in EEOC charges). Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's GINA, ADA, and Title VII race, religion, and ethnicity discrimination claims.

## B. Discrimination Claims

### 1. Title VII, PDA,[8] and NYSHRL

#### a. Statutes of Limitations

**\*6** To bring claims under Title VII, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory act. 🔖 42 U.S.C. § 2000e-5(e)(1); 🔖 National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). The plaintiff filed her EEOC charge on April 3, 2014. Thus, her Title VII claims are barred to the extent that they are based on conduct that occurred prior to June 7, 2013, 300 days before she filed her EEOC charge.

The statute of limitations under the NYSHRL is three years. 🔖 CPLR § 214(2); Taylor v. City of New York, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016). The plaintiff's NYSHRL claims are therefore barred to the extent that they are based on conduct that occurred prior to June 23, 2013, three years before she filed her complaint.

#### b. Merits

Courts in this Circuit analyze employment discrimination claims under Title VII and the NYSHRL according to the same standard. McGill v. University of Rochester, 600 Fed.Appx. 789, 790 (2d Cir. 2015); Taylor, 207 F. Supp. 3d at 303. To survive a motion to dismiss a discrimination claim under either statute, a plaintiff must allege that she suffered an "adverse employment action" and "sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." 🔖 Littlejohn, 795 F.3d at 311; see also Taylor, 207 F. Supp. 3d at 304. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment" that "is more disruptive than a mere inconvenience or alteration of job responsibilities." 🔖 Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (quoting 🔖 Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)).

Only one timely allegation in the plaintiff's pleadings merits significant discussion as a discrimination claim: that Vormittagg discouraged her from applying for a promotion to his position in 2014.[9] To establish a prima facie case of a discriminatory failure to promote, a plaintiff must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Barrett v. Forest Laboratories, Inc., 39 F. Supp. 3d 407, 441 (S.D.N.Y. 2014) (quoting ⚠️ Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004)).

**\*7** The plaintiff does not allege that she actually applied for Vormittagg's position or that her application was rejected. Rather, she alleges that she was discouraged from applying while less qualified men were encouraged to apply. Though Vormittagg's statement that the plaintiff would not want the job because she needs to take care of her children would satisfy the plaintiff's burden of showing discriminatory motivation, such discouragement alone does not constitute an adverse employment action under Title VII or the NYSHRL.

See 🔖 Rogers v. Fashion Institute of Technology, No. 14 Civ. 6420, 2016 WL 889590, at *9 (S.D.N.Y. Feb. 26, 2016) ("[A]lthough Plaintiff claims he expressed interest in a full-time position but was told not to apply, 'a plaintiff must allege that she applied for a specific position or positions and was rejected therefrom....' " (internal quotation marks omitted)

(quoting 🚩 Hughes v. Xerox Corp., 37 F. Supp. 3d 629, 643 (W.D.N.Y. 2014))); Johnston v. Carnegie Corp. of New York, No. 10 Civ. 1681, 2011 WL 1085033, at *11 (S.D.N.Y. Feb. 24, 2011) ("Even if Defendants discouraged Plaintiff from applying for other positions ..., such discouragement would not give rise to a claim for failure to promote."), report and recommendation adopted, 2011 WL 1118662 (S.D.N.Y. March 23, 2011). Therefore, the plaintiff's pleadings fail to state a timely, colorable discrimination claim under Title VII or the NYSHRL.

Nevertheless, the plaintiff argues that claims that accrued before the Title VII and NYSHRL statutes of limitations are actionable under the continuing violation doctrine (Pl. Memo. at 10-13), which provides that where "a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Washington v. County of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (alteration in original) (quoting 🚩 Fitzgerald v. Henderson, 251 F.3d 345, 349 (2d Cir. 2001)). The doctrine applies to claims "composed of a series of acts that collectively constitute one unlawful [ ] practice." Gonzalez v. Hasty, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting 🚩 Washington, 373 F.3d at 318). It "has generally been limited to situations where there are specific policies or mechanisms, such as discriminatory seniority lists or employment tests." 🚩⚠ Crosland v. City of New York, 140 F. Supp. 2d 300, 307 (S.D.N. Y 2001). Accordingly, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan, 536 U.S. at 113. The doctrine applies "only if the plaintiff 'allege[s] ... some non-time-barred acts' contributing to the alleged violation." Gonzalez, 802 F.3d at 220 (alterations in original) (quoting 🚩 Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999)).

Here, the plaintiff does not allege that ConEd instituted any discriminatory policy or mechanism, much less that any non-time-barred acts contributed to such a policy or mechanism. Therefore, the continuing violation doctrine does not apply here. I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's Title VII and NYSHRL discrimination claims.

### 2. NYCHRL

#### a. Statute of Limitations

Like the NYSHRL, the statute of limitations under the NYCHRL is three years. N.Y.C. Admin. Code § 8-502(d); Taylor, 207 F. Supp. 3d at 302. Thus, the plaintiff's NYCHRL claims are barred to the extent that they are based on conduct that occurred prior to June 23, 2013.

#### b. Merits

Discrimination claims under the NYCHRL are governed by a more liberal standard than claims under Title VII and the NYCHRL. 🚩 Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102, 109 (2d Cir. 2013). Therefore, "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." Id. "To establish a [ ] discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of [a protected characteristic].' " 🚩 Id. at 110 (quoting 🚩 Williams v. New York City Housing Authority, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)); see also Taylor, 207 F. Supp. 3d at 304. Under this standard, a plaintiff need not allege that she suffered a materially adverse employment action to plead a discrimination claim. 🚩 Mihalik, 715 F.3d at 114; Taylor, 207 F. Supp. 3d at 308.

**\*8** Still, courts applying this standard "must be mindful that the NYCHRL is not a 'general civility code.' " 🚩 Mihalik, 715 F.3d at 110 (quoting 🚩 Williams, 61 A.D.3d at 79, 872 N.Y.S.2d at 40). Accordingly, the NYCHRL permits defendants to establish, as an affirmative defense, "that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." 🚩 Id. at 111 (internal quotation marks omitted) (quoting 🚩 Williams, 61 A.D.3d at 80, 872 N.Y.S.2d at 41).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 276 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

The plaintiff makes numerous timely allegations that she received inferior treatment because she is a woman. These include Vormittag discouraging her from applying for his supervisory position because "you have young kids and[ ] cannot help your family" (Proposed SAC, ¶ 52), Mr. Gibbs' lewd remarks to Mr. Barnes in her presence (Proposed SAC, ¶ 57), and supervisors in 2013 giving female mechanics lower ratings and calling them "bottom of the barrel" in her presence. (Proposed SAC, ¶ 58). These incidents amount to more than petty slights and trivial inconveniences, as they reflect a workplace in which the plaintiff was repeatedly demeaned and discouraged from opportunities to advance in the company because she is a woman. Thus, the plaintiff's pleadings state a colorable sex discrimination claim under the NYCHRL.

The only timely allegation that the plaintiff was treated less well than other employees on the basis of race is that she and other black women were referred to as "going to the fields," whereas white men were referred to as "going to the job," throughout the duration of her employment.[10] (Proposed SAC, ¶ 22). Though this allegation concerns only one offensive phrase that is not connected to any material adverse employment action, its arguable reference to slavery[11] makes it more than a petty slight or trivial inconvenience, particularly given that the plaintiff alleges that the phrase was used throughout her time at ConEd by more than ten different supervisors. Thus, the plaintiff's pleadings also state a colorable claim of race discrimination under the NYCHRL.[12]

*9 As with her Title VII and NYSHRL claims, the plaintiff argues that the continuing violation doctrine permits consideration of conduct that occurred before the statute of limitations. (Pl. Memo. at 10-13). The continuing violation doctrine is given a broader construction under the NYCHRL than under Title VII or the NYSHRL. Taylor, 207 F. Supp. 3d at 302-03; Mohamed v. NYU, No. 14 Civ. 8373, 2015 WL 5307391, at *3 n.8 (S.D.N.Y. Sept. 10, 2015). Under the NYCHRL, "[o]therwise time-barred discrete acts can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.' " Sotomayor v. City of New York, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (quoting Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)). Courts tend to find that discrete instances of discrimination are sufficiently "specific and related" where

they consist of the same type of conduct or where the same individual targets a plaintiff with similar discriminatory acts over time. See Taylor, 207 F. Supp. 3d at 303 (applying continuing violation doctrine where the plaintiff applied for the same position fourteen times without success); Mohamed, 2015 WL 5307391, at *3-4 (applying continuing violation doctrine to "recurring failure to pay Plaintiff higher wages"); Sotomayor, 862 F. Supp. 2d at 251 (applying continuing violation doctrine to conduct of individual defendant who "subject[ed] [the plaintiff] to an inordinate number of formal and informal observations[ ] and [gave] her negative ratings" over a three-year period).

Repeated references to the plaintiff and other black women as "going to the fields" consist of the same type of conduct carried out over a long period of time by the same group of supervisors. There is no allegation that the defendant attempted to remedy this conduct, even though it persisted throughout the duration of the plaintiff's employment. Accordingly, these incidents are sufficiently specific and related to establish a discriminatory practice at ConEd under the NYCHRL's continuing violation doctrine. Use of that phrase to the plaintiff before June 2013 is actionable as part of her NYCHRL discrimination claim.

The plaintiff's remaining allegations prior to June 2013, on the other hand, concern a wide variety of discriminatory conduct carried out by a number of different individuals. Though some individuals involved in timely allegations are also involved in untimely allegations, the incidents are sporadic, and the plaintiff fails to connect the timely and untimely allegations in any meaningful way. Accordingly, the remainder of her untimely allegations are not actionable under the continuing violation doctrine, even under the NYCHRL's more lenient standard. See Mohamed, 2015 WL 5307391, at *3-4 (declining to apply continuing violation doctrine to failure-to-promote allegation where complaint did "not provide an adequate basis to determine whether the promotion decision [was] connected to Plaintiff's timely allegations"); Dimitracopoulos v. City of New York, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) ("Later evaluations and letters to file by separate individuals are not part of the same continuing pattern of discriminatory conduct by a prior principal."). Therefore, I recommend that dismissal be denied and leave to amend be granted with respect to the plaintiff's race and sex discrimination claims under the NYCHRL.[13] However, with the exception of references to the plaintiff as "going to the fields" by various supervisors, conduct that occurred before June 23, 2013, should be barred by the statute of limitations.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 277 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

### 3. Disparate Impact and Facial Discrimination

All of the allegations discussed above consist of disparate treatment claims, that is, that the plaintiff was "treated [ ] less favorably than a similarly situated employee outside [her] protected group." 🚩 Graham v. Long Island Railroad, 230 F.3d 34, 39 (2d Cir. 2000). However, the plaintiff also asserts that she suffered "disparate impact" and "facial discrimination." Both of these claims are without merit. To state a prima facie claim of disparate impact, a plaintiff must "(1) 'identify a specific employment practice' or policy; '(2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.' " Chin, 685 F.3d at 151 (first quoting 🚩 Malave v. Potter, 320 F.3d 321, 326 (2d Cir. 2003); then quoting 🚩 Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147, 160 (2d Cir. 2001)); see also 🚩 Lewis v. City of Chicago, 560 U.S. 205, 212 (2010). Conversely, a "policy is discriminatory on its face if it expressly classifies persons on the basis of [a protected characteristic]." 🚩 Correction Officers Benevolent Association of Rockland County v. Kralik, No. 04 Civ. 2199, 2011 WL 1236135, at *6 (S.D.N.Y. March 30, 2011) (quoting 🚩 Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)). None of the plaintiff's timely allegations concerns a policy or practice implemented by ConEd that either explicitly discriminates on the basis of a protected characteristic or has a disparate impact on a protected group. Therefore, the plaintiff's pleadings do not state a claim based on either of these theories of discrimination.

### 4. ADA and GINA

**\*10** Even if the plaintiff had properly exhausted administrative remedies for her ADA and GINA claims, her pleadings fail to state a discrimination claim under either statute. To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability.

🚩 McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013). To bring claims under the ADA, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory act. 🚩 Harris, 186 F.3d at 247. Thus, like the plaintiff's Title VII claim, her ADA claims are barred to the extent that they are based on conduct that occurred prior to June 7, 2013. The plaintiff fails to allege that she had a disability or that an adverse employment action was taken against her because of a disability since that date.

GINA makes it unlawful for an employer "to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee ... because of genetic information with respect to the employee." 🚩 42 U.S.C. § 2000ff-1(a)(1). The Act defines "genetic information" as (1) an employee's genetic tests; (2) the genetic tests of the employee's family members; or (3) the manifestation a disease or disorder in the employee's family members. 🚩 42 U.S.C. § 2000ff(4). The plaintiff does not allege that anyone at ConEd had such information or that she was discriminated against because of such information. Therefore, the plaintiff fails to state a colorable discrimination claim under GINA or the ADA

### C. Retaliation Claims

As discussed earlier, the defendant does not move to dismiss the retaliation claims under Title VII, the NYSHRL, and the NYCHRL to the extent that they are based on conduct that occurred within their respective statutes of limitations, with one exception. (Def. Memo. at 3 n.1).[14] The timely allegations of retaliation in the plaintiff's pleadings are (1) that she was denied a transfer to the Bronx in April 2015 as part of a systemic course of retaliation against her (Proposed SAC, ¶¶ 20-21); (2) that she was "put into isolation" for reporting acts of discrimination and harassment to ConEd management and to the EEOC in 2013 and 2014 (Proposed SAC, ¶¶ 57, 59); and (3) that she was told she would be "written up by management" if she told coworkers about Mr. Gibbs' and Mr. Barnes' lewd conversation about her in 2013. (Proposed SAC, ¶ 57). Although the defendant does not move to dismiss the timely retaliation claims in their entirety, it does move to dismiss the claims based on the denial of the plaintiff's transfer request on the ground that that denial did not constitute an adverse employment action. (Def. Memo. at 15-16).

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 278 of 331

### 1. Denial of Transfer

Retaliation claims, like discrimination claims, are governed by a different standard under Title VII and the NYSHRL than they are under the NYCHRL. See Mihalik, 715 F.3d at 113.

#### a. Title VII and NYSHRL

To survive a motion to dismiss a retaliation claim under Title VII or the NYSHRL, "the plaintiff must plausibly allege that: (1) [the] defendant[ ] discriminated—or took an adverse employment action—against [her], (2) 'because' [s]he has opposed any unlawful employment practice." Vega v. Hempstead Union Free School District, 801 F.3d 72, 90 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)); accord Taylor, 207 F. Supp. 3d at 307. The definition of "adverse employment action" sweeps more broadly in the context of retaliation claims than it does in the context of discrimination claims: "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " Vega, 801 F.3d at 90 (quoting Burlington North & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006)). In this analysis, "[c]ontext matters"; for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Burlington North & Santa Fe Railway, 548 U.S. at 69. Still, the standard is objective, examining the impact the action would have on a reasonable employee. Id. at 68-69.

 **\*11** Here, the plaintiff describes the Bronx as her "home base" and explains that she made numerous requests to be transferred there. However, she fails to provide any information about how the denial of the transfer actually affected her, such that it might dissuade a reasonable employee in her shoes from reporting discrimination or harassment. This is insufficient to establish an adverse employment action in the context of a retaliation claim under Title VII or the NYSHRL. See Feliciano v. City of New York, No. 14 Civ. 6751, 2015 WL 4393163, at \*7-8 (S.D.N.Y. July 15, 2015) (granting motion to dismiss Title VII and NYSHRL retaliation claims where the plaintiff "[did] not provide any information as to how the transfer impacted him").

Even if the plaintiff had sufficiently alleged an adverse employment action, her retaliation claim based on the denial of the transfer request would fail on the causation prong. "[F]or an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90. Here, however, the plaintiff does not tie the denial of the transfer request to the reporting of any act of discrimination or harassment. She makes only the conclusory allegation that she "has been systematically retaliated against by [the] [d]efendant and its employees" in that all of her requests to be transferred to the Bronx have been denied since the she was transferred out of the Bronx in 1993. (Proposed SAC, ¶ 21). This is insufficient to establish the but-for causation needed to state a retaliation claim. See Feliciano, 2015 WL 4393163, at \*7-8 (granting motion to dismiss where the plaintiff alleged nothing "[b]eyond the conclusory allegation that in retaliation for his complaints and prior lawsuits, Plaintiff was transferred to the Bronx"). Therefore, the denial of the transfer request does not state a colorable retaliation claim under Title VII or the NYSHRL.

#### b. NYCHRL

The claim based on the denial of the plaintiff's transfer request fails for similar reasons under the NYCHRL. To state a retaliation claim under the NYCHRL, a plaintiff must show that "(1) [she] participated in a protected activity known to defendants; (2) defendants took an action that disadvantaged [her]; and (3) a causal connection exists between the protected activity and the adverse action." Taylor, 207 F. Supp. 3d at 308 (alterations in original) (quoting Fletcher v. Dakota, Inc., 99 A.D.3d 43, 51-52, 948 N.Y.S.2d 263, 269 (1st Dep't 2012)). As discussed above, the plaintiff fails to make a causal connection between the reporting of any specific act of discrimination or harassment and the denial of the transfer request. Therefore, the denial of the transfer request also does not state a colorable retaliation claim under the NYCHRL.

### 2. Remaining Allegations

The defendant does not specify which of the remaining timely allegations it concedes is adequately pled. I therefore assume that the defendant does not move to dismiss any of the remaining timely allegations of retaliation. The plaintiff,

Case 5:22-cv-00761-BKS-ML   Document 12   Filed 02/27/23   Page 279 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

meanwhile, argues that untimely allegations of retaliation should survive under the continuing violation doctrine. (Pl. Memo. at 10-13). This argument is without merit. The plaintiff's untimely allegations involve acts of retaliation carried out by different individuals in retaliation for the reporting of different acts of discrimination and harassment than those involved in her timely allegations. [15] (See, e.g., Proposed SAC, ¶¶ 27, 34). Thus, as alleged, the time-barred and non-time-barred acts of retaliation are discrete events that were not carried out pursuant to a specific policy or mechanism. I therefore recommend that dismissal be granted and leave to amend be denied with respect to the Title VII, NYSHRL, and NYCHRL retaliation claims based on all of the untimely allegations under those statutes and based on the denial of the plaintiff's transfer request in April 2015. [16] The remaining timely allegations of retaliation—which the defendant concedes are adequately pled—survive.

### D. Harassment Claims

#### 1. Hostile Work Environment

**\*12**  As with the retaliation claims, the defendant does not move to dismiss the plaintiff's Title VII, NYSHRL, and NYCHRL hostile work environment claims based on race and sex to the extent that they are based on conduct that occurred within the statutes of limitations. (Def. Memo. at 3 n.1). The timely allegations of harassment in the plaintiff's pleadings are: (1) Mr. Gibbs' and Mr. Barnes' lewd conversation about the plaintiff's body in 2013; (2) Mr. Galloza, Mr. Nolan, Mr. McEnery, and Mr. Jaworsky calling female mechanics "bottom of the barrel" in 2013; (3) Mr. Sheard telling other ConEd employees that the plaintiff "keeps getting pregnant so she can get time off the job"; (4) Mr. Sheard telling the plaintiff, "I do not trust your ass"; and (5) numerous supervisors referring to the plaintiff and other black female mechanics as "going to the fields" throughout the duration of her employment.

Unlike with the retaliation claims, the defendant does not argue that any of the timely allegations should be dismissed. I therefore assume that the defendant considers all of the above conduct to be part of the adequately pled hostile work environment claim. Accordingly, the only question to resolve is whether the untimely conduct is actionable as part of the same hostile work environment under the continuing violation doctrine.

The continuing violation doctrine applies differently to hostile work environment claims than it does to discrimination and retaliation claims, though the standard for applying the continuing violation doctrine to hostile work environment claims is the same under Title VII, the NYSHRL, and the NYCHRL. [17] Taylor, 207 F. Supp. 3d at 309 n.10. Because "the entire hostile work environment encompasses a single unlawful employment practice," all of the conduct that constitutes part of the hostile work environment, including that which occurred before the limitations period, is actionable as long as "any act that is part of the hostile work environment" occurred within the limitations period. Morgan, 536 U.S. at 117-18; see also E.E.O.C. v. Bloomberg, L.P., 751 F. Supp. 2d 628, 647 (S.D.N.Y. 2010). Under this standard, an "offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 77 (2d Cir. 2010). This "requires courts to make an individualized assessment of whether incidents and episodes are related, " an inquiry in which courts have "flexibility [that] is useful in a context ... as amorphous as hostile work environment." Id.

The Supreme Court has held that untimely acts of harassment are sufficiently related to timely acts where there is "evidence from a number of ... employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." Morgan, 536 U.S. at 120; see also Rowe v. Hussmann Corp., 381 F.3d 775, 781 (8th Cir. 2004) (where "the same harasser ... commit[ed] the same harassing acts ..., the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment"). On the other hand, untimely acts and timely acts of harassment are not sufficiently related when they are committed by "different coworkers in a different section of the [workplace]." Dziedzic v. State University of New York at Oswego, 648 Fed.Appx. 125, 128 (2d Cir. 2016).

**\*13**  The allegation that numerous supervisors referred to the plaintiff—along with other black female employees —as "going to the fields" throughout the duration of her employment consists of the same harassing conduct committed by the same group of supervisors. Therefore, allegations that this occurred prior to June 2013 are part of the

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 280 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

same actionable hostile work environment as allegations that it occurred after June 2013.

The remaining untimely allegations in the plaintiff's pleadings, on the other hand, date back as far as 1990 and involve distinct conduct by a number of different coworkers and supervisors. To be sure, some of the people involved in timely incidents of harassment are also involved in untimely allegations. For example, in 2004, Mr. Galloza called the plaintiff "unreliable" because of her pregnancy, and in 2000, he refused to give her to access shower facilities that were used by men (Proposed SAC, ¶¶ 32, 37); in 2004, Mr. McEnery refused to work with the plaintiff on a job and stated that she "should be in the kitchen bare foot and pregnant and have nothing to say on this job" (Proposed SAC, ¶ 38); in 2012, Mr. Barnes told the plaintiff that "no one wants you around here because you turn people in." (Proposed SAC, ¶ 56).

As the examples above demonstrate, however, the vast majority of the untimely allegations of harassment by the same people involved in timely allegations occurred nearly a decade, if not more, before the timely conduct. These acts are too sporadic to be considered actionable as part of the same hostile work environment. See, e.g., 🚩 Benjamin, 387 F. Supp. 2d at 154 (six-year gap between alleged events precludes application of continuing violation doctrine on hostile work environment claim).

Moreover, the plaintiff does not allege any facts connecting Mr. Barnes' 2012 statement to the lewd conversation he had with Mr. Gibbs in 2013, as the former concerns the plaintiff turning people into the EEOC and the latter consists of sexual harassment. Nor does the plaintiff allege a plausible theory connecting the remaining untimely allegations of harassment committed by different individuals to the timely allegations in her pleadings. Therefore, with the exception of pre-2013 references to the plaintiff as "going to the fields," the continuing violation doctrine does not apply the plaintiff's hostile work environment claims. I recommend that the motion to dismiss be granted and leave to amend be denied with respect to the plaintiff's Title VII, NYSHRL, and NYCHRL hostile work environment claims to the extent that they are based on conduct before June 7, 2013 (Title VII), and June 23, 2013 (NYSHRL and NYCHRL), with the exception that claims based on supervisors referring to black female employees as "going to the fields" before those dates should be permitted to proceed. [18]

## 2. Quid Pro Quo Harassment

"Quid pro quo harassment occurs when 'a tangible employment action result[s] from a refusal to submit to a supervisor's sexual demands.' " 🚩 Brown v. City of New York, No. 10 Civ. 6491, 2011 WL 2693677, at *6 (S.D.N.Y. July 11, 2011) (alteration in original) (quoting 🚩 Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753 (1998)). In the context of a quid pro quo harassment claim, a tangible employment action means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 🚩 Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 604 (2d Cir. 2006) (quoting 🚩 Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004)). Although the plaintiff alleges that Mr. Barnes and Mr. Gibbs made lewd remarks about her body in her presence in 2013, she does not allege that anyone at ConEd has made a sexual advance toward her since June 2013 or that she was retaliated against for refusing such an advance. [19] Accordingly, the plaintiff's pleadings fail to state a quid pro quo harassment claim.

## E. FMLA

*14 Courts in this Circuit recognize two types of claims under the FMLA: interference and retaliation. See 🚩 Potenza v. City of New York, 365 F.3d 165, 167-68 (2d Cir. 2004); 🚩 Drew v. Plaza Construction Corp., 688 F. Supp. 2d 270, 276 (S.D.N.Y. 2010). To state an FMLA interference claim, a plaintiff must allege:

> [ (1) ] that she is an eligible employee under the FMLA; [ (2) ] that the defendant is an employer as defined by the FMLA; [ (3) ] that she was entitled to take leave under the FMLA; [ (4) ] that she gave notice to the defendant of her intention to take leave; and [ (5) ] that she was denied benefits to which she was entitled under the FMLA.

Graziadio v. Culinary Institute of America, 817 F.3d 415, 424 (2d Cir. 2016); accord Smith v. Westchester County, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011). The statute of limitations under the FMLA is two years unless the alleged violation is willful, in which case the statute of limitations is three years. 29 U.S.C. § 2617(c)(1)-(2); Smith, 769 F. Supp. 2d at 463. The plaintiff commenced this action on June 23, 2016. Thus, her FMLA claim is barred to the extent that it is based on conduct that occurred before June 23, 2014, or, if any alleged conduct is willful, June 23, 2013. None of the plaintiff's allegations since June 23, 2013, concern the denial of benefits to which she was entitled under the FMLA, willful or otherwise.

To establish a retaliation claim under the FMLA, a plaintiff must show that she was punished for exercising her rights under the FMLA. Hill v. New York City Housing Authority, —— F. Supp. 3d ——, ——, 2016 WL 6820759, at *6 (S.D.N.Y. 2016). Though the plaintiff alleges that Mr. McEnery complained that the plaintiff "keeps getting pregnant so she can get time off the job" in 2014 (Proposed SAC, ¶ 60), she does not allege any instance within the statute of limitations in which an adverse action was taken against her for taking or attempting to take family or medical leave. Thus, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's FMLA claims.

### F. Intentional Infliction of Emotional Distress

To establish liability for intentional infliction of emotional distress ("IIED"), a plaintiff must prove that the defendant engaged in " '(1) extreme and outrageous conduct' with the '(2) intent to cause severe emotional distress,' that there was '(3) a causal connection between the conduct and the injury,' and that '(4) severe emotional distress' resulted." Rentas, 816 F.3d at 227 (quoting Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)). The statute of limitations for IIED claims is one year. CPLR § 215(3); Rentas, 816 F.3d at 226. Thus, only conduct that occurred on or after June 23, 2015, may be considered part of the plaintiff's IIED claim. Not a single allegation in the plaintiff's pleadings, however, concerns conduct that occurred on or after that date. [20] Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's IIED claim.

### G. ERISA

**\*15** The plaintiff does not expressly state the section of ERISA under which she brings her claims. She alleges that ConEd "engaged in practices and acts and policies in which [the] [p]laintiff[ ] directly and indirectly suffered loss of benefits as to pensions and retirement plans." (Proposed SAC, ¶ 225). Thus, her claim is properly characterized as a claim "to recover benefits due to [her] under the terms of [her] plan[ ] [and] to enforce [her] rights under the terms of the plan" under 29 U.S.C. § 1132(a)(1)(B).

"ERISA does not expressly provide a statute of limitations for civil enforcement actions, so the most similar state statute of limitations applies to most ERISA claims...." Bilello v. JPMorgan Chase Retirement Plan, 607 F. Supp. 2d 586, 592 (S.D.N.Y. 2009). In New York, claims under Section 1132(a)(1)(B) are subject to a six-year statute of limitations, which is inferred from the statute of limitations for breach of contract claims under CPLR § 213. Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan, 572 F.3d 76, 78 (2d Cir. 2009); Bilello, 607 F. Supp. 2d at 592. Therefore, the plaintiff's ERISA claim is barred to the extent that it is based on conduct that occurred prior to June 23, 2010, six years before she commenced this action.

None of the plaintiff's allegations since June 23, 2010, concern the denial of benefits due to her under the terms of an employee benefit plan. Although the plaintiff attached a letter to her cross-motion for leave to amend that provides dates on which she took leave in connection with the calculation of her pension benefits (Letter of Rosann C. Milian dated Dec. 7, 2016, attached as Exh. C to Jasne Decl.), neither of her pleadings explains the significance of this letter. Therefore, I recommend that dismissal be granted and leave to amend be denied with respect to the plaintiff's ERISA claim.

### H. Undue Prejudice

As for the claims for which leave to amend is not futile, the defendant argues that permitting amendment would be unduly prejudicial because the "[d]efendant should not be forced to expend resources and bear the cost of filing a second motion to dismiss" so that the plaintiff may file "a slightly tidier complaint." (Def. Opp. Memo. at 9). However, the plaintiff's motion for leave to amend resolves the exact same issue that would be resolved by a motion to dismiss —whether the Proposed Second Amended Complaint states

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 282 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

claims on which relief can be granted. The proposition that the defendant would need to expend additional resources to file a motion addressing the identical legal question addressed here is dubious. Moreover, this is not a situation where permitting amendment would require significant additional discovery or where the plaintiff is attempting to ambush the defendant with new claims on the eve of trial. Discovery has not yet started, and both parties acknowledge that the Proposed Second Amended Complaint raises the same claims as the Amended Complaint. This leaves the defendant with only bare "[a]llegations that an amendment will require the expenditure of additional time, effort, or money," which "do not [themselves] constitute undue prejudice." A.V.E.L.A. v. Estate of Monroe, 34 F. Supp. 3d 311, 318 (S.D.N.Y. 2014) (alterations in original) (quoting A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000)). Therefore, leave to amend should not be denied on the basis of undue prejudice.

### I. Attorneys' Fees

The plaintiff requests that she be awarded attorneys' fees in the event that she is ruled to be a prevailing party on any of her claims. (Pl. Memo. at 30-31). I have made no such recommendation here, nor is it possible for a plaintiff to be deemed a prevailing party on a motion to dismiss or motion for leave to amend. Therefore, the request for attorneys' fees should be denied.

### J. Leave to Replead

**\*16**  "[I]t is the usual practice ... to allow leave to replead" when a complaint is dismissed for failure to state a claim upon which relief can be granted. Cruz v. TD Bank, N.A., 742 F.3d 520, 523 (2d Cir. 2013) (per curiam); Woodward v. Morgenthau, 740 F. Supp. 2d 433, 441 (S.D.N.Y. 2010). Leave to replead may be denied, however, where a court has previously identified deficiencies in the pleadings and the deficiencies remain uncorrected in subsequent pleadings.

Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 168 (2d Cir. 2003); see also Foman, 371 U.S. at 182. Although the plaintiff previously amended her complaint and conceded that some of the claims in her original complaint were deficiently pled (Stipulation), this is the first time that a court has identified the deficiencies in her pleadings. Therefore, I recommend giving the plaintiff leave to replead one more time

to cure the deficiencies identified above. However, leave to replead should not be granted on the plaintiff's GINA, ADA, and Title VII claims based on race, religion, and ethnicity, as further amendment could not cure the plaintiff's failure to exhaust administrative remedies on these claims.

### Conclusion

For the reasons discussed above, I recommend that the defendant's motion to dismiss (Docket No. 21) and the plaintiff's cross-motion for leave to amend (Docket no. 33) each be granted in part and denied in part. Specifically, I recommend that dismissal be granted and leave to amend be denied with respect to all of the plaintiff's claims except:

1. Race and sex discrimination claims under the NYCHRL to the extent that they are based on conduct that occurred on or after June 23, 2013, except that references to the plaintiff as "going to the fields" before that date are actionable under the continuing violation doctrine.

2. Retaliation claims under Title VII based on conduct that occurred on or after June 7, 2013, and under the NYSHRL and NYCHRL based on conduct that occurred on or after June 23, 2013, except that the denial of the plaintiff's transfer request in April 2015 is not actionable under any statute.

3. Hostile work environment claims based on race and gender under Title VII based on conduct that occurred on or after June 7, 2013, and under the NYSHRL and NYCHRL based on conduct that occurred on or after June 23, 2013, except that references to the plaintiff's as "going to the fields" before that date are actionable under the continuing violation doctrine.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Analisa Torres, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections will preclude appellate review.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2258374

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 283 of 331

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

# Footnotes

1    Unless otherwise indicated, the factual allegations in the Proposed Second Amended Complaint are identical to those in the Amended Complaint.

2    The plaintiff also asserts facial discrimination, disparate treatment, and disparate impact as separate causes of action. (third, fourth, and fifth causes of action). As these are theories of discrimination, not independent causes of action, I consider them in connection with the plaintiff's discrimination claims.

3    Because this is a damages claim, not a distinct cause of action, I do not address it at this stage of the litigation. See Denis v. Home Depot, U.S.A., Inc., No. 10 CV 3227, 2014 WL 6632486, at *6 (E.D.N.Y. Nov. 21, 2014) ("Punitive damages are not a separate cause of action and, thus, courts generally find motions to strike punitive damages at the motion to dismiss stage to be premature.")

4    The plaintiff brings this claim under the heading of "severe emotional distress" (Amended Complaint ("FAC"), ¶¶ 112-119), which the defendant construes as a claim for emotional distress damages, not a separate cause of action. (Defendant Consolidated Edison Company of New York, Inc.'s Memorandum of Law in Support of Its Motion for Partial Dismissal of Plaintiff's Amended Complaint ("Def. Memo.") at 5 n.6). Under the this heading, however, the plaintiff alleges that (1) the defendant engaged in "outrageous conduct" (2) "for the purpose of causing severe emotional distress," which (3) actually "caus[ed] emotional distress" that was (4) severe. (FAC, ¶¶ 114-15, 117-18). These are the elements of an intentional infliction of emotional distress claim under New York Law. See Rentas v. Ruffin, 816 F.3d 214, 227 (2d Cir. 2016)

5    The plaintiff argues that the Amended Complaint (but not the Proposed Second Amended Complaint) should be construed liberally, like a pro se pleading, because her relationship with her lawyer was "on the rocks" at the time it was filed. (Pl. Memo. at 4-5). There is no law to support this proposition. Therefore, I do not evaluate the Amended Complaint under the more generous pleading standard afforded to pro se plaintiffs.

6    Viewing the facts in the light most favorable to the plaintiff, I treat such conduct as timely under statutes of limitations that bar consideration of conduct that occurred before a specific date in 2013.

7    Courts in this Circuit have recognized two other types of "reasonably related" claims: (1) where "the plaintiff alleges retaliation for filing an EEOC charge"; and (2) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Sahni v. Legal Services of the Hudson Valley, No. 14 Civ. 1616, 2015 WL 4879160, at *6 (S.D.N.Y. Aug. 13, 2015) (quoting Butts v. City of New York Department of Housing, 990 F.2d 1397, 1402-03 (2d Cir. 1993)). Neither exception is relevant here.

8    The PDA amended Title VII to clarify that its prohibition on sex discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); Young v. United Parcel Service, Inc. —— U.S. ——, ——, 135 S. Ct. 1338, 1345 (2015). Thus, analysis of the plaintiff's PDA claims is coextensive with that of her Title VII sex discrimination claims.

9    I do not analyze the denials of the plaintiff's requests to be transferred to the Bronx as a discrimination claim because she alleges that retaliation—not discrimination based on a protected characteristic—was the reason for the denials. (Proposed SAC, ¶¶ 20-21). I also do not analyze the purported statements of four supervisors that they gave male mechanics higher ratings than female mechanics as a discrimination claim because the plaintiff does not allege that she suffered tangible negative consequences from receiving such a rating. See Siddiqi v. New York City Health & Hospitals Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 284 of 331

wages, or other tangible loss, may constitute an adverse employment action. However, 'negative evaluations, standing alone without any accompanying adverse results, are not cognizable.' " (citation omitted) (quoting Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001))).

10      Viewing the facts in the light most favorable to the plaintiff, where the plaintiff alleges that conduct occurred repeatedly and "throughout the duration of her employment," I assume that at least some of the conduct occurred within the Title VII, NYSHRL, and NYCHRL limitations periods.

11      This is the plaintiff's interpretation of the phrase, which may be accepted on a motion to dismiss. It is at least equally probable that supervisors referred to "going into the field," meaning "out of the office," a term with no connotations of slavery. Evidence of the context in which it was used will ultimately shed light on the intended meaning of the phrase.

12      To the extent that allegations like Mr. Barnes' lewd remarks and references to the plaintiff as "going to the fields" appear to constitute harassment rather than discrimination, courts in this Circuit have recognized that " '[u]nder the NYCHRL, there are not separate standards for "discrimination" and "harassment" claims.' Instead, 'there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based' on a protected characteristic." Johnson v. Strive East Harlem Employment Group, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (citations omitted) (quoting Clarke v. InterContinental Hotels Group, PLC, No. 12 Civ. 2671, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013)). I analyze the NYCHRL discrimination and harassment claims separately only because the continuing violation doctrine applies in different ways to discrimination and harassment claims under the NYCHRL.

13      Though the plaintiff also asserts discrimination based on religion, national origin, and ethnicity, none of the plaintiff's timely allegations describes inferior treatment based on these characteristics. Therefore, dismissal should be granted and leave to amend should be denied with respect to discrimination claims based on these characteristics under Title VII, the NYSHRL, and the NYCHRL.

14      The defendant "incorporates all of the arguments contained in its Motion to Dismiss into [its opposition to the plaintiff's cross-motion for leave to amend]." (Def. Opp. Memo. at 7 n.5). Therefore, I assume that the defendant also does not oppose leave to amend for these claims on the ground of futility.

15      For example, Mr. Sheard, who was involved in the decision to put the plaintiff "into isolation" in 2013 and 2014 (Proposed SAC, ¶¶ 57, 59), is mentioned only once elsewhere in the plaintiff's pleadings—as one of the supervisors who referred to the plaintiff and other black female mechanics as "going to the fields." (Proposed SAC, ¶ 22). He is not mentioned in connection with any other acts of retaliation. The same goes for Mr. Barnes, who is otherwise mentioned in connection with pre-2013 conduct only once—for telling the plaintiff in 2012 that "no one wants you around here because you turn people in." (Proposed SAC, ¶ 56). The plaintiff also does not allege that she was "put into isolation" at any point before 2013, let alone explain what actually happened when she was "put into isolation," such that this act of retaliation might be connected to pre-2013 conduct as part of a specific policy or mechanism instituted by ConEd.

16      Although the plaintiff also alleges retaliation under the ADA and GINA, she makes no timely allegations of retaliation for reporting discrimination or harassment based on a disability or her genetic information. I address her FMLA retaliation claim later in this Report.

17      Still, the standard to establish the existence of a hostile work environment is more lenient under the NYCHRL than it is under Title VII or the NYSHRL. Title VII and the NYSHRL require a plaintiff to establish "severe and pervasive" harassment in the workplace. Summa v. Hofstra University, 708 F.3d 115, 124 (2d Cir. 2013) (quoting Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009)). By contrast, the NYCHRL does not require

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 285 of 331

a plaintiff to show severe and pervasive conduct, but only that the plaintiff was treated less well based on a protected characteristic. Mihalik, 715 F.3d at 110; see also Johnson, 990 F. Supp. 2d at 445.

18    The plaintiff makes no timely allegations of harassment based on religion, national origin, or ethnicity. Dismissal should be granted and leave to amend should be denied with respect to the hostile work environment claims based on these characteristics.

19    The plaintiff does allege that she refused "repeated sexual advances" by a supervisor named Darlene Wells from 2009 through 2011, which led to retaliation. (Proposed SAC, ¶ 47). However, this allegation is untimely.

20    Even assuming that at least one of the references to the plaintiff as "going to the fields" occurred within the statute of limitations, the plaintiff does not allege any emotional distress within the limitations period. The general allegation that such remarks were made throughout the duration of the plaintiff's employment is not enough to survive a motion to dismiss this "highly disfavored cause of action." De Sesto v. Slaine, 171 F. Supp. 3d 194, 201-02 (S.D.N.Y. 2016) (quoting Guan N. v. NYC Dep't of Education, No. 11 Civ. 4299, 2013 WL 67604, at *25 (S.D.N.Y. Jan. 7, 2013)).

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Grimes-Jenkins v. Consolidated Edison Company of New..., Not Reported in Fed....

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 286 of 331

KeyCite Yellow Flag - Negative Treatment

Distinguished by Munjal v. Emirates,  S.D.N.Y.,  January 24, 2022

2017 WL 2709747
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry GRIMES-JENKINS, Plaintiff,

v.

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Defendant.

16 Civ. 4897 (AT) (JCF)
|
Signed 06/22/2017

**Attorneys and Law Firms**

Hugh G. Jasne, Jasne & Florio, White Plains, NY, Victor Anthony Carr, Stock & Carr, Esqs, Mineola, NY, for Plaintiff.

Lorie Elizabeth Almon, Scott Roblan Rabe, Joanna Suzan Smith, Seyfarth Shaw LLP, New York, NY, for Defendant.

**ORDER ADOPTING REPORT
AND RECOMMENDATION**

ANALISA TORRES, United States District Judge

 **\*1** Defendant, Consolidated Edison Company of New York, Inc., has moved to dismiss the Amended Complaint in part

and Plaintiff Sherry Grimes-Jenkins has cross-moved for leave to file a second amended complaint. ECF Nos. 21 and 33. The Court referred the matter to the Honorable James C. Francis IV. After careful consideration, Judge Francis issued a Report and Recommendation (the "R&R") on May 22, 2017, proposing that dismissal and leave to amend be granted in part and denied in part. ECF No. 42. Objections to the R&R were due June 5, 2017. *See id.*

Despite notification of the right to object to the R&R, no objections were filed, and the time to do so has now passed. *See* Fed. R. Civ. P. 72(b)(2). When no objection is made, the Court reviews the R&R for clear error. *Dunham v. City of New York,* No. 11 Civ. 1223, 2013 WL 929029, at *1 (S.D.N.Y. Mar. 11, 2013). The Court finds no clear error. Accordingly, the Court ADOPTS the R&R in its entirety. The motions to dismiss and amend are GRANTED in part and DENIED in part.

By **July 6, 2017**, Plaintiff shall file her amended complaint pursuant to the R&R.

The Clerk of Court is directed to terminate the motions at ECF Nos. 21 and 33.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2709747

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  1

2013 WL 2467923
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Queen M. ALLEN and Waltrina R. Whitman, Plaintiffs,
v.
VERIZON WIRELESS, et al., Defendants.

Civil Action No. 3:12–cv–482 (JCH).
|
June 6, 2013.

**Attorneys and Law Firms**

Queen M. Allen, Bloomfield, CT, pro se.

Waltrina Rene Whitman, Bloomfield, CT, pro se.

Peter C. Moskowitz, Jackson Lewis LLP, Matthew P. Mazzola, Michael H. Bernstein, Sedgwick LLP, New York, NY, Sarah R. Skubas, Jackson Lewis, Colleen M. O'Neill, Murtha Cullina, Hartford, CT, Catherine S. Nietzel, John Wade Cannavino, Jr., Nicole D. Wright, Ryan Ryan Deluca LLP, Stamford, CT, Barry J. Waters, Murtha Cullina LLP, New Haven, CT, Jude Francois, Montstream & May, Glastonbury, CT, for Defendants.

**RULING RE: MLS GROUP OF COMPANIES'
MOTION TO DISMISS (Doc. No. 91),
PROFESSIONAL DISABILITY ASSOCIATES'
MOTION TO DISMISS (Doc. No. 92), VERIZON
WIRELESS'S MOTION TO DISMISS (Doc. No.
93), METLIFE'S MOTION TO DISMISS (Doc. No.
98), METLIFE'S MOTIONS TO STRIKE (Doc.
Nos.125, 129), and PLAINTIFFS' MOTION FOR
LEAVE TO FILE SUR–REPLY (Doc. No. 128).**

JANET C. HALL, District Judge.

**I. INTRODUCTION**

 **\*1** Plaintiffs Queen M. Allen ("Allen") and Waltrina R. Whitman ("Whitman") bring this suit against defendants Verizon Wireless ("Verizon"), Metropolitan Life Insurance Company s/h/a MetLife ("MetLife"), MLS Group of Companies ("MLS"), and Professional Disability Associates ("PDA"), alleging 27 state and federal claims related to Allen's requests for leave pursuant to the Family Medical Leave Act ("FMLA") and for short-term disability ("STD") as well as the release of Whitman's confidential medical

information in the process of administering those requests. Before the court are Verizons', Metlife's, MLS's, and PDA's Motions to Dismiss the plaintiffs' Fifth Amended Complaint.

**II. STANDARD OF REVIEW**

Upon a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether a plaintiff has stated a legally-cognizable claim by making allegations that, if true, would show he is entitled to relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief' "). The court takes the factual allegations of the complaint to be true, *Hemi Group, LLC v. City of New* York, 559 U.S. 1, 130 S.Ct. 983, 986–87, 175 L.Ed.2d 943 (2010), and from those allegations, draws all reasonable inferences in the plaintiff's favor, *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (2009) (quoting *Twombly,* 550 U.S. at 556).

The plausibility standard does not impose an across-the-board, heightened fact pleading standard. *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008). The plausibility standard does not "require[ ] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8." *Arista Records, LLC v. Doe* 3, 604 F.3d 110, 119 (2d Cir.2010); *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (holding that dismissal was inconsistent with the "liberal pleading standards set forth by Rule 8(a)(2)"). However, the plausibility standard does impose some burden to make

factual allegations supporting a claim for relief. As the *Iqbal* court explained, it "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 129 S.Ct. at 1949 (citations and internal quotations omitted). Under the Second Circuit's gloss, the plausibility standard is "flexible," obliging the plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin,* 521 F.3d at 213 (citation omitted); *accord Arista Records,* 604 F.3d at 120. Further, the court must construe *pro se* pleadings "broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000).

## III. FACTUAL BACKGROUND

**\*2** Allen was employed by Cellco Partnership d/b/a Verizon from November 8, 2004 to January 14, 2011, first as a customer service representative and later as a business support coordinator. Fifth Am. Compl. (Doc. No. 88) ¶ 7. From 2004 through 2007, Allen received a "performing" evaluation, which means she consistently attained and may have periodically exceeded job requirements. *Id.* In 2008, Allen received a "leading" evaluation, which means she consistently exceeded job requirements above and beyond expectations. *Id.* In July 2009, she received a "performing" evaluation. *Id.* at ¶ 11.

Metlife administers Verizon's claims for leave pursuant to the FMLA as well as for STD. *Id.* at ¶ 127. Verizon and Metlife have entered into a service agreement for this purpose. *Id.* at ¶ 334. Diane Anderson, a Verizon employee, coordinates requests for leave with Metlife. *Id.* at ¶ 186.

Allen requested leave for January 29, 2009, through February 13, 2009. *Id.* at ¶ 9. When Allen returned to work, she completed a "return to work" form, which represented that she suffered from a serious illness. *Id.* at ¶ 155. In August 2009, Allen was taken off a telephone call and brought into a meeting with Verizon's Management Team. *Id.* at ¶ 158. The Management Team discussed her net promoter score performance, which is a score rated by the consumer, and they discussed how Allen needed to improve her performance. *Id.*

Allen was emotional after the meeting and felt undermined. *Id.*

Allen experienced high anxiety and depression in response to the meeting. *Id.* at ¶ 163. She sought psychiatric care and took time off from work, from September 2009 through November 2009. *Id* . at ¶ 163. She was originally denied FMLA and STD benefits for this period. *Id.* at. ¶ 222, Ex. 7. However, on appeal, Metlife reinstated her short-term benefits for that period. *Id.* at Ex. 8. In October 2009, Allen sought an accommodation for her anxiety and depression and requested a position that did not require her to be on the telephone. *Id.* at ¶ 165. Verizon informed Allen that there were no offline positions available and did not offer other options. *Id.*

Allen requested leave from February 6, 2010, through February 21, 2010, this time to care for her mother, Whitman. *Id.* at ¶ 23. As part of her request for leave—claim number ending in 5978—Allen provided Whitman's confidential medical information in the form of a certification ("FMLA certification"). *Id.* at ¶¶ 23, 41.

Allen submitted another claim—claim number ending in 8494—for FMLA leave and STD for March 8, 2010, through June 24, 2010. *Id.* at ¶ 24. Allen suffered from allergies and fatigue, she recently had her wisdom tooth pulled, and she was undergoing pulmonary and sleep testing. *Id.* at Ex. 15. Laura Cosme, an employee at Metlife, gained unauthorized access to Whitman's FMLA certification on March 26, 2010, while processing claim 8494. *Id.* at ¶ 41, Ex. 15. Shelly Bennett of Metlife denied Allen's 8494 claim for STD by letter on April 1, 2010. *Id.* at ¶ 43. In that letter, Bennett acknowledged that Metlife contacted Linda M. Spiegel, APRN ("Speigel"), who was Whitman's, not Allen's, health care provider. *Id.* at ¶¶ 3, 43. The information regarding Spiegel's care of Whitman was provided in the FMLA certification. *Id.* at ¶ 43.

**\*3** Allen's request under the FMLA was denied on April 5, 2010. *Id* . at Ex. 17. The denial of Allen's claim for STD was overturned months later. *Id.* at ¶ 92, Ex. 12. On July 14, 2010, Verizon sent Allen a memorandum on how to manage her time off as well as a "final written warning." *Id.* at ¶ 169. When an employee receives a "final written warning," she is unable to apply for jobs within Verizon. *Id.*

Allen later requested leave—unrelated to her request to care for her mother—from November 15, 2010, through January 14, 2011. *Id.* at ¶ 28. This claim ended in the number 8804.

*Id.* at ¶ 44. Allen requested leave because she had a chronic serious health condition involving depression, anxiety, and severe pain in her mouth. *Id.* at ¶¶ 70, 82, 187. On November 23, 2010, Metlife emailed Allen to inform her that she needed to complete a medical authorization form so her physician could release medical information necessary for evaluating her claim. *Id.* at ¶ 178. Allen gave her physician the required forms. *Id.* at ¶ 188.

Metlife provided MLS and PDA's Independent Medical Peer Reviewer access to Allen and Whitman's private information. *Id.* at ¶¶ 141, 405. MLS used information from Whitman's FMLA certification in its peer review of Allen's STD claim. *Id.* at ¶ 378. PDA's Independent Medical Peer Reviewer created a report regarding the basis for Allen's claim. *Id.* at ¶ 149. In that report, PDA represented Whitman's medical history as though it were Allen's history. *Id.* at ¶ 185.

Metlife denied Allen's 8804 STD claim, stating that, "[t]he information available noted you received treatment, however, lacked the objective evidence sufficient to document a condition or symptoms that were of a level of severity that would be consistent with functional impairment and inability to perform your job." *Id.* at ¶ 81. Allen alleges that Metlife used Whitman's certification to deny her claim. *Id.* at ¶ 150. On January 4, 2011, Allen attempted to appeal her claim for STD and FMLA benefits. *Id.* at ¶ 181. Metlife acknowledged Allen's appeal request on January 14, 2011, and provided the administrative file to Allen in June 2011. *Id.* at ¶¶ 183–84.

While Allen was absent from work, Allen emailed her supervisor, Debra Bushman ("Bushman"), daily regarding her health. *Id.* at ¶¶ 189, 196. Bushman informed Allen that, as of January 1, 2011, she could no longer communicate her absences to Bushman via email. *Id.* at ¶ 189. She had to call the Call Center instead. *Id.* Due to her health condition, Allen had a difficult time calling Bushman. *Id.* Bushman was aware that Allen was ill and could not advocate for herself. *Id.* at ¶ 196. In addition, Anderson, as the coordinator for unplanned leaves, usually sent Allen emails regarding her absences. *Id.* at ¶¶ 179, 186, 247. However, Allen did not receive any emails from Anderson from November 15, 2010, through January 14, 2011. *Id.* at ¶ 179.

**\*4** On January 14, 2011, Verizon terminated Allen, alleging job abandonment. *Id.* Further, at some point during her employment with Verizon, Allen was informed that she would receive two "Recognizing You" certificates—awarded for stellar performance—valued at $75 in total. *Id.* at ¶

230. Augeo Incent emailed Allen on September 16, 2011, promising her the certificates. *Id.* at ¶ 231. Allen never received the certificates. *Id.*

## IV. DISCUSSION

A. *Intentional infliction of emotional distress claims*
Allen and Whitman claim intentional infliction of emotional distress against Verizon and Metlife in Count Three, PDA in Counts 21 and 25, and MLS in Count 27. To raise a claim for intentional infliction of emotional distress, under Connecticut law, Allen and Whitman must allege: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Peytan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). Whether a defendant's conduct is extreme and outrageous is initially a question for the court to determine. *Perez–Dickson v. City of Bridgeport,* 304 Conn. 483, 527 (2012). Courts have found liability for IIED claims only where the conduct has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Conduct that is merely insulting, displays bad manners, or results in hurt feelings is insufficient to support a claim of IIED. *Id.*

Allen and Whitman allege that the defendants intentionally engaged in outrageous and extreme behavior when they used Whitman's confidential information, without Allen's or Whitman's consent, to tarnish Allen's reputation and deny her STD benefits. Fifth Am. Compl. ¶¶ 91, 392, 415. According to Allen and Whitman, the defendants' use of the confidential information was "intentional and malicious insofar that their actions were taken with knowledge that plaintiffs' emotional and physical distress would increase as a result of their conduct." Fifth Am. Compl. ¶¶ 96, 398, 421. Further, as to MLS and PDA, the use of the confidential information was "extreme and outrageous" because they each had an agreement with Metlife to provide an accurate peer review and were considered experts in the FMLA. Fifth Am. Compl. ¶¶ 396, 419.

1. Metlife and Verizon

Both Metlife and Verizon argue that Allen's claims for intentional infliction of emotional distress must fail because they are preempted by ERISA. "ERISA is an intricate, comprehensive statute. Its federal regulatory scheme governs employee benefit plans, which include both pension and welfare plans." *Boggs v. Boggs,* 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Thus, ERISA preempts state law whenever state law comes into conflict with one of ERISA's provisions. *See Boggs,* 520 U.S. at 841 (holding that ERISA preempted a state law permitting the testamentary transfer of a nonparticipant spouse's community property interest in undistributed pension plan benefits).

**\*5** "The determination of whether a state law is preempted by ERISA requires two prongs of analysis." *Case v. Hospital of St. Raphael,* 38 F.Supp.2d 207, 208 (D.Conn.1999). First, a state law claim is preempted when it "refers to ERISA plans in the sense that it acts solely upon such plans or depends upon the existence of an ERISA plan as an essential part of its operation." *Id.* Second, even if the state law does not refer to ERISA, it is preempted if it "has a clear connection with a plan by mandating employee benefit structures and administration or by providing alternative enforcement mechanisms." *Id.* In *Case,* the court held that state contract, emotional distress, and CUTPA claims were preempted because the liability of the parties was dependent on the existence of the ERISA plan and the rights conferred by it. *Id.* at 209.

Allen's claims for intentional infliction of emotional distress are preempted because the actions taken by Verizon and Metlife that form the basis of her claims took place in the processing of her STD benefits request. *See Rovira v. AT & T,* 760 F.Supp. 376, 379 (S.D.N.Y.1991) (recognizing that when a beneficiary claims relief for injuries which arise out of the administration of an ERISA benefit plan, the state claims "relate to" the plans and are preempted). The case most on point is *Darcangelo v. Verizon Communic.,* 292 F.3d 181 (4th Cir.2002). In *Darcangelo,* the plaintiff alleged that Verizon's agent, CORE, solicited her private medical information. *Id.* at 188. The court stated that, "[i]f CORE obtained Darcalengelo's medical information in the course of processing a benefits claim or in the course of performing any of its administrative duties under the plan, these claims would be 'related to' the ERISA plan under [section] 514 and would therefore be preempted." *Id.* The court distinguished

the allegations in Darcangelo's complaint because she alleged that CORE solicited her private medical information for the sole purpose of trying to terminate her. *Id.* Under that factual scenario, CORE did not obtain the information in the processing of a benefits claim, which is why the state law claim for intentional infliction of emotional distress was not preempted. *Id.* Because, here, Allen alleges that Metlife intentionally obtained her information—and Verizon intentionally used that information—in the processing of her request for STD benefits, her claims for intentional infliction of emotional distress are dismissed.

As for Whitman's claims, [1] her allegations of intentional conduct by Verizon are merely "threadbare recitals of elements of a cause of action." *Iqbal,* 556 U.S. at 678–79. She fails to plead any facts that allow the court to draw the reasonable inference that Verizon *intentionally used* (or intentionally allowed Metlife to use) Whitman's confidential information in Allen's FMLA and STD review. However, Whitman's allegations as to Metlife, while not a model of clarity, at this stage of litigation and as pled by a *pro se* plaintiff, are sufficient to withstand Metlife's Motion to Dismiss. Whitman alleges that "Cosme of Metlife gained unauthorized access" to her FMLA certification and contacted her physician on March 26, 2010, even though Allen spoke to Cosme on March 25, 2010, "and provided Cosme ... [with the] full details of her Health Care Provider information." Fifth Am. Compl. ¶¶ 12, 308. These allegations are enough to state a claim for relief. Therefore, Count Three is dismissed as to Verizon and as to Allen's claim against Metlife. Metlife's Motion to Dismiss Count Three as to Whitman is denied.

### 2. MLS and PDA [2]

**\*6** Allen and Whitman allege that MLS and PDA committed the tort of intentional infliction of emotional distress in conclusory terms. They claim that PDA and MLS "intended to inflict emotional distress and knew or should have known that emotional distress was the likely result" when they (1) failed to acknowledge that there wasn't a consent form signed by Whitman or Allen to use Whitman's medical information and (2) used Whitman's confidential medical information to tarnish and deny Allen of short term disability. Fifth Am. Compl. ¶¶ 388, 390–92, 41, 413–15. They allege that using Whitman's confidential medical information in the processing of Allen's claim for STD benefits was extreme and outrageous because PDA and MLS each had an agreement with Metlife to perform an accurate peer review. Fifth Am. Compl. ¶¶ 396, 419.

These allegations do not include factual assertions sufficient 'to raise a right to relief above the speculative level.' " *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (quoting *Twombly,* 550 U.S. at 555). Therefore, Allen and Whitman's claims, set forth in Counts 21, 25, and 27, are dismissed without prejudice to replead.

### B. *Negligent misrepresentation*

Whitman alleges a claim of negligent misrepresentation against Metlife in Count Four. To state a claim for negligent misrepresentation under Connecticut law, Whitman must allege: "(1) a false representation was made to the party as a statement of fact, (2) it was made for the guidance of the party, (3) the party making the representation failed to exercise reasonable care in obtaining or communicating the information, and (4) the pleading party justifiably relied on the representation to its detriment." *MacNeal v. Alden Design, Inc.,* 2007 WL 3318259, at *2 (Conn.Super.Nov.1, 2007).

According to Whitman, Metlife made a misrepresentation of fact by suggesting in its April 1, 2010 letter that Allen provided Whitman's FMLA Certification rather than acknowledging that it obtained Whitman's FMLA certification without authorization. Fifth Am. Compl. ¶¶ 102–104. Metlife argues that Whitman fails to state a claim for negligent misrepresentation as a matter of law because the alleged statement by Metlife was made to *Allen* in its April 1, 2010, letter, not *Whitman* (who is the plaintiff bringing this claim). Metlife's Mem. in Supp. Mot. to Dismiss at 11 (Doc. No. 98). Metlife further argues that, "Whitman does not allege any specific fact that Metlife purportedly misrepresented," only that Metlife did not acknowledge how it obtained Whitman's FMLA certification. *Id.* at 12.

The court concludes that Whitman fails to state a claim for negligent misrepresentation. There are no allegations in the Fifth Amended Complaint to allow this court to make the reasonable inference that Metlife made any statement to Whitman *for her* guidance or that Whitman justifiably relied on Metlife's statements to *her* detriment. *See Meade v. Yale University,* 2006 WL 2730320, at *5 (Conn.Super.Sept.7, 2009) (describing facts that sufficiently establish the reliance element of a cause of action for negligent misrepresentation). All Whitman alleges is that, "she relied on Metlife's misrepresentation until she reviewed" the FMLA, the Genetic Information Nondiscrimination Act (GINA), and Metlife's

Customer Privacy Policy and Administrative Records. Fifth Am. Compl. ¶ 104. This is insufficient to state a claim and, therefore, Count Four is dismissed.

### C. *Invasion of privacy*

**\*7** Allen and Whitman allege invasion of privacy against all four defendants in Count Five. "[T]he law of privacy has not developed as a single tort, but as a complex of four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone." *Foncello v. Amorossi,* 284 Conn. 225, 234, 931 A.2d 924 (2007). The four categories are: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) publicity that unreasonably places the other in a false light before the public. *See id.* (citing *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 127–28, 448 A.2d 1317 (1982)).

Allen and Whitman do not specify in their Fifth Amended Complaint which category of invasion of privacy they are alleging. However, based on their allegations and their briefs in opposition to the defendants' Motions to Dismiss, it appears that they are alleging a claim for unreasonable intrusion upon the seclusion of another. *See* Pl. Mem. in Opp. Metlife's Mot. to Dismiss at 17. In their Fifth Amended Complaint, they claim that Cosme, a Metlife employee, "participated in theft or unauthorized access to Allen's employee record," and that MLS and PDA "gained unauthorized access to Allen's employee file when the party administrator [Metlife] provided ... [them] with medical and non-medical documentation" including Whitman's FMLA certification. Fifth Am. Compl. ¶¶ 110–11.

The claim of unreasonable intrusion upon the seclusion of another "consists solely of an intentional interference with [a person's] interest in solicitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." *Bremmer–McLain v. City of New London,* 2012 WL 2477921, at *14 (Conn.Super. June 1, 2012). The intrusion may be physical, but it does not have to be; it may be some other form of investigation or examination into the plaintiff's private concerns. *Id.*

### 1. MLS and PDA

MLS argues[3] that Allen and Whitman fail to raise a claim for unreasonable intrusion upon the seclusion of another, as a matter of law, because Allen and Whitman allege that Metlife gave MLS Whitman's FMLA certification. *See* MLS's Mem. in Supp. Mot. to Dismiss at 7; *see also* Fifth Am. Compl ¶ 111 (alleging that Metlife provided Whitman's FMLA certification to both MLS and PDA). The Fifth Amended Complaint is void of allegations that MLS and PDA intruded into Allen and Whitman's personal lives to obtain the FMLA certification. *See id.* at *15 (stating that the claim for unreasonable intrusion upon the seclusion of another failed because the complaint was void of allegations that the defendant obtained Bremmer–McLain's personal letter by opening his personal mail or intruding upon his personal life in some way). The allegations in the Fifth Amended Complaint cannot form the basis of an unreasonable intrusion upon the seclusion of another claim against MLS and PDA because, as alleged by Allen and Whitman, it was another party that committed the intrusion. Therefore, Count Five is dismissed as against MLS and PDA.

### 2. Verizon

**\*8** Verizon argues that the claim for unreasonable intrusion into the seclusion of another must be dismissed as to it because Allen and Whitman "fail to allege that Verizon did anything that would constitute an invasion of privacy." Verizon's Mem. in Supp. Mot. to Dismiss (Doc. No. 95) at 16. Allen and Whitman merely allege in conclusory terms that Verizon committed an unauthorized intrusion. Fifth Am. Compl. ¶ 109. However, nowhere in the Fifth Amended Complaint do Allen and Whitman allege that Verizon took anything from Allen; rather they allege that Verizon should have protected Allen's employee file. Fifth Am. Compl. ¶ 113. Because the plaintiffs do not allege an intentional intrusion by Verizon, their claim against Verizon fails.

### 3. Metlife

Metlife argues that Allen and Whitman do not—and cannot—allege that Metlife intruded on their seclusion because, although Allen and Whitman allege that Metlife participated in theft or unauthorized access of Allen's employee record, this allegation is belied by their admission that Metlife provided Metlife with Whitman's FMLA certification. *See* Metlife's Mem. in Supp. Mot. to Dismiss at 13; *see also* Fifth Am. Compl. ¶ 3. To the extent that Allen and Whitman claim that Metlife improperly accessed Whitman's FMLA certification

after its authority to view the certification had expired, Metlife argues that Allen and Whitman fail to allege facts to raise the reasonable inference that Metlife intentionally accessed Whitman's FMLA certification. *See* Metlife's Mem. in Supp. Mot. to Dismiss at 13–14.

Regardless of the factual allegations set forth in the Fifth Amended Complaint, Allen's claim against Metlife fails because it is preempted by ERISA, *see supra,* p. 8–10. Any intrusion to obtain Whitman's FMLA certification occurred in the process of determining whether Allen should receive STD benefits. *See* 🚩 *Darcangelo,* 292 F.3d at 188 (stating that, if the plan administrator obtained the plaintiff's medical information in the course of processing a benefits claim, the claims are preempted).

As for Whitman, just as with her claim for intentional infliction of emotional distress, she has alleged facts, at least at this stage of litigation, to allow the court to draw the reasonable inference that Metlife intentionally interfered with her private affairs. Whitman alleges that, "Cosme of Metlife gained unauthorized access" to her FMLA certification and contacted her physician on March 26, 2010, even though Allen spoke to Cosme on March 25, 2010, "and provided Cosme ... [with the] full details of her Health Care Provider information." Fifth Am. Compl. ¶¶ 12, 308. Therefore, Metlife's Motion to Dismiss as to Count Five, as brought by Whitman, is denied.

### 4. Unreasonable publicity

Although Allen and Whitman appear to only raise a claim for unreasonable intrusion upon seclusion, in an abundance of caution, the defendants have also argued that the Fifth Amended Complaint fails to raise a claim for unreasonable publicity given to the other's private life. *See e.g.,* Metlife's Mem. in Supp. Mot. to Dismiss at 14. In an equal abundance of caution, the court will consider their arguments.

**\*9** To state a claim for unreasonable publicity given to the other's private life, the plaintiffs must allege that the defendants publicly disclosed a matter that (1) "would be highly offensive to a reasonable person, and (2) is not of a legitimate concern to the public." *Bremmer–McLain,* 2012 WL 2477921, at *15. "Publicity ... means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.*

Allen and Whitman allege that Metlife disclosed Whitman's FMLA certification to MLS and PDA, *see* Fifth Am. Compl ¶ 111, and that MLS and PDA used that same information in their reports, which were sent to Metlife. *See* Fifth Am. Compl. ¶¶ 378, 391–92. These disclosures are simply too limited to constitute an invasion of privacy. *See e.g., Bremmer–McLain,* 2012 WL 2477921, at *15 (stating that it is not an invasion of privacy to communicate a fact concerning the plaintiff's private life to a small group of persons); *Grigorenko v. Pauls,* 297 F.Supp.2d 446, 448–49 (D.Conn.2003) (analyzing the publication requirement for a claim of false light invasion of privacy and determining that communicating to nine people at Yale and three people outside of Yale does not constitute public disclosure). For this reason, if the plaintiffs attempted to allege a claim for unreasonable publicity given to the other's private life, it is dismissed.

### D. *False light*

Allen alleges a claim of false light against PDA in Count Eight. The definition of false light invasion of privacy is as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* at 448. Allen alleges that PDA created a false peer review report which suggested that Allen suffered from the medical inflictions that her mother, Whitman, suffered. Fifth Am. Compl. ¶ 149. This claims fails for the same reason a claim for unreasonable publicity given to the other's private life fails, *see supra,* pp. 16–17. Allen alleges that PDA sent this false report only to Metlife. [4] Fifth Am. Compl. ¶¶ 150, 367. Distribution to one other entity does not constitute "public" disclosure. *See Grigorenko,* 297 F.Supp.2d at 448–49.

### E. *Breach of contract claims*

Allen and Whitman allege claims of breach of contract against Verizon in Count One and Metlife in Count Two. Allen alleges breach of contractual duty against Metlife in Count 17, while Whitman alleges breach of contractual duty against Metlife in Count 18. Allen and Whitman together allege breach of contractual duty against PDA in Count 19, and against MLS in Count 20. Under Connecticut law, the elements of a breach of contract are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo,* 82 Conn.App. 396, 411, 844 A.2d 893(Conn.App.Ct.2004) (quoting *Bouchard v. Sundberg,* 80 Conn.App. 180, 189, 834 A.2d 744, (Conn.App.Ct.2003)).

#### 1. Breach of contract claim against Verizon

**\*10** Allen and Whitman allege that Verizon breached two agreements: Verizon's Code of Conduct Policy and the Administrative Services Agreement entered into with Metlife for the administration of FMLA and STD claims. Fifth Am. Compl. ¶¶ 37, 39. Verizon argues that neither of these documents can form the basis of a breach of contract claim because they were not agreements entered into between Verizon and Allen or Whitman. Verizon's Reply at 5.

First, as to Verizon's Code of Conduct Policy, Verizon argues that there are no allegations to suggest that the Code of Conduct Policy constituted an agreement conferring rights of any kind on Allen and Whitman. *Id.* Verizon cites to an Exhibit 35, purportedly attached to the plaintiffs' Fifth Amended Complaint, which includes the Code of Conduct Policy. *Id.* According to Verizon, the Code of Conduct Policy explicitly disclaims giving employees rights of any kind and states that the policy can be changed by Verizon at any time. *Id.* Therefore, because under Connecticut law, personnel manuals are not considered contracts if they eschew "language that could reasonably be construed as a basis for a contractual promise ... [or include] appropriate disclaimers of the intention to contract," *Finley v. Aetna Life and Cas. Co.,* 202 Conn. 190, 199 n. 5, 520 A.2d 208 (1987) (overturned on other grounds), a breach of the Verizon Code of Conduct cannot form the basis of a breach of contract claim. *See* Verizon's Reply at 5.

The court cannot find an Exhibit 35 attached to the plaintiffs' Fifth Amended Complaint. However, the plaintiffs supplied the Code of Conduct as an attachment to its Motion for Leave

to File a Fourth Amended Complaint (Doc. No. 64). The attached policy does, in fact, include appropriate disclaimers of the intention to contract. Therefore, it cannot form the basis of Allen and Whitman's breach of contract claim.[5]

See *Gaudio v. Griffin Health Serv. Corp.,* 249 Conn. 523, 533, 733 A.2d 197 (1999) (allowing a claim for breach of contract to go forward because the personnel manual at issue did not include express language definitively stating that the employees were at-will).

Second, as to the Administrative Services Agreement entered into with Metlife for the administration of FMLA and STD claims, Verizon argues that Allen and Whitman have failed to allege any facts to support a conclusion that they are third-party beneficiaries to the Agreement. Verizon's Reply at 6. "In general, in order to claim breach of contract, the plaintiff must be a party to the contract." *Reyes v. Nautilus Ins. Co.,* 2012 WL 1004302, at *4 (Conn.Sup.Ct. Mar. 6, 2012). However, Connecticut courts have recognized an exception when the party bringing suit is an intended third party beneficiary. *Id.* "A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract." *Id.* (quoting *Rapaport & Benedict, P.C. v. Stamford,* 39 Conn.App. 492, 497, 664 A.2d 1193 (1995)).

**\*11** "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary]." *Id.* (quoting *Dow & Condon, Inc. v. Brookfield Development Corp.,* 266 Conn. 572, 580–81, 833 A.2d 908 (2003)). "[I]ntent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Id.*

Although Allen and Whitman state in conclusory terms that they are third-party beneficiaries, the court has the benefit of reviewing the Administrative Services Agreement.[6] While it is true that the Administrative Services Agreement explicitly states that "[n]othing in this [Indemnification] section is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, any right, claim or cause of action against the Indemnified Party or Supplier," Metlife's Mem. in Supp. Mot. to Dismiss, Ex. B., at 11, this third-party disclaimer is only listed in the "Indemnification" section and does not apply to the entire Agreement. In the Agreement, both Verizon and Metlife

agree to keep health data—obtained during the performance of Metlife's duties and obligations under the Agreement—private and confidential. *Id.* at 6, 833 A.2d 908 (listed under the heading "Privacy of Medical Records: Mutual Obligations of Supplier [Metlife] and Verizon Wireless"). Verizon further agrees to "undertake those efforts reasonably deemed necessary by Supplier to protect the information used in connection with the Supplier's administration, evaluation, analysis, or management of Verizon Wireless' disability plans, leave of absence programs or Family and Medical Leave Act compliance obligations subject to this Service Agreement." *Id.* at 7, 833 A.2d 908 (section 12.2). As the beneficiary of the programs subject to the Service Agreement and the individual whose medical information Verizon and Metlife promise to keep confidential, Allen and Whitman, respectively, are the intended beneficiaries of the contracting parties' promises. Therefore, at this stage of litigation, the court concludes that there are enough facts in the Fifth Amended Complaint to plausibly assert that the parties to the Administrative Services Agreement—Verizon and Metlife—intended to assume a direct obligation to Allen and Whitman.[7] See *Dow & Condon,* 266 Conn. at 580–81, 833 A.2d 908. Therefore, Verizon's Motion to Dismiss Count One is denied.

### 2. Breach of contract claims against Metlife

#### a. Claim for ERISA

In Count Two, Allen alleges that she entered into a contract with Metlife when she applied for STD benefits, and that Metlife breached that contract when it wrongfully denied her medical benefits. Fifth Am. Compl. ¶¶ 70–71. Although titled as a claim for breach of contract, this count appears to state a claim pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq. See* Fifth Am. Compl. ¶ 72 (stating that plaintiff can bring a lawsuit regarding wrongful denial of benefits according to ERISA section 502(a)(1)(B)). Metlife has not moved to dismiss this claim for denial of benefits under section 502(a)(1)(B) of ERISA; therefore, the court does not consider it. *See* Mem. in Supp. Mot. to Dismiss at 7, n. 7 (recognizing, without further discussion, that "Allen has improperly asserted her ERISA § 502(a)(1)(B) cause of action as part of her state law breach of contract cause of action, but does actually invoke her ERISA rights to pursue a claim for benefits in the second count.").

#### b. Common law breach of contract

**\*12** In Counts 17 and 18, Allen and Whitman, respectively, allege common law breach of contract claims against Metlife. They argue that they were third party beneficiaries to the Administrative Services Agreement between Verizon and Metlife and, in addition, that Metlife breached its Customer Privacy Policy. As to the Customer Privacy Policy, Metlife argues that it is not a contract because Allen and Whitman have failed to allege facts that they entered into an agreement with Metlife based on a mutual meeting of the minds. Metlife's Mem. in Supp. Mot. to Dismiss at 18. Allen and Whitman merely claim that Metlife *has* a Customer Privacy Policy. Fifth Am. Compl. ¶ 331.

However, for the reasons discussed above, *see supra,* pp. 20–21, the Administrative Services Agreement includes enough facts to plausibly suggest that Allen and Whitman are third-party beneficiaries to the Agreement and that Verizon and Metlife intended to create a direct obligation to Allen and Whitman to keep medical information provided pursuant to the FMLA confidential. Therefore, Metlife's Motion to Dismiss is denied as to Counts 17 and 18. [8]

#### 3. Breach of contract claims against MLS and PDA

The crux of Allen and Whitman's claims against both PDA and MLS is that they "owed Whitman and Allen as third-party beneficiaries to the contract[s] between Metlife and" PDA and MLS. Fifth Am. Compl. ¶¶ 357, 374. The contracts between Metlife and PDA and MLS were to provide an accurate peer review for claims relating to STD. *Id.* at ¶¶ 359, 382. Therefore, according to Allen and Whitman, PDA and MLS breached the contracts with Metlife by failing to provide an accurate peer review of Allen's medical information, as their reviews included information from Whitman's FMLA certification.

Both PDA and MLS argue that Allen and Whitman have failed to allege that they are third party beneficiaries to the Metlife contracts with PDA and MLS. *See* PDA's Mem. in Supp. Mot. to Dismiss at 8; MLS's Mem. in Supp. Mot. to Dismiss at 9. There are no allegations in the Fifth Amended Complaint to plausibly suggest that PDA and MLS intended to assume a direct obligation to Allen or Whitman. Allen and Whitman merely state, without more, that the two are third-party beneficiaries to the contracts. Furthermore, the fact that PDA and MLS were completing the peer review on Allen's claim does not offer any support to the plaintiffs' argument that they were third-party beneficiaries. "The fact that a person is a foreseeable beneficiary of a contract is not sufficient for him to claim rights as a third party beneficiary."

*Grigerik v. Sharpe,* 247 Conn. 293, 318, 721 A.2d 526 (1998). Therefore, Allen and Whitman's claims for breach of contractual duty in Counts 19 and 20 are dismissed without prejudice to replead facts that plausibly allege that Allen and Whitman are third-party beneficiaries to the contracts between Metlife and MLS and PDA.

#### F. *Breach of fiduciary duty*

**\*13** In Counts 23 and 24, Allen and Whitman allege claims for breach of duty against PDA and MLS. In addition to alleging that PDA and MLS failed to exercise reasonable care, the plaintiffs claim that they "have material evidence that prove that the Defendants ... [PDA and MLS] breach fiduciary duties." Fifth Am. Compl. ¶¶ 419, 437. Because Allen and Whitman raise claims for general negligence against PDA and MLS in other counts, the court will construe these claims—as the defendants did—as ones for breach of fiduciary duty.

To state a claim for breach of fiduciary duty, the plaintiff must first allege that a fiduciary duty exists. *Biller Assoc. v. Peterken,* 269 Conn. 716, 721–22, 849 A.2d 847 (2004). "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise *and is under a duty* to represent the interests of the other." *Id.* at 723, 849 A.2d 847 (citing Hi–Ho *Tower, Inc. v. Com–Tronics, Inc.,* 255 Conn. 20, 38, 761 A.2d 1268 (2000)). "In the seminal cases in which ... [the Supreme Court of Connecticut] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Hi–Ho Tower,* 255 Conn. at 38, 761 A.2d 1268. The Supreme Court has refused to recognize, as a matter of law, a fiduciary relationship when the parties were dealing at arm's length or when the parties were not engaged in a relationship of special trust and confidence. *Id.* at 39, 761 A.2d 1268.

Allen and Whitman have failed to allege facts to suggest that they had a fiduciary relationship with PDA and MLS. None of the allegations in the Fifth Amended Complaint suggest Allen or Whitman ever interacted with PDA or MLS, let alone had a relationship of special trust and confidence. As discussed earlier, *see supra,* p. 24, there are similarly no allegations

to plausibly suggest that PDA or MLS were under a specific duty to act for the benefit of Allen or Whitman. Therefore, Allen and Whitman's claims for breach of fiduciary duty are dismissed as to PDA and MLS, with leave to replead facts that plausibly allege the existence of a fiduciary relationship.

G. *Breach of implied oral contract*

Allen alleges in Count 11 that Verizon breached an implied oral contract after it failed to provide Allen with two "Recognizing You" certificates valuing $75. Fifth Am. Compl. ¶¶ 230–231. "An implied contract is an agreement between the parties which is not expressed in words but which is inferred from the acts and the conduct of the parties.... The test is whether the conduct and acts of the parties show an agreement." *Brighenti v. New Britain Shirt Corp.,* 167 Conn. 403, 406, 356 A.2d 181 (1974) (internal citations omitted). "The elements of a breach of an implied contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Mahov v. Chicago Title Ins. Co.,* 2012 WL 3544883, at *2 (D.Conn. Aug.16, 2012) (citing *Pelletier v. Galske,* 105 Conn.App. 77, 81, 936 A.2d 689 (2007)).

**\*14** Verizon argues that Allen fails to allege that she and Verizon entered into a contract. Verizon's Mem. in Supp. Mot. to Dismiss at 13. All that Allen alleges is that Verizon offered her two certificates worth $75, and that Allen never received them. Fifth Am. Compl. ¶¶ 230–231. These allegations cannot form the basis of a breach of implied contract claim as Allen merely alleges an offer without any acceptance or performance. [9] Therefore, Allen's claim for breach of implied contract is dismissed.

H. *Negligence claims*

Allen and Whitman allege claims of negligence against Verizon and Metlife in Count Seven, PDA in Count 22, and MLS in Count 26. Allen and Whitman also bring a claim against Verizon in Count Six for "breach of duty" for failing to properly select and monitor service providers.

The court will consider the "failure to select" claim against Verizon first, as it can be summarily dismissed. Under Connecticut law, to prevail on a claim for negligence, a plaintiff must prove: (1) duty; (2) breach of that duty; (3) causation; and (4) actual injury or damages. *See Murdock v. Croughwell,* 268 Conn. 559, 848 A.2d 363, 367 (Conn.2004). "[A] duty of care may arise from a contract, from a statute,

or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Gerber Trade Finance, Inc. v. Davis, Sita & Co., P.A.,* 128 F.Supp.2d 86, 95 (D.Conn.2001) (citing *Burns v. Board of Educ.,* 228 Conn. 640, 646, 638 A.2d 1 (1994)). The court is unaware of any basis for a duty Verizon owed Allen and Whitman to select and monitor a plan administrator. *See* Verizon's Mem. in Opp. Mot. to Dismiss at 18 (stating that the plaintiffs "merely assert that it [Verizon] had a duty, but fail to allege how this duty came about"). Therefore, Count Six is dismissed.

Moving to the claims for general negligence against the four defendants, as Verizon argues, Allen and Whitman cannot maintain a negligence claim against the defendants because they have only alleged emotional injury as a result of the alleged negligence. Verizon Mem. in Opp. Mot. to Dismiss at 19 (citing *Fischer v. Yale Univ.,* 2006 Conn.Super. LEXIS 386, at *2 (Conn.Super.Ct. Feb. 8, 2006)). "Emotional injury can provide the basis of a claim for simple negligence only as a consequence of a physical injury." *Fischer,* 2006 Conn.Super. LEXIS 386, at *2 (citing *Bushnell v. Bushnell,* 103 Conn. 583, 594, 131 A. 432 (1925)).

Allen and Whitman allege that, due to Verizon and Metlife's alleged negligence, they experienced "conscious pain and suffering and physical injuries, medical expenses, and other damages." Fifth Am. Compl. ¶ 145. As for MLS and PDA, Allen alleges that her "depression and anxiety worsened," she "began to vomit, cry and worry excessively about the future," and she suffered a "fear of loneliness and sleeplessness." Fifth Am. Compl. ¶¶ 408–09. These injuries are "purely emotional or are physical manifestations of emotional injuries, and therefore cannot provide the basis for [a] negligence cause[ ] of action." *Fischer,* 2006 Conn.Super. LEXIS 386, at *2.

**\*15** However, rather than dismiss these claims, the court will, given plaintiffs' *pro se* status, construe them as claims for negligent infliction of emotional distress. Under Connecticut law, a cause of action for negligent infliction of emotional distress requires a showing "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Perodeau v. City of Hartford,* 259 Conn. 729, 748–49, 792 A.2d 752 (2002) (quoting *Montinieri v. S. New England Tel. Co.,*

175 Conn. 337, 345, 398 A.2d 1180 (1978)); *see Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 197 (D.Conn.2000). Or, in other words, "[i]n order to prevail on a negligent infliction of emotional distress claim, the following elements must be proven: '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.' " *Vega v. Sacred Heart Univ., Inc.,* 871 F.Supp.2d 81, 85 (D.Conn.2012) (citing *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444, 815 A.2d 119 (2003)).

### 1. Verizon

The court will consider Allen and Whitman's claims separately. First, as to Allen, her claim against Verizon must fail because, "[i]n the employment context, liability for negligent infliction of emotional distress cannot arise from behavior that is part of an ongoing relationship. It can arise only from conduct occurring in the termination process." *Mody v. Gen. Electric Co.,* 2006 WL 1168051 at *3 (D.Conn. Apr.26, 2006) (internal quotation marks and citations omitted); *Perodeau,* 259 Conn. at 762–63, 792 A.2d 752 (holding that municipal employer could not be liable for negligent infliction of emotional distress based on conduct occurring "within a continuing employment context" rather than "in the termination of employment"). Because Allen's claim for negligent infliction of emotional distress does not pertain to any actions taken by Verizon in the termination process, Allen's claim must fail.

As for Whitman, she claims that she was injured when Verizon negligently failed to protect her FMLA certification. [10] Fifth Am. Compl. ¶ 140. Although the claim is not particularly clear, when taking the Fifth Amended Complaint as a whole, there are facts plausibly alleged that Verizon should have known that, by failing to protect Whitman's private, confidential medical information, she could suffer emotional harm. Therefore, Verizon's Motion to Dismiss Count Seven, as to Whitman, is denied.

### 2. Metlife

Because the court has construed Allen and Whitman's cause of action for negligent infliction of emotional distress, Allen and Whitman must allege facts to plausibly assert "that the defendant should have realized that its conduct involved

an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Perodeau,* 259 Conn. 729, 748–49, 792 A.2d 752 (2002) (quoting *Montinieri* 175 Conn. at 345, 398 A.2d 1180); *see also Vega v. Sacred Heart Univ., Inc.,* 871 F.Supp.2d 81, 85 (D.Conn.2012) ("In order to prevail on a negligent infliction of emotional distress claim, the following elements must be proven: '(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.' ") (citing *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444, 815 A.2d 119 (2003)).

**\*16** Taking Whitman's claim first, she has alleged that Metlife, by failing to keep her FMLA certification confidential, created an unreasonable risk of causing Whitman emotional pain. Fifth Am. Compl. ¶ 140 (stating that "Metlife has a duty to administer FMLA claims for Verizon ... [and] failed to protect Whitman['s] ... confidential ... medical records"). Such allegations, at this stage of litigation and by a *pro se* plaintiff, are enough to survive a Motion to Dismiss.

As for Allen's claim, the court has difficulty seeing how Allen has stated a claim that Metlife's conduct created an unreasonable risk of causing *her* emotional distress. To the extent that Allen's claim rests on Metlife's failure to protect the FMLA certification, it was only foreseeable that such a breach in confidentiality would harm Whitman, the person whose medical information was breached. To the extent that Allen's claim rests on Metlife's use of Whitman's confidential information against Allen in denying her STD benefit claim, such a claim is preempted by ERISA. Therefore, Allen's negligence claim against Metlife—construed as a claim for negligent infliction of emotional distress—is dismissed without prejudice to replead with facts that plausibly allege that Metlife's failure to protect Whitman's FMLA certification created an unreasonable and foreseeable risk of causing harm to Allen.

### 3. PDA and MLS

According to Allen and Whitman, both PDA and MLS had a legal duty to provide an accurate peer review of Allen's medical claim. Fifth Am. Compl. ¶¶ 407, 425. They also had a duty to "protect patients unlawful confidential

protected employee records and to base Allen's review solely on Allen's medical documentation not Whitman's medical information." Fifth Am. Compl. ¶ 424; *see also* ¶ 406. Allen and Whitman allege that the two peer review companies "should have known that when Allen and Whitman reviewed the administrative file ending with 8804 that included ... Whitman's unauthorized medical documentation ... this would cause extreme emotional distress." Fifth Am. Compl. ¶ 408.

MLS argues that these allegations are insufficient to plausibly state a claim for negligent infliction of emotional distress. MLS Mem. in Opp. Mot. to Dismiss at 17. MLS claims that there are no facts to support a claim that Allen and Whitman's distress was foreseeable or that "emotional distress is a foreseeable result of reading a review of a short-term disability claim." *Id.* However, at this stage of litigation, construing claims by *pro se* plaintiffs, the court disagrees. Allen and Whitman allege that MLS and PDA negligently used Whitman's FMLA certification in reviewing Allen's claim and that the use of Whitman's medical information caused emotional distress to Whitman—because her confidential information was used without her consent—and to Allen—because she believed MLS and PDA would provide an accurate review. See Fifth Am. Compl. ¶¶ 405–06, 418. Therefore, MLS and PDA's Motions to Dismiss Counts 22 and 26—construed as claims for negligent infliction of emotional distress—are denied.

### I. *Breach of ADA confidentiality*

**\*17** Allen alleges in Count 16 that Verizon violated the ADA by breaching Allen's confidentiality. Section 12112(d) of the Americans with Disabilities Act requires employees to treat information obtained regarding the medical condition or history of any employee as a confidential medical record and to maintain such information on separate forms and in separate medical files. *See* 42 U.S.C. § 2112(d)(C). According to Allen, she only authorized Verizon to use Whitman's FMLA certification to determine whether she could obtain FMLA leave as part of her 5978 claim. Fifth Am. Compl. ¶ 292. Any further use of the FMLA certification, according to Allen, breached her confidentiality.

First, Verizon questions whether Allen may bring a claim for breach of ADA confidentiality without bringing a claim for discrimination under the ADA. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 30. In *Giaccio v. City of New York,* 308 Fed. Appx. 470, 471 (2d Cir.2009), the Second Circuit raised the possibility that a violation of the confidentiality

provision of the ADA is not actionable without demonstrating discrimination. However, the Second Circuit ultimately did not decide whether discrimination is necessary to bring such a claim because it held that the plaintiff did not present evidence raising an inference that her drug test results were disclosed by the defendant. *See id.* Because any discussion of a discrimination requirement in *Giaccio* is *dicta,* the court will continue to consider whether Allen has alleged facts to plausibly suggest that Verizon violated her confidentiality.[11]

Verizon next argues that Allen cannot state a claim for relief because the records at issue are Whitman's medical records, and not her own. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 30. Allen appears to argue in response that, because Whitman's medical information should be protected pursuant to the FMLA, it should also be protected under the ADA's confidentiality provision. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 45. The court has not found any case in which a plaintiff brought a claim for violation of the ADA's confidentiality provision based on disclosure of another person's medical records. The cases that address whether disclosure of an FMLA certification constitutes a violation of section 12112(d) all include medical information regarding the employee, and not a family member. *See e.g., Doe v. U.S. Postal Service,* 317 F.3d 339 (D.C.Cir.2003) (disclosure of employee's HIV status on FMLA form). Furthermore, in *Doe,* the court held that disclosure of an FMLA form is only a violation of the ADA's confidentiality requirement if the form was submitted in response to the employer's request (1) for information in connection with a voluntary medical examination which is part of an employee health program available to employees at the work site, or (2) for information regarding the ability of an employee to perform job-related functions. *Id.* at 345; *see also* 42 U.S.C. § 12112(d)(4)(B). Allen submitted Whitman's FMLA form so she could take leave to care for Whitman, not so she could take leave because of her own medical needs. *C.f.* *Doe,* 317 F.3d at 345 (stating that, when the plaintiff submitted his FMLA certification so he could take leave due to his own medical problems, the employer was seeking to determine whether the plaintiff was unable to perform the functions of his position). Because the FMLA certification includes Whitman's medical information—not Allen's—and was submitted to Verizon for a purpose other than the two categories set forth in section 12112(d)(4)(B), Allen's claim for breach of ADA confidentiality is dismissed.

J. *Discrimination based on perceived disability, wrongful discharge*

**\*18** Allen brings a claim for discrimination/wrongful discharge against Verizon in Count Nine. It appears that, within Count Nine, Allen is attempting to raise three claims: wrongful discharge; creating a hostile work environment, in violation of the ADA; and discrimination based on perceived disability, in violation of the ADA. The court will consider each claim in turn.

1. Wrongful discharge

Allen claims that she was unlawfully terminated because of her perceived disability, actual disability, and Whitman's genetic information. Fifth Am. Compl. ¶¶ 209–10. As Verizon argues, a plaintiff is precluded from bringing a claim for wrongful discharge in violation of public policy when she has an adequate statutory remedy for the violation of public policy. *See Burnham v. Karl and Gelb, P.C.,* 252 Conn. 153, 164, 745 A.2d 178 (2000). This is because, "the rationale underlying the tort of termination in violation of public policy is that 'permitting the discharge to go unaddressed would leave a valuable social policy to go unvindicated.' " *Van Kruiningen v. Plan B, LLC,* 485 F.Supp.2d 92, 96 (D.Conn.2007) (quoting *Burnham,* 252 Conn. at 182, 745 A.2d 789).

All of the bases for which Allen alleges Verizon unlawfully terminated her may be remedied by seeking statutory recourse. Allen admits as much when she alleges that she was wrongfully terminated in violation of the public policies of the ADA, FMLA, GINA, and the Civil Rights Act of 1964. Fifth Am. Compl. ¶ 212; *see also* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 32. The public policies articulated in those statutes "are already safeguarded by the remedies enumerated in those statutes, and thus a claim for public policy wrongful discharge is not plaintiff's sole means for vindicating the anti-discrimination policy." *Storm v. ITW Insert Molded Prod.,* 400 F.Supp.2d 443 (D.Conn.2005). Therefore, Allen's claim for wrongful discharge is dismissed.

2. Hostile work environment

Allen alleges that she was subjected to a hostile work environment based on her perceived disability. Fifth Am. Compl. ¶ 164. "To establish a claim of hostile work environment, 'the workplace [must be] permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ...'" [12] *Martin v. Town of Westport,* 558 F.Supp.2d at 242 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). " '[I]n order to be actionable ... a [n] ... objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (quoting *Britell v. Dept. of Correction,* 247 Conn. 148, 167, 717 A.2d 1254 (1998)). Furthermore, "[a] plaintiff must ... demonstrate that she was subjected to the hostility because of her membership in a protected class." *Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 241 (2d Cir.2007).

**\*19** To support her hostile work environment claim, Allen alleges that, six months after learning of Allen's chronic health condition, her supervisors pulled her off of a telephone call and brought her to a meeting to discuss her performance. Fifth Am. Compl. ¶¶ 157–58, 160–61. The meeting ran long and forced her to work past the end of her shift. Fifth Am. Compl. ¶ 158. According to Allen, she perceived the meeting to be hostile, and she felt "undermined" because she took FMLA and STD leave. Fifth Am. Compl. ¶¶ 158, 161. Allen also alleges that she was "placed under greater scrutiny and treated differently," and that this led to a downward trend in her performance. [13] Fifth Am. Compl. ¶¶ 163–64. She further claims that Verizon's denial of her requests for FMLA leave and failure to protect her confidential medical records contributed to the hostile work environment. Fifth Am. Compl. ¶ 168; *see also* Pl. Mem. in Opp. Verizon's Motion to Dismiss at 31.

These allegations of being subjected to scrutiny and feeling undermined do not suggest "severe and pervasive" treatment that altered the conditions of Allen's employment nor do they in any way suggest that Allen was treated in a hostile manner because of her disability. *See e.g., Balonze v. Town Fair Tire Centers, Inc.,* 2005 WL 752198, at \* 4, 8–9(D.Conn. Mar.31, 2005) (finding that allegations that an employer called the plaintiff "gimpy" and "useless" and complained about the plaintiff attending therapy during work hours did not meet the standard for a hostile work environment claim under the ADA); *Murphy v. BeavEx, Inc.,* 544 F.Supp.2d 139, 151 (D.Conn.2008) (stating that alleged harsh criticism is insufficient to establish a hostile work environment

claim); *LaBella v. New York City Admin. for Children's Servs.,* 2005 WL 2077192, at *20 (E.D.N.Y. Mar.28, 2005) ("[A]n employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult.") (internal quotation marks omitted). Allen's allegations are insufficient and, therefore, Allen's hostile work environment claim is dismissed.

3. Discrimination based on perceived or actual disability
Allen alleges that Verizon discriminated against her because of her disability, in violation of the ADA, by terminating her employment on January 14, 2011. Fifth Am. Compl. ¶ 197. The ADA provides, *inter alia,* that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112(a). To state a claim for disability discrimination under the ADA, a plaintiff must allege that: (1)[her] employer is subject to the ADA; (2)[she] was disabled within the meaning of the ADA; (3)[she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4)[she] suffered adverse employment action because of [her] disability." *Rieger v. Orlor, Inc.,* 427 F.Supp.2d 105, 115 (D.Conn.2006) (quoting *Giordano v. City of New York,* 274 F.3d 740, 748 (2d Cir.2001)).

**\*20** Verizon argues that "Allen's allegations that Verizon terminated her ... because she was disabled, or perceived as such, amount to nothing more than a legal conclusion that is 'not entitled to be assumed true.' " Verizon's Mem. in Supp. Mot. to Dismiss at 24. Verizon relies on *Fritz v. The Eye Center,* 2010 WL 3210863, 2010 U.S. Dist. LEXIS 81805 (D.Conn. Aug. 11, 2010), to support its argument. In *Fritz,* the court held that the plaintiff established that she suffered from a disabling disease, that the defendant knew about her condition, and that she had collected an unspecified number of sick absences over her eight year employment due to this condition. *Id.,* at *11. However, according to the court, such allegations do not raise an inference that the plaintiff was terminated because of her condition.

Unlike *Fritz,* Allen alleges that she had attempted to contact her supervisor via email regarding her absences, but was told that she had to call her supervisor instead. Fifth Am. Compl. ¶ 189. According to Allen, she had a difficult time speaking

on the telephone due to her serious health condition. Fifth Am. Compl. ¶ 189. In addition, her supervisor knew she was ill and could not advocate for herself. [14] Fifth Am. Compl. ¶ 180. Ultimately, Verizon terminated Allen for alleged job abandonment after restricting the best method for Allen to communicate her absences. Fifth Am. Compl. ¶¶ 196, 236.

Although not a model of clarity or the most plausible claim for disability discrimination possible, the court cannot conclude at this stage of litigation that Allen has not stated a claim for relief. If Verizon interfered with Allen's ability to explain her absences to her supervisors—knowing that Allen could not comply with the change in protocol due to her disability—and terminated her for failing to report her absences to her supervisors, then Allen can make out a *prima facie* case for disability discrimination. [15] Therefore, Verizon's motion to dismiss Allen's claim for disability discrimination is denied. [16]

K. *FMLA interference and retaliation*
Allen alleges FMLA interference and retaliation against Verizon in Counts 12 and 13. "The FMLA entitles eligible employees to 'twelve workweeks per year of unpaid leave, 'because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Ridgeway v. Royal Bank of Scotland Group,* 2012 U.S. Dist. LEXIS 41995, at * 13, 2012 WL 1033532 (D.Conn.2012) (quoting *Sista v. CDC Ixis North America, Inc.,* 445 F.3d 161, 174 (2d Cir.2006)).

1. FMLA interference
To state a claim for FMLA interference, Allen must allege: (1) she is an eligible employee under the FMLA; (2) Verizon is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to Verizon of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA. *Id.* (citing *Higgins v. NYP Holdings, Inc.,* 836 F.Supp.2d 182 (S.D.N.Y.2011)). Allen bases her FMLA interference claim on two instances in which Verizon denied her FMLA benefits: when she sought leave between September 2009 and November 2009, Fifth Am. Compl. ¶ 222, and when she sought leave between February 2010 and June 2010, Fifth Am. Compl. ¶ 225.

**\*21**  Verizon argues that Allen cannot state a claim for FMLA interference because she has admitted in her Fifth Amended Complaint that she was not entitled to FMLA leave during those time periods because she failed to provide necessary medical information within the designated deadline. Verizon's Mem. in Supp. Mot. to Dismiss at 28; *see also* Fifth Am. Compl. ¶¶ 170, 217–18. An employer may require an employee seeking leave pursuant to the FMLA to provide, in a timely manner, a certification issued by the health care provider of the eligible employee describing the appropriate medical facts regarding the condition, when the serious health condition started, and how long it is expected to continue. ⚑ 29 U.S.C. § 2613. "The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification." 29 C.F.R. 825.305(b).

Allen argues that she was exempt from the deadline because she had "extenuating circumstances." Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 39. "The FMLA contains a built-in equitable provision in its regulations, specifying that an employee must submit requested medical certification [within 15 calendar days] ... *unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.*" *Peter v. Lincoln Technical Institute,* 255 F.Supp.2d 417, 441 (E.D.Pa.2002) (internal citations omitted). "Good faith requires 'at least that the employee contact his employer by telephone and make it aware that he is unable to return his certification before the deadline.' " *Id.* (quoting *Washington v. Fort James Operating Co.,* 2000 WL 1673134, at \*5, (D.Or.Nov.7, 2000).

Allen has alleged that her health care providers, Wendy Brus, MSW, and Susan Hope, APRN, contacted Metlife so as to complete the FMLA forms during the appropriate time period for her request for leave between February 2010 and June 2010. Fifth Am. Compl. ¶ 224. She also attached to her Fifth Amended Complaint a facsimile from Susan Hope requesting the necessary FMLA paperwork on April 22, 2010. Fifth Am. Compl., Ex. 18. Although not entirely clear, the Fifth Amended Complaint includes allegations that could state a plausible claim that Allen made a good faith effort to comply with the requirement that she provide a certification, at least as to her request for leave between February 2010 and June 2010. [17] Furthermore, Allen alleges in her Fifth Amended

Complaint that, as for her claim for leave between September 2009 and November 2009, Verizon set a deadline for her to provide a certification "which deviated from Family Medical Leave Act laws." Fifth Am. Compl. ¶ 219. If Verizon denied Allen benefits based on her failure to provide certification within a period of time less than the statutorily-required 15 days, such action would interfere with Allen's ability to exercise her statutory rights. *See Ridgeway,* 2012 U.S. Dist. LEXIS 41995, at \*18–19 (stating that an employer's failure to provide notice to an employee "which inhibits or restricts an employee from successfully obtaining leave can substantiate a cause of action for interference"). Therefore, Verizon's Motion to Dismiss as to Allen's claim for FMLA interference is denied. [18]

#### 2. FMLA retaliation

**\*22**  Allen alleges that Verizon terminated her in retaliation for seeking and taking FMLA leave. Fifth Am. Compl. ¶ 243. FMLA retaliation claims are subject to the *McDonnell Douglas* burden shifting analysis. To state a prima facie case of retaliation, the plaintiff must allege that "(1) she exercised her rights under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Milne v. Navigant Consulting,* 2010 U.S. Dist. LEXIS 115650, at \*34–35, 2010 WL 4456853 (S.D.N.Y. Oct. 27, 2010).

Verizon argues that Allen has failed to state a claim for FMLA retaliation because she has not alleged any facts to suggest Verizon terminated her *because* she took prior FMLA leave and that, instead, Allen admits that she was terminated for failing to return to work. Verizon's Mem. in Supp. Mot. to Dismiss at 26. However, as discussed above, *see supra,* pp. 38–39, Allen has alleged facts to plausibly suggest that Verizon made it difficult for Allen to comply with its policy for informing her supervisor of her absences. Further, "[t]he fourth element of plaintiff's prima facie case, an inference of discrimination, is established by proximity between plaintiff's exercise of his FMLA leave and the adverse employment action, which immediately followed." ⚑ *Stevens v. Coach U.S.A.,* 386 F.Supp.2d 55, 62 (D.Conn.2005). Allen alleges that she requested and took FMLA leave on numerous occasions, including from November 15, 2010 through January 14, 2011, Fifth Am. Compl. ¶ 28, and that she was terminated on January 14,

2011, Fifth Am. Compl. ¶ 250. Therefore, Allen has stated a plausible claim for retaliation.

L. *ERISA interference and retaliation*

Allen alleges two claims against Verizon of ERISA interference and retaliation in Counts 14 and 15.

1. ERISA interference

"Section 510 of ERISA prohibits terminations 'for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan].' " *Hayes v. Compass Group USA, Inc.,* 343 F.Supp.2d 112, 121 (D.Conn.2004) (citing 29 U.S.C.A. § 1140). "Stated differently, a § 510 claim involves three elements: (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled." *Id.* (citing *Romero v. SmithKline Beecham,* 309 F.3d 113, 119 (3rd Cir.2002)).

Verizon argues that Allen fails to state an ERISA interference claim because the Fifth Amended Complaint fails to include any allegations that Verizon terminated her to avoid paying her STD benefits, as Verizon denied her claim for STD benefits before she was terminated. Verizon's Mem. in Supp. Mot. to Dismiss at 23, n. 8. However, Allen alleges that she appealed the denials for her STD and FMLA benefits on January 4, 2011. Fifth Am. Compl. ¶ 181. Metlife acknowledged the appeal on January 14, 2011, the same day Allen was fired. Fifth Am. Compl. ¶ 183. Therefore, Verizon's Motion to Dismiss is denied as to Allen's claim for ERISA interference.

2. ERISA Retaliation

**\*23** "ERISA [section] 510 [also] provides that it is illegal to 'discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan.' " *Giordano v. Thompson,* 564 F.3d 163, 169 (2d Cir.2009) (citing 29 U.S.C. § 1140). To allege a prima facie case of ERISA retaliation, Allen must allege that: (1) she was engaged in protected activity; (2) Verizon was aware of that activity; (3) she suffered an adverse employment decision; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.*

Again, as with Allen's claims for disability discrimination and FMLA retaliation, Verizon relies on the fact that Allen admits she was terminated for job abandonment. Verizon's Mem. in Supp. Mot. to Dismiss at 24. However, as discussed when analyzing Allen's claims for disability discrimination and FMLA retaliation, Allen has alleged facts to suggest, at least at this stage of litigation, that Verizon interfered with her ability to report her absences, *see supra,* pp. 38–39. Further, she has alleged that she engaged in protected activity —filing and appealing her request for STD benefits—in close proximity to her termination. *Perry v. NYSARC, Inc.,* 424 Fed. Appx. 23, 25 (2d Cir.2011) (stating that temporal proximity can support an inference of causal connection if the retaliatory action and protected activity were "very close" in time). This is sufficient to state a claim for relief. Therefore, the Motion to Dismiss the claim for ERISA retaliation in Count 15 is denied.

M. *Discrimination in violation of Title II of GINA*

Allen alleges in Count Ten that Verizon violated Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA) by denying her fringe benefits—namely STD— due to her family medical history. GINA makes it "an unlawful employment practice for an employer to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee." 42 U.S.C. § 2000ff–1(a)(1). Genetic information is defined as "information about—(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff. Therefore, to state a claim for genetic discrimination under GINA, Allen must allege "(1) that she was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from Plaintiff's genetic tests." *Leone v. North Jersey Orthopaedic Specialists, P.A.,* at * 5 (D.N.J. Apr. 27, 2012).

Allen clearly alleges that she was an employee of Verizon and that she was denied STD benefits. [19] The issue is whether Allen alleges that Verizon considered her genetic information in deciding to deny her request for STD. Verizon argues, first, that Allen "has not met her burden of establishing that the medical information at issue consists of 'genetic information.' " Verizon's Mem. in Supp. Mot. to Dismiss at 29. According

to Allen, she has met her burden because "family history is included in the definition of genetic information because it is often used to determine whether someone has an increased risk of getting a disease, disorder, or condition in the future." Pl. Mem. in Opp. Verizon's Mot. to Dismiss (Doc. No. 106) at 35; *see also* Poore v. Peterbilt of Bristol, LLC, 852 F.Supp.2d 727, 730 (W.D.Va.2012). However, evidence of a family member's disease diagnosis is only considered "genetic information" if used to determine the likelihood of disease in another individual. It is not considered "genetic information" if it "is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual." Poore, 852 F.Supp.2d at 731.

**\*24** The court finds it hard to imagine how Allen has alleged that Whitman's medical history was used as genetic "family history" when she claims that PDA accidentally reported that Allen herself suffered from Whitman's afflictions. However, assuming *arguendo,* that Allen has alleged that Verizon possessed her genetic information, she has failed to allege facts to raise a reasonable inference that Verizon denied her STD benefits *because* of this genetic information.[20] Allen merely states in a conclusory manner that her STD claim "was denied due to Allen's family medical history." Fifth Am. Compl. ¶ 225. Such conclusory allegations do not meet the standard set forth in *Twombly* and *Iqbal*. Therefore, Allen's claim for discrimination pursuant to GINA is dismissed.

## V. CONCLUSION

For the foregoing reasons:

MLS's Motion to Dismiss (Doc. No. 91) is **DENIED** as to Count 26. It is **GRANTED** as to Count Five, Count 20 (with leave to replead), Count 24, and Count 27 (with leave to replead).

PDA's Motion to Dismiss (Doc. No. 92) is **DENIED** as to Count 22. It is **GRANTED** as to Count Five, Count Eight, Count 19 (with leave to replead), Count 21 (with leave to replead), Count 23, and Count 25 (with leave to replead).

Metlife's Motion to Dismiss (Doc. No. 98) is **DENIED** as to Count Three (Whitman's claim only), Count Five (Whitman's claim only), Count Seven (Whitman's claim only), and Counts 17 and 18. It is **GRANTED** as to all other claims, with leave to replead as to Count Seven (Allen's claim). The Motion to Dismiss does not address, and this Ruling does not apply to, Count Two.

Verizon's Motion to Dismiss (Doc. No. 93) is **DENIED** as to Count One, Count Seven (Whitman's claim only), Count Nine (only as to claim for disability discrimination), Count 12, Count 13, Count 14, and Count 15. It is **GRANTED** as to all other claims, with leave to replead as to Count Three (Whitman's claim only).

Plaintiffs have until **July 7, 2013** to file an Amended Complaint as to only those claims dismissed with leave to replead, upon plausible allegations, supported by bases in fact and law. *See* Fed.R.Civ.P. 11. The court reminds the plaintiffs that, although they need to allege facts to support their claims for relief, they need not provide supporting documentation nor do they need to repeat the same factual allegations in different iterations for each claim.

Further, because the plaintiffs are proceeding *pro se* and unfamiliar with the rules governing motions practice, the court has given them some leeway to file additional papers related to the various Motions to Dismiss. Thus, the court **GRANTS** plaintiffs' Motion for Leave to File Sur-reply (Doc. No. 128) and **DENIES** Metlife's Motions to Strike (Doc. Nos.125, 129). However, to the extent that Allen and Whitman have included any additional claims in their Sur-replies, as noted throughout this Ruling, such claims are not considered.

**\*25  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2467923

## Footnotes

1    Verizon and Metlife appear to argue that Whitman's claims are also preempted under ERISA. However, case law suggests that state laws are not preempted if they do not "implicate the relations along the ERISA plan entities, the principals, the employer, the plan, the plan fiduciaries and the plan beneficiaries." *Lyons v. Fairfax Properties, Inc.,* 2002 WL 31060373, at * 4 (D.Conn. May 30, 2002). As Whitman's claims do not involve such relationships—she is a third party unrelated to the administration of STD benefits—her claims do not implicate such relationships and are not preempted.

2    Neither MLS or PDA argue that the claims alleged against them are preempted by ERISA. There is case-law that states claims against third parties who provide professional services to ERISA plans are not preempted. *See Lyons,* 2002 WL 31060373, at *4 (collecting cases). Because MLS and PDA did not argue ERISA preemption, the court will not consider whether such case-law applies to peer reviewers.

3    PDA argues that Allen and Whitman fail to raise a claim against it for unreasonable intrusion into the seclusion of another because the plaintiffs have not alleged that the parties had a relationship. *See* PDA's Mem. in Supp. Mot. to Dismiss at 6. It is not an element of a claim for invasion of privacy that the plaintiff and defendant have a relationship. *See, e.g., Bremmer–McLain,* 2012 WL 2477921, at *14 (setting forth elements). Although PDA does not offer any other argument to rebut Allen and Whitman's claim for unreasonable intrusion into the seclusion of another, it does note—while discussing the possibility that Allen and Whitman brought a claim for invasion of privacy based on the category of unreasonable publicity given to the other's private life —that it cannot be liable for providing allegedly unauthorized information to Metlife when Metlife was the one who originally provided PDA with the information. *Id.* The court will consider this argument generally in determining whether Allen and Whitman stated a claim under any of the categories of invasion of privacy.

4    Allen alleges that Verizon "used" PDA's report. Fifth Am. Compl. ¶ 150. However, there are no allegations that PDA sent the report to Verizon. Allen alleges only that PDA had an agreement with Metlife to prepare a peer review report. Fifth Am. Compl. ¶ 367.

5    Furthermore, as Verizon argues, even if the Code of Conduct were to constitute a contract between Verizon and Allen—an employee of Verizon—there are no allegations to support the claim that Whitman was a party to such a contract. There is no allegation that Whitman was an employee of Verizon or that the Code of Conduct applied to her in any way. *See* Verizon's Reply at 5.

6    "Even where a document is not [attached to a complaint or] incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). As Allen and Whitman's breach of contract claims rest on the obligations set forth in the Administrative Services Agreement, the court will consider the Agreement in its Ruling.

7    Verizon attempts to argue that Allen and Whitman's claims for breach of contract are preempted by ERISA. However, to the extent that Allen and Whitman are alleging that Verizon breached its obligation to keep medical records submitted on behalf of an FMLA claim confidential, that obligation arises from, and relates to, Verizon's obligation under the FMLA and not under the STD policy (only the latter of which is an ERISA plan).

8    Again, as with Allen's claim for breach of contract against Verizon, to the extent that Allen and Whitman are alleging that Verizon breached its obligation to keep medical records submitted on behalf of an FMLA claim confidential, that obligation arises from and relates to Metlife's obligation under the FMLA and not under the STD policy (only the latter of which is an ERISA plan). Therefore, the claim is not preempted.

9    Further, Allen attached emails to her opposition to Verizon's Motion to Dismiss—exhibits which were not included in her Fifth Amended Complaint—which show that Allen was communicating with a vendor, Augeo Incent, regarding these certificates, and not Verizon. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss, Ex. 40.

10   To the extent that Verizon argues that Whitman's claim is preempted by ERISA, the court disagrees. Any duty owed to Whitman to keep the medical certification confidential arises out of the FMLA and not the STD Plan.

11   In *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 970 (8th Cir.1999), the court explained that the plaintiff needed to establish that the defendant's violation of the ADA under section 12112(d)—disclosing the plaintiff's back injury—caused some sort of tangible injury. However, the court did not decide whether that injury must be an "adverse employment action" as required to raise a claim for disability discrimination pursuant to section 12112(a). *Id.* at 971. Allen merely alleges in a conclusory manner that Whitman's genetic information was used as a factor leading to her discharge. Fifth Am. Compl. ¶ 209.

12   It should be noted that, "[t]he Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments." *Bonura v. Sears Roebuck & Co.,* 62 F. App'x 399, 400 n. 3 (2d Cir .2004). However, certain district courts within the Second Circuit recognize such a cause of action, *Monterroso v. Sullivan & Cromwell, LLP,* 591 F.Supp.2d 567, 584 (S.D.N.Y.2008), and "the circuits that have reached this question have answered it in the affirmative." *Bonura,* 62 F. App'x at 400 n. 3.

13   For the first time in her Opposition to Verizon's Motion to Dismiss, Allen alleges that she was subjected to 'staredowns' at work. Pl. Mem. in Opp. Verizon's Motion to Dismiss at 31. These allegations are not part of the Fifth Amended Complaint and will not be considered by the court. However, even if they were considered, it would not alter this analysis.

14   Verizon argues that Allen does not allege that she informed Verizon of her inability to speak over the phone. Verizon's Mem. in Supp. Mot. to Dismiss at 27. Allen's allegation that her supervisor knew that she could not advocate for herself, Fifth Am. Compl. ¶ 180, when construed in Allen's favor, suggests that she informed her supervisor of her inability to speak over the telephone.

15   Verizon's citation to *Vandenbroek v. PSEG Power Conn., LLC,* 2009 WL 650392, 2009 U.S. Dist. LEXIS 18320, at *17 (D.Conn. Mar. 10, 2009), does not alter this conclusion. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 26. In *Vandebroek,* the plaintiff conceded that he was terminated for violating the company's no call/no show policy, and the court granted summary judgment to the defendant because the plaintiff did not produce any evidence to suggest that his disability was a factor in the termination decision. The plaintiff only argued that his disability—alcoholism—was the reason why he violated the no call/no show policy. *Id.* The *Vandebroek* case is distinguishable for two reasons: (1) the court acted at the summary judgment stage rather than at the motion to dismiss stage; and (2) Allen, unlike Vandebroek, alleges that Verizon manipulated the no call/no show policy to prevent Allen from abiding by it. Fifth Am. Compl. ¶ 189.

16   For the first time, in her Sur-reply to Verizon's Reply at 6 (Doc. No. 120), Allen alleges that Verizon failed to offer her a reasonable accommodation—a leave of absence—under the ADA. Allen did not allege this claim in her Fifth Amended Complaint. Therefore, the court will not consider it. However, Allen did allege that she requested an accommodation after she took a leave of absence in 2009. She alleges that, after experiencing emotional distress, which caused her to be "confused, distraught and anxiety ridden," she requested a position that would not require her to speak on the telephone. Fifth Am. Compl. ¶ 165. According to Allen, Verizon "stated there were no offline position[s] and did not offer any options." *Id.* As Verizon did not move to dismiss a claim for failure to accommodate based on these allegations, the court will not consider it.

17    Verizon's citation to 📁 *Townsend–Taylor v. Ameritech Serv.,* 523 F.3d 815 (7th Cir.2008), is not on point, as the court considered on a motion for summary judgment whether the plaintiff introduced evidence to explain or justify his delay in providing a certification. Here, the court is only considering whether Allen has alleged facts to plausibly suggest she made a good faith effort to provide the certification within the required time frame.

18    In addition, although not alleged within the specific count claiming FMLA interference, Allen alleges elsewhere in the Fifth Amended Complaint that Verizon failed to keep Whitman's FMLA certification confidential, in violation of the FMLA. Fifth Am. Compl. ¶ 140. At least one court has interpreted such allegations to be a claim for FMLA interference. *See Mahran v. Benderson Development Co., LLC,* 2011 WL 1467368, at *4 (W.D.N.Y. Apr.18, 2011) (interpreting plaintiff's claim that defendant violated the privacy of the medical information he submitted to secure short-term disability leave as a claim for FMLA interference). In *Mahran,* the court recognized that the confidentiality of medical records submitted when one is applying for leave is one of the rights protected under the FMLA. *Id.* Because a claim for FMLA interference is based on an employer's interference, restraint, or denial of an FMLA right, Allen's claim that Verizon failed to protect the FMLA certification as required under the FMLA may, at this stage, be considered a claim for FMLA interference. *Id.*

19    In her Opposition to Verizon's Motion to Dismiss, Allen claims, for the first time, that Verizon discriminated against her because of her genetic information when she was fired on January 14, 2011. *See* Pl. Mem. in Opp. Verizon's Mot. to Dismiss at 35. Nowhere in the Fifth Amended Complaint does Allen allege that her GINA claim was based on her termination from Verizon. Rather, she explicitly states that Verizon discriminated against her by denying her fringe benefits. Fifth Am. Compl.¶ 223. Therefore, the court will not consider this termination claim.

20    Verizon also argues that nowhere does Allen allege that Verizon even had access to this genetic information, as it was Metlife who viewed Whitman's FMLA certification, not Verizon. *See* Verizon's Mem. in Supp. Mot. to Dismiss at 29.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00761-BKS-ML Document 12 Filed 02/27/23 Page 307 of 331

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.


DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,
1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2.
On August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss— the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

 **2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge

recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint;

(5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* Camardo v. General Motors Hourly–Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* Scipio v. Keane, 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 309 of 331

Brown v. Peters, Not Reported in F.Supp. (1997)

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

Brown v. Peters, Not Reported in F.Supp. (1997)

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.
Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 311 of 331

Brown v. Peters, Not Reported in F.Supp. (1997)

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 312 of 331

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3827742
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Benedict R. GENCO, Plaintiff,

v.

SARGENT & COLLINS LLP, Defendant.

18-CV-0107-LJV-MJR

|

Signed 06/01/2018

|

Filed 06/04/2018

**Attorneys and Law Firms**

Benedict R. Genco, N. Tonawanda, NY, pro se.

Richard G. Collins, Sargent & Collins, LLP, Williamsville, NY, for Defendant.

REPORT AND RECOMMENDATION

HONORABLE MICHAEL J. ROEMER, United States Magistrate Judge

## INTRODUCTION

**\*1** This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo, for hearing and reporting on dispositive motions for consideration by the District Court. Before the Court is defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 3). For the following reasons, it is recommended that defendant's motion to dismiss be granted and the complaint dismissed with prejudice.

## RELEVANT FACTS AND BACKGROUND

Plaintiff Benedict Genco ("plaintiff" or "Genco"), who is proceeding pro se, filed the instant complaint against the law firm of Sargent & Collins, LLP ("Sargent & Collins" or "defendant") on January 22, 2018. (Dkt. No. 1). The allegations in plaintiff's complaint are, in large part, difficult to follow or fully understand. In light of

plaintiff's pro se status, the Court has attempted to discern the causes of action asserted. Plaintiff's claims appear to be premised upon Sargent & Collins' legal representation of his employer, Starpoint Central School District ("Starpoint"), in or around January of 2017. (Id.). Plaintiff contends that, on account of his various disabilities, Starpoint placed him on administrative leave pursuant to Section 72 of the New York State Civil Service Law and forced him to undergo a fitness for duty medical examination. (Id.). He claims that by serving as legal counsel to Starpoint during this time, Sargent & Collins also discriminated and retaliated against him on the basis of his disabilities. [1] (Id.). Plaintiff alleges that Sargent & Collins contacted the doctor who performed the examination, that they engaged in the "unauthorized disclosure" of his medical records, and that they "assisted" Starpoint in placing him on unpaid leave. (Id.). Plaintiff indicates that the nature of his suit against Sargent & Collins is "disability discrimination, retaliation, providing unauthorized medical records and failure to accommodate." Genco's complaint further alleges that: (1) Starpoint failed to accommodate his disability with respect to boiler training; (2) his fitness for duty examination was improper because the doctor who performed the examination was not a physician; [2] and (3) the fitness for duty examination as well as his placement on administrative leave violated the New York State Civil Service Law and the New York State Education Law. (Id.).

**\*2** On February 20, 2018, Sargent & Collins filed the instant motion to dismiss the complaint on the basis that plaintiff fails to assert any viable claims for relief. (Dkt. Nos. 3-5). Plaintiff filed responses in opposition to the motion to dismiss. [3] (Dkt. Nos. 8, 10). The responses allege, for the first time, that Sargent & Collins committed the criminal offense of "offering a false instrument for filing" and that their motion to dismiss his complaint was untimely. Defendant filed a reply in further support of the motion to dismiss on March 29, 2017. (Dkt. No. 9). On April 16, 2018, this Court heard oral argument as to defendant's motion to dismiss. [4]

## DISCUSSION

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim on which relief can be granted. See Fed. R. Civ. P. 12(b)(6). In order to state a claim on which relief can be granted, a complaint must contain, inter alia, "a short and plain statement of the claim

Case 5:22-cv-00761-BKS-ML    Document 12    Filed 02/27/23    Page 314 of 331

Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)

showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). In reviewing a complaint in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all factual allegations and draw all reasonable inferences from those allegations in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Specifically, a complaint must plead "enough facts to state a claim to relief that is plausible on its face", *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must "allow[ ]the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Supreme Court has further instructed that "[d]etermining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Bell Atl. Corp.*, 550 U.S. at 679.

**\*3** Additionally, the court must be mindful when an individual is proceeding *pro se*. "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("[T]he submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."). However, even a *pro se* complaint will be dismissed if it does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face' ." *Ashcroft*, 556 U.S. at 678; *quoting* *Bell Atl. Corp.*, 550 U.S. at 570.

In reviewing Genco's complaint and response to the motion to dismiss, the Court has accepted as true all factual allegations, drawn all inferences in plaintiff's favor, and held plaintiff's *pro se* pleadings to a less stringent standard than those drafted by an attorney. Moreover, the Court has attempted to interpret Genco's lengthy, disjointed and confusing allegations and arguments in a manner consistent with a claim or claims upon which relief may be granted. However, the Court concludes

that plaintiff has not stated a claim for relief that is plausible on its face.

Genco alleges that his placement on administrative leave and the requirement that he undergo a fitness for duty examination amounted to disability discrimination by Starpoint, his employer. He contends that Sargent & Collins also discriminated and retaliated against him based upon his disabilities by providing legal representation to Starpoint at the time these actions were taken. Indeed, plaintiff cannot maintain a cause of action against Sargent & Collins pursuant to the Americans with Disabilities Act ("ADA"). Title I of the ADA prohibits employers from discriminating against a qualified individual with a disability in regard to any aspect of employment. 42 U.S.C. § 12112(a) ("no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees ... and other terms, conditions, and privileges of employment."). Genco admits in his complaint that he is not a current or former employee of Sargent & Collins. Therefore, he cannot sue defendant for disability discrimination pursuant to Title I of the ADA. [5] *See Curry v. Town of Islip*, 13-CV-3597, 2017 U.S. Dist. LEXIS 203382, \*10 (EDNY Dec. 8, 2017) (*sua sponte* recommendation that plaintiff's ADA claim be dismissed because she was not an employee or a former employee of defendant); *Lauria v. Donahue*, 438 F. Supp. 2d 131, 140 (EDNY 2006) (because plaintiff "was neither an employee, nor former employee of the ADA was dismissed."); *Morgenthal v. AT&T*, 97-CIV-6443, 1999 U.S. Dist. LEXIS 4294, at \*4 (S.D.N.Y. 1999) (holding that because the plaintiff was not an employee of the defendant he could not be considered a "qualified individual" under the ADA).

Plaintiff also seems to claim that in providing legal representation to Starpoint and communicating with the doctor who performed the fitness for duty examination, Sargent & Collins "assisted" Starpoint in placing plaintiff on unpaid leave. His complaint further alleges, albeit in a vague and confusing manner, that Starpoint failed to accommodate his disability with respect to a boiler training. However, it is unclear exactly how Sargent & Collins was involved in the alleged failure to accommodate. For the reasons just stated, to the extent that plaintiff is claiming that he suffered adverse employment actions on account of his disabilities during his tenure at Starpoint, his cause of action rests with his employer and not his employer's legal counsel. [6]

**\*4** Further, even if plaintiff were able to bring a claim against Sargent & Collins under the ADA, Genco's conclusory allegations of discrimination fail to explain how benign actions taken by the law firm in course of representing a client, such as writing letters on behalf of their client or facilitating an independent medical examination and communicating the results, are in any way discriminatory or otherwise connected to plaintiff's disabilities. *See* *Iqbal, 556 U.S. at 678* (Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation ... [n]or does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotations omitted); *Reyes v. Fairfield Props., 661 F. Supp.2d 249, 268-269 (EDNY 2009)* (conclusory statements that defendants retaliated and discriminated against plaintiff based upon race "do not establish plausibility on [their] face and are insufficient to satisfy even the liberal pleading standards under *Rule 8(a)* and *Iqbal*.").

Genco's allegations that Sargent & Collins was involved in the "unauthorized disclosure" of his medical information also fail to state a claim under federal law. Even if the Court were to construe these vague allegations as a claim under the Health Insurance Portability and Accountability Act ("HIPAA"), no such cause of action exists here. Sargent & Collins is not a health care provider and HIPAA does not provide private rights of action to individuals. *See Mathie v. Lawrence Womack*, 14-CV-6577, 2015 U.S. Dist. LEXIS 11266 (EDNY Jan. 29, 2015) (there is no private right of action under HIPAA and HIPAA enforcement actions are "in the exclusive purview of the Department of Health and Human Services"); *Hunt v. Conry, Simberg, Gannon, Drevans, Abel, Lurvey, Morrow & Schefer, P.A.*, 13-CV-1493, 2013 U.S. Dist. LEXIS 187052 (NDNY Dec. 11, 2013) (dismissing plaintiff's claim that law firm defendant disclosed medical information about plaintiff during the law suit because "the law firm is certainly not a health care provider, and plaintiff has no private right of action under HIPAA.").

Finally, to the extent plaintiff is attempting to assert causes of action based upon allegations that Sargent & Collins filed an untimely motion to dismiss or offered "a false instrument for filing", his claims lack even an arguable basis in law or fact. Offering a false instrument for filing is a violation of Section 175.35 of the New York State Penal Law, for which there is no private right of action. Furthermore, the record is bereft of evidence that defendant filed any document containing false or fraudulent information. Likewise, no cause of action exists for the untimely filing of a motion to dismiss a complaint nor is the instant motion to dismiss untimely. Genco served the summons and complaint on defendant on January 30, 2018. (Dkt. No. 2). Rule 12 of the Federal Rules of Civil Procedure indicates that a party has twenty-one days to answer or move to dismiss a complaint. *See* Fed. R. Civ. P 12(a). Rule 5 of the Federal Rules of Civil Procedure provides that service is "complete upon mailing." *See* Fed. R. Civ. P. 5(b)(2)(C). Defendant filed the motion and mailed a copy to plaintiff on February 20, 2018, which is twenty-one days after the motion to dismiss was served.

For these reasons, the Court finds that plaintiff has not alleged a claim for relief that is plausible on its face and recommends that the complaint be dismissed. The Court now turns to whether the complaint should be dismissed with or without prejudice. The Second Circuit has advised that "[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013)* (internal citations omitted). However, leave to replead may be denied where it is apparent that no amendments would cure the deficiencies of the pleading and an attempt to replead would be futile. *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). *See also* *Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir. 1999)* ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Here, the Court cannot identify any allegations in plaintiff's complaint that, even if properly pled, would constitute a viable claim under the law. The deficiencies are substantive in nature and cannot be remedied by amendment or repleading. Therefore, it is recommended that plaintiff's complaint against Sargent & Collins be dismissed with prejudice.

## CONCLUSION

Case 5:22-cv-00761-BKS-ML   Document 12   Filed 02/27/23   Page 316 of 331

Genco v. Sargent & Collins LLP, Not Reported in Fed. Supp. (2018)

**\*5**  For the foregoing reasons, it is recommended that Sargent & Collins, LLP's motion to dismiss the complaint be granted and the complaint dismissed with prejudice. (Dkt. No. 3).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. See* Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." Failure to comply with these provisions may result in the District Court's refusal to consider the objection.*

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3827742

---

## Footnotes

1      Genco has filed a separate suit in this Court against Starpoint alleging employment discrimination, retaliation and failure to accommodate in violation of the Americans with Disabilities Act. (*See Genco v. Starpoint Central School District*, Case No. 1:17-CV-01168). Starpoint moved to dismiss plaintiff's *pro se* complaint. Today, the Court issued a Report recommending that Starpoint's motion to dismiss plaintiff's complaint be denied. (Case No. 1:17-CV-01168, Dkt. No. 26). Plaintiff further filed suit, also on a *pro se* basis, against the law firm of Webster Szanyi LLP. (*See Genco v. Webster Szanyi, LLP*, Case No. 1:18-CV-00093). Webster Szanyi, who is representing Starpoint in the course of plaintiff's employment discrimination lawsuit, moved to dismiss the complaint. Today, this Court issued a Report recommending that the complaint against Webster Szanyi be dismissed with prejudice. (*Id.* at Dkt. No. 18). It is also noted that plaintiff filed a previous employment discrimination lawsuit against Starpoint, in this Court, in March of 2013. In February of 2015, the Honorable William M. Skretny granted summary judgment in favor of Starpoint. *See Genco v. Starpoint Central School District*, 1:13-CV-301, 2015 WL 540217 (WDNY Feb. 10, 2015).

2      The complaint states that Michael P. Santa Maria, Ph.D. performed plaintiff's medical examination. (Dkt. No. 1). Defendant's response papers indicate that Dr. Santa Maria is a board-certified neuropsychologist and that he performed a neuropsychological evaluation and independent medical examination of plaintiff. (Dkt. No. 5).

3      The allegations and arguments in plaintiff's responses, like those in his complaint, lack clarity or coherence. His disjointed narrative sets forth a litany of grievances against Starpoint, Sargent & Collins, and Dr. Santa Maria. He attaches various documents including letters from Sargent & Collins and Starpoint relative to his leave and fitness for duty examination, Dr. Santa Maria's report from his neuropsychological evaluation

and independent medical examination, a "transcript" of the medical examination that plaintiff transcribed himself, HIPAA releases provided to Dr. Santa Maria, plaintiff's individualized education plan from when he was enrolled in the Starpoint School District, internet research regarding Dr. Santa Maria's practice and areas of specialty, a decision in a prior federal lawsuit filed by plaintiff against Starpoint, and information regarding the elements of the crime of filing a false instrument. As best the Court can ascertain, plaintiff's chief complaint against defendant is that by providing legal representation to Starpoint when plaintiff was placed on administrative leave, Sargent & Collins discriminated against him.

4   Also at that time, this Court heard oral argument as to the motion to dismiss and a request for a filing injunction on behalf of Starpoint in *Genco v. Starpoint Central School District*, and oral argument as to the motion to dismiss in *Genco v. Webster Szanyi LLP*.

5   Likewise, the facts of this lawsuit have nothing to do with the other four titles of the ADA, which prohibit disability discrimination in: (1) access to public services, programs and activities provided by public entities (Title II); (2) access to public accommodations, such as hotels and theaters, provided by private entities (Title III); and (3) telecommunications (Title IV). *See* 42 U.S.C. §§ 12101-12213.

6   Similarly, plaintiff has failed to establish any viable claim for relief against Sargent & Collins based upon his allegations that the doctor who performed the fitness for duty examination was not a physician and that the examination was not performed in accordance with the New York State Civil Service Law or New York State Education Law. Plaintiff acknowledges in his complaint that Starpoint, his employer, placed him on administrative leave and sent him for a medical examination. No cause of action exists against Sargent & Collins for their role in facilitating the medical examination or communicating Starpoint's position to plaintiff or others. *See Hills v. Praxair, Inc.*, 11-CV-678, 2012 U.S. Dist. LEXIS 74125 (WDNY May 29, 2012) (dismissing plaintiff's complaint against the attorneys who represented his employer in defense of plaintiff's EEOC charge because, *inter alia*, statements made in quasi-judicial proceedings, such as arguments submitted in response in an EEOC charge or while representing a client at a hearing, are protected by absolute privilege).

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   5

2021 WL 6050305
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph GUARNERI, Plaintiff,

v.

SCHOHARIE COUNTY DEPARTMENT OF
SOCIAL SERVICE; Commissioner Donna Becker;
Acting Commissioner Jullie Sammon; Worker
Melissa Goodearu; Worker Kaylthin Russel;
Office of Temporary and Disability Assistance;
Case Worker Leann Bradt, of Rehabilitation
Support; and Governor Cuomo, Defendants.

1:21-CV-0991 (TJM/ML)
|
Signed 12/21/2021

**Attorneys and Law Firms**

JOSEPH GUARNERI, Plaintiff, Pro Se, 354 Edison Street, Schenectady, New York 12300.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* Complaint (Dkt. No. 1) together with an application to proceed *in forma pauperis* (Dkt. No. 3) filed by Joseph Guarneri ("Plaintiff") to the Court for review. For the reasons discussed below, I grant Plaintiff's *in forma pauperis* application (Dkt. No. 3), and I recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed in its entirety (1) in part with leave to amend, and (2) in part without leave to amend.

### I. BACKGROUND

Liberally construed, [1] Plaintiff's Complaint asserts that his civil rights were violated by Defendants Schoharie County Department of Social Service, Commissioner Donna Becker, Acting Commissioner Jullie Sammon, Worker Melissa Goodearu, Worker Kaylthin Russel, Office of Temporary and Disability Assistance, Case Worker Leann Bradt of Rehabilitation Support, and Governor Cuomo (collectively "Defendants"). (*See generally* Dkt. No. 1.)

Plaintiff alleges that at some point in time, he underwent a coronary angiograph and was cared for by Bassett Healthcare in Cooperstown. (*Id.*) Plaintiff alleges that he was discharged from Bassett Healthcare on April 29, 2019, with instructions that he take all medications with foods. (*Id.*) Plaintiff alleges that on May 8, 2019, the medical instructions—that he take all medications with food—was shown to Defendant Goodearu. (*Id.*) The Complaint alleges that at some point in time, Defendant Goodearu threatened and coerced Plaintiff to prevent him from taking life threatening medication with food. (*Id.*)

Plaintiff alleges that he is a diabetic and, as such, requires a diet that includes carbohydrates and a snack at night. (*Id.*) Plaintiff alleges that on August 9, 2021, without any advance notice, Defendants stopped his Supplemental Nutrition Assistance Program ("SNAP") benefits. (*Id.*) Plaintiff alleges that his SNAP benefits were reduced from $194.00 per month, to $114.00 per month, to $189.00 per month. (*Id.*) Plaintiff alleges that his benefits were reduced intentionally to kill him. (*Id.*) In addition, Plaintiff alleges that Defendants "use" a homeless shelter that has been "called out by the state for poor" health and safety conditions. (*Id.*) Plaintiff alleges that Defendants "sent" him to "Riverside Motel with no medication or food." (*Id.*)

Plaintiff alleges that—on an unspecified date—he agreed, in writing, to repay Defendants $7,830.00—for an unspecified debt. (*Id.*) Plaintiff alleges that he paid Defendants $7,090.00, which, according to Plaintiff, was an overpayment. (*Id.*) Plaintiff alleges that he and Social Security were not informed by Defendants that Defendants "stole" the money and Plaintiff will not recover the money that he overpaid. (*Id.*)

Plaintiff alleges that he filed an action in Schoharie County Supreme Court against Defendant Sammon, which is still pending. (*Id.*)

Based upon the foregoing allegations, the Complaint appears to assert the following three claims: (1) a claim that Defendants violated Plaintiff's civil rights pursuant to 42 U.S.C. § 1983, (2) a claim that Defendants violated Plaintiff's rights under the Americans with Disabilities Act ("ADA"), and (3) a claim pursuant to New York state law of negligence. (*See generally* Dkt. No. 1.) Plaintiff requests a jury trial and seeks $500,000.00 in damages. (*Id.* at 4.)

**\*2** Plaintiff also filed an application for leave to proceed *in forma pauperis*. (Dkt. No. 3.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 3), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [3]

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation

omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**\*3** Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having

reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

## A. Claims Pursuant to 42 U.S.C. § 1983

"To state a valid claim under § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). Thus, § 1983 does not create any independent substantive right, but rather "provides a civil claim for damages" to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

The Complaint fails to allege a deprivation of federal rights established elsewhere. (*See generally* Dkt. No. 1.) Instead, the Complaint states that it is brought pursuant to 42 U.S.C. § 1983 and that the Court has jurisdiction pursuant to 28 U.S.C. § 1331. (Dkt. No. 1 at 1.) The only other federal statute mentioned is the ADA, which provides an independent cause of action separate from § 1983.

In addition, and in the alternative, the Complaint is replete with allegations that shock but fails to allege actions attributable to state actors. State action is an essential element of any section 1983 claim. *Gentile v. Republic Tobacco Co.*, 95-CV-1500, 1995 WL 743719, at *2 (N.D.N.Y. Dec. 6, 1995) (Pooler, J.) (citing *Velaire v. City of Schenectady*, 862 F. Supp. 774, 776 (N.D.N.Y. 1994) (McAvoy, J.)). To survive scrutiny under section 1915(e) where a plaintiff has asserted a section 1983 claim, the complaint must allege facts that plausibly suggest state action on the part of the named defendants. *See DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 311 (2d Cir. 1975), *modified on other grounds by DeMatteis v. Eastman Kodak Co.*, 520 F.2d 409 (2d Cir. 1975), ("A private party violates [ section] 1983 only to the extent its conduct involves state action."); *see also Wilson v. King*, No. 08-CV-0509, 2008 WL 2096593, at *1 (N.D.N.Y. May 16, 2008) (Sharpe, J.).

### 1. Claims Against Defendants Office of Temporary and Disability Assistance and Governor Cuomo in his Official Capacity

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity." *Brokamp v. James*, 21-CV-0389, 2021 WL 5444277, at *6 (N.D.N.Y. Nov. 22, 2021) (Hurd, J.) (citing *Brown v. New York*, 975 F. Supp. 2d 209, 221 (N.D.N.Y. 2013) (D'Agostino, J.)).

"New York has not waived its sovereign immunity for 42 U.S.C. § 1983 claims." *Brokamp*, 2021 WL 5444277, at *6 (citing *Jones v. N.Y. Div. of Military and Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999)). "Moreover, it is well-settled that states and their officials acting in their official capacities are not 'persons' under § 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute." *Id.* (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

I recommend that, to the extent Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 against Defendant Office of Temporary and Disability Assistance, that claim be dismissed because it seeks monetary relief against a defendant that is immune from such relief. 42 U.S.C. § 1915(e)(2)(B)(iii); *see Clark v. United States*, 16-CV-0740, 2016 WL 10570930, at *8 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) (recommending dismissal with prejudice, claims under § 1983 against the defendant New York State Office of Temporary and Disability Assistance pursuant to the Eleventh Amendment bar that extends to agencies), *report and recommendation adopted by* 2016 WL 6610734 (N.D.N.Y. Nov. 9, 2016) (Sannes, J.); *Roosevelt Council v. New York*, 08-CV-1158, 2008 WL 5243887, at *2 (N.D.N.Y. Dec. 15, 2008) (Kahn, J.) ("The law is well established that under the Eleventh Amendment to the United States Constitution, both

the State of New York and its subdivisions are immune from [🚩 § 1983] suits such as this.").

In addition, damages against state officials in their official capacities are essentially actions against the state and will be barred by the Eleventh Amendment unless (1) Congress has abrogated immunity; (2) the state has consented to suit; or (3) the *Ex parte Young* doctrine applies. 🚩 *Ex parte Young*, 209 U.S. 123 (1908); 🚩 *Will*, 491 U.S. at 71; *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). The Eleventh Amendment bars actions against state officials sued in their official capacities where, as here, the state is a real party in interest. *See* 🚩⚠ *Edelman v. Jordan*, 415 U.S. 651, 663, 669 (1974) (holding that suits against state employees in their official capacities are barred by the Eleventh Amendment); 🚩 *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (rejecting federal suit against state officials under the Eleventh Amendment); 🚩 *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) ("The [E]leventh [A]mendment also bars suits against state officials and state agencies if the state is the real party in interest"); *Muhammad v. Rabinowitz*, 11-CV-2428, 🚩 2012 WL 1155098, at *6 (S.D.N.Y. Apr. 6, 2012) (dismissing claims for damages against state employees in their official capacity as being barred by the Eleventh Amendment); *Crockett v. Pataki*, 97-CV-3539, 1998 WL 614134, at *5 (S.D.N.Y. Sept. 14, 1998) (dismissing claims against governor and housing commissioner sued in their official capacities); 🚩 *Sassower v. Mangano*, 927 F. Supp. 113, 121 (S.D.N.Y. 1996) (dismissing claims for damages against state officials sued in their official capacities).

**\*5** Where claims are brought against an official in their official capacity, the state is considered the real party in interest, and therefore the same sovereign immunity principles apply as if the claim was brought directly against the state. *Spiteri v. Russo*, 12-CV-2780, 🚩 2013 WL 4806960, at *16 (E.D.N.Y. Sept. 7, 2013), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015); *see KM Enter., Inc. v. McDonald*, 518 F. App'x 12, 13-14 (2d Cir. 2013) (finding that a suit against a state agent in her official capacity effectively rendered the suit against the State of New York and was thus covered under sovereign immunity); 🚩 *Gollomp v. Spitzer*, 568 F.3d 355, 369 (2d Cir. 2009) ("Eleventh Amendment sovereign immunity 'is not a mercurial area of law, but has been definitively settled by the Supreme Court since 1890 with respect to actions against the state itself, and 1945 with respect to actions against state agencies or state officials named in their official capacity.' " (quotation marks omitted)); 🚩⚠ *Huminski v. Corsones*, 386 F.3d 116, 133 (2d Cir. 2004) ("[S]tate officials cannot be sued in their official capacities for retrospective relief under [§] 1983."); *Anghel v. N.Y. Dep't of Health*, 12-CV-3484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) (quoting 🚩 *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993)) ("A suit for damages against a state official in his or her official capacity 'is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.' "), *aff'd*, 589 F. App'x 28 (2d Cir. 2015); *Pietri v. New York Office Of Court Admin.*, 936 F. Supp. 2d 120, 128 (E.D.N.Y. 2013) ("The Eleventh Amendment also bars suits against state officials in their official capacities for money damages.").

Here, Plaintiff seeks solely monetary damages against Defendants. (*See generally* Dkt. No. 1.) As a result, I recommend that Plaintiff's claim pursuant to 🚩 42 U.S.C. § 1983 against Defendant Cuomo in his official capacity be dismissed as barred by the Eleventh Amendment.

### 2. Claims Against Defendant Goodearu

The only allegation in the Complaint that relates to Defendant Goodearu is that she coerced and threatened Plaintiff, which resulted in him taking life threatening medication without food and that this occurred in the presence of Schoharie County Sheriff Deputy Woods and a person named Ashley. (Dkt. No. 1 at 2.) Although the Complaint alleges that all Defendants are sued in their individual and official capacities, it is not clear what, if any, position Defendant Goodearu holds. Further, to the extent that Defendant Goodearu is employed by a state or municipal entity, the Complaint fails to allege facts plausibly suggesting that her actions coercing and threatening Plaintiff, which resulted in him taking life threatening medication without food, occurred in the context of her employment. [4]

As a result, I recommend that Plaintiff's claims against Defendant Goodearu pursuant to 🚩 42 U.S.C. § 1983, be dismissed for failure to state a claim.

### 3. Claims Against Defendants Becker, Sammon, Russel, Bradt, and Cuomo in their Individual Capacities

To the extent that Plaintiff attempts to assert claims pursuant to 42 U.S.C. § 1983, the factual allegations in the Complaint do not plausibly suggest that Defendants Becker, Sammon, Russel, Bradt, and Cuomo were personally involved in Plaintiff's alleged injuries.

The failure "to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint 'fatally defective on its face.' " *Linares v. Annucci*, 19-CV-11120, 2021 WL 2689736, at *6 (S.D.N.Y. June 30, 2021) (quoting *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987)).

**\*6** Plaintiff's only allegation regarding Defendant Becker is that he mailed a letter addressed to her on November 23, 2020, in which, Plaintiff told her to fix the issues he was having with his monthly SNAP benefits. (Dkt. No. 1 at 3.) This conclusory and vague allegation fails to allege facts plausibly suggesting Defendant Becker's involvement with a violation of Plaintiff's federal rights.

In addition, aside from the caption and list of Defendants, the body of the Complaint does not mention Defendants Sammon, Russel, Bradt, or Cuomo. *See Crichlow v. Annucci*, 18-CV-3222, 2021 WL 5234522, at *2 (S.D.N.Y. Nov. 10, 2021) (dismissing for failure to state a claim upon which relief may be granted those claims against defendants who were identified in the caption of the third amended complaint but, "the Court [wa]s unable to find reference to them anywhere else in the pleading."); *Joseph v. Annucci*, 18-CV-7197, 2020 WL 409744, at *4 (S.D.N.Y. Jan. 23, 2020) (dismissing claims against defendants that were "named in the caption only" where "[t]he body of the Complaint does not contain any factual allegations naming them, or indicating that they violated the law or injured Plaintiff in some manner."); *Manley v. Ramos*, 13-CV-2662, 2014 WL 1496094, at *2 (S.D.N.Y. Apr. 16, 2014) (dismissing claims where the plaintiff "name[d police officers] as defendants in the caption, but ... never mention[ed] them again in the body of the complaint."); *Ortiz v. Bloomberg*, 10-CV-9434, 2011 WL 4822829, at *3 (S.D.N.Y. Oct. 7, 2011) (dismissing claims where "the only named reference to [certain correctional officers was] in the caption of the Complaint, and the only additional references to these defendants [were] merely

conclusory statements about their personal involvement and liability."); *Purdie v. Mahoney*, 05-CV-0705, 2005 WL 3050969, at *1 (N.D.N.Y. Nov. 14, 2005) (Mordue, J.) ("Plaintiff is obligated to set forth allegations of personal involvement by each named defendant in his complaint, and may not meet this obligation with conclusory allegations. Thus, plaintiff is advised that if he seeks to sue individuals who allegedly violated his rights, he must name them in the caption of his complaint *and* set forth specific allegations of wrongdoing as to each individual in the body of his complaint.")

As a result, I recommend that Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants Becker, Sammon, Russel, Bradt, and Cuomo in their individual capacities be dismissed for failure to state a claim.

### 4. Claims Against Defendant Schoharie County Department of Social Services and Defendants Becker, Sammon, Russel, and Bradt in Their Official Capacities

A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

**\*7** Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train

the municipality's employees. *Connick*, 563 U.S. at 51. However, municipal liability is most tenuous when a claim turns on the failure to train. *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")). To satisfy the statute, a municipality's failure to train its employees must amount to " 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

There is no basis for municipal liability alleged in the Complaint. Plaintiff essentially that Defendants (1) use a homeless shelter that has poor health and safety conditions, (2) disbursed his SNAP benefits in incorrect amounts, and (3) over payment [5] of a debt that Plaintiff agreed to. (*See generally* Dkt. No. 1.) Plaintiff does not allege that he has been required to use the homeless shelter and instead alleges that he has been "sent" to Riverside Motel. (Dkt. No. 1 at 3.) In New York State, the Office of Temporary and Disability Assistance oversees the local administration of the SNAP program; as set forth above in Part IV.A.1. of this Order and Report-Recommendation, that agency is an arm of the state and thus, entitled to immunity pursuant to the Eleventh Amendment. Further, Plaintiff fails to allege which, of any, of Defendants were involved in the alleged overpayment of his debt. (*See generally* Dkt. No. 1.)

There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with Defendants.

As a result, I recommend that Plaintiff's claims against Defendant Schoharie County be dismissed at this time. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted by*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.).

Further, to the extent that Plaintiff asserts claims against Defendants Becker, Sammon, Russel, and Bradt in their

official capacities pursuant to 42 U.S.C. § 1983, as employees of Schoharie County Department of Social Services—or some other municipal entity—I recommend that those claims be dismissed. "Claims against a government employee in his official capacity [is] treated as a claim against the municipality." *Malay v. City of Syracuse*, 638 F. Supp. 2d 203, 311 (N.D.N.Y. 2009) (McCurn, J.). For the reasons stated above, Plaintiff has failed to allege facts plausibly suggest a cause of action against Defendant Schoharie County (or any other municipal entity). As a result, the claims against Defendants Becker, Sammon, Russel, and Bradt in their official capacities pursuant to 42 U.S.C. § 1983, should be dismissed for failure to state a claim upon which relief may be granted.

### B. Claims Pursuant to the ADA

**\*8** Plaintiff refers to the ADA as a basis for recovery. (Dkt. No. 1.) To the extent that Plaintiff intended to assert claims pursuant to the ADA, I recommend that those claims be dismissed for failure to state a claim upon which relief may be granted.

Although the Complaint is sparse and largely incomprehensible, it states that Plaintiff has diabetes and undergone a "coronary angiograph" which left him with four stents. (*Id.* at 3.) The Complaint provides no allegations of discrimination based on his disability. (*See generally* Dkt. 1.) However, construing the Complaint liberally, as the Court must, Plaintiff failed to allege facts plausibly suggesting claims pursuant to Title II or Title III of the ADA. [6]

### 1. Title II of the ADA

**\*9** Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84-85 (2d Cir. 2004), *corrected*, 511 F.3d 238 (2d Cir. 2004)). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To plead a violation of Title II of the ADA, a plaintiff must allege "(1) that [he] is a qualified individual with a disability; (2) that [he] was excluded

from participation in a public entity's services, programs, or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [his] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)) (internal quotation marks omitted). A "qualified individual" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). A qualified individual can base a discrimination claim on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

Here, the Compliant is devoid of factual allegations plausibly suggesting that Plaintiff was unable to access programs due to his disability, how his disability prevented him from accessing those programs, or what accommodations he sought and was denied by Defendants. (*See generally* Dkt. 1.)

Moreover, "[w]hen a private individual seeks damages under Title II of the ADA, the Second Circuit requires the plaintiff to 'establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability.' " *Day v. Warren*, 06-CV-0155, 2008 WL 474261, at *4 (D. Conn. Feb. 7, 2008) (quoting *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 111 (2d Cir. 2001)). The Complaint fails to allege facts plausibly suggesting discriminatory animus or ill will towards Plaintiff's alleged disability or disabilities. (*See generally* Dkt. No. 1.)

As a result, I recommend that Plaintiff's ADA claims under Title II be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted. *See Hill v. LaClair*, 20-CV-0441, 2020 WL 2404771, at *8 (N.D.N.Y. May 11, 2020) (Hurd, J.) (dismissing ADA Title II claims "pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted."). [7]

## 2. Title III of the ADA

**\*10** Title III of the ADA prevents discrimination based on a disability in places of public accommodation. 42 U.S.C. § 12182. However, Title III "expressly does not apply to public entities, including local governments." *Bloom v. Bexar Cnty.*, 130 F.3d 722, 726 (5th Cir. 1997); *see Morales v. New York*, 22 F. Supp. 3d 256, 266-67 (S.D.N.Y. 2014) ("Title III is not applicable to public entities."). Instead, "[a] claim under Title III of the [ADA] can only be asserted against a private entity engaged in the provision of public accommodations, such as an inn, hotel or private school." *Morales*, 22 F. Supp. 3d at 266 (citing 42 U.S.C. §§ 12181(7); 12182); *see also Booker v. City of New York*, 17-CV-7035, 2018 WL 4616048, at *5, n.3 (S.D.N.Y. Sept. 26, 2018) (holding that a claim pursuant to Title III of the ADA cannot be asserted against the City of New York or its employees in their official capacities because they are not private entities engaged in the provision of public accommodations).

Here, Defendants Schoharie County Department of Social Service and Office of Temporary and Disability Assistance are public entities, which are thus, not amenable to a Title III ADA claim. *See Maioriello v. New York State Office for People with Dev. Disabilities*, 14-CV-0214, 2015 WL 5749879, at *16 (N.D.N.Y. Sept. 30, 2015) (Suddaby, C.J.) (dismissing the plaintiff's claims to the extent that they were based on a violation of Title III because the New York State Office for People with Developmental Disabilities is a public entity). [8]

Further, to the extent that Plaintiff intended to assert a Title III claim against Defendants Becker, Sammon, Goodearu, Russel, Bradt, and Cuomo in their individual capacities, Title III provides a private right of action for injunctive relief but no right of action for monetary relief. 42 U.S.C. § 12188;

*see Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages.");

*Powell*, 364 F.3d at 86 ("Monetary relief ... is not available to private individuals under Title III of the ADA."); *see also Ervine v. Deser View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) ("Damages are not an available remedy to individuals under Title III of the ADA; individuals may receive only injunctive relief."). As a result, those claims should also be dismissed because Plaintiff seeks solely monetary damages.

**\*11** In addition, "Title[ ] ... III of the ADA prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations."

*Powell*, 364 F.3d at 85, opinion corrected, 511 F.3d 238 (2d Cir. 2004) (citations omitted). To adequately plead a claim pursuant to Title III of the ADA for failure to provide reasonable accommodations, a plaintiff must allege facts establishing that the defendant's "failure to make 'reasonable modifications' to their policies, practices, and procedures deprived plaintiff the ability to access the 'goods, services, facilities, privileges, advantages, or accommodations' available to those lacking [the] plaintiff's disabilities." *Andersen v. N. Shore Long Island Jewish Healthcare Sys. Zucker Hillside Hosp.*, 12-CV-1049, 2013 WL 784391, at \*9 (E.D.N.Y. Jan. 23, 2013) (quoting 42 U.S.C. 12182(b)(2)(A)(i)-(ii) (additional citation omitted)), *report and recommendation adopted* as modified, 2013 WL 784344 (E.D.N.Y. Mar. 1, 2013).

Here, the Complaint is devoid of factual allegations concerning "policies, practices, [or] procedures" by Defendants that deprived Plaintiff of ability to access goods, services, or privileges available to those without Plaintiff's disabilities. *Doe v. NYSARC Tr. Serv., Inc.*, 20-CV-0801, 2020 WL 5757478, at \*8 (N.D.N.Y. Sept. 28, 2020) (Hummel, M.J.), *report and recommendation adopted by*, 2020 WL 7040982 (N.D.N.Y. Dec. 1, 2020) (Sannes, J.).

As a result, I recommend that, to the extent that Plaintiff intended to assert claims pursuant to Title III of the ADA, those claims be dismissed for failure to state a claim upon which relief may be granted.

## C. New York State Common Law Negligence Claim

In the event that Plaintiff's federal claims—to the extent that he alleged any—are dismissed, I recommend that the Court decline to exercise supplemental jurisdiction over any state law claims. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction.").

In the alternative, I recommend that Plaintiff's negligence claim be dismissed for failure to state a claim. "In order to prevail on a negligence claim, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.' "

*Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (N.Y. 2016) (quoting *Soloman v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985)).

The Complaint fails to allege facts plausibly suggesting that Defendants owed a duty to Plaintiff, a breach of that duty, or an injury resulting from that breach. (*See generally* Dkt. No. 1.) As a result, in the alternative, I recommend that Plaintiff's negligence claim be dismissed for failure to state a claim upon which relief may be granted.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."

*Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993);

*accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[9]

**\*12** With respect to Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that the claims against Defendants Office of Temporary and Disability Assistance and Cuomo in his official capacity, be dismissed with prejudice and without leave to amend because they are immune from suit. *See Forjone*, 414 F. Supp. 3d at 303-04 (dismissing with prejudice the plaintiff's claims against the state and federal defendants based on the doctrine of sovereign immunity because "[p]ermitting amendment would be unproductive in this instance.").

However, I am unable to conclude with complete certainty that if permitted leave to amend his Complaint, Plaintiff could not assert a plausible claims pursuant to (1) 42 U.S.C. § 1983 against Defendants Schoharie County, Becker, Sammon, Goodearu, Russel, and Bradt, (2) 42 U.S.C. § 1983 against Defendant Cuomo in his individual capacity, (3) the ADA, and (4) New York state common law negligence. Accordingly, I recommend that leave to amend be granted with respect to those claims.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any named Defendant in the constitutional deprivations alleged in sufficient detail to establish that it was tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or

document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 3) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's claims pursuant to (1) 42 U.S.C. § 1983 against Defendants Schoharie County, Becker, Sammon, Goodearu, Russel, and Bradt, (2) 42 U.S.C. § 1983 against Defendant Cuomo in his individual capacity, (3) the ADA, and (4) New York state common law negligence, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants Office of Temporary and Disability Assistance and Cuomo in his official capacity, because those claims seek monetary relief against Defendants who are immune from such relief pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**\*13 ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2021 WL 6050305

## Footnotes

1   The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2   The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3   Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

4   The Court also notes that under the caption, the Complaint appears to include numbered paragraphs listing Plaintiff and his current address and Defendants with their addresses. (Dkt. No. 1 at 1-2.) In paragraph number 2, the Complaint names Defendant Becker but omits an address for her. (*Id.* at 1.) The Complaint then appears to jump to paragraph number 4, where it names Defendant Goodearu. (*Id.*) This apparent omission of paragraph number three and an address for Defendant Becker further compounds the ambiguity surrounding what, if any, position Defendant Goodearu holds and whether she was acting in her capacity as a state actor at the time of her alleged improper conduct.

5   The Complaint alleges that on October 13, 2020, Defendants were re-paid $7,830.00, which Plaintiff agreed to. (Dkt. No. 1 at 3.) The Complaint further alleges that Defendants were paid $7,090.00, which was an "overpayment." (*Id.*) These allegations are far from clear and the Court takes judicial notice of the fact that $7,090.00 is, in fact, less than $7,830.00, which Plaintiff acknowledges that he agreed—in writing—to paying.

6   Based on the facts alleged, Plaintiff could not proceed with a claim under Title I of the ADA, which addresses employment discrimination, because he has neither alleged that he was employed by Defendants, nor alleged that he exhausted administrative remedies by filing a charge with the Equal Employment Opportunity Commission before pursuing litigation in federal court. 42 U.S.C. § 12117; *see Mary Jo C. v. New York State Local Retirement Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, n.1 (2001)) (" 'Title I of the ADA expressly deals with th[e] subject' of employment discrimination."). Moreover, Title IV of the ADA does not appear to be applicable to Plaintiff's claims because Title IV prohibits disability discrimination in telecommunications. *Genco v. Sargent & Collins LLP*, 18-CV-0107, 2018 WL 3827742, at *3, n.5 (W.D.N.Y. June 4, 2018). Finally, Title V of the ADA, sometimes referred to as the "retaliation provision," also does not appear applicable because Plaintiff does not allege that he engaged in activity protected by the ADA, that Defendants were aware of that activity, or any causal connection between the allegedly adverse actions that Defendant took against him and the protected activity. *Chiesa v. New York State Dep't of Labor*, 638 F. Supp. 2d 316, 323 (N.D.N.Y. 2009) (Hurd, J.); *see*

*also Constantine v. Merola*, 2020 WL 8450544, at *5 (N.D.N.Y. Nov. 6, 2020) (Lovric, M.J.) (recommending dismissal of the plaintiff's ADA Title V claims where the complaint failed to allege that the plaintiff "engaged in any protected activity, that any [d]efendant knew that [p]laintiff was involved in the protected activity, or that any adverse decision or course of action taken by [d]efendants was causally connected to that protected activity."), *report and recommendation adopted by* 2021 WL 392487 (N.D.N.Y. Feb. 4, 2021) (Hurd, J.).

The Court also notes that, "[i]t is firmly established that Titles I and V of the ADA do not abrogate states' sovereign immunity." *Penird v. Better*, 19-CV-1146, 2021 WL 3077853, at *4 (N.D.N.Y. July 21, 2021) (D'Agostino, J.) (citing *Rosenfield v. New York State Div. of Veterans' Affairs*, 18-CV-1299, 2019 WL 4621962, at *8 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.); *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 536 (S.D.N.Y. 2014)). "Further, New York State has not waived its sovereign immunity under Titles I or V of the ADA." *Penird*, 2021 WL 3077853, at *4 (citing *Quadir*, 39 F. Supp. 3d at 537). As a result, in the alternative, I recommend that, to the extent Plaintiff asserted claims pursuant to Title I or V of the ADA against Defendant Office of Temporary and Disability Assistance and Cuomo in his official capacity, those claims be dismissed because those Defendants are immune from suit pursuant to the Eleventh Amendment.

7    In the alternative, to the extent that Plaintiff attempts to assert ADA Title II claims against Defendants Becker, Sammon, Goodearu, Russel, Bradt, and Cuomo in their individual capacities, I recommend that those claims be dismissed because "individuals cannot be held liable under the ADA." *Netti v. Ayers*, 17-CV-0976, 2017 WL 7542494, at *18 (N.D.N.Y. Oct. 5, 2017) (Baxter, M.J.) (citing *Baross v. Greenlawn*, 16-CV-4805, 2017 WL 2124424, at *4 (E.D.N.Y. May 15, 2017)), *report and recommendation adopted by* 2018 WL 813509 (N.D.N.Y. Feb. 9, 2018) (Suddaby, C.J.); *accord Rosenfield v. New York State Div. of Veterans' Affairs*, 18-CV-1299, 2019 WL 4621962, at *10 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.); *see* ⚑ *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law*, 96-CV-6935, 🛆 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA.").

8    To the extent that Plaintiff intended to assert Title III claims against Defendants Becker, Sammon, Goodearu, Russel, Bradt, and Cuomo in their official capacities as government employees, I recommend that those claims be dismissed. As an initial matter, as set forth above in Part IV.A.2. of this Order and Report-Recommendation, the Complaint fails to allege facts plausibly suggesting the position, if any, that Defendant Goodearu holds. To the extent that Defendant Goodearu holds a position with a private entity, the Complaint fails to allege facts plausibly suggesting that the private entity is engaged in the provision of public accommodations. (*See generally* Dkt. No. 1.) Moreover, to the extent that Defendants Becker, Sammon, Goodearu, Russel, Bradt, and Cuomo are government employees, a claim against them in their official capacities pursuant to Title III of the ADA would be treated as a claim against the municipality or government agency, which cannot be sustained. *See Malay v. City of Syracuse*, 638 F. Supp. 2d 203, 311 (N.D.N.Y. 2009) (McCurn, J.) (dismissing as duplicative claims against defendants in their "official capacity" because "claims against a government employee in his official capacity are treated as a claim against the municipality.")

9    *See also* ⚑ *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in ⚑ *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after ⚑ *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

10    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1472562
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph GUARNERI, Plaintiff,

v.

SCHOHARIE COUNTY DEPARTMENT OF
SOCIAL SERVICE; Commissioner Donna Becker;
Acting Commissioner Jullie Sammon; Worker
Melissa Goodearu; Worker Kaylthin Russel;
Office of Temporary and Disability Assistance;
Case Worker Leann Bradt, of Rehabilitation
Support; and Governor Cuomo, Defendants.

1:21-CV-0991 (TJM/ML)
|
Signed 05/10/2022

**Attorneys and Law Firms**

Joseph Guarneri, Schenectady, NY, Pro Se.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1**  The Clerk of the Court sent the *pro se* Complaint (Dkt. No. 1) together with an application to proceed *in forma pauperis* (Dkt. No. 3) filed by Joseph Guarneri ("Plaintiff") to the Hon. Miroslav Lovric, United States Magistrate Judge, for review. Judge Lovric granted Plaintiff's *in forma pauperis* application, and recommended:

-that the Court DISMISS WITH LEAVE TO REPLEAD Plaintiff's claims pursuant to (1) ⚑42 U.S.C. § 1983 against Defendants Schoharie County, Becker, Sammon, Goodearu, Russel, and Brandt, (2) ⚑42 U.S.C. § 1983 against Defendant Cuomo in his individual capacity, (3) the ADA, and (4) New York state common law negligence, for failure to state a claim upon which relief may be granted

pursuant to ⚑28 U.S.C. § 1915(e)(2) (B);

and,

-that the Court DISMISS WITHOUT LEAVE TO REPLEAD Plaintiff's claims pursuant to ⚑42 U.S.C. § 1983 against Defendants Office of Temporary and Disability Assistance and Cuomo in his official capacity, because those claims seek monetary relief against Defendants who are immune from such relief pursuant to ⚑28 U.S.C. § 1915(e)(2)(B).

Order and Rep-Rec., Dkt. No. 4, at 23-24.

Plaintiff did not object to the Order and Report-Recommendation, and the time to do so has passed. [1]

**II. DISCUSSION**

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice. The Court will accept and adopt Judge Lovric's recommendations for the reasons stated within the Order and Report-Recommendation.

**III. CONCLUSION**

Accordingly, Judge Lovric's Order and Report-Recommendation, Dkt. No. 4, is **ACCEPTED and ADOPTED**. Thus, it is hereby

**ORDERED** that Plaintiff's claims pursuant to (1) ⚑42 U.S.C. § 1983 against Defendants Schoharie County, Becker, Sammon, Goodearu, Russel, and Brandt, (2) ⚑42 U.S.C. § 1983 against Defendant Cuomo in his individual capacity, (3) the ADA, and (4) New York state common law negligence, are **DISMISSED WITH LEAVE TO REPLEAD** pursuant to ⚑28 U.S.C. § 1915(e)(2)(B); and, it is further

**ORDERED** that Plaintiff's claims pursuant to 🚩42 U.S.C. § 1983 against Defendants Office of Temporary and Disability Assistance and Cuomo in his official capacity are **DISMISSED WITHOUT LEAVE TO REPLEAD** pursuant to 🚩28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that **Plaintiff is granted leave of thirty (30) days from the date of this Decision and Order in which to file an amended complaint**. If Plaintiff files an amended complaint within thirty (30) days of the date of this Decision

and Order, the Clerk of the Court is directed to send it to Judge Lovric for initial review. **If Plaintiff does not file an amended complaint within thirty (30) days of the date of this Decision and Order, the Clerk of the Court is directed to close the file in this case.**

**\*2  IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 1472562

---

## Footnotes

1   Judge Lovric's Order and Report-Recommendation was initially served on Plaintiff by mailing to what turned out to be an improper address, resulting in it being returned as undeliverable. Dkt. No. 5. Then, on January 3, 2022, the Clerk of the Court reserved the Order and Report-Recommendation on Plaintiff by mailing it to Plaintiff's address listed in the Complaint. *Id.* No objections have been filed to date.

---

**End of Document**                                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.